Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3                Richmond Division

4

5

6  DAVID WILLIAM WOOD,            )

7                Plaintiff,       )

8     v.                          )   Civil Action No.:

9  EQUIFAX CREDIT INFORMATION     )   3:15CV594(MHL)

10 SERVICES, LLC, et al.,         )

11               Defendants.      )

12

13

14

15       VIDEO DEPOSITION UPON ORAL EXAMINATION

16            OF DAVID WILLIAM WOOD

17   TAKEN ON BEHALF OF DEFENDANT CREDIT ONE BANK, N.A.

18            Newport News, Virginia

19              July 14, 2016

20

21

22

23

24

25   Job No. CS2331616

Page 2

```
 1  Appearances:
 2
 3      On behalf of the Plaintiff:
 4      CRAIG C. MARCHIANDO, ESQUIRE
 5      Consumer Litigation Associates, P.C.
 6      763 J. Clyde Morris Boulevard, Suite 1-A
 7      Newport News, Virginia  23601
 8      757-930-3660
 9      craig@clalegal.com
10
11      On behalf of Defendant Credit One Bank, N.A.:
12      CHRISTOPHER J. SEARS, ESQUIRE
13      Cipriani & Werner, PC
14      500 Lee Street East, Suite 900
15      Charleston, West Virginia  25301
16      304-341-0500
17
18
19      Also Present:
20      ROQUE KING, Videographer
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2
 3  WITNESS:          Examination by:      Page
 4  DAVID WILLIAM WOOD      Mr. Sears       5
 5
 6
 7
 8
 9          E X H I B I T S
10      (EXHIBITS APPENDED TO THE TRANSCRIPT)
11  No.      Description          Page
12  Exhibit 1   Deposition notice        46
13  Exhibit 2   Letter           67
14  Exhibit 3   Letter           76
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          Video deposition upon oral examination of
 2  DAVID WILLIAM WOOD, taken on behalf of Defendant Credit
 3  One Bank, N.A., before Sheila H. Matthews, a Notary Public
 4  for the Commonwealth of Virginia at Large, commencing at
 5  9:59 a.m., on the 14th day of July, 2016, at the law
 6  offices of Consumer Litigation Associates, P.C., 763 J.
 7  Clyde Morris Boulevard, Suite 1-A, Newport News, Virginia.
 8          THE VIDEOGRAPHER:  My name is Roque King
 9  representing Veritext Legal Solutions.  The date today is
10  July 14th, 2016, and the time is approximately 9:59 a.m.
11  This deposition is being held at Consumer Litigation
12  Associates, located at 763 J. Clyde Morris Boulevard,
13  Newport News, Virginia 23601, and is being taken by
14  counsel for the defendant.
15          The caption of this case is David William
16  Wood versus Equifax Credit Information Services, LLC, et
17  al.  This case is being held in the United States District
18  Court for the Eastern District of Virginia, Rich --
19  Richmond Division, Case Number 3:15CV594MHL.
20          The name of the witness is David William
21  Wood.  At this time, attorneys present in the room and
22  everyone attending remotely will identify themselves and
23  the parties they represent for the record.
24          MR. MARCHIANDO:  Craig Marchiando with
25  Consumer Litigation Associates for the witness.
```

Page 5

```
 1          MR. SEARS:  Christopher Sears with Cipriani &
 2  Werner on behalf of Credit One Bank, N.A.
 3          THE VIDEOGRAPHER:  Our court reporter is
 4  Sheila Matthews, representing Veritext, will swear in the
 5  witness so we can proceed.
 6          DAVID WILLIAM WOOD, having been first duly
 7  sworn, was examined and testified as follows:
 8          EXAMINATION
 9  BY MR. SEARS:
10      Q.   Good morning, Mr. Wood.
11      A.   Good morning.
12      Q.   My name is Chris Sears.  I'm an attorney from
13  Charleston, West Virginia, and I represent Credit One Bank
14  in this action that you have brought against it and some
15  other entities as well.
16          MR. MARCHIANDO:  Chris, I'm sorry to
17  interrupt.
18          MR. SEARS:  Yes.
19          MR. MARCHIANDO:  But before we get too far, I
20  want to state an objection about the -- well, for the
21  deposition in its entirety.  The notice -- the notice
22  doesn't comply with the federal rules.  It doesn't
23  indicate that it will be -- the deposition will be
24  stenographically recorded or recorded at all, and it
25  doesn't indicate that it will be videotaped.
```

2 (Pages 2 - 5)

Page 6

1      Now, we've got everyone here, so we're not
2  going to end things. But we'll go forward, but with those
3  objections.
4      MR. SEARS: Okay. Is that an objection that
5  you'd move to exclude his deposition transcript later?
6      MR. MARCHIANDO: Perhaps. We'll see what
7  happens. We have -- I think we have that option. We have
8  the option to -- sorry.
9      MR. SEARS: I'm sorry?
10     MR. MARCHIANDO: I didn't mean to interrupt
11 you. I thought you were done.
12     MR. SEARS: Well, I mean, I don't want to go
13 through a deposition and not be able to use it later on.
14 So if -- do you want to go off the record? Let's go off
15 the record for a second and talk about this. I mean, if
16 you have an objection --
17     THE VIDEOGRAPHER: One second, sir.
18     MR. SEARS: Okay.
19     THE VIDEOGRAPHER: We're going off the video
20 record at 10:01 a.m.
21     (Discussion off the record.)
22     THE VIDEOGRAPHER: We're back on the record
23 at 10:03 a.m.
24     MR. SEARS: All right. And while we were off
25 the record, plaintiff's counsel and I had a meet and

Page 7

1  confer with regard to the objection that he made. And I
2  believe that the agreement -- and you can confirm this
3  when I'm done stating it -- is that plaintiff's counsel
4  would withdraw the objection to having the deposition
5  taken today based upon a deficient notice that did not
6  include a notice that it was going to be stenography
7  (sic) recorded, but preserve their objection with regard
8  to the videotaping of the same.
9      MR. MARCHIANDO: Correct. Agreed.
10     MR. SEARS: All right. Thank you.
11     MR. MARCHIANDO: Uh-huh.
12 BY MR. SEARS:
13     Q.   Mr. Wood, like I said before, I'm Chris
14 Sears. And have you ever had your deposition taken
15 before?
16     A.   Yes.
17     Q.   Okay. And what kind of case was that? Or
18 how many times have you had your deposition taken?
19     A.   What are you asking? How many times or --
20     Q.   Yes. How many times have you had your
21 deposition taken?
22     A.   Once.
23     Q.   One other time? And were you a party to the
24 case?
25     A.   I don't understand.

Page 8

1      Q.   Okay. Was it a civil action or a criminal
2  action?
3      A.   I don't think it was either. It was a auto
4  accident.
5      Q.   It was an auto accident. Okay. And were you
6  the plaintiff or the defendant?
7      A.   I'm unfamiliar with the terminology, but I
8  was the one injured.
9      Q.   Okay. So you were suing another party?
10     A.   Yes.
11     Q.   And you had your deposition taken.
12     A.   Yes.
13     Q.   Okay. And do you recall when that was that
14 you had your deposition taken?
15     A.   About a year ago.
16     Q.   Okay. So you -- you're familiar with -- with
17 the deposition process. So what I'd like to do is -- is
18 just begin by telling you a little bit about it from my
19 perspective. I'm sure your attorney has gone over some
20 things, but I wanted to kind of lay some ground rules
21 or -- before we -- we get into it. Okay?
22     First of all, the deposition is being taken
23 down stenography (sic) -- by a court reporter. How about
24 that? And -- stenographically. How about that? And so
25 everything that you say today and what I say today is

Page 9

1  being recorded. There's a record being made.
2      And so it's very important that we try not to
3  talk overtop of each other. So please wait until I finish
4  asking the question before you answer it, and I will
5  endeavor to wait until you're finished answering the
6  question before I ask another question. Okay?
7      A.   (Witness nods head.) Right.
8      Q.   Okay. And it also is important that we
9  verbally speak instead of nodding our head or saying
10 uh-huh or huh-uh because otherwise it's difficult for the
11 court reporter to take down. You understand that?
12     A.   I understand.
13     Q.   Okay. And you understand that even though
14 we're not in a courtroom or anything, this is similar to
15 providing testimony in a courtroom in that you have been
16 sworn to tell the truth and that if you do not tell the
17 truth, then you subject yourself to a claim of perjury.
18 Do you understand that?
19     A.   Understood.
20     Q.   Okay. If you need to take a break at any
21 time today, please let me know. Do you have any
22 limitations with regard to providing testimony today or
23 any special considerations I need to know about?
24     A.   Are you asking are there subjects I won't
25 divulge? Or are you saying can I not finish a sentence or

3 (Pages 6 - 9)

Page 10

1 something like -- some disability?
2    Q.   Okay.  And thank you for doing that.  If
3 there's any question I ask that you don't understand,
4 please ask me to restate it, clarify it, or -- or explain
5 it, and I will do that.
6          So what I'm asking is, first of all, do you
7 have any physical limitations that I should know about
8 today.  For instance, you indicated that you were in a car
9 accident.
10         So do you have problems sitting for a
11 prolonged period of time?  Do you need to take breaks
12 certain periods of time so you can get up and move around?
13 Anything like that.
14   A.   As far as I'm aware of, no.
15   Q.   Okay.  Are there any time limitations today?
16 Do you have an appointment later on today or someplace you
17 have to be that I need to be aware of?
18   A.   Not that I can recall at the moment.
19   Q.   Okay.  Now, if I ask a question and you
20 respond to the question, I'm going to assume that you
21 understood the question and the answer that you're giving
22 is responsive to that.  Is that fair?
23   A.   Yes.
24   Q.   Okay.  Mr. Wood, what is your current
25 address?

Page 11

1    A.   2710 Wickham Avenue, Newport News, Virginia
2 23607.
3    Q.   And how long have you lived at that address?
4    A.   About a year.
5    Q.   And do you live by yourself or with anyone
6 else?
7    A.   By myself.
8    Q.   So it would have been from about July of 2015
9 to present; is that correct?
10   A.   I don't know the specific date that I moved
11 in there.  But it's been about a year.
12   Q.   Okay.  Where are you -- are you employed?
13   A.   Yes.
14   Q.   Where are you employed?
15   A.   Eastern State.
16   Q.   What do you do there?
17   A.   I'm a CNA.
18   Q.   Do you have a professional license in the
19 State of Virginia?
20   A.   Yes.
21   Q.   How long have you held that license?
22   A.   Since about 2012.
23   Q.   And have you held that license continuously?
24   A.   Yes.
25   Q.   Before living at 2710 Wickner (sic) Avenue,

Page 12

1 where did you live?
2    A.   I can't remember the correct number address,
3 but it was something similar to 15-something River Bend
4 Trail, Lanexa, Virginia.
5    Q.   How long did you live at that address?
6    A.   About six or seven months.
7    Q.   So from about the beginning of July of 2015?
8    A.   I don't know the exact date.
9    Q.   Okay.  And between your move between River
10 Bend Trail and Wickner Avenue, did you temporarily reside
11 any -- anywhere else, or did you move from one place to
12 the other?
13   A.   Yes.  I lived at -- I can't remember the
14 numbers if I correctly, but it was in Williamsburg for a
15 short period of time.
16   Q.   Like days?  Weeks?
17   A.   Whatever the gap is in between the two.
18   Q.   Okay.  Since I don't have dates, I don't know
19 what the gap is, but --
20   A.   I didn't write down the dates, so --
21   Q.   All right.  So it was a Williamsburg address,
22 though?
23   A.   Yes.
24   Q.   Between the River Bend Trail residency and
25 the Wickner Avenue residency; is that correct?

Page 13

1    A.   Yes.
2    Q.   Do you remember the street that it was on?
3    A.   Centerville.
4    Q.   Centerville.  Did you live by yourself or
5 with someone else?
6    A.   No.  I stayed -- there was a room to rent.  I
7 rented a room.
8    Q.   Okay.  Rented a room.  And who did you rent
9 that room from?
10   A.   A man named Wayne Davis.
11   Q.   Do you know -- okay.  The River Bend Trail
12 residency, where did you reside before then?
13   A.   Before River Bend Trail?
14   Q.   Yes.
15   A.   It was -- I don't remember the number address
16 again, but it was 30-something Chelsea Road, West Point,
17 Virginia.
18   Q.   How long did you live there?
19   A.   I'd say that was about a year.  Maybe two.
20   Q.   Did you live with someone?
21   A.   I rented a room again.
22   Q.   Rented a room?  Was it like in a house or --
23   A.   Yes.
24   Q.   Okay.  And who -- who did you rent from?
25   A.   Jennifer Maynard Brannon.

4 (Pages 10 - 13)

Page 14

1    Q.    And between living at Chelsea Road and River
2 Bend Trail, did you stay anywhere else temporarily?
3    A.    Not that I can recall.  This is going pretty
4 far back on the time line, however.
5    Q.    Okay.  So -- and we're back now at the
6 Chelsea Road to 2013 maybe?
7    A.    I don't know.
8    Q.    Okay.  Where did you live before the Chelsea
9 Road?
10   A.    I can't remember if it was either my
11 grandmother's house or my mother's house.  Both were in
12 New Kent.
13   Q.    And do you recall the address?
14   A.    I do not.
15   Q.    It's in New Kent?  You don't remember the
16 street name?
17   A.    No.
18   Q.    How long did you live there?
19   A.    I don't know.
20   Q.    Do you recall where you lived before living
21 at -- in New Kent with either your grandmother or mother's
22 house?
23   A.    My mother at some point along the time line
24 moved back into West Point and jumped back and forth
25 between New Kent and West Point.  So it's difficult to

Page 15

1 place exactly where on the time line without a specific
2 date.  And then even then I wouldn't recall it.
3    Q.    Okay.  So you were living with her during
4 this time period that she was moving back and forth?
5    A.    Yes.
6    Q.    Okay.  And you said West Point.  What was the
7 address in West Point that she moved between?
8    A.    21st Street.
9    Q.    21st Street?  Have you ever lived at 8315
10 Mill Creek Road, West Point, Virginia?
11   A.    Yes.  That is the -- sounds like the New Kent
12 address for my grandmother.
13   Q.    Okay.  So you said that was in New Kent.  Is
14 that New Kent County that you're referring to or New Kent
15 as a city?
16   A.    It has a West Point address.  Pay New Kent
17 taxes.
18   Q.    Okay.  All right.  So just so I'm clear, you
19 did live for a period of time at 8315 Mill Creek Road,
20 West Point, Virginia; is that correct?
21   A.    Yes.
22   Q.    Okay.  Have you ever lived at 8120 Kentwood
23 Avenue, West Point, Virginia?
24   A.    Yes.
25   Q.    When was that?  Do you recall?

Page 16

1    A.    Quite a while ago.
2    Q.    Are you able to be more specific?
3    A.    No.
4    Q.    Have you ever lived at 2115 Lee Street?
5          MR. MARCHIANDO:  Chris, do you have a
6 document you're reading from?  Are these your notes?
7          MR. SEARS:  I am reading from a document,
8 yes.
9          MR. MARCHIANDO:  Do you have a document you
10 can show the witness?
11         MR. SEARS:  I'm not -- I mean, I have
12 documents, but I don't want to move to documents.  I'm
13 just asking him a question of whether or not he has lived
14 at a specific address.
15         MR. MARCHIANDO:  Okay.  I'm asking if we
16 could please see the document that you're reading these
17 addresses from.
18 BY MR. SEARS:
19   Q.    Sir, do you need to see a document in order
20 to answer my question of whether or not you've ever lived
21 at 2115 Lee Street?
22   A.    If you have a time line of previous addresses
23 I've lived at, yes, that would greatly help.
24   Q.    I -- I don't have a -- a time line.  I
25 have -- and I don't know whether or not you've lived at

Page 17

1 these addresses.  That's why I'm asking you.
2    A.    If you have any information on previous
3 addresses I may have lived at, that would be helpful to
4 help me recall.
5    Q.    All right.  So let me ask you this question
6 then.  You don't -- you don't specifically recall at this
7 time whether or not you lived at 2115 Lee Street, West
8 Point, Virginia.  But you would need to see some document
9 to refresh your recollection; is that correct?
10   A.    I believe that's what I just said.  Yes.
11   Q.    Okay.  Do you -- we'll come back to that
12 later then.  Okay?  Do you recall living at any other
13 addresses other than what we have just gone over?
14   A.    To my memory, there was one in Zuni.  I do
15 not remember any details on that.  That's really far back
16 on the time line.
17   Q.    How do you spell that?
18   A.    Z-u-n-i.
19   Q.    Is that in Virginia?
20   A.    Yes.
21   Q.    Have you always lived in Virginia?  Lived in
22 any other state?
23   A.    Always lived in Virginia.
24   Q.    Have you ever received mail at any address
25 other than what we have gone through?

5 (Pages 14 - 17)

Page 18

1    A.    I have never received mail anywhere besides
2 those addresses.
3    Q.    Okay.  Have you -- are you familiar with a
4 Post Office Box 725 in West Point, Virginia?
5    A.    Yes.  That's -- in the West Point that's the
6 only way to get mail.
7    Q.    Okay.  Why is that?  Do they not have
8 delivery to specific physical addresses?
9    A.    They do not.
10    Q.    Okay.  And did you receive mail at West
11 Point -- I'm sorry -- at P.O. Box 725 in West Point,
12 Virginia?
13    A.    Yes.  That would have been the West Point
14 address that I lived at's mailing address.
15    Q.    All right.  And did you own that post office
16 box or did someone else own that?
17    A.    I did not own it.
18    Q.    Do you know who owned that post office box?
19    A.    My mother or stepfather.  No, I do not know
20 who owned it.
21    Q.    But you know you did not own it; is that
22 correct?
23    A.    I did not own it.
24    Q.    Okay.  Did you have access to that post
25 office box?

Page 19

1    A.    Sometimes.
2    Q.    What do you mean by sometimes?  Can you
3 explain that for me?
4    A.    By law, you're not allowed to make a copy of
5 the post office box key.
6    Q.    Uh-huh.
7    A.    There was only one key.
8    Q.    Okay.  So sometimes you would have the key
9 and sometimes you would not have the key?  Is that what
10 I'm understanding your testimony to be?
11    A.    Sometimes I was asked to pick up the mail.
12    Q.    And you were given the key to do so; is that
13 correct?
14    A.    Yes.
15    Q.    All right.  And would you use the Post Office
16 Box 725 address -- would you give that to other parties
17 for them to send mail to you during the time that you
18 lived on Mill Creek Road?
19    A.    No.
20    Q.    What about when you were -- the licensing
21 board for your CNA?  Did you give them the Post Office Box
22 725 address to send you mail?
23    A.    Licensing board wants the physical address of
24 where you physically live.  I gave them an address where I
25 could receive mail at that time.

Page 20

1    Q.    And that would be the Post Office Box 725; is
2 that correct?
3    A.    Your question is not clear.
4    Q.    Okay.  So my question is did you give the
5 licensing board, Virginia state licensing board that --
6 for which you have the CNA the Post Office Box 725, West
7 Point, Virginia, address so that they could send you mail.
8    A.    I don't understand if you're trying to be
9 oddly specific as to ask what address do they have on file
10 now or has that ever been on file.
11    Q.    Yeah.  My -- my question is has it ever been
12 on file with the licensing board that they could send mail
13 to you at P.O. Box 725, West Point, Virginia.
14    A.    I do not recall.
15    Q.    Okay.  What about Department of Motor
16 Vehicles?  Similar question.  Did you have a vehicle, own
17 a vehicle, or register a vehicle for the State of Virginia
18 at the time that you lived at the Mill Creek Road address?
19    A.    Yes.
20    Q.    And did you provide the Department of Motor
21 Vehicles the Post Office Box 725 address so that they
22 could send mail to you?
23    A.    I had issues getting mail at the post office
24 box, so it is unlikely that I would use that address to
25 receive important mail.

Page 21

1    Q.    Okay.  So the question is did you provide the
2 Post Office Box 725 -- and so let me just clarify what --
3 what I understand your response is.  Do you -- do you
4 remember?  Or, I mean, what is your response?  I
5 understand that you had issues and that maybe you would
6 not have given out that post office box.
7        But do you remember whether or not you
8 provided the Post Office Box 725 to the Department of
9 Motor Vehicles?
10    A.    To me it sounds like you understand my
11 answer.
12    Q.    Okay.
13    A.    Perhaps you can reask your question.
14    Q.    Did you provide the Virginia Department of
15 Motor Vehicles a mailing address of Post Office Box 725,
16 West Point, Virginia?
17    A.    I don't recall.
18    Q.    What would happen if a piece of mail was
19 addressed to the 8315 Mill Creek Road address and sent?
20 Would it go into the post office box, or how would it get
21 to that address?
22    A.    I believe it would come straight to the
23 address.
24    Q.    Okay.  So they do have physical delivery to
25 that address?

