# MAXENE WEINBERG AGENCY, INC.

*Litigation Support From Opening to Verdict*

(800) 640-1949 Toll Free
(949) 582-8569 Fax
www.mwadepos.net

| | | | | |
|---|---|---|---|---|
| **Mission Viejo**<br>27281 Las Ramblas<br>Suite 160<br>Mission Viejo, CA 92691<br>(949) 582-2503 | **Los Angeles**<br>1801 Century Park East<br>24th Floor<br>Los Angeles, CA 90067<br>(310) 552-0702 | **San Diego**<br>525 B. Street<br>15th Floor<br>San Diego, CA 92101<br>(800) 640-1949 | **San Francisco**<br>201 Spear Street<br>Suite 1100<br>San Francisco, CA 94105<br>(800) 640-1949 | **Palm Desert**<br>77564 Country Club Drive<br>Suite 150<br>Palm Desert, CA 92211<br>(760) 341-7331 |

*Worldwide
Deposition &
Litigation
Support Services*

*Primary Affiliate
Offices:*

New York, NY

Washington, DC

Chicago, IL

Miami, FL

Fort Lauderdale, FL

Atlanta, GA

Philadelphia, PA

San Antonio, TX

Houston, TX

St. Louis, MO

Florham Park, NJ

Columbus, OH

Charlotte, NC

Charleston, SC

Nashville, TN

Richmond, VA

Wilmington, DE

Fresno, CA

Riverside, CA

June 6, 2016

Alexandra Chu
c/o Christopher Sears, Esq.
Cipriani & Werner, P.C.
500 Lee Street East
Suite 900
Charleston, WV  25301

Re:        David William Wood vs.
           Equifax Information Services, LLC, et al.
Case No.:  3:15-cv-594

Dear Ms. Chu:

The transcript of your deposition, taken 05/11/2016, in the above-entitled matter has been prepared and is now available for you to read, correct if necessary, and sign.  Pursuant to Federal Rule 30 (e), you have 30 days from the date of this letter to review your deposition.

Please contact our Client Services Representative at 800-640-1949 between the hours of 8:30 a.m. and 5:00 p.m. to schedule an appointment to review your deposition.

Sincerely,

MAXENE WEINBERG AGENCY
Litigation Support From Opening to Verdict


cc:    Susan M. Rotkis, Esq.
       Narine Yenovkian, Esq.

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                    RICHMOND DIVISION


DAVID WILLIAM WOOD,                    )
                                       )
                                       )
Plaintiff,                             )
                                       )
                    vs.                ) CASE NO.:  3:15-cv-594
                                       )
EQUIFAX INFORMATION SERVICES,          )
LLC, Et al.,                           )
                                       )
                                       )
Defendants.                            )
                                       )
```

```
                VIDEOTAPED DEPOSITION OF
     PERSON MOST KNOWLEDGABLE OF CREDIT ONE BANK,
                    ALEXANDRA CHU
                  LAS VEGAS, NEVADA
              WEDNESDAY, MAY 11, 2016
                10:04 a.m. - 1:44 p.m.



