# MAXENE WEINBERG AGENCY, INC.
*Litigation Support From Opening to Verdict*

(800) 640-1949 Toll Free
(949) 582-8569 Fax
www.mwadepos.net

| Mission Viejo | Los Angeles | San Diego | San Francisco | Palm Desert |
|---|---|---|---|---|
| 27281 Las Ramblas | 1801 Century Park East | 525 B. Street | 201 Spear Street | 77564 Country Club Drive |
| Suite 160 | 24th Floor | 15th Floor | Suite 1100 | Suite 150 |
| Mission Viejo, CA 92691 | Los Angeles, CA 90067 | San Diego, CA 92101 | San Francisco, CA 94105 | Palm Desert, CA 92211 |
| (949) 582-2503 | (310) 552-0702 | (800) 640-1949 | (800) 640-1949 | (760) 341-7331 |

*Worldwide
Deposition &
Litigation
Support Services*

*Primary Affiliate
Offices:*

New York, NY

Washington, DC

Chicago, IL

Miami, FL

Fort Lauderdale, FL

Atlanta, GA

Philadelphia, PA

San Antonio, TX

Houston, TX

St. Louis, MO

Florham Park, NJ

Columbus, OH

Charlotte, NC

Charleston, SC

Nashville, TN

Richmond, VA

Wilmington, DE

Fresno, CA

Riverside, CA

June 6, 2016

Jennifer Schmidt
c/o Christopher Sears, Esq.
Cipriani & Werner, P.C.
500 Lee Street East
Suite 900
Charleston, WV 25301

Re:      David William Wood vs.
           Equifax Information Services, LLC, et al.
Case No.:  3:15-cv-594

Dear Ms. Schmidt:

The transcript of your deposition, taken 05/11/2016, in the above-entitled matter has been prepared and is now available for you to read, correct if necessary, and sign. Pursuant to Federal Rule 30 (e), you have 30 days from the date of this letter to review your deposition.

Please contact our Client Services Representative at 800-640-1949 between the hours of 8:30 a.m. and 5:00 p.m. to schedule an appointment to review your deposition.

Sincerely,

MAXENE WEINBERG AGENCY
Litigation Support From Opening to Verdict

cc:   Susan M. Rotkis, Esq.
       Narine Yenovkian, Esq.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

DAVID WILLIAM WOOD,   )

  )

  )

Plaintiff,   )

  )

            vs.      ) CASE NO.:   3:15-cv-594

  )

EQUIFAX INFORMATION SERVICES,   )

LLC, Et al.   )

  )

  )

Defendants.   )

  )

VIDEOTAPED DEPOSITION OF

PERSON MOST KNOWLEDGABLE OF CREDIT ONE BANK,

JENNIFER SCHMIDT

LAS VEGAS, NEVADA

WEDNESDAY, MAY 11, 2016

1:52 p.m. - 3:21 p.m.

REPORTED BY: JOHANNA VORCE, CCR NO. 913

JENNIFER SCHMIDT - 5/11/2016

## Page 2

1  VIDEOTAPED DEPOSITION OF PERSON MOST KNOWLEDGABLE OF
2  CREDIT ONE BANK, JENNIFER SCHMIDT, taken at 3770 Howard
3  Hughes Parkway, Suite 300, Las Vegas, Nevada 89169, on
   Wednesday, May 11, 2016, at 1:52 p.m., before Johanna
4  Vorce, Certified Court Reporter, in and for the State
   of Nevada.
5
6  APPEARANCES:
7  For the Plaintiff:
      Consumer Litigation Associates, P.C.
8     Susan M. Rotkis, Esq.
      763 J. Clyde Morris Boulevard
9     Suite 1-A
      Newport News, Virginia 23601
10    757-930-3660
11 For the Defendant:
      CIPRIANI & WERNER, P.C.
12    CHRISTOPHER J. SEARS, ESQ.
      4500 Lee Street East
13    Suite 900
      Charleston, West Virginia 25301
14    304-341-0500
      csears@c-wlaw.com
15
   For CREDIT ONE BANK:
16    CREDIT ONE BANK
      NARINE YENOVKIAN, ESQ.
17    585 Pilot Road
      Las Vegas, Nevada 89119
18    702-269-1190
      narine.yenovkian@creditone.com
19
20 Also Present:      The Videographer, Jacob Florez
21
22
23
24
25

## Page 3

1              I N D E X
2
3  WITNESS: JENNIFER SCHMIDT
4
5  EXAMINATION                    PAGE
6  By Ms. Rotkis              6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1         INDEX (CONTINUED)
2            EXHIBITS
3
4  NUMBER                      MARKED
5
6         (NONE MARKED)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1      LAS VEGAS, NEVADA; WEDNESDAY, MAY 11, 2016
2              1:52 P.M.
3               -oOo-
4       (The Court Reporter was relieved of her duties
5  under NRCP 30(b)(4).)
6       THE VIDEOGRAPHER: This is Disc No. 1 of the video
7  deposition of Jennifer Schmidt. This deposition is
8  requested on behalf of Plaintiff in the matter of Wood
9  versus Credit One Bank. This is Case No. 315-CV-594.
10      This deposition is being held at 3770 Howard
11 Hughes Parkway, No. 300, Las Vegas, Nevada 89169. Today's
12 date is March 11th, 2016. Current time on the monitor is
13 1:52 p.m. We're on record.
14      My name is Jacob Flores. I'm the videographer. I
15 represent Litigation Services in Las Vegas, Nevada.
16      Would counsel in the room please introduce
17 themselves for this transcript?
18      MR. SEARS: Chris Sears, on behalf of Credit One.
19      MS. YENOVKIAN: Narine Yenovkian, on behalf of
20 Credit One.
21      THE VIDEOGRAPHER: Thank you.
22      Will counsel on the phone please introduce
23 herself?
24      MS. ROTKIS: This is Susie Rotkis reporting --
25 reporting -- joining from Newport News, Virginia, on behalf

2 (Pages 2 to 5)

## Page 6

1  of David Wood.
2  THE VIDEOGRAPHER:  Thank you.
3  MR. SEARS:  And -- and I -- I just want to clarify
4  something for both this deposition and the last deposition.
5  Ms. Yenovkian is counsel -- general counsel -- assistant
6  general --
7  MS. YENOVKIAN:  In-house counsel.
8  MR. SEARS:  -- in-house counsel for Credit One and
9  is not appearing on the record in this action. I just want
10  to make that clear.
11  THE VIDEOGRAPHER:  Thank you.
12  Will our court reporter please swear in the
13  witness?
14  Whereupon,
15  JENNIFER SCHMIDT,
16  having been first duly sworn to testify to the truth, was
17  examined and testified as follows:
18
19  EXAMINATION
20  BY MS. ROTKIS:
21  Q.  Have you ever had your deposition taken before?
22  A.  I have.
23  Q.  Okay. And when did you have your deposition
24  taken?
25  A.  I don't remember the exact dates, but it was for