6 (Pages 18 - 21)

Page 22

1    A.    You're in New Kent now. Earlier you were
2  asking about West Point's post office box system.
3    Q.    Okay. All right. So maybe I misunderstood
4  your earlier testimony. Let me clarify. I understood
5  what you said earlier to be that if you lived at 8315 Mill
6  Creek Road, New Kent/West Point -- it's in New Kent, but
7  it has a West Point mailing address -- that the only way
8  you could receive mail was to have it delivered to the
9  post office box. Is that a correct understanding of your
10 testimony or incorrect?
11   A.    Incorrect.
12   Q.    Okay. So if you lived at 8315 Mill Creek
13 Road in New Kent but has a West Point, Virginia, address,
14 mailing address, and someone sent a letter to 8315 Mill
15 Creek Road, it would have been delivered to the physical
16 location.
17   A.    Yes.
18   Q.    Okay. But at the same time that you were
19 living there, either your mother or your stepfather also
20 owned a Post Office Box 725 in West Point, Virginia; is
21 that correct?
22   A.    Yes.
23   Q.    Okay. Why did they, if you know -- do you
24 know why they had a post office box?
25   A.    That is the only way to receive mail in West

Page 23

1  Point. There was an address they lived at in West Point.
2    Q.    Okay. When you say -- are you talking about
3  a different address than the 8315 Mill Creek Road?
4    A.    Yes. Earlier you asked me about a West Point
5  address.
6    Q.    Well, the address that I'm asking you about
7  is the 8315 Mill Creek Road, West Point, Virginia. Is
8  that an address where you resided?
9    A.    Yes.
10   Q.    Okay. And it is -- is it at that address,
11 then, that -- well, let me ask you this. If the post
12 office box is the only way to receive mail for a
13 unknown-to-me West Point address, what West Point address
14 are you unable to receive mail but through a post office
15 box?
16   A.    If you could show me that document earlier
17 that has all those addresses on it, I could maybe recall
18 it. But as I remember a question earlier, it was like a
19 21st or a 22nd Street.
20   Q.    Oh, okay.
21   A.    In West Point.
22   Q.    All right. That makes sense then. So
23 there's a 21st Street, West Point, address that you lived
24 at. And the only way you could receive mail at that
25 particular address was through a post office box.

Page 24

1    A.    Yes.
2    Q.    Okay. And do you know how -- what period of
3  time either your mother or stepmother -- or stepfather
4  owned this post office box?
5    A.    No.
6    Q.    All right. Now, you had indicated before
7  that you had issues receiving mail; is that correct?
8    A.    Yes.
9    Q.    Okay. Tell me about that.
10   A.    I would be expecting mail. I would not
11 receive it.
12   Q.    All right. And where would you -- where --
13 what address were you living at where you expected mail
14 but did not receive mail? Or addresses.
15   A.    Both addresses in New Kent, the address I
16 can't recall, and West Point --
17   Q.    All right. So --
18   A.    -- which includes the P.O. box.
19   Q.    All right. So that would be the 21st Street
20 address and the Mill Creek address; is that correct?
21   A.    I believe there's one more somewhere in New
22 Kent.
23   Q.    Okay. And so you were expecting mail and you
24 would not receive mail as you lived at different
25 addresses. Were the -- the mail that you were expecting

Page 25

1  and did not receive, was that being sent to the post
2  office box, to one of the addresses that you were living
3  at, or a mixture?
4    A.    I'm confused with your previous question. I
5  thought you had asked me which addresses did I have
6  trouble receiving mail at.
7    Q.    Uh-huh.
8    A.    And I believe I said the two in New Kent and
9  the 21st or 22nd Street, West Point, address, which
10 includes the P.O. box address.
11   Q.    All right. So whether the mail was being
12 sent to one of the addresses in New Kent or the -- one of
13 the addresses in West Point, including the post office
14 box, at all those addresses you had issues receiving your
15 mail; is that correct?
16   A.    Yes.
17   Q.    Okay. What was the source of those issues?
18 The issue being that you would not receive your mail; is
19 that correct? You would expect someone to mail something
20 to you and you would not receive that mailing. Is that
21 fair?
22   A.    Say that one more time.
23   Q.    All right. The issue -- I'm just trying to
24 be very specific as to what that issue is. And that is
25 that you expected someone to mail something to you, and

Page 26

1  you would not receive that mail when you resided at one of
2  these addresses either in New Kent or in West Point.
3      A.   Correct. I would receive virtually no mail.
4      Q.   And do you know why?
5      A.   No.
6      Q.   Did you make any inquiries as to why you were
7  not receiving mail?
8      A.   I don't understand.
9      Q.   Did you ask -- did you go to anyone, a family
10  member or a member of the post office or people sending
11  you mail, and ask questions as to why you're expecting to
12  receive mail and not receiving it?
13      A.   Yes. I started putting tracking on objects,
14  but it would still say delivered. I wouldn't get it.
15      Q.   Like, for instance, if you're ordering
16  something by mail, like a product or something, and they
17  would send it, you would put a tracking number on it so
18  you could track it, and you still would not receive it
19  even though it said it was delivered?
20      A.   Correct.
21      Q.   Is that an example? Okay. And did you do
22  anything else with regard to your nonreceipt of mail?
23      A.   Yes.
24      Q.   What else?
25      A.   I found if I cleared my schedule and was

Page 27

1  there when the -- right as soon as the mail was delivered,
2  I could get everything.
3      Q.   All right. So was it your belief that
4  someone at the address that it was -- where the mail was
5  being received was tampering with your mail?
6      A.   That's what it started to look like.
7      Q.   Okay. Do you have that belief as we sit here
8  today, that you did not receive mail that was intended to
9  be mailed to you at one of these address because someone
10  at the mailing address was tampering with your mail?
11      A.   That is what I believe.
12      Q.   Okay. Do you have a belief as to who that
13  person or persons were?
14      A.   Yes.
15      Q.   And who do you believe was responsible for
16  that?
17      A.   My mother.
18      Q.   And that's Dyan Lollis?
19      A.   Yes.
20      Q.   And did you confront her about this?
21      A.   Yes.
22      Q.   What did she say?
23      A.   She said I hadn't gotten anything.
24      Q.   Did she ever admit to you that -- that she
25  was tampering with your mail?

Page 28

1      A.   No.
2      Q.   Did you suspect anyone else of tampering with
3  your mail?
4      A.   Yes.
5      Q.   Who else did you suspect of tampering with
6  your mail?
7      A.   My aunt.
8      Q.   What is your aunt's name?
9      A.   Frieda Wood.
10      Q.   F-r-e-d-a?
11      A.   F-r-i-e-d-a.
12      Q.   F-r-i-e-d-a? Wood. Does she live at the
13  address where you were living at the time you expected to
14  receive mail?
15      A.   She was in and out of many addresses.
16      Q.   Did you ever confront Frieda Wood about your
17  belief that she had possibly tampered with your mail?
18      A.   Yes.
19      Q.   And what did she say?
20      A.   Ask my mom.
21      Q.   Ask her what?
22      A.   About my mail.
23      Q.   All right. So you would -- you would -- you
24  had a belief that Frieda Wood was tampering with your --
25  your mail. You made inquiry of her regarding your belief.

Page 29

1  And she referred you to Dyan Lollis. Is that what you're
2  telling me?
3      A.   Yes. But I'd already suspected both of them.
4      Q.   All right. Did Frieda Wood ever admit to you
5  that she had tampered with your mail?
6      A.   I don't understand the question. Did Frieda
7  admit to tampering with the mail herself, or did Frieda
8  admit that she knew my mom was tampering with the mail?
9      Q.   Okay. Let me ask both. So the first one is
10  did Frieda ever admit to you that she tampered with your
11  mail?
12      A.   No.
13      Q.   Did Frieda ever make any statements to you of
14  her belief or knowledge as to whether or not Dyan Lollis
15  was tampering with your mail?
16      A.   No. She told me my mom had some mail for me.
17      Q.   Is this a specific conversation that you're
18  recalling or just generally?
19      A.   This would be anytime I would bring it up,
20  these would be the same answers.
21      Q.   Okay. So she would say that your mother has
22  mail for you.
23      A.   Yes.
24      Q.   Okay. But not that she was -- not --
25  Frieda -- well, let me ask you this. Did Frieda make any

8 (Pages 26 - 29)

Page 30

1 statements suggesting that Dyana (sic) Lollis was
2 preventing mail from getting to you?
3     A.   No.
4     Q.   Okay.  Did you suspect of anyone -- anyone
5 else of tampering with your mail?
6     A.   No.
7     Q.   Did you report your suspicions of anyone
8 tampering with your mail to any authorities?
9     A.   No.
10    Q.   Whether it be post office or law enforcement.
11    A.   No.  I did tell the post office for some
12 things that were coming to hold the item at location, and
13 I could get it that way.
14    Q.   Okay.  When you're living at the four
15 addresses that we -- well, living at the three addresses
16 that we just talked about, the 21st Street, the 8315 Mill
17 Creek Road -- let me reask the question.
18         So we -- we have been talking about problems
19 that you had in receiving mail while residing at two
20 addresses in New Kent and one address in West Point and
21 also problems that you've had in receiving E-mail (sic) at
22 a post office box located in West Point.
23         Are these the only times that you had
24 problems receiving mail?
25    A.   To my knowledge, that would be the only time

Page 31

1 I've had a problem receiving mail was when I was staying
2 at the two addresses in New Kent and then the one with
3 the P -- which includes the P.O. box in West Point.
4     Q.   Okay.  What is your educational background?
5     A.   I have a GED and some trade school.
6     Q.   And when did you get your GED?
7     A.   I do not recall.
8     Q.   Do you recall the year?
9     A.   I do not recall.
10    Q.   Where did you attend trade school?
11    A.   Riverside School of Nursing.
12    Q.   Did you graduate from that school?
13    A.   Yes.
14    Q.   You receive a degree?
15    A.   Yes.
16    Q.   What degree was that?
17    A.   A certified nurse aide.
18    Q.   Do you recall the year that you completed
19 that program?
20    A.   I believe it was 2012.
21    Q.   Okay.  And have you worked for any other
22 employers other than Eastern State as a CNA?
23    A.   Yes.
24    Q.   What other employers have you worked at?
25    A.   BAYADA Home Health Care.  Dominion Village.

Page 32

1 Envoy of Westover Hills.
2     Q.   Envoy?
3     A.   Yes.  Hope In Home.
4     Q.   Hope In?
5     A.   Hope In.  Like I have hope in my home.
6     Q.   Oh, okay.
7     A.   Americare Plus or something similar.
8 Riverside.  There are two more.  I can't remember their
9 strange names.
10    Q.   Okay.  And you worked at all these places
11 since 2012 or since receiving your CNA?
12    A.   Yes.
13    Q.   How long have you been at Eastern State?
14    A.   Over two years.
15    Q.   Have you ever used any of your employers'
16 addresses to receive mail?
17    A.   No.
18    Q.   Have you ever used any addresses other than
19 what we have identified today where you resided and other
20 than any of the employment -- or employers that you had,
21 did you use any other addresses to receive mail since
22 2000 -- January 2013?
23    A.   Yes.
24    Q.   What other addresses have you used to receive
25 mail?

Page 33

1     A.   There's quite a number.  I would just use a
2 friend's address, whoever was going to be available, to
3 get some mail of importance, be it a registration or a
4 package.
5     Q.   Okay.  So you would use other people's
6 addresses even though you didn't reside at that address;
7 is that correct?
8     A.   Yes.  I would use other addresses as a
9 mailing address.
10    Q.   All right.  And why was that?  I understand
11 the purpose was to make sure that you received certain
12 things.  But was it because you didn't trust the address
13 that you were living at to receive the packages, or was
14 there some other reason why you would use someone else's
15 address?
16    A.   I did not trust the address that I lived at.
17    Q.   All right.  So these -- this use of friends'
18 addresses, is it fair to say that that would occur during
19 the time period that you lived at the two New Kent
20 addresses and the one West Point address that also
21 received mail through the post office box?
22    A.   Yes.
23    Q.   Do you remember the year that -- or strike
24 that.  I suppose you probably -- well, let me ask.  Do you
25 recall any of the addresses that you used that you didn't

9 (Pages 30 - 33)

Page 34

1 live at or work at?
2    A.    No, because I had no reason to memorize them.
3 Most of them I used one time or a handful of times, all of
4 which the friends gave me them as -- live as I was
5 updating it.
6    Q.    Okay.  Sir, do you claim that someone stole
7 your identity?
8    A.    Yes.
9    Q.    And who do you believe stole your iden --
10 your identity?
11    A.    My mother.
12    Q.    That would be Dyan Lollis?
13    A.    Yes.
14    Q.    When do you believe that she stole your
15 identity?
16    A.    Around 2012 I became aware that someone had
17 stolen my identity.
18    Q.    All right.  So that's -- the first indication
19 that -- that someone had stolen your identity was in 2012.
20 At what point did you come to believe that that person was
21 your mother, Dyan Lollis?
22    A.    Some date in October 2015.
23    Q.    October 2015?
24    A.    Yes.
25    Q.    Okay.  And how -- did you confront Ms. Lollis

Page 35

1 regarding your belief that she had stolen your identity?
2    A.    Yes.
3    Q.    When did you confront her?
4    A.    October 2015.
5    Q.    And what did -- did she ever admit to you
6 that she stole your identity?
7    A.    Yes.
8    Q.    What did she say?
9    A.    I owe it to her.
10    Q.    Okay.  So -- so she -- I'm not going to guess
11 as to what you mean by that.  Explain what you understand
12 that to mean.
13    A.    I asked her a question along the lines of,
14 Why would you take my identity.  She replied with I owe it
15 to her.  But before she said I owe -- I owed it to her,
16 she -- she then told me she didn't remember it but
17 obviously it was -- it was her and that I owed it to her.
18 She gave me a roof over my head, that sort of thing.
19    Q.    All right.  So let's back up.  In 2012 you
20 became aware that someone may have stolen your identity.
21 How did you become aware of that?
22    A.    For I think it was about two -- a long period
23 of time, my mother had misplaced the keys to the post
24 office box.  I found them.  Went up to the post office box
25 and found some mail saying I owed money to some credit

Page 36

1 cards.  I then called the credit cards, and they said I
2 had opened this account way back when and owed all this
3 stuff.
4    Q.    Okay.  Do you recall what credit cards in
5 2012 that you saw that led you to the knowledge that your
6 identity had been stolen?
7    A.    Credit One.
8    Q.    Any other?
9    A.    No.
10    Q.    All right.  Mr. Wood, the -- the account that
11 is at issue in this case, according to my notes, was
12 opened in 2013.  So with that representation, does that
13 help refresh your recollection as when you may have become
14 aware of this?
15         Or was there another Credit One account that
16 was opened in your name other than the one that's at issue
17 in this case that you discovered in 2012?
18    A.    Like I have said, I do not -- this is really
19 far back on the time line.  I'm not certain of the dates.
20 However, the moment I discovered it, I did close it and
21 requested them to start a identity theft investigation.
22 And I started credit monitoring with Equifax.
23    Q.    Okay.
24    A.    All on the same day.
25    Q.    Had you ever had credit monitoring with

Page 37

1 Equifax prior to signing up for it upon your discovery
2 that your identity had been stolen?
3    A.    I don't recall.
4    Q.    Okay.  I'm going to show you two documents
5 that you produced as part of the Rule 26(a)(1)
6 disclosures.  They are Exhibits Number 33 and 34, which
7 indicate, looks like, a history with the Equifax Complete
8 Advantage Plan.  Is that the plan that we're talking about
9 that you signed up for?
10    A.    I don't recall what they call it.
11    Q.    Okay.  But that -- would that be the only
12 plan -- you had only signed up for one plan; is that
13 correct?
14    A.    That I'm aware of.
15    Q.    Okay.  So I want to show this to you.  I'm
16 going to have your attorney review it first.  But I want
17 you to look at that and see if that helps at all to
18 refresh your recollection as to the date that you
19 initially discovered that your identity had been stolen.
20    A.    (Pause.)
21         MR. MARCHIANDO:  Do you want to mark these
22 separately?  I'm sorry.
23         MR. SEARS:  You know, the last time that we
24 did this, we just -- because they're Rule 26(a)(1)
25 disclosures, we didn't make them as exhibits.

10 (Pages 34 - 37)

Page 38

```
 1        MR. MARCHIANDO: Okay. Sure. That's fine.
 2        MR. SEARS: So I'm fine with doing it that
 3  way.
 4        MR. MARCHIANDO: Well, then, let's just read
 5  the Bates numbers in the record for fun. The Bates
 6  numbers are Wood v. Equifax, et al., Exhibit Number -- I
 7  can't count the zeros -- four zeros and then 33 and 34.
 8  BY MR. SEARS:
 9   Q.   Have you had an opportunity to review that?
10   A.   I have.
11   Q.   Okay. Does that help in any way to refresh
12  your recollection of when you first became aware that your
13  identity had been stolen?
14   A.   Not like I had hoped it would.
15   Q.   Okay. Why is that?
16   A.   I don't know.
17   Q.   Okay. So in your mind, you still believe it
18  was 2012. This indicates -- I mean, this doesn't indicate
19  when you started. It just goes back to a certain date.
20  There could have been charges before that. I don't know.
21        But -- but that doesn't help you at all in
22  determining specifically the date. You still believe it
23  was 2012?
24   A.   I am not ever going to be a hundred percent
25  on the date.
```

Page 39

```
 1   Q.   Okay.
 2   A.   But I do know sometime or all on the same
 3  day, once -- once I discovered something was going on, I
 4  did sign up for this.
 5   Q.   Okay. And -- and you do remember that it was
 6  a Credit One account?
 7   A.   The only bill that I found at that P.O. box
 8  address that day was a Credit One account that made me
 9  aware that there might have been other things. That's why
10  I got the credit monitoring.
11   Q.   I understand. But on that date, you received
12  a Credit One -- a statement? Was it an account statement?
13   A.   Yes. It was --
14   Q.   And it was addressed to you?
15   A.   Yes.
16   Q.   Do you know -- it was obviously at the P.O.
17  box address, correct?
18   A.   Right.
19   Q.   All right. And you then on that same date
20  called Credit One; is that correct?
21   A.   Yes.
22   Q.   Closed the account?
23   A.   Yes.
24   Q.   And signed up for credit monitoring.
25   A.   Yes. To my knowledge.
```

Page 40

```
 1   Q.   Okay. Can I have that back, please? Okay.
 2  Thank you.
 3        All right. So when you confronted Ms. Lollis
 4  about it, she said she didn't remember stealing your
 5  identity. Did you confront her specifically with regard
 6  to the Credit One account? Or were there other accounts?
 7  Well, let me ask you this. Strike that.
 8        All right. So you became aware first time
 9  that -- that your identity had been stolen by getting --
10  receiving a Credit One account statement in your name. Is
11  that correct?
12   A.   It was a Credit One bill or statement. I
13  don't know what it's called. But yes, it said I owed some
14  money.
15   Q.   All right. Do you allege that your identity
16  was stolen with regard to any other accounts other than
17  Credit One?
18   A.   Are you saying has my identity been used to
19  open other fraudulent accounts?
20   Q.   Yes.
21   A.   Yes.
22   Q.   All right. What other accounts do you
23  believe someone used to open up in your identity?
24   A.   Since all I could look at was the credit
25  monitoring report, they had bizarre names, such as, like,
```

Page 41

```
 1  GWLS and some Texas bank, stuff like that. But I would
 2  have no idea what they were.
 3   Q.   Okay.
 4   A.   It'd just tell me a phone number and where it
 5  was located.
 6   Q.   And other than -- than Dyan Lollis, did you
 7  suspect of anyone else being involved in stealing your
 8  identity?
 9   A.   At what point in time?
10   Q.   Since becoming aware of it in 2012.
11   A.   I had no idea who it was or who to suspect.
12  There was no evidence to go on.
13   Q.   Okay. Well, then how -- how did you come to
14  believe that it was your mother who stole your identity?
15   A.   I read a online organization article. I
16  believe it was Victims of Identity Theft, dot, org. Made
17  me aware that 98 percent of the time identity theft is
18  within the family. One percent is your best friend, and
19  less than -- less than one percent is some, like, China
20  man or something.
21   Q.   Okay. So when you spoke to Dyan Lollis about
22  it -- before your discussion, did you suspect that she had
23  done it? I mean, how did you come to believe that Dyan
24  Lollis stole your identity?
25   A.   She told me.
```

11 (Pages 38 - 41)

**Page 42**

1 Q. Well, she told you she didn't remember doing
2 it but obviously she did. Is that what she -- is that
3 what you recall her saying, or did she say something else?
4 A. That's what she said. Then she went on to
5 tell me that --
6 Q. You owed her.
7 A. -- I owed it to her and put a roof over my
8 head, this, that, and the other.
9 Q. All right. And, again, when was that
10 conversation?
11 A. That was October -- it was either
12 October 2015 or 2014. I can't --
13 Q. All right.
14 A. I do remember October, though.
15 Q. And if you became aware of it in 2012 or even
16 2013, depending on, you know, when it could have been, why
17 are you just having that conversation with your mother in
18 October 2014 or '15?
19 I would -- I would represent to you that it
20 indicates that you may have known in 2014, based upon
21 documents. So assuming that that was the date, 2014, why
22 the -- the lapse of time between becoming aware of it and
23 then finding out that it's your mother?
24 MR. MARCHIANDO. Object to form. You can
25 answer.

**Page 43**

1 THE WITNESS: How was I to know who it was?
2 BY MR. SEARS:
3 Q. Okay. So had you never talked to her about
4 that before? Did she know that you had become aware that
5 your identity had been stolen prior to your conversation
6 with her?
7 A. Yes. She told me it was all my online
8 activity.
9 Q. But it was after reading this article that
10 it's usually a family member that you had a discussion
11 with her, and she said, well, obviously she did it? I
12 don't understand.
13 A. Yes.
14 Q. Okay. All right. Did you report this claim
15 of identity theft to any authorities, like law enforcement
16 authorities?
17 A. Yes.
18 Q. And who did you report this to?
19 A. I don't remember her name. I believe I have
20 it somewhere. West Point Police Department.
21 Q. Okay. Did you report it to any other law
22 enforcement authorities?
23 A. Yes.
24 Q. Who else?
25 A. I tried Florida, Orange County, I believe,

**Page 44**

1 and I tried New Kent.
2 Q. Is that the sheriff's department?
3 A. I don't recall. Both of those said it had to
4 be where I was living at the time of the identity theft.
5 However, West Point would tell me that it's not a Virginia
6 issue.
7 Q. The West Point Police Department told you it
8 was not a Virginia issue?
9 A. Yes. Because after this conversation with my
10 mother when I thought it was her, she moved to Florida.
11 Q. Down to Crystal -- Crystal River? Is that
12 where she's living?
13 A. I don't know where she's living.
14 Q. When's the last time you spoke to her?
15 A. Somewhere in 2015.
16 Q. What happened with the West Point Police
17 Department report of identity theft?
18 A. Nothing that I know of. That's how I feel,
19 anyway.
20 Q. Okay. Did you ever receive a copy of the
21 police report that you filed?
22 A. I never received one.
23 Q. You say I. Did someone else receive it that
24 you know of?
25 A. I don't know if someone else got it.