     REPORTED BY: JOHANNA VORCE, CCR NO. 913
```

ALEXANDRA CHU - 5/11/2016

---

**Page 2**

1  VIDEOTAPED DEPOSITION OF PERSON MOST KNOWLEDGABLE
2  OF CREDIT ONE BANK, ALEXANDRA CHU, taken at 3770 Howard
3  Hughes Parkway, Suite 300, Las Vegas, Nevada 89169,
4  on Wednesday, May 11, 2016, at 10:04 a.m., before Johanna
   Vorce, Certified Court Reporter, in and for the State of
5  Nevada.

6  APPEARANCES:

7  For the Plaintiff:
       Consumer Litigation Associates, P.C.
       Susan M. Rotkis, Esq.
8      763 J. Clyde Morris Boulevard
       Suite 1-A
9      Newport News, Virginia 23601
       757-930-3660
10

11 For the Defendant:
       CIPRIANI & WERNER, P.C.
       CHRISTOPHER J. SEARS, ESQ.
12     500 Lee Street East
       Suite 900
13     Charleston, West Virginia 25301
       304-341-0500
14     csears@c-wlaw.com

15 For CREDIT ONE BANK:
       CREDIT ONE BANK
16     NARINE YENOVKIAN, ESQ.
       585 Pilot Road
17     Las Vegas, Nevada 89119
       702-269-1190
18     narine.yenovkian@creditone.com
19
20 Also Present:        The Videographer, Jacob Florez
21
22
23
24
25

---

**Page 3**

1              I N D E X

2
3  WITNESS: ALEXANDRA CHU
4
5  EXAMINATION                    PAGE
6  By Ms. Rotkis                    6
7  By Mr. Sears                   108
8  FURTHER EXAMINATION
9  By Ms. Rotkis                  112
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1              INDEX (CONTINUED)
2
3
4
5              EXHIBITS
6
7  NUMBER                          MARKED
8
9  Exhibit A    Screenshots         108
10 Exhibit B    Screenshots         108
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1       LAS VEGAS, NEVADA; WEDNESDAY, MAY 11, 2016
2              10:04 A.M.
3              -oOo-
4       (The Court Reporter was relieved of her duties
5  under NRCP 30(b)(4).)
6       THE VIDEOGRAPHER:  This is the beginning of Disc
7  No. 1 of the video deposition of Alexandra Chu.  This
8  deposition is requested on behalf of plaintiff on the matter
9  of Wood versus Credit One Bank.  This is Case
10 No. 315-CV-594.  This deposition is being held at
11 3770 Howard Hughes Parkway, Number 300, Las Vegas,
12 Nevada 89169.  Today's date is May 11th, 2016.  The current
13 time on the monitor is 10:04 a.m.  We're on the record.
14      My name is Jacob Flores, the videographer.  I
15 represent -- I represent Litigation Services in Las Vegas,
16 Nevada.
17      Would counsel in the room please introduce
18 themselves for the record.
19      MR. SEARS:  Christopher Sears on behalf of Credit
20 One Bank.
21      MS. YENOVKIAN:  Narine Yenovkian with Credit One
22 Bank.
23      THE VIDEOGRAPHER:  Thank you.
24      Will counsel on the phone please introduce herself
25 for the record.

---

2 (Pages 2 to 5)

## Page 6

1    MS. ROTKIS: This is Susie Rotkis, participating
2 from my office in Newport News, Virginia for the plaintiff,
3 Mr. Wood.
4    THE VIDEOGRAPHER: Thank you.
5    Will our court reporter please swear in the
6 witness.
7    Whereupon,
8    ALEXANDRA CHU,
9 having been first duly sworn to testify to the truth, was
10 examined and testified as follows:
11
12    EXAMINATION
13 BY MS. ROTKIS:
14    Q. Okay. We are on the record. My name is Susie
15 Rotkis. I'm an attorney representing David Wood in the case
16 against Credit One Bank, and you've been identified as a
17 witness by your employer. And so you're not in any trouble.
18 I'm just here today to ask you questions about factual
19 things that you will or will not know. Okay?
20    If you would please answer audibly for the benefit
21 of the court reporter and the record. You can say "yes" or
22 "no," and then -- then provide any other elaboration as
23 appropriate. Just some -- I like to call them ground rules.
24 They're not really rules. That's just kind of an
25 explanation that I like to give at the beginning of a

## Page 7

1 deposition.
2    Have you ever had your deposition taken before?
3    A. No, I haven't.
4    Q. Okay. So I'm taking the deposition. I'll be
5 asking you questions, and if you would just wait a second
6 until I complete my question and give your attorney a chance
7 to interpose an objection if he so desires, and then you can
8 answer the questions, unless it's in that really narrow area
9 where your attorney may instruct you not to answer. I just
10 want to say I'm not asking you for any attorney-client
11 privilege information that falls within that narrow category
12 of testimony that you aren't protected from giving.
13    Do you have an attorney?
14    A. No.
15    Q. Okay. Is there anything that prevents you from
16 testifying truthfully today?
17    A. No.
18    Q. Okay. And will you please -- I know that you're
19 already provided this once, but will you please provide your
20 full name and spell it for the record.
21    A. My full name is Alexandra Chu, A-l-e-x-a-n-d-r-a;
22 last name, C-h-u.
23    Q. And what is your home address?
24    A. 5512 Jackpot Winner Lane, Unit 101, and that's in
25 Las Vegas, Nevada 89122.

## Page 8

1    Q. How long have you lived at that address?
2    A. About a year and five months.
3    Q. And where did you live before that?
4    A. You want the address?
5    Q. Yes, please.
6    A. Oh, 1070 Tonyville Avenue, Las Vegas,
7 Nevada 89149. I'm sorry. It's 9749 Tonyville Avenue. 1070
8 was a prior --
9    Q. And do you recall --
10    A. Sorry about that.
11    Q. Okay. Do you recall how long you've lived at the
12 Tonyville Avenue address?
13    A. Three years.
14    Q. Okay. Did you go to high school?
15    A. Yes.
16    Q. Where did you go to high school?
17    A. Cheyenne High School.
18    Q. And where is that located?
19    A. In Las Vegas, Nevada.
20    Q. Okay. And what year did you graduate?
21    A. 2010.
22    Q. And after high school, what did you do?
23    A. I began working and then later went to school.
24    Q. Where did you work after high school?
25    A. Global Cash Access, a gaming company.

## Page 9

1    Q. What did you do at Global Cash Access?
2    A. I was a customer service representative for a call
3 center.
4    Q. And where is Global Cash Access located?
5    A. They're in Las Vegas, Nevada.
6    Q. And how long did you work there?
7    A. Four years.
8    Q. And what were your duties as a customer service
9 representative?
10    A. I just answered inbound calls and processed
11 transactions for those trying to get money out of our ATM
12 machines.
13    Q. Okay. I'm sorry. I thought I understood you to
14 say it was a gaming company?
15    A. It is a gaming company. So we own the ATM
16 machines in the casino. They also did markers at the casino
17 for credit lines and things like that. We didn't have any
18 actual gaming machines.
19    Q. Okay. And how did you find out about that job?
20    A. My sister worked there.
21    Q. Does she still work there?
22    A. She does not.
23    Q. Did you receive any training for your job as a
24 customer service rep at Global Cash Access?
25    A. Yes.

3 (Pages 6 to 9)

ALEXANDRA CHU - 5/11/2016

Page 10

1    Q.  What kind of training did you receive?
2    A.  It was a weeklong side-by-side training.
3    Q.  What do you mean by "side-by-side training"?
4    A.  I worked with a seasoned employee who went through
5    the process with me.
6    Q.  And would it be fair to say that you handled
7    inbound calls from consumers?
8    A.  Yes.
9    Q.  Anyone else?
10   A.  No.
11   Q.  Why did you leave Global Cash Access?
12   A.  For an opportunity at a bank with Barclaycard.
13   Q.  Okay.  And do you re- -- recall when that was?
14   A.  I believe it was March of 2014.
15   Q.  And how did you find out about that job?
16   A.  They actually contacted me.  They were recruiting.
17   I must have had a résumé on a career Web site or something.
18   Q.  Okay.  And did -- how did they contact you?
19   A.  Via phone.
20   Q.  Okay.  And what was the job?
21   A.  Same thing like a customer service representative
22   handling inbound calls for general inquiries.
23   Q.  And did you get that job?
24   A.  Yes, I did.
25   Q.  And did you work at Barclaycard?

Page 11

1    A.  Yes.
2    Q.  And how long did you work there?
3    A.  I worked there for a year.
4    Q.  Did you receive any training to do your job --
5    A.  Yes, I did.
6    Q.  -- there?
7        And what kind of training did you receive?
8    A.  In-class group training for about six weeks.
9    Q.  Okay.  And what were the subject areas that you've
10   learned about in your six-week in-class training?
11   A.  Just general customer inquiries, how to navigate
12   the systems, where to find information, escalation,
13   processes, the procedures of the company and how to handle
14   the request, general stuff like that.
15   Q.  Okay.  Did you receive inbound calls from
16   consumers?
17   A.  Yes, I did.
18   Q.  And are they fi- -- financial services consumers?
19   A.  Yes.
20   Q.  And what were the consumer calls that were routed
21   to you?  What was the subject matter of those consumer calls
22   that were routed to you?
23   A.  It varied.  It depended on what they wanted.  If
24   need be, I would route it off to somebody else.  But it was
25   general, you know, payments, statement balance, late payment

Page 12

1    fees, things like that.
2    Q.  Okay.  Did you ever receive phone calls from
3    consumers there about disputes about their accounts?
4    A.  I would be the first point of contact for that,
5    but I -- I didn't handle that request or that concern.
6    Q.  Okay.  Okay.  And did you receive any training
7    about how to handle consumer account disputes when you were
8    there?
9    A.  Only to route it to the appropriate department.
10   Q.  Okay.  Do you remember what department that was?
11   A.  That would have been the disputes department.
12   Q.  Okay.  And did you learn anything about the Fair
13   Credit Reporting Act while you were at Barclays?
14   A.  No.
15   Q.  Okay.  And you said you were there about a year?
16   A.  Yes.
17   Q.  And why did you leave Barclays?
18   A.  For an opportunity with Credit One Bank.
19   Q.  And how did you learn about the job at Credit One
20   Bank?
21   A.  I know an employee who was already there.
22   Q.  And who was that that you knew that was already at
23   Credit One Bank?
24   A.  Sandra Moore.
25   Q.  Is she still there?

Page 13

1    A.  Yes.
2    Q.  Do you know what her job is?
3    A.  A fraud analyst.
4    Q.  How do you know her?
5    A.  For a long time, I was friends with her daughter.
6    Q.  How did you apply for the job at Credit One Bank?
7    A.  Through their Web site.  I sent in a résumé.
8    Q.  And what -- do you recall what job you applied
9    for?
10   A.  If I remember correctly, I don't think I actually
11   applied for a specific job.  I think it was just a general
12   send in your résumé and I'll tell you what's available.
13   Q.  Okay.  And what happened after you submitted your
14   application online?
15   A.  I got a call for an interview and I went in for
16   the interview.
17   Q.  Do you recall who called you for the interview?
18   A.  I don't remember.
19   Q.  Do you recall who you met with when you went in
20   for an interview?
21   A.  It was Traci Madura and another supervisor who has
22   left the company.  I don't recall her name.
23   Q.  Okay.  And so what happened after you went in for
24   the interview?
25   A.  We had the interview and then she sent me for

4 (Pages 10 to 13)

ALEXANDRA CHU - 5/11/2016

Page 14

1    fingerprints and drug testing the same day.
2        Q. Okay. Then what happened after that?
3        A. I was contacted once the results of my drug test
4    came in, and then there was a start date for that.
5        Q. Do you recall what your start date was?
6        A. March 30th of 2015.
7        Q. Okay. So you just -- you just completed about a
8    year and two -- almost two months --
9        A. Yes.
10       Q. -- at Credit One bank?
11          Okay. And did you receive any training at Credit
12   One Bank?
13       A. Yes, I did.
14       Q. What position were you hired for in March of 2015?
15       A. A fraud analyst.
16       Q. And what job are you doing now?
17       A. I'm still in fraud.
18       Q. And is your title still fraud analyst?
19       A. It's fraud investigator.
20       Q. When did you become a fraud investigator?
21       A. January of 2016.
22       Q. Is it a promotion to go from fraud analyst to
23   fraud investigator?
24       A. Yes.
25       Q. Who is your employer?

Page 15

1        A. Credit One Bank.
2        Q. Is that what it says on your paycheck?
3        A. Yes.
4        Q. Okay. Do you recall what your job description was
5    as a fraud analyst?
6        A. I don't remember specifics. I know that I
7    would -- it was to monitor reports and determine if there
8    were any fraud that we can catch.
9        Q. What reports did you monitor?
10       A. New applications, address change reports, Social
11   Security number change reports, reports where a -- there
12   were too many addresses for -- or too many cards with the
13   same addresses, things of that nature.
14       Q. How did you receive those reports?
15       A. Electronically through an Excel spreadsheet.
16       Q. Who sent the Excel spreadsheet to you?
17       A. I'm not sure. It was in our customer service
18   directory, and we would just go in there every day when it
19   populated and work the -- the spreadsheets.
20       Q. What else did you do as a fraud analyst?
21       A. I also processed the incoming ACDVs that came from
22   credit reporting agencies.
23       Q. Anything else?
24       A. No.
25       Q. Okay. Let's go back to your start date. When did

Page 16

1    you -- strike that.
2           Tell me about the training that you received at
3    Credit One Bank.
4        A. The training was side by side with a -- a seasoned
5    employee, and that was for -- depending on the task,
6    anywhere from a couple of days to about a week.
7        Q. Do you recall how long your training took?
8        A. For which process? Because they were different
9    each time.
10       Q. Well -- okay. Do you recall what the first thing
11   that you got trained side by side about was?
12       A. I don't remember.
13       Q. Do you recall who trained you to process ACDVs?
14       A. It was Jennifer Schmitt as well as Traci Madura.
15       Q. Remind me who Traci Madura is.
16       A. She's -- was my supervisor at the time.
17       Q. How many days did you spend learning how to do --
18   how to investigate an ACDV?
19       A. The investigation part was ongoing. I would say
20   it was anywhere between two to three weeks.
21       Q. Okay.
22       A. It wasn't side by side. It was kind of learn as
23   you go.
24       Q. Okay. How about for processing ACDVs? How long
25   did it take you to learn that --

Page 17

1        A. About three days.
2        Q. -- in side-by-side training?
3        A. I'm sorry. Three days.
4        Q. Tell me everything you remember about the training
5    you received about how to process ACDVs.
6        A. The beginning point was me sitting with Jennifer,
7    how to process and respond back to them, what codes to use.
8    And this was side-by-side training. She would -- the
9    procedures -- she had the procedures and she would just tell
10   me case-to-case scenarios on how to process it back. That
11   was for the -- responding to the credit reporting agency's
12   portion.
13          The investigation portion was more handled with
14   Traci and what she wanted us to look for. And we would kind
15   of just be at her desk, sort of like a side-by-side training
16   on what she would want us to look for, as well.
17       Q. Was there anybody else going through this training
18   with you at the same time?
19       A. Jennifer Tabor was there, as well.
20          MR. SEARS: Counsel, just for clarification, are
21   you talking about physically present at the same time or
22   during the same time period also undergoing training?
23   BY MS. ROTKIS:
24       Q. Was Jennifer Tabor physically present with you at
25   the same time that you were receiving training from Traci?

5 (Pages 14 to 17)

ALEXANDRA CHU - 5/11/2016

Page 18

1   A. Yes.
2   Q. Do you still process ACDVs?
3   A. No.
4   Q. You mentioned that you went back to school at some
5   point after high school. Did you go to college?
6   A. Yes.
7   Q. And when did you go to college?
8   A. I started January of 2011.
9   Q. And where did you go?
10  A. Nevada State College in Henderson, Nevada.
11  Q. And were you a full-time student?
12  A. Yes.
13  Q. And were you pursuing a degree -- a degree
14  program?
15  A. Yes, for psychologist.
16  Q. And what was that de- -- okay.
17  Did you complete your college degree?
18  A. No.
19  Q. How long did you attend Nevada State?
20  A. Two and a half years.
21  Q. Have you attended any other colleges or schools
22  after Nevada State?
23  A. No.
24  Q. Have you obtained any certificates or any kind of
25  licensure --

Page 19

1   A. No, I haven't.
2   Q. -- after high school?
3   A. No, I haven't.
4   Q. What is Credit One?
5   A. Credit One --
6   MR. SEARS: Do you understand the question? I
7   don't know that I understand the question.
8   MS. ROTKIS: Just let her.
9   MR. SEARS: Objection to form.
10  BY MS. ROTKIS:
11  Q. Okay. Ms. Chu, if you don't understand one of my
12  questions, you can say, "I don't understand your question,"
13  and I'll try to make it clearer for you, okay? But I think
14  it's an improper objection.
15  So what is Credit One Bank?
16  A. In regards to what they do, or --
17  Q. What is your understanding of what Credit One Bank
18  is?
19  MR. SEARS: Objection as to form.
20  BY MS. ROTKIS:
21  Q. You may answer.
22  A. It's a credit card company issuing credit to those
23  who need credit restoration help, from my understanding.
24  Q. Do you know whether Credit One issues any other
25  type of credit other than credit cards?

Page 20

1   A. I'm not aware if they do, no.
2   Q. Please tell me about how you were trained to
3   investigate fraud on new applications?
4   A. That was side-by-side training, as well. And the
5   training involved me in looking at Experian, looking for
6   inconsistencies in Social Security numbers and addresses,
7   things that don't fit the profile of the cardholder.
8   Q. Who taught you how to look at Experian to see
9   whether new applications might not fit the profile of the
10  cardholder?
11  A. That was Sandra Moore, as well.
12  Q. Is there anything else that you did to investigate
13  new applications?
14  A. Other than send out for validation, trying to get
15  in contact with the cardholder to see if they were the ones
16  who actually applied for the credit card.
17  Q. How did you try to get in touch with cardholders
18  to see if they were the ones who applied for the card?
19  A. We would pend the application and send them a
20  letter for validation.
21  Q. Did you ever call cardholders on the phone?