## Page 7

1  car accidents in the past. I've had two.
2  Q.  Was it -- was it a car accident in which you were
3  injured?
4  A.  Yes.
5  Q.  And were you the plaintiff?
6  A.  What? Explain. I don't -- is that --
7  Q.  Did you file a lawsuit --
8  A.  Yes.
9  Q.  -- against the person who caused the accident?
10  A.  Yes.
11  Q.  And -- okay. So let me just introduce myself, and
12  I'll give you a couple of general guidelines to go by for
13  this deposition. You've already been experienced at it, and
14  so I don't need to go into any great detail.
15  My name is Susie Rotkis. I represent a gentleman
16  named David Wood, and he has filed a lawsuit against Credit
17  One. And Credit One has identified you as somebody with
18  information about facts in the case.
19  And you're not in any trouble. I'm just asking
20  you information that you have knowledge about and -- or I
21  think you have knowledge about it and your employer thinks
22  you do too.
23  Is there any reason why you can't testify
24  truthfully today?
25  A.  No.

## Page 8

1  Q.  Okay. And could you please say your full name and
2  then spell it for the record?
3  A.  Jennifer Lynn Schmidt, J-e-n-n-i-f-e-r L-y-n-n
4  S-c-h-m-i-d-t.
5  Q.  And what is your home address, Ms. Schmidt?
6  A.  1023 Pearl, P-e-a-r-l, Marble, M-a-r-b-l-e,
7  Avenue, North Las Vegas, Nevada 89081.
8  Q.  So you're familiar with the way this is going to
9  work. I've noticed the deposition, so I'll be asking the
10  questions, and you'll answer them to the best of your
11  ability.
12  There's a little bit of a delay on this video,
13  so -- and I also have a tendency to talk over the witness.
14  I apologize in advance. But just give me a minute after I
15  finish my question.
16  Credit One's counsel may want to interpose an
17  objection. Even if he objects, you can still answer the
18  question. And there's a very narrow set of circumstances
19  under which he may instruct you not to answer and that would
20  be attorney-client privileged information.
21  Are you represented by an attorney?
22  A.  By Credit One.
23  Q.  Do you understand that you're represented by
24  Credit One's attorney?
25  A.  Yes.

## Page 9

1  Q.  How long have you lived at the Pearl Marble
2  address?
3  A.  Since 2008, June. June 13th of 2008.
4  Q.  And where did you live before that?
5  A.  I was born and raised in Las Vegas. I lived at
6  my -- with my cousin.
7  Q.  Did you go to high school in Las Vegas?
8  A.  Yes, I did.
9  Q.  And where did you go to high school?
10  A.  Southern Nevada Vocational Technical Center.
11  Q.  Did you graduate?
12  A.  Yes.
13  Q.  Did you go on to any other form of education after
14  graduating?
15  A.  I did not.
16  Q.  What year did you graduate high school?
17  A.  1998.
18  Q.  And what did you do after you graduated high
19  school?
20  A.  I started working at a cab company.
21  Q.  And what did you do for the cab company?
22  A.  I worked doing accounts receivable and accounts
23  payable.
24  Q.  How did you learn to do accounts receivable and
25  payable?

3 (Pages 6 to 9)

Page 10

1    A.  It was my vocational training in high school.
2    Q.  And how long did you work at the cab company?
3    A.  For a year and a half.
4    Q.  And why did you leave?
5    A.  Different opportunities.
6    Q.  What different opportunities did you have that
7  caused you to leave your job?
8    A.  Benefits.
9    Q.  Are you saying that you went into the benefits
10 area of work?
11   A.  I went into -- I worked -- I started working at
12 Citibank, which had better benefits and retirement, things
13 like that.
14   Q.  Okay.  All right.  I understand what you're
15 saying.
16       You're not saying you went to a benefits job.  You
17 went to a different job because you wanted different
18 benefits?
19   A.  Yes.
20   Q.  Got it.
21   A.  Better benefits.
22   Q.  So after the cab company, you went to work at
23 Citibank.
24       And what did you do there?
25   A.  I worked in multiple different departments doing

Page 11

1  data entry, processing payments, statements insertion,
2  presort, until I was laid off from there, for job
3  discontinuation.
4    Q.  And how long did you work -- I apologize.  How
5  long did you work there?
6    A.  Thirteen years.
7    Q.  Oh, my gosh.  Okay.
8        So what did you do after you got laid off from
9  Citibank?
10   A.  I -- I applied for other jobs and I got hired
11 on -- at Credit One.
12   Q.  When did you get hired at Credit One?
13   A.  In May of 2013.
14   Q.  Did you have a period of unemployment after
15 leaving Citibank?
16   A.  No.
17   Q.  Okay.  And what did you get hired to do when you
18 joined Credit One?
19   A.  I worked in process accounting.
20   Q.  And how did you learn about that job?
21   A.  Through various websites, job career websites.
22   Q.  Do you recall how you applied for the job?
23   A.  Through careerbuilder.com.
24   Q.  And I'm sorry.  What was the first job you had at
25 Credit One?

Page 12

1    A.  Process accounting.
2    Q.  And what is that?
3    A.  Treasury and finance department, processing
4  payments, adjustments.
5    Q.  And what did you do in that job?
6    A.  I worked a -- check clearing, posting payments.
7    Q.  So when you got to work, what was the first thing
8  that you did to clear the checks and process payments?
9    A.  Payment research.
10   Q.  And how did you --
11   A.  Look --
12   Q.  -- go about doing that?
13   A.  Looking up the account numbers through customer's
14 information that they've provided through our --
15   Q.  In what system did you look that up?
16   A.  Our FDR system.
17   Q.  What is FDR?
18   A.  It's a Rumba session.
19       THE COURT REPORTER:  It's a what session?
20       THE WITNESS:  A Rumba.
21 BY MS. ROTKIS:
22   Q.  And what does that mean?
23   A.  It's just -- it's the name of the program.
24   Q.  So it's a computer program?
25   A.  Yes.