**Page 45**

1 Q. Okay.
2 A. I never got one.
3 Q. So you've never -- to this -- to this day,
4 have you ever seen a copy of the West Point Police
5 Department report?
6 A. Not that I can recall, no.
7 Q. Okay. Sir, I'm going to hand to your
8 attorney, who will then review and give to you, what has
9 been marked as part of Credit One's disclosures as
10 COB04157 and COB04158. Please take some time and read
11 through that and let me know when you're done.
12 A. (Pause.)
13 THE VIDEOGRAPHER: Excuse me, Mr. Sears. We
14 have eight minutes left on the media.
15 MR. SEARS: Okay. Do you want to take a
16 break?
17 MR. MARCHIANDO: Yeah. If it's a good time
18 for you, sure.
19 THE VIDEOGRAPHER: This marks the end of
20 media number 1. We're going off the record at 11:18 a.m.
21 (Recess.)
22 THE VIDEOGRAPHER: This marks the beginning
23 of media number 2. We're back on the video record at
24 11:26 a.m.
25 MR. SEARS: As a matter of housekeeping,

12 (Pages 42 - 45)

Page 46

1 let's make the notice of deposition Exhibit Number 1 since
2 it's an issue of concern.
3          (Exhibit No. 1 was marked.)
4          THE VIDEOGRAPHER: Excuse me, Mr. Sears. Do
5 you have your mike attached?
6          MR. SEARS: I do not. Thank you.
7 BY MR. SEARS:
8     Q.    Have you had an opportunity to read through
9 that report?
10    A.    Yes.
11    Q.    Okay. And is this the -- today the first
12 time you've ever seen that?
13    A.    Yes.
14    Q.    Does that provide information to you that you
15 were not aware of prior to today with regard to the
16 investigation or the results of it?
17    A.    Yes.
18    Q.    Okay. So the report indicates it was
19 prepared by L. Woodson, who I believe is a -- she's a
20 sergeant with the police department. So she never did any
21 follow-up with you to let you know the status of it?
22    A.    No.
23    Q.    Okay. Does that help refresh your
24 recollection with regard to the dates and timing of
25 conversations or finding out about the Credit One account

Page 47

1 or anything like that? Any of the issues we've talked
2 about before, does that help refresh your recollection
3 regarding any of those issues of identity theft?
4     A.    Not specifically, no.
5     Q.    All right. It indicates here that you had
6 discovered phone, cable, and Internet through Cox was in
7 your name as well; is that correct?
8     A.    Yes.
9     Q.    It indicates that the Credit One account
10 statement that you brought to the police officer was dated
11 August 15th, 2013. Do you recall whether or not -- strike
12 that.
13          Prior to December 8th, 2014, when you went to
14 the West Point Police Department to report this claim
15 of -- actually, I think the violation is impersonation,
16 had you seen any other account statements from Credit One
17 other than the August 15th, 2013, statement?
18    A.    I asked them for something more specific.
19 They gave me a really vague document, that I can remember.
20    Q.    Who's they? Credit One?
21    A.    Credit One, yes.
22    Q.    Okay. All right. So you had asked for
23 something more specific prior to going there, and they had
24 given you something, but you don't recall what it is?
25    A.    Yes.

Page 48

1     Q.    All right. How did they give that to you?
2 Did they mail it to you?
3     A.    They kept mailing it to some address Credit
4 One had on file. I told them to mail it to this address
5 where I could get mail.
6     Q.    What address was that?
7     A.    It was either a friend's address or the River
8 Bend Trail exit -- address.
9     Q.    Okay. On March 25th, 2015, there's a note in
10 here with regard to a vehicle title. Tell me about that.
11 What was the issue with the vehicle title?
12    A.    As I would go to renew my vehicle, I would
13 discover I owed taxes on many other vehicles that I didn't
14 own.
15    Q.    What other vehicles? Do you recall?
16    A.    Vehicles that my mother had owned at the
17 time.
18    Q.    And you were on the title of these vehicles?
19    A.    Yes.
20    Q.    Were there any loans against these vehicles?
21    A.    I don't know.
22    Q.    Okay. But you were obligated for the taxes
23 on these vehicles because your name was on the titles?
24    A.    Yes.
25    Q.    Okay. And it's your position that your name

Page 49

1 should not have been on these -- on the title of these
2 vehicles?
3     A.    Yes. My name should not have been on them.
4     Q.    Okay. We're done with that. Would you --
5 I'm sorry. You can have this back.
6          Would you agree with me that based upon this
7 report, it appears that the investigating officer did not
8 find sufficient evidence to pursue prosecution against
9 Dyan Lollis? Is that fair?
10    A.    I don't see where it says that.
11    Q.    On March 26th, 2015 -- it doesn't say that.
12 I'm characterizing it. I'm asking you whether or not
13 that -- you would agree whether or not that's a fair
14 characterization.
15          She indicates here -- well, she indicates, I
16 believe that Mr. Wood is only trying to get the credit
17 card companies to write off his bill, based upon some
18 prefatory language regarding, I guess, her questioning the
19 signatures on titles by comparing handwriting and your
20 request to have the police report faxed to other entities
21 and her knowledge that credit card companies only require
22 that a police department fax them a copy of the report and
23 they'll write off the total charges on the account.
24          So is it -- in your reading of it -- let me
25 put this way. It appears that the police officer was

13 (Pages 46 - 49)

Page 50

1 not impressed with the quality of the evidence of the
2 claim of impersonation or identity theft as against Dyan
3 Lollis and concluded that this was not a claim for further
4 investigation or prosecution.
5        Would you agree with that assessment? Does
6 that appear to you to be the case? Is that fair?
7        MR. MARCHIANDO: Object to form.
8        THE WITNESS: I -- I agree. She wasn't
9 interested in a lot of --
10 BY MR. SEARS:
11   Q.   All right. Obviously, you disagree with
12 that, correct?
13   A.   I'm sorry?
14   Q.   You disagree with the result of this
15 investigation; is that correct?
16   A.   The -- the question seems to be going back
17 and forth. I'm -- I'm not happy with what I read then,
18 if that's what you're --
19   Q.   Okay. When you went to make this report, did
20 you fill out any paperwork or any forms when you went to
21 the police department? Or you just talked to the police
22 officer?
23   A.   She had me write my name on a stickie note.
24   Q.   Okay. I'm going to show you a series of
25 documents, and you can take as much time to read through

Page 51

1 them as you would like. But my question ultimately is
2 have you ever seen this or have you received it, something
3 along those lines.
4        I'm not going to ask you about the content
5 necessarily. And if I do, then if you need additional
6 time to look at it, please feel free to do that. Okay?
7        All right. First document -- set of
8 documents I'm going to hand to you is marked COB00001
9 through COB00006. And I will represent to you that this
10 is a sample of a solicitation -- I'm going to hand it to
11 your attorney so he can look at it -- sample of a
12 solicitation for a credit card account that Credit One
13 sends out to prospective customers and is indicative of
14 the solicitation that they would have mailed to you in
15 offering you a credit account.
16        And my question is do you recall ever
17 receiving anything like that in the mail from Credit One
18 Bank.
19   A.   No.
20   Q.   You can hand that back. Thank you.
21        Okay. I'm going to hand to you what has been
22 disclosed as COB00017, which is a Credit One Bank credit
23 card statement for account number ending 8609, which
24 includes the date of August 15th of 2013.
25        Do you recall whether or not this is the

Page 52

1 account statement or Credit One bill that you submitted to
2 the police officer?
3   A.   Yes. This does look similar to it.
4   Q.   Okay. Where did you find that bill in your
5 mother's house? You found it in your mother's house; is
6 that correct?
7   A.   I found the first Credit One bill in the P.O.
8 box mailbox when I found the key.
9   Q.   Right. But that -- that's not the first one
10 that you found, is it? Or is it?
11   A.   At -- at some point it went to collections.
12 So I don't know specifically if it was for Credit One.
13 But this is the only one that I had found that said Credit
14 One Bank on it.
15   Q.   Okay. Is that the statement that you
16 received in the mail, in the post office box?
17   A.   This does look similar to the one I got out
18 of the post office box.
19   Q.   Okay. Are you able to tell me where you
20 obtained the August 15th, 2013, Credit One bill that you
21 showed to Sergeant Woodson with the West Point Police
22 Department?
23   A.   That was the same one I pulled out of the
24 post office box.
25   Q.   All right. Therefore, is it reasonable to

Page 53

1 conclude that the Credit One account statement that you
2 received in the post office box was the August 15th, 2013,
3 account statement?
4   A.   I did not memorize the dates or anything. I
5 just remember I had some bill that I got some time ago out
6 of a P.O. box of Credit One. And there was --
7   Q.   And you kept that bill, and you later gave
8 that bill -- that same bill that you removed from the post
9 office box to the -- Sergeant Woodson with the police
10 department; is that correct?
11   A.   Yes.
12   Q.   All right. And to the extent that she
13 recorded that it had a billing date of August 15th, 2013,
14 would you have any reason to dispute that that was an
15 accurate recording of the date of the statement that you
16 gave to her?
17   A.   No. Not to my knowledge.
18   Q.   All right. So you believe that it's possible
19 that Sergeant Woodson would have recorded the wrong date
20 of the account statement that you gave her?
21   A.   I am confused over the question.
22   Q.   So let me -- let me start over. I guess the
23 premise is is that you received -- I want to walk along
24 here, and you tell me if I'm right. Okay?
25        You received a Credit One account statement

14 (Pages 50 - 53)

Page 54

1 through the post office box, 725, correct?
2    A.   Yes.
3    Q.   And it is that statement that you received
4 that you ultimately gave to Sergeant Woodson in support of
5 your claim of identity theft, correct?
6    A.   Yes.
7    Q.   All right.  You do not remember independently
8 the date of that statement as you sit here today; is that
9 correct?
10   A.   That's correct.
11   Q.   Okay.  The police report indicates that the
12 billing date on the statement -- Credit One bill that you
13 gave to Sergeant Woodson is August 15th, 2013.
14        My question is do you have any reason to
15 believe that Sergeant Woodson would have incorrectly
16 recorded the date of the billing statement that you gave
17 to her.
18   A.   Nobody is perfect.  So it's very possible she
19 could have made a mistake, just as anyone could.
20   Q.   All right.  So based upon what -- the
21 evidence that we just walked through, you still believe
22 that you received that original Credit One statement
23 sometime in 2012?
24   A.   I don't remember the dates, but I know it was
25 some -- quite some time ago.

Page 55

1    Q.   Okay.  Let me ask.  Would that help refresh
2 your recollection that maybe that you had received that --
3 that Credit One statement sometime in August of 2013 and
4 that's when you first became aware of the Credit One
5 account?
6    A.   I don't remember the dates.
7    Q.   That's fine.  All right.  Do you recall ever
8 seeing any other Credit One credit card statements during
9 that time period?
10   A.   I believe about a year or so -- quite --
11 quite a bit of time, I was able to get them to -- get
12 Credit One to send me -- I was looking for a more itemized
13 item.  But it was just -- it was not what I was looking
14 for.  I'm not sure what -- if it would be called a
15 statement or what they would call it.
16   Q.   And I can show these to you, if you'd like.
17 And I will.  I'll just -- I need it to look at to make the
18 representation.  Then I'll show it to you.
19        I'm looking at COB00014 through COB00031.
20 And these are account statements from June 10th, 2013,
21 through March 15th, 2014.  And they are all addressed to
22 David Wood, Post Office Box 725, West Point, Virginia.
23 I'll hand those to you.
24   A.   (Pause.)
25   Q.   Okay.  I've got two questions.  Number one,

Page 56

1 during that time period, is that Post Office Box 725 an
2 address that you would have received mail -- received mail
3 at, assuming no one had tampered with your mail?
4    A.   It would be hard to -- to pinpoint.  But
5 yeah, that was one of the addresses.  I did do quite a bit
6 of moving around during this --
7    Q.   And despite the moving around, you -- during
8 this time period, you would have used that Post Office Box
9 725 to receive mail, assuming that no one was tampering
10 with it, correct?
11   A.   Correct.
12   Q.   Okay.  To your knowledge, do you recall
13 receiving any of those?
14   A.   The only one of --
15   Q.   Other than the August 15th that we've already
16 talked about.
17   A.   The August 15th one is the only one I had.
18 So I held onto that one.
19   Q.   Okay.  Thank you.  All right.  So the next
20 series of documents I want to show to you are -- have been
21 disclosed as COB00032 through, same prefix, 41.  And they
22 are again account statements on the Credit One Bank credit
23 card statement -- I mean account ending in 8609 from
24 March 16th, 2014, through July 27th, 2014.
25        MR. MARCHIANDO:  Was this the same account

Page 57

1 number as the previous set?
2        MR. SEARS:  Yes.  Uh-huh.
3 BY MR. SEARS:
4    Q.   All right.  And those account statements all
5 have an address of the 8315 West -- I don't have it in
6 front of me -- 8315 Mill Creek Road address.  Is that --
7 I'm sorry.  I will wait until you are finished reviewing.
8    A.   (Pause.)
9    Q.   All right.  During that time period, is the
10 8315 Mill Creek address an -- one of the addresses at
11 which you would have received mail, assuming that no one
12 had tampered with it?
13   A.   This is 2014.  By now I'm using friends'
14 addresses.  But I'm sure some mail would still be on its
15 way here, assuming no one had tampered with it.
16   Q.   Okay.  So I just want to --
17   A.   Yes.
18   Q.   -- make sure I'm clear.  So the question is
19 that is the 8315 Mill Creek address during this time
20 period one of the addresses at which you would have
21 received mail, assuming no one had tampered with it.  And
22 your answer is yes.
23   A.   Yes.
24   Q.   Is that correct?
25   A.   Yes.

15 (Pages 54 - 57)

**Page 58**

1 Q. All right. And then your qualification, to
2 be fair, is that during this time period, you were using
3 other addresses as well because someone was tampering, in
4 your mind, with your mail, correct?
5 A. Yes.
6 Q. Okay. Thank you. Do you recall ever
7 receiving any of those statements that are included in
8 that designation that I just showed to you?
9 A. No. I only had the -- the one.
10 Q. Okay. And by that one is August 15 -- I'm
11 sorry -- the Credit One statement that you received out of
12 the post office box that you've given to Sergeant Woodson
13 that she recorded as being August 15th, 2013, correct?
14 A. Yes.
15 Q. Did you keep any -- did you write any letters
16 to Credit One?
17 A. Yes.
18 Q. All right. Did you keep a copy of those
19 letters that you wrote to Credit One?
20 A. Yes.
21 Q. All right. Did you make phone calls to
22 Credit One?
23 A. Oh, yeah.
24 Q. Did you keep a record or diary of your
25 contact either by letter or telephone or E-mail or some

**Page 59**

1 other way of communication with Credit One?
2 A. No.
3 Q. As we sit here today, do you remember dates
4 of telephone conversations with Credit One?
5 A. No.
6 Q. Do you remember how many telephone calls you
7 had with Credit One?
8 A. No.
9 Q. Do you remember any conversations
10 specifically with Credit One?
11 A. Not specifically.
12 Q. I'm going to show you -- I'm going to show
13 you a document that's been disclosed by Credit One Bank.
14 It is, in my file, a document that appears before the
15 document that is Bates stamped COB00043, but does not
16 appear to have a Bates stamp on it.
17 I would assume that it's 42 in the document,
18 but it's something I would have to go back and review. I
19 will attach it as an Exhibit Number 2 to this deposition.
20 A. (Pause.)
21 Q. Have you had an opportunity to review that?
22 A. Yes.
23 Q. Do you recognize that letter?
24 A. Yes.
25 Q. What do you recognize that letter to be?

**Page 60**

1 A. This was -- I believe this one to be one of a
2 credit repair company's assistants helped me write a
3 better letter.
4 Q. All right. So you had a credit repair
5 company help you write that letter, or they wrote it for
6 you?
7 A. They helped me write it.
8 Q. Okay. So how did they help you write it?
9 MR. MARCHIANDO: Object. And I'll instruct
10 the witness not to answer. I don't know the specifics of
11 the relationship with the credit repair company, whether
12 or not they were lawyers.
13 BY MR. SEARS:
14 Q. Okay. Was the credit repair company lawyers?
15 A. I don't know.
16 Q. You don't know. Do you have a belief that
17 you had an attorney-client relationship with whoever
18 helped you write that letter?
19 A. I don't know.
20 MR. SEARS: Okay. So I'm going to ask the
21 question again. I don't know if you're going to have an
22 objection because I don't know that there's an assertion of
23 privilege with regard to that. Certainly, if it turns out
24 that there is attorney-client privilege, I would agree to
25 have his testimony in response to this stricken because of

**Page 61**

1 that privilege.
2 MR. MARCHIANDO: Fair enough.
3 BY MR. SEARS:
4 Q. What assistance did this credit repair
5 company provide to you in writing that letter?
6 A. I showed them what I wrote. They gave me
7 advice of points that I should put in there, such as the
8 account number and --
9 Q. Okay. Was this done in person?
10 A. No.
11 Q. Was it a company through the Internet?
12 A. Yes.
13 Q. Okay. What was the name of that credit
14 repair company?
15 A. Credit Repair.
16 Q. Okay. How did you find them?
17 A. Online search.
18 Q. Okay. I'm sorry. Could I see that?
19 So by this date, you were aware -- the date
20 is November 4th, 2014. You were aware that you were
21 having issues receiving mail at 8315 Mill Creek Road; is
22 that correct?
23 A. Yes.
24 Q. And you were also aware that someone had
25 stolen your identity, I think your prior testimony was, by

16 (Pages 58 - 61)

Page 62

1 this date?
2    A.    Yes.
3    Q.    Okay.  So my -- my question is, number one,
4 you would agree with me that the letter does not state
5 your belief that your identity has been stolen; is that
6 correct?
7    A.    That is not correct.
8    Q.    Okay.  Read to me there what you believe is
9 the language that would communicate that your identity had
10 been stolen.
11    A.    Error.
12    Q.    I'm sorry?
13    A.    The use of the word "error."
14    Q.    In what context?
15    A.    In the context of a mistake.
16    Q.    No.  What is the context of the -- where does
17 the word appear?  Can you read the sentence?
18    A.    Since personnel -- personally harmful
19 institutional error may be in those materials, I formally
20 request that Credit One Bank document and send this
21 notarized validation promptly.
22    Q.    Okay.  So it's your position as we sit here
23 today when you use the term "institutional error," you
24 mean to convey that your mother had stolen your identity.
25    A.    Yes.

Page 63

1    Q.    Okay.  Is there a reason why you didn't just
2 specifically state that, My identity has been stolen and I
3 believe that Dyan Lollis is the one that did it?
4    A.    I had before.
5    Q.    Okay.
6    A.    I got no reply.
7    Q.    All right.  But my question is is there a
8 reason why you did not include that language in that
9 letter more specifically, other than saying institutional
10 error and expecting someone to understand from that
11 identity theft.  My question is why wouldn't you just come
12 out and say, My identity has been stolen.
13    A.    I was told innocent until proven guilty kind
14 of thing.
15    Q.    I don't understand that.  What does that
16 mean?
17    A.    You are innocent until proven guilty.  I had
18 not taken her to court or anything to prove that she had
19 stolen my identity.
20    Q.    But you had a conversation with her in
21 October, just the previous month, had you not, where she
22 says, I don't remember opening the account but obviously I
23 did and you owed her.
24    A.    Yes.
25    Q.    And you -- you take that as a -- an admission

Page 64

1 on her part that she had stolen your identity, correct?
2    A.    Yes.
3    Q.    And in December you go to the police to
4 report that she had stolen your identity and had engaged
5 in the act of -- criminal act of impersonation.  And you
6 specifically name your mother as the suspect, correct?
7    A.    Correct.
8    Q.    All right.  So I -- I -- I guess I'm having a
9 difficult time reconciling your explanation that you were
10 told innocent until proven guilty as to the reason why you
11 would not say, I have identity theft here, Credit One, in
12 this letter.
13    A.    This is not the only letter I wrote to Credit
14 One.  Other ones did include that.
15    Q.    Okay.
16    A.    Just trying something else.
17    Q.    I understand.  So -- that's fair.  Thank you.
18         But you don't have a copy of the other
19 letters --
20    A.    No.
21    Q.    -- that you sent to them.  You don't have a
22 diary, and you don't -- as we sit here today, you don't
23 have an independent recollection of the number of letters
24 or the dates of those letters.
25    A.    I had -- I do have a copy of.

Page 65

1    Q.    Copy of what?
2    A.    Of some of the letters I sent.
3    Q.    To Credit One?
4    A.    I don't recall.
5    Q.    Okay.  Have you provided those to your
6 counsel in this case?
7    A.    Yes.
8         MR. SEARS:  I don't believe -- I'd have to go
9 back and look, but I don't believe -- I know you're not on
10 the case full-time.  I don't believe that they were
11 included in the disclosures.
12         MR. MARCHIANDO:  Credit One letters or
13 letters, period?
14         MR. SEARS:  Letters that he wrote to Credit
15 One.
16         MR. MARCHIANDO:  There's a letter -- I think
17 he's probably thinking of a letter to Equifax, Experian,
18 and TransUnion --
19         MR. SEARS:  Okay.
20         MR. MARCHIANDO:  -- raising a dispute, which
21 then gets communicated to Credit One.  So --
22         MR. SEARS:  Let me just ask, are -- is
23 counsel in possession of letters written by Mr. Wood to
24 Credit One regarding this account that have not been
25 disclosed?