22  A. No.
23  Q. What did you do to investigate whether an address
24  change indicated fraud?
25  A. I'm sorry. Can you repeat that?

Page 21

1   Q. What did you do to -- learn how to investigate
2   whether an address change indicated there might be fraud?
3   A. We would look through our Experian application to
4   see if that address has ever been associated with the
5   cardholder. We would also look in Accurint as well to see
6   if there were any types of utilities or car registration,
7   driver's license, things to that nature under the
8   cardholders -- under the cardholder to see if it linked to
9   them.
10  Q. What were you trained to do to investigate whether
11  a Social Security change -- a Social Security number change
12  indicated fraud?
13  A. That would also be pulled through Experian as well
14  to see if we when we pull that Social Security number up, it
15  matched to the cardholder. If it didn't, it would be
16  blocked.
17  Q. How did you block it?
18  A. There was a -- a block placed on the account by
19  the bank restricting the card access, and then we would --
20  Q. And then what?
21  A. -- and then we would send a letter to the
22  cardholder as well asking them for the reason why that it
23  was updated to a different Social Security number.
24  Q. And then what would happen after that?
25  A. After that, my process was done. The corre- -- if

6 (Pages 18 to 21)

## Page 22

1 they sent any correspondence back, would go through a
2 different department, so I didn't handle anything from that
3 point going forward.
4    Q. Okay. Do you know what department that
5 correspondence would go to?
6    A. I believe it's just called "correspondence
7 department."
8    Q. Oh, okay. And do you know anybody who works
9 there?
10   A. I don't.
11   Q. Okay. You mentioned that too many cards with the
12 same address might indicate fraud. Tell me how you learned
13 to investigate whether there were too many cards with the
14 same address that might indicate fraud.
15   A. The same way. It would be side by side. We would
16 pull up every account that had that address and see if any
17 other type of suspicious activity was going on, determine if
18 it could be or could not be fraudulent at that point.
19   Q. What would indicate a suspicious activity?
20   A. Very large transactions out of their normal
21 spending, multiple changes on the account within short
22 period of time frames, phone numbers when looked up in the
23 system didn't match to anybody, it was a -- a number that
24 wasn't registered to anybody. Those were some of the flags.
25   Q. Okay. When you say "in the system," what system

## Page 23

1 are you talking about?
2    A. I'm sorry. It's Accurint.
3    Q. Okay. Are there any other systems that you used
4 to investigate the possibility of fraud?
5    A. Yes. Externally, it would have been things like
6 Accurint, Experian. There was a Speedpay application for
7 debit card transac- -- or payments. I'm sorry. And then a
8 system for ACH payments, and then another system for
9 physical checks sent through the mail, as well. As well as
10 our internal applications, as well.
11   Q. Do you recall the names of any of the internal
12 applications?
13   A. CAPS, CASH, Remitco, CAPS, and that -- that's all
14 that I remember.
15   Q. How about for physical payments that came in to
16 the bank?
17   A. Remitco.
18   Q. What about ACH?
19   A. I believe that -- I don't remember.
20   Q. Do you recall what -- were you able to access
21 Ex- -- Experian from a computer terminal?
22   A. Yes.
23   Q. And do you recall what the products were that you
24 accessed through your computer terminal at Experian?
25   A. I'm sorry. Can you repeat that?

## Page 24

1    Q. Do you recall what products you had access to?
2    A. I just did a Social Security number search.
3    Q. What kind of information was returned when you did
4 a Social Security number search on Experian?
5    A. It would have name, date of birth, other names
6 they may have gone by, spouse information if applicable,
7 address history and current address, phone numbers, and
8 current employers.
9    Q. Did it have any other credit information, other
10 credit that they had?
11   A. No.
12   Q. I'm sorry. Do -- do you still process ACDVs?
13   A. No.
14   Q. Okay. When did you stop processing ACDVs?
15   A. Late December of 2015.
16   Q. Okay. So at the time that you were working as a
17 fraud analyst processing ACDVs, tell me -- how many other
18 ACDV processers were there?
19   A. Two.
20   Q. And who were they?
21   A. Jennifer Schmitt and Jennifer Tabor.
22   Q. Do you know Chantel Reed?
23   A. I don't.
24   Q. Have you ever heard the name Chantel Reed?
25   A. Yes. Recently, yes.

## Page 25

1    Q. And how did you hear the name Chantel Reed?
2    A. Due to the deposition.
3    Q. Who told you the name Chantel Reed?
4    A. I don't remember specifically who told me that.
5    Q. How did you prepare for this deposition today?
6    A. I was prepped with Chris and Narine.
7    Q. And who -- who else knows that you're here in a
8 deposition today?
9    A. I'm not sure of everybody, but I know my
10 supervisors and also vice president in my department, as
11 well.
12   Q. Can you please tell me the names of all the people
13 who are your supervisors or vice presidents in your
14 department that know that you're here today?
15   A. Traci Madura, Frankie Rambay, Phillip Harris, Kim
16 Maragos, Tina Cook, and that's all I know who would know.
17   Q. Did you speak with Ms. Cook about your deposition?
18   A. No.
19   Q. Did you speak with any of the people who you just
20 named about your deposition?
21   A. No.
22   Q. How did you first learn that you were going to
23 give a deposition today?
24   A. Through a meeting with Narine and the people that
25 I mentioned, Kim Maragos, specifically.

7 (Pages 22 to 25)

ALEXANDRA CHU - 5/11/2016

|  | Page 26 |
| --- | --- |
| 1 | **Q.  When you say through Narine, did Narine tell you** |
| 2 | **that you were going to give a deposition?** |
| 3 | A.  Yes. |
| 4 | **Q.  What did she say to you?** |
| 5 | MR. SEARS:  Objection.  It's attorney-client |
| 6 | privilege. |
| 7 | MS. ROTKIS:  Is Narine -- oh, you're Narine. |
| 8 | Sorry. |
| 9 | **Q.  Anybody else tell you that -- anybody else talk to** |
| 10 | **you about your deposition?** |
| 11 | A.  Other than Chris here, no. |
| 12 | **Q.  Ms. Harris didn't discuss anything with you?** |
| 13 | A.  Phillip Harris?  No. |
| 14 | **Q.  I'm sorry.  Mr. Harris?** |
| 15 | A.  Oh, yes.  No, he -- he didn't. |
| 16 | **Q.  Okay.  Are you married?** |
| 17 | A.  I'm not. |
| 18 | **Q.  Do you live with anybody?** |
| 19 | A.  I do not. |
| 20 | **Q.  Did you tell anyone else that you were going to be** |
| 21 | **giving a deposition today?** |
| 22 | A.  No. |
| 23 | **Q.  Did you examine any documents preparing for your** |
| 24 | **deposition today?** |
| 25 | A.  I did.  My investigation of the ACDVs. |

|  | Page 27 |
| --- | --- |
| 1 | **Q.  And what specifically was included in your** |
| 2 | **investigation of the ACDVs?** |
| 3 | A.  They were screenshots of the incoming ACDV and the |
| 4 | information provided by the credit reporting agencies and |
| 5 | then my investigation screenshots of how that information |
| 6 | linked to the cardholder through some of the systems I |
| 7 | mentioned earlier, Accurint, CAPS, CASH. |
| 8 | **Q.  And so you have information about how that** |
| 9 | **information linked to Mr. Wood?** |
| 10 | A.  Yes. |
| 11 | **Q.  In the CAPS?** |
| 12 | A.  Yes. |
| 13 | **Q.  And in CASH?  And what's included in the CAPS** |
| 14 | **information?** |
| 15 | A.  The CAPS information would have been what was |
| 16 | provided on the application, so address, date of birth, |
| 17 | phone numbers, e-mail address if it was provided. |
| 18 | **Q.  And you can see where you looked at the CAPS** |
| 19 | **information in investigating the ACDV?** |
| 20 | A.  Yes. |
| 21 | **Q.  Okay.  And there were screenshots available of** |
| 22 | **that?** |
| 23 | A.  Yes. |
| 24 | **Q.  Okay.  Is there some kind of electronic audit** |
| 25 | **trail that I can look at that would have that information on** |

|  | Page 28 |
| --- | --- |
| 1 | it, as well? |
| 2 | MR. SEARS:  Counsel, I -- those were the three |
| 3 | documents that I sent to you -- two or three documents that |
| 4 | I sent to you yesterday that I told you I had not had time |
| 5 | to Bates stamp, but I was sending it to you. |
| 6 | MS. ROTKIS:  Okay.  All right. |
| 7 | MR. SEARS:  We had just learned that when she |
| 8 | conducted her investigations, she would document it in that |
| 9 | way. |
| 10 | BY MS. ROTKIS: |
| 11 | **Q.  Are you able to see whether an IP address is** |
| 12 | **attributable to a particular job of -- or a particular** |
| 13 | **credit applicant?** |
| 14 | A.  Yes.  You can see that through CAPS -- CAPS. |
| 15 | **Q.  And how do you determine whether an IP address is** |
| 16 | **attributable to a particular individual?** |
| 17 | A.  I'm sorry.  Can you rephrase that or -- I don't |
| 18 | understand. |
| 19 | **Q.  So -- okay.  What -- what is your understanding of** |
| 20 | **an IP address?** |
| 21 | A.  It's an address associated with a specific device, |
| 22 | whether it be a computer or a cell phone. |
| 23 | **Q.  Okay.  And is there a name associated with the IP** |
| 24 | **address that you have access to?** |
| 25 | A.  No. |

|  | Page 29 |
| --- | --- |
| 1 | **Q.  How do you -- can -- how can -- can you identify a** |
| 2 | **person by an IP address?** |
| 3 | A.  Not that I'm aware of, other than -- it's on the |
| 4 | application. |
| 5 | **Q.  What --** |
| 6 | A.  Go ahead. |
| 7 | **Q.  Okay.  So what -- what information can you** |
| 8 | **determine by looking at an IP address?** |
| 9 | A.  I personally can't.  I just know -- I see the |
| 10 | application and then I see what the IP address was for that |
| 11 | application.  It -- nothing more extensive than that. |
| 12 | **Q.  So between March of 2015 and December of 2015 when** |
| 13 | **you were processing ACDVs, just let -- let me kind of** |
| 14 | **explore that period of time.  Okay?** |
| 15 | **During that period of time, were you living on** |
| 16 | **Jackpot Winner?** |
| 17 | A.  Yes. |
| 18 | **Q.  Okay.  And about how far is that from your work?** |
| 19 | A.  Twenty minutes. |
| 20 | **Q.  And how do you get -- how do you get to work?** |
| 21 | A.  I drive. |
| 22 | **Q.  Okay.  And where do you park when you arrive at** |
| 23 | **work?** |
| 24 | A.  In a parking lot right outside of the -- |
| 25 | **Q.  So there's a parking lot associated --** |

8 (Pages 26 to 29)

ALEXANDRA CHU - 5/11/2016

Page 30

1    A. Yes.
2    Q. I'm sorry. There's a little bit of a delay, and I
3  talk right over you. That's my fault.
4    A. That's okay.
5    Q. So go ahead and just explain about the parking lot
6  and the building and that kind of stuff.
7    A. I am just parking right outside the doors of the
8  company. It's a small parking lot. It's right there at the
9  entrance.
10   Q. What kind of a building is the company in?
11   A. What do you mean? It's --
12   Q. Is it an office building?
13   A. Yes.
14   Q. Is it -- how many stories is that -- is the
15  building?
16   A. It's a single story.
17   Q. And are there any other tenants in that building?
18   A. There is a building that has another company in
19  it, but it is blocked off to us.
20   Q. Okay. And what Credit One departments are in the
21  building that you're in?
22   A. Fraud, correspondence, vendor support, and that's
23  all I can remember at this point.
24        MR. SEARS: And I just want to make sure the
25  witness is -- is clear.

Page 31

1        She's talking about the time period between
2  March 15th and December 15th.
3        THE WITNESS: Right.
4        MR. SEARS: Okay.
5  BY MS. ROTKIS:
6    Q. Do you have an ID badge that you use to get into
7  your building?
8    A. Yes, I do.
9    Q. Okay. And is -- is it required to get into your
10  office to have your ID badge?
11   A. Yes.
12   Q. Is there any kind of security that keeps people
13  without ID badges out?
14   A. Yes. Right at the entrance of the door.
15   Q. Is there a person there?
16   A. Yes.
17   Q. And is it a receptionist?
18   A. No.
19   Q. Is it a security person?
20   A. Yes.
21   Q. And is it a Credit One person?
22   A. I don't know.
23   Q. Okay. So you -- do you, like, hold your badge up
24  to a -- something that scans your badge that lets you in?
25   A. Yes.

Page 32

1    Q. And then what do you do after you enter the -- the
2  front door?
3    A. There's a set of -- type of gates that you have to
4  scan again and then the glass doors open for you, and then
5  there's a secondary door that doesn't require you to swipe.
6  You can just walk through and then you're in the office
7  building.
8    Q. And where do you go after you get through that --
9  those -- those second doors?
10   A. It's an open room so I go straight to my cubicle.
11   Q. And is that open room just fraud or does that
12  include correspondence and -- can't remember what the other
13  department is.
14   A. Vendor support. Yes, it includes them.
15   Q. Okay. Are there any offices in that room other
16  than cubes?
17   A. Yes, there is.
18   Q. How many offices are there?
19   A. I would say nine or ten.
20   Q. Do you know who occupied those offices?
21   A. Some of them are only for meetings. There are
22  three offices occupied by some of the executives, Jim
23  Shaughnessy, Jim B., and Laurie. I don't know her last
24  name.
25   Q. About how many cubes are there in the open room?

Page 33

1    A. I don't have an exact answer for that. Maybe 80,
2  80 to 100.
3    Q. Okay. So there's -- during this period of time,
4  there were two -- a total of three ACDV processers, you and
5  Jennif- -- Jennifer and Jennifer?
6    A. Correct.
7    Q. Right?
8    A. Correct.
9    Q. All right. And how many fraud investigators were
10  there?
11   A. Probably approximately 20.
12   Q. Okay. And are all the cubicles filled with people
13  working?
14   A. During that time, no.
15   Q. Okay. During that time, were you employed full
16  time by Credit One Bank?
17   A. Yes.
18   Q. And were you an hourly employee or a salaried
19  employee?
20   A. Hourly.
21   Q. And do you recall what your hourly wage was when
22  you started working at Credit One Bank?
23   A. $15.00.
24   Q. And did you receive any raises during that -- that
25  period between March of 2015 and December of 2015?

9 (Pages 30 to 33)

ALEXANDRA CHU – 5/11/2016

Page 34

1    A. Yes, I did.
2    Q. And are you still an hourly employee?
3    A. Yes, I am.
4    Q. And what's your current wage?
5    A. $15.60.
6    Q. And how do you -- like in the olden times, we used
7  to clock in. We'd take a time card and clock in.
8        What -- what -- how is it done these days?
9    A. It's done through the computer through our ADP
10  system. We log in username, password, and then hit clock
11  in, and it clocks our time.
12    Q. Okay. And did you work in the same cube every
13  day?
14    A. Yes.
15    Q. And now, do you still have that cube?
16    A. Yes.
17    Q. Okay. And so when you go in and you -- you log in
18  to ADP, what is the first thing that comes up on the screen
19  after you log in?
20    A. The first thing is things like announcements,
21  employer discounts that you get for working for the
22  employee. Across the top is different sections. I'm not --
23  I'm not familiar with all of them. I just go straight to
24  the one where I clock in.
25    Q. Okay. And then after you clock in, what do you

Page 35

1  do?
2    A. Is -- are you talking about currently or at the
3  time that I was doing the ACDVs?
4    Q. Very good. I'm just still focused on the -- on
5  the point in time when you were working on ACDVs, March
6  through December. Well, we'll catch up to modern time in a
7  couple of minutes.
8    A. Okay. At that time, I was logging in to -- I was
9  setting up my screen for all of my investigation tools, all
10  of the applications that I mentioned prior, as well as
11  pulling up e-OSCAR to work from the queue for the ACDVs
12  responding and investigating to them.
13    Q. When you say "investigation tools," and then you
14  mentioned the applications that you mentioned before, is
15  that the same thing? Are they applications, your
16  investigation tools?
17    A. Yes.
18    Q. Are there any other investigation tools that you
19  used that you didn't mention yet?
20    A. A system called P360. That is for any written
21  correspondence that the customer provided to us. And
22  occasionally a Google search, but not very often, and that's
23  it.
24    Q. Okay. How -- when you conduct an investigation,
25  how do you maintain the information about that

Page 36

1  investigation?
2        MR. SEARS: Objection as to form.
3  BY MS. ROTKIS:
4    Q. You may answer.
5    A. Can you repeat the question?
6    Q. When you conduct an investigation, how do you
7  maintain the information about the investigation?
8    A. Maintain, like keep the information for my own
9  records?
10    Q. Well, not for your own -- I'm just -- I'm
11  wondering, you know, when you're conducting an
12  investigation -- I don't know how many you do yet. We'll
13  get to that in a minute. I'm really just looking for, like,
14  when -- you know, I only have my own point of reference.
15  I'm really just sorting this for the first time from you.
16  When I'm doing an investigation, you know, I start out with
17  the manila folder and then we go to binders and I'm still,
18  you know, an ancient dinosaur. I have that on paper. I
19  have some things electronically in a folder with my client's
20  name on it, so I'm just asking you, like, how do you -- how
21  do you do that? I mean, you're -- you know, you've
22  mentioned all these different tools. I want to know how you
23  put the investigation together, and if you maintain the
24  information, how do you do it?
25    A. Well, I do the screenshots or snippets of it, and

Page 37

1  I take bits and pieces of where I found the information and
2  compile it into a Word document for it to make sense so you
3  can understand how -- how I linked the information.
4    Q. And how did -- did you learn to do that?
5    A. How did I? Is that what you asked?
6    Q. Yes. How did you learn to do that?
7    A. That was taught by Traci Madura. We have an
8  application, a snipping tool, that we can just snip out the
9  parts of the screen we want and paste it into a document.
10    Q. Do you think that's something that Traci taught
11  you to do -- is -- is that what she expects you to do when
12  you conduct an investigation?
13    A. Yes.
14    Q. Okay. And is that -- is that expected of you when
15  you investigate an ACDV, as well?
16    A. Yes.
17    Q. Okay. All right. So what's the first thing you
18  did after you got your screen set up and you pulled up the
19  OSCAR to look at the queue?