Page 13

1    Q.  FDR is a computer program.  Okay.
2        And what kind of information does FDR have on it?
3    A.  All of the account information, when the account
4  was opened, closed, any -- any authorized user information
5  for the credit card itself, the balance, the statements,
6  charges, payment history.
7    Q.  Anything else?
8    A.  Not that I -- I can recall right now.
9    Q.  Okay.  And does Credit One still use FDR?
10   A.  Yes.
11   Q.  Okay.  Do you -- do you still use FDR?
12   A.  Yes.
13   Q.  How long did you work in process accounting?
14   A.  For approximately eight months.
15   Q.  Okay.  And what did you do after that?
16   A.  I had put in my two weeks to go work for the post
17 office.  I had received a job offer through them.
18   Q.  And did you go work at the post office?
19   A.  Yes.  I worked there for --
20   Q.  Okay.  When did --
21   A.  I worked there for six months, from February --
22 the end of February of 2014, I believe, to August of 2014,
23 and I left there and applied -- or I applied back at Credit
24 One Bank and got a job in correspondence, back at Credit One
25 Bank, and I put in my two weeks at the post office.

Maxene Weinberg Agency
(800) 640-1949

JENNIFER SCHMIDT - 5/11/2016

Page 14

1  Q.  Why did you leave the post office?
2  A.  It wasn't a career job.  I was a contract
3  employee.
4  Q.  What do you mean?
5  A.  I was a contract employee.
6  Q.  Okay.  Were you an hourly employee at the post
7  office?
8  A.  Yes.
9  Q.  Do you recall what your hourly wage was at the
10  post office?
11  A.  I believe 14.25 an hour.
12  Q.  And were you working there full time?
13  A.  Yes.
14  Q.  And going back to the time when you worked at
15  Credit One Bank, in process accounting, were you an hourly
16  employee then?
17  A.  Yes.
18  Q.  Did you work full time for Credit One Bank in
19  process accounting?
20  A.  Yes.
21  Q.  Okay.  And do you recall what your wage was?
22  A.  14.25 an hour.
23  Q.  Okay.  And then when you applied for the job with
24  correspondence -- I'm sorry.  When was that?  That was in
25  February?

Page 15

1  A.  It was in July --
2  Q.  No.  August of 2014?
3  A.  Yeah.  I applied.  I sent -- I sent my résumé
4  through human resources and they called me from there to
5  come in for an interview.
6  Q.  Do you recall who called you to come in for an
7  interview?
8  A.  No, I do not.
9  Q.  Did you -- did you, in fact, come in for an
10  interview?
11  A.  Yes.
12  Q.  Do you recall who interviewed you?
13  A.  Robert Capparella.
14  Q.  What does he do?
15  A.  He's the manager of customer service
16  correspondence.
17  Q.  And did he offer you a job?
18  A.  Yes.
19  Q.  And was it in correspondence?
20  A.  Yes.
21  Q.  Okay.  And how much does that pay?
22  A.  I was hired back at the same wage I left at, at
23  14.25.
24  Q.  Okay.  And did you start working in August of
25  2014?

Page 16

1  A.  Yes.
2  Q.  Okay.  And how long did you work in
3  correspondence?
4  A.  From August until February.
5  Q.  And what was involved in your job in
6  correspondence?
7  A.  Responding to cardholder's inquiries, questions,
8  information.
9  Q.  How did you receive these inquiries?
10  A.  Through our system, P360.  It's a dock-imaging
11  system on the computer.
12  Q.  So you could see the actual letter --
13  A.  Yes.
14  Q.  -- that --
15  Okay.  And did you receive any training in
16  correspondence?
17  A.  Yes.
18  Q.  What kind of training did you receive?
19  A.  Side-by-side training.
20  Q.  What does that mean?
21  A.  Sat with somebody to -- to train on the process.
22  Q.  Who did you sit with?
23  A.  I don't recall at this time.
24  Q.  Do you recall when you did this training?
25  A.  When I first started.

Page 17

1  Q.  So like in August of 2014?
2  A.  Yes.
3  Q.  And do you recall how many -- how long it took to
4  do the side-by-side training?
5  A.  I don't remember.
6  Q.  Do you recall whether it was a man or a woman that
7  you trained with?
8  A.  No.
9  Q.  Do you recall whether it was one person that you
10  trained with, or more than one person?
11  A.  I don't remember.
12  Q.  How many people work in correspondence?
13  A.  I -- honestly, I don't know.
14  Q.  Is it more than five people?
15  A.  Yes.
16  Q.  Is it more than ten people?
17  A.  Yes.
18  Q.  Is it more than 20 people?
19  A.  Yes.
20  Q.  Do you think it's more than 50 people?
21  A.  I don't know.
22  Q.  Would it be fair to say that it's more than 20 but
23  less than 50 people?
24  A.  Possibly.
25  Q.  Okay.  Who is your supervisor in correspondence?

Maxene Weinberg Agency
(800) 640-1949

JENNIFER SCHMIDT - 5/11/2016

Page 18

1    A. I -- I'm no longer in correspondence. My
2  supervisor at the time?
3    Q. Who was your -- yes.
4    A. Robert Capparella.
5    Q. Did he provide any training to you?
6    A. I don't remember.
7    Q. Do you remember anything that you learned when you
8  were getting trained on correspondence?
9    A. No.
10   Q. Okay. So you worked there until February of 2015.
11 What did you do in February of 2015?
12   A. I was transferred to fraud.
13   Q. Did you apply for a transfer?
14   A. No.
15   Q. Why were you transferred to fraud?
16   A. A process that I was -- the process of ACDVs that
17 I was doing in fraud -- or in correspondence, the process
18 was transferred to fraud, for fraud ACDVs, and I was
19 transferred with the process.
20   Q. So when you were in correspondence, you were
21 processing ACDVs?
22   A. Um-hmm.
23   Q. How many other people in correspondence were
24 processing ACDVs?
25   A. I don't remember.

Page 19

1    Q. Do you recall who trained you how to process
2  ACDVs?
3    A. I'm trying to remember.
4    Q. Sorry about that. I may have missed the answer.
5  Do you recall who trained you?
6    A. I believe two other operators.
7    Q. Do you recall their names?
8    A. Rosalie Taylor and Bridgette Jones.
9    Q. Do you know Chantel Reed?
10   A. No.
11   Q. Do you know Alexandra Chu?
12   A. Yes.
13   Q. Do you know Tracy Madura?
14   A. Yes.
15   Q. Did Tracy Madura do any training with you?
16   A. Yes.
17   Q. Do you recall what Tracy Madura did to train you?
18   A. She -- she gave us information on further
19 investigative systems to search through.
20   Q. Who is your supervisor now?
21   A. Linda Hines.
22   Q. What department do you work in now?
23   A. Process accounting.
24   Q. When did you go to process accounting?
25   A. In November of 2015.