17 (Pages 62 - 65)

Page 66

1      MR. MARCHIANDO:  Are you asking me?
2      MR. SEARS:  Yes.
3      MR. MARCHIANDO:  I'm not on the record as
4  being -- as testifying truthfully or under oath today, but
5  I'm not aware of any personally.  I thumbed through the
6  documents.  I saw the letter which I think he knows about,
7  but I'm not aware of us withholding any letters.
8      MR. SEARS:  Right.  So I would make a request
9  that if some are found, that the --
10     MR. MARCHIANDO:  Yeah.  Of course.
11     MR. SEARS:  -- disclosure be supplemented.
12 BY MR. SEARS:
13     Q.   Do you still have those letters to Credit
14 One?  I know this can be very confusing because there's a
15 lot of entities involved.  Okay?  But I'm not asking about
16 letters that you may have sent to credit reporting
17 agencies like Experian or Equifax or TransUnion.
18          I'm asking about any letter that you
19 specifically sent to Credit One like the letter that I
20 just showed you dated November 4th, 2014.
21     A.   No.
22     Q.   Okay.  And --
23     MR. MARCHIANDO:  That needs to be marked
24 Exhibit 2, by the way.
25     MR. SEARS:  Yeah.  That's Exhibit 2.

Page 67

1          (Exhibit No. 2 was marked.)
2  BY MR. SEARS:
3      Q.   And also the address that you provided here
4  under your name is the 8315 Mill Creek Road, West Point,
5  Virginia, address; is that correct?
6      A.   Yes.
7      Q.   All right.  Why did you provide that address?
8      A.   Credit One's reply was that my address didn't
9  match my name on file, so I used one of the ones I believe
10 they may have had.
11     Q.   Okay.  Does -- does the letter -- you would
12 agree with me the letter doesn't say that you have
13 problems receiving mail at this address; is that correct?
14     A.   Correct.
15     Q.   Okay.  Did you intend to receive a response
16 from Credit One to this mail that you had sent?
17     A.   No.  What -- to this address?
18     Q.   When -- when you -- all right.  When you sent
19 this letter, did you do so in anticipation that Credit One
20 would respond directly to you through the mail?
21     A.   Yes.
22     Q.   All right.  And were you then -- had you made
23 arrangements to make sure that you could review the mail
24 that was being sent to the 8315 to your attention?
25          Like, for instance, earlier you said that

Page 68

1  sometimes you would go down and have the post office hold
2  mail for you.
3      A.   I forwarded the mail to my address.
4      Q.   Okay.  So at what point -- did you put a
5  forwarding address notice with the post office box -- or
6  post office that served this address?
7      A.   Yes.
8      Q.   All right.  And when did you do that?
9      A.   I don't know.
10     Q.   You don't recall?
11     A.   I don't recall.
12     Q.   Do you recall whether it was before this
13 November 14th -- or November 4th, '14 date?
14     A.   That would -- that would make sense to me.
15 Yes.
16     Q.   Okay.  What was that forwarding address that
17 you had on file with the post office?
18     A.   I don't recall.  One of my friends or one of
19 the addresses I was staying at.
20     Q.   Okay.  Okay.  I'm going to show you what has
21 been disclosed as COB00043.
22     A.   (Pause.)
23     Q.   Let me know when you're ready.
24     A.   (Pause.)  Okay.
25     Q.   That is a letter from Credit One to you, sent

Page 69

1  to that 8315 Mill Creek Road.  It appears to be in
2  response to the November 4th, 2014, letter that they
3  received several days later.
4          Do you recall receiving that correspondence
5  from Credit One?
6      A.   I don't recall specifically, but I remember
7  getting a bunch of stuff telling me it was this -- this
8  collection agency or that one.
9      Q.   All right.  So you do recall receiving
10 communication from Credit One saying that you needed to
11 contact Midland?
12     A.   Yes.
13     Q.   Okay.  And it was in the same time period as
14 when you sent this letter out to them of November 4th,
15 2014?
16     A.   To my knowledge.
17     Q.   And what did you do in response to receiving
18 that letter from Credit One?
19     A.   I called Midland Credit.
20     Q.   Okay.  Thank you.  I'll hand to you what
21 again has a Bates numbering issue.  It should have been
22 disclosed as COB00044.  I'll mark it as Exhibit Number 3
23 to the deposition.  It's a letter dated December 9th,
24 2014, from David Wood to Credit One Bank.
25     A.   (Pause.)

18 (Pages 66 - 69)

Page 70

1  Q.  Do you recognize that document?
2  A.  Vaguely. But, yes.
3  Q.  What do you recognize that document to be?
4  A.  Another letter I sent to Credit One Bank.
5  Q.  All right. And did you also have assistance
6  in preparing that letter?
7  A.  I don't recall.
8  Q.  Okay. Did you write that letter?
9  A.  Yes.
10  Q.  What was the purpose of writing the letter?
11  A.  To try and get the Credit One report
12  resolved.
13  Q.  Okay. You would agree with me that you do
14  not state in that letter your claim that your identity had
15  been stolen, correct?
16  A.  In this one, correct.
17  Q.  All right. And it doesn't even include the
18  language "error" or the word "error" or language
19  "institutional error," correct?
20  A.  Correct.
21  Q.  And is that date the correct date, as far as
22  you know, of the date that you wrote that letter?
23  A.  I don't remember.
24  Q.  Okay. But as you sit here today, you can't
25  say that that is not the date that you wrote that letter,

Page 71

1  December 9th, 2014.
2  A.  Correct.
3  Q.  And the day before, you had gone into the
4  West Point Police Department to report an identity theft
5  and specifically named Dyan Lollis as the suspect,
6  correct?
7  A.  Correct.
8  Q.  And the day that you wrote this letter on
9  December 9th, you went back to the police department and
10  gave Sergeant Woodson that Credit One bill dated
11  August 15th, 2013, that we previously talked about,
12  correct?
13  A.  I don't recall the specifics of it, but --
14  Q.  But that's the date that you gave the --
15  according to the report, that you gave the Credit One bill
16  to Sergeant Woodson, correct?
17  A.  If that's what it says.
18  Q.  All right. Is there a reason why you didn't
19  advise Credit One of your claim that your identity had
20  been stolen on -- in that letter dated December 9th, 2014?
21  A.  They reply with a lot of legal terms saying I
22  need a police report proving her guilty.
23  Q.  Okay. So I -- I don't understand. Can you
24  explain your answer a little bit more? My question is why
25  did you not include in that letter your claim that your

Page 72

1  identity had been stolen, whether or not you specifically
2  named Dyan Lollis or not.
3  And your response was because they will reply
4  something. But I don't understand why you didn't include
5  that. How does that play --
6  A.  I get a response from them this way. When I
7  don't say identity theft, I get a response. If I say
8  identity theft, it's like it was lost in the mail, or they
9  give me some around -- something to the effect of I need a
10  police report, I need the court findings, I need --
11  Q.  All right. So I just want to make sure I
12  understand what you're saying. And if I get this wrong,
13  correct me. Okay?
14  You did not tell Credit One in the
15  December 9th, 2014, letter that your identity had been
16  stolen because one of the reasons is that their response
17  may get lost in the mail. Is that correct?
18  MR. MARCHIANDO: Objection. Mischaracterizes
19  his testimony.
20  MR. SEARS: I think it -- that's fine. The
21  record speaks for itself. I think it specifically quotes
22  what he said.
23  THE WITNESS: I don't get a reply.
24  BY MR. SEARS:
25  Q.  Okay. That if you -- you believe that if you

Page 73

1  had put identity theft in there, that Credit One would not
2  have replied to your letter.
3  A.  There is a strong correlation to me putting
4  identity theft and naming my mother to no reply.
5  Q.  What do you base that on?
6  A.  A correlation.
7  Q.  Yeah.
8  A.  Do -- do you know the word correlation?
9  There's -- it's not a connection. But it would be like, I
10  drink water but I don't have cancer. Water -- correlation
11  of water and not having cancer.
12  Q.  Okay. What I'm -- what I'm asking is you --
13  you have expressed the opinion there that if you had
14  included a disclosure to Credit One of your claim that
15  your identity had been stolen, that there is a correlation
16  then to Credit One not responding to your letter.
17  My question to you is on what basis do you
18  make that statement that there is a correlation. What
19  experience had you had in the past with Credit One or any
20  other creditor or utility company or any other entity
21  where you've raised the issue of identity theft that you
22  have not received a response?
23  A.  Credit One.
24  Q.  Okay. When?
25  A.  I don't recall the dates.

19 (Pages 70 - 73)

Page 74

1    Q.    Okay.  The November 14th -- I'm sorry --
2  November 4th, 2014, letter, they responded to that letter,
3  correct?
4    A.    Correct.
5    Q.    And according to you, you did raise the issue
6  of identify theft in this letter.  Even though you didn't
7  specifically use those words, you included language in
8  there in which you intended to convey to Credit One that
9  your identity had been stolen.
10    A.    Yes.
11    Q.    Did you intend Credit One to understand that
12  by using the word "institutional error" that they should
13  know that you're claiming identity theft?
14    A.    I wasn't sure how else to explain it, if they
15  don't understand identity theft when I tell them over the
16  phone or when I tell them in a letter.  So I'm trying to
17  find a different -- like with you and not understanding
18  the correlation -- the word "correlation" and my example
19  with water, I was just trying to find a different wording
20  to explain it to them.  Yes, it was my intention that they
21  understood it.
22    Q.    Okay.  So you sent the November 4th, 2014,
23  letter to Credit One with the intention that they would
24  understand the language you were using to mean that you
25  had a claim of identity theft, correct?

Page 75

1    A.    Correct.
2    Q.    And they responded to you in response to that
3  letter where, according to you, the language you used
4  would put them on notice that you had a claim of identity
5  theft, correct?
6    A.    Correct.
7    Q.    So the next month, you send a letter to them
8  and you don't include "institutional error," you don't
9  include the word "identity theft" or any language that
10  would suggest that your identity had been stolen.  And
11  your explanation is, Because if I raise the issue of
12  identity theft, they won't respond.
13          So, again, I'm trying to understand what
14  basis that you're -- you're making that Credit One would
15  not respond to you if you had raised identity theft.
16    A.    Past experience.  That's the only place (sic)
17  I can make of it.  I don't -- I don't really know.
18    Q.    And that's what I'm asking.  Can you -- as
19  you sit here today, can you state any specific instance of
20  a past experience with Credit One or any other entity
21  where you have raised the issue of identity theft and
22  they've ignored you?
23    A.    No, not specifically.
24    Q.    Okay.
25    A.    You want this --

Page 76

1    Q.    Yes.  It's going to go to her, actually.
2          (Exhibit No. 3 was marked.)
3  BY MR. SEARS:
4    Q.    I'm going to show you what is going to be
5  marked as Exhibit -- I'm sorry.  Not marked.  It's been
6  disclosed as COB00045, dated January 12th, 2015, a letter
7  from David -- to David Wood from Credit One Bank.  Let me
8  know when you've had a chance to review that.
9    A.    (Pause.)  Okay.
10    Q.    Do you recognize that letter?
11    A.    Yes.
12    Q.    What do you recognize that letter to be?
13    A.    Telling me a collection agency has my
14  file or --
15    Q.    Do you recall receiving that letter?
16    A.    I don't remember how I got it.
17    Q.    You did -- okay.  I don't remember how I got
18  it.  You do remember getting it, though.
19    A.    Yes.
20    Q.    Okay.  And it was mailed to the 8315 address,
21  correct?
22    A.    Then forwarded to wherever I had it go.
23    Q.    Right.  So it was mailed to the 8315 address,
24  and then it would have been forwarded to whatever address
25  that you had listed with the post office box, correct?

Page 77

1    A.    Yes.
2    Q.    All right.  What did you do in response to
3  that letter, if anything?
4    A.    Contacted Midland Credit.
5    Q.    All right.  Thank you.  How are we doing on
6  time?  I'm not -- this isn't a marathon.  I'm not testing
7  your endurance.  If you need to take a break, we can do
8  that.  Or anyone else.
9    A.    I'm fine.
10          MR. MARCHIANDO:  I'm okay.
11  BY MR. SEARS:
12    Q.    All right.  Do you know the telephone number
13  804-843-4080?  I can show it to you if you want.
14    A.    It seems familiar.  I can't remember.
15    Q.    Do you know whether or not that's ever been
16  associated with you or someone else that you know?
17    A.    I don't -- I don't even know my own phone
18  number right now.
19    Q.    Okay.  So it could be yours, but you don't
20  know either way.
21    A.    I don't recall.
22    Q.    Okay.  What about 804-370-4900?
23    A.    I believe at one point that was mine.
24    Q.    Your what?  A home telephone?  Cell phone?
25    A.    Cell phone.

20 (Pages 74 - 77)

Page 78

1    Q.    Who was your service provider?
2    A.    Verizon, I believe.
3    Q.    Did anyone else use your cell phone?
4    A.    Not that -- not that I would know of.
5    Q.    Do you suspect that anyone else ever used
6  your cell phone to make phone calls or receive phone
7  calls?
8    A.    I'm not sure how I would -- how I would know
9  that.
10   Q.    Okay. When you called Credit One -- you did
11 call Credit One directly, correct?
12   A.    Yes.
13   Q.    All right. When you called them, did you
14 tell them that you believed that your identity had been
15 stolen?
16   A.    Yes.
17   Q.    What was their response?
18   A.    Do I have a police report.
19   Q.    Okay. What else?
20   A.    Went on to tell me some law code about
21 statute of limitations or something. Some stuff I didn't
22 really understand.
23   Q.    Okay. Anything else that you can recall?
24   A.    No.
25   Q.    Do you recall them ever -- so they -- they

Page 79

1  asked for you to send them a police report; is that
2  correct?
3    A.    Yes.
4    Q.    Do you recall whether or not they ever asked
5  you to send an affidavit of fraud?
6    A.    They asked for a -- like I said, I didn't
7  understand the language they were using, but something to
8  the effect of need a police report, some -- I don't know
9  what the law code thing is. Looks like a ampersand with
10 some long number and statute of limitations.
11   Q.    Okay. Did you ever send Credit One a police
12 report?
13   A.    No.
14   Q.    Why?
15   A.    I was never able to get one.
16   Q.    Did you ask for one?
17   A.    Yes.
18   Q.    All right. So you went to the West Point
19 Police Department and asked for a copy of the police
20 report, and they would not give it to you?
21   A.    They would tell me to come back another day.
22   Q.    Okay. Who did you speak with down there?
23   A.    Woodson and -- Sergeant Woodson. And I -- I
24 don't know the names of the people working in the office.
25   Q.    Karen is in charge of records. Did you talk

Page 80

1  to Karen?
2    A.    I don't remember the names of the people
3  working in the office and whatnot, but --
4    Q.    How many times did you make a request for a
5  police report?
6    A.    Quite a few. I didn't --
7    Q.    Can you estimate?
8    A.    Seven.
9    Q.    Seven times you made -- over what period of
10 time?
11   A.    Sixty days.
12   Q.    Seven times over 60 days. Starting what
13 month and year?
14   A.    I don't know.
15   Q.    Well, it would have been after December of
16 2014, either that month or after, correct? Because you
17 didn't go to the police until then.
18   A.    That would make sense.
19   Q.    Do you recall ever receiving an affidavit of
20 fraud from Credit One in the mail for you to fill out?
21   A.    No.
22   Q.    Do you recall them telling you that they were
23 going to be sending you an affidavit of fraud and asking
24 you to fill it out and return it?
25   A.    No.

Page 81

1    Q.    I'm going to show you what has been disclosed
2  as COB04160 through same prefix ending with 2. Mr. Wood,
3  I am handing you this document, and I will represent to
4  you that this is a sample letter that's been produced by
5  Credit One Bank of the form letter and then attachment
6  regarding affidavits of fraud that they send to customers
7  who either write or call in claiming that their identity
8  had been stolen. Okay?
9         I show this to you to see if any of this
10 looks familiar to you that might refresh your recollection
11 as to whether or not you received such correspondence from
12 Credit One at any time.
13   A.    It's my first time seeing it.
14   Q.    Okay. Thank you. Sir, I will represent to
15 you that in our review of records, those are the only two
16 letters that we could find that you had sent directly to
17 Credit One, the ones that I'd shown to you, the
18 November 4th and December 9th, 2014, letters.
19        Are you able to state as we sit here today
20 whether you had sent any other letters directly to Credit
21 One?
22   A.    Yes.
23   Q.    Okay. Give me the -- the dates of those
24 letters.
25   A.    I don't know the dates.

**Page 82**

1  Q.  Okay.  Can you give me the approximate dates?
2  A.  I don't know the dates.
3  Q.  Okay.  Can you give me the approximate dates?
4  A.  I don't know the dates.
5  Q.  You can't approximate the dates for me?
6  A.  I don't know the dates.
7  Q.  Do you know the year?
8  A.  I don't know the dates.
9  Q.  How many letters were there?  In addition to
10 the two that we have here.
11 A.  I want to say three.
12 Q.  Three more letters in addition to the two
13 that we have.  So a total of five letters?
14 A.  I believe so.  Yes.
15 Q.  All right.  Again, these are correspondence
16 directly with Credit One, not to a credit reporting
17 agency.  I just want to make that clear.
18 A.  Correct.
19 Q.  You understand that, and you're -- it doesn't
20 change your previous answer, correct?
21 A.  Correct.
22 Q.  All right.  What were those other three
23 letters about?  Let's take the first letter.
24 A.  All three of them were about identity theft
25 and I don't know what this account is.

**Page 83**

1  Q.  All three of them -- okay.  Am I to
2  understand your testimony that you sent three more letters
3  at some point to Credit One wherein you raised your claim
4  of identity theft on this account that we're dealing with
5  in this case?
6  A.  Yes.
7  Q.  Further, am I to understand your testimony
8  that you do not have a copy of these letters?
9  A.  Correct.
10 Q.  That you do not know the dates of these
11 letters.
12 A.  Correct.
13 Q.  That you cannot approximate the dates for
14 these letters.
15 A.  Correct.
16 Q.  Do you recall receiving any responses from
17 Credit One either by mail or -- or telephone to the three
18 letters that you sent in addition to the two that we have
19 on record?
20 A.  I got no response.
21 Q.  You received no response.
22 A.  I received no response.
23 Q.  Okay.  Do you know how many -- I may have
24 asked this.  If I did, I apologize.  Do you know how many
25 times you spoke with Credit One directly on the telephone?

**Page 84**

1  A.  A lot.
2  Q.  A lot.  Can you approximate that for me?
3  A.  Twenty-five-some times.
4  Q.  Twenty-five more times -- twenty-five or more
5  times on the telephone?
6  A.  Over the phone.  It was -- it was a really
7  big number.
8  Q.  Okay.  But you didn't keep a record or diary
9  or log of those telephone calls.
10 A.  No.
11 Q.  It would be all up here in your memory?
12 A.  Uh-huh.
13 Q.  Okay.  But you -- are you able to
14 specifically remember the details of any of those 25-plus
15 phone calls?
16 A.  Most of them ended with a forever -- almost a
17 positive feedback loop of let me transfer you, let me
18 transfer you, until eventually I end up back to the first
19 person who originally started the transfer loop.
20 Q.  Do you have any witnesses who have been
21 involved in the telephone call with you or witnessed your
22 phone call with Credit One where this has occurred?
23 A.  Yes.
24 Q.  Who?
25 A.  George Brannon.

**Page 85**

1  Q.  Who's George Brannon?
2  A.  A friend that I stayed with for a while.
3  Q.  And he would be able to testify specifically
4  with regard to your telephone calls with Credit One?
5  A.  Yes.  Because I said it would be -- it would
6  be interesting, watch how long they will keep transferring
7  this -- this call.
8  Q.  And what is George Brannon's address?
9  A.  I don't know his address.
10 Q.  What is his telephone number?
11 A.  I don't know his telephone number.
12 Q.  What city does he live in?
13 A.  Williamsburg.
14 Q.  And did he -- was he able to hear both sides
15 of the conversation or just one side?
16 A.  Yeah.  Speakerphone.
17 Q.  Speakerphone?  And how many occasions did he
18 do this?
19 A.  It was a couple times.  It's not funny after
20 you use the same joke.
21 Q.  I'm sorry?
22 A.  That Credit One would just keep transferring
23 me forever and never actually answer any of my questions
24 about identity theft.
25 Q.  But you said something about a joke.