20    A. I pulled up and an ACDV is picked out random by
21  the system, and then I look at the ACDV. I'm looking for --
22  if there were any images provided by the credit reporting
23  agencies. I'm looking at the information that was provided
24  by the credit reporting agencies and then verifying if
25  that's the information that we have in our system.

10 (Pages 34 to 37)

ALEXANDRA CHU - 5/11/2016

Page 38

1  Q. What information are you looking for specifically
2  to verify that it's the information in your system?
3  A. Initially, I'm looking at things like addresses,
4  Social Security matches, date of birth, prior addresses, as
5  well. That's the investigation part of the ACDV.
6  Q. Anything else?
7  A. Dispute code. We want to know what they're
8  disputing, if it's identity theft or account takeover, and
9  that determines kind of how we work the case, as well.
10  Q. Okay. If the dispute code is identity theft, what
11  do you do next?
12  A. Well, I'm verifying the information as I've
13  mentioned, so I'm verifying the information that was
14  provided to me, what we have on the account, you know, if it
15  was the same information that was provided on the
16  application, if it was once -- if it was at any point the
17  information on the account if it isn't currently.
18  Q. Okay. And that would be Social Security number,
19  right?
20  A. Social Security number, addresses and any previous
21  addresses that were pro- -- provided on the ACDV, date of
22  births, yes, like that.
23  Q. And name?
24  A. And name, yes.
25  Q. Okay. All right. And after you verify all that

Page 39

1  information in the investigation, what do you do for a
2  dispute code? What did you do for dispute code of identity
3  theft?
4  A. In -- we would -- if none of that information
5  matched our system that was provided on the ACDV, if I
6  couldn't verify, I would then go, you know, more thoroughly
7  into it and look into our -- the other systems, such as
8  Accurint, Experian, Remiteo, try to find other ways to see
9  if the cardholder once had that account or is it their
10  account.
11  Q. Okay. So you would go into an additional system
12  only if you had a mismatch in those items that you conducted
13  the initial -- initial investigation; is that correct?
14  A. No, not necessarily, no. It wouldn't be where I
15  stopped.
16  Q. Okay. What would -- if you -- if you did not have
17  a mismatch in those four items of information that you
18  mentioned, what would you do next?
19  MR. SEARS: Objection as to form of the question
20  and mischaracterizes her testimony.
21  BY MS. ROTKIS:
22  Q. You may answer.
23  A. Can you repeat the question?
24  Q. If you did not have a mismatch in those four items
25  of information that you used to conduct the initial

Page 40

1  investigation, what would you do next?
2  MR. SEARS: Same objection.
3  BY MS. ROTKIS:
4  Q. You -- you may answer.
5  A. I would verify the rest of the information on the
6  account payment history and report it back to the credit
7  reporting agencies appropriately.
8  Q. What would be the appropriate report back to a
9  credit reporting agency if all the four items of information
10  matched?
11  MR. SEARS: Objection as to form and
12  mischaracterizes her previous testimony.
13  BY MS. ROTKIS:
14  Q. You may answer.
15  A. I would hold the cardholder responsible for that.
16  Q. Okay. So you would -- what is that called when
17  you say -- do you have a special term of art if the
18  cardholder is responsible?
19  A. Do I have a special what, I'm sorry?
20  Q. Term of art. Is there a special term that you --
21  that you use in your industry when you say that the
22  cardholder is responsible?
23  A. No.
24  Q. Okay. So if someone is claiming identity theft in
25  an ACDV between March of 2015 and December of 2015, and all

Page 41

1  of the information matches your system, is there any way
2  that it goes on to a secondary investigation?
3  MR. SEARS: Objection. Asked and answered.
4  THE WITNESS: Yes. If we receive another dispute,
5  there would be another investigation.
6  BY MS. ROTKIS:
7  Q. Okay. About, on average, how many ACDVs would you
8  have in your e-OSCAR queue per day?
9  MR. SEARS: Objection as to form. Calls for
10  speculation.
11  MS. ROTKIS: Okay. Chris, I'm going to ask you to
12  please refrain from these form speaking objections. You may
13  object to form.
14  Q. You can speculate. You can guess how many you had
15  per day. That's fine. Please answer the question.
16  A. Are you asking how many came through the queue per
17  day or how many did I process a day?
18  Q. How many ACDVs would you usually process per day?
19  A. I would process anywhere between 80 to 100 a day.
20  Q. Do you know on average about how long it would
21  take you to process each ACDV?
22  A. It varied. I would say the average would be about
23  five minutes -- five, six minutes.
24  Q. How many hours per day did you work during that
25  period of time?

Maxene Weinberg Agency
(800) 640-1949

Page 42

1   A.  It was an eight-hour workday.
2   Q.  What time did you arrive at work?
3   A.  6:00 a.m.
4   Q.  And what time did you clock out?
5   A.  2:30 p.m.
6   Q.  Were you able to take any breaks?
7   A.  Yes.
8   Q.  What -- what was the break schedule?
9   A.  The morning break was 15 minutes.  We had a
10  30-minute lunch and then an afternoon break of 15 minutes.
11  Q.  Did you clock out when you took your breaks and
12  your lunch?
13  A.  Only my lunch.  I would not clock out for breaks.
14  Q.  Do you have a break room at the office building?
15  A.  Yes.
16  Q.  Did you use the break room for your breaks?
17  A.  Sometimes, yes.
18  Q.  What else do you do on your break?
19  A.  Go outside and sit on the benches outside of the
20  entrance.
21  Q.  What about for lunch?  What did you usually do for
22  lunch?
23  A.  I would usually be in the break room.
24  Q.  Do you usually bring your lunch?
25  A.  Yes.

Page 43

1   Q.  And who was your direct supervisor during this
2   period of time?
3   A.  Traci Madura.
4   Q.  And did she supervise you also for the fraud
5   analyst duties that you had?
6   A.  Yes.
7   Q.  You know, speaking of break, I forgot to mention
8   at the beginning, Ms. Chu, that if you need a break, like if
9   you need to go to the bathroom or something, just let me
10  know.  I'm not, you know, some cruel person who makes you
11  sit there when you got to go, so just let me know.
12  A.  Okay.
13  Q.  All right.  And it's fine.  You can take a five-
14  or ten-minute break pretty much at any time.
15  I would just ask that when you need a break, that
16  you just -- if we have a question pending, you just answer
17  it first and then we'll take care of that.  Okay.
18  So I'm just -- I'm taking out my calculator
19  because I'm trying to figure out -- let's see.
20  About how much of your day did you spend
21  processing ACDVs in your queue?
22  A.  In the beginning, it would be about 75 percent of
23  my day, and then she would have me in there for a hundred
24  percent of my day.
25  Q.  Okay.  So the fraud analyst part of your job

Page 44

1   investigating applications and address changes, Social
2   Security number changes, and too many cards at the same
3   address, when did you do that portion of your job?
4   A.  It was throughout the day because the reports
5   sometimes weren't generated until later in the day, so it
6   was at different times.
7   Q.  Okay.  So like you might interrupt what you were
8   doing on your ACDV queue -- I'm sorry, your e-OSCAR queue to
9   look at the Excel spreadsheet that had the fraud analyst
10  duties.  Is that --
11  A.  Well, I wouldn't --
12  Q.  -- what you're saying?
13  A.  I wouldn't interrupt my current investigation.  I
14  would finish that and then go on to the Excel spreadsheets.
15  Q.  Did you have a certain number of ACDVs that you
16  were expected to process --
17  A.  No.
18  Q.  -- each day?
19  A.  No.
20  Q.  How about each week?
21  A.  No.
22  Q.  Each month?
23  A.  No.
24  Q.  Did anybody ever mea- -- measure how many ACDVs
25  you were able to process in a given time period?

Page 45

1   MR. SEARS:  Objection as to form.
2   THE WITNESS:  Not -- not -- no.
3   BY MS. ROTKIS:
4   Q.  Were you ever aware at any time of anybody
5   evaluating your performance?
6   A.  Yes.  We would have --
7   Q.  Do you know how your performance --
8   A.  Oh, I'm sorry.
9   Q.  No.  I talked right over you again.  I'm sorry.
10  A.  What was your question?
11  Q.  Were you aware at any time of anyone evaluating
12  your performance?
13  A.  I was aware it was being done.  I wasn't aware of
14  when exactly it was done.
15  Q.  Did you know what criteria was used to measure
16  your performance?
17  A.  I don't.
18  Q.  Did anyone ever tell you what they expected of you
19  in the performance of your job?
20  MR. SEARS:  Objection as to form.
21  THE WITNESS:  Can you repeat the question for me?
22  BY MS. ROTKIS:
23  Q.  Did anyone ever tell you what was expected of you
24  in the performance of your job?
25  A.  In the performance of it, yes.  They would want to

12 (Pages 42 to 45)

ALEXANDRA CHU - 5/11/2016

Page 46

1    make sure I was thorough.
2        Q.  Who explained to you what your -- what the
3    expectations were for the performance of your job?
4        A.  Traci Madura.
5        Q.  And what did she tell you?
6        A.  That we wanted to be thorough in our investigation
7    and have a trail of how we came to that conclusion, which
8    would be the screenshots I mentioned earlier.
9        Q.  And how -- how did you know if you were doing a
10   good job?
11       A.  We had monthly one-on-one meetings.  And she would
12   let me know if my performance was up to par.  She would
13   evaluate my ACDVs and my investigation and let me know if I
14   was doing well.
15       Q.  Please tell me everything you remember that Traci
16   discussed with you one on one about your performance.
17       A.  She let me know that when she reviewed my
18   investigation, she -- there weren't any issues.  I wasn't
19   responding back to the ACDV incorrectly.  She let me know
20   that I was doing fine.
21       Q.  So when you conducted your investigations, you
22   were doing a good job according to your supervisor?
23       A.  Yes.
24       Q.  Okay.  You were doing everything that credit one
25   wanted you to do?

Page 47

1        A.  Yes.
2        Q.  Okay.  Good.
3            Did Traci ever tell you about how much time you
4    should spend on investigating an ACDV?
5        A.  No.
6        Q.  Did any other employee ever tell you about how
7    much time you should spend on investigating an ACDV?
8        A.  No.
9        Q.  Did anybody ever measure how many ACDVs you were
10   able to process in a given period of time?
11       A.  No.
12       Q.  Did you ever receive any written evaluations in
13   addition to these one-on-one meetings you had with Traci?
14       A.  No.
15       Q.  Do you know how many new applications you
16   investigated when you were a fraud analyst during this
17   period of time?
18       A.  No.
19       Q.  Do you have any idea how many address changes you
20   investigated during this period of time?
21       A.  No.
22       Q.  Like with the new applications, do you think it
23   was more than ten?
24       A.  Daily?
25       Q.  Just -- well, more than ten a day?

Page 48

1        A.  Yes.
2        Q.  Okay.  Was it more than 20 new applications per
3    day that you investigated?
4        A.  Yes.
5        Q.  Was it more than 30 new applications a day that
6    you investigated?
7        A.  Yes.
8        Q.  Was it more than 40 new applications per day that
9    you investigated?
10       A.  Yes.
11       Q.  Was it more than 50 new applications per day that
12   you investigated?
13       A.  Yes.
14       Q.  Was it more than 60 new applications per day that
15   you investigated?
16       A.  Yes.
17       Q.  Was it more than 100 new applications per day that
18   you investigated?
19       A.  Yes.
20       Q.  Was it more than 200 new applications per day that
21   you investigated?
22       A.  Yes.
23       Q.  With respect to address changes, was it more than
24   200 address changes that you investigated per day?
25       A.  No.

Page 49

1        Q.  Was it more than ten address changes?
2        A.  No.
3        Q.  Social Security number changes, was it more than
4    ten Social Security number changes that you investigated per
5    day?
6        A.  It varied.  But usually, yes.
7        Q.  Was it more than 20?
8        A.  Yes.
9        Q.  Was it more than 60?
10       A.  No.
11       Q.  Too many cards with the same address, how many of
12   those would you investigate per day?
13       A.  That was actually part of the new application
14   process, so it varied.
15       Q.  Okay.
16       A.  It wouldn't be on every new application, so I
17   don't know how many.
18       Q.  Okay.  About how much time do you think it would
19   take you to investigate a new application?
20       A.  It's usually one to two minutes for an
21   application.
22       Q.  Please tell me everything that you did between
23   March of 2015 and December 2015 to investigate new
24   applications.
25       A.  I would bring up the application.  There -- I

13 (Pages 46 to 49)

Page 50

1  would check a tab within the application process at that
2  would trigger flags such as, you know, the too many
3  addresses or if an e-mail address was linked to this
4  application -- this new application and other applications
5  as well.  I would pull up those ones and determine whether
6  or not there was any fraudulent activity on those ones as
7  well.
8      Q.  What kind of fraudulent activity would you be
9  looking for?
10     A.  Large authorizations, multiple attempts within a
11 short period of time, address changes, e-mail changes, phone
12 number changes, new authorized user right before all of the
13 changes happened, things like that.  Things that don't link
14 to the cardholder.
15     Q.  If you detected some fraudulent activity on a new
16 application, what would you do?
17     A.  I would decline the application or I would block
18 the application and ask for validation.
19     Q.  Okay.  And did all new applications come through
20 fraud analysts like you?
21     A.  From my understanding, yes.
22     Q.  Is there anything else that supervised you during
23 this period of time other than Traci?
24     A.  At the time, Phillip Harris was a lead for my
25 department, and I would report to him if I had any

Page 51

1  questions.
2      Q.  Okay.  And did they -- did Traci walk around to
3  supervise the people that she supervised?
4      A.  No.
5      Q.  Or did she sit at her desk?
6      A.  She was at her desk.
7      Q.  Could she monitor your work remotely from her
8  computer?
9      A.  I don't know.
10     Q.  Okay.  Were you ever trained in Credit One
11 policies regarding the Fair Credit Reporting Act?
12     A.  No.
13     Q.  Do you know what the Fair Credit Reporting Act is?
14     A.  No.
15     Q.  Do you know what ACDV stands for?
16     A.  No.
17     Q.  Other than -- do you know what a credit reporting
18 agency is?
19     A.  Yes.
20     Q.  What is your understanding of credit reporting
21 agencies?
22     A.  It's an agency that collects data from creditors
23 for the cardholder to report credit worthiness.
24     Q.  What credit reporting agencies are you familiar
25 with?

Page 52

1      A.  Experian, TransUnion, Equifax.
2      Q.  Does Credit One receive ACDVs from these credit
3  reporting agencies?
4      A.  Yes.
5      Q.  Any other credit reporting agencies?
6      A.  No.
7      Q.  Do you have a telephone at your desk?
8      A.  I do.
9      Q.  When do you use your telephone?
10     A.  When I'm making -- during that time frame, I
11 didn't really use my phone.
12     Q.  If -- do you recall ever using your phone to call
13 a consumer while you were investigating an ACDV?
14     A.  I don't recall, no.
15     Q.  Do you know whether your telephone calls are
16 recorded when you're talking on your phone at your desk?
17     A.  I don't know.
18     Q.  You mentioned earlier that sometimes you do a
19 Google search.  Is Google accessible from your computer
20 terminal?
21     A.  Yes.
22     Q.  Have you received any security training about how
23 to keep your computer and keep the company safe when using
24 the Internet?
25     A.  Yes.

Page 53

1      Q.  What kind of training have you received in that
2  regard?
3      A.  That was group training with head of security and
4  he just went through the basics of, you know, them blocking
5  account -- or I'm sorry, blocking Web sites that we
6  shouldn't be accessing, not putting any passwords in, you
7  know -- you know, things to that effect.
8      Q.  Okay.  Do you have Wi-Fi at your work?
9      A.  Not that I'm aware of.
10     Q.  Do you have a file cabinet at your cube?
11     A.  I do.
12     Q.  What do you have in your file cabinet?
13     A.  I have notes, procedures, general office supplies,
14 pens, paper, notebook, things like that.
15     Q.  Can you recall what procedures you have in your
16 file cabinet?
17     A.  At that time, it would have been the ones that
18 were printed out to me during training, which was for the
19 Social Security number, ACDVs, address change, new
20 applications.
21     Q.  Do you think you still have that in your file
22 cabinet?
23     A.  I'm sure I do.  I haven't thrown it away.
24     Q.  Okay.  Do you have access to any databases?
25     A.  Can you give me an example or what do you mean?

14 (Pages 50 to 53)

ALEXANDRA CHU - 5/11/2016

Page 54

1    Q.  Well, sometimes lenders and creditors maintain
2  databases about their consumers, about their account
3  holders.  And so sometimes people who work at a creditor or
4  lender can pull up this database and type in the person's
5  name or their Social Security number and get the account
6  information.
7        Do you have any access to anything like that?
8    A.  Yes.  That's our CAS and CASH systems.
9    Q.  Do you know what cast --
10   A.  And CASH.  I'm sorry?
11   Q.  Do you know what that stands for?  Do you know
12  what -- is CAS an acronym?
13   A.  It is, but I don't know what that is.
14   Q.  Do you know what CASH is an acronym for?
15   A.  I don't.
16   Q.  What about CAPS, does that have account holder
17  information in it?
18   A.  It has application information on it.
19   Q.  Okay.  Can you access account history?
20   A.  No, not through CAPS.  Or in general?
21   Q.  Yes.
22       Can you access it in general?
23   A.  Yes.
24   Q.  Okay.  Can you enter notes into any of those
25  systems about consumer accounts?

Page 55

1    A.  Yes.
2    Q.  What systems can you enter notes in?
3    A.  I can enter notes into CAS, CASH, and CAPS.
4    Q.  Okay.  What's CAPS?
5        MR. SEARS:  I think you may have misheard.
6        Can you restate what you said?