Page 20

1    Q. And why did you transfer to process accounting?
2    A. A step up in pay and -- what's the word I'm
3  looking for?
4    Q. You can take your time.
5    A. Promotion. It was a promotion.
6    Q. Okay. And let's see. You worked in
7  correspondence. Did you do ACDVs the whole time you worked
8  in correspondence?
9    A. No.
10   Q. When did you start doing ACDVs in correspondence?
11   A. In, I believe, November and December.
12   Q. So November and December of 2014?
13   A. Yes.
14   Q. Okay. So is it fair to say November 2014 through
15 November 2015 is when you were processing ACDVs first in
16 correspondence. Then in -- I'm sorry. Where did you go
17 after correspondence?
18   A. Fraud. In February --
19   Q. Fraud.
20   A. -- I was transferred.
21   Q. Okay. And to the best of your recollection,
22 Rosalie Taylor and Bridgette Jones trained you in how to
23 process ACDVs.
24     Does that sound right?
25   A. We did have a training class on the ACDV.

Page 21

1    Q. And how long was the class?
2    A. It was a -- a day class.
3    Q. Okay. And do you recall who taught the class?
4    A. I believe it was Karen Romero.
5    Q. Is Karen Romero an employee at Credit One Bank?
6    A. She's a supervisor, yes.
7    Q. And do you know what she supervises?
8    A. I believe quality.
9    Q. Okay. And where was this class taught?
10   A. On the Credit One site.
11   Q. So it was electronic?
12   A. No. It was in a room.
13   Q. No. It was -- okay.
14     It was in a room --
15   A. In a training class.
16   Q. -- on the site of the building. Okay.
17     All right. And do you recall who else was in the
18 training with you?
19   A. I don't recall.
20   Q. Do you -- were there any other students in the
21 class?
22   A. Yes.
23   Q. Did you recognize any of them?
24   A. I don't remember.
25   Q. When did you learn that you were going to be asked

6 (Pages 18 to 21)

JENNIFER SCHMIDT - 5/11/2016

Page 22

1  to give a deposition in this case?
2  A. I don't remember the exact date.
3  Q. Was it within the last 30 days?
4  A. No.
5  Q. Was it more than 30 days ago?
6  A. I -- I believe so.
7  Q. Did you provide any documents --
8  A. No.
9  Q. -- for this case?
10 Okay. What did you do to prepare for this
11 deposition?
12 A. Spoke with my attorneys over the -- the items that
13 the case is regarding to.
14 Q. Did you talk to anybody other than --
15 A. Sorry.
16 Q. Sorry. I just want to make sure. I'm not asking
17 for any information that you exchanged, that you learned
18 solely from your attorneys. Okay?
19 But did you talk to anybody else about this case?
20 A. No.
21 Q. Are you married?
22 A. Yes.
23 Q. Okay. Does your spouse know where you are today?
24 A. Yes.
25 Q. Okay. Did you talk to your spouse about this

Page 23

1  case?
2  A. No.
3  Q. Does your supervisor know where you are today?
4  A. Yes.
5  Q. Did you explain anything about the case to your
6  supervisor?
7  A. No.
8  Q. So you don't meet many people who are born and
9  raised in Las Vegas.
10 Do you live close to work?
11 A. Eighteen miles.
12 Q. Okay. About how long does it take you to get into
13 work in the morning?
14 A. About half an hour.
15 Q. Do you drive in?
16 A. Yes.
17 Q. What time do you start?
18 A. At 7 o'clock.
19 Q. And just looking back on the period of time from
20 November of 2014 to November of 2015, when you were
21 processing ACDVs, what were your work hours then?
22 A. I believe 6:30 till 2:00 -- or 3:00. Sorry.
23 Q. Get any breaks?
24 A. Yes.
25 Q. How many breaks?

Page 24

1  A. Two.
2  Q. What did you usually do on your break?
3  A. Sat in the break room and talked to coworkers.
4  Q. Okay. And what about -- did you have a lunch
5  break?
6  A. Yes.
7  Q. And how long was your lunch break?
8  A. Thirty minutes.
9  Q. What is your understanding of this lawsuit?
10 A. That David Woods is filing because there was fraud
11 on his account. He's claiming fraud.
12 Q. Do you know what the FCRA is?
13 A. I do not.
14 Q. Have you ever heard of the Fair Credit Reporting
15 Act?
16 A. Yes.
17 Q. Do you have any knowledge about the Fair Credit
18 Reporting Act?
19 A. I do not.
20 Q. Have you ever been trained regarding compliance
21 with the Fair Credit Reporting Act?
22 A. No.
23 Q. Do you work in a cubicle?
24 A. Yes.
25 Q. When you were -- okay. So all the questions I'm

Page 25

1  going to ask you about for the time being are going to be
2  all for the period of time that you were processing ACDVs.
3  Okay?
4  So we're only talking about that period of time in
5  correspondence and fraud from November 2014 through
6  November 2015. Okay?
7  At that time, were you sitting in a cubicle as
8  well?
9  A. Yes.
10 Q. Did you move cubicles when you went over to
11 process -- process accounting?
12 A. Yes.
13 Q. Okay. Is it in the same building?
14 A. No.
15 Q. No. Okay.
16 So when you transferred over to process
17 accounting, you transferred to a new building?
18 A. Yes.
19 Q. Okay. And so when you were -- are they -- are
20 they near -- near each other, the two buildings?
21 A. Yes.
22 Q. Okay. How close together are they?
23 A. Across the street from one another.
24 Q. Okay. When you were processing ACDVs, how many
25 monitors did you have in your cubicle?

7 (Pages 22 to 25)

JENNIFER SCHMIDT - 5/11/2016

Page 26

1    A. Two.
2    Q. Okay. And who was your supervisor when you were
3 processing ACDVs?
4    A. Robert Capparella, in correspondence, and in
5 fraud, it was Tracy Madura.
6    Q. And did Robert ever like walk around, supervising
7 people? How did he supervise you?
8    A. Checked on people, walked around.
9    Q. Okay. Do you know if he could see what you were
10 doing while you were on your computer?
11    A. No.
12    Q. Okay. You don't know?
13    A. No, he didn't. If he --
14    Q. He did not do that?
15    A. If he walked around, yes.
16    Q. Okay. But he couldn't see what you were doing
17 from his computer?
18    A. No.
19    Q. Okay. And did you have a phone at your desk?
20    A. I did not.
21    Q. Okay. And --
22    A. While I was in correspondence, I did not, but when
23 I transferred over to fraud, I did get a phone.
24    Q. All right. So you had a phone beginning in
25 February of 2015. Okay.