22 (Pages 82 - 85)

Page 86

1    A.    It seemed to be like they were taking me like
2 a joke.
3    Q.    Oh, I see.  You didn't feel Credit One was
4 taking you seriously.
5    A.    No.
6    Q.    Okay.  All right.
7         THE VIDEOGRAPHER:  Excuse me, Mr. Sears.  We
8 have five minutes left on the media.
9         MR. SEARS:  Okay.  Do you mind if we take a
10 little bit longer of a break, number one, to just take a
11 break and then, number two, I'm going to move into kind of
12 a different, more direct, form-feeding type of
13 examination.  So it will give me some time to organize a
14 little bit.
15         MR. MARCHIANDO:  Okay.  Sure.  How long do
16 you think?
17         MR. SEARS:  Well, do you guys want to take
18 a -- a lunch break?  There's a lot of documentation that
19 I'm going to go through.  We can go off the record.  I'm
20 sorry.
21         THE VIDEOGRAPHER:  Okay.  One second, sir.
22 We're going off the video record at 12:46 p.m.
23         (Recess.)
24         THE VIDEOGRAPHER:  This marks the beginning
25 of media number 3.  We're back on the video record at

Page 87

1 1:08 p.m.
2 BY MR. SEARS:
3    Q.    All right, Mr. Wood.  Before getting into the
4 documents, I just want to go through just some
5 straightforward questions and get your responses to them
6 on the record.
7         Did you apply for the Credit One credit card
8 that's at issue in this case?
9    A.    No.
10    Q.    Did you ever use the credit card issued by
11 Credit One at issue in this case for purchases of
12 merchandise, services, or cash advances?
13    A.    No.
14    Q.    Did you ever authorize anyone else, orally or
15 in writing or given consent to anyone, to use the Credit
16 One credit card for purchases of merchandise, services, or
17 cash advances?
18    A.    No.
19    Q.    Have you ever received any goods, services,
20 or otherwise benefited directly or indirectly from the
21 Credit One credit card account, to your knowledge?
22    A.    No.
23    Q.    With regard to not just the Credit One
24 account but as to all your credit reporting issues that
25 you've experienced in the last few years, did you have a

Page 88

1 particular system or method for keeping documentation that
2 you received or sent out related to your credit reporting
3 issues?
4    A.    No.
5    Q.    We have received disclosures from your
6 counsel of certain documents that you had in your
7 possession, custody, or control related to the credit
8 reporting issues gen -- generally.
9         Do you currently have any documents that you
10 have not provided to your counsel?
11    A.    No.
12    Q.    What you provided to your counsel, is that a
13 collection of everything that you have received regarding
14 these credit issues in the last few years, or have some
15 been lost or thrown away or discarded in some way?
16    A.    That was everything I had.
17    Q.    Okay.  All right.  So I am going to show a
18 series of documents to you now.  The first set is
19 designated as EXPWOOD, underscore, 0000025 through the
20 same prefix ending in 46 instead of 25.  And for matter of
21 convenience, I will refer to that designation as Experian
22 disclosures.
23         They appear to be duplicates of a set of
24 documents that have the prefix EXPWOOD, underscore, SUBP,
25 underscore, 0000009 through same prefix ending in 30.  And

Page 89

1 also appear to be the same document that is produced with
2 the same prefix ending in 107 through 128.  And with
3 regard to that prefix, the EXPWOOD SUBP, I'll refer to it
4 as Experian subpoena documents.
5         So we've got the Experian Rule 26(a)(1)
6 disclosures and then their subpoena responses that include
7 what appears to be duplicates of what was in that.
8         MR. MARCHIANDO:  All right.  So then what are
9 we doing?  You're going to give us --
10         MR. SEARS:  Just one set, if that's okay with
11 you, unless you want to inspect all three of them.  But
12 this is going to be a matter --
13         MR. MARCHIANDO:  No.  That's fine.
14         MR. SEARS:  -- later on I'll work out with
15 Suzie to narrow down the documents that we use because
16 there's a lot of duplicates.
17 BY MR. SEARS:
18    Q.    So, Mr. Wood, for the purpose of my question,
19 I -- I just want you to look at page 1.  It says page 1 of
20 20.  It appears to be a communication from Experian to
21 you.  It's addressed to David Wood, 3990 Chelsea Road,
22 West Point, Virginia, and the date is June 25th, 2014.
23         Two questions.  First of all, number one, is
24 this the complete address for the address that you
25 referred to earlier when you said it was 30-something

23 (Pages 86 - 89)

Page 90

1 Chelsea Road? Does that help refresh your recollection of
2 that address that you lived at when you rented a room from
3 Jennifer Brannon?
4    A.   Yes.
5    Q.   Okay. And do you recall receiving this
6 communication from Experian? And you can take your time
7 to look through that, if you'd like to, to see if it looks
8 familiar to you.
9    A.   Yeah. I remember this.
10   Q.   Okay. And I will -- would note that I do not
11 believe that this was included in your Rule 26(a)(1)
12 disclosures. So if that's the case and if you had
13 produced to your counsel all the documents that you had
14 currently in your possession, is it possible that if this
15 was not produced in that, that for some reason since
16 June 25th, 2014, it's no longer in your possession?
17   A.   Being that it was at the 399 (sic) Chelsea
18 Road, it would have taken me some time to get over there
19 to get it.
20   Q.   Okay. So my question is -- but you did get
21 this, correct?
22   A.   I got this, yes.
23   Q.   All right. And -- and to the extent that it
24 wasn't produced as part of the disclosures that your
25 counsel made on your behalf and if you had given

Page 91

1 everything to your counsel that you had in your
2 possession, is it fair to assume that for some reason at
3 the time that you gave the documents to your counsel in
4 this case, this was no longer in your possession?
5    A.   Yes. This was misplaced.
6    Q.   Okay. But you do recall receiving this.
7    A.   Yes.
8    Q.   And you said it would have been some time
9 before you would have gotten over to Chelsea Road. You
10 were not living at Chelsea Road at this time?
11   A.   I don't recall the specific time line.
12   Q.   Yeah. Later on you lived at Chelsea Road,
13 correct?
14   A.   I don't recall the specific time line.
15   Q.   Okay. Do you remember when you would have
16 received this? If it was mailed June 25th, 2014, sent to
17 3990 Chelsea Road, it may have been some time before you
18 went over there, do you know how much time may have
19 elapsed between the time that it was mailed and the time
20 that you actually picked it up?
21   A.   No. I don't recall the time.
22   Q.   I'll ask you to look through that document
23 now and turn to page 11 of 20. It's in the top, right
24 corner.
25   A.   (Complies.)

Page 92

1    Q.   Do you see that? Are you there?
2    A.   Yes.
3    Q.   Okay. And you see there's a -- an account
4 listed for Credit One Bank, correct?
5    A.   Yes.
6    Q.   All right. And that's the account that is at
7 issue in this case and for which you just answered the
8 questions that you had never opened it or used it or
9 authorized anyone else to use it, correct?
10   A.   As far as I'm concerned, yes.
11   Q.   All right. And this is the account for which
12 you claim that your mother stole your identity and opened,
13 correct?
14   A.   I believe she opened many accounts other than
15 just this one.
16   Q.   But this is one of those accounts, correct?
17   A.   Yes.
18   Q.   All right. So now return to page 1, please.
19 It indicates that -- that Experian was notified by one or
20 more of the nationwide consumer credit reporting companies
21 that you recently reported to them that you believe
22 information in your credit report is inaccurate due to
23 fraud.
24        Do you recall to whom you made a report and
25 when you made that report of your credit report being

Page 93

1 inaccurate due to fraud? It would have been prior to
2 June 25th, 2014.
3    A.   No.
4    Q.   Okay. You don't doubt the fact that you did
5 report it to someone. You just don't recall who or when.
6    A.   I made many reports. But no.
7    Q.   I understand. And on page 1, there's a
8 section here saying, Remedying the effects of identity
9 theft. Do you see that?
10   A.   Yes.
11   Q.   And it sets forth certain rights that you
12 have under the Fair Credit Reporting Act when you believe
13 that you are the victim of identity theft; is that
14 correct?
15   A.   Yes.
16   Q.   One of which, under 1, is to have a fraud
17 alert placed on your file?
18   A.   Yes.
19   Q.   Two is to get free copies of the information
20 in your file, file disclosures, correct?
21   A.   That's what I'm reading.
22   Q.   All right. Three, the right to obtain
23 documents relating to fraudulent transactions made or
24 accounts opened using your personal information. Do you
25 see that?

24 (Pages 90 - 93)

Page 94

```
1      A.   Yes.
2      Q.   Four, the right to obtain information from a
3  debt collector?
4      A.   Yes.
5      Q.   Five, if you believe the information in your
6  file results from identity theft, you have the right to
7  ask that a consumer reporting agency block that
8  information from your file?
9      A.   Yes.
10     Q.   And 6, you may also prevent businesses from
11 reporting information about you to consumer reporting
12 agencies if you believe the information is a result of
13 identity theft, correct?
14     A.   Yes.
15     Q.   All right.  So going back to 5, it indicates
16 that if you want a consumer reporting agency to block the
17 information from your file, specifically in this case
18 the -- for instance, the Credit One Bank account, that you
19 must identify the information to block and provide the
20 consumer reporting agency with proof of your identity and
21 a copy of your identity theft report.  Do you see that?
22     A.   Yes.
23     Q.   Did you ever from June 25th, 2014, to the
24 present date send Credit -- not to the present date -- to
25 the date of filing this action send to any credit
```

Page 95

```
1  reporting agency an identity theft report?
2      A.   Not that I know of because this is going into
3  a realm where I don't know what they're -- what to do.
4      Q.   Well, it's telling you what to do.  You agree
5  with me that it's telling you what to do, correct?
6      A.   It is telling me actions to take, not how to
7  take them.
8      Q.   Okay.  So what I'm hearing from you is that
9  you know you need to file an identity theft report, but
10 you don't know how to do it, correct?
11     A.   Correct.
12     Q.   All right.  Did you contact Experian to ask
13 them about how to -- at any time since June 25th, 2014, up
14 to the time of filing the complaint in this case, how to
15 file an identity theft report so that you can exercise
16 your right to have the consumer reporting agency block
17 that information from your file?
18     A.   No.
19     Q.   Why did you not do that?
20     A.   I didn't think that was who I would need to
21 talk to about it.  Why is -- why would Experian alone be
22 the one to talk to about when there's TransUnion and,
23 whatever, Equifax?
24     Q.   Okay.  Did you talk to the credit repair
25 company that you had hired about this?
```

Page 96

```
1      A.   At some point, yes.
2      Q.   Number 6, it says, You may prevent businesses
3  from reporting information about you to consumer reporting
4  agencies if you believe the information is a result of
5  identity theft.  In this case, you believe that the Credit
6  One account that's listed on that -- later on in this
7  report was the result of identity theft.
8           And it says here, To do so you must send your
9  request to the address specified by the business that
10 reports the information to the consumer reporting agency.
11 The business will expect you to identify what information
12 you do not want reported and to provide an identity theft
13 report.
14          Again, did you ever send to Credit One from
15 June 25th, 2014, to the date of filing of the complaint a
16 identity theft report?
17          MR. MARCHIANDO:  Object to form.
18          THE WITNESS:  I -- I didn't really know what
19 I was doing.  I was just --
20 BY MR. SEARS:
21     Q.   So the answer is no.
22     A.   Not that I know of.  I filled out many forms.
23 I don't know what they are.
24     Q.   For Credit One?
25     A.   Huh?
```

Page 97

```
1      Q.   For Credit One you filled out forms?  Or just
2  generally?
3      A.   Just in general.  Stuff I was -- fill this,
4  do that.
5      Q.   Okay.  Did you -- to learn more about that,
6  did you visit the website that's provided here in the next
7  paragraph, Consumer Finance, dot, gov, slash, Learn More?
8      A.   I visited many websites in my research.
9      Q.   Okay.  But do you specifically remember
10 visiting that one?
11     A.   I'm sure.
12     Q.   The answer would be no, you do not
13 specifically remember it, but you're sure you did.  Is
14 that fair?
15          MR. MARCHIANDO:  Object to form.
16          THE WITNESS:  I don't know whether I've been
17 to this website or not.
18 BY MR. SEARS:
19     Q.   Okay.  You can't say that you have as you sit
20 here today.
21     A.   I don't know whether or not I've been to this
22 website or not.
23     Q.   Did you write to the Consumer Financial
24 Protection Bureau to ask them about filling out an
25 identity theft report?
```

25 (Pages 94 - 97)

Page 98

1   A.   No.
2   Q.   May I have that back, please? Thank you.
3        All right. The next set of documents is from
4   Experian to Mr. Wood dated June 25th, 2014. EX -- EXPWOOD
5   125 and EXPWOOD subpoena 221 through 222. And that first
6   cite is 125 through 126. Appears -- the second set
7   appears to be a duplicate.
8   A.   (Pause.)
9   Q.   Are you done?
10  A.   Uh-huh.
11  Q.   Okay. So again it looks like the same date,
12  another correspondence, the same address. This is
13  something that would have been mailed because no one's
14  tampering with your mail, and you would have picked up at
15  some point after that because you may not have been living
16  there. Is that all true for this correspondence as well?
17  A.   Yes.
18  Q.   All right. And -- and even though it's not
19  included in your disclosures, you did receive this,
20  correct?
21  A.   Uh-huh.
22  Q.   All right. And this is indicating that
23  Experian has placed a initial security alert on your
24  credit file. You understood that?
25  A.   I did.

Page 99

1   Q.   Okay. Thank you.
2        All right. Next series of documents is
3   Experian subpoena 31 through 50, which appears to have
4   duplicates, and then Experian subpoena documents 129
5   through 148, and in the Experian disclosures, 47 through
6   66.
7   A.   (Pause.) Okay.
8   Q.   All right. Sir, this appears to be a copy of
9   your personal credit report. It says that it's responding
10  to your recent request for the report. It's dated October
11  22nd, 2014, and it's being mailed to 8315 Mill Creek Road.
12       By this point on October 22nd, 2014, are you
13  having your mail forwarded to another address?
14  A.   Yes.
15  Q.   Such that you would receive this?
16  A.   Uh-huh.
17  Q.   Okay. So you did receive this?
18  A.   Yes.
19  Q.   Do you recall when you made the request for
20  the credit report?
21  A.   No.
22  Q.   Okay. Do you recall how you made that
23  request?
24  A.   I don't remember if I had to write or if it
25  was online. I just remember I made the request.

Page 100

1   Q.   Okay. And again these were included in
2   Experian's disclosures but not in your disclosures, which
3   would suggest that even though you had it in your
4   possession, at the time you gave it to your counsel
5   something had happened to it, correct?
6   A.   Makes sense.
7   Q.   All right. So, again, if you turn to page 8
8   of 18 -- yeah, top right-hand corner -- you see the Credit
9   One account that you claim was not yours, correct?
10  A.   Right.
11  Q.   All right. And if you would turn to -- well,
12  hold on a second. (Pause.)
13       All right. If you would turn to page 14 of
14  18, there's a list of addresses. Do you see that?
15  A.   Yes.
16  Q.   All right. There's a 2115 Lee Street, West
17  Point. Do you recall living at that address?
18  A.   Yes.
19  Q.   You do?
20  A.   Uh-huh.
21  Q.   When did you live there?
22  A.   I don't remember the time period. I believe
23  we went over this earlier.
24  Q.   Okay.
25  A.   That's 21st Street or 22nd Street.

Page 101

1   Q.   Oh, is that the 21st Street address?
2   A.   Yes. That's the physical address, but the
3   mail goes to the P.O. box.
4   Q.   Okay. Thank you.
5        MR. MARCHIANDO: No. I'm just saying
6   reassemble.
7        MR. SEARS: Believe me. I don't want to get
8   these out of order.
9   BY MR. SEARS:
10  Q.   Next set of documents, Experian subpoena 51
11  through 70. Appears to be duplicates of Experian subpoena
12  149 through 168 and Experian disclosures 67 through 86.
13  Let me know when you're ready.
14  A.   (Pause.) Okay.
15  Q.   Okay. In my review, it appears to be the
16  exact same report as the one we discussed previously, but
17  it's being sent on October 27th pursuant to another
18  request.
19       Is it possible you made several requests for
20  your credit report and then received the same report?
21  A.   It's possible.
22  Q.   Okay. And, again, you -- you did receive
23  this, correct?
24  A.   Correct. Or --
25  Q.   All right. Thank you.

26 (Pages 98 - 101)

Page 102

1       All right. The next one is some TransUnion
2   disclosures designated TU072 through -- I'm sorry -- 70
3   through 83, dated November 24th, 2014. We just went back
4   three days. This is something you would have received
5   three days before what I just showed you.
6       And for the record, the first two pages would
7   not have been sent to you. That's part of the disclosure
8   from TransUnion.
9   A.    (Pause.) Okay.
10  Q.    All right. And that is sent to the Chelsea
11  Road address, correct? Don't look at the first two pages.
12  A.    It was sent somewhere. Yeah, I guess the
13  Chelsea Road.
14  Q.    And you -- and you would have received that?
15  A.    Yes.
16  Q.    Do you remember receiving that?
17  A.    Maybe not this one specifically, but I did
18  receive many of these printouts of just information that I
19  don't understand how to digest. It all looks similar to
20  this, yes.
21  Q.    Okay. And that credit report has the Credit
22  One account on there; is that correct?
23  A.    Can you help me out? Do you know what page
24  it's on?
25  Q.    I'm trying to pull up my electronic version.

Page 103

1   I apologize. It would be page 3 of 5.
2   MR. MARCHIANDO: Do you have a Bates number?
3   THE WITNESS: One of 5, you mean?
4   MR. SEARS: It's 76.
5   MR. MARCHIANDO: Seventy-six.
6   MR. SEARS: TU76.
7   THE WITNESS: That's TU76 there.
8   MR. MARCHIANDO: Oh, it is? Sorry.
9   THE WITNESS: Oh. Yes. I see it.
10  BY MR. SEARS:
11  Q.    Okay. And that's the Credit One account,
12  correct?
13  A.    That is a Credit One Bank account, yes.
14  Q.    Yes. And if you turn to TU80, included in
15  this report is a summary of your rights under the FCRA,
16  which includes how to go about to dispute inaccurate,
17  incomplete, or unverifiable information, correct?
18  A.    This is just a summary of my rights.
19  Q.    Right.
20  A.    Where are you seeing instructions?
21  Q.    No. I'm not -- okay. You're right. It's a
22  summary of your rights. It's included on that, correct?
23  A.    Yes.
24  Q.    Now, you actually -- there was a dispute that
25  came about in October from this. So you -- you did go

Page 104

1   through a dispute process.
2       MR. MARCHIANDO: Objection, vague.
3   BY MR. SEARS:
4   Q.    Is that correct? A process of dispute.
5   Filing a dispute with the --
6       MR. SEARS: You're right. It is vague.
7   BY MR. SEARS:
8   Q.    You did go through a process of -- of filing
9   a dispute as to certain information that was being
10  reported by data furnishers to the credit reporting
11  agencies in October of 2014, correct?
12  A.    I went through I don't know how many things
13  that were -- I was told were a dispute start. I did have
14  one actually come back to me was my credit monitoring
15  by -- through Equifax had -- where I could actually go and
16  actually put items on it to dispute, and then they
17  investigated it. And they actually gave me a date that
18  they would let me know the results of it.
19  Q.    Okay. So when you filed disputes, how would
20  you -- because you filed several disputes over a period of
21  time. How did you normally do that? Through the
22  Internet?
23  A.    Various forms. Whatever instructions I was
24  given from whoever I was talking to at that point who told
25  me they could help me.

Page 105

1   Q.    Would this be any of the data furnishers or
2   the reporting agencies or someone outside of that?
3   A.    I don't understand the -- some from --
4   Q.    Who was giving you advice?
5   A.    A company I hired. The Equifax credit
6   monitoring. I don't know what you call it. And the
7   police officers I talked to.
8   Q.    Police officers, plural? Did you talk to
9   someone other than Sergeant Woodson?
10  A.    Yes.
11  Q.    Who else did you speak with?
12  A.    I don't know.
13  Q.    Was it with the -- oh, you mean the other --
14  when you -- with the New Kent sheriff's department and the
15  Florida police? Is that who you're referring to?
16  A.    Yes. I talked to many people trying to --
17  because --
18  Q.    Okay. I'm just going to stick with Experian
19  stuff right now. All right. So the next set of docs are
20  Experian subpoenas 71 through 88, which appears to be a
21  duplicate of Experian subpoena docs 169 through 186 and
22  Experian's disclosures 87 through 104.
23      This was not included in your disclosures,
24  but did you receive it nonetheless?
25  A.    Again, it's a collection of information I'm

27 (Pages 102 - 105)

Page 106

1  not really sure how to decipher.
2      Q.   My question is did you receive this document
3  mailed to the 8315 Mill Creek Road address.
4      A.   I believe so.
5      Q.   And, again, page -- there's no page number at
6  the top. It's going to be the second from the last page
7  has a summary of your rights under the Fair Credit
8  Reporting Act. Is that true?
9      A.   Do you have a page number?
10     Q.   No. It's -- it's not marked as a page
11  number, and the Bates numbering would be different. It's
12  the second from the last page.
13     A.   This is a summary again of my rights --
14     Q.   Yes.
15     A.   -- under the Fair Credit Reporting Act.
16     Q.   Okay. Thank you. Documents Experian
17  disclosure 127 through 130, 223 -- Experian subpoena 223
18  through 226. It's dated April 27th, 2015, indicating that
19  they added a initial security alert to your credit file,
20  mail being sent to 8315 Mill Creek Road.
21          You would have received this?
22     A.   Yes.
23     Q.   And if you turn to the second page, 2 of 4,
24  the information that you received through this mail
25  included a discussion with regard to remedying the effects

Page 107

1  of identity theft, correct?
2      A.   Yes.
3      Q.   And again it goes -- it lists those six
4  rights that you have that we previously discussed,
5  including right number 5, getting the consumer reporting
6  agency to block the information from your credit file by
7  filing an identity theft report, correct?
8      A.   Yes.
9      Q.   And also number 6, by -- your right to
10  prevent the business, such as Credit One, from reporting
11  information about you to consumer reporting agencies if
12  you believe the information is a result of identity theft.
13  And what you needed to do with that is also provide an
14  identity theft report, correct?
15     A.   Correct.
16     Q.   And -- thank you. You didn't provide a
17  identity theft report to either a credit reporting agency
18  or to Credit One in response to this letter that you
19  received?
20          MR. MARCHIANDO: Object to form.
21          THE WITNESS: Not that I'm aware of.
22  BY MR. SEARS:
23     Q.   Okay. This is your own documents, and it
24  indicates that you did receive it. It's plaintiff's
25  disclosure 60 through -- 58 through 75.