7        THE WITNESS:  Yes.  CAS, CASH, and CAPS.
8  BY MS. ROTKIS:
9    Q.  Oh, and CAPS.  Okay.
10       Have you received any bonuses since working at
11  Credit One?
12   A.  Yes.
13   Q.  And tell me about the bonuses you've received.
14   A.  It was a company-wide holiday bonus.  Everybody
15  received it.
16   Q.  Okay.  Anything else?
17   A.  No.
18   Q.  Have you participated in any incentive program
19  offered by your employer?
20   A.  No.
21   Q.  Do you provide training to any employees?
22   A.  I have, yes.
23   Q.  Okay.  What employees have you trained?
24   A.  I've trained an employee named Bonnie Knight and
25  an employee named Angel Jennings.

Page 56

1    Q.  And what have you trained those individuals to do?
2    A.  Process ACDVs.
3    Q.  Okay.  Does anyone report to you?
4    A.  No.
5    Q.  And since January of 2016, you said you don't
6  process ACDVs anymore, right?
7    A.  That's correct.
8    Q.  And that period that we talked about, March of
9  2015 through December of 2015, did you ever process any
10  direct disputes from consumers?
11   A.  Direct disputes?  Does written correspondence
12  count?  Because, yes, I have done that -- oh, I'm sorry, I
13  apologize.
14   Q.  Okay.  Yes, yes, that is --
15   A.  That wasn't through March.
16   Q.  That's okay.  I mean -- go ahead.
17   A.  It wasn't during that time frame.  That's been
18  since January.  So during the time frame of March to
19  December, no, I haven't.
20   Q.  Okay.  All right.  Now, we just call them direct
21  disputes because, you know, the -- usually, people who do
22  ACDVs get the disputes through e-OSCAR, right?
23   A.  Right.
24   Q.  But a lot of times, the consumers don't know that
25  they're supposed to send a -- a dispute to the consumer

Page 57

1  reporting agency so they just go first to the creditor?
2    A.  Right.
3    Q.  And we call it a direct dispute, but that's why
4  sometimes I need to -- you know.  Sometimes counsel's
5  objections are correct when it's maybe not clear, so -- all
6  right.
7        Do you have access to any policies or procedures
8  on your desktop?
9    A.  Yes.
10   Q.  And how do you access policies and procedures on
11  your desktop?
12   A.  Through our CAS system.  There is a drop-down menu
13  for us to see all of the -- all of the procedures.
14   Q.  And what procedures do you -- did you use between
15  March of 2015 and December of 2015?
16   A.  I don't know the name of them offhand.  But I know
17  that I used fraud, the fraud manual, and I used the e-OSCAR
18  manual as well and then within those manuals are the
19  different job function.
20   Q.  Okay.  Do you know what a furnisher is?
21       MR. SEARS:  Objection as to form.
22       THE WITNESS:  No, I don't.
23  BY MS. ROTKIS:
24   Q.  Have you ever heard the term "identity theft"?
25   A.  Yes.

15 (Pages 54 to 57)

Page 58

1    Q.   What do you understand identity theft to be?
2    A.   Identity theft, from my understanding, is when
3  somebody unbeknownst to the actual person has taken over
4  their identity and used it to obtain credit or goods, things
5  that would harm them.
6    Q.   What -- what is your understanding of this
7  lawsuit?
8    A.   That we held a customer responsible several times
9  for an account he says he did not open.
10    Q.   I've sent over some documents that your employer
11  supplied to us in discovery.  And did you look at any of
12  these documents before your deposition today?
13    A.   No.
14    MR. SEARS:  Well --
15  BY MS. ROTKIS:
16    Q.   You haven't looked at any of these documents?
17    A.   Well --
18    MR. SEARS:  Clarification.  She hasn't seen the
19  exhibits.  She may have seen the documents themselves, but
20  she has not reviewed this exhibit book.  So I would say --
21    MS. ROTKIS:  Okay.
22    MR. SEARS:  -- she probably doesn't know what
23  documents are in here exactly.
24  BY MS. ROTKIS:
25    Q.   All right.  Did you provide any documents related

Page 59

1  to this lawsuit to be produced in this case?
2    A.   The screenshots is what I've provided.
3    Q.   Okay.  And -- and that -- and when did you do
4  that?
5    A.   I'm sorry, when did I provide it?
6    Q.   Yes.
7    A.   Yesterday.
8    Q.   When did you first find out that you were going to
9  give a deposition?
10    A.   I don't know exactly.  Maybe a month ago.  I don't
11  know exactly.
12    Q.   Before you were asked to give a deposition in this
13  case, had anybody talked to you about any of the facts of
14  this case?
15    MR. SEARS:  Objection, calls for attorney-client
16  privilege.
17  BY MS. ROTKIS:
18    Q.   Were you aware of -- did you provide any documents
19  to anybody about this case prior to a month ago?
20    A.   No.
21    Q.   All right.  If you would please look at the
22  exhibits under tab 1.
23    MR. SEARS:  Counsel, when you reach a good spot, I
24  do need to take a break, so --
25    MS. ROTKIS:  Oh, yeah.  No problem.  We've been

Page 60

1  going for an hour and a half and we probably are getting
2  cl- -- how are we doing on the videotape?
3    THE VIDEOGRAPHER:  This says an hour and
4  32 minutes on a two-hour disk, so we have 28 minutes left.
5    MS. ROTKIS:  Oh, okay.  Let's just take a break
6  then be back in five or ten?
7    MR. SEARS:  Let's do ten.  Okay?
8    MS. ROTKIS:  Okay.
9    MR. SEARS:  Thank you.
10    THE VIDEOGRAPHER:  The time is 11:37 a.m.  This is
11  the end of Disc 1.  Off record.
12    (Discussion off the record.)
13    THE VIDEOGRAPHER:  This is the beginning of Disc
14  No. 2.  The current time on the monitor is 11:57 a.m.  We're
15  back on record.
16  BY MS. ROTKIS:
17    Q.   Okay.  This is part 2 of Ms. Chu's deposition and
18  we're moving now toward the exhibit book.  And so if you
19  would pull out the exhibit book and go to tab 1.
20    MR. SEARS:  Will you be sending a different
21  exhibit book for the Friday depositions or we're going to be
22  using this?
23    MS. ROTKIS:  Yes.  Well, why don't you hang on to
24  this.  I want to look through what you sent me to see if
25  there's something I need to send.  So hang on to this, we

Page 61

1  may be using the same one, but I may add some more exhibits
2  to it.
3    MR. SEARS:  Sure.
4    MS. ROTKIS:  Yeah.  Let's not kill my more trees
5  than we need to.
6    MR. SEARS:  Okay.
7  BY MS. ROTKIS:
8    Q.   All right.  So if you would just take a couple
9  minutes, Ms. Chu, and look through, well, all of the pages
10  of Exhibit 1, tab 1.
11    And for the benefit of the court reporter and
12  Mr. Sears, we didn't talk about this beforehand, but
13  normally what I do is I just refer to the Bates number
14  pages.  And the Bates number pages are -- are identified in
15  the bottom right-hand corner, Ms. Chu.  We call those Bates
16  numbers.  I don't know why.  But instead of marking things
17  as Exhibits, we just use the Bates numbers, and the reason
18  is because then we always just have one set of numbers that
19  we're dealing with in the case as we go later in the case.
20  So I'm just going to be referring to the last two digits of
21  each one these numbers, so --
22    A.   Okay.
23    Q.   -- that first one is -- it says QV00048.  I'm just
24  going to be calling that page 48.
25    A.   Okay.

16 (Pages 58 to 61)

ALEXANDRA CHU - 5/11/2016

Page 62

1    Q.  Fair enough.  Okay.
2    A.  Okay.
3    Q.  Okay.  Does this look familiar to you?
4    A.  Yes, it does.
5    Q.  Okay.  And what is this?
6    A.  This is the ACDV out of e-OSCAR.
7    Q.  And it's the ACDV -- let's just go now to page 48.
8    And page 48 through page 50, I think, this is one ACDV,
9    correct?
10   A.  Correct.
11   Q.  Okay.  And who is this ACDV about?
12   A.  David Wood.
13   Q.  And how do you know that?
14   A.  The consumer name at the top.
15   Q.  Okay.  And do you know who processed this ACDV?
16   A.  I did.
17   Q.  Okay.  And do you know what date you processed it?
18   A.  April 28th of 2015.
19   Q.  And were you still in training at that time?
20   A.  I was on my own at that time.
21   Q.  Okay.  And so let's just look at this first one
22   starting at page 48.  And the -- is this what the ACDV looks
23   like in e-OSCAR when you receive it?
24   A.  Yes.
25   Q.  And do you receive anything else in addition to

Page 63

1    this ACDV?
2    A.  We sometimes document, not in every case, attach
3    documents.
4    Q.  And how do you know if there are documents?
5    A.  I can't tell from the printout, but when you bring
6    it up -- well, first, we go into a queue.  There's a queue
7    with docs and a queue without docs.  So depending on which
8    one we choose, we're told to work in that day.  And then
9    when we bring it up, there's a red line towards the top of
10   the ACDV that tells us that there are docs attached.
11   Q.  Okay.  And so there's nothing on this one that
12   tells you whether any docs were attached?
13   A.  From the printout, no, I can't tell.
14   Q.  Okay.  And do you remember processing this ACDV?
15   A.  I don't.
16   Q.  Okay.  So let's go to the very top.  The first
17   thing at the top left says, "ACDV response."
18   A.  Right.
19   Q.  And -- okay.  So what does that mean?
20   A.  I'm not sure.  I've never noticed that.
21   Q.  Okay.  The next block over, it says, "search
22   ACDV."  What does that mean?
23   A.  I'm not familiar with that either.  I don't recall
24   seeing that.
25   Q.  The next item over in that top line is a number.

Page 64

1    It's 9- -- it looks to me, with my old lady eyes, 9.9995E
2    plus 16.  Do you know what that means?
3    MR. SEARS:  Objection as to form.
4    THE WITNESS:  That is the control number, but it's
5    truncated.  It's usually going to be longer than that and
6    it's going to be strictly numbers.
7    BY MS. ROTKIS:
8    Q.  Okay.  Do you know what any -- what -- what
9    9.9951 -- or I don't know.
10   Can you explain the number to me?  Do you know
11   what the different --
12   A.  No, it's -- it's --
13   Q.  -- elements of this number are?
14   A.  I don't.  From my understanding, it's just a
15   reference number to this specific ACDV for a way --
16   Q.  Okay.
17   A.  -- for us to like pull it up at a later date, if
18   need be.
19   Q.  And where would you pull this up?
20   A.  Through e-OSCAR.
21   Q.  And how would you know about that control number?
22   How would you be able to find this control number in order
23   to go into e-OSCAR and pull up this ACDV?
24   A.  Well, we notate our investigation in CAS.  And we
25   are supposed to notate the control number.  I also provide

Page 65

1    the control number on the Word document that shows my
2    investigation, all of the screenshots I have, the control
3    number listed at the top.
4    Q.  Okay.  The next line down, account number?
5    A.  Yes.  So that would be the card number associated
6    with his dispute.
7    Q.  Okay.  So 4.44796E plus 15 --
8    A.  Yeah.
9    Q.  -- is the account number?
10   A.  Well, that's not the way it shows up in e-OSCAR
11   when we first pull it up.  I don't know if it's truncated
12   for security when we print it out.  I don't know why it's
13   showing that way.
14   Q.  Okay.  But this doesn't look like an account
15   number that you would normally see when you pull up an ACDV?
16   A.  No, it would be a full 16-digit account number.
17   Q.  Okay.  And then the next line over?
18   A.  The Social Security number?
19   Q.  Yes.
20   Is that where -- do you have the full Social
21   Security number that usually appears on the ACDV?
22   A.  I'm assuming this is the full social, yes.
23   Q.  I mean, it has the correct number of digits?
24   A.  Yes.
25   Q.  All right.  Okay.  And is that something that you

17 (Pages 62 to 65)

ALEXANDRA CHU - 5/11/2016

Page 66

1  would look for when you receive an ACDV?
2      A.  Yes.
3      Q.  Do you ever receive ACDVs without socials?
4      A.  No.
5      Q.  Okay.  The next block down, consumer name.  It
6  says, "David Wood."  Is there any other information that
7  should be there?
8      A.  No.
9      Q.  Okay.  The next block over, the control number,
10  would you agree it looks to be the same that's in the upper
11  right-hand corner?
12      A.  Yes.
13      Q.  Okay.  And do you think that's the number that's
14  generated by e-OSCAR?
15      A.  Yes.
16      Q.  Okay.  The next line down says, "response code."
17  And then it has in the next block, "2 colon."  Do you know
18  what that means?
19      A.  I'm not sure.  Oh, response code is just us
20  responding to the ACDV.  For instance, if it were a 7, it
21  would mean I was deleting it due to fraud.  It's just a
22  different type of code telling them what we did with the
23  ACDV.
24      Q.  Do you know what 2 means?
25      A.  I don't know it off of the top of my head, but

Page 67

1  it's responding to the ACDV.
2      Q.  Okay.  And do you have -- how do you know what
3  response code to put in there?
4      A.  When we finish our investigation, you know, either
5  we're putting an O2 to tell them we verified everything or a
6  7 to say that we couldn't verify, we are going to delete it.
7      Q.  Okay.  So a 2 is -- means verify?
8      A.  Right.
9      Q.  Okay.  Then the next block over is "subscriber
10  code."  Do you know what that is?
11      A.  From my knowledge, that is going to be the credit
12  reporting agency.  For instance, I know that 180, the
13  beginning of that number is for Equifax.
14      Q.  Oh, okay.  And do you know what the other CRA
15  subscriber codes start with?
16      A.  I don't remember off of the top of my head.  I --
17  I would have to see it in front of me.
18      Q.  Okay.  How many screens do you have in your cube?
19      A.  In my queue, just one.  And then when we bring it
20  up, this screen comes up.
21      Q.  How many computers do you have in your cubical?
22      A.  Two monitors.
23      Q.  Two monitors.  Okay.
24          And is one monitor -- what -- what do you have on
25  the first monitor when you're in e-OSCAR?

Page 68

1      A.  My left monitor is going to be a full screen of
2  e-OSCAR.
3      Q.  Okay.  And what about the right monitor?
4      A.  The right monitor, I split into two sections.  The
5  top portion would be CASH alone, and then the top portion
6  would be Internet Explorer with all of the systems that I
7  mentioned earlier.
8      Q.  Okay.  The next block down says, "response date."
9  What does that -- what does that tell you?
10      A.  That's the day I completed the ACDV.
11      Q.  The next block down says, "response due date" and
12  it says, "May 17th, 2015."  So it looks like you completed
13  this rather early before the due date, correct?
14      A.  Yes.
15      Q.  Okay.  Going over to the right side, there are two
16  blocks.  One says, "DF contact number."  What does that
17  mean?
18      A.  I'm not familiar with that.  I don't see that when
19  I pull it up.
20      Q.  Okay.  And what does DF mean, do you know?
21      A.  I have no idea.  No, I don't.
22      Q.  So the next block down says, "DF authorized name."
23  And then it has your name, Alexandra Chu.  Do you know what
24  that means?
25      A.  No.  I don't know why it's there other than to

Page 69

1  tell them that I'm the one who worked the ACDV.
2      Q.  Okay.
3      A.  I've never seen it.
4      Q.  Okay.  So neither one of these blocks are on the
5  ACDV when you receive it from e-OSCAR?
6      A.  No.
7      Q.  Okay.  Then you go down to the next block, it
8  says, "dispute information"?
9      A.  Um-hmm.
10      Q.  And in the first block, it says, "dispute code 1."
11  And what does that tell you?
12      A.  That tells us the type of dispute that they put in
13  through the credit reporting agency.  In this case, it's a
14  103, which we know it's identity fraud.
15      Q.  Okay.  What else does it have in there?
16      A.  For the code, it's saying that they're claiming
17  identity fraud and that the account was fraudulently opened
18  and its request to provide or confirm.
19      Q.  Provide or confirm what?
20      A.  Complete identification.
21      Q.  And what does that mean to you?
22      A.  To me, that is asking me to verify the information
23  that they provided to us.  Does it match the disputing
24  consumer?
25      Q.  Okay.  And can you tell what you did at that point

Page 70

1 after you received this dispute code 103, claims to identity
2 fraud, account fraudulently opened, provide or confirm ID?
3     A.   So at this point, once I see that code, the first
4 thing that I'm going to do is look and see if there were any
5 provided docs, whether it be an affidavit or a police
6 report.  And then I'm going to verify the information that
7 they provided to us to see if it matches what we have on the
8 account and then, you know, investigate if any of the
9 information we have links to the cardholder.
10     Q.   When you say investigate whether any of the
11 information links to the cardholder, what do you mean?
12     A.   Well, we want to know if the information on the
13 account can be reasonably linked to the cardholder so our
14 investigation would entail, you know, trying to determine
15 whether or not it does link to them.  And that would be
16 going through all of our --
17     Q.   And how --
18         MR. SEARS:  Go ahead and finish.
19         THE WITNESS:  And that would be to go through
20 our -- not only our in-house applications, but, you know,
21 Accurint to see, as I mentioned before, if any of the
22 addresses provided or on the account link to a cardholder,
23 for instance, through driver's license, car registration,
24 you know, things to that nature.
25

Page 71

1 BY MS. ROTKIS:
2     Q.   Well, let me go back a little bit.
3         What's the first thing you do when you get a
4 dispute code like this?
5     A.   I look to see if there are any documents provided
6 that would help in our investigation.
7     Q.   Okay.  Okay.  And then what do you do?
8     A.   Well, if we receive a police report, then we would
9 automatically delete due to fraud.  If we don't have any
10 documents such as a police report and affidavit, I would
11 validate and investigate the account.
12     Q.   When you say "validate," what does that mean?
13     A.   Well, I want to validate the information that was
14 provided by the CRA's matches -- or does not match.  We want
15 to validate whether or -- whether or not it does link to the
16 cardholder.
17     Q.   Okay.  So in this case with David Wood's ACDV,
18 what did you do?
19     A.   In this case, I don't remember specifics on what I
20 did.  But from the way that I filled it out, I verified the
21 information provided by the CRA's match as far as name and
22 Social Security number and addresses and then reported back
23 to the credit reporting agencies based on my investigation
24 that I have screenshots of.
25     Q.   What did you -- okay.  And what did you report

Page 72

1 back to the consumer reporting agency?