Page 27

1        When you were processing ACDVs, do you have any
2 idea how many ACDVs you could process in a day?
3    A. I don't remember offhand.
4    Q. Could you process 50 ACDVs in a day?
5    A. Yes.
6    Q. Did you ever process 50 ACDVs in a day?
7    A. Yes.
8    Q. Did you keep track of how many you did each day?
9    A. Yes.
10    Q. How did you keep track of how many you did each
11 day?
12    A. A productivity log sheet.
13    Q. What is a productivity log sheet?
14    A. A way for the managers to give information about
15 productivity, daily, for everybody on the team.
16    Q. Who was on the team?
17    A. All of my coworkers, the employees under the
18 supervisor.
19    Q. So while you were in correspondence, please tell
20 me the names of everybody who processed ACDVs.
21    A. I don't remember.
22    Q. While you were in fraud, please tell me the names
23 of everybody that you can remember that processed ACDVs?
24    A. In fraud, it was me, Alex and Jennifer Taber.
25    Q. Did you ever see Jennifer Taber's productivity

Page 28

1 logs?
2    A. I did not.
3    Q. Were you made aware of her productivity logs?
4    A. No.
5    Q. Were you ever made aware of Alex -- Alexandra
6 Chu's productivity logs?
7    A. No.
8    Q. And how did you get access to the productivity log
9 regarding your productivity?
10    A. We had our own file.
11    Q. And was it a paper file?
12    A. No. Electronic.
13    Q. And did you input information into your
14 productivity log?
15    A. Yes.
16    Q. So tell me how that would work.
17    A. We would get a count off of e-OSCAR, the system we
18 process the ACDVs through, through the day and keep track of
19 the numbers, our breaks, and through our productivity sheet
20 and Excel.
21    Q. Did you submit that somewhere at the end of the
22 day.
23    A. No. The managers went in and pulled them.
24    Q. Did the managers ever talk to you about your
25 productivity?

Page 29

1    A. No.
2    Q. Did your managers ever talk to you about -- and I
3 mean good or bad or indifferent -- just about how many ACDVs
4 you were able to process each day?
5    A. Not that I recall.
6    Q. Do you recall ever having a goal of how many you
7 should be processing each day?
8        MR. SEARS: Objection; vague.
9 BY MS. ROTKIS:
10    Q. You may answer.
11    A. There was no standard.
12    Q. On average, how long do you think it would take
13 you to process an ACDV?
14    A. I -- I don't know.
15    Q. An hour?
16    A. Per individual ACDV? No.
17    Q. Yes.
18    A. It's all depending on the information.
19    Q. Okay. Two hours?
20    A. No. Maybe --
21    Q. Less -- less than one hour?
22    A. Yes.
23    Q. Okay.
24    A. Maybe in between 5 to 15 minutes.
25    Q. So I'm just taking my calculator out here. I'm

8 (Pages 26 to 29)

JENNIFER SCHMIDT - 5/11/2016

Page 30

1  going to see.
2      So eight hours is 480 minutes, divided by 15.
3      So if you took 15 minutes on each ACDV, that would
4  be about 32 per day.
5      Does that sound right?
6  A.  It sounds -- it sounds approximate.
7  Q.  Yes?  Okay.
8      So you would process about 32 or maybe -- let's
9  see -- between 96 and 32 a day.
10     Does that sound right?
11     So if you spent five minutes on each one, that
12 would be 96 that you can process in a day.
13     Does that sound about right?
14 A.  A case-by-case basis.  I can't give you an exact
15 number of 92.
16 Q.  All right.  I'm not asking for an exact number.  I
17 know you can't do that.  That's a lot of days and a lot of
18 ACDVs.  I'm just asking you for like a guess of about --
19 about how many per day.
20 A.  It could be anywhere from 30 to maybe 70 a day.
21 Q.  Did you do anything other than process ACDVs
22 during that time that you were process -- doing that job?
23 A.  In fraud?  No.
24 Q.  You didn't have any other duties other than ACDV
25 processing?

Page 31

1  A.  No.
2  Q.  Okay.  And what about when you were in
3  correspondence?
4  A.  Yes.
5  Q.  So about how much of your day did you devote to
6  ACDVs when you were in correspondence?
7  A.  I don't remember.
8  Q.  How much of your day did you devote to other
9  duties when you were in correspondence?
10 A.  I don't remember.
11 Q.  When you see an ACDV with a dispute code of true
12 identity theft, what do you do to investigate that ACDV?
13 A.  Verify information to our system.
14 Q.  Okay.  Take me through it.  You get the ACDV.  It
15 has that dispute code.  What's the first thing you do?
16 A.  If there's documents, I review the documents.  If
17 there's no documents, I verify through our multiple
18 systems -- to verify -- to -- whether to hold that
19 cardholder responsible.
20 Q.  Okay.  If there are no documents, tell me the
21 first system you'd go to and what you'd do.
22 A.  Our CAS system.
23 Q.  What is CAS?
24 A.  It's a system that holds all of the information
25 for the cardholders, the -- if it's a -- statements, Social

Page 32

1  Security numbers, information on the account, balances.
2  Q.  Okay.  What information do you specifically look
3  at in CAS to do your investigation?
4  A.  Social Security number and address, name.
5  Q.  Okay.  And what do you specifically do?
6  A.  Bring up the account number into the system,
7  review --
8  Q.  Okay.
9  A.  -- what is provided by the cardholder -- by the
10 cardholder themselves on the ACDV, and review and verify the
11 information given by them versus the information that is in
12 our system.
13 Q.  Okay.  So when you get the ACDV, do you have it on
14 a screen?
15 A.  Yes.
16 Q.  Okay.  And so would you look at -- like would you
17 look at the name and then look over on your other screen
18 where you have the information pulled up on CAS?
19 A.  Um-hmm.
20 Q.  Okay.  And then what do you do, just with the
21 name?
22 A.  Just with the name, verify if it's the same or if
23 it's different.
24 Q.  Okay.  So do you -- do you match the first names?
25 A.  Match any name given that matches from our -- from

Page 33

1  the ACDV to our system.
2  Q.  Do you match middle names?
3  A.  We don't have middle names in our systems, just --
4  usually, we have the -- the middle initial.  If it's given
5  by the -- on the ACDV, we do -- and it's in our system, we
6  do match that as well.
7  Q.  Okay.  So first name, middle initial, if
8  available, and last name, right?
9  A.  Yes.
10 Q.  Okay.  And then the next thing?  What's the next
11 thing you look for to verify?
12 A.  We go down the list on e-OSCAR and verify any
13 information.
14 Q.  Okay.  What's the next thing on the list in
15 e-OSCAR that you would --
16 A.  I don't --
17 Q.  -- verify?
18 A.  I don't remember down the line.
19 Q.  Okay.  Would Social Security number be one of
20 them?
21 A.  Yes.
22 Q.  Okay.  Date of birth?
23 A.  If available, yes.
24 Q.  Okay.  What else?
25 A.  Phone number and address.