Page 108

1      A.   (Pause.)
2      Q.   Have you read that? And that's something
3  that -- that's a credit report that you received that also
4  includes a summary of your rights under the FCRA,
5  including a link to what to do about identity theft,
6  correct?
7      A.   I guess so.
8      Q.   Okay. Next set of documents, Experian
9  subpoena 187 through 204, dated May 1st, from Experian to
10  David William Wood at 3990 Chelsea Road address. And it
11  appears to be a duplicate of Experian subpoena 89 through
12  106 and Experian's disclosures 105 through 122.
13          So this is sent to 3990 Chelsea Road. You
14  would have received this; is that correct?
15     A.   I'm sure.
16     Q.   You have no -- as you sit here today, you
17  have no knowledge that you did not receive this; is that
18  correct?
19     A.   Correct.
20     Q.   And it indicates that again they are sending
21  you your credit report because they were advised that your
22  credit report is inaccurate due to fraud; is that true?
23     A.   That's what it says.
24     Q.   Okay. And again at the end, there is a
25  summary of your rights under the Fair Credit Reporting

Page 109

1  Act, which includes a link to information regarding those
2  who are victims of identity theft. Next to the last page.
3      A.   There's that same thing again, summary of my
4  rights.
5      Q.   Which includes the identity theft bullet
6  point with a link to a website.
7      A.   Yes.
8      Q.   I'm sorry?
9      A.   Yes.
10     Q.   Okay. And -- but in response to this, you
11  did not -- strike that.
12          Okay. This is plaintiff's disclosure ending
13  in 78 through 81, which appears to be duplicated in
14  Experian's disclosures 133 through 136 and Experian's
15  subpoena 229 through 232.
16          Sir, this was a communication from Experian
17  to you dated June 5th, 2015, being sent to 5781
18  Centerville Road. Was that an address that you were
19  associated with during that time period?
20     A.   Yes.
21     Q.   And this indicates that you had filed a
22  dispute and they're reporting the dispute results. Is
23  that a fair characterization of this report?
24     A.   Are you reading that?
25     Q.   Well, it just says Dispute Results at the top

28 (Pages 106 - 109)

Page 110

1  there.
2       MR. MARCHIANDO: Top of which page?
3       MR. SEARS: Page 1.
4       MR. MARCHIANDO: Oh, okay.
5       THE WITNESS: Yes.
6  BY MR. SEARS:
7       Q.   Okay. Second page, it says, Personal
8  statement you've asked us to include. And it says, You've
9  given us the following statement to include every time a
10 company asks us for your credit report.
11      Did you cause this personal statement to be
12 included on your report?
13      A.   That's what it says.
14      Q.   Okay. I'm not asking you what it says. I'm
15 asking you whether or not you agree with that statement,
16 that you -- that -- that you gave Experian the following
17 statement to include on your credit report.
18      A.   I agree with this statement.
19      Q.   You agree with the statement.
20      A.   Uh-huh.
21      Q.   Did you provide that statement to Experian?
22      A.   Yes.
23      Q.   Okay. How did you provide that statement to
24 Experian?
25      A.   Through my counsel.

Page 111

1       Q.   Okay. So by June of 2015, you had retained
2  counsel?
3       A.   Yes.
4       Q.   Okay. When did you retain counsel?
5       A.   I don't recall the exact date.
6       Q.   Was it in 2015 or 2014?
7       A.   I don't recall the exact date.
8       Q.   Do you remember the year?
9       A.   I don't recall the date.
10      MR. MARCHIANDO: You want this one back?
11      MR. SEARS: Yep.
12 BY MR. SEARS:
13      Q.   All right. I've handed to you a document
14 from plaintiff's disclosure. I didn't catch the numbers
15 at the bottom.
16      MR. MARCHIANDO: Okay. It is ending in 102
17 and 103.
18 BY MR. SEARS:
19      Q.   From Experian to Mr. Wood at the Centerville
20 Road address, dated June 9th, 2015. You obviously
21 received this since you disclosed it. The -- this appears
22 to be a letter to you regarding a dispute that you made
23 with regard to your credit report.
24      And if you look on the second page, it
25 indicates in the second paragraph that Experian is

Page 112

1  responding to a request that information in your personal
2  credit report be blocked due to alleged iden -- identity
3  theft.
4       So it looks like here you're exercising that
5  right number 5 to request a consumer reporting agency to
6  block the reporting of something. And it says that in
7  order to have the information removed, that you must send
8  a recent valid identity theft report or a valid copy of a
9  Federal Trade Commission affidavit with a police officer's
10 signature and police report number. And then it lists
11 what the identity theft report should include.
12      Did you send that identity theft report or a
13 copy of a Federal Trade Commission affidavit in response
14 to this letter?
15      A.   I'm not sure what -- what action I took next.
16      Q.   Well, by this time, you were represented by
17 counsel; is that correct?
18      A.   Correct.
19      Q.   So as you sit here, you -- you cannot say
20 that either you or your counsel filed an identity theft
21 report or a copy of the Federal Trade Commission
22 affidavit.
23      A.   I don't know the titles of the actions I
24 took, but I do know I did take actions.
25      Q.   Did you have -- what actions did you take in

Page 113

1  response to this?
2       MR. MARCHIANDO: Objection. And I'll
3  instruct the witness not to answer unless you can answer
4  without revealing confidential communications with your
5  attorneys.
6       THE WITNESS: Actions I do not know the
7  titles of.
8  BY MR. SEARS:
9       Q.   Explain them then. Describe them to me.
10      A.   I'm unable to answer.
11      Q.   What did you do? Did you go on a computer,
12 write a letter, make a telephone call to someone, fill out
13 a form?
14      A.   I don't know how to answer without revealing
15 communications.
16      Q.   Well, I'm not asking for a communication.
17 I'm asking for your action.
18      A.   I filled out some papers.
19      Q.   Were they papers provided by your counsel?
20      A.   I'm not sure of the true origin of the
21 papers, but --
22      Q.   Were they papers intended for your counsel's
23 eyes only or to be shared -- or filed with a third party?
24      A.   I wasn't that curious as to where they would
25 go.

29 (Pages 110 - 113)

Page 114

1   Q.   I don't understand.  You weren't curious?
2   A.   I -- I filled out the paper, and that was the
3 end of it.  I didn't really care where it went.
4   Q.   All right.  So it was only documents that you
5 filled out for your attorney.  You didn't fill out -- take
6 any other actions outside of what you did in working with
7 your attorney; is that correct?
8   A.   Correct.
9   Q.   Someone's playing a game and hiding papers on
10 me or something.  Or maybe I'm just absentminded and lost
11 it.
12       So the next thing I'm going to show you is
13 listed as Wood versus Equifax.  It's the plaintiff's
14 disclosures 86 through 87.  Duplicated at Experian's
15 disclosures 139 through 140 and Experian's subpoena 235
16 and 236.
17       All right.  So what we have here, then, is a
18 communication from Experian to you dated June 9th, 2015,
19 delivered to Centerville Road.  You received it because
20 you produced it.  And it says that the documentation you
21 provided with your dispute, they have determined that they
22 are now (sic) able to use it to make the changes or
23 deletions you requested.
24       So whatever you filled out and sent to them,
25 they couldn't use.  You don't remember what you sent to

Page 115

1 them?  It wasn't -- I mean, if I understand correctly --
2 this is horrible.  I'm asking tons of questions, so I need
3 to stop and go back.
4       So the question is, number one, what
5 documentation did you provide to Experian that they have
6 reviewed and determined that they're unable to use to make
7 changes?
8   A.   Some paper.
9   Q.   Some paper.
10   A.   I don't know.
11   Q.   You weren't curious enough to know what it
12 was or what the import of it was?
13   A.   In my several years of chasing this credit
14 reporting issue, I haven't really -- at this point I
15 hadn't had much luck.  So --
16   Q.   But now you have counsel.
17   A.   Correct.
18   Q.   You have a lawyer.  Correct?
19   A.   Right.
20   Q.   You're filling out a form that is going to be
21 provided to someone.  And they send it back and say,
22 Whatever you sent us, we can't use.
23       You don't remember what you sent them, and
24 you don't know what it was about; is that correct?
25   A.   That's correct.

Page 116

1   Q.   Do you have a copy of it?
2   A.   I don't remember what it was.
3   Q.   Well, I mean, it's not included in your
4 disclosures.  I wonder why.  Especially if it was
5 something that your counsel sent.
6       Did you send it or did your counsel send it?
7       MR. MARCHIANDO:  Are you sure it's not -- how
8 are you making the representation it's not included in our
9 disclosures?
10       MR. SEARS:  Maybe it is.  He can't
11 identify -- that's a fair point.
12       THE WITNESS:  We don't know what it is.  It
13 just says document.  So --
14 BY MR. SEARS:
15   Q.   Okay.
16   A.   You don't --
17   Q.   Would it be anything included -- strike that.
18       The only communication that's in your
19 disclosure that I've seen is an April 15th letter that
20 includes an explanation with regard to a dispute,
21 something that is -- appears to be an affidavit with your
22 signature on it and your mother's signature, and a card
23 for Sergeant Woodson with an incident number on it.
24       Do you recall whether or not that's the
25 documentation that you sent on June 9th, 2015?

Page 117

1   A.   It could be.  I sent that to everybody.
2   Q.   Okay.  When you received this communication
3 June 9th, 2015, that they were unable to use what you had
4 sent to them, what did you do in response to that?  And
5 I'm not asking about any conversations you had with your
6 legal counsel.
7   A.   I took whatever action I was advised to take
8 next, which would be the action I took.
9   Q.   What action did you take?
10   A.   The action I was advised to take next.
11   Q.   Well, what action -- I don't want to hear
12 about what the advice was, but what action did you
13 actually take next?
14   A.   I can't remember the specifics of the time
15 line.
16       MR. MARCHIANDO:  We're moving on to a new
17 document?
18       MR. SEARS:  Yes.
19       MR. MARCHIANDO:  Do you want this one back?
20       MR. SEARS:  Yes.  Thank you.
21 BY MR. SEARS:
22   Q.   All right.  So next is a document that you
23 disclosed.  So I think it's fair to assume --
24       MR. SEARS:  Correct me if I'm incorrect,
25 counsel, that he did receive this.

30 (Pages 114 - 117)

Page 118

1 BY MR. SEARS:
2    Q.   Plaintiff's disclosure 82 through 85 with
3 duplicates found at Experian's disclosures 141 through 144
4 and Experian's subpoena 237 through 240.
5    A.   Okay.
6    Q.   All right.  This is a letter dated June 9th,
7 2015, and it indicates that another secur -- initial
8 security alert is being sent -- or being set on your
9 credit report.  Is that a fair characterization?
10    A.   Where do you read that at?
11    Q.   Opening paragraph, Dear David William Wood,
12 in accordance with Experian's identity theft protection
13 policies, initial security alert has been added to your
14 credit file.
15    A.   That's what it says.
16    Q.   Okay.  And this is on the same date that
17 you're receiving -- no.  Let me restate that.  This is
18 dated the same date as the two previous correspondence
19 regarding the information that you sent to them that they
20 could not use.
21        And, again, on page 3 of 4, they're
22 indicating to you that you could block the consumer
23 reporting agency's reporting of you if you send them a
24 copy of an identity theft report.  Correct?
25    A.   Under what number?

Page 119

1    Q.   Number 5.  It's the same disclosures we've
2 seen before.
3    A.   That's what it says.
4    Q.   And number 6, that you could prevent a
5 business like Credit One, for instance, to stop reporting
6 if you sent them an identity theft report.
7    A.   It doesn't say anything about Credit One.
8    Q.   No, it doesn't.  I wasn't reading.  I was
9 paraphrasing.  That you may prevent businesses from credit
10 report -- from reporting information about you to consumer
11 reporting agencies if you believe the information is a
12 result of identity theft, correct?
13    A.   Correct.
14    Q.   And it says in order to do so, you must send
15 your request to the address specified by the business that
16 reports the information to the consumer reporting agency,
17 correct?
18    A.   Correct.
19    Q.   And it says that the business will expect you
20 to identify what information you do not want reported and
21 to provide an identity theft report, correct?
22    A.   Correct.
23    Q.   And one such business that you could have had
24 them stop reporting to the reporting agency is Credit One,
25 correct?

Page 120

1        MR. MARCHIANDO:  Object to form.
2        THE WITNESS:  It does not say Credit One will
3 comply once they get this report -- this identity theft
4 report.
5 BY MR. SEARS:
6    Q.   Did you ever send -- I've already asked this
7 question, and you've already answered that you had not.
8 But let me just ask specifically with regard to the
9 June 9th, 2015, again, letter advising you of your rights
10 and what to do, did you send an identity theft report to
11 Credit One regarding the account that you claim was opened
12 as a result of identity theft by sending that identity
13 theft report to an address specified by Credit One?
14    A.   No.
15    Q.   Can I have that?  Now, you said before that
16 in response to the June 9th letter that they couldn't
17 block your information because the information or
18 documentation you provided was not acceptable to them.
19 You said, well, whatever I did next was -- I did whatever
20 I was advised to do.  And I don't want to know what your
21 lawyer advised you to do.
22        But you would agree with me that Experian by
23 setting forth your rights and what to do about it is
24 something that a reasonable person could take into
25 consideration as to how to deal with this claim of

Page 121

1 identity theft that you -- you've been dealing with for a
2 considerable period of time.
3        MR. MARCHIANDO:  Object to form.
4        THE WITNESS:  I'm confused.  Are you calling
5 me unreasonable?  Or are you saying my actions were -- can
6 you rephrase the question?
7 BY MR. SEARS:
8    Q.   I'm not calling you anything, sir.  I'm
9 asking whether or not -- would you agree with me that it
10 would be reasonable that for someone trying to correct a
11 reporting of identity theft for them to take into
12 consideration the instructions that are being given to
13 them by a credit reporting agency several times over a
14 course of a period of time about what to do by filing a
15 identity theft report either with the credit reporting
16 agencies or with the data furnishers directly?
17        MR. MARCHIANDO:  Object to form.
18        THE WITNESS:  I would only agree if the
19 individual is able to digest the information and able to
20 use it.  Just because someone can write, say, instructions
21 on how to do brain surgery doesn't mean everybody can do
22 it.  Therefore --
23 BY MR. SEARS:
24    Q.   So just so I understand, you believe that the
25 instructions with regard to filing an identity theft

31 (Pages 118 - 121)

Page 122

1 report are more difficult for you than the process of
2 submitting a dispute with regard to the accuracy or
3 completeness of information? Because you did that time
4 and time again.
5    A.    Yes. One required --
6         MR. MARCHIANDO: Sorry.
7         THE WITNESS: One required one click of a
8 mouse. The other one -- this requires all the
9 instructions in there.
10 BY MR. SEARS:
11    Q.    All right. This is Experian -- no. This is
12 plaintiff's disclosure 88 through 101, dated June 24th,
13 2015, a letter from Experian to Mr. Wood at the
14 Centerville address. Appears to be duplicates of
15 Experian's disclosure 145 through 158 and Experian's
16 subpoenas 24 -- I'm sorry -- 241 through 254.
17         (Pause.) Okay.
18    Q.    All right. This is a -- appears to be a
19 correction summary, which is a -- a credit report that's
20 being sent to you that has corrections made after an ACDV
21 investigation has been conducted.
22         Is that a fair characterization based upon
23 your understanding?
24         MR. MARCHIANDO: Object to form.
25         THE WITNESS: It does say, Here are updated

Page 123

1 results.
2 BY MR. SEARS:
3    Q.    Okay. This is something that you would have
4 received because you disclosed it, correct? You would
5 have received it at the Centerville Road address?
6    A.    Makes sense.
7    Q.    You don't have any reason to dispute that you
8 did not receive this or --
9    A.    Not that I --
10    Q.    -- to state that you didn't receive it.
11    A.    Not that I'm aware of.
12    Q.    Okay. In the second column on the first
13 page, it indicates Credit One Bank. And it says, If
14 account was opened as a result of identity theft, the
15 credit granter may not know how to contact you to discuss
16 this matter. The credit granter requests that you contact
17 them directly.
18         Did I read that correctly?
19    A.    Where'd you read that at?
20         MR. MARCHIANDO: On the first page.
21         THE WITNESS: Yeah. I read that.
22 BY MR. SEARS:
23    Q.    Did I read that correctly?
24    A.    Yes.
25    Q.    Did you contact Credit One directly in

Page 124

1 response to this June 24th, 2015, correspondence from
2 Experian?
3    A.    Yeah.
4    Q.    You did?
5    A.    Uh-huh.
6    Q.    All right. When did you -- how did you
7 contact them directly?
8    A.    Phone.
9    Q.    You called them?
10    A.    Uh-huh.
11    Q.    What date did you call them?
12    A.    I don't know the dates.
13    Q.    You called them after you received this
14 June 24th, 2015?
15    A.    Yes.
16    Q.    What did you tell them?
17         MR. MARCHIANDO: I'm sorry. I didn't hear
18 the question.
19 BY MR. SEARS:
20    Q.    Tell me about that conversation.
21    A.    I asked them if they were going to remove
22 this identity theft, this item that is not mine.
23    Q.    What did they say to you?
24    A.    We need a police report.
25    Q.    Did you send them a police report?

Page 125

1    A.    No.
2    Q.    Why did you not send them a police report?
3    A.    I didn't know there was one.
4    Q.    You had filed a complaint with the
5 Woodbury -- or with the West Point Police Department.
6    A.    I made several attempts to try and get that
7 police report, all of which failed.
8    Q.    All right. So you said that you had tried
9 over a period of -- I forget how many months you said --
10 five, six, seven, maybe something like that. So did you
11 try again getting a police report after June 24th, 2015?
12    A.    No.
13    Q.    All right. So you receive this on June 24th,
14 2015, this correspondence from Experian saying contact
15 Credit One Bank. You state that you called Credit One
16 Bank, and they said, Send us a copy of the police report.
17 And after that phone call, you did not attempt to get a
18 copy of the police report. Is that correct?
19    A.    Correct.
20    Q.    Why?
21    A.    If I had tried seven times and all of which
22 failed, what then would -- how would I know that the
23 eighth, ninth, tenth, fifteenth time it would be
24 successful? If the answer to one plus one is two and I
25 keep trying to submit three as the answer, it's always

32 (Pages 122 - 125)

Page 126

1  going to be wrong.
2     Q.   All right. What are you referring to?
3         MR. MARCHIANDO: Objection, vague.
4  BY MR. SEARS:
5     Q.   Are you referring to your request with the
6  police department? Your previous requests? That you
7  didn't request again because they hadn't responded to your
8  request before, so you just decided it wasn't worth it?
9     A.   Albert Einstein defined insanity as trying
10  the same thing over and over again and expecting a
11  different result.
12     Q.   Okay. Your previous answer, I asked you why
13  you didn't call the police department to ask for the
14  report again. Is it my understanding that you didn't
15  think it was worth the effort to do because they had not
16  responded to your previous attempts to get a copy of the
17  police report?
18     A.   Correct.
19     Q.   Okay. When you were on the telephone with
20  Credit One, did you -- and they suggested to you to send
21  in a copy of the police report, did you tell them that
22  you'd been trying to get a copy of the police report but
23  they won't give it to you?
24     A.   I gave them the incident report number, a
25  phone number they could reach, and then they started the

Page 127

1  transfer game. They transferred me around until I would
2  hang up. Maybe an hour, 45 minutes later.
3     Q.   You were on the phone call for an hour, hour
4  and 45 minutes?
5     A.   Sometimes longer.
6     Q.   No. On this particular one. Is that your
7  recollection? It was an hour to an hour and 45 minutes?
8     A.   I don't remember exactly how long.
9     Q.   Okay. So back to my question, though. My
10  question was when Credit One told you to send in a copy of
11  the police report, did you tell them that you were having
12  difficulty getting a copy of the police report?
13     A.   Yes. I gave them the incident report number,
14  and it was -- I gave them the incident report number and
15  the number they could call.
16     Q.   All right. And did you have any discussion
17  with them? Did they suggest to you that perhaps you could
18  file an affidavit of fraud?
19     A.   No.
20     Q.   That never came up at all about an affidavit,
21  anything like that?
22     A.   No.
23     Q.   Did you tell them that you had an affidavit
24  that had been previously prepared --
25     A.   I don't know the --

Page 128

1     Q.   -- back in 2014?
2     A.   I don't know the terminology. But I did send
3  them that notarized thing I signed and had my mom sign.
4     Q.   Sent to who?
5     A.   Everyone.
6     Q.   Okay. You didn't send it directly to Credit
7  One. You sent it to --
8     A.   Oh, yes, I did.
9     Q.   Okay. When did you send it to Credit One?
10  Because we have no record that you sent it directly to
11  Credit One.
12     A.   I don't know the date.
13     Q.   You don't -- how -- how would you be able to
14  prove that you sent it to Credit One, directly to Credit
15  One?
16     A.   I can't.
17     Q.   Okay.
18         THE VIDEOGRAPHER: Excuse me, Mr. Sears. We
19  have six minutes left on the media.
20         MR. SEARS: Okay. Let me just finish up with
21  this, and then we can take a break.
22  BY MR. SEARS:
23     Q.   All right. So, sir, you -- you testified
24  that you -- after you received this request on June 24th,
25  2015, to call Credit One regarding the identity theft,

Page 129

1  that you did in fact call Credit One and had a lengthy
2  discussion with them.
3         In -- in reviewing the account history notes
4  that I have, I do not see any record of a phone call
5  during that time period or even on that date. So my
6  documentation does not verify that.
7         My question to you is other than your
8  testimony that that is something you did that day, are
9  there any witnesses or any other evidence that you can
10  port to -- point to to support the fact that you had a
11  conversation by telephone on June 24th, 2015, with Credit
12  One?
13     A.   I guess somewhere in the Middle East, whoever
14  that person was I talked to with the heavy accent, I'm
15  sure he remembers. Maybe the 10 or 15 people that I got
16  transferred to.
17     Q.   All right. So no one that -- that you would
18  be able to identify as we sit here today; is that correct?
19     A.   Correct.
20         MR. SEARS: Oh, we need to take a break. I
21  forgot.
22         THE VIDEOGRAPHER: This marks the end of
23  media number 3. We're going off the video record at
24  2:30 p.m.
25         (Recess.)