2     A.   That it's a resolved dispute and that they are
3 held responsible.
4     Q.   Okay.  What do you mean by "resolved dispute"?
5     A.   Meaning we investigated it and that we came to the
6 conclusion that -- or I came to the conclusion, rather, that
7 he was responsible for the account.
8     Q.   And you did that because you matched -- let's just
9 go through here and look at what -- what you did.  Last
10 name, same?
11     A.   Correct.
12     Q.   Is that right?
13     A.   Yes.
14     Q.   Okay.  And then the next thing you did was check
15 to see if the first name was the same?
16     A.   Correct.
17     Q.   Okay.  And then the next thing you did was check
18 to see if the Social Security number was the same?
19         MR. SEARS:  I'm going to object to form.
20         THE WITNESS:  Yes, that's correct.
21         MR. SEARS:  And -- and and --
22 BY MS. ROTKIS:
23     Q.   Okay.  And then the next thing you did was --
24         MR. SEARS:  I'm sorry.  I'm -- I'm just --
25         MS. ROTKIS:  Please stop interrupting my

Page 73

1 questioning.
2         MR. SEARS:  All right.  Go ahead and answer -- ask
3 the question, then I'll object.  I was going to do a
4 continuing objection so you could go, but I will do it one
5 by one.
6         MS. ROTKIS:  Well, I would appreciate no objection
7 at all.  There's nothing improper about my question.
8         MR. SEARS:  Absolutely.  She already indicated to
9 you that she doesn't exactly remember everything you did and
10 now you're going in and saying, "The first thing you did,"
11 "The second thing you did," "The next thing you did, the
12 next thing you did."
13         MS. ROTKIS:  Well, I'm going through -- I'm going
14 through this ACDV as she testified, and I'm -- I'm going
15 through each element that she testified she filled out.
16         MR. SEARS:  Right.  And you're establishing --
17         MS. ROTKIS:  So --
18         MR. SEARS:  You are -- let me finish.  You are, in
19 your questioning, establishing a sequence, you did this and
20 then this and then this and then this, and you are using the
21 word "next" to indicate a sequence.  And to the extent that
22 that is inconsistent with her previous testimony that she
23 does not specifically recall the details of the
24 investigation --
25         MS. ROTKIS:  Okay.  Now stop it with the -- with

19 (Pages 70 to 73)

Page 74

1  the speaking objections. It's over. You may object to
2  form. That's it.
3       MR. SEARS: Okay. Then don't --
4       MS. ROTKIS: Got it?
5       MR. SEARS: -- don't complain --
6       MS. ROTKIS: Got it?
7       MR. SEARS: -- about my objections. You don't
8  want to hear the basis of them, don't complain when I
9  object.
10       MS. ROTKIS: That's right. I don't want to hear
11  the basis of them. I want to hear a form objection and
12  that's it.
13       MR. SEARS: That's what I was giving.
14       MS. ROTKIS: This is over. All right.
15  Q    (By Ms. Rotkis) Did you confirm the date of birth?
16  A.   Based on the ACDV, I did not.
17  Q.   Did you confirm the telephone number?
18  A.   I did not.
19  Q.   Did you confirm the ECOA code?
20  A.   I did not.
21  Q.   On what basis did you change the ECOA code?
22  A.   I don't remember.
23  Q.   How would you determine whether it was joint
24  contractual liability rather than individual liability?
25  A.   Whether or not he was the primary on the account.

Page 75

1  I can't really tell you why I would have changed it to 2. I
2  have no idea why it was changed.
3       Q.   Did you pull up the credit application to make a
4  determination that there should be a change in the ECOA
5  code?
6  A.   I don't remember if I did that specifically, but I
7  would have to look at the account to see if he was the
8  primary.
9       Q.   How -- on what -- okay. Did you confirm the
10  street address?
11  A.   I did confirm it.
12       Q.   And is it true that based on that information, you
13  determined that this individual was liable on the account?
14  A.   No, that's not true.
15       Q.   Okay. Please correct me.
16  A.   Well, I went further than that. And I looked at
17  the address. I don't remember the exact details. It's on
18  the screenshots that I provided to you of my investigation
19  where I went to other systems and verified them. I don't
20  know that offhand.
21       Q.   Okay. What is the protocol after you verify four
22  items of information in a dispute code 103?
23  A.   Well --
24       MR. SEARS: Objection as to form.
25       THE WITNESS: I don't understand your question.

Page 76

1  Can you repeat it?
2  BY MS. ROTKIS:
3       Q.   If there's a dispute code 103, what is the
4  protocol for revolving the ACDV after you verified those
5  four items of information?
6  A.   Well, we wouldn't want to just verify what was on
7  the -- or I wouldn't want to just verify what was on the
8  account. I would want to make sure that those are valid
9  addresses and if there was a telephone number, that it was
10  valid and does link to the cardholder in ways -- you know,
11  it's a previous address through these years or, you know, as
12  I mentioned before, the driver's license, car registration,
13  things of that nature.
14       Q.   Okay. The next page, page 49, what's SCC mean?
15  A.   I don't know what that stands for. But that is
16  our response code back to them on whether it was -- the
17  status of the account.
18       Q.   Okay. Going back to page 48, the block at the
19  bottom of the page that starts with "account information,"
20  that first block, "account status," what does that mean?
21  A.   The status of the account. So in this instance,
22  it was a charged-off account. It was sold to a collection
23  agency.
24       Q.   The next block, "payment rating," what does that
25  mean?

Page 77

1  A.   I'm sure.
2       Q.   The next block says, "cons./CUM/status." Do you
3  know what that means?
4  A.   I don't.
5       Q.   Are these two blocks that appear on your ACDV when
6  you're conducting the investigation?
7  A.   I think they -- they may -- I don't know for sure.
8  They may appear or may not. I don't remember.
9       Q.   The next block is C -- looks like CII, something
10  like that. Do you know what that is?
11  A.   I don't.
12       Q.   The next block says, "M" -- looks like -- "OP."
13  Do you know what that is?
14  A.   No.
15       Q.   The next block says, "CCC." Do you know what that
16  is?
17  A.   That stands for -- I believe it's consumer
18  compliance code. But the XH, as I mentioned before, tells
19  you the status of our investigation, so XH means that we are
20  closing it because the dispute is finished or the
21  investigation is finished.
22       Q.   All right. And we already talked about SCC. Did
23  you supply the information in the response data block that
24  says, "AH purchased by another lender"?
25  A.   Yes.

ALEXANDRA CHU - 5/11/2016

## Page 78

1  Q. How did you determine that this was purchased by
2  another lender?
3  A. Because it was a charged-off account. And the --
4  in CAS, it tells you who bought the account. In this case,
5  it was Midland Funding.
6  Q. What made you think that Midland Funding was a
7  lender?
8  MR. SEARS: Objection as to form.
9  THE WITNESS: I'm not sure. That's just the
10 response that we are instructed to put in if it was
11 purchased by somebody else.
12 BY MS. ROTKIS:
13 Q. Do you know whether there's something in your
14 system that demonstrates that something was purchased by a
15 debt buyer or by an investor?
16 A. I'm sorry, can you repeat that?
17 Q. Is there something in your system that shows that
18 a -- an account was sold to a debt buyer or another type of
19 investor?
20 A. Yeah, that would show in CAS.
21 Q. All right. The next block says, "portfolio type"?
22 A. Um-hmm. That's --
23 Q. What does that mean?
24 A. It's a revolving account. It's a revolving credit
25 line.

## Page 79

1  Q. The next line says, "account type"?
2  A. It's a credit card.
3  Q. What does that mean? Okay.
4  MR. SEARS: Yeah, wait for the question.
5  BY MS. ROTKIS:
6  Q. The next block says, "interest-type indicator."
7  Do you know what that means?
8  A. No, I don't.
9  Q. So there's information in the response data field.
10 Did you input that information?
11 A. Not to my recollection.
12 Q. If there is information in the response data field
13 in an ACDV that you processed, who would have put the
14 information in the response data field?
15 MR. SEARS: Objection as to form.
16 THE WITNESS: In -- for this, I'm not sure,
17 because we don't use any codes for that. It would have been
18 me, but I don't think this was something that I would have
19 put in.
20 BY MS. ROTKIS:
21 Q. Do you know what these -- do you know what this
22 means, these things that are in this data field?
23 A. I don't. I've never seen that.
24 Q. So comma, 1, comma, 1, comma, Y, comma, 17039587,
25 comma, fraud with docs, comma, 32163 colon, you don't know

## Page 80

1  what any of that means?
2  MR. SEARS: Asked and answered.
3  THE WITNESS: No, I don't.
4  BY MS. ROTKIS:
5  Q. Okay. "Terms duration," what does that mean?
6  A. I'm not sure, I don't know.
7  Q. "Terms frequency," do you know what that means?
8  A. I don't know.
9  Q. "Date opened," what does that mean?
10 A. The date that the account was opened.
11 Q. So the date that the account was opened in the
12 response data request field says, "6/01/2013" and it has a
13 different date in the response data field. Would that -- is
14 that something that you corrected?
15 A. I -- yeah, I would have corrected it if it was
16 incorrect.
17 Q. "Date of account information," do you know what
18 that means?
19 A. Date of account information? That would have been
20 the date that I filled it out and responded back to them.
21 Q. "Date of last payment." There was nothing in the
22 response data request field and there's nothing in the
23 response field either. Is that something that should be
24 filled out?
25 A. It would only be filled out if there was a

## Page 81

1  payment. In this instance, I don't know because I don't
2  have the account in front of me. But we would leave it
3  blank if there was never a payment.
4  Q. Okay. "Date closed," what does that mean?
5  A. So that's the day we charged it off.
6  Q. What does FCRADOFD mean?
7  A. I don't know. I don't recall.
8  Q. Okay. "Current balance reads zero in both
9  fields," do you know what that is?
10 A. Because we no longer own the debt, so it's zero
11 for us.
12 Q. "Amount past due," do you know what that means?
13 A. If the account was past due, we would put
14 something there. But we don't own the debt, so it's not
15 past due.
16 Q. Okay. "High credit/original amount," do you know
17 what that means?
18 A. That would have been the highest balance that was
19 ever on the account.
20 Q. Okay. Slash, original amount, there doesn't
21 appear to be any slash anything there. Does that -- what
22 does -- does that tell you anything?
23 A. No. I think that's the same. I'm not sure.
24 Q. Okay. "Credit limit," what does that mean?
25 A. The credit line that the bank allowed them.

21 (Pages 78 to 81)

Maxene Weinberg Agency
(800) 640-1949

Page 90

1      MR. SEARS: Okay.
2      THE WITNESS: I provided an XH which means it was
3  in dispute, but it's been resolved and that we're reporting
4  it back to the CRA.
5  BY MS. ROTKIS:
6      Q.  And under what conditions would you report an XB
7  compliance condition code?
8      A.  If there wasn't an immediate resolution, if it was
9  an active account with the bank and we had to process the
10  loss stolen and do an investigation that way.
11      Q.  Going down now to "interest type indicator." In
12  the response code, there are, again, some numbers, some
13  commas, the word "fraud." Does that mean anything to you?
14      A.  I've never seen that.
15      Q.  And again, that's your -- it's your testimony that
16  you would not have put that in there?
17      A.  I don't recall putting it in there. I don't
18  recall ever doing that.
19      Q.  Okay. Turning now to page 55. Do you know what
20  this is?
21      A.  It's another ACDV.
22      Q.  And can you tell where you got this ACDV from?
23      A.  In this instance, it would be Experian.
24      Q.  How do you know it's Experian?
25      A.  The subscriber code.

Page 91

1      Q.  And what is the dispute code?
2      A.  That they're claiming the account was fraudulently
3  opened and they're asking us to confirm the complete
4  identification of the consumer.
5      Q.  And what about "FCRA relevant information," what
6  does that mean?
7      A.  I don't know.
8      MR. SEARS: I'm assuming that you mean what is in
9  the box there as opposed to what the FCRA relevant
10  information itself means, the dashes in the box? All right.
11  I'm going to object to --
12  BY MS. ROTKIS:
13      Q.  Ms. Chu, do you understand there's -- there's a
14  field that's next to the block that says, rele-- "FCRA
15  relevant information," and it has -- it's either like a
16  bunch of ones or just some -- some marks in that -- in that
17  block. Do you understand what those -- those marks
18  reference?
19      A.  No.
20      Q.  Okay. And it's your understanding that the
21  consumer would have put those marks in that block; is that
22  correct?
23      A.  That's my understanding, yes.
24      Q.  Where did you get your understanding that the
25  consumer would have put that information into that block?

Page 92

1      A.  From my understanding, it is -- I don't know if
2  they physically put it in or if they are notes that they are
3  providing the CRAs to tell us. But from my understanding,
4  they're notes from the customer, from Traci Madura just
5  asking, you know, what it was. They're just notes for
6  additional reference.
7      Q.  Have you ever seen an actual consumer dispute
8  letter included with the documents that you receive from
9  e-OSCAR?
10      A.  An actual dispute letter? I mean, with the docs,
11  yeah, there would be a letter. There are sometimes letters
12  from the consumers saying that it's not theirs, that it's
13  fraud. They might include an affidavit stating the same
14  thing.
15      Q.  Okay. Can you tell from this ACDV whether any
16  documents were included?
17      A.  From the printout, I cannot tell.
18      Q.  Okay. Going down to the consumer information
19  block all the way down to the block that says, "ECOA code"?
20      A.  Um-hmm.
21      Q.  The request is whether it's individual, one
22  individual. And your response, what was your response?
23      A.  It was also individual.
24      Q.  What date did you resolve this ACDV?
25      A.  I resolved it on June 10th of 2015.

Page 93

1      Q.  And would you agree that the compliance condition
2  code still says, "XH"?
3      A.  Yes.
4      Q.  Under what circumstances would you change that
5  compliance condition code to something else?
6      A.  If it was still an active account with the bank,
7  then the other option would be an XB to let them know that
8  it was received and we're working on it.
9      Q.  As long as an account is charged off, would you
10  ever change the compliance condition code to XB?
11      A.  No.
12      Q.  Going down now to the interest type indicator. If
13  you look over in the right column for response data, do you
14  know what any of those responses are?
15      A.  I -- I haven't -- I'm not familiar with that. No,
16  I don't know.
17      Q.  Okay. And like the other ACDVs, you did not put
18  those codes or that information in that response data field?
19      A.  No.
20      Q.  Are there any other ACDVs that you're familiar
21  with that you processed for David Wood?
22      A.  No.
23      Q.  Going to page 59, it's under tab 4, do you know
24  what this is?
25      A.  These are notes on the account from CAS.

24 (Pages 90 to 93)

Page 94

1    Q.  Why don't you just take a couple of minutes and
2  look through these notes.
3    A.  Okay.
4    Q.  Would it be fair to say that these notes actually
5  start on page 65 and go to -- in descending order to
6  page 59?
7    A.  Yes.
8    Q.  Do you know how to read this document?
9    A.  I'm familiar with it, yes.
10   Q.  Do you have access to this document?
11   A.  Yes.
12   Q.  Okay.  And does this printout look like the
13 document that you would see in CAS?
14   A.  Yes.
15   Q.  Okay.  Is there anything missing from this
16 document that you would see when you looked at your screen
17 in CAS?
18   A.  In regards to the notes, no.
19   Q.  That's how the notes appear when you look at the
20 screen?
21   A.  Yes.
22   Q.  Okay.  Are there any other things like any
23 commands or any toolbars or anything on the screen?
24   A.  No.
25   Q.  Do you ever have occasion to print out the notes

Page 95

1  from CAS?
2    A.  No.
3    Q.  Okay.  So starting with page 65, it looks like the
4  first entry is on June 11th of 2013.  And so the first
5  column looks like it has the date and the time; is that
6  correct?
7    A.  Yes.
8    Q.  Okay.  And how is that date and time recorded, do
9  you know?
10   A.  At the time that the note was put in, it would
11 time-stamp out.
12   Q.  So does the -- do you ever put notes into the
13 system?
14   A.  Yes.
15   Q.  Okay.  And does that happen automatically, that
16 the date and the time get stamped when you put a note in?
17   A.  Yes.
18   Q.  Okay.  And so -- and then the next column looks
19 like it says, "agent"; is that fair?
20   A.  Yes.
21   Q.  And who is agent 1?
22   A.  I don't know.
23   Q.  Okay.  And the next column says, "call type."
24 What does that mean?
25   A.  It's the type of request that comes through on the

Page 96

1  account from my understanding.
2    Q.  Okay.  What does "work case history" mean?
3    A.  I'm not exactly sure.
4    Q.  Okay.  Do you know what the next column result is?
5    A.  That's usually just where our notes show up at.
6    Q.  Okay.  Do you know what "adjust fee dash R closed"
7  means?
8    A.  It would mean that there was a fee that was
9  adjusted on the account and that that issue has been
10 resolved.
11   Q.  Okay.  Then the next entry is on June 14th of
12 2013.  Do you know who Agent 311633987 is?
13   A.  No, I don't.
14   Q.  Do you have an agent number?
15   A.  I do.
16   Q.  What is your agent number?
17   A.  My agent number is 312949906.
18   Q.  Is there anything on page 55 or 56 that tells you
19 whether this application was reviewed by somebody in the
20 fraud investigation department?
21   A.  No, it wouldn't show in CAS notes.
22   Q.  Oh, where does that show up?
23   A.  That shows in CAPS.
24   Q.  Okay.  Looking through these notes, are there any
25 notes or any entries that you've made in this case history?

Page 97

1    A.  Yes.
2    Q.  Can you please tell me what page that's on?
3    A.  That began on page 61.
4    Q.  Okay.  And is it 42861 at 8:22 a.m.?
5    A.  Yes.
6    Q.  Okay.  And how do you enter the information into