9 (Pages 30 to 33)

Page 34

1    Q.  Okay.  So if the person claims true identity theft
2    and you verify all of those items of information, what do
3    you do next?
4    A.  If I verify -- once I verify, I fill out the
5    remainder of the ACDV.
6    Q.  Okay.  So what do you mean by "fill out the
7    remainder of the ACDV"?
8    A.  Verify and input any information from our system
9    into the ACDV.
10   Q.  Okay.  So if it -- if the information matches,
11   what do you input into your system?
12   A.  We click on the radial buttons next to the
13   system -- or next to the information, whether it's "same" or
14   "different."
15   Q.  Okay.  And so it fills in -- if it's -- if it's
16   the same, it fills in the word "same," right?
17   A.  It's just the -- the "same" radial button, that
18   you don't have to input any information if the information
19   is the same.
20   Q.  Okay.
21   A.  It doesn't auto --
22   Q.  And what if it is different, what happens?
23   A.  It doesn't auto fill.
24       If it's different, we will fill in the information
25   that's different and click the radial button "different."

Page 35

1    Q.  Okay.  All right.  And then -- then what do you
2    do?
3    A.  Go to the next page of the ACDV and fill out the
4    information that is the -- at the account status.
5    Q.  Okay.  And then after you fill out the account
6    status, how do you resolve -- what action do you take on
7    that ACDV?
8    A.  We -- when we hold them responsible, we submit the
9    ACDV, and it goes -- I'm assuming it goes back to the credit
10   bureau and --
11   Q.  Okay.  Under what circumstances with a true
12   identity theft would you make a decision to not hold the
13   cardholder responsible?
14   A.  If we can't find anything that links the
15   cardholder to the account from the information they've
16   provided.
17   Q.  Okay.  So if you can't find anything.
18       So none of those factors match; is that -- is that
19   correct?
20   A.  Through our -- our multiple systems we use, if we
21   can't find them responsible, linking them to the account, we
22   delete it due to fraud.
23   Q.  Okay.  So what -- give me an example of how you
24   would -- of what would have to happen for you to find no
25   linkage between a person claiming identity theft and your

Page 36

1    multiple -- information in your multiple systems.
2        MR. SEARS:  Objection as to form.
3        THE WITNESS:  With the objection --
4    BY MS. ROTKIS:
5    Q.  You -- you may answer.
6    A.  Oh, okay.  Sorry.  Repeat the question.
7    Q.  Well, I'm trying to understand what my client had
8    to do to get this fraud cleared, and so I'm just trying to
9    find out what you do to investigate it.  And you've told me
10   that if there's any linkage through the multiple systems --
11       This -- this is what I'm perceiving you're saying.
12   Correct me if I'm wrong, please.  I'm perceiving that you're
13   saying that if you look through these multiple systems and
14   you find any link between the person who submits the dispute
15   and the information that you have on your system, then
16   you're going to hold him responsible.
17       So I'm just trying to find out what an identity
18   theft victim has to say or show in order for them not to be
19   held responsible.
20   A.  Submit a police report.
21   Q.  Because --
22   A.  Sorry.
23   Q.  So if they submit a police report, what
24   happens?
25   A.  If a police report is submitted, or a signed

Page 37

1    affidavit from the cardholder claiming fraud, we would
2    delete the -- the information from the Credit Bureau's.  We
3    would delete the account due to fraud.
4    Q.  Okay.  What if he doesn't have a police report or
5    an affidavit, are there any other circumstances that you
6    would delete the account?
7    A.  If we can link through multiple accounts -- or
8    multiple systems, we will hold them responsible.
9        The only --
10   Q.  Okay.  So --
11   A.  -- instances are -- is a police report, incident
12   number with the police report or a signed affidavit, fraud
13   affidavit.
14   Q.  All right.  So I have some exhibits in this
15   notebook -- you've got a copy of the notebook there -- that
16   were provided to me by Credit One and I would appreciate it
17   if you would look at the notebook and go to tab 2.
18   A.  Okay.
19   Q.  Do you recognize this document?
20   A.  I do not.
21   Q.  Okay.  This is Bates-numbered 57 and 58.  Have you
22   ever seen a document that looks like this before?
23   A.  In the system, processing ACDVs, yes.  This
24   individual, no.
25   Q.  Okay.  So -- okay.  You don't recall processing

10 (Pages 34 to 37)

Page 38

1  this particular ACDV?
2      A.  No, I do not.
3      Q.  Okay.  Do you know -- do you know who processed
4  this ACDV?
5      A.  I processed it.
6      Q.  Okay.  How do you know that?
7      A.  It has my name on "authorized name."
8      Q.  Okay.  And do you know when you processed this?
9      A.  On 6/15 of 2015.
10      Q.  Okay.  And can you tell from this ACDV what you
11  did to investigate Mr. Wood's dispute?
12      A.  I don't recall at this time.
13      Q.  I'm not asking you to recall.  I'm just asking,
14  can you tell from this document what you did?
15      A.  No.
16      Q.  Does this document record anything that you did?
17      A.  I verified the name was same; the Social Security
18  number, same; the address that he provided was same from --
19  or that was -- what was in our system.
20      Q.  Did you do anything to investigate his claim of
21  fraud?
22      MR. SEARS:  Objection as to form.
23      THE WITNESS:  I don't recall.
24  BY MS. ROTKIS:
25      Q.  Does this document show whether you did

Page 39

1  anything -- if you had done something else other than
2  verified the name, the Social Security number and the -- I'm
3  sorry -- the name, the Social Security number and the
4  address?  Would it show on this document what else you did?
5      A.  It would not.
6      Q.  Okay.  How did you determine that the date of
7  birth was different?
8      A.  One of our systems that we use.
9      Q.  What system shows you the date of birth?
10      A.  I believe CAPS.
11      Q.  And if there's a different date of birth, why
12  didn't that cause you to be concerned that there might be
13  fraud on this account?
14      MR. SEARS:  Objection as to form.
15  BY MS. ROTKIS:
16      Q.  Okay.  I'll withdraw the question.
17      And under what circumstances would a different
18  date of birth cause you to further investigate a dispute of
19  true identity fraud?
20      MR. SEARS:  I object as to form on that one as
21  well.
22  BY MS. ROTKIS:
23      Q.  You may answer.
24      A.  Verifying other information that the cardholder
25  has provided as well is the same as what we have in our