33 (Pages 126 - 129)

Page 130

1    THE VIDEOGRAPHER: This marks the beginning
2 of media number 4. We're back on the video record at
3 2:40 p.m.
4 BY MR. SEARS:
5    Q.   Mr. Wood, I am going to go through a series
6 of documents that have been produced by TransUnion. These
7 include correspondence to you from TransUnion of various
8 dates and likely to the same address. And if there's a
9 difference, I will note that. But it appears to all be to
10 the 3990 Chelsea Road, West Point, Virginia 23181-9733.
11    And I will be going in chronological order,
12 starting with December 29th, 2014, because we've already
13 dealt with a couple of them.
14    THE VIDEOGRAPHER: Excuse me, Mr. Sears. Do
15 you have your mike on?
16    MR. SEARS: No, I do not. Do you need me to
17 restart?
18    THE VIDEOGRAPHER: No. No. You're fine. I
19 have everything. It just seemed --
20 BY MR. SEARS:
21    Q.   And the purpose of this -- these series of
22 questions is just to confirm whether this is something
23 that, number one, you were receiving mail at this address
24 and, number two, whether you actually remember seeing
25 this. Okay?

Page 131

1    The first document is TransUnion 151,
2 December 29th, 2014. Did you receive that?
3    A.   Yes.
4    Q.   And if we could, I'm going to keep the cover
5 on these, but not designate them in the record. The next
6 one is designated TU159 through 168, dated December 31st
7 2014. Did you receive that?
8    A.   I believe so.
9    Q.   Any reason -- strike that. As you sit here
10 today, are you able to state that you did not receive
11 that?
12    A.   No.
13    Q.   Okay. Next is TU171 through 182. And if you
14 could for me, just turn it upside down and then pile the
15 rest of them on top. I think that would be easier. Dated
16 January 26, 2015. Did you receive that?
17    A.   Yeah. They all look similar to each other.
18    Q.   So your testimony is that you would -- that
19 you did receive that?
20    A.   They are all looking similar. I don't know
21 which ones specifically I received over the others. Is
22 there information in this one different than any of the
23 other ones? Looks like it's the same thing over and over
24 again. Perhaps we could save some time.
25    Q.   Are you able to state that you did not

Page 132

1 receive that?
2    A.   I cannot state whether or not I did not
3 receive this.
4    Q.   Okay. I am going to show you 203 -- I'm
5 sorry -- TU203 and 204. This is not correspondence. This
6 is -- appears to be a printout from the U.S. courts,
7 bankruptcy court in particular.
8    I believe during this time period the
9 disputed information that was being reported was one that
10 should have been discharged in bankruptcy, and I think
11 that that was the subject of your dispute.
12    So my question to you is did you provide this
13 information to TransUnion in support of your dispute?
14    A.   How else would they have gotten it?
15    Q.   Are you able to state that you did provide
16 that to TransUnion?
17    A.   Yes.
18    Q.   Okay. Next document is TU90 -- 194, dated
19 January 30th, 2015. Did you receive that?
20    A.   It looks similar to a paper I've already been
21 shown. Yes, I received one or both of them.
22    Q.   Are you able to state that you did not
23 receive that?
24    A.   I cannot.
25    Q.   Okay. Next document set, TU208 through

Page 133

1 TU219, dated February 10th, 2015. Did you receive that?
2    A.   This also looks similar to the other two we
3 just looked at.
4    Q.   Are you able to state that you did not
5 receive that?
6    A.   I cannot.
7    Q.   Next document set, TU252 through TU253, dated
8 April 27th, 2015. Did you receive that?
9    A.   Yes.
10    Q.   Okay. Next document set, TU257 through
11 TU272. Did you receive -- dated April 27th, 2015. Did
12 you receive that?
13    A.   Looks similar to the other four we've seen.
14 Yes.
15    Q.   Are -- are you able to state that you did not
16 receive that?
17    A.   I cannot.
18    Q.   Next document set, TU274 through 275, dated
19 April 27th, 2015. Did you receive that?
20    A.   Also looks similar to two of the other
21 documents we've seen.
22    Q.   Are you able to state that you did not
23 receive that?
24    A.   I cannot.
25    Q.   Next document set, TU282 through TU300, dated

34 (Pages 130 - 133)

Page 134

1 April 29th, 2015. Did you receive that?
2    A.   Looks similar to the other five we've just
3 looked at.
4    Q.   Are you able to state that you did not
5 receive that?
6    A.   I cannot.
7    Q.   Next document set, TU303 through 304, dated
8 June 9th, 2015. Did you receive that?
9    A.   Looks similar to the last three I just looked
10 at.
11    Q.   Are you able to state that you did not
12 receive that?
13    A.   I cannot.
14    Q.   Next document set, TU306 through 308. Did
15 you receive that?
16    A.   Looks similar to four of the documents I've
17 been shown.
18    Q.   Are you able to state that you did not
19 receive that?
20    A.   I cannot.
21    Q.   Okay. Bear with me on this. On TU306, first
22 page -- well, on that page towards the bottom it says,
23 R-E, active duty or fraud alert. It indicates, If you
24 have received an official valid identification theft
25 report from a federal, state, or local law enforcement

Page 135

1 agency, including the United States Postal Inspection
2 Service, and wish to add a statement to your file, please
3 contact TransUnion at, and it gives a phone number to
4 speak to a representative.
5         After receiving this correspondence, did you
6 contact a TransUnion representative regarding identity
7 theft?
8    A.   I did not.
9    Q.   Why did you not do that?
10    A.   I don't know. I just didn't.
11    Q.   Okay. Did you ever add a statement to your
12 credit report file regarding your position that the Credit
13 One credit card account was obtained fraudulently through
14 identity theft?
15         MR. MARCHIANDO: Objection, form and asked
16 and answered.
17         THE WITNESS: Yes.
18 BY MR. SEARS:
19    Q.   When?
20    A.   One of these documents actually has the date
21 that it was updated on. Do you --
22    Q.   Well --
23    A.   I can't -- if you can find that for me, I can
24 tell you the date.
25    Q.   Well, we had looked at the statement before,

Page 136

1 and it indicated that it -- you were providing notice to
2 other furnishers that your identity has been stolen and to
3 contact you directly. Is that the one you're talking
4 about?
5    A.   You asked me -- you wanted to know when I had
6 the comment added to Credit One. I don't understand how
7 that has any bearing on -- on that. But you did show me a
8 document earlier when Credit One was updated with that
9 comment. You do have that document. Show me it. I can
10 tell you the date. I remember seeing it a little while
11 ago.
12    Q.   Okay. I'm not going to argue with your
13 memory with regard to that document. I don't recall that.
14 What I recall -- and I will find it if you believe I've
15 shown it to you because it's important that we clarify
16 that.
17         But what I recall was a comment section that
18 we discussed where you provided notice to people who may
19 be thinking about extending credit that you felt your
20 identity had been stolen. Now, am I incorrect there? Is
21 there one that we've gone over today --
22         MR. MARCHIANDO: I'll object. Let's not play
23 who recalls what. We have it on the record. The court
24 reporter can read it. And we have a document. We can
25 look at the documents. Let's do that.

Page 137

1         MR. SEARS: I would like to look at the
2 document, but I don't know what document to look at.
3         MR. MARCHIANDO: Well, I think you do. You
4 just don't want to hunt for it. So --
5         MR. SEARS: I mean, we can do that. I'm just
6 asking for some clarification there. I will certainly go
7 through it.
8 BY MR. SEARS:
9    Q.   Was it an Experian document?
10    A.   I don't understand your system.
11    Q.   Well, it had to have been when we were going
12 through Experian.
13         MR. MARCHIANDO: I think it was an Experian
14 document.
15         MR. SEARS: Okay. I'm just asking for a
16 little help.
17         MR. MARCHIANDO: I'm trying to be helpful.
18 I'm not digging into your system either. I think it was
19 an Experian document. It was a blocked quote.
20         MR. SEARS: Right. I remember discussing a
21 statement, but I don't remember it applying to Credit One.
22 So that was my question.
23 BY MR. SEARS:
24    Q.   So if that's the one you're talking about,
25 we're on the same page. That's what I'll look for because

35 (Pages 134 - 137)

Page 138

1 I don't recall any other.
2     A.   I think it was a fairly thin page.
3     Q.   I believe it was a corrected credit report.
4         MR. MARCHIANDO:  That, I'm not certain of.
5 But I think it was one series of quotes or statements
6 and --
7 BY MR. SEARS:
8     Q.   Right there.  See, I'm not -- there we go.
9 Is this what you're talking about?
10    A.   There -- there was one that -- this is the
11 fraud alert.  This is not the comment.
12    Q.   Well, this says, Personal statement you've
13 asked us to include.
14    A.   You were asking about the comment added to
15 the Credit One account, not on all people looking for
16 credit.
17    Q.   That's correct.  And so there is --
18    A.   Why am I looking at this?
19    Q.   Because I don't -- okay.  Let me just back up
20 a second.  My question was did you add a comment
21 specifically with regard to Credit One.  And you believe
22 you did, correct?
23    A.   Yes.
24    Q.   Okay.  And I'm showing you this because I
25 don't know of any other statement that's been included

Page 139

1 anywhere.  And so I'm asking you is this what you're
2 talking about.
3         And what I take is the answer is no, that in
4 the documents that I have, there is a comment that you
5 added or a statement that you added specifically with
6 regard to the Credit One account.
7     A.   No.  Because this isn't even on the same
8 subject.  You're talking about an updated comment on the
9 Credit One file.  This is warning to all -- anyone who is
10 extending credit without first identifying the identity of
11 the applicant.  This isn't specific to a Credit One
12 account.  This is just --
13    Q.   Right.  And that's why I asked the question
14 did you provide a statement specific to the Credit One
15 account.
16    A.   Yes.  Somewhere you have a document -- you
17 want to go back through all the documents you've shown me,
18 we will find it.
19    Q.   That's fine.  I will accept your answer as it
20 is, that you have seen a document that has that on it.
21 Obviously, the documents speak for itself.  So -- and I
22 can derive the date from that.
23         So I have not seen that in my review, but if
24 you recall seeing it, then we'll let the documents speak
25 for themselves in that regard and get the date from that.

Page 140

1 So thank you.
2         MR. MARCHIANDO:  You want this back in?
3         MR. SEARS:  Yeah.  Let me see that.
4 BY MR. SEARS:
5     Q.   All right.  Next document set, TU002 through
6 TU004.  Did you receive that?
7     A.   This looks similar to the other six papers
8 I've seen in this.
9     Q.   Are you able to state that you did not
10 receive that?
11    A.   I cannot.
12    Q.   Next document set, TU007 through TU018, dated
13 October 21st, 2014.  Did you receive this?
14    A.   Looks similar to other documents I've already
15 seen, you've already shown me.
16    Q.   Are you able to state that you did not
17 receive that?
18    A.   I cannot.  I don't want to mess up your
19 system.
20    Q.   Thank you for the compliment that it's a
21 system.  I don't know if I would give it that.
22         All right.  Next document set, TU062 through
23 TU069, dated November 19th, 2014.  Did you receive that?
24    A.   This one looks different from the others.  I
25 don't recall getting this one.

Page 141

1     Q.   Are you able to state that you did not
2 receive that?
3     A.   I did not receive this one.
4     Q.   You did not receive that one?
5     A.   No.
6     Q.   Okay.  Can I take a look at it again, please?
7 All right.  On -- on what basis are you able to answer
8 that you did not receive this correspondence?
9     A.   I don't recognize it.
10    Q.   All right.  Let me ask you, November 19th,
11 2014, were you able to receive mail at 3990 Chelsea Road,
12 West Point, Virginia 23181-9733?
13    A.   I believe we've gone over I had a forwarding
14 placed on --
15    Q.   Well, you had -- sorry.  Go ahead.
16    A.   Whenever I needed to get mail somewhere else,
17 as trying to find a new place to go, I would put
18 forwarding on the previous address.
19    Q.   All right.  So my understanding of -- of the
20 issue with regard to forwarding was that you forwarded it
21 from the 8315 Mill Creek address.  So my understanding is
22 incomplete then?  Is that what I am to now understand?
23 That it also included the Chelsea Road?
24    A.   If you place a forwarding on the Kentwood
25 Avenue or whatever you just said address, mail going to

36 (Pages 138 - 141)

**Page 142**

1 that one will be forwarded to whatever new address you
2 give them. So then if you move to a different location,
3 let's say location Y, and you put a forwarding on location
4 Y to also reroute everything to location one, both will go
5 to the location you said. But only stuff that's going to
6 those addresses in question.
7    Q.   All right. Did you place a forwarding mail
8 request with the post office specifically with regard to
9 3990 Chelsea Road address?
10   A.   I believe so. Yes.
11   Q.   And when did you do that?
12   A.   I don't recall the date.
13   Q.   Do you have any documentation still from
14 that?
15   A.   No.
16   Q.   Is that a no?
17   A.   Not that I know of.
18   Q.   Okay. Next document set is TU114 through
19 TU125, dated December 18th, 2014. Did you receive that?
20   A.   Yes. I got this one.
21   Q.   All right. Thank you. I don't know if I've
22 covered this one or not. Document set TU128 through
23 TU139, dated December 25th, 2014. Did you receive that?
24   A.   Looks similar to many of the other documents
25 I've already seen.

**Page 143**

1    Q.   Are you able to state that you did not
2 receive that?
3    A.   I cannot.
4    Q.   Okay. Next document is TU30, dated
5 October 27, 2014. Did you receive that?
6    A.   I don't know.
7    Q.   Are you able to state that you did not
8 receive that?
9    A.   I don't know anything about it.
10   Q.   Are you able to state that you did not
11 receive it, though? Would you be able to testify under
12 oath that you did not receive that letter?
13   A.   No. Because I do not have enough memory -- I
14 don't remember ever getting a single sheet of paper like
15 this before. Usually, it's a pile like the other
16 documents you've sent. Is this removed from -- is there
17 more to this?
18   Q.   It indicates it's page 1 of 1.
19        TU72 through TU83, dated November 24th, 2014.
20 Do you know whether you received that?
21   A.   I don't know. Looks similar to the other, I
22 think we're at ten now, documents that I've gotten.
23   Q.   Are you able to state that you did not
24 receive that?
25   A.   I cannot.

**Page 144**

1    Q.   Okay. If you could hand me that back,
2 please. And then that other pile there. Much
3 appreciated. (Pause.)
4        MR. SEARS: Do you have real time?
5        THE COURT REPORTER: I don't have my laptop
6 with me. Otherwise, I would.
7        MR. SEARS: That's fine.
8 BY MR. SEARS:
9    Q.   I'm going to show you again the West Point
10 Police Department report, COB04157 and 158. I have a
11 question. Under the section that says Victims, the police
12 department redacted some information there but included a
13 ZIP code there under your name. Do you see that?
14   A.   Okay.
15   Q.   Do you recognize that ZIP code?
16   A.   I believe it is the River Bend Trail address,
17 Lanexa.
18   Q.   Yeah.
19   A.   I don't know. You can -- do you have the
20 Internet? You can do a search for the ZIP code.
21   Q.   My -- my understanding, because I've looked
22 at it, it appears to be Lanexa. So --
23   A.   There you go.
24   Q.   My question, though, is that on the same date
25 that you went in there -- well, I don't know it's the same

**Page 145**

1 day. December 9th you wrote that letter to Credit One
2 that we discussed earlier. That includes a different
3 address for you. And I will show that letter to you if
4 you want to see it. I believe it's the Mill Creek Road
5 address.
6        But my question to you would be why would you
7 place an address -- Lanexa address on the police report
8 but then in correspondence to Credit One include the Mill
9 Creek address.
10   A.   We've answered this before.
11   Q.   Okay.
12   A.   The police wanted to know where I physically
13 lived. Credit One wanted one that matched the application
14 on file.
15   Q.   All right.
16   A.   Do you want this back?
17   Q.   Yes. Thank you. I'm going to show you
18 what's been marked as your disclosure, plaintiff's
19 disclosure 104 through 111.
20   A.   (Pause.)
21   Q.   Have you had the opportunity --
22   A.   Uh-huh.
23   Q.   -- to look at it? Do you recognize that
24 document?
25   A.   Yes.

37 (Pages 142 - 145)

Page 146

1   Q.   What do you recognize that document to be?
2   A.   Whatever the terminology would be that I sent
3   in to the credit bureaus, I believe, about my identity
4   theft.
5   Q.   Okay.  Is that a document that you prepared?
6   A.   I had participation in preparing this.
7   Q.   Okay.  Who else participated in preparing
8   that document?
9   A.   Counsel.
10   Q.   All right.  That would be Consumer Litigation
11   Associates?
12   A.   Yes.
13   Q.   All right.  So before when we spoke, June 9th
14   correspondence, you had indicated that you were
15   represented by counsel at that point, but you couldn't
16   remember when you retained representations.
17        This is dated April 15th, 2015, and you
18   participated with counsel in preparing that.  Does that
19   help refresh your recollection as to when you retained
20   counsel in this case?
21   A.   I'm not sure how that would help me remember
22   something from post this.  But no.
23   Q.   Okay.  But you would have -- by April 15th,
24   2015, you would have been -- you would have -- you would
25   have retained counsel by that date; is that correct?

Page 147

1   A.   Did I have a lawyer at this point?  Yes.
2   Q.   Right.  Do you know whether or not your
3   lawyer contacted the Town of West Point Police Department
4   to try to get a copy of the police report?
5   A.   I don't know.
6   Q.   All right.  So if you go past the letter,
7   there is a -- I don't know what page it would be for you.
8   If you need help finding it --
9   A.   That thing there?
10   Q.   Yep, that's it.  So tell me about this
11   document.
12   A.   I made this.
13   Q.   You prepared that document?
14   A.   Yes.
15   Q.   Okay.  And it indicates -- there's a fax note
16   that it was sent to Credit Repair.  Do you recall sending
17   this to Credit Repair?
18   A.   This document I made, had my mom sign it and
19   notarized.  I signed it and notarized.  I sent this one to
20   everyone doing anything regarding my credit.
21   Q.   Right.
22   A.   This probably was the only one of the
23   surviving ones I had.  I sent this everywhere.
24   Q.   All right.  And the dates of signature,
25   there's one next to David Wood of October 29th and one

Page 148

1   next to Dyana -- Dyan Lollis of October 31st, 2014.  Is
2   that about the date that these were prepared in
3   October 2014?
4   A.   Yes.
5   Q.   Okay.  Where did your mother sign this?
6   Where was she when she signed it?  Let me ask that.
7   A.   Some notari -- notar -- notary in Florida.
8   Q.   Okay.  Is that your signature, David Wood?
9   A.   Yes.
10   Q.   Okay.  And Dyan Lollis, you did not sign
11   that.  Or did you?
12   A.   I am not Dyan Lollis.
13   Q.   Right.  You did not sign that -- make that
14   signature, did you?
15   A.   No.
16   Q.   Okay.  I ask because of the issue raised by
17   Sergeant Woodson in her police report with regard to
18   comparison of signatures.
19        All right.  So now I'm going to show you --
20   can I see that document again, please?  One more question
21   about this document before I move on.
22        Why did you not sign -- any reason you didn't
23   sign that in the signature block area of the letter?
24   A.   I believe the notary just said we could just
25   sign there and that'd be fine.

Page 149

1   Q.   Okay.  Now I'm going to show you -- well, I'm
2   not done with this one.  All right.  So who did you send
3   that letter to?
4   A.   Equifax, TransUnion, Experian (indicating).
5   Q.   Okay.  Did you send that letter directly to
6   Credit One?
7   A.   No.
8   Q.   Okay.  Now I'm going to show you document
9   sets TU220 through 235 and Experian disclosure 1 through
10   10.  And I want you to compare these documents.  It -- it
11   appears that the TransUnion disclosure and the Experian
12   disclosure contains the same document.
13        But the first thing I notice is that the
14   address at the top of the documents that TransUnion and
15   Experian has produced with regard to the April 15th
16   communication from you has the 87 -- I'm sorry -- 5781
17   Centerville Road address, whereas -- well, let me start
18   all over again.
19        The Experian Wood -- Experian disclosures set
20   of documents has Centerville Road, Williamsburg, Virginia,
21   as does the TransUnion 220 through 234 disclosures.  And
22   the disclosure that you made with regard to this version
23   of the letter has a Lanexa, Virginia.
24        What happened between the letter that you
25   produced to us and the letters that were received by

38 (Pages 146 - 149)

Page 150

1  TransUnion and Experian that resulted in the change of the
2  address information, if you recall?
3      A.   I think one of them I -- I moved and then
4  changed the address but then sent them out but then only
5  saved the one.  I don't know.
6      Q.   Okay.  You don't know.
7      A.   I don't know.
8      Q.   That's fine.  I don't know is an answer.
9           There's also some substantive changes, if you
10 look on the second page, I believe.  Yeah.  There are some
11 substantive changes in this as well.  All right.  Looks
12 like it's on the third page of the documents.
13          Appears that you had included a paragraph
14 regarding the police report in the documents that were
15 received by Experian and TransUnion.  And in fact their
16 documents include Sergeant Woodson's business card;
17 whereas, the document that you disclosed does not include
18 the business card.
19          Can you explain that?
20     A.   No.  I don't know.
21     Q.   Okay.  Now, despite the variations -- you
22 would agree with me that these are two different letters.
23 They're similar, but they're different.  The body of --
24 the language is different and -- and the --
25     A.   Language?