7  CAS?  Did you type all this information in the result
8  field --
9    A.  Yes.
10   Q.  -- or did you copy and paste it from the ACDV?
11 Okay.
12   A.  Well, there's a template.  I copy and paste the
13 dispute code, which is 103 claims true identity, fraud
14 account fraudulently opened.  Everything else is typed in.
15   Q.  Okay.  So what does CH mean?
16   A.  Cardholder.
17   Q.  Okay.  So at the very top of this entry, it looks
18 like the first line says, "RCVD."  What does that mean?
19   A.  Received.
20   Q.  Okay.  The next one is "ACDV."  What does that
21 mean?
22   A.  I don't know exactly what it stands for.
23   MR. SEARS:  Objection.
24 BY MS. ROTKIS:
25   Q.  Okay.  But this is the ACDV that we've been

25 (Pages 94 to 97)

Page 98

1  talking about?
2     A. Yes.
3     Q. Okay. And would you -- would you trust me -- we
4  don't have -- this is not really relevant, but it just helps
5  us avoid this objection in the future. It stands for
6  Automated Consumer Dispute Verification. And in olden times
7  we just used to call it a CDV, it's Consumer Dispute
8  Verification, but now it's automated through e-OSCAR. Okay.
9  So you received an ACDV. And then what's the next -- next
10 bit of that sentence, that note? What does it say?
11    A. It's saying that there were images included from
12 Equifax.
13    Q. Okay. And what does that mean to you?
14    A. It means that there were documents attached to the
15 ACDV at the time I brought it up.
16    Q. Okay. And that's -- that's something that you
17 wrote in there, right?
18    A. Right.
19    Q. Okay. And you wrote that at the time that you
20 resolved that dispute, right?
21    A. Right.
22    Q. Okay. And then going down here a little bit more,
23 "103 claims true identity fraud, account fraudulently
24 opened, CH" -- meaning cardholder -- "claims ID theft."
25 What does ADRS mean?

Page 99

1     A. Address.
2     Q. Okay. PROV?
3     A. Provided.
4     Q. Okay. By, just the word by?
5     A. Yeah.
6     Q. Okay. CH, cardholder.
7        Why don't you go through and just tell me what the
8  rest of this note says?
9     A. It's saying that the address provided by the
10 cardholder matches what we have on file in CAS and CASH.
11 It's also telling you that the address provided on the
12 application through CAPS -- which isn't noted, I'm sorry --
13 the address provided on that application. And then I
14 provided the address that was on the application links to
15 cardholder through Accurint. So my final decision --
16    Q. Okay.
17    A. -- was the cardholder was responsible. And then
18 it has the control number for reference, and then those are
19 just my initials and my department at the end.
20    Q. Okay. And so based on this note, would it be fair
21 to say that you verified that the cardholder was responsible
22 because of the address matches?
23    A. Yes.
24    Q. All right. Do you see any other notes that you
25 entered?

Page 100

1     A. Yes, the one right above that one.
2     Q. Okay. And let's just take it like we did the last
3  time. I won't go through each individual thing since now
4  we've established that the first line received ACDV with
5  images from TU meant that you received documents from TU; is
6  that fair?
7     A. Yes.
8     Q. Okay. And then why don't you just go through the
9  rest of the note to tell me what it says?
10    A. We received images from TransUnion. They're
11 claiming identity fraud that it's been fraudulently opened.
12 They're, again, claiming ID theft. I'm noting that the
13 account was previously investigated on 4/28/15. Again, the
14 cardholder is responsible. No further action taken. The
15 control number, again, with my initials and department.
16    Q. Okay. So would it be fair to say you did no
17 additional investigation on that one because you had already
18 investigated the one from Equifax earlier in the day?
19    A. No, I still did verify the information on the
20 account.
21    Q. Okay. Meaning -- meaning what? What information
22 did you verify?
23    A. The information that the CRAs asked us to verify
24 which would be on ACDV, the addresses, you know, the full
25 list of the ACDV, we verified and went through and responded

Page 101

1  back and validated everything.
2     Q. Okay. And you did that by checking the
3  information that was in Credit One's systems about this
4  account?
5     A. Yes.
6     Q. Going up, do you see any other notes here that
7  were entered by you?
8     A. The one above that for May 5th of 2015.
9     Q. Yes. And just go ahead and explain to me what the
10 notes that you entered say.
11    A. We -- we received an ACDV from Equifax. They're
12 claiming identity frauds, account fraudulently opened. The
13 cardholder claims ID theft. It was previously found
14 responsible on April 28th in 2015. There was no further
15 action taken. The control number and my initials and
16 department.
17    Q. Okay. Going over to page 60, do see any other
18 entries by you on this page?
19    A. Yes, the very last entry.
20    Q. And what -- just starting with the beginning of
21 the note, why don't you tell me what you did.
22    A. We received an ACDV with images from Experian.
23 They're, again, claiming identity fraud that it was
24 fraudulently opened. And then the address on file links to
25 cardholder through the vehicle registration per Accurint.

26 (Pages 98 to 101)

ALEXANDRA CHU - 5/11/2016

Page 102

1    And then the phone number provided on the application per
2    CAPS links to address on file per Accurint. The cardholder
3    was held responsible. There's the control number, my name,
4    and department.
5        Q.  Okay. So anything else on this page that
6    indicates that you made an entry?
7        A.  No.
8        Q.  On page 59, do you see anything on page 59 that
9    you entered?
10       A.  Just the note on the very bottom, but it's the
11   same note as the one on page 60.
12       THE COURT REPOTER:  Page 60?
13       THE WITNESS:  Sixty.
14   BY MS. ROTKIS:
15       Q.  Okay. So this one might just be like a printing
16   issue that it carries over from --
17       A.  Right.
18       Q.  Yeah. It appears to be the same thing. Okay.
19   Anything else on that page?
20       A.  No.
21       Q.  Okay. So do you believe that you saw documents
22   with respect to these ACDVs where you noted that images were
23   received?
24       A.  Yes.
25       Q.  Okay. Turning now to tab 5. Tab 5 is Bates 317

Page 103

1    through Bates 323. If you would, just take a minute to
2    thumb through these pages and let me know when you're ready.
3        A.  Okay. I'm ready.
4        Q.  Okay. Are you familiar with this document?
5        A.  No.
6        Q.  Okay. Tab No. 6. If you would, look at Tab No. 6
7    and let me know when you're finished. Tab No. 6 is Bates
8    number 324 through 359.
9        A.  Okay.
10       Q.  And are you familiar with this document?
11       A.  I am not. Bless you.
12       Q.  Thank you. I'm sorry, I must have missed your
13   response. Are you familiar with this document?
14       A.  No, I'm not.
15       Q.  You're not. Okay. Nonetheless, I'd like you to
16   turn to page 340, please.
17       A.  Okay.
18       Q.  On page 340, it says, "Responsibility as a
19   furnisher of information to the CRAs." And then, "The bank
20   is required by law to report accurate information to the
21   CRAs." Are you aware of that requirement?
22       A.  Yes.
23       Q.  Okay. And one of the duties under the law that I
24   want to direct your attention to is 8C, C as in Charlie.
25   And there, it says, "The duty to provide notice of dispute."

Page 104

1    And there, it says, "If a consumer disputes the completeness
2    or accuracy of any information that the bank has reported to
3    a CRA, the bank will not report the information to the CRA
4    without notice that the information is disputed by the
5    consumer." Are you familiar with that requirement?
6        MR. SEARS:  Objection as to form.
7        THE WITNESS:  I'm not familiar with that.
8    BY MS. ROTKIS:
9        Q.  Okay. Thank you. Flipping over to tab 7, we've
10   got page 360. Are these codes that you would work with?
11       A.  Some of them, yes.
12       Q.  What codes are you familiar with?
13       A.  I'm familiar with CBR.
14       Q.  What does that stand for?
15       A.  Credit balance refund.
16       Q.  And what would you use that code for?
17       A.  I wouldn't. I'm just familiar with it. Are you
18   asking what I -- if I would use it?
19       Q.  Oh, okay. Yeah -- no, good point. Very good
20   point. You're right. What codes do you use --
21       A.  Oh, okay.
22       Q.  -- in -- or did you use from March of 2015 through
23   December of 2015 when you were an ACDV operator?
24       A.  I would have used CH, cardholder customer. And
25   that's about it.

Page 105

1        Q.  To me, these -- I mean, it says, "collection
2    code," so this, to me, would be something that would be used
3    by debt collectors and not in the fraud investigation
4    department. Does that sound right to you?
5        A.  Yes.
6        Q.  Do you know any fraud investigators that use these
7    codes?
8        A.  Not extensively. Like as an investigator now,
9    things like left message or spoke with, but during the
10   timeframe, no.
11       Q.  Okay. Tab 8. Tab 8 contains Bates 361 to 378.
12   Are you familiar with this document?
13       A.  I am not.
14       Q.  Okay. Tab 9. Tab 9 has -- I will just tell you
15   this. It has three versions of the same general thing. So
16   just page through it and see if -- let me know when you're
17   ready.
18       A.  Okay. I'm ready.
19       Q.  Okay. Are you familiar with this document?
20       A.  Yes.
21       Q.  Okay. How are you familiar with this document?
22       A.  It's a training manual.
23       Q.  And are you aware of what version of the training
24   manual you were trained on?
25       A.  I don't know.

27 (Pages 102 to 105)

ALEXANDRA CHU - 5/11/2016

Page 106

1   Q.  Do you have a copy of this manual at your desk?
2   A.  Yes.
3   Q.  And do you have a paper copy of this manual at
4   your desk?
5   A.  No.
6   Q.  Do you use this electronically?
7   A.  Yes.
8   Q.  And is this the process that you follow for
9   processing ACDVs?
10  A.  Yes.
11  Q.  Okay.  Can you please point me to the process for
12  investigating a dispute code of true identity theft under
13  tab A?  Let's start with tab A.
14  A.  This manual doesn't provide investigation.  That's
15  through a different manual.  This is just how to respond to
16  the ACDV.
17  Q.  Can you tell me the name of the manual that
18  provides investigation guidance?
19  A.  It's the fraud procedures.
20  Q.  And the fraud procedures manual provides the
21  procedure by which an ACDV processer would investigate the
22  dispute code of true identity theft?
23  A.  Yes, that's correct.
24  MS. ROTKIS:  Counsel, do you know whether you've
25  provided that to me?

Page 107

1   MR. SEARS:  Yeah, we did.
2   MS. ROTKIS:  Okay.  Was -- was it in yesterday's
3   production?
4   MS. YENOVKIAN:  That was the un-redacted
5   yesterday.  I don't know what else you provided.
6   MR. SEARS:  It -- it was -- it -- it -- it was
7   definitely in yesterday's production with the un-redacted
8   version.  I would have to go back and look at the previously
9   provided documents to tell you exactly where in the mass of
10  documents it first appeared, but...
11  MS. ROTKIS:  Okay.
12  MR. SEARS:  I -- that -- that -- that is something
13  you should have.
14  MS. ROTKIS:  Okay.  All right.  I have no further
15  questions for Ms. Chu.
16  Thank you very much.  I know that this is not your
17  normal day and I apologize for taking you away from your
18  work.  But since no one is keeping track of how many ACDVs
19  she processes, I think it's probably not going to be that
20  much of a -- a loss.  Thank you very much.
21  THE WITNESS:  Thank you.
22  MS. ROTKIS:  I have no further questions.
23  MR. SEARS:  Okay.  Can we take a short break?  And
24  then I've got some questions.
25  MS. ROTKIS:  Of course.

Page 108

1   THE VIDEOGRAPHER:  The time is 1:16 p.m.  This is
2   the end of Disc 2.  Off record.
3   (Short recess taken.)
4   (Defendant's Exhibits A-B were
5   marked for identification.)
6   THE VIDEOGRAPHER:  This is the beginning of Disc
7   No. 3.  The time is 1:33 p.m.  We're back on record.
8   EXAMINATION
9   BY MR. SEARS:
10  Q.  Ms. Chu, with regard to the ACDVs that you
11  conducted that are marked as Exhibit No. 1 that we looked at
12  today with regards to Mr. Wood's account, did you link
13  responsibility on the account based solely on a review of
14  his name and address?
15  A.  No.
16  Q.  Did you link responsibility solely based upon
17  checking S- -- CIS codes?
18  A.  No.
19  Q.  In your answer to some of plaintiff's counsel's
20  question, you indicated that you would look at the Social
21  Security number, date of birth, prior addresses, dispute
22  code, and you also -- I'm trying to find the actual words
23  you used, but I think you said something like -- like that.
24  A.  Um-hmm.
25  Q.  Are there other things that you would look at as

Page 109

1   well?
2   A.  Yes.
3   Q.  Okay.  So it wasn't just limited to those four
4   items; is that correct?
5   A.  No.
6   Q.  Okay.  Plaintiff's counsel asked you if you would
7   check information that was on Credit One's system or
8   systems.  Does that information include account documents
9   like the application and so forth?
10  A.  The paper -- paper form of it or the electronic
11  form of it?
12  Q.  Just the information that is Credit One's account
13  systems.
14  A.  Yes.
15  Q.  I wanted to hand to you what has been marked as
16  Exhibit A.
17  Can you please tell me what that exhibit is?
18  A.  These are screenshots for my investigation on the
19  wood dispute.
20  Q.  Okay.  And can you tell with regard to which
21  particular ACDV that screenshot refers to?
22  A.  Yes.
23  Q.  Okay.  And how can you do that?
24  A.  I wrote down a control number or I typed in a
25  control number on the top left-hand side.

28 (Pages 106 to 109)

Page 110

1    Q. And to which ACDV report or response do those
2  screenshots refer?
3    A. It was for the inves- -- the first investigation
4  which I believe was the Equifax.
5    Q. Okay. And what does Exhibit A tell you with
6  regard to what you may have done as part of your
7  investigation?
8    A. So the first screenshot under ACDV is the
9  information provided by the CRA, which shows the address,
10  which if you look lower out of CAS and CASH, there are
11  screenshots of that address being associated with the
12  account which is where we would have sent statements.
13    The second printout is -- the first section is
14  CAPS which is our application system. The PO Box provided
15  at the time linked to the cardholder through Accurint
16  between October 2011 until April of 2014.
17    Q. And the results of that investigation are
18  consistent with the account history notes which you added
19  notes to; is that correct?
20    A. In CAS, yes.
21    Q. Okay. Now, I'm going to show you what's been
22  marked as Exhibit B.
23    Can you identify to which ACDV investigation
24  Exhibit B refers?
25    A. Yes.

Page 111

1    Q. And which one would that be?
2    A. That would be the one for June, which would be the
3  third ACDV. And I know that with the control number.
4    Q. Okay. And what does -- what do those screenshots
5  indicate with regard to what you may have done as part of
6  your investigation on that ACDV?
7    A. So the first section is screenshots of CAS and
8  CASH, again, with the address. About halfway down the sheet
9  in Accurint, you'll see that address links to a 1998 Subaru
10  Legacy for the cardholder and that address.
11    The second section is CAPS, which has a primary
12  phone number that was provided on the application, which
13  under the Accurint section links to the address on file.
14    And then the bottom portion is just the United
15  States Postal Service to verify the cities are the same via
16  the ZIP Code even though they're different on the -- on CAS.
17  It says West Point, and then in Accurint, it says Cologne.
18    THE COURT REPORTER: It says what?
19    THE WITNESS: Cologne.
20  BY MR. SEARS:
21    Q. And again, those results are consistent with your
22  notes in the CAS system; is that correct?
23    A. Yes.
24    MR. SEARS: All right. That's all the questions I
25  have.

Page 112

1    FURTHER EXAMINATION
2  BY MS. ROTKIS:
3    Q. Okay. I just have a couple more questions.
4    Have you ever been trained on things to look for
5  when a person claims true identity theft?
6    A. On the investigation part of it, yes.
7    Q. Okay. What do you look for when someone trains --
8  claims true identity theft?
9    A. I'm looking for things that are not consistent
10  with the cardholder, any addresses for or phone numbers or
11  information on the account, we're trying to validate whether
12  or not that information belongs to the consumer.
13    Q. But if someone's identity has been stolen, is
14  there anything else that you can do to determine whether it
15  is a true identity theft when you investigate their dispute?
16    A. The additional research that I did which would be,
17  you know, trying to link it to government IDs and, you know,
18  at that point, we would want to make -- you know, we're
19  trying -- I'm trying to link it to something that is
20  validated such as a car registration or a driver's license.
21    Q. So Exhibits A and B are your investigative notes;
22  is that correct?
23    A. Yes.
24    Q. And you have no other investigative notes other
25  than Exhibits A and B?

Page 113

1    A. Right.
2    Q. What government identification did you identify
3  that was associated with Mr. Wood?
4    A. Well, the car registration, which would have --
5  not necessarily government, but it would have been needed to
6  be verified at the time that it was obtained. So like a --
7  the car registration.
8    Q. What did you do to investigate whether he had
9  opened the account?
10    A. I verified the information on the ACDV. I looked
11  at the application and what was provided on the application
12  and verified if that information on the application was
13  associated with the cardholder prior -- even prior to the
14  account being opened, which in this case, it was.
15    Q. Could you please point me to the application that
16  you examined as part of your investigation?
17    A. It's on Exhibit A, second page, the top portion
18  under CAPS. It's also on Exhibit B, the second portion
19  that's labeled CAPS.
20    Q. So this screenshot of data fields is what you
21  claim is the application under CAPS?
22    A. Under CAPS, yes.
23    Q. Okay. It appears to be a screenshot. Okay.
24    Is Mr. Wood's signature on the CAPS screenshot
25  anywhere?

29 (Pages 110 to 113)

ALEXANDRA CHU - 5/11/2016

Page 114