Page 40

1  system.
2      Q.  Going down to, on page 57, account information,
3  the CCC, the compliance condition code, why did you put
4  "XH"?
5      A.  Because there was an investigation done.
6      Q.  Were you aware that the cardholder had previously
7  disputed this account when you conducted this investigation?
8      A.  I believe so.
9      Q.  Why did you use "XH" instead of "XB"?
10      A.  Because the account was not under investigation
11  when I submitted this.
12      Q.  Okay.  Do you know what "XB" means?
13      A.  Account under investigation, I believe.
14      Q.  Okay.  Going down to -- a couple down below the
15  compliance condition code, there's something that says
16  "interest-type indicator."  Do you know what that is?
17      A.  I do not.
18      Q.  It shows that you input some codes here --
19      MR. SEARS:  Objection.
20  BY MS. ROTKIS:
21      Q.  -- over in the response data.
22      Well, okay, strike that.
23      MR. SEARS:  Yeah.
24  BY MS. ROTKIS:
25      Q.  It shows some codes input into the response data

Page 41

1  field.  Do you know what that means?
2      A.  I do not.
3      Q.  Have you ever seen those codes before?
4      A.  No.
5      Q.  Who else besides you, the ACDV operator that
6  signed this ACDV, could have input a response into that data
7  field?
8      MR. SEARS:  Objection as to form.
9      THE WITNESS:  Nobody but me.  I can't tell you if
10  that is auto filled after I input the items and submit the
11  ACDV.
12  BY MS. ROTKIS:
13      Q.  Okay.  If you would please go over to tab 4.  And
14  that's Bates Nos. 59 through 65.  And if you would look
15  through this -- did you look through it already?  And
16  just -- after you finish paging through it, just let me know
17  when you're ready.
18      A.  Okay.
19      Q.  Do you recognize this document?
20      A.  They are notes out of our CAS system.
21      THE COURT REPORTER:  CAS system?
22      THE WITNESS:  Um-hmm.
23  BY MS. ROTKIS:
24      Q.  Have you ever seen this before?
25      A.  Yes.

Page 42

1    Q. When did you see this?
2    A. I look at the system on a daily basis.
3    Q. Oh, okay. So -- but this particular account
4    history for David Wood -- have you seen this particular
5    account history for David Wood before?
6    A. When I posted the -- or when I did the
7    investigation, yes.
8    Q. Okay. Can you tell me the page number -- and when
9    I say "page number," I'm just talking about the -- the last
10   two digits of the page number. Could you tell me the page
11   number where you made the entry, where you did the
12   investigation?
13   A. On page 59.
14   Q. Okay. And do you have your agent number?
15   A. It's 31-22-34-334.
16   Q. Okay. And so -- all right. So on 6/15/15,
17   there's an entry at 12:40 p.m. Is that the one you're
18   referring to?
19   A. Yes.
20   Q. Okay. And could you just take me through the
21   notes that you entered about the investigation that you
22   conducted?
23   A. It's saying I received an ACDV claiming true
24   identity theft. "The cardholder claims ID theft. Address,
25   the same. Account was previously investigated on 6/10/15.

Page 43

1    Cardholder found" -- "previously found responsible. No
2    further action taken."
3    Q. Okay. And you received this ACDV from Equifax,
4    right?
5    A. Yes.
6    Q. And what is "DC"? It says "EQDC." Do you know
7    what that is?
8    A. Description -- "E"- -- "EQ" is Equifax. "DC" is
9    the dispute code.
10   Q. Oh, okay. Right. Right. All right. And so
11   would you have -- all right. So it shows the -- that you
12   investigated the address. The address is the same; is that
13   correct?
14   A. Yes.
15   Q. Okay. And did you do any other investigation
16   related to this ACDV?
17   A. I did not.
18   Q. Okay. And if an account has previously been
19   investigated and the -- and the cardholder is found
20   responsible, what does that mean to you?
21   MR. SEARS: Objection as to form.
22   THE WITNESS: That the prior agent that
23   investigated this further -- with further information in the
24   previous 30 days was already found responsible for this
25   account.

Page 44

1    BY MS. ROTKIS:
2    Q. And -- and so I'm just curious. Does that mean
3    that -- I mean, do you take that to be kind of like "that
4    investigation was already done. I don't need to redo that.
5    What -- I don't need to go any further"?
6    What does that mean as far as the investigation
7    actions that you would take?
8    A. If the account was previously found responsible in
9    the prior 30 days for the same reason, we do no further
10   investigation. The ACDV is to be responded to --
11   Q. Do you ever call consumers when they -- oh, sorry.
12   A. -- verifying all information that's still in our
13   systems as well as provided by the cardholder on the ACDV
14   itself.
15   Q. Okay. Do you ever call a cardholder that claims
16   true identity theft?
17   A. We do not.
18   Q. Going now to tab 5. If you would take a few
19   minutes to look at that document.
20   Is this a document that you recognize?
21   A. Offhand, no.
22   Q. Okay. Turn to tab 9A, please. And this is -- I'm
23   sorry.
24   And for the court reporter, tab 5 is 317, Bates
25   317 through 323.

Page 45

1    And now, I just want to go to tab 9A.
2    Is this a document you recognize?
3    A. Yes.
4    Q. Okay. How do you recognize this document?
5    A. This is one of the training manuals.
6    Q. Okay. If you would go to page 392. So -- all
7    right. So tab 9A is Bates-marked 384 through 437 and I'm
8    asking you to go to 392. I just want to direct your
9    attention to the subheading that says "Fraud ACDV."
10   Would you agree that what you've testified about
11   so far today is using the procedures outlined to verify all
12   the information on the ACDV required?
13   You may answer.
14   A. There were process changes after.
15   Q. There were process changes after what?
16   A. After this was written.
17   Q. Okay. What process change was implemented after
18   this was written? I'm listening.
19   MR. SEARS: I -- answer if you -- if you know. If
20   you don't know, let her know.
21   THE WITNESS: Offhand, I don't remember the exact
22   changes that were made.
23   BY MS. ROTKIS:
24   Q. Okay. So on page 392, where it says you're
25   supposed to update the compliance condition code and the

12 (Pages 42 to 45)

JENNIFER SCHMIDT - 5/11/2016

Page 46

1    fraud ACDV to XB, was that changed?
2        A. I believe so, yes.
3        Q. Okay. If you'll now go to tab B, page 445. If
4    you'll look where it talks about how to treat a fraud ACDV,
5    that subheading "Fraud ACDV." First, it deals with active
6    accounts in FDR.
7            What does this manual say you're supposed to do in
8    the compliance condition code as far as the compliance
9    condition? What -- what indicator are you supposed to put
10   in there?
11       A. For active accounts, "XB."
12       Q. Um-hmm. And what about for sold accounts? The
13   next subheading is "sold accounts."
14       A. For sold accounts, "XB."
15           THE COURT REPORTER: "XB" for sold accounts?
16           THE WITNESS: Yes.
17   BY MS. ROTKIS:
18       Q. No. It says "No longer input the compliance
19   condition XB," I think is what it says.
20       A. Yes. "No longer input the compliance condition
21   code XB."
22       Q. But it doesn't say what compliance condition code
23   you're supposed to put in there?
24           MR. SEARS: I'm sorry.
25           Is that a question?