Page 151

1      Q.   -- address.  Well, I mean, you added a
2  paragraph that doesn't exist in the one that you disclosed
3  to us.  And it includes a different address for you.  You
4  can agree with that, correct?
5      A.   There's a sentence added that includes
6  Sergeant Wilson's (sic) incident number.
7      Q.   These two letters are not identical.
8      A.   No.
9      Q.   Okay.  Did you sign it and have it notarized
10 twice, or is that the same notary signature?  It looks
11 like one is reduced a little bit image size.
12     A.   That would be an effect of a 16 to 9 copier.
13     Q.   Right.  So even though the letters are
14 different, the -- the notary and your signature are the
15 same on both documents?  Is that the same specimen?
16 That's what I'm asking you.
17          MR. MARCHIANDO:  Object to form.
18          THE WITNESS:  I don't know specifically if
19 this one is a copy.  But I do remember with this -- with
20 this notary I did sign -- we did repeatedly sign these on
21 each -- each page.  This might have been the only one that
22 I retained for each copy sent, you know, to each bureau.
23 BY MR. SEARS:
24     Q.   Okay.  So this would be a fresh signature.
25 Comparing the documents, you would have signed them each

Page 152

1  individually?
2      A.   Originally, we signed each one individually.
3  I think I may have just sent the one.  I just made copies.
4      Q.   As a result of this letter being sent to
5  Equifax, TransUnion, and Experian, a dispute process
6  began, and in the -- is that your understanding?  This --
7  this resulted in a investigation of a dispute raised by
8  this letter that you had sent to those three entities?
9      A.   I don't know.  Do you have a document to help
10 me out with that?
11     Q.   Sure.  All right.  So, for instance, we have
12 the TransUnion copy of the letter, April 15th, 2015.  And
13 this is a document that's disclosed by TransUnion in their
14 disclosures.  You would have no reason to have any
15 knowledge with regard to this.  It is TU277 through 280.
16          And it indicates that a dispute was filed.
17 It was received on April 27th, 2015.  The disputes -- it's
18 a D2 code.  Claims true identity fraud, account
19 fraudulently opened, provider confirmed complete ID,
20 the -- and it indicates that you provided a comment.  It
21 says, Consumer comment, provided police report.
22          So based upon that, is it your understanding
23 that this letter resulted in a dis -- investigation of a
24 dispute as to information that was being reported on your
25 credit report regarding matters for which you claim

Page 153

1  identity theft as listed in your April 15th, 2015, letter?
2          MR. MARCHIANDO:  Object to the form.
3          THE WITNESS:  I don't know what any of that
4  means.  I just know at some point through some of the
5  actions I took resulted in a dispute.
6  BY MR. SEARS:
7      Q.   Okay.  So if -- if -- if the evidence were to
8  establish, Mr. Wood, that the April 15th, 2015, letter
9  that you sent resulted -- and you sent it to several
10 credit reporting agencies, including TransUnion --
11 resulted in an investigation of your dispute regarding
12 identity theft, you would have no reason to contradict
13 that evidence.
14     A.   Do you have evidence that --
15     Q.   I'm asking do you have any evidence to
16 contradict that.  If that was established, do you have
17 anything to contradict that this April 15th letter
18 resulted in a subsequent investigation?
19     A.   I don't understand this.  So I wouldn't know
20 whether I did or didn't.
21     Q.   Okay.  Did -- I'm going to show you a
22 document produced by TransUnion, and it's TU245.  Have you
23 ever seen that before?  Show it to your counsel first.
24          MR. MARCHIANDO:  It's fine.  I know what it
25 is.

39 (Pages 150 - 153)

Page 154

1    MR. SEARS:  Okay.
2         THE WITNESS:  I don't know what this is.
3  BY MR. SEARS:
4    Q.    All right.  If the evidence were to establish
5  that at least for TransUnion, when it received your letter
6  of April 15th, 2015, which opened an investigation on
7  their part as to your claim of identity theft, that they
8  rejected the documentation that you provided in support of
9  that, do you have any reason to believe -- strike that.
10        Do you have any knowledge as to whether
11 Credit One actually received the April 15th, 2015,
12 correspondence at least from TransUnion who indicates that
13 they rejected that?
14        MR. MARCHIANDO:  Object to form.
15        THE WITNESS:  What are you asking?  Which one
16 of those four questions am I to answer?
17 BY MR. SEARS:
18    Q.    It's one big, long question.  I apologize if
19 it's so long.
20        Were you aware at any time before today that
21 TransUnion found the law enforcement report that was
22 submitted to them and received by them via mail on
23 April 21st, 2015, not to be acceptable documentation to
24 support the dispute?
25        MR. MARCHIANDO:  Object to form.

Page 155

1         THE WITNESS:  As I've said before, I've
2  never -- I didn't see the police report until today.
3  BY MR. SEARS:
4    Q.    Okay.  My question is the information that
5  you sent to TransUnion via correspondence April 15th,
6  2015, were you aware that they -- in which you indicate
7  that you were including information regarding a police
8  report -- rejected that documentation because it was not
9  an actual police report?
10        MR. MARCHIANDO:  Object to form.
11        THE WITNESS:  It -- where -- where on there
12 does it say I -- I sent a police report?  It should say an
13 incident report.  Not police report.
14        MR. SEARS:  Okay.
15        MR. MARCHIANDO:  I'm sorry.  We need to go
16 off the record.  I guess you have an emergency.
17        (Discussion off the record.)
18        THE VIDEOGRAPHER:  We're going off the video
19 record at 3:39 p.m.
20        (Recess.)
21        THE VIDEOGRAPHER:  We're back on the video
22 record at 3:42 p.m.
23 BY MR. SEARS:
24    Q.    Do you have any direct knowledge as to
25 whether your April 15th, 2015, correspondence to Equifax,

Page 156

1  TransUnion, and Experian was actually ever provided to the
2  data furnishers who were conducting an investigation of
3  your dispute?
4         MR. MARCHIANDO:  Object to form.
5         THE WITNESS:  What data furnishers?
6  BY MR. SEARS:
7    Q.    Credit One.
8    A.    Credit One was --
9         MR. MARCHIANDO:  Same objection.
10        THE WITNESS:  I don't know.
11 BY MR. SEARS:
12    Q.    Okay.  Have you sustained any out-of-pocket
13 costs or expenses as a result of the Credit One account
14 being included on your credit report?
15    A.    What do you mean?  It negatively impacted my
16 credit.  I couldn't get apartments.  I had to keep moving
17 around.  I had to sometimes stay in a car because the
18 houses I was staying at wouldn't -- they were just tired
19 of having another person in the house.  Places I should
20 have gone, I couldn't.  People I should have seen, I
21 didn't.
22    Q.    Since the Credit One account was opened -- I
23 don't have a pen.
24        THE COURT REPORTER:  You can use mine.
25        MR. SEARS:  Thank you.

Page 157

1  BY MR. SEARS:
2    Q.    Have you applied for credit anywhere since
3  the Credit One account has been included in your credit
4  report?
5    A.    Between what period of time and what?
6    Q.    Well --
7    A.    Then -- the existence then all the way to
8  today?
9    Q.    The -- my records indicate -- you indicate
10 that -- that you noticed a Credit One account back in
11 2012.  Mine indicated it was opened in 2013.
12        So since 2013 to the present day, have you
13 applied for credit for which you have been denied or given
14 less favorable terms as a result of your credit report?
15    A.    Yes.
16    Q.    Where?
17    A.    Countless number of apartments ran my credit
18 report.  Would not let me move in.
19    Q.    All right.  I need names.
20    A.    I don't have them.
21    Q.    You don't know?  I mean, as you sit here
22 today, you can't identify any entity, any individual for
23 whom you have sought an extension of credit and they have
24 denied you because of what was being reported on your
25 credit report?

40 (Pages 154 - 157)

Page 158

1  A.  There were apartments.  I applied for I think
2 it was a Capital One credit card.  I tried to get a
3 personal loan.  I tried to -- I tried to get a -- I don't
4 know what they call it -- construction loan.  And I
5 attempted a -- some private school loan.
6  Q.  Any other categories?
7  A.  Tried to get a car.  That's all I can think
8 of at the time.
9  Q.  Okay.  What apartment places did you apply
10 for residency or tenancy and was denied because of your
11 credit?
12  A.  I don't remember the names.  Why would I
13 write them down if they decline me?  To remember them --
14  Q.  So as you sit here today, you cannot identify
15 any landlords that have refused to rent to you because of
16 your credit; is that correct?
17  A.  Correct.
18  Q.  When did you apply for a Capital One credit
19 card?
20  A.  I don't remember the date.
21  Q.  Did you respond to a solicitation or did you
22 seek them out?
23  A.  Solicitation.
24  Q.  Do you remember what year?
25  A.  I don't remember the date.

Page 159

1  Q.  Did you receive a denial letter from them?
2  A.  Yes.
3  Q.  Do you have a copy of that denial letter?
4  A.  No.
5  Q.  Who did you seek a personal loan from?
6  A.  I believe it's called Springleaf and Wells
7 Fargo.
8  Q.  And when did you seek a loan from Springleaf?
9  A.  I don't remember the date.
10  Q.  Do you remember the year?
11  A.  I don't remember the date.
12  Q.  When did you seek a loan from Wells Fargo?
13  A.  I don't remember the date.
14  Q.  Do you remember the year?
15  A.  I don't remember the date.
16  Q.  Did you receive denial letters from
17 Springleaf?  Or letter.
18  A.  Yes.
19  Q.  Do you have that letter?
20  A.  No.
21  Q.  Did you receive a denial letter from Wells
22 Fargo?
23  A.  Yes.
24  Q.  Do you have a copy of that letter?
25  A.  No.

Page 160

1  Q.  Do you recall the basis of the denial for
2 extension of credit from Springleaf?
3  A.  I'm trying to remember how they worded it.
4 Whatever their terminology is for missed payments greater
5 than X number of days.
6  Q.  How much were you seeking from Springleaf?
7  A.  8,000.
8  Q.  What were you planning to do with that?
9  A.  I owned a piece of land.  I was going to try
10 and put something up on it.
11  Q.  Do you still own that land?
12  A.  Yes.
13  Q.  And where is that land located?
14  A.  New Kent.
15  Q.  What is the address?
16  A.  New Kent won't give me an address because
17 there's no house on it.  It's tax ID 902.  Lot 902.
18  Q.  How much were you seeking from Wells Fargo?
19  A.  8,000.
20  Q.  What were you going to use that money for?
21  A.  Put something up on the land.
22  Q.  Who did you seek a construction loan from?
23  A.  Wells Fargo.
24  Q.  Different?  Or you -- you applied for a
25 personal loan through Wells Fargo?  Then you applied

Page 161

1 through Wells Fargo for a construction loan?
2  A.  The loan adjustor advised me a construction
3 loan I might have a better shot at.
4  Q.  So you submitted a second application?
5  A.  We didn't even get that far.
6  Q.  So you never submitted an application for the
7 construction loan?
8  A.  The loan adviser looked at my credit and said
9 that this would hurt my credit if I submitted it because
10 there's no way that would ever get approved with these
11 late -- missed late payments.
12  Q.  All right.  So the question was did you
13 submit a loan application to Wells Fargo for a
14 construction loan.
15  A.  No.
16  Q.  Who was the person you dealt with at Wells
17 Fargo?
18  A.  I don't remember his name.
19  Q.  Where was it located?
20  A.  Williamsburg.
21  Q.  Who's the person you dealt with at
22 Springleaf?
23  A.  I don't remember her name.
24  Q.  Where was that office located?
25  A.  One was in Gloucester, I believe, and the

41 (Pages 158 - 161)

Page 162

1 other one was Chester.
2    Q.    Who did you seek a school loan through?
3    A.    I don't remember what they -- what they call
4 this.
5    Q.    You don't remember the date. Who did you
6 seek it through?
7    A.    I don't remember the dates.
8    Q.    I'm sorry?
9    A.    I do not remember the dates.
10    Q.    I'm not asking you for the date. I'm asking
11 who did you seek the loan through.
12    A.    I don't remember the name. Some strange --
13    Q.    The name --
14    A.    Some strange name.
15    Q.    Okay. Did you say name before or dates? You
16 didn't remem --
17    A.    I do not remem --
18    A.    I heard you say the dates. Okay. All right.
19 So you don't remember who you sought a school loan
20 through, correct?
21    A.    It was -- correct.
22    Q.    Okay. Who did you seek a car loan through?
23    A.    When you go to a car dealership, they say
24 they got 150 banks or something like that. Then they run
25 the application through all that. I don't know who of

Page 163

1 them or anything. It's just one application you kind of
2 fill out.
3    Q.    What car dealership did you go to?
4    A.    Casey.
5    Q.    Casey?
6    A.    Not Casey. I'm sorry. CarMax.
7    Q.    What location?
8    A.    Newport News.
9    Q.    Did you submit an application?
10    A.    Yes.
11    Q.    Did you get a denial letter?
12    A.    I don't remember.
13    Q.    Do you have a copy of the application or the
14 denial?
15    A.    No, because I was denied in the store.
16    Q.    Any other entities for whom you have sought
17 an extension of credit?
18    A.    No.
19    Q.    Have you sustained any mental or emotional
20 distress as a result of the claims that you've asserted in
21 this case?
22    A.    Aside from having to stay in your car when
23 it's 17 degrees outside? Not being able to go anywhere,
24 have anyone come over. It's my family.
25    Q.    Are you telling me you lived out of your car

Page 164

1 for a while?
2    A.    Yes.
3    Q.    When was that?
4    A.    In between periods of time when the rooms
5 that I would stay in, when the land -- landlord or -- I
6 guess that's what you'd call them -- didn't want me in
7 there anymore or wanted a break. All I was able to do was
8 rent rooms from people, to find locations that were
9 actually renting rooms and stay in there.
10    Q.    How many nights have you spent in a car?
11    A.    I'm not scratching on the wall tally marks of
12 the nights. But it was a little over a month.
13    Q.    All at one time?
14    A.    It probably totals to a month. No, not at
15 all one time.
16    Q.    Okay. Do you know the months, years, that
17 you did this?
18    A.    No.
19    Q.    You know it was 17 degrees outside, right?
20 Does that help --
21    A.    It was obviously in the winter then.
22    Q.    All right. So winter of 2015? 2014?
23 2000 --
24    A.    I don't know the dates. The temperature
25 could be that degree any year.

Page 165

1    Q.    All right. So you lived in a car, when added
2 all together adds up to almost a month, and you can't
3 remember how long ago it was?
4    A.    Why would I write that down? That's not a
5 milestone I really want to remember.
6    Q.    Where would you park your car?
7    A.    At -- Wal-Mart lets you stay there all night.
8 They encourage 24-hour parking. Obviously, not to live
9 there. Various friends said it was okay to park on -- in
10 their yard. I don't know. Wherever.
11    Q.    All right. Tell me the friends who allowed
12 you to park on their yard when you lived in your car.
13    A.    Oh, geez. Some of them were the landlords I
14 used to stay at said it was all right to stay out there.
15 George Brannon. Samantha Cunningham. And Kevin Eugene
16 Bagby.
17    Q.    Is that it?
18    A.    There were more. I don't remember their
19 names. People I met in school. People that don't even
20 live here anymore.
21    Q.    Have you ever sought any counseling or
22 medical attention because of any emotional stress as a
23 result of your credit reporting?
24    A.    No.
25    Q.    Do you know when this case is scheduled for

42 (Pages 162 - 165)

**Page 166**

1 trial?

2    A.   No. What is this case?

3    Q.   This lawsuit that we're here about.

4    A.   Okay. No.

5    Q.   Have you ever talked with a gentleman by the

6 name of Evan Hendricks?

7    A.   Can you tell me more about the person?

8    Q.   You have identified him in your Rule 26(a)(1)

9 disclosures as a potential witness in the case.

10    A.   I don't know.

11    Q.   Has your credit score impacted any interest

12 rates that you have on current loans?

13    A.   I believe that's how credit works. The lower

14 it is, the higher interest you pay.

15    Q.   Okay. My question is have you had any loans

16 for which the interest rate has increased as a result of

17 your credit score.

18        MR. MARCHIANDO: Object to form.

19        THE WITNESS: I couldn't get any loans for

20 the interest rate to increase. So no.

21 BY MR. SEARS:

22    Q.   Do you have any loans right now?

23    A.   Yes.

24    Q.   Okay. What do you currently have loans for?

25    A.   I have a -- a student loan. And I have a --

**Page 167**

1 I guess it's a retail card, a PayPal credit card.

2    Q.   Anything else?

3    A.   No.

4        THE VIDEOGRAPHER: Excuse me, Mr. Sears. We

5 have six minutes left on the media.

6 BY MR. SEARS:

7    Q.   Okay. When's the last time you spoke to

8 Sergeant Woodson?

9    A.   A long time ago. I don't remember the date.

10    Q.   It would have been in her report. She

11 indicates the last time she spoke to you looks like

12 December 9th, 2014. Does that sound about right?

13    A.   Could be. I don't remember.

14    Q.   When's the last time you spoke to Dyan

15 Lollis?

16    A.   I believe it was 2015 sometime.

17    Q.   Does she know about this lawsuit?

18    A.   I don't -- I don't know.

19        MR. SEARS: That's all the questions I have.

20        MR. MARCHIANDO: We have no questions. He

21 will read and sign.

22        THE VIDEOGRAPHER: This concludes the

23 deposition of David William Wood. We're going off the

24 media at 4:05 p.m.

25        THE COURT REPORTER: Mr. Sears, are you

**Page 168**

1 ordering the original?

2        MR. SEARS: Yes.

3        THE COURT REPORTER: Mr. Marchiando, do you

4 wish to order a copy of the transcript?

5        MR. MARCHIANDO: Yes.

6        (The video deposition was concluded at

7 4:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 169**

1        C E R T I F I C A T E

2

3      I, the undersigned, DAVID WILLIAM WOOD, do hereby

4 certify that I have read the foregoing deposition and

5 that, to the best of my knowledge, said deposition is true

6 and accurate (with the exception of the following

7 corrections listed below):

8 Page   Line    Correction

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43 (Pages 166 - 169)

Page 170

1        C E R T I F I C A T E (Continued)

2

3 Page    Line    Correction

4

5

6

7

8

9

10

11 _____    _____

12 Date      Signature

13

14

15 STATE OF:        )

16 CITY OF:      ) To wit:

17

18

19    Subscribed and sworn to before me this _____ day

20 of _____, 2016, at _____, _____.

21

22

23

24          Notary Public

25 My Commission Expires:

Page 171

1 COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2    I, Sheila H. Matthews, a Notary Public for the

3 Commonwealth of Virginia at Large, of qualification in the

4 Circuit Court of the City of Newport News, Virginia, whose

5 commission expires June 30, 2019, do hereby certify that

6 the within deponent, DAVID WILLIAM WOOD, appeared before

7 me at Newport News, Virginia, as hereinbefore set forth;

8 and after being first duly sworn by me, was thereupon

9 examined upon his oath by counsel; that his examination

10 was recorded in Stenotype by me and reduced to typescript

11 under my direction; and that the foregoing transcript

12 constitutes a true, accurate, and complete transcript.

13    I further certify that I am not related to nor

14 otherwise associated with any party or counsel to this

15 proceeding, nor otherwise interested in the event thereof.

16    Given under my hand and notarial seal at Norfolk,

17 Virginia, this _____ day of _____, 2016.

18

19

20      Sheila H. Matthews, Notary Public

21      Notary Registration Number. 126500

22

23

24

25

Page 172

1         Veritext Legal Solutions

2      290 W. Mt. Pleasant Ave. - Suite 3200

         Livingston, New Jersey 07039

       Toll Free: 800-227-8440  Fax: 973-629-1287

3

4 _____, 2016

5 To: Craig C. Marchiando, Esq.

6 Case Name: David William Wood v. Credit One Bank

7 Veritext Reference Number: 2331616

8 Witness:  David William Wood    Deposition Date:  7/14/2016

9

  Dear Sir:

10

  Enclosed please find a deposition transcript.  Please have the witness

11  review the transcript and note any changes or corrections on the

    included errata sheet, indicating the page, line number, change, and

12  the reason for the change.  Have the witness' signature at the bottom

    of the sheet notarized except in California where they are signing

13  under penalty of perjury and forward the errata sheet back to us at

    the address shown above.

14

15

16 If the jurat is not returned within thirty days of your receipt of

17 this letter, the reading and signing will be deemed waived.

18

19

20 Sincerely,

21

22 Production Department

23

24 Encl.

25 Cc: Christopher Sears, Esq.

171

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2        I, Sheila H. Matthews, a Notary Public for the

3   Commonwealth of Virginia at Large, of qualification in the

4   Circuit Court of the City of Newport News, Virginia, whose

5   commission expires June 30, 2019, do hereby certify that

6   the within deponent, DAVID WILLIAM WOOD, appeared before

7   me at Newport News, Virginia, as hereinbefore set forth;

8   and after being first duly sworn by me, was thereupon

9   examined upon his oath by counsel; that his examination

10   was recorded in Stenotype by me and reduced to typescript

11   under my direction; and that the foregoing transcript

12   constitutes a true, accurate, and complete transcript.

13        I further certify that I am not related to nor

14   otherwise associated with any party or counsel to this

15   proceeding, nor otherwise interested in the event thereof.

16        Given under my hand and notarial seal at Norfolk,

17   Virginia, this 25th day of July , 2016.

18

19

20        Sheila H. Matthews, Notary Public

21        Notary Registration Number:  126500

22

23

24

25

TAYLOE COURT REPORTING LLC

171

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2         I, Sheila H. Matthews, a Notary Public for the

3   Commonwealth of Virginia at Large, of qualification in the

4   Circuit Court of the City of Newport News, Virginia, whose

5   commission expires June 30, 2019, do hereby certify that

6   the within deponent, DAVID WILLIAM WOOD, appeared before

7   me at Newport News, Virginia, as hereinbefore set forth;

8   and after being first duly sworn by me, was thereupon

9   examined upon his oath by counsel; that his examination

10  was recorded in Stenotype by me and reduced to typescript

11  under my direction; and that the foregoing transcript

12  constitutes a true, accurate, and complete transcript.

13        I further certify that I am not related to nor

14  otherwise associated with any party or counsel to this

15  proceeding, nor otherwise interested in the event thereof.

16        Given under my hand and notarial seal at Norfolk,

17  Virginia, this 25th day of July     , 2016.

18

19         _____

20         Sheila H. Matthews, Notary Public

21         Notary Registration Number:   126500

22

23

24

25

TAYLOE COURT REPORTING LLC