```
 1        A.  Not on the screenshot itself.
 2        Q.  Is it anywhere in Credit One's systems?
 3        A.  It -- I don't know.  If we have an application
 4    image, it would be on there.
 5        Q.  Okay.  And what is the No. 1 form of identity
 6    theft in the United States?
 7           MR. SEARS:  Objection.
 8           THE WITNESS:  I don't know.
 9    BY MS. ROTKIS:
10        Q.  Did you do anything to investigate -- no, strike
11    that.
12           MS. ROTKIS:  I have nothing further.
13           MR. SEARS:  Okay.  We're done.
14           Thank you.  We will read.
15           THE VIDEOGRAPHER:  The time is 1:44 p.m.  This is
16    the end of Disc 3, end of Volume 1.  Off record.
17              (The deposition was concluded at
18               1:44 p.m.)
19
20
21
22
23
24
25
```

Page 115

```
 1           CERTIFICATE OF DEPONENT
 2    PAGE    LINE    CHANGE        REASON
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13              -oOo-
14        I, ALEXANDRA CHU, deponent herein, do hereby
15    certify and declare under penalty of perjury the within and
16    foregoing transcription to be my deposition in said action;
17    that I have read, corrected, and do hereby affix my
18    signature to said deposition.
19
20
21        _____
22        ALEXANDRA CHU
23        Deponent
24
25
```

Page 116

```
 1           REPORTER'S CERTIFICATE
      STATE OF NEVADA )
 2                    ) SS
      COUNTY OF CLARK )
 3        I, Johanna Vorce, Certified Court Reporter, do
      hereby certify:
 4        That I reported the taking of the deposition of
      the witness, ALEXANDRA CHU, commencing on Wednesday, May 11,
 5    2016, at 10:04 a.m.
          That prior to being examined, the witness was by
 6    me duly sworn to testify to the truth.
          That I thereafter transcribed my shorthand notes,
 7    and the typewritten transcript of said deposition is a
      complete, true, and accurate transcription of said shorthand
 8    notes.
          That a request has been made to review the
 9    transcript.
10        I further certify that I am not a relative or
11    employee of an attorney or counsel of any party involved in
      said action, nor a relative or employee of the parties
12    involved, nor a person financially interested in said
13    action.
14
15        Dated this 11th day of May, 2016.
16
17        _____
18        Johanna Vorce, CCR No. 913
19
20
21
22
23
24
25
```

30 (Pages 114 to 116)

Maxene Weinberg Agency
(800) 640-1949