Page 47

1    BY MS. ROTKIS:
2        Q. Okay. Does it say what compliance condition code
3    you're supposed to put in there for sold accounts?
4        A. It does not.
5            THE COURT REPORTER: She answered.
6            MS. ROTKIS: What was that?
7            THE COURT REPORTER: I said she answered. Did you
8    not -- did you hear it?
9            MS. ROTKIS: No, I didn't hear it. No.
10           THE COURT REPORTER: She said, "It does not."
11   BY MS. ROTKIS:
12       Q. Okay. Then going to tab C and it's Bates
13   No. 4- -- I think it might be 490 -- it's 493, but it says
14   page 10 on the document itself, but Bates No. 493.
15           I'm sorry. And if you would go to the previous
16   page, 492.
17           Okay. So 492 has that subheading "Fraud ACDV."
18   Would you agree that this is the same section of this
19   version, October 8th, 2015, of the prior two? I'm sorry.
20           This is the new version of that section, the fraud
21   ACDV section, dated October 8th, 2015?
22       A. I believe so.
23       Q. And have you seen this document before?
24       A. I don't recall.
25       Q. It's dated October 8th, 2015. Were you still

Page 48

1    doing ACDVs at that time?
2        A. I was.
3        Q. Okay. And what does it say to do if there is a --
4    a fraud dispute and the account still resides in FDR?
5        A. Update client condition -- compliance condition
6    code to "XB" in e-OSCAR. If the -- if the account still
7    resides in FDR, update the compliant -- compliance condition
8    code on FDR-NMCB screen also to reflect XB.
9        Q. Okay. So then I asked you to go to the next page.
10   And would you agree that this -- that this document governs
11   how ACDV operators at Credit One Bank should be performing
12   these investigations?
13           MR. SEARS: Objection as to form, calls for, you
14   know, ultimate issue.
15           MS. YENOVKIAN: You can still answer if you know.
16   BY MS. ROTKIS:
17       Q. You may answer.
18       A. Without reviewing further -- I'd have to review
19   the manual and guidelines.
20       Q. Okay. Fair enough.
21           The -- page 10 talks about sold accounts. If you
22   go down to the subheading that says "sold accounts," what
23   does it now instruct the compliance condition code to be if
24   the account is not -- if the account still resides in FDR
25   for a sold account?

Page 49

1        A. If the account is a sold account, I don't believe
2    that the account is still going to reside in FDR.
3        Q. Okay.
4        A. If it's a sold --
5        Q. The compliance condition code -- go ahead.
6        A. If the account is sold, we verify and respond to
7    the ACDV as required, update the compliance condition code
8    to "XH" in e-OSCAR, and if the account still resides in --
9    in FDR, update the compliance condition code in FDR-NMCB
10   screen also to reflect XH.
11       Q. Okay. And so if you entered "XH" in the
12   compliance condition code, you were doing exactly what you
13   were supposed to do, according to this manual, correct?
14       A. I believe so.
15           MS. ROTKIS: Okay. I have nothing further.
16           MR. SEARS: I don't have -- I'm sorry?
17           MS. YENOVKIAN: Do you want to take a five-minute
18   break? Five-minute break?
19           MR. SEARS: Okay. We're going to take a little
20   break.
21           THE VIDEOGRAPHER: The time is 3:15 p.m.
22   Off record.
23           MS. ROTKIS: Wait a minute. What's going on?
24           MS. YENOVKIAN: Five-minute break.
25           MS. ROTKIS: What's happening?

13 (Pages 46 to 49)

JENNIFER SCHMIDT – 5/11/2016

Page 50

1        MS. YENOVKIAN: Five-minute break.
2        MS. ROTKIS: Oh, okay. Fine.
3            (Short recess taken.)
4        THE VIDEOGRAPHER: The time is 3:21 p.m. We're
5    back on record.
6        MR. SEARS: I have no questions.
7        All right. You -- we'll -- we'll read.
8        THE VIDEOGRAPHER: Counsel on the line, do you --
9        MS. ROTKIS: Nothing further. Thank you.
10       THE VIDEOGRAPHER: Thank you.
11       The time is 3:21 p.m. This is the end of Disc 1.
12   Off record.
13           (The deposition was concluded at
14           3:21 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 51

1            CERTIFICATE OF DEPONENT
2    PAGE   LINE   CHANGE        REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13            -oOo-
14       I, JENNIFER SCHMIDT, deponent herein, do hereby
15   certify and declare under penalty of perjury the within and
16   foregoing transcription to be my deposition in said action;
17   that I have read, corrected, and do hereby affix my
18   signature to said deposition.
19
20
21
22       _____
23       JENNIFER SCHMIDT
24       Deponent
25

Page 52

1            REPORTER'S CERTIFICATE
2    STATE OF NEVADA  )
3                     ) SS
     COUNTY OF CLARK  )
4        I, Johanna Vorce, Certified Court Reporter, do
5    hereby certify:
6        That I reported the taking of the deposition of
7    the witness, JENNIFER SCHMIDT, commencing on Wednesday, May
8    11, 2016, at 1:52 p.m.
9        That prior to being examined, the witness was by
10   me duly sworn to testify to the truth.
11       That I thereafter transcribed my shorthand notes,
12   and the typewritten transcript of said deposition is a
13   complete, true, and accurate transcription of said shorthand
14   notes.
15       That a request has been made to review the
16   transcript.
17       I further certify that I am not a relative or
18   employee of an attorney or counsel of any party involved in
19   said action, nor a relative or employee of the parties
20   involved, nor a person financially interested in said
21   action.
22       Dated this 11th day of May, 2016.
23                          _____
24                          Johanna Vorce, CCR No. 913
25

14 (Pages 50 to 52)