```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4                CASE NO. 3:15-cv-594

 5

 6   DAVID WILLIAM WOOD,

 7          Plaintiff,

 8   v.

 9   EQUIFAX INFORMATION SERVICES,

10   LLC, et al.,

11          Defendants.

12   _____

13

14

15

16        VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

17                  JAMES F. LYNN

18

19              Thursday, August 25, 2016
                Western Washington University
20               516 High Street
                Miller Hall, 56 & 58
21

22

23

24
     Reported by:  JUDY ROBINSON, CCR #2171
25   Notary Public - State of Washington
```

**JAMES F. LYNN on 08/25/2016**

```
 1                    A P P E A R A N C E S

 2
    Appearing via Videoconference
 3  on behalf of the Plaintiff:
    David William Wood
 4  MR. LEONARD BENNETT, ESQ.
    CONSUMER LITIGATION ASSOCIATES, P.C.
 5  763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
 6  757-930-3660 (phone)
    LBennett@CLAlegal.com
 7

 8
    Appearing on behalf of the Defendant:
 9  Credit One Bank
    CHRISTOPHER SEARS, ESQ.
10  CIPRIANI & WERNER, P.C.
    500 Lee Street East, Suite 900
11  Charleston, West Virginia 25301
    304.341.0500 (phone)
12  CSears@c-wlaw.com

13

14  ALSO PRESENT:  Jordan Donovan, Videographer at Current Media
    Productions, Peter Sheldrup, Video Production Specialist,
15  Duncan Gannicott, Intern

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2
     WITNESS                   EXAMINATION              PAGES
 3
     JAMES F. LYNN
 4
                         BY MR. BENNETT ............. 4-129
 5

 6

 7

 8
                        E X H I B I T S
 9

10
                     NO EXHIBITS MARKED
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Videoconferenced Deposition taken

 2   before JUDY A. ROBINSON, CERTIFIED COURT REPORTER and Notary

 3   Public in and for the State of Florida at Large,

 4   in the above cause.

 5                   -----------------

 6              THE VIDEOGRAPHER:  This is the beginning of

 7   media card number one in the deposition of James F. Lynn in

 8   the matter of David William Wood, Plaintiff, v. Equifax

 9   Information Services, LLC, et al., Defendants.

10              The Case Number is 3:15-cv-594.

11              Today's date is August 25th, and the time is

12   approximately 11:04 a.m.

13              My name is Jordan Donovan.  Our court reporter is

14   Judy Robinson.

15              We're here with the Maxine Weinberg Agency.

16              Counsel, please introduce yourself, after which the

17   court reporter will swear in the witness.

18                   MR. BENNETT:  Good morning.  My name is

19   Leonard Bennett.  I represent the Plaintiff.  I'm appearing

20   by videoconference from Newport News, Virginia.

21                   MR. SEARS:  This is Christopher Sears, from

22   the Law Firm of Cipriani & Werner, appearing on behalf of

23   Credit One Bank, N.A.

24                   E X A M I N A T I O N

25   BY MR. BENNETT:
```

1    Q.   Sir, can you please state your full name for the
2    record.
3    A.   Yes.  First name is James.  Middle initial is "F,"
4    which stands for Francis.  And my middle name is Lynn,
5    L-Y-N-N.
6    Q.   Sir, in what city and state do you reside?
7    A.   My permanent address is 613 Eldrin Drive in Silver
8    Spring, Maryland.  And my secondary address is 12070 Chinook
9    Drive in Burlington, Washington.
10   Q.   And where do you spend most of the time when you're
11   not traveling between those two locations?
12   A.   We are trying to make it a 50/50 proposition at
13   this point.
14   Q.   How old are you?
15   A.   66.
16   Q.   And you understand that you're being deposed today
17   because the defendant, Credit One, has disclosed you as its
18   intended expert witness; correct?
19   A.   That is correct.
20   Q.   How many times have you had your deposition taken
21   in your capacity as a purported expert witness?
22   A.   I believe about 30.
23   Q.   And when prior to today was the most recent one
24   you've sat for?
25   A.   I believe it was in February of 2015.

```
 1        Q.   Can you tell me about that case?  First of all,

 2   what was the name of that case if you recall, the one -- the

 3   last time you sat for a deposition?

 4        A.   Do I have my resume here?

 5        Q.   No.  I'll go through your resume --

 6        A.   Okay.

 7        Q.   -- but right now, I want to check your memory.

 8        A.   Okay.  I just can't recall the caption on the case,

 9   frankly.

10        Q.   Do you know if it was state or federal court?

11        A.   Federal.

12        Q.   And do you know what state it was in?

13        A.   It was in the District of Columbia.

14        Q.   Have you ever testified at trial before?

15        A.   Yes.

16        Q.   And how many times approximately?

17        A.   Five.

18        Q.   When was the last time that you testified at trial?

19        A.   I believe it was in March of 2013.

20        Q.   What's the name of your business?

21        A.   The Lynn Group, Inc.

22        Q.   Are there any owners of the corporation other than

23   yourself?

24        A.   No.

25        Q.   Are there any employees of that corporation other
```

 1   than yourself?

 2       A.   No.

 3       Q.   Have there even been any employees of that

 4   corporation other than yourself?

 5       A.   For temporary time, my wife was an -- an employee.

 6       Q.   Okay.  Do you have an office outside of your home

 7   for that corporation, physical office?

 8       A.   No.

 9       Q.   And have you ever had a physical office for that

10   corporation outside of your home?

11       A.   I thought that was the last question.  Did I -- I

12   miss something?

13       Q.   Well, the first question was, do you have, implying

14   the present.  And the second question asked if you've ever

15   had a physical office.

16       A.   No.

17       Q.   Do you recall the names of the five cases in which

18   you've testified at trial?

19       A.   No.  I would have to review them in my resume.

20   They are so denoted in my resume.

21       Q.   All right.  And have you ever testified at trial

22   regarding the Fair Credit Reporting Act?

23       A.   No.

24       Q.   Have you ever been -- outside of those five cases,

25   have you ever been the subject of any motion to either

1    qualify you as an expert or disqualify you as an expert?

2        A.    Yes.

3        Q.    And how many times has a court ruled in favor of

4    qualifying you or not disqualifying you as an expert?

5        A.    Every time except one.

6        Q.    And which one were you not qualified?

7        A.    It was a bankruptcy case about a year and a half

8    ago.  And it was a hearing in the process of a bankruptcy

9    procedure, and I was asked to testify as to a series of

10   income-producing properties as to whether the -- the debtor's

11   plan of action was appropriate.  And I wasn't permitted to --

12   to -- to render that testimony.

13       Q.    And why were you not permitted to render that

14   testimony?

15       A.    The judge ruled against it.  It didn't permit me

16   to -- to present findings and conclusions I had.

17       Q.    And do you know the name of that case?

18       A.    I don't off the top of my head, no.

19       Q.    But you put that on your resume?

20       A.    It is not.

21       Q.    Why isn't that in your resume?

22       A.    I didn't do anything.

23       Q.    Well, you -- you rendered a written opinion; right?

24       A.    No, I didn't.  I just compiled some information on

25   an income-producing property -- a series of income-producing

1   properties, and I didn't render a -- a -- an opinion that

2   didn't testify at the hearing, so I didn't include it.

3       Q.   So let me -- let me try to understand how qualified

4   you think you are.

5            Are you an attorney?

6       A.   No.

7       Q.   Do you believe that you're qualified to render an

8   opinion as to the meaning or purpose of the law?

9       A.   Which law?

10      Q.   One second.  Go off the record, please.

11           THE VIDEOGRAPHER:  We are going off the record

12   at 11:14.

13           (Off the record.)

14           THE VIDEOGRAPHER:  We are on the record.  The

15   time is now approximately 11:15 a.m.

16   BY MR. BENNETT:

17      Q.   I'll start at the top here.

18           I want to figure out what topics you feel you

19   should be qualified -- qualified to testify about.

20           And I ask you, do you believe you are qualified to

21   render an opinion as to the meaning or interpretation of a

22   law?

23      A.   Specific laws, yes.  But -- but -- yeah, that deal

24   with consumer and/or banking matters.  That's what my

25   specialty is.

**JAMES F. LYNN on 08/25/2016**

```
 1        Q.   All right.  So in this particular instance, in this
 2   case here today with Mr. Wood's case, you would agree with me
 3   that a significant part of your opinion is founded upon your
 4   opinion as to the meaning and interpretation of the Fair
 5   Credit Reporting Act; right?
 6        A.   That's correct.
 7        Q.   And so you would agree with me that your expert
 8   witness report in this case -- in Mr. Wood's case is seeking
 9   to render a legal meaning opinion as to the meaning or
10   interpretation of the Fair Credit Reporting Act; correct?
11             MR. SEARS:  Objection.  Calls for a legal
12   conclusion.
13             MR. BENNETT:  He'll say things periodically or
14   unless he instructs you not to answer, you can keep looking
15   at me and/or at the camera and answer the question.
16             THE WITNESS:  Okay.  Will you repeat the
17   question?
18   BY MR. BENNETT:
19        Q.   Sure.
20             Do you want to talk to -- you're looking at him.
21   Do you want to talk to him?
22        A.   No.  I was looking at the court reporter.  Ask me
23   if -- it's been my experience, the court reporter would
24   usually repeat it.  Or if you would like to repeat the
25   question and -- then, that's fine.
```

```
 1        Q.   Yeah, I'll do that.  It's a pain for her to do

 2   that.

 3        A.   Okay.

 4        Q.   So you would agree with me that your expert opinion

 5   in this case is significant, at least a significant part of

 6   the opinion is a legal opinion as to the interpretation of

 7   the Fair Credit Reporting Act; correct?

 8        A.   I'm troubled by the word "legal" because I'm not

 9   representing myself as a law.  I'm recommending myself as an

10   expert in banking matters.  This is a -- a law and

11   regulations that are within the context of my expertise.  As

12   a result --

13        Q.   I understand that.

14        A.   -- I feel comfortable in rendering opinions on that

15   basis.

16        Q.   But you agree that the significant component of

17   your expert report in this case is your opinion as to the

18   meaning of the law, the Fair Credit Reporting Act; correct?

19        A.   Specific parts of that law, yes.

20        Q.   Okay.  Even though you agree, you're not a lawyer;

21   right?

22        A.   Yes.  I testified to that already.

23        Q.   Have you ever read the Johnson versus MBNA case --

24   the Johnson MBNA case that the Fourth Circuit rendered before

25   Mr. Sears sent that to you in this case?
```

```
 1        A.   I don't recall reading it before, but I did read it
 2   in conjunction with this case.
 3        Q.   How about Mos Sanders versus ADT case?  Have you
 4   read the Fourth Circuit's decision in that before Mr. Sears
 5   sent it to you in this case?
 6        A.   Not that I recall.
 7        Q.   And you also disclosed one of my expert -- I mean,
 8   one of congressional testimony transcripts, the 2007 one.
 9             Did Mr. Sears send that to you, or did you find
10   that on your own?
11        A.   He sent it to me and I read it.
12        Q.   Had you ever read that before this case?
13        A.   I don't recall that I did.
14        Q.   Did you learn anything in reading the Johnson
15   decision?
16        A.   You want to be more specific?
17        Q.   Did your understanding of what the Fair Credit
18   Reporting Act requires change after you read the Johnson
19   decision?
20        A.   No.
21        Q.   Did it change after you read the Sanders decision?
22        A.   No.
23        Q.   Are you aware that those decisions that govern the
24   law, at least in Virginia; right?  You're aware of that?
25        A.   Yes.
```

1    Q.   But you had never read them before rendering your

2    decision or before being asked to render your opinion in this

3    case; right?

4    A.   That's correct.

5    Q.   Now, how did you become such an expert in the

6    meaning of the Fair Credit Reporting Act?

7    A.   Well, by the cases that I've worked on and the fact

8    that I am a user of credit reports, given the professional

9    experience that I have.

10         The preponderance of my professional experience has

11   been as a lending officer with Merrill National Bank, as a

12   training officer with Merrill National Bank, as a consultant

13   to various financial institutions around the country, and --

14   and obviously from litigation.  And in the context of that,

15   we read credit reports.  We understand what they are and we

16   read them.

17         What I want to know are -- what you know are that

18   the -- the rules that give one confidence to understand that

19   the information that you're looking on is credible, is

20   reliable and you can depend upon it.

21   Q.   Well, I want to put that your experience in two

22   categories and see if you can agree that that's a fair

23   delineation.

24         The first way that you obtained expert knowledge

25   was when you were actually working in the financial services

1    industry and specifically for Merrill National Bank; correct?

2         A.   That's correct.

3         Q.   And the second way that you learned information

4    that you were using for your expert opinion was when you were

5    hired as an expert for -- by either financial services

6    entities or -- or parties in litigation regarding

7    credit-reporting cases or the Fair Credit Reporting Act;

8    right?

9         A.   That's correct.

10        Q.   And is there any other category besides those two?

11        A.   On my resume, you'll note that I was a facilitator

12   of various credit-training programs for the Omega Corporation

13   between 2000 and 2004, and in that context, I taught a

14   consumer-lending program or facilitated a consumer-lending

15   program approximately 15 times at various institutions in the

16   mid-Atlantic region as well as in the south.

17             Part of that consumer-lending program was an

18   explanation of various consumer protection regulations that

19   included the Equal Credit Opportunity Act, Real Estate

20   Settlement Procedures Act, Fair Debt Collection Practices

21   Act, among others.

22             So I had a third component to give me some

23   background and experience in the Fair Credit Reporting Act.

24        Q.   And -- but under oath, you can't say that you

25   taught how to comply with the furnisher obligations of the

1   Fair Credit Reporting Act, the safety 81S-2B provision in

2   this case when you worked for Omega; right?

3       A.   I can't say that for sure because I don't have the

4   materials.  I did search for them, but I don't have them any

5   longer.  I've done it -- I did it 10, 12 years ago.  There

6   was a segment in there explaining the fair Credit Reporting

7   Act, the obligation of financial institutions which would

8   include the data furnishers, what they were supposed to do

9   with respect to credit reporting.

10          I can't be more specific than that, but there was a

11  segment in that program that described and gave situational

12  elements as to how the Fair Credit Reporting Act works and

13  how it's applied.

14      Q.   And that is in the context of discussing sort of a

15  survey course of all the different laws that might affect a

16  financial services entity; right?

17              MR. SEARS:  Objection as to form.

18              THE WITNESS:  Yeah.  There were -- as I said,

19  there were several of the major -- what I would consider the

20  major federal statutes at the time which I've described

21  before, and that was -- the Fair Credit Reporting Act was

22  part of that description and there was, you know, again, some

23  analysis of what it was, what its purpose was, how -- what

24  expectations were with respect to data furnishers because

25  most financial institutions, especially the ones I was

1  teaching were data furnishers, and what individual persons

2  who worked at financial institutions, do they back office

3  staff or lenders, needed to know about that particular law as

4  well as the other laws that I've described.

5  BY MR. BENNETT:

6       Q.   Okay.  So I want to talk about the first category.

7  I'm sorry.

8            You would agree that your greatest source of

9  information about the Fair Credit Reporting Act came from

10  your years working with or for Merrill National Bank;

11  correct?

12      A.   I would say that, but I'd also say working with

13  other financial institutions as a consulting -- as a

14  consultant.

15      Q.   Okay.  Well, so let's start with the bank.  And I'm

16  going to get very precise.  I'm going to want to know the

17  financial institutions, what you learned, any of the details

18  about your supposed consulting on how to do a credit

19  reporting dispute investigation of identity theft, the issue

20  in this case.

21           But first I want to start with your job at Merrill

22  National Bank.  When did you leave Merrill National Bank?

23      A.   I think it was in January of 1993.

24      Q.   And what experience did you have at that point at

25  handling credit-reporting disputes at Merrill National Bank?

```
 1        A.   I didn't work in that area.  I worked as -- again,
 2   as a lender end as part of being a lender -- and I was a
 3   commercial lender at Merrill National, small business lender.
 4   And it was normal and customary when you were lending to
 5   small businesses, to have financials -- personal financial
 6   statements on the principals of the company as well as credit
 7   reports, individual consumer credit reports on those same
 8   individuals.  So you were evaluating their personal credit
 9   standing as part of the overall underwriting process.
10        Q.   But you didn't have any experience with the ACDV
11   process while you were at Merrill National Bank?
12        A.   That's correct.
13        Q.   And what about 81S-2B?  Did you have any experience
14   with that while you were at Merrill National Bank?
15        A.   No.
16        Q.   When is the first time you had any experience with
17   furnisher obligations under 1681S-2B?
18        A.   It may very well have been when I was teaching the
19   Omega program in consumer lending what I referenced in my
20   report.
21        Q.   And approximately what year was that?
22        A.   It was between the year 2000 and 2004.
23        Q.   And you would've of course discussed the ACDV
24   process, then; right?
25        A.   I believe I did.  And I can't recall.
```

1    Q.   How did you learn about the ACDV process, given

2    that you didn't have any professional experience in it prior

3    to that point?

4    A.   You learn it and understand it and do research on

5    it and so forth.  And it was a helpful and useful learning

6    experience for me, and I was able to share the knowledge that

7    I had with those participants who were in the program and

8    after you do it once or twice, you have some working

9    knowledge of it and you go from there.

10    Q.   It doesn't make it an expert; right?  I mean, my --

11    my receptionist handles ACDV's literally every day, so I

12    wouldn't seek to have her qualified as an expert because she

13    knows how to read an ACDV.

14              MR. SEARS:  Objection, argumentative.

15    BY MR. BENNETT:

16    Q.   You're not claiming that you're an expert because

17    you have been an expert; right?

18              That is, you have had an opportunity to read

19    documents when defendants like Credit One hire you, and thus,

20    that makes you an expert, are you?

21    A.   Well, first of all, Credit One did not hire me.

22    Mr. Sears's law firm hired me.

23              Can you repeat the rest of the question, please?

24    Q.   Are you claiming that you have obtained your expert

25    knowledge in significant part because you have reviewed

```
 1   documents and information in lawsuits where lawyers or
 2   clients hired you to serve as an expert?
 3        A.   That was a significant part of it, yes.
 4        Q.   Okay.  So other than when you were hired in
 5   litigation to be an expert, the only other source of
 6   information that you have that educated you about the
 7   furnisher obligation in the Fair Credit Reporting Act would
 8   have been when you were putting together the survey
 9   coursework for the Omega training you did maybe 15 times;
10   right?
11                  MR. SEARS:  Objection as to form.
12                  THE WITNESS:  Yes.  Both of those sources were
13   basically -- gave me the background and experience I have.
14   And specifically in ACDV's.
15   BY MR. BENNETT:
16        Q.   What does ACDV stand for?
17        A.   Automatic Consumer Dispute Verification.
18        Q.   How does that arrive?  How does the ACDV arrive?
19   What -- what preceded it as a -- as a tool in the dispute
20   process?
21        A.   It didn't have the "A."  It just had the CDV.
22        Q.   How are CDV's communicated?
23        A.   It was by paper as I understood it.
24        Q.   All right.  And how did you learn that it was by
25   paper?
```

1      A.   That was by recollection, but I can't -- you know,

2  I was more interested in what the documents said rather than

3  how it was communicated.

4      Q.   Uh-huh.  And who sends ACDV's to a company, a

5  furnisher like Credit One?

6      A.   The three -- the three CRAs.

7      Q.   That's what you think?  That's your testimony?

8  They come in from the three CRAs; right?

9      A.   That's what I understand it.  If a consumer

10  disputes an item to any one of the three credit reporting

11  agencies, Equifax, Experian and TransUnion, they in turn

12  report it back to the originating data furnisher, which in

13  this case was Credit One.  Obviously, a person can also

14  directly dispute a matter with -- with the data furnisher.

15     Q.   So have you ever heard of Online Data Exchange,

16  LLC?

17     A.   No, not that I can recall.

18     Q.   How much does Credit One pay to a third party when

19  that third party sends an ACDV lead to it?

20     A.   I don't know.

21     Q.   Do you know how much any creditor or whether or not

22  any creditor or furnisher pays for an ACDV?

23     A.   No.

24     Q.   How many cases have you rendered an expert

25  opinion -- a purported expert opinion regarding furnisher

1   obligations under the Fair Credit Reporting Act?

2       A.   I've located at least three -- in the -- in the

3   search that I did with respect to the subpoena to produce

4   documents.

5            I believe that I've dealt with it at least one or

6   two times more.  In previous experience, it was over 10 years

7   ago.  I just can't be more specific than that.  I've been

8   doing this -- let me rephrase it.

9            I've been doing this -- "this" being -- working as

10  an expert witness in consumer and commercial banking matters

11  for 15 years, and I can recall and can't name the cases that

12  I've worked on.  But there were a couple that I worked on

13  that were not included in the scope of the production of

14  documents in this case.

15      Q.   All right.  So -- I'm sorry.  You said -- I'm

16  trying to get the number right.  Five cases in which you have

17  been hired to make a determination regarding the furnisher

18  obligations under the Fair Credit Reporting Act?

19      A.   It would be about that.  This would be one more or

20  two more.  It could be.  But it's a -- I'm reasonably certain

21  to say the amount -- the number of cases is a single digit.

22      Q.   And you -- of course, you were in a Johnson case, a

23  different case, the Johnson Lau case?

24      A.   That's right.

25      Q.   You know how that one settled; right?

```
 1      A.   I don't.  I don't know the terms, but that's never

 2  part of what I do.  I just know that they settled.

 3      Q.   Do you know what year that was in?

 4      A.   First time around, it was in 2007; and the second

 5  time around, it was in 2010.

 6      Q.   And are you counting those as two separate cases

 7  when I ask you how many -- how many expert opinions you have

 8  given?

 9      A.   With respect to fair credit reporting matters; is

10  that correct?

11      Q.   Yes.  What were your obligations under the Fair

12  Credit Reporting Act?

13      A.   I did not have the complaint in the 2007 case.  I

14  consulted with Mr. Sears yesterday -- or it was the day

15  before yesterday, very recently.  He told me that the 2007

16  case did not have any claims under Section 16812-S2 -- or SB.

17  And -- but the 2010 case was -- did have claims under that

18  statute and that's why the production of documents was

19  included.

20      Q.   Okay, so --

21      A.   I didn't have the complaint in that case.

22      Q.   -- other than the Johnson Lau case --

23      A.   Go ahead.  I'm sorry.

24      Q.   Other than the Johnson Lau case, do you recall any

25  other specific cases in which you claim to be qualified to
```

1    render an opinion as to a furnisher's obligation under the

2    Fair Credit Reporting Act to conduct a dispute investigation?

3        A.   I furnished the documents in a case yesterday -- or

4    recently -- this week on -- on a case that originated in

5    Michigan.  The plaintiffs' names were Johannson,

6    J-O-H-A-N-N-S-O-N.  There was another case, Jennings versus

7    Experian.  That was excluded from the production of

8    documents, but dealt with Fair Credit Reporting Act matters.

9        Q.   And specifically, what did it deal with under the

10   Fair Credit Reporting Act?

11       A.   I can't recall frankly, but it was Section 1681.

12   But it wasn't the -- what was covered in this case.  There

13   were other areas under 1681.

14       Q.   Now, you have Johannson.  You have Johnson Lau.  We

15   excluded Jennings.  What other S-2B cases have you been hired

16   to render an opinion in?

17       A.   Those are the other cases.

18            In my previous testimony, that occurred sometime

19   during the five years or so of my work as an expert that were

20   excluded from this.  But I did it a couple of times.  I can't

21   remember which --

22       Q.   Have you ever --

23       A.   I just simply can't remember which cases they may

24   have been.

25       Q.   All right.  Are you an expert at reading or

1   understanding Metro 2?

2       A.   I am not.  Just the output -- just the output.

3       Q.   Do you know what Metro 2 is?

4       A.   It's the technical format, as I understand it,

5   for -- they were the system in which data is communicated.  I

6   can't speak to it as specifically.

7       Q.   Are you an expert in the e-Oscar system, and that

8   is little "e," hyphen, capital "O," Oscar.

9       A.   No.  Didn't represent myself either.

10      Q.   Well, what do you understand the e-Oscar system to

11  be about?

12      A.   I understand it as the -- the standard of -- the

13  language data furnishers communicate with outside parties,

14  including the three credit-reporting agencies with respect to

15  credit-reporting matters.

16      Q.   Are you an expert in the procedures that are

17  followed by the consumer reporting agencies in handling and

18  processing consumer disputes?

19      A.   The general knowledge of it.

20      Q.   I understand.

21           Are you an expert in that?

22      A.   To the extent that I have -- I am qualified as

23  such, but I'm not representing myself as a -- well, I have a

24  general knowledge of what the expectations are.  That's it.

25      Q.   Are you an expert in what the procedures are

```
 1  followed or should be followed by the consumer reporting
 2  agencies that's been handling and processing consumer
 3  disputes?
 4            MR. SEARS:  First of all, objection.  I'm
 5  going to do a continuing -- continuing objection with regard
 6  to whether he is actually an expert.  That is a matter for
 7  the court to determine.  And also as a housekeeping matter,
 8  his mike fell off.  So that's being fixed.
 9  BY MR. BENNETT:
10      Q.   What aspects of the consumer reporting agency
11  requirements for handling consumer disputes do you believe
12  you're an expert in -- in?
13      A.   I understand the timing issues, the 30 days once a
14  dispute is received, it has to be answered unless there are
15  extenuating circumstances.  I generally understand the
16  process that the consumer reporting agency receives a
17  complaint of a dispute from a consumer, what the consumer
18  reporting agency does, it refers it to the data furnisher
19  with an expectation that it's -- the -- the --
20            THE WITNESS:  We just had a delivery.
21  Delivered supplies here.
22            THE VIDEOGRAPHER:  The time is now
23  approximately 11:44 a.m.  We are off the record.
24            (Off the record.)
25            THE VIDEOGRAPHER:  We are on the record.  The
```

1   time is now approximately 11:44 a.m.

2                   (Requested testimony was read.)

3                   THE WITNESS:  That the data furnisher has a

4   time period to respond to that in terms doing a -- conducting

5   a reasonable investigation of the -- of the facts and

6   circumstances of the -- of the issues and reporting back to

7   the data -- excuse me -- to the CRA, its findings and

8   conclusion.

9   BY MR. BENNETT:

10      Q.   Okay.  Are you an expert in what consumer reporting

11  agencies do when they handle and receive consumer disputes?

12                   MR. SEARS:  Please note my continuing

13  objection.

14                   THE WITNESS:  I'm sorry.  Can you repeat that

15  again?

16  BY MR. BENNETT:

17      Q.   Are you or do you consider yourself an expert, able

18  to opine with specialized knowledge about what the consumer

19  reporting agencies do when they receive consumer disputes?

20      A.   Yes.  They -- I just described the process, what

21  they do.  Or are you asking something different?

22      Q.   Well, what you described is either:  A, in the

23  statute; or B, known by anybody who has ever had any

24  interaction with a credit dispute.  So if you make your own

25  dispute and write a letter to the CRAs, you get a document

**JAMES F. LYNN on 08/25/2016**

1   back from them that says, this is what we do.

2          I'm -- I'm either trying to narrow down that you

3   don't have expert knowledge in everything that you claim or

4   in all aspects of financial services law or I'm going to be

5   shown the records saying, I'm an expert, I'm an expert, I'm

6   an expert.  So I'm going to go through every bit of this.

7          A.   Okay.

8          Q.   I've read a lot independent of what you provided in

9   this case, and so far I have not found something that you

10  don't claim to be an expert in.  And so I want to find out if

11  there is such a thing.

12         Do you believe you're an expert who could testify

13  in a court of law with specialized knowledge about what the

14  consumer reporting agency's procedures are for handling

15  consumer disputes?

16         A.   Yes.

17         Q.   Okay.  Now, you have testified that you have some

18  knowledge related to the timing, which you know is actually

19  in the Fair Credit Reporting Act; right?

20         A.   Yes.

21         Q.   And you can access the Fair Credit Reporting Act, a

22  copy of it by Googling "Fair Credit Reporting Act"; right?

23         A.   Correct.

24         Q.   Right.  Now, you are an expert in the consumer

25  reporting agency dispute procedures; right?

1     A.   That's correct.

2     Q.   What is the name of the procedure that Experian

3  calls its dispute procedures?

4     A.   I don't know.

5     Q.   What's the name of their manual that they use to

6  detail those procedures?

7     A.   I don't know.

8     Q.   When a consumer writes a letter to Experian, where

9  is the letter received?

10    A.   I can't say for sure.  They have a process

11  obviously to receive them, but I can't speak specifically to

12  where they are received and how they are processed.  I just

13  note the general.  I can't explain the mechanics of it.  I

14  just understand the outcome -- what the expected outcome from

15  it is.

16    Q.   Until I asked the following question, you were not

17  aware that all ACDV's are actually sent through a third-party

18  company, Online Data Exchange, rather than sent to furnishers

19  directly by the CRAs; right?

20    A.   Correct.

21    Q.   Right?

22    A.   That's correct.

23    Q.   So the next case, would you be able to integrate

24  that information and represent yourself as an expert on the

25  fact that ACDV's are sent by Online Data Exchange?

    1                    MR. SEARS:  Objection, argumentative.

    2                    MR. BENNETT:  This is argumentative.  I

    3    apologize for that.

    4    BY MR. BENNETT:

    5        Q.   But my point is, do you believe you are gathering

    6    specialized expert knowledge by what you learn when you are

    7    trying to be an expert in a case?

    8        A.   Can you repeat that?

    9        Q.   Sure.

   10             Do you believe that you are properly building your

   11    expert knowledge to testify in a litigated case based on what

   12    you learn after you're hired in a litigated case?

   13        A.   In part, yes.  You're reacting to the facts of the

   14    case and drawing your -- reaching your findings, opinions,

   15    judgments and conclusions based upon the facts of the case,

   16    and understanding -- with the wealth, background and

   17    experience that I have in fair credit reporting matters as

   18    well as other matters -- other related matters, to -- to

   19    opine and draw such opinion -- draw such findings,

   20    conclusions and judgments accordingly.

   21        Q.   You know -- you're not actually claiming you have a

   22    wealth of knowledge in furnisher credit reporting disputes

   23    under the Fair Credit Reporting Act, are you?

   24        A.   No.  I'm not -- I'm not representing myself as an

   25    expert in the technical details of how information is

1    communicated.  I'm representing myself as an expert on the

2    facts of the case, on what happened, what was supposed to

3    happen, what should have happened and so forth.

4        Q.   So are you an expert in identity theft?

5        A.   It's obviously a subject I've worked with before on

6    multiple cases, and applying a standard that do I understand

7    it at a -- at a level where a court can rely on it, obviously

8    that's for the court to determine, but I do know a lot about

9    it.

10       Q.   So how common is familial identity theft?

11       A.   What kind of identity theft?

12       Q.   Identity theft by a family member.

13       A.   I understand, I think, from your article -- or

14   excuse me -- your testimony, it's very rare.

15       Q.   Okay.  That family ID theft is very rare?

16       A.   That's what I recall.  If I misstated that, I

17   apologize.  But my recollection was that it was rare.

18       Q.   All right.  Even though that testimony said exactly

19   the opposite, but it's the most frequent credit reporting

20   type of identity theft.  Like --

21             MR. SEARS:  Is --

22   BY MR. BENNETT:

23       Q.   So you don't know one way or the other the

24   prevalence of family identity theft beyond having read my

25   congressional testimony?

```
1        A.   Well, I -- again, your professional testimony was
2   one element of it, and I've read other information about
3   identity theft.  I can't give you the -- what I've learned
4   from where and so forth, but again, I have a reasonable
5   working knowledge of it.  That's what I'm representing.
6        Q.   So in this case, you're aware that the account that
7   is at issue that was disputed was a credit card account;
8   correct?
9        A.   That's correct.
10       Q.   And how was the application for that credit card
11  received by Credit One?
12       A.   It was online.
13       Q.   Can you explain to me what an online credit
14  application means?
15       A.   Someone at their home computer or similar
16  instrument accessing the website, reporting the required
17  information effectively hitting "enter" and it's sent.
18            That's what I understand.
19       Q.   And were any hard copy documents or anything with
20  actual human handwriting on them sent to Credit One when this
21  account was applied for?
22       A.   Not to my knowledge.
23       Q.   What is an IP address?
24       A.   IP address?
25       Q.   Yes.
```

```
 1        A.   I'm not sure.

 2        Q.   What is an email?

 3        A.   I'm sorry?

 4        Q.   What is an email address?

 5        A.   Oh, email.  An address where one party can -- well,

 6   I've never been asked this question before.  An email address

 7   is a place where -- is a -- an online communication mechanism

 8   where a person can communicate with another party or another

 9   party can communicate with that person.

10        Q.   And what email address was provided with the online

11   application in this case?

12        A.   Can you guide me to a document where I could read

13   it?

14        Q.   Well, I want to know, do you -- do you recall

15   anything about the email address that seemed strange?

16        A.   I believe I did.

17        Q.   I'll show you the documents in a second.  You can

18   say "I don't know," if you don't know.

19        A.   I believe the email address was a person who has

20   been represented as Mr. Wood's mother.  At least, it was her

21   name that was part of that email address.

22        Q.   And again, you do not know what an IP address is;

23   correct?

24        A.   I might know it, but I don't know it as an IP

25   address.  Sorry.  I can't speak to it.
```

```
 1        Q.   So you're not aware that -- at least in the modern
 2   day, after Merrill National Bank years for you, that thanks
 3   to interaction over the Internet, tracked the IP address, the
 4   computer location and address of the opposite party to a
 5   communication.
 6             In this case, the opposite, the person that
 7   submitted the application.
 8        A.   Oh, didn't know it.  Thank you.
 9        Q.   Are you aware that the -- well, obviously, you're
10   not -- you're not aware that Credit One archived the IP
11   address for the person who sent or the computer from which
12   the application was sent to it.
13        A.   They had a home address on the boarding data
14   that I -- that I saw that was located in West Point,
15   Virginia.  I believe it was on Lee Street.
16             THE REPORTER:  What street?
17             MR. SEARS:  Lee, L-E-E.
18   BY MR. BENNETT:
19        Q.   You -- do you have any children?
20        A.   Yes.
21        Q.   Do you know their address?
22        A.   Email address?
23        Q.   Physical mailing address.
24        A.   Not off the top my head, no.
25        Q.   How hard would it be to find out their address
```

1  without talking to them?

2      A.   I really don't know.  I have never investigated

3  that.

4      Q.   How about Social Security Number?  How hard would

5  it be for you to find out their Social Security Number?

6      A.   My own?

7      Q.   Your kids.

8      A.   My daughters?  I don't know how hard or how we -- I

9  can't speak to it.

10     Q.   Now, are you an expert in banking procedures that

11 credit card companies use for security procedures, that

12 credit card companies use to stop or protect against online

13 application identity theft?

14     A.   I can't speak to it specifically, no.

15     Q.   Are you an expert in diagnosing or seeing indicia

16 of identity theft in an account -- in account activity or

17 account history?

18     A.   After some knowledge from that case and from other

19 cases where one of the fraud -- one of the deponents,

20 Ms. Chu, described receipt of Excel spreadsheets to look for

21 various things -- elements that didn't quite naturally fit

22 together.  I can't describe exactly how she did that, but

23 that as part of her job.  And I'm aware that that's the kind

24 of task that's undertaken in financial institutions on an

25 ongoing basis.

```
 1        Q.   Is looking at a spreadsheet that has some things
 2   that might stand out about an account, that's what you're
 3   aware of --
 4        A.   Yes.
 5        Q.   -- in this regard; all right?
 6             Other than that, do you consider yourself an expert
 7   in diagnosing or observing indicia of identity theft?
 8        A.   No.
 9        Q.   Are you a handwriting expert?
10        A.   No.
11        Q.   Can you analyze and compare signatures?
12        A.   No.  I don't represent myself as such.
13        Q.   Well, why did you put that in your expert witness
14   report?  Signatures -- I withdraw the question.
15             Had you ever heard of Accurint before this case?
16        A.   No.
17        Q.   Have you ever read our Fourth Circuit decision
18   regarding Accurint, Berry versus -- well, we would --
19   remember what the opposite parties -- but the Berry decision?
20        A.   No, I didn't.
21        Q.   Do you know where Accurint gets its address data?
22        A.   No, I don't.  I -- I know what they represented
23   themselves on -- as on their website.  Again, I was not
24   familiar with the company, as I disclosed to you.  So when
25   you see the same name coming up oftentimes in deposition
```

 1   testimony, it triggers a natural curiosity as to who are

 2   these people?

 3            And so I punched up Accurint.com and found out they

 4   were affiliated with LexisNexis.  They have, at least

 5   according to their website, extensive experience in this

 6   area, and I guess the tested market is, do people still use

 7   them?  And that appears to be the case.

 8       Q.   Well, all that information comes from you looking

 9   on their website; right?

10       A.   That's correct.

11       Q.   And in this case, your -- I'm sorry.  The

12   defendant, Credit One, used a binder report; right?

13       A.   I'm -- I'm not sure.

14       Q.   Okay.  All right.  Are you an expert in credit

15   scoring?

16       A.   You mean FICO scores?

17       Q.   I'll get more specific in a minute.

18       A.   Okay.  Generally speaking, yes, just what I know

19   from my experience as -- as a lender, so forth.

20       Q.   Well, you were a lender.  Again, what was your last

21   year as a lender?

22       A.   1992.

23       Q.   And what FICO score model was used in 1992?

24       A.   None that I can recall.  I think that it -- FICO

25   scores came about, I believe, in the mid 1990's.  And at that

```
 1   time, again, that was when I was getting into -- the mid to
 2   late 1990's, I was working as a consultant to various banks,
 3   and I was teaching that consumer lending course that I
 4   referenced before.  And I basically educated myself on FICO
 5   scores because I was certainly becoming a relevant and
 6   prevalent way of evaluating consumer product.
 7        Q.   What is a scorecard?
 8        A.   Boy.  In the old days, you gave certain points for
 9   various components of a consumer profile.  That's what it
10   used to be known as, but I can't tell you --
11        Q.   Sure.  In the context of a FICO score model, what
12   is a scorecard?
13        A.   In the context of what model?
14        Q.   A FICO credit score model.
15        A.   I don't know the term scorecard as applied to that,
16   but I can tell you the components of a FICO score and
17   relevant weights of different -- and characteristics of a
18   FICO score.  Is that what you're asking?
19        Q.   No.  I'm trying to see if you know anything that's
20   not readily available on the Internet.
21             How much weight does the existence of a major
22   derogatory trade line in a credit file have on a credit score
23   if that major derogatory has an XB compliance condition code?
24        A.   Just -- just the XB compliance -- compliance code,
25   you're trying to isolate that out; is that correct?
```

1     Q.   Yes.

2     A.   Okay.  As I understand it, it's going to be

3   negligible.

4     Q.   Why -- first of all, it's going to be zero.  It's

5   not scored.  But why would you understand it would be

6   negligible?

7     A.   I'm not sure if it's not scored.  The account XB

8   means the account is in dispute, and I'm not sure that it's

9   counted in -- as long as it's classified XB, as I understand

10   it, the calculation of a FICO score accommodates the payment

11   history on that account if that is, in fact, what the dispute

12   is about.  Other issues, like the length of time the credit

13   has been open is not a matter of dispute and is counted as it

14   would normally be counted.

15              MR. SEARS:  Excuse me.  Lynn, hold on a

16   second.  I'd like to interject an objection.  I was not able

17   to fit it in between the question and the answer.  I object

18   to testimony provided by plaintiff's counsel and would move

19   to have that stricken.

20              MR. BENNETT:  I was trying to help the

21   gentleman become an expert.

22              MR. SEARS:  And any editorial comments, I

23   object to as well.

24   BY MR. BENNETT:

25     Q.   So where did you come up with that belief, that an

```
 1   XB code blocks scoring if the dispute does not block scoring
 2   as to components of the trade line that are not subject to
 3   the dispute?
 4        A.   I believe it was Bankers Online.
 5        Q.   And when did you check Bankers Online?
 6        A.   It was within the last couple of days.
 7        Q.   So how does -- how does an ex -- I'm sorry.  I'm
 8   trying to find a way to phrase this?
 9             Why do you believe it's proper to remove an XB
10   compliance condition code when the consumer still disputes
11   attribution of an account to their credit file?
12        A.   Well, they disputed it.  It was reviewed.  They did
13   their normal -- "they" being Credit One Bank, did their
14   normal and customary investigation process.  Based upon that
15   investigation process, verifying and validating information
16   that they had in their file and confirming such information
17   as they were able to through an independent third party, such
18   as Accurint, they concluded, "they" being the bank, that the
19   information they rendered or information they had in their
20   file was either correct or if it was not correct, they --
21   they corrected it or updated it.  And then they reported it
22   back to the CRA, and as far as Credit One Bank was concerned,
23   the dispute was resolved.
24        Q.   I understand that.  But as far as Mr. Wood, you
25   would agree it was not resolved; right?  Mr. Wood did not
```

1    believe his --

2         A.   I'm sorry.  Could you repeat that?  I'm sorry.

3         Q.   You agreed that Mr. Wood would not agree his

4    dispute was resolved; correct?

5         A.   He submitted subsequent ACDV's.  So it -- they --

6    they again filed the normal and customary procedures and

7    reported it back.  Same thing.

8         Q.   I understand.

9              I'm asking you why you think that a furnisher is

10   permitted to remove an XB code claiming a dispute is resolved

11   when a consumer does not believe it is resolved?

12        A.   The function of the investigation is on the fax and

13   data that the data furnisher has in its possession and what

14   it's able to verify and validate, and based upon its own

15   investigation, it came to its conclusion.  Now, whether

16   Mr. Wood agrees with it or not is a different matter.

17        Q.   Okay.  Where did you learn about the XB code?

18        A.   It was either in this case or it may have been in

19   prior cases.  I can't recall.

20        Q.   Well, that's a big distinction here.  It may have

21   been in this case that you first learned about the XB code;

22   correct?

23              MR. SEARS:  Objection.  Asked and answered.

24              THE WITNESS:  If I had worked on it before, it

25   was at least two years ago, and so I updated myself and

1    became familiar with it and understood what it was.  And

2    reading the manuals that were here and reading Credit One

3    first as well as the CDIA information that was also at my

4    disposal.

5    BY MR. BENNETT:

6         Q.   Well, what CDIA information at your disposal did

7    you read?

8              Mr. Lynn, before we -- Mr. Lynn?  You can put them

9    aside.  I understood your answer to mean there was other

10   information outside the documents disclosed here from the

11   CDIA.

12             What you're saying, though, is you have produced to

13   us the manuals for documents from the defendant and/or from

14   the CDIA from which you have obtained your knowledge about

15   the XB code; correct?

16        A.   That's correct.

17        Q.   If you --

18        A.   If I hadn't worked on it before, which I can't

19   recall directly, then I was updated, if not originated, in

20   terms of my knowledge on the XB code with respect to this

21   case.

22        Q.   Have you done any legal research to find out what

23   courts across the country have said regarding you right to

24   remove -- a creditor's right to remove when the consumer so

25   disputes?

```
 1        A.   No.
 2        Q.   Have you ever spoken with or listened to anyone
 3   from a consumer reporting agency explain the use and
 4   requirements for use of an XB code?
 5        A.   No.
 6        Q.   Are you an expert in contract law?
 7        A.   No.
 8        Q.   And, of course, then obviously, you -- you do not
 9   hold yours out as an expert to determine whether or not a
10   consumer contracted to be responsible for a credit card under
11   Virginia law; right?
12        A.   That's correct.
13        Q.   So you do not represent yourself as an expert to
14   opine as to whether or not Mr. Wood is legally responsible
15   for the Credit One account that was the subject of this case?
16        A.   That's correct.
17        Q.   Do you have expert knowledge sufficient to testify
18   as to an individual's mental or psychological injury in
19   dealing with identity theft or credit reporting issues?
20        A.   No.
21        Q.   Do you think identity theft can suffer emotional
22   and mental distress as a general rule from the identity theft
23   experience?
24             MR. SEARS:  Objection as to form.
25             THE WITNESS:  Yes.
```

1  BY MR. BENNETT:

2      Q.   Have you ever issued an opinion under the Fair

3  Credit Reporting -- or the Fair Reporting Act case where you

4  concluded that the bank or financial institution had violated

5  the -- or had not complied with the standard required under a

6  federal consumer protection law?

7      A.   I do not recall.

8      Q.   Have you ever provided an expert opinion in any

9  case in which you found that anybody violated or does not

10  comply with the Fair Credit Reporting Act?

11      A.   Not that I can recall.

12      Q.   How much money per hour are you paid for your work

13  in this case?

14      A.   $225.

15      Q.   And do you know how much you have billed or how

16  many hours -- billable hours you have incurred in this case

17  through today?

18      A.   Not through today.  I did furnish Mr. Sears an

19  invoice as of approximately two weeks ago, and I believe you

20  should have that in your possession.  Obviously I've done

21  work on the case since then.

22      Q.   Approximately hoe much money do you make a year

23  serving as an expert witness for financial services

24  defendants?

25      A.   I was married over the years.  I've also worked as

**JAMES F. LYNN on 08/25/2016**

1  representing financial services institutions.  I've also

2  worked with individuals bringing actions against financial

3  services institutions.  I can't give you a break-out of --

4  the breakout is different year-by-year, and the amount of

5  money that I earned is different from year to year.

6      Q.   Okay.  Well, how much money have you made so far

7  this year representing financial services institutions or

8  their lawyers?

9            MR. SEARS:  Objection as to form.

10           THE WITNESS:  Approximately $20,000.

11  BY MR. BENNETT:

12      Q.   And approximately how much did you make last year

13  serving as an expert witness on behalf of a financial

14  services institution or its lawyers?

15      A.   I'd have to go back and check my records.  I can

16  tell you that my gross revenue last year was approximately

17  $100,000 in the breakout between the financial services

18  institutions and individuals.

19        I can't speak to that specifically, and when I say

20  that, I also should reference that I don't work for the

21  financial institution directly.  I work for the law firm

22  representing their client, whether it be a financial

23  institution or individual.

24      Q.   Okay.  How many cases in 2015 were you opining in

25  favor of a defendant?  What percentage of -- of your cases in

1   which you issued an expert opinion in 2015 did your expert

2   opinion favor the defendant?

3                  MR. SEARS:  Objection as to form.

4                  THE WITNESS:  I -- I think a more accurate and

5   fair way to state it is, is my expert opinion favors the

6   truth as I find it or as I understand it.  Whether that

7   benefits or penalizes one party or the other is not an issue.

8   BY MR. BENNETT:

9       Q.   Well, the qualifier as you see it is the issue.

10  And as I see it, you favor banks.

11              I'm asking you, how much of your -- what percentage

12  of your 2015 cases were cases in which you issued an expert

13  opinion in favor of a defendant?

14      A.   Well, I'm not saying --

15                  MR. SEARS:  Objection.  Excuse me.  Objection

16  as to the editorial comments, and move to strike.  And

17  objection as to form.

18  BY MR. BENNETT:

19      Q.   Okay.  Let me try it this way.  Let me try it this

20  way.  Withdraw the question.

21              What percentage of your cases in 2015 in which you

22  were paid as an expert witness were cases in which you were

23  paid by the lawyer representing a defendant or by the

24  defendant?

25                  MR. SEARS:  Objection as to form.

```
 1                    THE WITNESS:  Again, that's on my resume.  I
 2    don't have it here in front of me, but I can check it to
 3    determine which cases I worked on and what I did.
 4                    MR. BENNETT:  Let's -- if you want to take a
 5    break, I'm okay with that.
 6                    MR. SEARS:  I could use a break.
 7                    THE VIDEOGRAPHER:  Stand by, then.
 8                    MR. BENNETT:  We're going to take a break,
 9    then.
10                    THE VIDEOGRAPHER:  The time is approximately
11    12:20 p.m.  We're off the record.
12                    (Recess.)
13                    THE VIDEOGRAPHER:  We are on the record.  The
14    time is now approximately 12:37 as we continue the deposition
15    of James F. Lynn.
16            Go ahead and proceed when you're ready.
17    BY MR. BENNETT:
18        Q.  Now, what -- I'm sorry.  I want to talk a bit about
19    the -- your actual expert witness report and then the resume
20    attached to it.
21            I think you have a copy of it as in Book 2 of 2.
22    There should be a book over there that says Book 2 of 2.  And
23    your resume, I believe, is at 32.
24            You want to put them aside?  You don't have to put
25    them back.
```

1        A.   I'm sorry.  Okay.

2        Q.   You don't have to put them back.  You can just set

3   them aside.

4        A.   I want to just make sure I got them in the right

5   order here.  Okay.

6        Q.   So that's the resume you provided in this case;

7   correct?

8        A.   Yes.

9        Q.   As a principal of Lynn Group, I want to talk about

10  that second bullet point, consulting the community financial

11  institutions on commercial and retail credit issues.  You

12  talked a little bit about that generally; right?

13       A.   That's correct.

14       Q.   And what years did you serve as a consultant on

15  commercial and retail credit issues?

16       A.   I'd say from the early onset, probably 1996

17  through, oh, 2008.

18       Q.   And how many different community financial

19  institutions paid you for your consulting?

20       A.   I would say about 25.  Now, sometimes they were one

21  task and -- and that was it.

22            Some of those institutions would be included in the

23  work that I did through Omega -- Omega Performance

24  Corporation that I described before, but if you take all of

25  those institutions together, there were all community

 1   institutions and there was about 25 of them.

 2       Q.   So 25 total and including the Omega Performance

 3   Corporation work?

 4       A.   That's a fair estimate.

 5       Q.   And how many those 25 did you -- were you paid to

 6   give advice or training regarding the Fair Credit Reporting

 7   Act?

 8       A.   Well, I did -- now again, we're going back to --

 9   again, the institutions that I did through Omega Performance

10   Corporation, and I'm going to guess it's 15 of the 25.

11           Some of the individual clients that I had I also

12   did the Omega consumer lending program that I described

13   before.  That may have been four or five.  So I would guess

14   about 20 of them on that basis.

15       Q.   And how many of those did you give the training or

16   consulting advice in person?

17       A.   All of them.

18       Q.   And what was the name of the course or courses that

19   touched on the Fair Credit Reporting Act?

20       A.   Yeah.  If you go to page 12 of my resume, you'll

21   see a description of Omega Performance Corporation, and

22   there's -- there's six different courses listed there, and

23   the fifth -- the fifth course, consumer lending is -- is --

24   is the one.

25       Q.   Okay.  And in that course -- first of all, how many

1    days was that course?

2        A.   It was three or four full-time -- excuse me.

3    There's two ways to answer that.

4            When I did it through Omega Performance

5    Corporation, it was done all at one time over the course of

6    three or four days.

7            When I did it myself as a -- consulting on my own

8    and had the bank itself purchased the materials, I did it

9    generally once a week over a 12-week period.

10       Q.   And again, we're talking just the part regarding

11   consumer lending?

12       A.   That's correct.

13       Q.   And what percentage of the consumer lending course

14   was -- so let's say, through Omega, three-day course, what

15   percentage of that was on the Fair Credit Reporting Act?

16       A.   It was one what they called the module, and that

17   was consumer protection regulations, as I described before.

18   That was a book, and my recollection is that the book is on

19   or about -- was -- it was like a book.

20           And it was about 200 pages long.  I'm going to

21   guess that the -- for -- for what it's worth, that the Fair

22   Credit Reporting segment was probably 15, 20 pages.

23       Q.   And in order -- I'm sorry.

24           Before you began that work for Omega Performance

25   and then the -- your -- on your own training version of the

```
 1  could be -- the consumer lending course, you did not have

 2  expert knowledge in furnisher's obligations under the Fair

 3  Credit Reporting Act; right?

 4              MR. SEARS:  Objection as to form.

 5              THE WITNESS:  A general knowledge, I didn't

 6  deal with that when I was a commercial lender at -- at

 7  Merrill National Bank on an ongoing basis or really on any

 8  basis.

 9  BY MR. BENNETT:

10      Q.   Okay.

11      A.   And if I could just clarify, that the work that I

12  did myself preceded the work I did with Omega.  When I was

13  working on my own consulting with financial institutions,

14  that was in '96, '97, '98 and '99, and then it evolved in a

15  relationship with Omega Performance in 2000.

16      Q.   When did the -- when did 16 -- when was 1681-2B

17  enacted?

18      A.   I think it was late '60s, early '70s.  I don't know

19  when 1681 was included in it.

20      Q.   But you would have taught that while you were

21  teaching the bank training that you did on your own before

22  Omega Performance?

23      A.   Yes.  Because I was using the same program.  I was

24  just doing it when I was doing it with individual banks on my

25  own.  I was doing it once a week.  When I was doing it with
```

1  Omega Performance, they had their own structured formats,

2  full time, doing it all day.

3       Q.   So during what years were you doing the Experian

4  program on the Fair Credit Reporting Act -- that would have

5  included something regarding the Fair Credit Reporting Act

6  outside or prior to the Omega Performance?

7       A.   That would probably be '96, in that neighborhood,

8  until '99.  I believe I did it subsequent to my relationship

9  with Omega Performance.  Or it might have been

10 contemporaneous with my relationship with Omega Performance.

11 I just can't recall.

12      Q.   And you don't know what materials that would have

13 regarded a furnisher's obligation of to conduct a dispute

14 under 1681S-QB?

15      A.   I didn't put materials together.  When I did it

16 with Omega Performance Corporation's materials, I didn't

17 write the materials.

18      Q.   Okay.  And so the expert knowledge that you contend

19 you obtained through those two training programs was through

20 your review of those Omega training materials?

21      A.   That's correct.

22      Q.   And do you know whether those training materials

23 existed in 1996?

24      A.   I believe they did, yes.  I want to say '96, '97,

25 in that range, I started doing this.  I can't remember

1  specifically the year.

2      Q.   And did they change in any -- any material ways

3  with respect to the explanation of the furnisher's

4  obligations under S-2B -- 1681S-2B?

5      A.   No.  No.  I think it was the same program that I

6  used at all times.  I mean, again, it was prepared by Omega

7  Performance.

8          They were -- they sold it under a licensing

9  agreement to the financial institution.  I got the teacher

10  materials that go along with it -- or instructor materials,

11  and that's what I used to facilitate the course.

12      Q.   And you are here today testifying on your personal

13  knowledge under -- under oath that those materials that you

14  used, starting in 1996, had information regarding what a

15  furnisher was to have done to comply with 1681S-2B?

16      A.   Well, I can't remember exactly what was in the

17  pages that were there in their materials because I haven't

18  looked at in over ten years.

19          My recollection is that there was a description of

20  the Fair Credit Reporting Act and what the highlights of the

21  act and what the purpose of the act was, what consumer

22  lenders ought to know about the act as they conduct

23  themselves in the consumer lending environment in a community

24  financial institution on an ongoing basis.

25      Q.   Even though 1681S-2B did not exist at that time?

1      A.   It may not have, but -- but I'm just telling you

2   what was in the materials.  I -- but that's what I presented.

3      Q.   So outside of the materials that you presented with

4   Omega and then either replicated or contemporaneously on your

5   own for that consumer lending course and your work as a

6   commercial banker prior to '95 and earlier at Merrill

7   National Bank, all of the knowledge that you claim makes an

8   expert regarding the Fair Credit Reporting Act's consumer

9   dispute requirements, comes from information you've learned

10  as an expert witness; right?

11     A.   Yes, that's correct.

12     Q.   If you could turn to page 32 of your resume under

13  "Litigation Support," I want to pause there.

14          I have seen in some of the documents that you've

15  produced in this case regarding Mr. Wood's case as well as in

16  response to our subpoena regarding other cases, that you have

17  provided notes and questions for defendant's counsel to use

18  in defending the lawsuit.

19          Is that accurate -- is that true?

20     A.   Yes.

21          MR. SEARS:  Objection as to form.

22          THE WITNESS:  Yes, it's true.

23  BY MR. BENNETT:

24     Q.   All right.

25     A.   At their request.  I didn't do it on my own.  I did

1  it at their request and only at their request.

2       Q.   Well, you're paid to do it; right?

3       A.   If they request it, it's -- it's billable work and

4  I do it.

5       Q.   Can you identify the names of any cases in which

6  after you reviewed the documents or information that a

7  financial institution provided you or its lawyer provided

8  you, you advised the financial institution or the lawyer that

9  you couldn't help them because your expert opinion would be

10  unfavorable to the financial institution?

11      A.   An attorney once told me, he said, if I have a

12  case, tell me.  And I think that's a good standard.

13          It doesn't matter whether I'm representing one

14  party or the other.  My opinions are going to be the same.

15  My judgments are going to be the same.  My conclusions are

16  going to be the same.  My findings are going to be the same.

17      Q.   All right.  So turn to page 2 under "Litigation

18  Support."  Now, you have on occasion represented one business

19  or entity against another business or entity; right?

20      A.   Are you referring to one specifically?  I -- I --

21      Q.   Well, you understand the difference between or the

22  distinction I'm drawing right now between Category 1 are

23  cases in which there are individual consumers against an

24  entity.  Category 2 is either business versus business or

25  government versus business; right?

```
 1      A.   That's correct.  And --

 2      Q.   All right.

 3      A.   -- and that's commercial.

 4      Q.   Sure.

 5           So with respect to the consumer cases, what is the

 6      last time that you were hired by the consumer's attorney or

 7      the consumer?

 8      A.   With respect to neglect or Fair Credit Reporting

 9      Act?

10      Q.   Well, let's start with anything.  And you have the

11      list of cases here to refresh your memory.

12      A.   I went in on a July of 2011 case.  Frempong versus

13      Frempong and Cosmopolitan Real Estate Settlements there was

14      the plaintiff.  Koby Frempong was the client.

15      Q.   So page 9?

16      A.   That's correct.

17      Q.   And the fourth bullet point up from the bottom?

18      A.   That's correct.

19      Q.   Okay.  So it was -- it was -- what was this case

20      about?

21      A.   It was a property bought by one or more of the

22      Frempongs under one set of circumstances.  The set of

23      circumstances changed as I recall, and there was a dispute

24      among all of the parties.  I can't speak to it more

25      specifically than that.
```

```
 1       Q.   But that was not a consumer protection case?
 2       A.   It was a consumer case, but it wasn't a consumer
 3  protection case, in that sense.
 4       Q.   Okay.  So between pages 2 and 9, there were no
 5  cases in which you were hired by the consumer --
 6       A.   Oh, I went the other way.
 7       Q.   -- or consumer's lawyer?
 8       A.   I'm sorry.  I started at the back and went
 9  backwards.
10       Q.   Okay.  All right.  That's -- that's fine, too.
11            So from page 9 through 11, there were no such
12  cases?
13       A.   Well, the Frempong is the first one.  I went
14  working with them, working my way back in time.
15       Q.   Okay.  And, in fact, that would mean that at least
16  since July 11, you have not represented the consumer side in
17  any consumer versus lender dispute; right?
18       A.   Again, I -- I've -- I've been hired by attorneys
19  representing financial institutions, mortgage servicers, and
20  so forth.  I've also been hired by attorneys representing the
21  FDIC, as you'll see in -- in -- in these cases.  But as I
22  continue to say, my opinions, findings, judgments and
23  conclusions are going to be the same, regardless of which
24  side I was hired on.
25       Q.   Now, if you continue forward and finish this up for
```

```
1    us, can you identify any of the other cases in which you

2    represented a consumer against a business or represented the

3    consumer's lawyer against -- in a case against the business?

4         A.   On page 6, there's a case, Timothy and Lisa

5    Limburger versus Sun Trust Mortgage.  The plaintiffs were the

6    Limburgers.

7         Q.   And what was that case about?

8         A.   It was a -- it was a residential real estate

9    construction loan that was -- there were problems with the

10   construction itself and the issues such as that.  There were

11   problems with the financing of it, and the Limburgers brought

12   suit against Sun Trust Mortgage, as -- as I said, et al.

13   There were other defendants in that case.  I can't remember

14   who they were, but they were seeking relief.

15        Q.   Okay.  Can you continue up the list, please.

16        A.   (Witness complies.)  I'm on the same page 6.  Brian

17   McLaughlin versus Pamela M. McLaughlin and Huntington

18   National Bank, two cases there.  But that one, I was sued,

19   counter-sued and Brian McLaughlin himself was the client.

20             On page 5, defendant, Indy Mac Bank versus Scott L.

21   Smith and Anthony DeMarra, doing business as Sincerity

22   Mortgage Corporation, Brad C. Fitch and Michelle Guest, and

23   two of the individuals were -- were the clients.  And when I

24   say "the clients," I do this -- I've testified several times

25   that I work for the attorney who works for the client, and
```

1   I'm just presenting it this way for ease of understanding.   I

2   just want to note that for the record.

3          Going up further on page 5.

4   Q.   What?

5   A.   On page 5, Habib Bahari and -- it's Mrs. Bahari --

6   versus Countrywide Home Loans and with loans servicing, and

7   the plaintiffs were the clients.

8          The next one up, U.S.A. versus Creative Financial

9   Services, Rita Noble and defendant Rita Noble was the client.

10  Q.   I'm sorry.  Where is this?

11  A.   Got it?

12  Q.   Yeah.

13  A.   Okay.  Further up on that page.  Idris Bilaal --

14  Q.   I'm sorry.  That was against -- that was against

15  the United States Government; right?

16  A.   Well, the United States was the plaintiff, the

17  United States Government.

18  Q.   Okay.

19  A.   And further -- oh, wait a minute.  Missed one.

20  Maria Teresa Wilson versus defendant Vincent Abell.

21  Defendant Vincent Abell was the client.

22          Again, I have a -- further up, Idris Bilaal

23  and Victor L. Abell -- oh, excuse me.  Idris Bilaal versus

24  Vincent L. Abell.  Mr. Abell and related parties.  Defendants

25  were the clients.

```
 1                    THE REPORTER:  Can you spell "Abell."

 2                    THE WITNESS:  A-B-E-L-L.  Oh, Bilaal.  I'm

 3    sorry.  B-I-L-A-A-L.

 4    BY MR. BENNETT:

 5        Q.   All right.  Let me stop you here.

 6             Do -- of -- just above that, there's the Sloan

 7    case?

 8             Do you see that?

 9        A.   Yes.

10                    MR. SEARS:  What page?

11                    MR. BENNETT:  Page 5.

12                    MR. SEARS:  Okay.

13    BY MR. BENNETT:

14        Q.   What do you recall about the Sloan case?

15        A.   I believe it was a fair credit reporting case.  I

16    don't have the file for it.  So --

17        Q.   Okay.  And you represented the bank or the credit

18    card company?

19        A.   Yeah, it was -- it wasn't the credit card company.

20    There were -- they were a consumer credit grantor.  I don't

21    recall -- it was a credit card case -- I believe they were a

22    mortgager, but I can't recall.

23        Q.   And what did you opine and what do you recall

24    opining in that case?

25        A.   I don't recall.
```

**JAMES F. LYNN on 08/25/2016**

1      Q.   And then, what, four cases up is the Kelly case.

2           Do you see that?

3      A.   Yes, I see that.  And I also see one past that,

4  Thiem, Michael Thiem.  That's T-H-I-E-M, Plaintiff, versus

5  William Jones, et al.  And Mr. Jones was the client.

6      Q.   Rather than go through the next four pages prior to

7  this, have you ever represented the consumer in a Fair Credit

8  Reporting Act case?

9      A.   Not that I can recall.  I think the record here is

10 showing that.

11     Q.   Now, was the Kelly case -- Kelly versus Experian,

12 that was a Fair Credit Reporting Act case; right?

13     A.   Oh, boy.  That was reported in October of 2005.  I

14 mean, it -- that was almost 11 years ago.  I just can't

15 recall the case.

16     Q.   Now, if you go up the report itself -- and I'm

17 sorry.  Let's go back up to -- we're fine.  Let's go to the

18 report itself, which I think is Exhibit 33.

19     A.   Yes.

20     Q.   This is your final report or no?  This is --

21     A.   This is another report.

22     Q.   This is your first draft?

23     A.   Okay.

24     Q.   And your final is 31?

25     A.   Okay.  Uh-oh.

1        Q.   If you turn to page -- I guess the fourth page in

2    from 31, please.

3        A.   (Witness complies.)

4        Q.   When were you first -- when were you first

5    contacted by Mr. Sears and asked to provide an expert report

6    in this case?

7        A.   I recall becoming aware in a general way of the

8    case but not the specific caption of the case.  You're going

9    down.

10       Q.   I'm fixing it here.

11       A.   Okay.

12       Q.   Okay.

13       A.   Again, I recall becoming aware of the case, but not

14   having a -- a case caption for the case in around February of

15   this year.  And then in, I believe it was May, I spoke with

16   Chris on the phone -- Mr. Sears on the phone about the case

17   and I wasn't retained at that time that I can recall.  And

18   then maybe late June, yeah, it was probably the last couple

19   weeks in June -- again, I'd have to -- I just can't recall

20   the specifics, but it was in that timeframe.

21            It appeared that Mr. Sears wanted to move forward

22   with retaining me as an expert in this case.  And I began

23   work on this case.  I can recall that.  It was on a Saturday

24   evening, July 2nd of this year with a deadline of July 2nd to

25   produce my expert report.

```
 1          Q.   Now, how -- have you ever worked for or with
 2    Mr. Sears before?
 3          A.   Yes.
 4          Q.   When?
 5          A.   On multiple occasions.  The first time that I
 6    worked with him was on a case on page 3 of my expert report.
 7    It's the second bullet, Jeffrey Scott Runyon and Melissa
 8    Runyon versus Nations Credit Financial Services Corporation
 9    dba Equa Credit, et al., expert report, December 2002.
10    Client was the defendant, and Mr. Sears involved in that
11    case.
12          Q.   I'm sorry.  Help me out.  Where -- what page are
13    you on?
14          A.   I'm on page 3 of my resume, the second bullet.
15          Q.   Okay.
16          A.   The second bullet -- the second bullet, the Runyon
17    case that you see there.
18          Q.   Okay.
19          A.   That was the first instance.  That was in December
20    of 2002.
21          Q.   How did you meet Mr. Sears?
22          A.   I was referred or I think he was referred to me by
23    an attorney with, perhaps Nations Credit.  I -- I -- I can't
24    recall.  But it was an attorney who knew me and also knew
25    him.
```

```
 1        Q.   Okay.  And do you recall what opinion you offered
 2   or the subject of that case?
 3        A.   It was a mortgage case and beyond that, I simply
 4   can't recall.
 5        Q.   It was a credit reporting case?
 6        A.   No, not that I can recall.
 7        Q.   Do you think consumers nowadays are too litigious
 8   generally?
 9        A.   I have no opinion on it.
10        Q.   What's your opinion of the consumer financial
11   protection bureau?
12        A.   In generalities, a good thing.
13        Q.   Is there anything that's problematic about it?
14        A.   Not that I'm aware of, no.
15        Q.   Now, since that 2002 case, how many other cases
16   have you -- how many other cases have you been hired by
17   Mr. Sears to give an expert opinion?
18        A.   Approximately ten times.
19        Q.   Have you ever had a case where Mr. Sears hired you
20   where he did not pay you?
21        A.   No.
22        Q.   Can you estimate how many in those ten cases
23   Mr. Sears has paid you?
24        A.   It would be a wild guess.
25        Q.   All right.  Would your pay in this case be typical
```

```
 1   of the pay you would have received in those other earlier

 2   cases?

 3        A.   No, it wouldn't.

 4        Q.   In what regard?  Why wouldn't it be typical?

 5        A.   Mortgage cases are a little bit more

 6   straightforward.  The issues are, generally speaking,

 7   they're -- they're easier to understand in terms of the

 8   litigation itself.  They are a little -- they're more

 9   straightforward, if you will.  It's not that this isn't.

10   It's just that they -- they seem to follow a general pattern,

11   if you will.

12        Q.   But this one's a little bit new for you; right?

13        A.   Well, in terms of my overall experience again, I

14   said I've worked on, you know, seven cases, plus or minus,

15   dealing with fair credit reporting issues.

16        Q.   Have you ever -- has any court ever found that you

17   were qualified to give an expert opinion?

18        A.   None has ever gone to trial that I can recall.  I

19   believe that is true.

20        Q.   So no -- no court has ever found that you're

21   qualified to give an expert opinion under the Fair Credit

22   Reporting Act?

23        A.   Yes.  It never got to trial, as far as I can

24   recall.  I believe that that is the case.

25        Q.   It is the case that you have never -- no court has
```

1  ever found you're qualified to give an opinion under the Fair

2  Credit Reporting Act?

3      A.   Yes, it has never disqualified me, but I was never

4  qualified in that sense.  I've written expert reports and

5  often, as you well know, these cases have a tendency to

6  settle.

7      Q.   So that 2002 case was the first that you -- which

8  you -- which you were hired by Mr. Sears.

9           What is the most recent one prior to the Wood case

10 in which Mr. Sears hired you?

11     A.   I believe on page 10, the second bullet from the

12 bottom, FIA Card Services versus Steven W. Snuffer, that's

13 S-N-U-F-F-E-R.  And I wrote an affidavit on that case, dated

14 August 2013.  And that was in Mr. Sears's case.

15     Q.   And what -- what did you opine in your affidavit?

16     A.   I just can't remember the issues of the case.

17     Q.   Do you know if it was a credit reporting case?

18     A.   I don't recall that it was.

19     Q.   Do you know what jurisdiction or city or state it

20 was in?

21     A.   It was in West Virginia, as I recall.

22     Q.   Do you know if it was in federal court or state

23 court?

24     A.   I can't recall.

25     Q.   All right.  Prior to that, what was the next one?

```
 1        A.   I found one on page 7, fourth bullet from the

 2   bottom of the Teresa Harvey and Brad J. Anderson versus

 3   FIA Card Services.

 4        Q.   Okay.  Do you -- why do you -- how can you recall

 5   that this would be a case with Mr. Sears?

 6        A.   There was some unique circumstances about that.

 7   The -- the case was going to go to trial.

 8             In February of 2010, I had to travel from my home

 9   in Silver Spring, Maryland to Charleston, West Virginia for a

10   trial, and we had 30 inches of snow before we had a -- before

11   we were able to get out of Silver Spring.  So it had a unique

12   characteristic to it and the case settled before it went to

13   trial.

14        Q.   So does Mr. Sears represent MBNA a lot?

15        A.   I can't speak to that.

16        Q.   Other than these two here -- I'm sorry.  You didn't

17   know that FIA is the MBNA from Johnson, the MBNA?

18        A.   I knew FIA Card Services was part of MBNA, but it

19   was a separate credit card issuer, as I understood it.  I

20   knew they were affiliated.

21        Q.   Bank of America Corporation -- I'm going to help

22   you for your next report -- Bank of America Corporation

23   bought MBNA Corporation --

24        A.   Correct.

25        Q.   Holding company bought holding company.  MBNA
```

1   America Bank, N.A. was the credit card insurer for Bank of

2   America Corporation.

3        A.   Correct.

4        Q.   And Bank of America Holding bought it.  It

5   eliminated its own credit card servicer and changed the name,

6   only the name, not the corporate structure of FIA -- or to

7   FIA.

8             MR. SEARS:  Objection to the testimony.  Move

9   to strike.

10             MR. BENNETT:  Not testimony.  I'm just sharing

11   information, which I'm sure, Mr. Sears, you represented him,

12   FIA, you already knew.

13             MR. SEARS:  And our objection is that's too

14   editorial; that's argumentative.

15   BY MR. BENNETT:

16        Q.   Was this a credit reporting case, this -- this --

17   this Harvey case?

18             MR. SEARS:  We're having a problem with the

19   mike again.

20             THE WITNESS:  I can't recall the specifics

21   well enough to say that it was or it wasn't.

22   BY MR. BENNETT:

23        Q.   All right.  Do you market the Lynn Group in -- at

24   all?  I mean, do you have any marketing effort?

25        A.   I have a website and that's it.

1    Q.   Do you ever go to any industry conferences?

2    A.   No.

3    Q.   Now, we'll take a look at Exhibit 31 again.  This

4    is your report.

5    A.   Okay.  (Witness complies.)

6    Q.   You know actually, let me -- I'm going to stop

7    that.  Before we do that, let's take a look at Exhibit 21 --

8    A.   (Witness complies.)

9    Q.   -- or 20 -- 23.

10   A.   (Witness complies.)  Yes, I'm there.

11   Q.   This at the top -- this is an email chain between

12   you and Mr. Sears; correct?

13   A.   That's correct.

14   Q.   And the first email, the top page is July 2nd,

15   2016; correct?

16   A.   That's correct.

17   Q.   And you -- as you have already testified, it was --

18   it was at this point, July 2nd, that you were retained in

19   this case; correct?

20          MR. SEARS:  Objection.

21          THE WITNESS:  Yes, I do -- perhaps a week

22   before that it was going to happen, and that's when it

23   happened.

24   BY MR. BENNETT:

25   Q.   But it was, by the subject of this email, it was

1  July 2nd that you first gained access to the documents in

2  this case; right?

3       A.   That's correct.

4       Q.   All right.  And then while I have you here, let's

5  turn to Exhibit 22.

6       A.   (Witness complies.)

7       Q.   It says, "Jim, please find attached two affidavits

8  I recently received from the West Point Police Department."

9            Do you see that?

10      A.   Yes, sir.

11      Q.   And this -- you saw this for the first time on

12  August 17th, 2016; correct, those affidavits?

13      A.   It's when I came into possession with both of them.

14  My recollection is that when I met with Mr. Sears in

15  Bethesda, Maryland, prior to that -- it was about a week

16  before, and we discussed the case.  I think he was in

17  possession of at least one of those affidavits.  I think it

18  was from Sergeant Woodson.

19      Q.   Have you ever talked to Ms. Woodson?

20           If you turn to Exhibit 20, can you identify that

21  document?

22      A.   Yes, sir.  It's my invoice I sent to Mr. Sears on

23  or about August 15th of 2016.

24      Q.   And this had all the time you had worked on this

25  case from the point when you were retained and had access to

1   those files, through August 12, 2016; correct?

2        A.   That's correct.

3        Q.   The time that you spent reviewing the documents on

4   the case, other than deposition transcripts is billed for

5   July 2nd and July 3rd; correct?  And then you had some on

6   July 5th?

7        A.   That's correct.  I was just going to mention that.

8        Q.   And that's -- those are the days that you billed

9   for reading documents that formed the basis for your expert

10  report; correct?

11       A.   Yes.  Basically, that's -- that's correct.  I --

12  you know, when I was writing the expert report, I was going

13  back and reviewing documents and consulting and so on.  But I

14  tried to summarize it as best I could.

15       Q.   All right.  Let's go to your report, which your

16  final is at 31.

17       A.   (Witness complies.)

18       Q.   If you'll turn to the second page of your report.

19       A.   Yes.

20       Q.   At the -- it has a heading towards the top that

21  says "Background," underlined.

22            Do you see that?

23       A.   Yes.

24       Q.   Under the background section, from what documents

25  did you obtain or what source did you obtain the information

1  such as the dates and the address that you referenced in this

2  section?

3      A.   They were in the binder that's notated "COB1"

4  through "COB553."

5      Q.   Okay.  Did you speak to any person personally to

6  get this information from Credit One to get this information?

7      A.   No, I never -- never spoke to anybody at all to get

8  this information from Credit One.

9      Q.   Okay.  If you turn to the next page at the top, the

10 header, you'll see a notation.  It says "Page 3 OF 7."

11         Do you see that?

12     A.   Yes.

13     Q.   All right.  So I want to go through your numbered

14 opinions here.  Number 1, you state that -- I'm summarizing

15 it -- that Credit One timely responded to each of the ACDV

16 disputes.

17         Is that a fair explanation of paragraph 1?

18     A.   Yes, based upon the information that I have.  Yes.

19     Q.   And you're unaware of any argument or allegation in

20 this case that Credit One is liable because it was untimely;

21 right?

22     A.   That is correct.

23     Q.   Paragraph 2, can you explain what your opinion is

24 in paragraph 2?

25              MR. SEARS:  Objection as to form.

1  BY MR. BENNETT:

2      Q.   I'll skip paragraph 2.  I mean, it's -- I'm not

3  sure why it's here.

4           But, let me -- let me ask you this:  Do you know

5  why or what caused Credit One to change the Equal Credit

6  Opportunity Act code from individual to joint in the April

7  28, 2015 ACDV you reference here?

8      A.   No, I have no explanation for it except that it

9  happened and it was -- as it turns out, there was a second

10 ACDV that was generated on the same day, also by Ms. Chu and

11 it was -- the -- the mistake was captured and corrected, as I

12 understood -- as I understood the -- the testimony of

13 Ms. Maragos.

14           THE REPORTER:  How do you spell that?

15           THE WITNESS:  It's M-A-R -- hold on.

16      It's M-A-R-A-G-O-S.

17      I'm sorry, Mr. Bennett.

18 BY MR. BENNETT:

19     Q.   Are you aware that some banks, when a family member

20 has opened an account by identity theft, will attempt to add

21 the punitive identity fee as a responsible party in account

22 records?

23     A.   I don't have an opinion on that.

24     Q.   But the info0rmation that you obtained in paragraph

25 2 was from your review 0of the documents and of Ms. Maragos's

1  deposition transcript?

2      A.   That's correct.

3      Q.   In paragraph -- in -- in -- I guess your opinion

4  number 3, you state that "No police report was provided."

5           What do you mean by that?

6              MR. SEARS:  Objection as to form.

7              THE WITNESS:  There was a notation that was

8  inserted by the consumer and the FCR relevant information

9  section on that ACDV, that a police provide -- that simply

10  stated provide a police report.  There was no evidence that a

11  police report was provided.

12  BY MR. BENNETT:

13      Q.   So you don't know who actually puts information in

14  the "all relevant information field" of an ACDV, do you?

15      A.   My understanding is that is the consumer.

16      Q.   And where do you get that understanding?

17      A.   It is in the documents.  I just have to -- the

18  TransUnion document.

19      Q.   It's not in any document.  It's entirely untrue.

20  It's put in by the ACDV agency at the credit reporting

21  agency.  But I'm trying to figure out why you think that.

22              MR. SEARS:  Characterization.

23  BY MR. BENNETT:

24      Q.   What document can I help you find that the consumer

25  puts the all relevant information pretext into the ACDV?

 1        A.   My understanding is that they're from the captions

 2    on documents that I looked at with respect to this particular

 3    ACDV, that it was consumer provided information.

 4        Q.   Are you aware if a consumer provides a police

 5    report to a consumer reporting agency, the consumer reporting

 6    agency puts "police report provided" to it -- implicitly to

 7    it -- the consumer reporting agency in the "all relevant

 8    information field"?

 9        A.   It wasn't my understanding.  That's the way it

10    worked.

11        Q.   Well, so your opinion here that my client did not

12    provide a police report to the consumer reporting agency --

13    I'm sorry.  Let me strike that.

14             Do you have any opinions as to whether my client

15    provided an incident report or police report to the consumer

16    reporting agencies?

17        A.   I could not find any documentation to support that.

18        Q.   Do you know who -- I'm sorry.  I withdraw that.

19             So you testified it's your opinion as a purported

20    expert in the Fair Credit Reporting Act, that the consumer is

21    the person who inserts the information into the "all relevant

22    information field" of an ACDV?

23                  MR. SEARS:  Objection.  Asked and answered.

24                  THE WITNESS:  That -- that was my

25    understanding from the documents, yes.

1  BY MR. BENNETT:

2      Q.   Okay.  How do you think a consumer gets access to

3  the terminal in which the ACDV is created to insert that

4  information?

5      A.   If it's done online, it's -- it's -- I have not

6  filled out the form, but if the ACDV is originated by the

7  consumer, presumably it is.  Certain data is furnished to the

8  CRA who, in turn, furnishes it to the data furnisher.  In the

9  context of that, it's my recollection in reviewing a document

10  from TransUnion, that led me to believe that that information

11  was provided by the consumer.

12      Q.   Do you know -- well, my head is spinning here.

13           So how do you think a consumer would go online and

14  create an ACDV?

15      A.   I've never done it myself.  But it can be done

16  online, and they have -- and documents can be attached, as I

17  understand the form.

18      Q.   No.  I'm not asking you how a consumer makes a

19  dispute.  I'm asking you how a consumer creates an ACDV,

20  online or otherwise.  Do you have any idea?

21      A.   I've never done it before, so I can't speak to the

22  specifics of it.

23      Q.   Have you ever seen or know of anyone who's ever

24  done that before?

25      A.   Not that I'm aware of.

```
1        Q.   Well, so you've never even been on a credit
2   bureau's website to see how disputes are received?
3        A.   No.
4        Q.   Are you aware -- do you have any knowledge as to
5   whether there is an "all relevant information field" in
6   the -- the online dispute?
7        A.   I can't speak to it, no.
8        Q.   Oh --
9        A.   I'm sorry.  I interrupted.
10       Q.   Do you know which ACDV's in this case were
11  generated of Mr. Wood making a dispute on the credit
12  reporting agency's website?
13       A.   My recollection is all of them were.
14       Q.   And why do you recall that?
15       A.   There is a code on the ACDV itself.  Each of the
16  three CRAs has a unique code.  And in the deposition
17  testimony that I read, the agent was able to identify the
18  originating source for each one of the ACDV's.  At least I
19  can speak for five out of six of them.  I can't speak for the
20  one in July of 2014 because I did a three-day deposition
21  transcript for the agent Shantell Reid.  That's
22  S-H-A-N-T-E-L-L.  But on my other documents indicate each of
23  the five documents, five ACDV's, show that each one was
24  originated with one of the three CRAs.
25       Q.   Well, I understand, but that's not my question.
```

1          My question is, why do you think they were all

2    generated from internet disputes made by Mr. Wood --

3          A.   I can't.

4          Q.   -- as opposed to letters that he sent?

5          A.   It could have been letters or it could have been an

6    online transmission.  I can't speak to either one.  There is

7    some documentation that there may have been one on or around

8    the 15th of April that there was a letter, but I can't speak

9    to -- to it.  I -- my focus was on the -- the transmission

10   from the -- from the CRA to Credit One.

11         Q.   So with respect to your purported opinion in

12   number paragraph 3 in page 4 of 7, where you say, in fact,

13   "No police report was provided," what you meant was that no

14   police report or police documents even, I guess, were

15   provided to Credit One; right?

16         A.   That's correct.

17         Q.   Now, the next sentence says, "In any event, in

18   connection with this litigation, the bank has been provided a

19   copy of an incident report."

20              Do you see that?

21         A.   Yes.

22         Q.   And after your examination of the bank's documents

23   in this case, are you able to determine whether or not the

24   bank sought the incident report prior to the filing of this

25   lawsuit?

1      A.   I have no knowledge of that.

2      Q.   Do you have any knowledge or was there any

3   indication, any wanting of documents that it sought the

4   incident report prior to the litigation in this case?

5      A.   I don't know that the bank was aware of it.  I

6   didn't see anything to tell me one way or another that I can

7   recall.

8      Q.   And did the bank ^  maintain it or obtain a copy of

9   the incident report prior to the filing of this lawsuit?

10      A.   I don't know.

11      Q.   Well, is there any review of your documents or the

12   bank's documents that were produced to you that show that

13   anyone at the bank ever spoke to Sergeant or whatever her

14   rank is, Police Officer Woodson prior to the filing of this

15   lawsuit?

16      A.   I'm not aware of it.

17      Q.   Well, the answer is, no, you have not seen any

18   documents in the defendant's production to you in this case

19   that show that it either sought or saw information from

20   Woodson or the police department prior to the filing of this

21   lawsuit?

22      A.   I'm not aware --

23      Q.   Right.

24      A.   Yes.  I'm not aware that the bank was even aware of

25   the incident report in the first place.  That's not a -- the

**JAMES F. LYNN on 08/25/2016**

1  document that I got did not have a -- a bank Bates stamp on

2  it.  In fact, it had no Bates stamp on it.

3      Q.  So is there or -- to your knowledge, did the bank

4  do any research with the West Point Police Department or any

5  other law enforcement authority to confirm the truthfulness

6  of Mr. Wood's statement that he had provided a police report

7  prior to the filing of this lawsuit?

8      A.  I'm not aware of it.

9      Q.  So all of the information about communications with

10  the police department or the West Point Police Department

11  here, in this -- of this page, 4 of 7, this all comes from

12  your review of the two affidavits in the incident report that

13  Mr. Sears gave you after July 2nd; right?

14             MR. SEARS:  Go ahead.  I'm not going to

15  object.

16             THE WITNESS:  Yes, that's correct.  Let me

17  clarify that.  I didn't have either one of the affidavits

18  when I produced this report.  I just had the police report.

19  BY MR. BENNETT:

20      Q.  Okay.  Now, on the second bullet point on the

21  bottom of that page, it says that "Even if the bank had

22  received the incident report, they contained allegations that

23  local law enforcement deemed not worthy of further

24  investigation."

25             Do you see that?

1      A.   Yes.

2      Q.   What does that have to do with whether or not there

3   was a contract between -- whether or not Credit One could

4   prove there was a contract between it and Mr. Wood?

5                MR. SEARS:   Objection.

6   BY MR. BENNETT:

7      Q.   Well, do you -- you don't believe that a consumer

8   has to prosecute an identity thief before a creditor would

9   have to remove a fraud account, do you?

10      A.   My plea of that is the bank needs credible evidence

11   to leave it to conclude that a -- an account is fraudulent,

12   and the two principal ways to confirm that are:  One, a

13   police report; and two, an affidavit of identity theft.  I

14   had no understanding that the bank ever had in its possession

15   prior to the filing of this lawsuit and perhaps after, the --

16   the copy of that incident report.  And I have no knowledge at

17   all that the bank has ever received an affidavit of identity

18   theft from Mr. Wood.

19      Q.   All right.  Let me try it this way, so I want to

20   understand your opinion and the understanding of the way the

21   Fair Credit Reporting Act works.

22                If a bank's records report that a consumer owes a

23   credit card and the bank does not have an application signed

24   by that consumer, the consumer says, I'm not the person who

25   applied for the credit card, is the bank allowed to continue

 1  to report the credit card even though it does not have a

 2  signed application?

 3                 MR. SEARS:  Objection.  Calls for a legal

 4  conclusion.

 5  BY MR. BENNETT:

 6      Q.   In your opinion.

 7                 MR. SEARS:  He's already testified he's not a

 8  lawyer or providing legal opinions in the case on contract

 9  law.

10                 MR. BENNETT:  Well, that's what his opinion

11  is, and now I'm about to prove it's entirely wrong based on

12  Johnson v. MBNA.

13                 MR. SEARS:  Actually, I don't believe that is

14  what the defendant says.  And I'm -- I don't want to argue

15  with you.

16                 MR. BENNETT:  Okay.

17                 MR. SEARS:  Just go ahead and answer.

18                 MR. BENNETT:  Sure.  Well, let me try it --

19  let me try it differently.

20  BY MR. BENNETT:

21      Q.   Whose burden is it to prove whether a debt is owed

22  or a credit card is owed or not owed between the bank and the

23  consumer when the consumer says it's not my account?

24                 MR. SEARS:  Objection.  Again, it calls for a

25  legal conclusion and also, it misstates the issues that -- an

1   issue in this case and what his opinions are pertaining to in

2   this case.  This is not a contract case.  It's a reasonable

3   investigation case under the FCRA about verifying

4   information, not proving identity theft.

5           Go ahead and answer if you can, but if you have an

6   opinion -- if you have a legal opinion as to --

7               MR. BENNETT:  Counsel, I'm not asking for his

8   legal opinion.  This witness believes --

9               MR. SEARS:  I'm not going to argue.  I'm not

10  going to argue.

11              MR. BENNETT:  Reasonably continue to credit

12  report even when it doesn't have proof that the consumer owes

13  the debt.  The witness himself testified that it did not have

14  credible evidence to refute its belief that would have --

15  would owe the debt.

16              MR. BENNETT:  Lynn -- so I agree with you on

17  that.  I'm asking for his legal opinion because that's all he

18  has offered in his expert report.

19              MR. SEARS:  Lynn --

20              MR. BENNETT:  If you want to continue to

21  object because I can't ask him his legal opinion, well, let's

22  put -- let's go through this and try to go to a new line of

23  questioning.

24              MR. SEARS:  Let's have this conversation on

25  Monday.  That's a good time to have this.

1          MR. BENNETT:  Monday -- after this evidence,

2    there's no way the case settles.

3          MR. SEARS:  I agree.  I agree.

4          MR. BENNETT:  We're -- we're way up in value

5    on this case and this case has skyrocketed.

6          MR. SEARS:  Okay.  Let's see what your expert

7    has to say.  Oh, I forgot.  You don't have one.

8          MR. BENNETT:  Same with Johnson when the bank

9    made the same argument here.

10          MR. SEARS:  Let's take a break; okay?  Yeah.

11    Let's take a break; okay?  I don't want to go down this road.

12    Let's take a break.  I'm getting a little edgy.  It's not as

13    hot now.  Let's just take a break now; okay?

14          THE VIDEOGRAPHER:  Stand by, please.  The time

15    is now approximately 1:55 p.m.

16          (Off the record.)

17          THE VIDEOGRAPHER:  We're on the record.  The

18    time is approximately 2:10 p.m. as we continue the deposition

19    of James F. Lynn, on August 20th, 2016.

20    BY MR. BENNETT:

21      Q.   When a consumer makes a dispute that they did not

22    open a credit card account, that it was opened by an identity

23    thief or a fraudster, some other person, what information

24    does the bank or credit card company investigation have to

25    uncover to support continued reporting of the trade line to

1    the credit reporting agencies?

2        A.    It would use its own documents.  When I say

3    "documents," their origination documents, underwriting

4    documents, settlement documents and documents with respect to

5    administration of a loan.

6             There are documentation -- all documentation that

7    should be within the purview of the bank and with the

8    ownership of the bank.

9             In addition, they corroborate that information as

10   best they can with independent sources of information that

11   are deemed to be credible and reliable to test the veracity

12   of that information and the reliability and the accuracy of

13   it.

14       Q.    So in this case, what information did Credit One

15   have to support the correctness of its reporting that

16   Mr. Wood applied for this account?

17       A.    Again, it was an online application.  They had the

18   information within that application, his address, his Social

19   Security Number, his date of birth.  And they could take that

20   information and other information to -- again, to test the

21   credibility of that information with independent sources

22   of -- of data, such as Accurint.  That's basically what they

23   did and they kept coming back to the same conclusion.  That

24   he was, in fact, responsible for the debt.

25       Q.    I understand that.

1          Do you have any opinion or knowledge -- I'll try

2    that -- as to whether or how common it is that an identity

3    theft occurs when the identity thief obtains access to the

4    personal identifiers of the consumer victim?

5          A.   I can't speak to it now.

6          Q.   In your opinion, if an identity thief did not have

7    the name, address, Social Security Number and date of birth

8    of the consumer, could they typically open a fraud account --

9          A.   It's possible.

10         Q.   -- at --

11         A.   It's possible.  I'm sorry.  Go ahead.  I

12    interrupted you.

13         Q.   I was going to say, at an American financial

14    institution?

15         A.   It's possible, certainly.

16         Q.   How?

17         A.   You're combining data from not just one source, but

18    multiple sources to make it appear it's a different person

19    and that's the essence of identity theft.

20         Q.   Right.  So it's your belief that Credit One

21    reasonably concluded that the credit card it was reporting to

22    Mr. Wood's credit file was his responsibility because Credit

23    One had his Social Security Number, date of birth and address

24    in its file?

25         A.   And they were able to test that as -- as possible.

1   Again, they had -- let me rephrase it.

2            They had the date of birth.  They had the Social

3   Security Number.  They had his address.  They were able to

4   confirm by an independent source, Accurint, that the

5   credibility of the address, so they could identify him to the

6   post office box in West Point.

7            Based upon that conclusion and in the absence of

8   any other information submitted to Credit One Bank by

9   Mr. Wood himself or others on behalf Mr. Wood, to lead them

10  and lead their investigation into a different direction, they

11  didn't have anything to challenge their -- their conclusions

12  in -- in -- in the matter.

13       Q.   So -- so what information -- I'm sorry.

14            You said they were able to determine the, I guess

15  reliability or veracity of the information that they had in

16  their system by using Accurint; correct?

17       A.   Some of that information.  They were able to

18  substantiate and support it by independent sources,

19  particularly Accurint, to support their position that

20  Mr. Wood was responsible for the account.

21       Q.   What other independent sources are you referring to

22  besides Accurint?

23       A.   I don't know they used another independent source

24  in this case.  I recall that Ms. Chu testified, and I believe

25  it was Experian was -- was another source.  I'm not sure

1   exactly how they used it, but I did read again that she --

2   she referred to it.  And there was a third source that she

3   referenced.  I cannot recall it at the moment.

4        Q.   Each of those sources, all they did was confirm

5   that the address that Credit One was using for Mr. Wood and

6   the Social it was using for Mr. Wood and the date of birth it

7   was using for Mr. Wood actually with an address, Social, date

8   of birth, that Accurint connected to Mr. Wood; right?

9        A.   That's correct.

10       Q.   So if the identity thief actually used Mr. Wood's

11  address, date of birth and Social Security Number to access

12  or to -- to obtain the credit card, you would expect it to be

13  true that the -- well, let me -- let me -- I'm not going to

14  go down that.  Sorry.  I can't make my point at all.  I keep

15  arguing with you about --

16            MR. SEARS:  You're going to make my point.  Go

17  ahead.

18  BY MR. BENNETT:

19       Q.   If you take a look at the binder that says "Credit

20  One's Bates Stamped Documents," please.

21       A.   (Witness complies.)  Okay.  Okay.

22       Q.   You've seen this document -- stack of documents

23  before today; correct?

24       A.   That's correct.

25       Q.   And they were provided by Mr. Sears to you in July

1  2nd in a Drop Box link; right?

2      A.   That's correct.

3      Q.   All right.  The first several pages, if you look at

4  the Bates number and you know how to read Bates numbers;

5  right?

6      A.   Yes.

7      Q.   The first Bates numbers 1 through 4 appear to be

8  just sort of a sample credit card solicitation.

9           Do you see that?

10     A.   Yes.

11     Q.   Do you have any personal knowledge as to what this

12  document has to do with this case?

13     A.   I believe it's -- it's a sample of the type of

14  solicitation which was sent to Mr. Wood.

15     Q.   Well, it was sent to his name at a particular

16  address; correct?

17     A.   That's correct.

18     Q.   You would agree with me there's no evidence as of

19  today that Mr. Wood is the person that actually received such

20  solicitation; right?

21     A.   It was addressed to his post office box.

22     Q.   It was?

23     A.   Well -- well, it was addressed to the post office

24  box which Credit One Bank was able to confirm he was a -- he

25  was a recipient of mail at that post office box.

```
 1        Q.   And that's pretty important -- that's a pretty
 2   important fact for you; right?
 3        A.   It is.  Yes, it is.
 4        Q.   "Yes"?
 5        A.   Yes.
 6        Q.   Okay.  Why -- why do you think the initial
 7   solicitation was sent to his post office box?
 8        A.   I believe that was the address they had.  That was
 9   where he was receiving his mail.
10        Q.   Okay.  So let's skip ahead to Bates number 7.
11        A.   (Witness complies.)
12        Q.   Do you recognize this document?
13        A.   Print's a little small, I will admit.  But I do
14   recognize it.
15        Q.   And what is this?  Do you want to correct your
16   answer?  Do you want to correct your opinion?
17        A.   I'm looking for the term "boarding data," because I
18   saw that, and I can't see it.  The print is a little bit
19   small.
20             But this is putting his application or the
21   application that was associated with him on to the Credit One
22   system.
23        Q.   And what is the address that Credit One had boarded
24   into the application system?
25        A.   2115 Lee Street.
```

1      Q.   Is there any indication in this -- at this point in

2   time, from Bank -- from Credit One's records, that it had

3   associated Mr. Wood's post office box with this account?

4      A.   I believe there was, and I thought I saw a

5   document, to tell you the truth.

6      Q.   Well, there are statements that come later --

7      A.   Uh-huh.

8      Q.   -- but I'm again talking at the boarding point.

9           MR. SEARS:  Counsel, for clarification, the

10   supplemental documentation, which is not here today, if

11   you'll see, there's the -- on this boarding information,

12   there is a mailing address and there's home address.  This is

13   the home address screen, and the supplementation information

14   we provided, there is a mailing address we produced and it

15   includes the PO box.

16           THE WITNESS:  Thank you.

17           MR. SEARS:  And that's not here today.  And

18   Mr. Lynn would not be able to locate it since we don't have

19   it here.

20   BY MR. BENNETT:

21      Q.   What was the --

22           MR. BENNETT:  Well, I understand that, but

23   this is the address that's listed; right?

24           MR. SEARS:  That's the address that's listed.

25   Under the home address tab, if you click, which I noticed

1  this was two different things.  I asked Credit One to click

2  under "mailing address tab," they produced that document to

3  me, which then I supplemented to you all that you put in the

4  PO box.

5           If you would like, I could pull that up.  We don't

6  have that document here.  I've got it electronically.

7  BY MR. BENNETT:

8      Q.   Now -- now, turning to the same Bates number search

9  on the far right, it says "Processing information."

10          Do you see that?

11     A.   Yes.

12     Q.   What does the signature flag field signify?

13     A.   I don't recall -- I don't recall seeing this

14  document before frankly, but that's what it says.

15     Q.   Which means there was not a signature -- an actual

16  human signature received by Credit One; correct?

17     A.   I'm going to assume that that's the case because my

18  understanding was that the application was -- was -- was

19  submitted online and if it was an online application, that

20  went directly from the originating source to Credit One Bank,

21  it would not have a signature.

22          That's my understanding or --

23     Q.   And your -- in your expert opinion, are online

24  credit card applications more vulnerable to identity theft

25  than personally solicited and signed credit card

1    applications?

2         A.    I don't have an opinion.

3         Q.    Are you aware of any banks, national banks that

4    went under -- collapsed because their business model was to

5    make online credit card applications?

6         A.    I'm not aware of it.

7         Q.    You don't know either way; right?

8         A.    That's correct.

9         Q.    Now, on the same Bates page, it says "Primary Email

10   Address."

11             Do you see that?

12        A.    Yes.

13        Q.    And is there any indication that that email

14   address, the presence of that email address for the mother

15   was considered by the Credit One employees that were

16   responsible for doing the credit reporting investigations in

17   this case?

18        A.    The only way I know that -- of the name

19   Diane Lawless is from the incident report of the West Point

20   Police Department.

21             My understanding at all times through the period

22   that the ACDV's were received and reviewed that the section

23   that I referred to, the bank did not have -- was not

24   knowledgeable of who Diane Lawless was.  So I don't know if

25   they could ascribe anything in their investigation, any

**JAMES F. LYNN on 08/25/2016**

1  significance at all in their investigation to that email

2  address.

3       Q.   Let me try my question again.

4            Are you aware of whether or not any employee of

5  Credit One Bank considered the email address or the lack of a

6  signature or the IP address in handling Mr. Wood's credit

7  reporting disputes?

8       A.   They had access to the information, but I don't

9  know in each instance that they could assign any significance

10  to lead them to believe one thing way or another.

11           MR. BENNETT:  I object to your answer.  I move

12  to strike it.  Objection based on not responsive to the

13  question.

14  BY MR. BENNETT:

15       Q.   I'm going to ask you again:  Are you aware, "yes"

16  or "no," of any documentary or testimonial evidence that

17  Credit One Bank did anything to examine or look at the

18  assigned email address, the lack of a signature or the IP

19  address when investigating Mr. Wood's credit reporting

20  disputes?

21       A.   No.

22       Q.   Now, if you can take a look at the statements that

23  follow.  I believe it's Bates numbers -- doesn't show.  Bates

24  14, number 14.

25           There are session charges showing on these pages;

```
 1   right?

 2        A.   Yes.

 3        Q.   For example, Bates number 15 shows charges at South

 4   Beach Smoke in Florida.

 5        A.   Wait a minute.  Yes.

 6        Q.   At a gas station ^  Joanna?

 7        A.   Yes.

 8        Q.   At a food line, Walmart.

 9             Do you see that?

10        A.   Yes.

11        Q.   And of course, you know that most businesses

12   require a signature over a certain amount of money or have

13   security cameras when someone would make a purchase like at

14   these establishments; right?

15        A.   That's correct.

16        Q.   And are you aware, "yes" or "no," of any evidence,

17   documentary or testimonial evidence that any person at Credit

18   One ever reached out to look at or research the identity of

19   the person or persons that used the credit card at any of

20   these facilities in any of these statements?

21        A.   I'm not aware of them.

22        Q.   Take a look at Bates number 45.

23        A.   (Witness complies.)

24        Q.   Have you ever seen that document before?

25        A.   Yes.
```

1      Q.   Actually, I'll skip back a couple pages.  Try 43.

2      A.   (Witness complies.)

3      Q.   When Mr. Wood contacted Credit One, this is the

4   letter that Credit One sent back to Mr. Wood; correct?

5      A.   Yes.

6      Q.   And this is because Credit One had sold the account

7   to a third party, Midland Credit Management; correct?

8      A.   I understand it went through one or two

9   intermediaries, but it did come into the possession of

10  Midland Credit, yes.

11     Q.   Did you ever review the court's decision in the

12  Northern District of Alabama case Brim, B-R-I-M --

13     A.   No.

14     Q.   -- v. Midland?

15     A.   No.

16     Q.   If you could take a look at Bates Exhibit 46,

17  please.

18     A.   (Witness complies.)

19     Q.   Now, you recognize this is a copy of an ACDV that

20  is maintained by Credit One; correct?

21     A.   Yes.

22     Q.   And can you explain to me how to read this

23  document?

24     A.   Are we down -- the request data is what's provided

25  to the data furnisher.  The response information is any

1  updated information that the bank has and knows that is

2  credible, reliable, accurate, to the request data.

3          And the third column is whether it's the same or

4  different or whether it's unknown.

5      Q.  Well, why do you think that the furnisher is to put

6  in response data only data that it knows is verified and

7  reliable --

8      A.  Because that's --

9      Q.  -- as opposed to --

10     A.  I'm sorry.  Go ahead.

11     Q.  No.  I'm sorry.

12     A.  Oh.

13     Q.  Why do you believe that the Credit One puts

14  information in here that is verified as opposed to the

15  information that is currently in its account system?

16             MR. SEARS:  Objection.  Calls for speculation.

17             THE WITNESS:  Their obligation is to provide

18  accurate information, and that's what they have strived to

19  do.  That's their obligation under the law.

20  BY MR. BENNETT:

21     Q.  Okay.  So you agree that it is Credit One's

22  obligation under the law to only put information and response

23  data that it has verified to be true and correct?

24     A.  That's correct.  That's what their obligation is.

25     Q.  And -- and by that, you mean verified that the

1   person that actually applied for this account is the person

2   listed here under "Request Data" from the CRA?

3        A.   That's correct.

4        Q.   Now, I want to -- you have two books that I want

5   you to take a look at.

6             The one is that document that's right in front of

7   you.

8        A.   Okay.

9        Q.   Well, actually no, I won't.  I'll keep proceeding

10  until I get to the right one.

11            Can you tell which consumer reporting agency this

12  ACDV was received from and then sent back to?

13       A.   It's -- I believe that's the subscriber code up on

14  top and -- in the box on the right-hand side.  I'm having a

15  little difficulty reading this, so owe bear with me, please.

16       Q.   Well, how about this --

17       A.   I think the subscriber code is 180BB27505.  I

18  understand that, based upon the documents that I've reviewed

19  that each of the CRAs has its own unique subscriber code.  So

20  the -- the agents who work with us all the time could tell

21  just by looking at it which one it was.  I have to go back to

22  the reference document to see which one it was.  But I

23  believe that identifies which one of the three it is.

24       Q.   So who do you believe -- well, are you aware that

25  the subscriber code is the code for Credit One that is

1   assigned by a credit reporting agency?

2       A.   I understood it was -- where's the other one?

3       Q.   Okay.

4       A.   That was my understanding.  The subscriber code

5   from the -- let me -- excuse me.  The control number is what

6   I meant to reference.  The box above it, which identifies the

7   CRA.  The subscriber code, I'm sure is -- yes, I stand

8   corrected.  The subscriber code, which is 180BB27505 defines

9   Credit One Bank, and the control number above it, which is,

10  on this particular ACDV on page 46 is 4 "9's," 4175045721018.

11  And that relates to a -- one of the three credit reporting

12  agencies.

13      Q.   Okay.  So tell me how you -- before this case

14  started, what knowledge did you have as to how a furnisher

15  would open and access an ACDV like this one?

16      A.   I couldn't tell you that.

17      Q.   What do you mean, you couldn't tell me that?

18      A.    In terms of how to open it on their system and

19  access it, I can't tell you that today.  All I can look at is

20  the hard data and interpret the hard data and what it means.

21  I can't give you the technical details of how they pull up

22  each -- each ACDV.

23      Q.   Do you know if Credit One ever responded to an ACDV

24  with the compliance condition code field -- CCC field value

25  of XB?

 1      A.   No.  The six I looked at, the six ACDV's which are

 2  listed on page of my report showed each one respond as XH.

 3      Q.   And you understand XH means there's no longer a

 4  dispute; right?

 5      A.   It -- it is.

 6           MR. BENNETT:  Objection.  Mischaracterizes the

 7  explanation code.  Go ahead.

 8           THE WITNESS:  Yeah.  The -- it's described

 9  as -- as an account previously in dispute, now resolved,

10  reported by credit grantor.

11  BY MR. BENNETT:

12      Q.   Can you take a look again at ACDV Bates 46 --

13      A.   Yes.

14      Q.   -- under the response -- response data under

15  account information for interest type indicator.

16      A.   Yes.

17      Q.   And there is a notation that says "Fraud With

18  Documents."

19           Do you see that?

20      A.   Yes.

21      Q.   What do you understand that was put there for?

22      A.   Everyone who was asked that, both of the agents in

23  deposition couldn't explain it, and I couldn't either.  I did

24  look up the interest type indicator.  That is whether it was

25  a fixed rate or a variable rate.  This was clearly a variable

 1   rate.  I had no explanation as to why that entry is in there.

 2       Q.   But again, this particular ACDV you see under

 3   the cc'd field, there had not been an earlier XB or XH by

 4   Credit One; correct?

 5       A.   Correct.  This was the first one I received as far

 6   as I know.

 7       Q.   Well, up above, do you see where it says "FCR, A

 8   Relevant Information"?

 9       A.   Yes.

10       Q.   Is there any -- do you have any opinion as to

11   whether or not the statement that Mr. Wood had called Credit

12   One and disputed it and that he called back over a four-month

13   period and was told it was under investigation is true?

14       A.   I could not find documentary evidence to support

15   the telephone calls which Mr. Wood claims to have made to

16   Credit One on this matter.

17       Q.   Do you know how much -- I'm sorry.  How many ACDV's

18   Credit One's employees process in a given hour?

19       A.   No.  I know there was discussion about -- with both

20   Alexander Chu and Jennifer Schmitt in both of their

21   respective depositions.  And they just gave rough estimates

22   as to how long it takes them to process an average ACDV, if

23   there is an average.

24       Q.   Do you recall what that amount of time is?

25       A.   Well, I recall that Jennifer Schmitt testified that

```
 1   she could process or that she processes on average somewhere
 2   between 30 and 70 a day.  And they also had other
 3   responsibilities besides ACDV's.  But that was my
 4   recollection, was her -- I can't recall what Alexander Chu's
 5   was.  It wasn't at deposition.
 6       Q.   Okay.  Can you take a look at Bates number 55.
 7            Actually, let me switch over to Exhibit 7 in the
 8   big book over there that says "Exhibit 2."
 9       A.   (Witness complies.)
10       Q.   Have you seen these documents before --
11       A.   Yes.
12       Q.   -- today?
13            MR. SEARS:  Counsel -- Lynn?
14            MR. BENNETT:  Yeah.
15            THE WITNESS:  My binder exploded on me.  I
16   just need to fix it.
17            MR. BENNETT:  Sure.
18            THE WITNESS:  Thank you.
19   BY MR. BENNETT:
20       Q.   So you understand the top part of this document
21   Bates numbers Wood Experian 1 through Experian 10 are --
22   would be a letter Mr. Wood sent to Experian's dispute
23   department; right?
24       A.   Yes.
25       Q.   And you're aware the credit reporting agencies now
```

```
 1   make those letters, letter like this one, available for the
 2   furnisher to look at through the ACDV exchange?
 3       A.   I didn't -- I was not aware of that.
 4       Q.   You're not aware since summer of 2013 that that's
 5   happened?
 6       A.   No, I wasn't.
 7       Q.   Okay.  Can you take a look at Bates number 11.
 8       A.   (Witness complies.)
 9       Q.   Do you know how to read these documents here?
10       A.   Generally.
11       Q.   Do you recognize it to be -- well, let me ask you
12   this:  Have you ever seen what an ACDV looks like from the
13   consumer reporting agency side?
14       A.   Well, I saw another copy similar to this, yes, in
15   the production of documents I reviewed.
16       Q.   Well, before this case, had you studied how to read
17   ACDV's generally?
18       A.   I've dealt with ACDV's before, but it hasn't been
19   for a couple years.  So you got to refresh yourself on it.
20       Q.   At the top, do you see the "Document View" field?
21       A.   Document -- I'm sorry.  I didn't understand the
22   last part of what you asked.
23       Q.   At the top in the field that the CRA version uses
24   to credit whether attached documents have been viewed, you
25   see where it has the letter "Y"?
```

1     A.   All right.  Yes, okay.  Yes.  Two "Y"'s in there.

2   I see one ACDV response and then document viewed.  Yes and

3   yes.

4     Q.   Now, you -- I believe you said that your client, or

5   it was Credit One, had not looked at any documents provided

6   by Experian.

7          Is that -- is that true; is that something --

8     A.   That was my recollection.

9     Q.   -- is that something you, as I understand your

10  report?

11    A.   In my report?  I don't know that I said that in my

12  report, but I don't know that I referenced that in my report.

13    Q.   Go back to the big book of Credit One's

14  Bates-stamped document, Bates 58 and 59 right after the

15  ACDV's.

16         In fact -- in fact, you could skip to score and I'm

17  going to work backup.

18    A.   (Witness complies.)  Okay.  Okay.

19    Q.   On 64, I'm confused by a couple things.  Up -- up

20  above, it says -- and I'm now looking at August 20, 2013.

21    A.   Yes.

22    Q.   And first, do you know when this solicitation was

23  supposedly sent?

24    A.   Yes.  It was late May or early June of 2013.

25    Q.   Okay.  And you know when the card was first

**JAMES F. LYNN on 08/25/2016**

```
 1  activated?
 2      A.   In my report, I state it as June 14th of 2013.
 3      Q.   All right.  So let's take a look at Bates 65.
 4      A.   (Witness complies.)
 5      Q.   So when the account was opened, can you tell me
 6  what event occurred or does Credit One's records show it
 7  occurred with respect to live human contact to activate the
 8  account?
 9      A.   I -- I'm not sure that I can read these or
10  interpret these notes to tell you -- give you a specific
11  answer to that question.
12      Q.   Well, it says "AU name not added."  You would
13  understand that to mean "Authorized user name not added";
14  correct?
15      A.   Where are you?
16      Q.   Second from the bottom.
17      A.   Yes.  "AU name not added.  Voice unrecognized."
18          THE REPORTER:  Can you repeat that, please?
19          THE WITNESS:  I'm sorry.  Go ahead,
20  Mr. Bennett.
21  BY MR. BENNETT:
22      Q.   So you understand that means that someone called in
23  trying to add their name as an authorized user and this was
24  denied because the voice of this person was not recognized;
25  correct?
```

1    A.   My understanding from Ms. Maragos's testimony is

2  that they have a system that can differentiate between a male

3  voice and a female voice.  Obviously, Mr. Wood was a male.

4  The voice, as I understood it, was a female and they rejected

5  it.

6    Q.   And this was at the point of activation that a

7  female voice called in; correct?

8    A.   That was what Ms. Maragos's testimony was, yes.

9    Q.   Okay.  And is there any evidence, documentary or

10 testimonial evidence, that you have observed in your review

11 of all the Credit One documents that shows that the fact it

12 was a woman that initially activated the account was

13 considered by Credit One employees that were handling

14 Mr. Wood's disputes?

15           MR. BENNETT:  Objection.  Mischaracterizes

16 evidence.

17           THE WITNESS:  This is for an authorized user

18 to be added to the account.  That's what I'm saying here.

19 I'm not -- I see the next one says "account activated" on

20 6/14/2013.

21           So I -- I -- there are two just separate notations

22 on the system.

23 BY MR. BENNETT:

24    Q.   Well, I understand.  Account activated, but they're

25 both occurring in the same phone call.  You would agree with

1  that; right?

2      A.   No.   It says "memo," and they're all dated the same

3  time, midnight on 6/13, so I'm not sure how you can

4  interpret, say all these events happened simultaneously.

5  It's probably posted to the system at midnight.   That --

6  that's my -- my -- the best inference I can make from the

7  information about it.

8      Q.   What is "IVR card activate"?  Do you know what

9  "IVR" is?

10     A.   Yes.   I'm assuming that's the activation of the

11 card.   You have to check the codes and their system.   These

12 are problematic, not just with Credit One Bank, but with any

13 bank you -- you deal with.   They all that their own

14 shorthand, and it appears it happened on 6/14/2013.

15     Q.   Again, I want to ask you, is there any indication

16 in the documents or testimony of the defendant that Credit

17 One considers or did consider with Mr. Wood in investigating

18 his credit reporting disputes any unusual circumstance

19 regarding how the account was activated?

20     A.   I don't know that there is.

21     Q.   Now, if you'll turn to Bates number 64.

22     A.   (Witness complies.)

23     Q.   By the way, whose phone number is 804.370.4900?

24     A.   It is one associated with a card number, I assume.

25 I have notes on that, but I don't have them with me.   But I

1  thought there were two numbers associated with them.  One is

2  listed on the -- on document number 7, which is 843.4080.

3  804.370.4900.  My recollection is both of them were

4  associated with the cardholder.

5      Q.   All right.  But whose numbers were they?

6      A.   Cardholder's, as I understood it.  They were

7  associated with them.

8      Q.   And why do you believe that?

9      A.   Again, this is recollection, looking at documents.

10  I remember looking for that specific one.

11      Q.   Now, I understand -- I understand these are numbers

12  that are showing up in Credit One's system.

13          I'm asking you if you have reason to believe that

14  those numbers belong to Mr. Wood.

15      A.   My assumption is that they were.

16      Q.   Why do you assume -- why is that your assumption?

17      A.   I didn't independently confirm it, but my -- again

18  the analysis that I did on this, I understood there were two

19  separate numbers.  And you can see one at the top of page 64.

20  They begin, the 804.843.4080 --

21          THE REPORTER:  Do you want to repeat that?

22          THE WITNESS:  Oh, I'm sorry.

23          804.843.4080.

24          And I can tell you that 843 is a West Point

25  exchange that I'm aware of.  And that the -- the other

1    number, 370.4900 was also associated with the account holder.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Maxene Weinberg Agency**

```
 1   BY MR. BENNETT:

 2       Q.   Associated within Credit One's computer record --

 3       A.   That's -- that's --

 4       Q.   -- right?

 5       A.   That's correct.

 6       Q.   Okay.  You don't have any knowledge as to who would

 7   have been answering the phones at either of those numbers in

 8   2013; correct?

 9       A.   No, no.

10       Q.   Now, if you'll take a look at page Number 80 -- or

11   64, the third line from the top, August 20th, 2013, 5:54 a.m.

12            Do you see that?

13       A.   Yes.  Yes, I do.

14       Q.   And says, "Spouse hung up during talk-off";

15   correct?

16       A.   Yes.

17       Q.   Are you aware whether or not if Mr. Wood has a

18   spouse or had a spouse in 2013?

19       A.   I thought I saw a snippet from Accurint that

20   Ms. Chu made -- held in her files, so it was made an exhibit

21   in her testimony that referred to a spouse that -- that -- a

22   spouse for Mr. -- Mr. Wood.

23       Q.   If you'll take a look at a page in front of that,

24   63, please.

25            Actually, I will not have you spending the rest of
```

1    our short time together having you read their codes.

2              Take a look at 1681, please.

3        A.   (Witness complies.)

4        Q.   Now, May 5th and April 28, you'll see lines that

5    say "Received ACDV With Images."

6              One says "Received ACDV With Images from TU,"

7    TransUnion, and the other from Equifax; do you see that?

8        A.   Again, we see basically being with images from the

9    reference you were talking to -- speaking to?

10       Q.   Yes.

11       A.   Okay.  Yes, I see them.

12       Q.   But Credit One has not produced for your review the

13   images that it reviewed with those ACDV's; correct?

14       A.   I don't know precisely what they do.

15       Q.   All right.  Now, on these entries, for example, it

16   says "Previously found responsible."  So at the top -- the

17   top two ACDV's.  "Previously found responsible 4/28/15.  No

18   further action taken."

19              Do you see that?

20       A.   Yes.

21       Q.   And then the same thing for the ACDV below it.

22              Do you see that?

23       A.   Yes.

24       Q.   Now, do you know -- do you understand that no new

25   investigation was performed for these ACDV's because Credit

1   One previously found Mr. Wood to be responsible on April 28,
2   2015; correct?
3        A.   All it's saying was the account was previously
4   investigated on 4/28/15.  I didn't read that to say that --
5   that it wasn't, again, examined on that particular day.
6        Q.   Well, it says "Previously found responsible,
7   4/28/15.  No further action taken"; correct?
8        A.   Yes.  "No further action taken," but I don't know
9   if they didn't -- they also investigated on 5/5 of '15.
10       Q.   You would agree with me there's no indication that
11  they did any additional investigation on 5/15; correct?
12       A.   There's no indication that they didn't do it
13  either.
14       Q.   Well, it says "No further action taken."
15       A.   Well, "No further action taken," but --
16       Q.   Oh look, you'll be a great witness at trial.
17       A.   Thank you.
18       Q.   If we go to Bates number 60.
19       A.   (Witness complies.)
20       Q.   At the bottom, the ACDV for June 10th, I guess --
21       A.   Yes.
22       Q.   -- 2015.
23            This as well as the April 28th on the -- on the
24  subsequent page, both show that the address on the
25  application links to cardholder through Accurint; right?

```
1      A.   Yes.

2      Q.   Have you ever heard of mailbox fraud?

3      A.   Yes.

4      Q.   What is that?

5      A.   Literally that.  Somebody can steal mail out of

6   your mailbox.  Usually it's a mailbox that has public access,

7   if you will, especially if it's at the street someone coming

8   by and literally taking your mail out.

9      Q.   Well, if somebody has access to your mail -- I

10   mean, if a family member has access to your mail, the family

11   member could also engage in mailbox fraud; right?

12      A.   Yes, but remember, that's where the post office box

13   is really a crucial element.  You have -- I do not know at

14   this point whether the mailbox was owned by Mr. Wood

15   individually or there were others associated with Mr. Wood

16   who were on the mailbox.  In either case, you don't get on a

17   mailbox or are able -- you can only be -- I'm making a

18   travesty of it -- the transcript.

19           But one can only receive mail through a U.S. postal

20   mailbox in a post office typically if he or she is registered

21   to receive mail in that mailbox.  And that is a -- there's an

22   identification process where you have to provide your picture

23   I.D. of who you are, and you also have to provide a secondary

24   I.D. that evidence is your place of residence.  It can be an

25   insurance police or a car registration or something like
```

1    that.

2            So if a new person wants to get on to the box, they

3    also have to through the same process and the boxholder who

4    is the owner of the box has to present the same

5    identification again.  So the -- the new --

6        Q.   This is --

7                MR. SEARS:  Let him finish, Lynn.

8                MR. BENNETT:  I object.  Not responsive to the

9    question; okay?

10               MR. SEARS:  Let him finish the question.

11   BY MR. BENNETT:

12       Q.   The question I asked you is if somebody has access

13   to -- if a fraudster has access to a victim's mailbox, it

14   wouldn't matter if they were a family member or not a family

15   member, as long as they had access; is that right?

16       A.   The only way they have access is to have a key.

17       Q.   Okay.  Or on the mailbox; right?

18       A.   Wait a minute.  What mailbox are we talking about?

19   Are we talking about a street mailbox at a single-family

20   residence?  Or are we talking about a postal box?  It's two

21   different things.

22       Q.   First, what -- what person has testified that they

23   have personal knowledge as to what address the credit card

24   itself was mailed?

25               MR. SEARS:  I don't understand the question.

```
 1                    MR. BENNETT:  Right.
 2  BY MR. BENNETT:
 3      Q.   There's no witness in this case that can testify it
 4  was mailed to the post office box.  So I'm asking you --
 5      A.   What was mailed -- what was mailed to the post
 6  office box?  The credit card itself?
 7      Q.   Yes.
 8                    MR. SEARS:  The credit card solicitation or
 9  statements or -- I'm confused.  And I think the witness is as
10  well.  Can you restate the question maybe?
11                    MR. BENNETT:  Sure.
12  BY MR. BENNETT:
13      Q.   The credit card itself.
14                    MR. SEARS:  The plastic piece?
15                    MR. BENNETT:  Right.  The one that Mr. Wood's
16  mother used.
17                    THE WITNESS:  Or whoever.
18  BY MR. BENNETT:
19      Q.   Well, or whoever.  In fact, from your review of
20  documents, there is not conclusive evidence either way that
21  either Mr. Wood or his mother received the credit card;
22  right?
23      A.   Or a third party.  But my understanding was that
24  the credit card was mailed to the post office box.
25      Q.   You would agree with me that at that time that
```

 1  Credit One's employees processed Mr. Wood's credit reporting

 2  disputes, there was not conclusive evidence available to

 3  those individuals to establish that Mr. Wood, himself, had

 4  received and used the subject credit card; correct?

 5      A.  We do not know who used the credit card.  At the

 6  same time, I believe it's reasonable to conclude that whoever

 7  used the credit card was either directly or indirectly

 8  associated with Post Office Box 725.

 9      Q.  And that's because you believe the credit card was

10  mailed to the post office box?

11      A.  Yes.  That was address if record.  That was the

12  mailing address.

13      Q.  Well, that's the record showing on the piece of

14  paper that Mr. Sears gave you; right?

15      A.  Yeah.  Well, wait a minute.

16          Do we have that document?

17          MR. SEARS:  I don't know what document you're

18  talking about.

19  BY MR. BENNETT:

20      Q.  Any document that's in that book, Mr. Sears gave it

21  to you; right?

22      A.  No.  I'm -- my recollection is different with

23  respect to -- I don't recall -- Document 7.

24      Q.  But we don't --

25      A.  But my recollection is different with Document 7.

1    I cannot look it up because I don't have it in front of me.

2    Mr. Sears went in and described, he said, look it.  There's a

3    mailing address and there's a home address.  There's two

4    different screens.  And what I had in my production of

5    documents for number 7 was -- was what I believe was a

6    mailing address, and I think it combined both of them.  It

7    had the mailing address and it had the post office box.

8         Q.    Okay.  Can you take a look at Exhibit 66.

9         A.    (Witness complies.)

10        Q.    I'm sorry.  Not Exhibit 66, the Bates in that book.

11        A.    Thank you.  Yes.

12        Q.    What is this document?

13        A.    "2011 Credit Reporting Resource Guide."

14        Q.    I understand that, but what do you understand it to

15   be?

16        A.    That's what you asked.  It's -- it's produced by

17   the Consumer Data Industry Association, which is a trade

18   association, and it outlines a lot of information about

19   formatting of information and transmission of information

20   between credit reporting agencies and individual data

21   furnishers, what to do and how to do it.

22        Q.    And how do you understand makes up and controls the

23   Consumer Data Industry Association if you know?

24        A.    Again, I assume it's a trade association.  I don't

25   know more than that about it.  Typically, I would assume that

```
 1  data furnishers are members of it.
 2            MR. SEARS:  Lynn, can you hear me?  Mr. Lynn
 3  has requested a break.
 4            MR. BENNETT:  Okay.  Take a break.
 5            MR. SEARS:  Okay.  Thank you.
 6            The VIDEOGRAPHER:  The time is now
 7  approximately 3:21 p.m.  We're off the record.
 8            (Off the record.)
 9            THE VIDEOGRAPHER:  We are on the record.  The
10  time is now approximately 3:35 p.m.
11  BY MR. BENNETT:
12       Q.  Sir, are you aware whether or not the big three
13  credit reporting agencies, Equifax, TransUnion and Experian,
14  are the governing parties of the Consumer Data Industry
15  Association?
16       A.  I was leading my way through it during the break,
17  and it appears that is the case.
18       Q.  And are you aware that this manual is the standard
19  that is created for Metro 2 reporting?
20       A.  Yes.  I got myself schooled on that, too.
21       Q.  Now, I can -- are you aware that the values and the
22  fields within the ACDV correspond to fields and values that
23  are in Metro 2 format and spelled out in detail in this
24  document?
25       A.  Yes.  That's my understanding, yes.
```

**JAMES F. LYNN on 08/25/2016**

1      Q.   Now, if you can look at the bottom of 528 --

2      A.   (Witness complies.)

3      Q.   -- which is Bates number 192.

4      A.   Yes.

5      Q.   Am I correct that you did not have expert knowledge

6   as to the proper reporting of the compliance condition code

7   field until you were hired in this case?

8      A.   And again, I've -- I've dealt with previous cases

9   that deal with these issues.

10          I can't say for sure whether I saw these codes or I

11  didn't.  But certainly when I came into this case, if it

12  wasn't a refresher course, it was understanding it from

13  scratch.  I -- I just can't recall what I knew dealing with

14  the other cases that were several years ago.

15     Q.   Well -- and at the point when you were hired in

16  this case, you did not have -- if somebody had come up to you

17  and just ask you, are you an expert on the use and meaning of

18  the compliance condition code field, you could not have

19  truthfully said yes, I can render expert testimony on that

20  subject; right?

21     A.   At that point, yes.  But then you've got to

22  educated.  We all start from somewhere.

23     Q.   Your knowledge of what the compliance condition

24  code field means and claims to its proper method of use comes

25  from reviewing this document in this case; right?

```
 1        A.   Yes.  And this document, I'm assuming, you're
 2   referring to all 553 pages; is that correct?
 3        Q.   I am.
 4        A.   Okay.  Yes.  And there's references to it, the
 5   compliance codes throughout this document, not just the CVII
 6   section.  That's what I'm saying.
 7        Q.   Okay.  You mean, the -- the document, the
 8   production by the defendant, Bates numbers 1 through 553?
 9        A.   That's correct.  I have several different
10   references on several different pages about the compliance
11   codes.
12        Q.   Okay.  Now, the other -- outside of this Consumer
13   Data Industry Association Credit Reporting Resource Guide,
14   the other document that you're referencing would be Credit
15   One's Internal Procedure Document; right?
16        A.   Some of them were Credit One documents.  I can't
17   sit here and say -- unless I walk through this whole thing
18   and I --
19        Q.   Yes.  I think I need you to walk through the whole
20   thing.
21        A.   All right.
22        Q.   Because there is nothing else that I'm aware of.
23        A.   (Witness complies.)  I'll guide you to page 389, in
24   the middle.
25             In the middle, it states, "Use the following
```

1   guidelines to update this field."  Just to give Mr. Bennett

2   guidance to what I'm looking at and expect is there.

3        Q.   I understand.

4        A.   They are --

5        Q.   This --

6        A.   Oh, I'm sorry.  I don't want to talk over you.  Go

7   ahead.

8        Q.   This -- this is Credit One's procedure manual --

9        A.   Uh-huh.

10       Q.   -- right?  It's not the -- it's not a document

11  analyzing what the law requires; right?

12       A.   It's a procedure, but the assumption is the

13  procedures are implementing what the expectations and

14  requirements are of Credit One under the circumstances.  And

15  I can say this is the same presentation is at least two other

16  times in the documents that I reviewed.

17       Q.   But if -- this is just telling Credit One's

18  employees, here are the instructions we want you to follow;

19  right?

20       A.   Under certain circumstances, a review of the

21  account history.  Well -- well, how are they going to review

22  the account history?  There are some standard things you do.

23  It depends on each -- each individual ACDV video as to what

24  you need to do or want to do.

25       Q.   Okay.  Do you get that our lawsuit says this manual

1  gives the employees an unlawful set of instructions; right?

2  The argument is this procedure itself is illegal.

3        Do you understand that's the law?

4     A.  Yes, I understand that.

5     Q.  All right.  So telling us that you read in the

6  procedures, Credit One's procedures to use the XH dispute

7  resolve, it doesn't inform you as a purported expert as to

8  what the law requires; correct?

9     A.  If that's the appropriate -- if that's the

10 appropriate compliance code to use, that's what you should

11 use.  And in their determination, that's what they -- that's

12 what they used.

13    Q.  And so the question then is, in what areas of facts

14 does Credit One believe or could Credit One reasonably

15 conclude that Mr. Wood's dispute has been resolved?

16    A.  Mr. Wood may believe that, but the bank was

17 satisfied based upon its individual review six different

18 times that it had brought closure to the issue.

19    Q.  Take a look at the actual credit industry standard

20 document at COB Bates 192.

21    A.  (Witness complies.)

22    Q.  I would say this is well for Mr. Sears as much as

23 you.

24        Normally, the fight, the argument which we -- which

25 we dealt with for a little while was whether or not the XC

1   code was proper.

2        A.   Uh-huh.

3        Q.   Do you see "XC" on there?

4        A.   I do.

5        Q.   So some banks would use the XC code in place of the

6   XB code, and the litigation was whether or not it was proper

7   to record XC.

8             Could you read out loud what the XC was intended to

9   signify.

10       A.   "Complete an investigation of FCRA dispute.

11  Consumer disagrees."

12       Q.   And you would agree that that code is -- appears to

13  you -- I know you're just reading out of the manual in this

14  case.  But that the XC code appears to most accurately

15  describe the -- the condition of the account that's at issue

16  in this case; correct?

17       A.   Not necessarily.  I think you could read it as XH

18  also, and that's what they -- they came to a determination of

19  XH based upon their review.  If the consumer disagrees, the

20  consumer can write a statement that the 100-word statement.

21  There are other remedies available to the consumer.

22       Q.   Well, have you ever read the case called Cushman

23  versus TransUnion?

24             THE REPORTER:  Versus who?

25  BY MR. BENNETT:

```
 1      Q.   A seminal case.

 2           Cushman, C-U-S-H-M-A-N?

 3           Third Circuit case.

 4      A.   No, I haven't.

 5      Q.   That a consumer could make?  Do you know what

 6  happens to the 100-word statement that the consumer can make?

 7  Do you know what effect it has on the credit report?

 8      A.   It has no impact in terms of your FICO score.  It

 9  is supplemental information that can be provided to -- by a

10  consumer with help and guidance from individuals designated

11  by each of the three credit reporting agencies to develop

12  such a statement and to have it and serve it in his or her

13  credit report.  They are entitled to that right.

14      Q.   And you know that because you have read the Fair

15  Credit Reporting Act.  15UScode 1681I, little "c"; right?

16      A.   I don't know the citation.  I will accept that your

17  citation is correct.

18      Q.   They do it directly with the credit reporting

19  agency; right?

20      A.   That's correct.

21      Q.   And you believe that would give Credit One the

22  right to -- information that it is no longer in dispute.

23      A.   In Credit One's opinion, based upon its review,

24  both its internal source of information and external sources

25  of information, that is the conclusion that they reached each
```

```
 1   and every time.
 2       Q.   So what is the industry standard for the
 3   completeness and accuracy of a consumer reporting
 4   investigation by a furnisher under 1681S-2B?
 5               MR. SEARS:  Objection as to form.
 6   BY MR. BENNETT:
 7       Q.   I'm asking you.  You're the expert.
 8               MR. SEARS:  I'm objecting as to form of this
 9   completeness and adequacy.  You may have misspoke.
10               THE WITNESS:  I stated in my expert report on
11   page 2, "Analysis and Complaint."  "If a consumer such as
12   Mr. Wood disputes the completeness or accuracy of any
13   information that a furnisher of consumer credit data such as
14   Credit One Bank has reported to any of the three major credit
15   reporting agencies, Experian, Equifax and TransUnion, then
16   the bank must take the following actions, pursuant to the
17   statutory reference cited above," which is what you cited,
18   "Section 1681-S2."
19   BY MR. BENNETT:
20       Q.   All right.
21       A.   Well --
22       Q.   And so forth.
23       A.   And I listed the A, B, C ad D, as well as E of
24   its -- of its requirements.  This is what they're supposed to
25   do.
```

1      Q.   Right.  This is the actual text.  Cut and paste.  I

2  don't know if you realize it, but it is taken from the actual

3  statute.

4      A.   That's what I said.  That's what I said.  That's

5  what I said.  Yeah.

6      Q.   But that's all I'm asking you.  I'm asking you what

7  the standard is for adequately, completely conducting a

8  reasonable investigation because you say in your expert

9  witness report, that the investigation was reasonable.

10        I'm asking you where you derive the standard for

11  what is reasonable?

12     A.   I think there is a reference to it in Section

13  1681S-2A, but I don't have that in front of me.

14     Q.   There's not.  But assuming -- assuming you think

15  there is, then is there anything else other than 1681S-2A

16  that informs you as an expert as to what the standard of care

17  is to conduct a reasonable investigation under 1681S-2B?

18     A.   It states it in 1681S-2B.  Again, conduct an

19  investigation with respect to the disputed information.

20  Review all relevant information provided by the consumer

21  reporting agency.

22        The investigation finds that the information is

23  incomplete or inaccurate.  Report those results to all other

24  consumer reporting agencies to which the bank furnished the

25  information and that complete and compile and maintain files

1    on consumers on a nationwide basis.

2          So if the question is, did they do a reasonable job

3    and -- and -- in carrying out their requirements under this

4    section?  I think that's a matter for the jury.

5       Q.   And I'm asking you -- that's a question for the

6    jury?

7       A.   I believe so.  And for the court.

8       Q.   Not -- not for the expert?

9       A.   Well, the expert -- you -- you look at what they

10   did and they used -- and I've testified to this before.  They

11   used their own internal source.  They've used their external

12   sources.  Based upon what they able to determine, they

13   believed -- it was their opinion that their -- their

14   investigation met the standards as stated in the statute.

15      Q.   I agree that you agree that the company paying you

16   believed it complied with the law.

17      A.   The company's not paying me.  Mr. Sears is.

18            MR. SEARS:  Don't argue, please.

19   BY MR. BENNETT:

20      Q.   So I'm asking why you believe -- no.  I'm sorry.

21   Let me withdraw that.

22          Do you have an expert opinion as to what the

23   standard of care is for conducting a reasonable

24   investigation?  At what point it's unreasonable?

25      A.   I believe it's in that statute in 1681S-2A.  I read

1   it in there, and I don't have it here in front of me.  It

2   basically says -- it's almost a prudent man -- I'm

3   paraphrasing it, but it's almost a prudent man rule.  What --

4   what did they do?  Was it reasonable?  Did they look at all

5   sources of information they had available to them?  And --

6   and was it consistent with their normal and customary

7   procedures?

8       Q.   Is there a cost-balancing test that is a component

9   of what a reasonable investigation requires?  What is the

10  cost of doing additional an external research versus the

11  possible harm to the consumer?  Is that a component of a

12  reasonable investigation in your expert opinion?

13      A.   At some point, you can -- you can reach a point

14  where you have used all normal and customary mechanisms

15  within the standard of care in the industry to conduct a

16  reasonable investigation.

17           Can you go beyond that?  There's nothing preventing

18  you from requesting beyond that.  But there are cost benefit

19  analyses that you have to do.

20      Q.   Does --

21      A.   What's the potential gain from it?  That's --

22  that's basically what you're dealing with.

23      Q.   So in our view of, is that in determining whether

24  or not Credit One's investigation was reasonable, we would

25  have to consider the cost to have the accuracy of the

1  information versus the possible harm of reporting that

2  inaccurate information?

3      A.   Well, they --

4      Q.   Do you have an expert opinion about whether or not

5  that's a -- whether or not we're correct?

6      A.   But they believed it was accurate.  They believed

7  it was credible.  Based upon their investigation using

8  internal sources that they had of information in their own

9  proprietary symptoms, testing that against an external source

10  of information, principally Accurint, they came up -- they

11  reached the conclusion that they're -- that the information

12  that they had was -- was -- was accurate and verified.

13     Q.   So --

14     A.   And the information in each ACVD that they created

15  or they responded to.

16     Q.   So what is the standard in your expert opinion for

17  what it takes for an investigation to be unreasonable?  What

18  has to happen for a furnisher to have done so little that

19  that is violating of 1681S-2B?

20     A.   One possibility that would -- would be appropriate

21  to use in this case would be Credit One Bank credible

22  external sources of information to verify, to validate the

23  accuracy of the information that they were reporting.

24     Q.   So in this case, the only external source that

25  Credit One used for -- and all the ACDV's was Accurint;

1    correct?

2        A.   As far as I could tell, that's -- that's correct.

3        Q.   And the only purpose they used Accurint for was to

4    confirm that the address and -- the address information, that

5    this -- that Credit One had connected with this account was

6    reporting inaccurate information that was also connected to

7    David Wood?

8        A.   That's correct.  There was a match between the two

9    sources.

10       Q.   Other than that -- sure.

11            Other than that external information, what other

12   external information and resources did Credit One use in

13   handling or investigating any of Mr. Wood's disputes?

14       A.   I'm not aware of any other external sources they

15   used other than Accurint.

16            MR. BENNETT:  All right.  You guys haven't

17   eaten.  Our tape's running out.  So I do not have other

18   questions.

19            MR. SEARS:  I don't have any further

20   questions.

21            THE VIDEOGRAPHER:  Stand by, please.  The time

22   is now approximately 4:02 p.m.

23            This ends the deposition of James F. Lynn on August

24   25th, 2016.  We are off the record.

25            THE REPORTER:  Mr. Bennett, would you like an

1   original and etranscript, sir?

2                   MR. BENNETT:  Yes, what you said.

3                   (The deposition of James F. Lynn was concluded

4   at 4:02 p.m.)

5                   (Signature was reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF WASHINGTON )

 2                       ) ss.

 3   COUNTY OF KING      )

 4

 5          I, the undersigned, declare under penalty of

 6   perjury that I have read the foregoing transcript, and

 7   I have made any corrections, additions, or deletions,

 8   that I was desirous of making; that the foregoing is a

 9   true and correct transcript of my testimony contained

10   therein.

11

12          EXECUTED this_____day of_____,

13   at_____ , Washington.

14

15

16                           _____

17

18

19                           James F. Lynn

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON )
                         )SS.
 4   COUNTY OF KING      )

 5

 6

 7            I, Judith A. Robinson, Certified Court Reporter and

 8   an officer of the Court under my commission as a Notary

 9   Public, in and for the State of Washington, do hereby certify

10   that the foregoing deposition was transcribed under my

11   direction; that the transcript of the deposition is a full,

12   true and correct transcript to the best of my ability; that I

13   am neither attorney for, nor a relative or employee of any of

14   the parties to the action or any attorney or Counsel employed

15   by the parties hereto, nor financially interested in its

16   outcome.

17            IN WITNESS WHEREOF, I have hereunto set my hand

18   and affixed my official seal this 28th day of August, 2016.

19                    _____

20
                      Judith A. Robinson, Notary Public
21                    in and for the State of Washington
                      residing at Seattle.
22                    My Commission expires November 4,
                      2020.
23                    CCR License #2171

24

25                    (Signature was reserved.)
```

```
                      CHANGES AND SIGNATURE
WITNESS NAME:            James F. Lynn,           08/25/2016
PAGE     LINE      CHANGE              REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
```

    I, James F. Lynn, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.

```
                      _____
                      James F. Lynn
Sworn to and Subscribed before me
_____, Notary Public.
This_____day of _____, 20_____.
My Commission Expires:
```

**JAMES F. LYNN on 08/25/2016**

**$**

**$100,000**
44:17

**$20,000**
44:10

**$225**  43:14

**0**

**0of**  72:25

**1**

**1**  54:22
71:14,17
88:7
101:21
119:8

**10**  15:5
21:6 65:11
101:21

**100-word**
122:20
123:6

**10th**  111:20

**11**  56:11,16
60:14
102:7

**11:04**  4:12

**11:14**  9:12

**11:15**  9:15

**11:44**  25:23
26:1

**12**  15:5
48:20 70:1

**12-week**  49:9

**12070**  5:8

**12:20**  46:11

**12:37**  46:14

**14**  93:24

**14th**  104:2

**15**  14:15
19:9 21:11
48:10
49:22 94:3
111:9

**15th**  69:23
77:8

**15uscode**
123:15

**16**  50:16

**1681**  23:11,
13 50:19
110:2

**1681-2B**
50:16

**1681-S2**
124:18

**16812-S2**
22:16

**1681I**  123:15

**1681S-2A**
125:13,15
126:25

**1681S-2B**

**17:17**
52:4,15,25
124:4
125:17,18
128:19

**1681S-QB**
51:14

**17th**  69:12

**180BB27505**
97:17 98:8

**192**  118:3
121:20

**1990's**  36:25
37:2

**1992**  36:22,
23

**1993**  16:23

**1996**  47:16
51:23
52:14

**1:55**  83:15

**2**

**2**  24:1,3
46:21,22
54:17,24
56:4
71:23,24
72:2,25
101:8
117:19,23
124:11

**20**  48:14
49:22 68:9

**69:20**
103:20

**200**  49:20

**2000**  14:13
17:22
50:15

**2002**  62:9,
20 63:15
65:7

**2004**  14:13
17:22

**2005**  60:13

**2007**  12:8
22:4,13,15

**2008**  47:17

**2010**  22:5,
17 66:8

**2011**  55:12
116:13

**2013**  6:19
65:14
102:4
103:20,24
104:2
109:8,11,
18

**2014**  76:20

**2015**  5:25
44:24
45:1,12,21
72:7
111:2,22

**2016**  68:15

**JAMES F. LYNN on 08/25/2016**

69:12,23
70:1 83:19
129:24

**20th** 83:19
109:11

**21** 68:7

**2115** 89:25

**22** 69:5

**23** 68:9

**25** 47:20
48:1,2,5,
10

**25th** 4:11
129:24

**28** 72:7
110:4
111:1

**28th** 111:23

**2:10** 83:18

**2nd** 61:24
68:14,18
69:1 70:5
79:13 88:1

---

**3**

**3** 62:6,14
71:10 73:4
77:12

**30** 5:22
25:13
66:10
101:2

**31** 60:24
61:2 68:3
70:16

**32** 46:23
53:12

**33** 60:18

**370.4900**
108:1

**389** 119:23

**3:15-cv-594**
4:10

**3:21** 117:7

**3:35** 117:10

**3rd** 70:5

---

**4**

**4** 77:12
79:11 88:7
98:10

**4/28/15**
110:17
111:4,7

**4175045721018**
98:10

**43** 95:1

**45** 94:22

**46** 95:16
98:10
99:12

**4:02** 129:22
130:4

---

**5**

**5** 57:20
58:3,5
59:11

**5/15** 111:11

**5/5** 111:9

**50/50** 5:12

**528** 118:1

**55** 101:6

**553** 119:2,8

**58** 103:14

**59** 103:14

**5:54** 109:11

**5th** 70:6
110:4

---

**6**

**6** 57:4,16

**6/13** 106:3

**6/14/2013**
105:20
106:14

**60** 111:18

**60s** 50:18

**613** 5:7

**63** 109:24

**64** 103:19
106:21
107:19

109:11

**65** 104:3

**66** 5:15
116:8,10

---

**7**

**7** 66:1
71:10
77:12
79:11
89:10
101:7
107:2
115:23,25
116:5

**70** 101:2

**70s** 50:18

**725** 115:8

---

**8**

**80** 109:10

**804.370.4900**
106:23
107:3

**804.843.4080**
107:20,23

**81S-2B** 15:1
17:13

**843** 107:24

**843.4080**
107:2

**JAMES F. LYNN on 08/25/2016**

**9**

**9** 55:15
56:4,11

**9's,"** 98:10

**95** 53:6

**96** 50:14
51:7,24

**97** 50:14
51:24

**98** 50:14

**99** 50:14
51:8

**A**

**A-b-e-l-l**
59:2

**a.m.** 4:12
9:15 25:23
26:1
109:11

**Abell** 58:20,
21,23,24
59:1

**absence** 86:7

**accept**
123:16

**access** 27:21
69:1,25
75:2 85:3
87:11 93:8
98:15,19
112:6,9,10

113:12,13,
15,16

**accessing**
31:16

**accommodates**
38:10

**account**
31:6,7,21
34:16,17
35:2 38:7,
8,11 39:11
42:15
72:20,21
80:9,11
81:23
83:22
84:16 85:8
86:20 90:3
95:6 96:15
97:1 99:9,
15 104:5,8
105:12,18,
19,24
106:19
108:1
111:3
120:21,22
122:15
129:5

**accuracy**
84:12
124:3,12
127:25
128:23

**accurate**
45:4 53:19

96:2,18
128:6,12

**accurately**
122:14

**Accurint**
35:15,18,
21 39:18
84:22
86:4,16,
19,22 87:8
109:19
111:25
128:10,25
129:3,15

**Accurint.com**
36:3

**ACDV** 17:10,
23 18:1,13
19:16,18
20:19,22
71:15
72:7,10
73:9,14,
20,25
74:3,22
75:3,6,14,
19 76:15
95:19
97:12
98:10,15,
22,23
99:12
100:2,22
102:2,12
103:2
110:5,6,21
111:20

117:22
120:23

**ACDV'S** 18:11
19:14 20:4
28:17,25
40:5
76:10,18,
23 92:22
99:1
100:17
101:3
102:17,18
103:15
110:13,17,
25 128:25

**act** 7:22
10:5,10
11:7,18
12:18 13:6
14:7,19,
20,21,23
15:1,7,12,
21 16:9
19:7 21:1,
18 22:12
23:2,8,10
27:19,21,
22 29:23
43:3,10
48:7,19
49:15 50:3
51:4,5
52:20,21,
22 55:9
60:8,12
64:22 65:2
72:6 74:20

80:21
123:15

**Act's** 53:8

**action** 8:11
110:18
111:7,8,
14,15

**actions** 44:2
124:16

**activate**
104:7
106:8

**activated**
104:1
105:12,19,
24 106:19

**activation**
105:6
106:10

**activity**
34:16

**actual** 31:20
46:19
91:15
121:19
125:1,2

**ACVD** 128:14

**ad** 124:23

**add** 72:20
104:23

**added**
104:12,13,
17 105:18

**addition**
84:9

**additional**
111:11
127:10

**address** 5:7,
8 31:23,24
32:4,5,6,
10,15,19,
21,22,25
33:3,4,11,
13,21,22,
23,25
35:21 71:1
84:18
85:7,23
86:3,5
87:5,7,11
88:16
89:8,23
90:12,13,
14,23,24,
25 91:2
92:10,14
93:2,5,6,
18,19
111:24
113:23
115:11,12
116:3,6,7
129:4

**addressed**
88:21,23

**adequacy**
124:9

**adequately**

125:7

**administration**
84:5

**admit** 89:13

**ADT** 12:3

**advice** 48:6,
16

**advised** 54:8

**affect** 15:15

**affidavit**
65:13,15
80:13,17

**affidavits**
69:7,12,17
79:12,17

**affiliated**
36:4 66:20

**agencies**
20:11
24:14,17
25:2
26:11,19
74:16 84:1
98:12
101:25
116:20
117:13
123:11
124:15
125:24

**agency** 4:15
25:10,16,
18 27:25
42:3

73:20,21
74:5,6,7,
12 97:11
98:1
102:13
123:19
125:21

**agency's**
27:14
76:12

**agent** 76:17,
21

**agents** 97:20
99:22

**agree** 10:2,7
11:4,16,20
13:22 16:8
39:25 40:3
82:16 83:3
88:18
96:21
105:25
111:10
114:25
122:12
126:15

**agreed** 40:3

**agreement**
52:9

**agrees** 40:16

**ahead** 22:23
46:16
79:14
81:17 82:5
85:11

87:17
89:10
96:10 99:7
104:19
120:7

**Alabama**
95:12

**Alexander**
100:20
101:4

**allegation**
71:19

**allegations**
79:22

**allowed**
80:25

**America**
66:21,22
67:1,2,4

**American**
85:13

**amount**   21:21
44:4 94:12
100:24

**analyses**
127:19

**analysis**
15:23
107:18
124:11

**analyze**
35:11

**analyzing**
120:11

**and/or**   9:24
10:15
41:13

**Anderson**
66:2

**answering**
109:7

**Anthony**
57:21

**apologize**
29:3 30:17

**appeared**
61:21

**appearing**
4:19,22

**appears**   36:7
106:14
117:17
122:12,14

**application**
31:10,14
32:11
33:7,12
34:13
80:23 81:2
84:17,18
89:20,21,
24 91:18,
19 111:25

**applications**
91:24
92:1,5

**applied**
15:13

31:21
37:15
80:25
84:16 97:1

**applying**
30:6

**approximately**
4:12 6:16
9:15 14:15
17:21
25:23 26:1
43:19,22
44:10,12,
16 46:10,
14 63:18
83:15,18
117:7,10
129:22

**April**   72:6
77:8 110:4
111:1,23

**archived**
33:10

**area**   17:1
36:6

**areas**   23:13
121:13

**argue**   81:14
82:9,10
126:18

**arguing**
87:15

**argument**
71:19 83:9
121:2,24

**argumentative**
18:14
29:1,2
67:14

**arrive**   19:18

**article**
30:13

**ascribe**
92:25

**aspects**
25:10 27:4

**assign**   93:9

**assigned**
93:18 98:1

**association**
116:17,18,
23,24
117:15
119:13

**assume**   91:17
106:24
107:16
116:24,25

**assuming**
106:10
119:1
125:14

**assumption**
107:15,16
120:12

**attached**
46:20 69:7
75:16
102:24

attempt
 72:20

attorney  9:5
 54:11 55:6
 57:25
 62:23,24

attorneys
 56:18,20

attribution
 39:11

AU  104:12,
 17

August  4:11
 65:14
 69:12,23
 70:1 83:19
 103:20
 109:11
 129:23

authority
 79:5

authorized
 104:13,23
 105:17

Automatic
 19:17

average
 100:22,23
 101:1

aware  12:23,
 24 28:17
 31:6 33:1,
 9,10 34:23
 35:3 61:7,

13 63:14
72:19 74:4
75:25 76:4
78:5,16,
22,24 79:8
92:3,6
93:4,15
94:16,21
97:24
101:25
102:3,4
107:25
109:17
117:12,18,
21 119:22
129:14

———————————
       B
———————————

B-i-l-a-a-l
 59:3

B-r-i-m
 95:12

back  16:2
 20:12 26:6
 27:1 39:22
 40:7 44:15
 46:25 47:2
 48:8 56:8,
 14 60:17
 70:13
 84:23
 95:1,4
 97:12,21
 100:12
 103:13

background

14:23
19:13
29:16
70:21,24

backup
 103:17

backwards
 56:9

Bahari  58:5

bank  4:23
 13:11,12
 14:1
 16:10,15,
 22,25
 17:11,14
 33:2
 39:13,18,
 22 43:4
 49:8 50:7,
 21 53:7
 57:18,20
 59:17
 66:21,22
 67:1,4
 77:18,24
 78:5,8,13,
 24 79:1,3,
 21 80:10,
 14,17,23,
 25 81:22
 83:8,24
 84:7,8
 86:8 88:24
 90:2 91:20
 92:23
 93:5,17
 96:1 98:9

106:12,13
121:16
124:14,16
125:24
128:21

bank's  77:22
 78:12
 80:22

banker  53:6

Bankers
 39:4,5

banking  9:24
 11:10
 21:10
 34:10

bankruptcy
 8:7,8

banks  37:2
 45:10
 50:24
 72:19 92:3
 122:5

based  29:11,
 15 39:14
 40:14
 71:18
 81:11 86:7
 93:12
 97:18
 121:17
 122:19
 123:23
 126:12
 128:7

basically

**JAMES F. LYNN on 08/25/2016**

19:13 37:4
70:11
84:22
110:8
127:2,22

**basis** 11:15
34:25
48:14
50:7,8
52:24 70:9
126:1

**Bates** 79:1,2
87:20
88:4,7
89:10 91:8
92:9 93:23
94:3,22
95:16
99:12
101:6,21
102:7
103:14
104:3
106:21
111:18
116:10
118:3
119:8
121:20

**Bates-stamped**
103:14

**Beach** 94:4

**bear** 97:15

**began** 49:24
61:22

**begin** 107:20

**beginning**
4:6

**behalf** 4:22
44:13 86:9

**belief** 38:25
82:14
85:20

**believed**
126:13,16
128:6

**believes**
82:8

**belong**
107:14

**benefit**
127:18

**benefits**
45:7

**Bennett**
4:18,19,25
9:16
10:13,18
16:5 18:15
19:15 25:9
26:9,16
29:2,4
30:22
33:18
38:20,24
41:5 43:1
44:11
45:8,18
46:4,8,17
50:9 53:23

59:4,11,13
67:10,15,
22 68:24
72:1,17,18
73:12,23
75:1 79:19
80:6 81:5,
10,16,18,
20 82:7,
11,16,20
83:1,4,8,
20 87:18
90:20,22
91:7
93:11,14
96:20
99:6,11
101:14,17,
19 104:20,
21 105:15,
23 109:1
113:8,11
114:1,2,
11,12,15,
18 115:19
117:4,11
120:1
122:25
124:6,19
126:19
129:16,25
130:2

**Berry** 35:18,
19

**Bethesda**
69:15

**big** 40:20

101:8
103:13
117:12

**Bilaal**
58:13,22,
23 59:2

**billable**
43:16 54:3

**billed** 43:15
70:4,8

**binder** 36:12
71:3 87:19
101:15

**birth** 84:19
85:7,23
86:2 87:6,
8,11

**bit** 27:6
46:18
47:12
64:5,12
89:18

**block** 39:1

**blocks** 39:1

**boarded**
89:23

**boarding**
33:13
89:17
90:8,11

**book** 46:21,
22 49:18,
19 101:8
103:13

115:20
116:10

**books**   97:4

**bottom**   55:17
65:12 66:2
79:21
104:16
111:20
118:1

**bought**   55:21
66:23,25
67:4

**box**   86:6
88:1,21,
24,25 89:7
90:3,15
91:4 97:14
98:6
112:12
113:2,4,20
114:4,6,24
115:8,10
116:7

**boxholder**
113:3

**boy**   37:8
60:13

**Brad**   57:22
66:2

**break**   46:5,
6,8 83:10,
11,12,13
117:3,4,16

**break-out**
44:3

**breakout**
44:4,17

**Brian**   57:16,
19

**Brim**   95:12

**bringing**
44:2

**brought**
57:11
121:18

**building**
29:10

**bullet**   47:10
55:17
62:7,14,16
65:11 66:1
79:20

**burden**   81:21

**bureau**   63:11

**bureau's**
76:2

**Burlington**
5:9

**business**
6:20 17:3
54:18,19,
24,25
57:2,3,21
92:4

**businesses**
17:5 94:11

---

**C**

---

**C-u-s-h-m-a-n**
123:2

**calculation**
38:10

**call**   105:25

**called**   49:16
100:11,12
104:22
105:7
122:22

**calls**   10:11
28:3 81:3,
24 96:16
100:15

**camera**   10:15

**cameras**
94:13

**capacity**
5:21

**capital**   24:8

**caption**   6:8
61:8,14

**captions**
74:1

**captured**
72:11

**car**   112:25

**card**   4:7
31:7,10
34:11,12
42:10

59:18,19,
21 65:12
66:3,18,19
67:1,5
80:23,25
81:1,22
83:22,24
85:21
87:12 88:8
91:24,25
92:5 94:19
103:25
106:8,11,
24 113:23
114:6,8,
13,21,24
115:4,5,7,
9

**cardholder**
107:4
111:25

**Cardholder's**
107:6

**care**   125:16
126:23
127:15

**carrying**
126:3

**case**   4:10
6:1,2,8
8:7,17
10:2,8
11:5,17,
23,24,25
12:2,3,5,
12 13:3

15:2 16:20
20:13
21:14,22,
23 22:13,
16,17,21,
22,24
23:3,4,6,
12 27:9
28:23
29:7,11,
12,14,15
30:2 31:6
32:11 33:6
34:18
35:15
36:7,11
40:18,21
41:21
42:15
43:3,9,13,
16,21 47:6
53:15
54:12
55:12,19
56:1,2,3
57:3,4,7,
13 59:7,
14,15,21,
24 60:1,8,
11,12,15
61:6,8,13,
14,16,22,
23 62:6,
11,17
63:2,3,5,
15,19,25
64:24,25
65:7,9,13,

14,16,17
66:5,7,12
67:16,17
68:19
69:2,16,25
70:4 71:20
76:10
77:23
78:4,18
81:8 82:1,
2,3 83:2,5
84:14
86:24
88:12
91:17
92:17
95:12
98:13
102:16
112:16
114:3
117:17
118:7,11,
16,25
122:14,16,
22 123:1,3
128:21,24

cases 7:17,
24 13:7
14:7 20:24
21:11,16,
21 22:6,25
23:15,17,
23 30:6
34:19
40:19
44:24,25
45:12,21,

22 46:3
53:16
54:5,23
55:5,11
56:5,12,21
57:1,18
60:1
63:15,16,
22 64:2,5,
14 65:5
118:8,14

categories
13:22

category
14:10 16:6
54:22,24

caused 72:5

cc'd 100:3

CCC 98:24

CDIA 41:3,
6,11,14

CDV 19:21

CDV'S 19:22

CERTIFIED
4:2

chain 68:11

challenge
86:11

change
12:18,21
52:2 72:5

changed
55:23 67:5

characteristic
66:12

characteristics 37:17

Characterization 73:22

charges
93:25 94:3

Charleston
66:9

check 6:7
39:5 44:15
46:2
106:11

children
33:19

Chinook 5:8

Chris 61:16

Christopher
4:21

Chu 34:20
72:10
86:24
100:20
109:20

Chu's 101:4

Cipriani
4:22

Circuit
11:24
35:17
123:3

Circuit's

**JAMES F. LYNN on 08/25/2016**

12:4

**circumstance**
106:18

**circumstances**
25:15 26:6
55:22,23
66:6
120:14,20

**citation**
123:16,17

**cited** 124:17

**city** 5:6
65:19

**claim** 22:25
27:3,10
53:7

**claiming**
18:16,24
29:21
40:10

**claims**
22:16,17
100:15
118:24

**clarification**
90:9

**clarify**
50:11
79:17

**classified**
38:9

**click** 90:25
91:1

**client** 44:22
55:14
57:19,25
58:9,21
60:5 62:10
74:11,14
103:4

**clients** 19:2
48:11
57:23,24
58:7,25

**closure**
121:18

**COB** 121:20

**COB1** 71:3

**COB553** 71:4

**code** 37:23,
24 39:1,10
40:10,17,
21 41:15,
20 42:4
72:6
76:15,16
97:13,17,
19,25
98:4,7,8,
24 99:7
118:6,18,
24 121:10
122:1,5,6,
12,14

**codes** 106:11
110:1
118:10
119:5,11

**collapsed**
92:4

**Collection**
14:20

**Columbia**
6:13

**column** 96:3

**combined**
116:6

**combining**
85:17

**comfortable**
11:14

**comments**
38:22
45:16

**commercial**
17:3 21:10
47:11,15
50:6 53:6
55:3

**common** 30:10
85:2

**communicate**
24:13
32:8,9

**communicated**
19:22 20:3
24:5 30:1

**communication**
32:7 33:5

**communications**
79:9

**community**
47:10,18,
25 52:23

**companies**
34:11,12

**company** 17:6
20:4 28:18
35:24
59:18,19
66:25
83:24
126:15

**company's**
126:17

**compare**
35:11

**compile**
125:25

**compiled**
8:24

**complaint**
22:13,21
25:17
124:11

**complete**
122:10
125:25

**completely**
125:7

**completeness**
124:3,9,12

**compliance**
37:23,24
39:10

**JAMES F. LYNN on 08/25/2016**

98:24
118:6,18,
23 119:5,
10 121:10

**complied**
43:5
126:16

**complies**
57:16 61:3
68:5,8,10
69:6 70:17
87:21
89:11
94:23
95:2,18
101:9
102:8
103:18
104:4
106:22
110:3
111:19
116:9
118:2
119:23
121:21

**comply** 14:25
43:10
52:15

**component**
11:16
14:22
127:8,11

**components**
37:9,16
39:2

**computer**
31:15
33:4,11
109:2

**concerned**
39:22

**conclude**
80:11
115:6
121:15

**concluded**
39:18 43:4
85:21
130:3

**conclusion**
10:12 26:8
40:15
81:4,25
84:23 86:7
123:25
128:11

**conclusions**
8:16
29:15,20
54:15
56:23
86:11

**conclusive**
114:20
115:2

**condition**
37:23
39:10
98:24
118:6,18,

23 122:15

**conduct** 23:2
51:13
52:22
125:17,18
127:15

**conducting**
26:4 125:7
126:23

**conferences**
68:1

**confidence**
13:18

**confirm** 79:5
80:12 86:4
87:4 88:24
107:17
129:4

**confirming**
39:16

**confused**
103:19
114:9

**congressional**
12:8 30:25

**conjunction**
12:2

**connected**
87:8
129:5,6

**connection**
77:18

**considered**
92:15 93:5

105:13

**considers**
106:17

**consistent**
127:6

**construction**
57:9,10

**consultant**
13:12
16:14 37:2
47:14

**consulted**
22:14

**consulting**
16:13,18
47:10,19
48:16 49:7
50:13
70:13

**consumer**
9:24 14:18
17:7,19
19:17 20:9
21:10
24:17,18
25:1,2,10,
11,16,17
26:10,11,
18,19
27:14,15,
24 28:8
37:3,6,9
39:10
40:11
41:24

42:3,10
43:6
48:12,23
49:11,13,
17 50:1
52:21,23
53:5,8
55:5,7
56:1,2,5,
16,17 57:2
59:20 60:7
63:10
73:8,15,24
74:3,4,5,
7,12,15,20
75:2,7,11,
13,18,19
80:7,22,24
81:23
82:12
83:21
85:4,8
97:11
102:13
116:17,23
117:14
119:12
122:11,19,
20,21
123:5,6,10
124:3,11,
13 125:20,
24 127:11

**consumer's**
55:6 56:7
57:3

**consumer-lending**
14:14,17

**consumers**
54:23 63:7
126:1

**contact**
104:7

**contacted**
61:5 95:3

**contained**
79:22

**contemporaneous** 51:10

**contemporaneously** 53:4

**contend**
51:18

**context**
11:11
13:14
14:13
15:14
37:11,13
75:9

**continue**
46:14
56:22,25
57:15
80:25
82:11,20
83:18

**continued**
83:25

**continuing**
25:5 26:12

**contract**
42:6 80:3,
4 81:8
82:2

**contracted**
42:10

**control**
98:5,9

**controls**
116:22

**conversation**
82:24

**copy**  27:22
31:19
46:21
77:19 78:8
80:16
95:19
102:14

**corporate**
67:6

**corporation**
6:22,25
7:4,7,10
14:12
47:24
48:3,10,21
49:5 57:22
62:8
66:21,22,
23 67:2

**Corporation's**
51:16

**correct**
5:18,19
10:6,10
11:7,18
13:4 14:1,
2,9 16:11
17:12
22:10
27:23
28:1,20,22
31:8,9
32:23
36:10
37:25
39:20
40:4,22
41:15,16
42:12,16
47:7,13
49:12
51:21
53:11
55:1,16,18
66:24 67:3
68:12,13,
15,16,19
69:3,12
70:1,2,5,
7,10,11
71:22 73:2
77:16
79:16
86:16
87:9,23,24
88:2,16,17
89:15,16
91:16 92:8
94:15

**JAMES F. LYNN on 08/25/2016**

95:4,7,20
96:23,24
97:3
100:4,5
104:14,25
105:7
109:5,8,15
110:13
111:2,7,11
115:4
118:5
119:2,9
121:8
122:16
123:17,20
128:5
129:1,2,8

**corrected**
39:21
72:11 98:8

**correctness**
84:15

**correspond**
117:22

**corroborate**
84:9

**Cosmopolitan**
55:13

**cost**
127:10,18,
25

**cost-balancing**
127:8

**counsel** 4:16
38:18

53:17 82:7
90:9
101:13

**counted**
38:9,13,14

**counter-sued**
57:19

**counting**
22:6

**country**
13:13
41:23

**Countrywide**
58:6

**couple** 21:12
23:20 39:6
61:18 95:1
102:19
103:19

**courses**
48:18,22

**coursework**
19:9

**court** 4:2,
13,17 6:10
8:3 10:22,
23 25:7
27:13
30:7,8
64:16,20,
25 65:22,
23 126:7

**court's**
95:11

**courts** 41:23

**covered**
23:12

**CRA** 26:7
39:22 75:8
77:10 97:2
98:7
102:23

**CRAS** 20:6,8
26:25
28:19
76:16,24
97:19

**create** 75:14

**created** 75:3
117:19
128:14

**creates**
75:19

**Creative**
58:8

**credibility**
84:21 86:5

**credible**
13:19
80:10
82:14
84:11 96:2
128:7,21

**credit** 4:23
5:17 7:22
10:5,10
11:7,18
12:17

13:6,8,15
14:7,19,23
15:1,6,9,
12,21
16:9,18
17:6,7,8
18:19,21
19:7 20:5,
10,13,18
21:1,18
22:9,12
23:2,8,10
26:24
27:19,21,
22 29:17,
22,23
30:19
31:7,10,
11,13,20
33:10
34:11,12
36:12,14
37:14,22
38:12
39:11,13,
22 41:2
42:10,15,
19 43:3,10
47:11,15
48:6,19
49:15,22
50:3 51:4,
5 52:20
53:8 55:8
59:15,17,
19,20,21
60:7,12
62:8,9,23

63:5
64:15,21
65:2,17
66:19
67:1,5,16
71:6,8,15,
20  72:5
73:20
74:20
76:1,11
77:10,15
80:3,21,
23,25
81:1,22
82:11
83:22,24
84:1,14
85:20,21,
22  86:8
87:5,12,19
88:8,24
89:21,23
90:2  91:1,
16,20,24,
25  92:5,
15,16
93:5,6,17,
19  94:17,
19  95:3,4,
6,7,10,20
96:13,21
97:25
98:1,9,11,
23  99:10
100:4,11,
16,18
101:25
102:24

103:5,13
104:6
105:11,13
106:12,16,
18  107:12
109:2
110:12,25
113:23
114:6,8,
13,21,24
115:1,4,5,
7,9
116:13,20
117:13
119:13,14,
16  120:8,
14,17
121:6,14,
19  123:7,
11,13,15,
18,21,23
124:13,14
127:24
128:21,25
129:5,12

credit-
reporting
14:7  16:25
24:14,15

credit-
training
14:12

creditor
20:21,22
80:8

creditor's
41:24

crucial
112:13

curiosity
36:1

Cushman
122:22
123:2

customary
17:4  39:14
40:6
127:6,14

Cut  125:1

CVII  119:5

──────────
D
──────────

data  15:8,
24  16:1
20:12,14,
15  24:5,13
25:18
26:3,7
28:18,25
33:13
35:21
40:13
75:7,8
84:22
85:17
89:17
95:24,25
96:2,6,23
97:2  98:20
99:14
116:17,20,
23  117:1,

14  119:13
124:13

date  4:11
84:19
85:7,23
86:2  87:6,
7,11

dated  65:13
106:2

dates  71:1

daughters
34:8

David  4:8
129:7

day  18:11
22:14  33:2
51:2  72:10
101:2
111:5

days  25:13
37:8  39:6
49:1,6
70:8

dba  62:9

deadline
61:24

deal  9:23
23:9  50:6
106:13
118:9

dealing
42:19
64:15
118:13

**JAMES F. LYNN on 08/25/2016**

127:22

**dealt**   21:5
23:8
102:18
118:8
121:25

**debt**   14:20
81:21
82:13,15
84:24

**debtor's**
8:10

**December**
62:9,19

**decision**
12:4,15,
19,21 13:2
35:17,19
95:11

**decisions**
12:23

**deemed**   79:23
84:11

**defendant**
5:17 36:12
41:13
44:25
45:2,13,
23,24
57:20
58:9,20,21
62:10
81:14
106:16
119:8

**defendant's**
53:17
78:18

**defendants**
4:9 18:19
43:24
57:13
58:24

**defending**
53:18

**defines**   98:8

**delineation**
13:23

**Delivered**
25:21

**delivery**
25:20

**Demarra**
57:21

**denied**
104:24

**denoted**   7:20

**department**
69:8 78:20
79:4,10
92:20
101:23

**depend**   13:20

**depends**
120:23

**deponents**
34:19

**deposed**   5:16

**deposition**
4:1,7 5:20
6:3 35:25
46:14 70:4
73:1
76:16,20
83:18
99:23
101:5
129:23
130:3

**depositions**
100:21

**derive**
125:10

**derogatory**
37:22,23

**describe**
34:22
122:15

**description**
15:22
48:21
52:19

**designated**
123:10

**detail**   28:6
117:23

**details**
16:17
29:25
98:21

**determination**
21:17
121:11

122:18

**determine**
25:7 30:8
42:9 46:3
77:23
86:14
126:12

**determining**
127:23

**develop**
123:11

**diagnosing**
34:15 35:7

**Diane**   92:19,
24

**difference**
54:21

**differentiate**
105:2

**differently**
81:19

**difficulty**
97:15

**digit**   21:21

**direction**
86:10

**directly**
20:14
28:19
41:19
44:21
91:20
115:7
123:18

**JAMES F. LYNN on 08/25/2016**

**disagrees**
122:11,19

**disclosed**
5:17 12:7
35:24
41:10

**discussed**
17:23
69:16

**discussing**
15:14

**discussion**
100:19

**disposal**
41:4,6

**dispute**
16:19
19:17,19
20:14 23:2
25:14,17
26:24,25
27:25 28:3
38:8,11,13
39:1,3,23
40:4,10
51:13 53:9
55:23
56:17
75:19
76:6,11
83:21
99:4,9
101:22
121:6,15
122:10
123:22

**disputed**
31:7 39:12
100:12
125:19

**disputes**
16:25
20:10
24:18
25:3,11
26:11,19
27:15
29:22
39:10
41:25
71:16 76:2
77:2 93:7,
20 105:14
106:18
115:2
124:12
129:13

**disqualified**
65:3

**disqualify**
8:1

**disqualifying**
8:4

**distinction**
40:20
54:22

**distress**
42:22

**District**
6:13 95:12

**document**

26:25
32:12
69:21
73:18,19,
24 75:9
79:1 87:22
88:12
89:12 90:5
91:2,6,14
94:24
95:23
97:6,22
101:20
102:20,21
103:2,14
107:2
115:16,17,
20,23,25
116:12
117:24
118:25
119:1,5,7,
14,15
120:10
121:20

**documentary**
93:16
94:17
100:14
105:9

**documentation**
74:17 77:7
84:6 90:10

**documents**
18:19 19:1
20:2 21:4,
14 22:18

23:3,8
31:19
32:17
41:10,13
53:14 54:6
69:1 70:3,
9,13,24
72:25
73:17
74:2,25
75:16
76:22,23
77:14,22
78:3,11,
12,18
84:2,3,4
87:20,22
97:18
99:18
101:10
102:9,15,
24 103:5
105:11
106:16
107:9
114:20
116:5
119:16
120:16

**Donovan**   4:13

**draft**   60:22

**draw**   29:19

**drawing**
29:14
54:22

**Drive**   5:7,9

Drop 88:1

**E**

e-oscar
  24:7,10

earlier 53:6
  64:1 100:3

early 47:16
  50:18
  103:24

earned 44:5

ease 58:1

easier 64:7

eaten 129:17

edgy 83:12

editorial
  38:22
  45:16
  67:14

educated
  19:6 37:4
  118:22

effect 123:7

effectively
  31:17

effort 67:24

Eldrin 5:7

electronically
  91:6

element 31:2
  112:13

elements
  15:12
  34:21

eliminated
  67:5

email 32:2,
  4,5,6,10,
  15,19,21
  33:22
  68:11,14,
  25 92:9,
  13,14
  93:1,5,18

emotional
  42:21

employee 7:5
  93:4

employees
  6:25 7:3
  92:15
  100:18
  105:13
  115:1
  120:18
  121:1

enacted
  50:17

end 17:2

ends 129:23

enforcement
  79:5,23

engage
  112:11

enter 31:17

entities
  14:6

entitled
  123:13

entity 15:16
  54:19,24

entries
  110:15

entry 100:1

environment
  52:23

Equa 62:9

Equal 14:19
  72:5

Equifax 4:8
  20:11
  110:7
  117:13
  124:15

essence
  85:19

establish
  115:3

establishments
  94:14

estate 14:19
  55:13 57:8

estimate
  48:4 63:22

estimates
  100:21

et al 4:9
  57:12 60:5

62:9

etranscript
  130:1

evaluating
  17:8 37:6

evening
  61:24

event 77:17
  104:6

events 106:4

evidence
  73:10
  80:10
  82:14 83:1
  88:18
  93:16
  94:16,17
  100:14
  105:9,10,
  16 112:24
  114:20
  115:2

evolved
  50:14

examination
  77:22

examine
  93:17

examined
  111:5

Excel 34:20

exchange
  20:15
  28:18,25

102:2
107:25

**excluded**
  23:7,15,20

**excuse**  26:7
  30:14
  38:15
  45:15 49:2
  58:23 98:5

**exhibit**
  60:18
  68:3,7
  69:5,20
  95:16
  101:7,8
  109:20
  116:8,10

**exist**  52:25

**existed**
  51:23

**existence**
  37:21

**expect**  87:12
  120:2

**expectation**
  25:19

**expectations**
  15:24
  24:24
  120:13

**expected**
  28:14

**Experian**
  20:11 23:7

28:2,8
51:3 60:11
86:25
101:21
103:6
117:13
124:15

**Experian's**
  101:22

**experience**
  10:23
  13:9,10,21
  14:23
  16:24
  17:10,13,
  16 18:2,6
  19:13 21:6
  29:17
  36:5,19
  42:23
  64:13

**expert**  5:18,
  21 8:1,4
  10:7 11:4,
  10,17 12:7
  13:5,24
  14:4,5
  18:10,12,
  16,17,20,
  24 19:2,5
  20:24,25
  21:10 22:7
  23:19,25
  24:7,16,
  21,25
  25:6,12
  26:10,17

27:3,5,6,
10,12,24
28:24
29:6,7,11,
25 30:1,4
34:10,15
35:6,9,13
36:14
38:21
42:6,9,13,
17 43:8,23
44:13
45:1,5,12,
22 46:19
50:2 51:18
53:8,10
54:9 61:5,
22,25
62:6,9
63:17
64:17,21
65:4 70:9,
12 74:20
82:18 83:6
91:23
118:5,17,
19 121:7
124:7,10
125:8,16
126:8,9,22
127:12
128:4,16

**expertise**
  11:11

**explain**
  28:13
  31:13 42:3

71:23
95:22
99:23

**explaining**
  15:6

**explanation**
  14:18 52:3
  71:17 72:8
  99:7 100:1

**exploded**
  101:15

**extensive**
  36:5

**extent**  24:22

**extenuating**
  25:15

**external**
  123:24
  126:11
  127:10
  128:9,22,
  24 129:11,
  12,14

_____
        **F**
_____

**facilitate**
  52:11

**facilitated**
  14:14

**facilitator**
  14:11

**facilities**
  94:20

**JAMES F. LYNN on 08/25/2016**

**fact** 13:7
28:25
38:11
56:15
77:12 79:2
84:24 89:2
103:16
105:11
114:19

**facts** 26:5
29:13,15
30:2
121:13

**fair** 7:22
10:4,10
11:7,18
12:17
13:6,22
14:7,20,23
15:1,6,12,
21 16:9
19:7 21:1,
18 22:9,11
23:2,8,10
27:19,21,
22 29:17,
23 43:2,3,
10 45:5
48:4,6,19
49:15,21
50:2 51:4,
5 52:20
53:8 55:8
59:15
60:7,12
64:15,21
65:1 71:17

74:20
80:21
123:14

**familial**
30:10

**familiar**
35:24 41:1

**family**
30:12,15,
24 72:19
112:10
113:14

**favor** 8:3
44:25
45:2,10,13

**favors** 45:5

**fax** 40:12

**FCR** 73:8
100:7

**FCRA** 82:3
122:10

**FDIC** 56:21

**February**
5:25 61:14
66:8

**federal**
6:10,11
15:20 43:6
65:22

**fee** 72:21

**feel** 9:18
11:14

**fell** 25:8

**female**
105:3,4,7

**FIA** 65:12
66:3,17,18
67:6,7,12

**FICO** 36:16,
23,24
37:4,11,
14,16,18
38:10
123:8

**field** 73:14
74:8,22
76:5 91:12
98:24
100:3
102:20,23
118:7,18,
24 120:1

**fields**
117:22

**fight** 121:24

**figure** 9:18
73:21

**file** 37:22
39:11,16,
20 59:16
85:22,24

**filed** 40:6

**files** 70:1
109:20
125:25

**filing** 77:24
78:9,14,20

79:7 80:15

**filled** 75:6

**final** 60:20,
24 70:16

**financial**
13:13,25
14:5 15:7,
16,25
16:2,13,17
17:5 27:4
34:24
43:4,23
44:1,2,7,
13,17,21,
22 47:10,
18 50:13
52:9,24
54:7,8,10
56:19 58:8
62:8 63:10
85:13

**financials**
17:5

**financing**
57:11

**find** 12:9
27:10
33:25 34:5
39:8 41:22
45:6 69:7
73:24
74:17
100:14

**findings**
8:16 26:7
29:14,19

**Maxene Weinberg Agency**

54:16
56:22

**finds** 125:22

**fine** 10:25
56:10
60:17

**finish** 56:25
113:7,10

**firm** 4:22
18:22
44:21

**fit** 34:21
38:17

**Fitch** 57:22

**fix** 101:16

**fixed** 25:8
99:25

**fixing** 61:10

**flag** 91:12

**Florida** 4:3
94:4

**focus** 77:9

**follow** 64:10
93:23
120:18

**food** 94:8

**forgot** 83:7

**form** 15:17
19:11
42:24 44:9
45:3,17,25
50:4 53:21

71:25 73:6
75:6,17
124:5,8

**format** 24:4
117:23

**formats** 51:1

**formatting**
116:19

**formed** 70:9

**forward**
56:25
61:21

**found** 27:9
36:3 43:9
64:16,20
65:1 66:1
110:16,17
111:1,6

**founded** 10:3

**four-month**
100:12

**fourth** 11:24
12:4 35:17
55:17 61:1
66:1

**Francis** 5:4

**frankly** 6:9
23:11
91:14

**fraud** 34:19
80:9 85:8
99:17
112:2,11

**fraudster**
83:23
113:13

**fraudulent**
80:11

**Frempong**
55:12,13,
14 56:13

**Frempongs**
55:22

**frequent**
30:19

**front** 46:2
97:6
109:23
116:1
125:13
127:1

**full** 5:1
51:2

**full-time**
49:2

**function**
40:12

**furnish**
43:18

**furnished**
23:3 75:7
125:24

**furnisher**
14:25
17:17 19:7
20:5,12,
14,22,25

21:17
25:18 26:3
29:22
40:9,13
52:15 75:8
95:25 96:5
98:14
102:2
124:4,13
128:18

**furnisher's**
23:1 50:2
51:13 52:3

**furnishers**
15:8,24
16:1 24:13
28:18
116:21
117:1

**furnishes**
75:8

---

G

**gain** 127:21

**gained** 69:1

**gas** 94:6

**gathering**
29:5

**gave** 15:11
19:13 37:8
79:13
100:21
115:14,20

**general**

**JAMES F. LYNN on 08/25/2016**

24:19,24
28:13
42:22 50:5
61:7 64:10

**generalities**
63:12

**generally**
25:15
36:18
47:12 49:9
63:8 64:6
102:10,17

**generated**
72:10
76:11 77:2

**gentleman**
38:21

**give** 13:18
14:22 31:3
44:3 48:6,
15 63:17
64:17,21
65:1 98:21
104:10
120:1
123:21

**good** 4:18
54:12
63:12
82:25

**Googling**
27:22

**govern** 12:23

**governing**
117:14

**government**
54:25
58:15,17

**grantor**
59:20
99:10

**great** 111:16

**greatest**
16:8

**gross** 44:16

**Group** 6:21
47:9 67:23

**guess** 36:6
48:10,13
49:21 61:1
63:24 73:3
77:14
86:14
111:20

**Guest** 57:22

**guidance**
120:2
123:10

**guide** 32:12
116:13
119:13,23

**guidelines**
120:1

**guys** 129:16

---

**H**

---

**Habib** 58:5

**half** 8:7

**handle** 26:11

**handles**
18:11

**handling**
16:25
24:17
25:2,11
27:14 93:6
105:13
129:13

**handwriting**
31:20 35:9

**happen** 30:3
68:22
128:18

**happened**
30:2,3
68:23 72:9
102:5
106:4,14

**hard** 31:19
33:25
34:4,8
98:20

**harm** 127:11
128:1

**Harvey** 66:2
67:17

**He'll** 10:13

**head** 8:18
33:24
75:12

**header** 71:10

**heading**
70:20

**hear** 117:2

**heard** 20:15
35:15
112:2

**hearing** 8:8
9:2

**held** 109:20

**helpful** 18:5

**highlights**
52:20

**hire** 18:19,
21

**hired** 14:5
18:22
19:2,4
21:17
23:15
29:12 55:6
56:5,18,
20,24
63:16,19
65:8,10
118:7,15

**history**
34:17
38:11
120:21,22

**hitting**
31:17

**hoe** 43:22

**hold** 38:15
42:9 72:15

holder 108:1

holding
 66:25 67:4

home 7:6,10
 31:15
 33:13 58:6
 66:8
 90:12,13,
 25 116:3

hot 83:13

hour 43:12
 100:18

hours 43:16

housekeeping
 25:7

human 31:20
 91:16
 104:7

hung 109:14

Huntington
 57:17

hyphen 24:8

_____

I

_____

I.D.
 112:23,24

ID 30:15

idea 75:20

identification
 112:22
 113:5

identifiers

85:4

identifies
 97:23 98:6

identify
 54:5 57:1
 69:20
 76:17 86:5

identity
 16:19
 30:4,10,
 11,12,20,
 24 31:3
 34:13,16
 35:7
 42:19,21,
 22 72:20,
 21 80:8,
 13,17 82:4
 83:22
 85:2,3,6,
 19 87:10
 91:24
 94:18

Idris 58:13,
 22,23

illegal
 121:2

images
 110:5,6,8,
 13

impact 123:8

implementing
 120:13

implicitly
 74:6

implying
 7:13

important
 89:1,2

inaccurate
 125:23
 128:2
 129:6

inches 66:10

incident
 74:15
 77:19,24
 78:4,9,25
 79:12,22
 80:16
 92:19

include 9:2
 15:8

included
 14:19
 21:13
 22:19
 47:22
 50:19 51:5

includes
 90:15

including
 24:14 48:2

income-
producing
 8:10,25

incomplete
 125:23

incurred

43:16

independent
 27:8 39:17
 84:10,21
 86:4,18,
 21,23

independently
 107:17

indication
 78:3 90:1
 92:13
 106:15
 111:10,12

indicator
 99:15,24

indicia
 34:15 35:7

indirectly
 115:7

individual
 16:1 17:7
 44:23
 48:11
 50:24
 54:23 72:6
 116:20
 120:23
 121:17

individual's
 42:18

individually
 112:15

individuals
 17:8 44:2,

18 57:23
115:3
123:10

**industry**
14:1 68:1
116:17,23
117:14
119:13
121:19
124:2
127:15

**Indy** 57:20

**inference**
106:6

**info0rmation**
72:24

**inform** 121:7

**information**
4:9 8:24
13:19 14:3
16:9 19:1,
6 28:24
29:25
31:2,17
36:8
39:15,16,
19 41:3,6,
10 52:14
53:9 54:6
67:11
70:25
71:6,8,18
73:8,13,
14,25
74:3,8,21,
22 75:4,10

76:5 78:19
79:9 82:4
83:23
84:9,10,
12,14,18,
20,21
86:8,13,
15,17
90:11,13
91:9 93:8
95:25
96:1,14,
15,18,22
99:15
100:8
106:7
116:18,19
123:9,22,
24,25
124:13
125:19,20,
22,25
127:5
128:1,2,8,
10,11,14,
22,23
129:4,6,
11,12

**informs**
125:16

**initial** 5:3
89:6

**initially**
105:12

**injury** 42:18

**insert** 75:3

**inserted**
73:8

**inserts**
74:21

**instance**
10:1 62:19
93:9

**institution**
43:4
44:14,21,
23 52:9,24
54:7,8,10
85:14

**institutions**
13:13
14:15
15:7,25
16:2,13,17
34:24
44:1,3,7,
18 47:11,
19,22,25
48:1,9
50:13
56:19

**instructions**
120:18
121:1

**instructor**
52:10

**instructs**
10:14

**instrument**
31:16

**insurance**

112:25

**insurer** 67:1

**integrate**
28:23

**intended**
5:18 122:8

**interaction**
26:24 33:3

**interest**
99:15,24

**interested**
20:2

**interject**
38:16

**intermediaries**
95:9

**internal**
119:15
123:24
126:11
128:8

**internet**
33:3 37:20
77:2

**interpret**
98:20
104:10
106:4

**interpretation**
9:21 10:4,
10 11:6

**interrupted**
76:9 85:12

**JAMES F. LYNN on 08/25/2016**

introduce
  4:16

investigated
  34:2
  111:4,9

investigating
  93:19
  106:17
  129:13

investigation
  16:19 23:2
  26:5
  39:14,15
  40:12,15
  79:24 82:3
  83:24
  86:10
  92:25 93:1
  100:13
  110:25
  111:11
  122:10
  124:4
  125:8,9,
  17,19,22
  126:14,24
  127:9,12,
  16,24
  128:7,17

investigations
  92:16

invoice
  43:19
  69:22

involved
  62:10

IP  31:23,24
  32:22,24
  33:3,10
  93:6,18

isolate
  37:25

issue  16:19
  31:7 45:7,
  9 82:1
  121:18
  122:15

issued  43:2
  45:1,12

issuer  66:19

issues  25:13
  26:6 38:12
  42:19
  47:11,15
  57:10
  64:6,15
  65:16
  81:25
  118:9

item  20:10

IVR  106:8,9

———————————

**J**

———————————

J-o-h-a-n-n-s-
o-n  23:6

James  4:7
  5:3 46:15
  83:19
  129:23
  130:3

January
  16:23

Jeffrey  62:7

Jennifer
  100:20,25

Jennings
  23:6,15

Jim  69:7

Joanna  94:6

job  16:21
  34:23
  126:2

Johannson
  23:5,14

Johnson
  11:23,24
  12:14,18
  21:22,23
  22:22,24
  23:14
  66:17
  81:12 83:8

joint  72:6

Jones  60:5

Jordan  4:13

judge  8:15

judgments
  29:15,20
  54:15
  56:22

Judy  4:2,14

July  55:12
  56:16

61:24
68:14,18
69:1 70:5,
6 76:20
79:13
87:25

June  61:18,
  19 103:24
  104:2
  111:20

jurisdiction
  65:19

jury  126:4,
  6

———————————

**K**

———————————

Kelly  60:1,
  11

key  113:16

kids  34:7

kind  30:11
  34:23

knew  62:24
  66:18,20
  67:12
  118:13

knowledge
  13:24
  18:6,9,25
  24:19,24
  26:18
  27:3,13,18
  29:6,11,22
  31:5,22

**JAMES F. LYNN on 08/25/2016**

34:18
41:14,20
42:17
50:2,5
51:18
52:13 53:7
76:4 78:1,
2 79:3
80:16 85:1
88:11
98:14
109:6
113:23
118:5,23

**knowledgeable**
92:24

**Koby**  55:14

---

**L**

**L-e-e**  33:17

**L-y-n-n**  5:5

**lack**  93:5,
18

**language**
24:13

**Large**  4:3

**late**  37:2
50:18
61:18
103:24

**Lau**  21:23
22:22,24
23:14

**law**  4:22

9:8,9,22
11:9,10,
18,19
12:24 16:3
18:22
27:4,13
42:6,11
43:6 44:21
79:5,23
81:9
96:19,22
120:11
121:3,8
126:16

**Lawless**
92:19,24

**laws**  9:23
15:15 16:4

**lawsuit**
53:18
77:25
78:9,15,21
79:7 80:15
120:25

**lawsuits**
19:1

**lawyer**  11:20
45:23
54:7,8
56:7 57:3
81:8

**lawyers**  19:1
44:8,14

**lead**  20:19
86:9,10

93:10

**leading**
117:16

**learn**  12:14
18:1,4
19:24
29:6,12
40:17

**learned**  14:3
16:17 31:3
40:21 53:9

**learning**
18:5

**leave**  16:22
80:11

**led**  75:10

**Lee**  33:15,
17 89:25

**legal**  10:9,
11 11:6,8
41:22
81:3,8,25
82:6,8,17,
21

**legally**
42:14

**lender**  17:2,
3 36:19,
20,21 50:6
56:17

**lenders**  16:3
52:22

**lending**
13:11

17:4,19
37:3
48:12,23
49:11,13
50:1 52:23
53:5

**length**  38:12

**Leonard**  4:19

**letter**  26:25
28:8,9
77:8 95:4
101:22
102:1,25

**letters**
77:4,5
102:1

**level**  30:7

**Lexisnexis**
36:4

**liable**  71:20

**licensing**
52:8

**Limburger**
57:5

**Limburgers**
57:6,11

**lines**  110:4

**link**  88:1

**links**  111:25

**Lisa**  57:4

**list**  55:11
57:15

**JAMES F. LYNN on 08/25/2016**

**listed** 48:22
  90:23,24
  97:2 99:2
  107:2
  124:23

**listened**
  42:2

**literally**
  18:11
  112:5,8

**litigated**
  29:11,12

**litigation**
  13:14 14:6
  19:5 53:13
  54:17 64:8
  77:18 78:4
  122:6

**litigious**
  63:7

**live** 104:7

**LLC** 4:9
  20:16

**loan** 57:9
  84:5

**loans** 58:6

**local** 79:23

**locate** 90:18

**located** 21:2
  33:14

**location**
  33:4

**locations**

**long** 38:9
  49:20
  100:22
  113:15

**longer** 15:5
  99:3
  123:22

**looked** 52:18
  74:2 99:1
  103:5

**lot** 27:8
  30:8 66:14
  116:18

**loud** 122:8

**Lynn** 4:7
  5:4 6:21
  38:15 41:8
  46:15 47:9
  67:23
  82:16,19
  83:19
  90:18
  101:13
  113:7
  117:2
  129:23
  130:3

          —————————
              **M**
          —————————

**M-a-r** 72:15

**M-a-r-a-g-o-s**
  72:16

**Mac** 57:20

**made** 44:6
  77:2 83:9
  100:15
  109:20

**mail** 88:25
  89:9
  112:5,8,9,
  10,19,21

**mailbox**
  112:2,6,
  11,14,16,
  17,20,21
  113:13,17,
  18,19

**mailed**
  113:24
  114:4,5,24
  115:10

**mailing**
  33:23
  90:12,14
  91:2
  115:12
  116:3,6,7

**maintain**
  78:8
  125:25

**maintained**
  95:20

**major** 15:19,
  20 37:21,
  23 124:14

**make** 5:12
  18:10
  21:17

  26:24
  43:22
  44:12 47:4
  85:18
  87:14,16
  92:5 94:13
  102:1
  106:6
  123:5,6

**makes** 18:20
  53:7 75:18
  83:21
  116:22

**making** 76:11
  112:17

**male** 105:2,
  3

**man** 127:2,3

**Management**
  95:7

**manual** 28:5
  117:18
  120:8,25
  122:13

**manuals**
  41:2,13

**Maragos**
  72:13

**Maragos's**
  72:25
  105:1,8

**March** 6:19

**Maria** 58:20

**JAMES F. LYNN on 08/25/2016**

market   36:6
  67:23

marketing
  67:24

married
  43:25

Maryland   5:8
  66:9 69:15

match   129:8

material
  52:2

materials
  15:4 49:8
  51:12,15,
  16,17,20,
  22 52:10,
  13,17
  53:2,3

matter   4:8
  20:14
  25:6,7
  38:13
  40:16
  54:13
  86:12
  100:16
  113:14
  126:4

matters   9:24
  11:10
  21:10 22:9
  23:8 24:15
  29:17,18

Maxine   4:15

MBNA   11:23,
  24 66:14,
  17,18,23,
  25 81:12

Mclaughlin
  57:17,19

meaning   9:8,
  21 10:4,9
  11:18 13:6
  118:17

means   31:14
  38:8 91:15
  98:20 99:3
  104:22
  118:24

meant   77:13
  98:6

mechanics
  28:13

mechanism
  32:7

mechanisms
  127:14

media   4:7

meet   62:21

Melissa   62:7

member   30:12
  72:19
  112:10,11
  113:14,15

members
  117:1

memo   106:2

memory   6:7
  55:11

mental
  42:18,22

mention   70:7

Merrill
  13:11,12
  14:1
  16:10,21,
  22,25
  17:3,11,14
  33:2 50:7
  53:6

met   69:14
  126:14

method
  118:24

Metro   24:1,3
  117:19,23

Michael   60:4

Michelle
  57:22

Michigan
  23:5

mid   36:25
  37:1

mid-atlantic
  14:16

middle   5:3,4
  119:24,25

Midland
  95:7,10,14

midnight

106:3,5

mike   25:8
  67:19

minus   64:14

minute   36:17
  58:19 94:5
  113:18
  115:15

Mischaracteriz
es   99:6
  105:15

Missed   58:19

misspoke
  124:9

misstated
  30:16

misstates
  81:25

mistake
  72:11

model   36:23
  37:11,13,
  14 92:4

modern   33:1

module   49:16

moment   87:3

Monday   82:25
  83:1

money   43:12,
  22 44:5,6
  94:12

morning   4:18

mortgage
  56:19
  57:5,12,22
  63:3 64:5

mortgager
  59:22

Mos  12:3

mother  32:20
  92:14
  114:16,21

motion  7:25

move  38:18
  45:16
  61:21 67:8
  93:11

multiple
  30:6 62:5
  85:18

_____

**N**
_____

N.A.  4:23
  67:1

names  7:17
  23:5 54:5

narrow  27:2

national
  13:11,12
  14:1
  16:10,22,
  25 17:3,
  11,14 33:2
  50:7 53:7
  57:18 92:3

Nations
  62:8,23

nationwide
  126:1

natural  36:1

naturally
  34:21

necessarily
  122:17

needed  16:3

neglect  55:8

negligible
  38:3,6

neighborhood
  51:7

Newport  4:20

News  4:20

Noble  58:9

normal  17:4
  39:13,14
  40:6
  127:6,14

Northern
  95:12

Notary  4:2

notated  71:3

notation
  71:10 73:7
  99:17

notations
  105:21

note  14:11
  26:12
  28:13 58:2

notes  53:17
  104:10
  106:25

noticed
  90:25

nowadays
  63:7

number  4:7,
  10 21:16,
  21 34:4,5
  71:14 73:4
  77:12
  84:19
  85:7,23
  86:3 87:11
  88:4 89:10
  91:8 93:24
  94:3,22
  98:5,9
  101:6
  102:7
  106:21,23,
  24 107:2
  108:1
  109:10
  111:18
  116:5
  118:3

numbered
  71:13

numbers
  88:4,7
  93:23

101:21
107:1,5,
11,14,19
109:7
119:8

_____

**O**
_____

oath  14:24
  52:13

object
  38:17,23
  79:15
  82:21
  93:11
  113:8

objecting
  124:8

objection
  10:11
  15:17
  18:14
  19:11
  25:4,5
  26:13 29:1
  38:16
  40:23
  42:24 44:9
  45:3,15,
  17,25 50:4
  53:21
  67:8,13
  68:20
  71:25 73:6
  74:23 80:5
  81:3,24
  93:12

**JAMES F. LYNN on 08/25/2016**

96:16 99:6
105:15
124:5

**obligation**
15:7 19:7
23:1 51:13
96:17,19,
22,24

**obligations**
14:25
17:17
21:1,18
22:11 50:2
52:4

**observed**
105:10

**observing**
35:7

**obtain** 70:25
78:8 87:12

**obtained**
13:24
18:24
41:14
51:19
72:24

**obtains** 85:3

**occasion**
54:18

**occasions**
62:5

**occurred**
23:18
104:6,7

**occurring**
105:25

**occurs** 85:3

**October**
60:13

**offered** 63:1
82:18

**office** 7:6,
7,9,15
16:2 86:6
88:21,23,
25 89:7
90:3
112:12,20
114:4,6,24
115:8,10
116:7

**officer**
13:11,12
78:14

**oftentimes**
35:25

**Omega** 14:12
15:2 17:19
19:9 47:23
48:2,9,12,
21 49:4,
14,24
50:12,15,
22 51:1,6,
9,10,16,20
52:6 53:4

**one's** 64:12
87:20 90:2
96:21

100:18
103:13
104:6
107:12
109:2
115:1
119:15
120:8,17
121:6
123:23
127:24

**ongoing**
34:25 50:7
52:24

**online** 20:15
28:18,25
31:12,13
32:7,10
34:12
39:4,5
75:5,13,
16,20 76:6
77:6 84:17
91:19,23
92:5

**onset** 47:16

**open** 38:13
83:22 85:8
98:15,18

**opened** 72:20
83:22
104:5

**opine** 26:18
29:19
42:14
59:23

65:15

**opining**
44:24
59:24

**opinion** 8:23
9:1,8,21
10:3,4,9
11:4,6,17
13:2 14:4
20:25
23:1,16
29:19
43:2,8
45:1,2,5,
13 54:9
63:1,9,10,
17 64:17,
21 65:1
71:23
72:23 73:3
74:11,19
77:11
80:20
81:6,10
82:6,8,17,
21 85:1,6
89:16
91:23 92:2
100:10
123:23
126:13,22
127:12
128:4,16

**opinions**
11:14 22:7
29:14
54:14

56:22
71:14
74:14 81:8
82:1

**opportunity**
14:19
18:18 72:6

**opposed**  77:4
96:9,14

**opposite**
30:19
33:4,6
35:19

**order**  47:5
49:23

**original**
130:1

**originated**
23:4 41:19
75:6 76:24

**originating**
20:12
76:18
91:20

**origination**
84:3

**Oscar**  24:8

**outcome**
28:14

**outlines**
116:18

**output**  24:2

**owe**  82:15

97:15

**owed**  81:21,
22

**owes**  80:22
82:12

**owned**  112:14

**owner**  113:4

**owners**  6:22

**ownership**
84:8

―――――――――――
            **P**
―――――――――――

**p.m.**  46:11
83:15,18
117:7,10
129:22
130:4

**pages**  49:20,
22 52:17
56:4 60:6
88:3 93:25
95:1
119:2,10

**paid**  43:12
45:22,23
47:19 48:5
54:2 63:23

**pain**  11:1

**Pamela**  57:17

**paper**  19:23,
25 115:14

**paragraph**
71:17,23,

24 72:2,24
73:3 77:12

**paraphrasing**
127:3

**part**  10:3
11:5 14:17
15:22
17:2,9
18:25 19:3
22:2 29:13
32:21
34:23
49:10
66:18
101:20
102:22

**participants**
18:7

**parties**  14:6
24:13
35:19
55:24
58:24
117:14

**parts**  11:19

**party**  20:18,
19 32:5,8,
9 33:4
39:17 45:7
54:14
72:21 95:7
114:23

**past**  60:3

**paste**  125:1

**pattern**

64:10

**pause**  53:13

**pay**  20:18
63:20,25
64:1

**paying**
126:15,17

**payment**
38:10

**pays**  20:22

**penalizes**
45:7

**people**  36:2,
6

**percentage**
44:25
45:11,21
49:13,15

**Performance**
47:23
48:2,9,21
49:4,24
50:15,22
51:1,6,9,
10,16 52:7

**performed**
110:25

**period**  26:4
49:9 92:21
100:13

**periodically**
10:13

**permanent**

**JAMES F. LYNN on 08/25/2016**

5:7

**permit**  8:15

**permitted**
8:11,13
40:10

**person**  20:13
32:8,9,19
33:6,11
48:16 71:5
74:21
80:24
83:23
85:18
88:19
94:17,19
97:1
104:24
113:2,22

**personal**
17:5,8
52:12 85:4
88:11
113:23

**personally**
71:5 91:25

**persons**  16:1
94:19

**pertaining**
82:1

**phone**  61:16
105:25
106:23

**phones**  109:7

**phrase**  39:8

**physical**
7:7,9,15
33:23

**picture**
112:22

**piece**  114:14
115:13

**place**  32:7
78:25
112:24
122:5

**plaintiff**
4:8,19
55:14
58:16 60:4

**plaintiff's**
38:18

**plaintiffs**
57:5 58:7

**plaintiffs'**
23:5

**plan**  8:11

**plastic**
114:14

**plea**  80:10

**PO**  90:15
91:4

**point**  5:13
16:24 18:3
29:5 33:14
47:10
55:17
68:18
69:8,25

79:4,10,20
86:6
87:14,16
90:1,8
92:19
105:6
107:24
112:14
118:15,21
126:24
127:13

**points**  37:8

**police**  69:8
73:4,9,10,
11 74:4,6,
12,15
77:13,14
78:14,20
79:4,6,10,
18 80:13
92:20
112:25

**position**
86:19

**possession**
40:13
43:20
69:13,17
80:14 95:9

**possibility**
128:20

**post**  86:6
88:21,23,
25 89:7
90:3
112:12,20

**114:4,5,24**
115:8,10
116:7

**postal**
112:19
113:20

**posted**  106:5

**potential**
127:21

**Practices**
14:20

**preceded**
19:19
50:12

**precise**
16:16

**precisely**
110:14

**prepared**
52:6

**preponderance**
13:10

**presence**
92:14

**present**  7:14
8:16 113:4

**presentation**
120:15

**presented**
53:2,3

**presenting**
58:1

pretext
  73:25

pretty   89:1

prevalence
  30:24

prevalent
  37:6

preventing
  127:17

previous
  21:6 23:18
  118:8

previously
  99:9
  110:16,17
  111:1,3,6

Primary   92:9

principal
  47:9 80:12

principally
  128:10

principals
  17:6

print   89:18

Print's
  89:13

prior   5:23
  18:2 40:19
  51:6 53:6
  60:6 65:9,
  25 69:15
  77:24
  78:4,9,14,

20 79:7
80:15

problem
  67:18

problematic
  63:13
  106:12

problems
  57:9,11

procedure
  8:9 28:2
  119:15
  120:8,12
  121:2

procedures
  14:20
  24:16,25
  27:14,25
  28:3,6
  34:10,11
  40:6
  120:13
  121:6
  127:7

proceed
  46:16

proceeding
  97:9

process   8:8
  17:9,11,24
  18:1 19:20
  25:16
  26:20
  28:10
  39:14,15

100:18,22
101:1
112:22
113:3

processed
  28:12
  115:1

processes
  101:1

processing
  24:18 25:2
  91:9

produce   21:3
  61:25

produced
  41:12
  53:15
  78:12
  79:18
  90:14 91:2
  110:12
  116:16

product   37:6

production
  21:13
  22:18 23:7
  78:18
  102:15
  116:4
  119:8

professional
  13:8,10
  18:2 31:1

profile   37:9

program
  14:14,15,
  17 15:11
  17:19 18:7
  48:12
  50:23 51:4
  52:5

programs
  14:12
  51:19

proof   82:12

proper   39:9
  118:6,24
  122:1,6

properly
  29:10

properties
  8:10 9:1

property
  8:25 55:21

proposition
  5:12

proprietary
  128:9

prosecute
  80:8

protect
  34:12

protection
  14:18 43:6
  49:17
  56:1,3
  63:11

**JAMES F. LYNN on 08/25/2016**

| | | | |
|---|---|---|---|
| **prove** 80:4 | **punched** 36:3 | | 129:18,20 |
| 81:11,21 | **punitive** | ——————— | |
| **provide** 61:5 | 72:21 | **Q** | ——————— |
| 73:9,10 | **purchase** | ——————— | **R** |
| 74:12 | 94:13 | **qualified** | ——————— |
| 96:17 | **purchased** | 8:6 9:3,7, | **range** 51:25 |
| 112:22,23 | 49:8 | 19,20 | **rank** 78:14 |
| **provided** | **purported** | 18:12 | **rare** 30:14, |
| 27:8 32:10 | 5:21 20:25 | 22:25 | 15,17 |
| 38:18 43:8 | 74:19 | 24:22 | **rate** 99:25 |
| 47:6 53:17 | 77:11 | 64:17,21 | 100:1 |
| 54:7 73:4, | 121:7 | 65:1,4 | **reach** 127:13 |
| 11 74:3,6, | **purpose** 9:8 | **qualifier** | **reached** |
| 15 75:11 | 15:23 | 45:9 | 94:18 |
| 77:13,15, | 52:21 | **qualify** 8:1 | 123:25 |
| 18 79:6 | 129:3 | **qualifying** | 128:11 |
| 87:25 | **pursuant** | 8:4 | **reaching** |
| 90:14 | 124:16 | **question** | 29:14 |
| 95:24 | **purview** 84:7 | 7:11,13,14 | **reacting** |
| 103:5 | **put** 8:19 | 10:15,17, | 29:13 |
| 123:9 | 13:21 | 25 18:23 | **read** 11:23 |
| 125:20 | 35:13 41:8 | 28:16 32:6 | 12:1,4,11, |
| **providing** | 46:24 47:2 | 35:14 | 12,18,21 |
| 81:8 | 51:15 | 38:17 | 13:1,15,16 |
| **proving** 82:4 | 73:20 | 45:20 | 18:13,18 |
| **provision** | 82:22 91:3 | 76:25 77:1 | 26:2 27:8 |
| 15:1 | 96:5,22 | 93:3,13 | 30:24 31:2 |
| **prudent** | 99:21 | 104:11 | 32:12 |
| 127:2,3 | **puts** 73:13, | 113:9,10, | 35:17 41:7 |
| **psychological** | 25 74:6 | 12,25 | 76:17 87:1 |
| 42:18 | 96:13 | 114:10 | 88:4 95:22 |
| **public** 4:3 | **putting** 19:8 | 121:13 | 102:9,16 |
| 112:6 | 89:20 | 126:2,5 | 104:9 |
| **pull** 91:5 | | **questioning** | 110:1 |
| 98:21 | | 82:23 | 111:4 |
| | | **questions** | 121:5 |
| | | 53:17 | |

JAMES F. LYNN on 08/25/2016

122:8,17,
22 123:14
126:25

**readily**
37:20

**reading**
12:1,14
23:25 41:2
70:9 97:15
122:13

**ready**  46:16

**real**  14:19
55:13 57:8

**realize**
125:2

**reason**
107:13

**reasonable**
26:5 31:4
82:2 115:6
125:8,9,
11,17
126:2,23
127:4,9,
12,16,24

**recall**  6:2,8
7:17 12:1,
6,13 17:25
20:17
21:11
22:24
23:11
30:16
32:14
36:24

40:19
41:19
43:7,11
51:11
55:23
59:14,21,
22,23,25
60:9,15
61:7,13,
17,19,23
62:24
63:1,4,6
64:18,24
65:18,21,
24 66:4
67:20
76:14 78:7
86:24 87:3
91:13
100:24,25
101:4
115:23
118:13

**receipt**
34:20

**receive**
26:11,19
28:11
112:19,21

**received**
25:14
28:9,12
31:11 64:1
69:8 76:2
79:22
80:17
88:19

91:16
92:22
97:12
100:5
110:5,6
114:21
115:4

**receives**
25:16

**receiving**
89:9

**recent**  5:23
65:9

**recently**
22:15 23:4
69:8

**receptionist**
18:11

**Recess**  46:12

**recipient**
88:25

**recognize**
89:12,14
95:19
102:11

**recognized**
104:24

**recollection**
20:1 30:17
49:18
52:19
69:14 75:9
76:13
101:4

103:8
107:3,9
115:22,25

**recommending**
11:9

**record**  5:2
9:10,11,
13,14
25:23,24,
25 46:11,
13 58:2
60:9
83:16,17
109:2
115:11,13
117:7,8,9
122:7
129:24

**records**  27:5
44:15
72:22
80:22 90:2
104:6

**reference**
44:20 72:7
97:22 98:6
110:9
124:17
125:12

**referenced**
17:19 37:4
71:1 87:3
103:12

**references**
119:4,10

**referencing**
  119:14

**referred**
  62:22 87:2
  92:23
  109:21

**referring**
  54:20
  86:21
  119:2

**refers**   25:18

**refresh**
  55:11
  102:19

**refresher**
  118:12

**refute**   82:14

**regard**   25:5
  35:5 64:4

**regarded**
  51:13

**region**   14:16

**registered**
  112:20

**registration**
  112:25

**regulations**
  11:11
  14:18
  49:17

**Reid**   76:21

**rejected**
  105:4

**related**
  27:18
  29:18
  58:24

**relates**
  98:11

**relationship**
  50:15
  51:8,10

**relevant**
  37:5,17
  73:8,14,25
  74:7,21
  76:5 100:8
  125:20

**reliability**
  84:12
  86:15

**reliable**
  13:20
  84:11
  96:2,7

**relief**   57:14

**rely**   30:7

**remedies**
  122:21

**remember**
  23:21,23
  35:19
  51:25
  52:16
  57:13
  65:16
  107:10
  112:12

**remove**   39:9
  40:10
  41:24 80:9

**render**   8:12,
  13 9:1,7,
  21 10:9
  13:2 23:1,
  16 118:19

**rendered**
  8:23 11:24
  20:24
  39:19

**rendering**
  11:14 13:1

**repeat**
  10:16,24
  18:23
  26:14 29:8
  40:2
  104:18
  107:21

**rephrase**
  21:8 86:1

**replicated**
  53:4

**report**   10:8
  11:17
  17:20
  20:12
  35:14
  36:12
  46:19
  60:16,18,
  20,21
  61:5,25

  62:6,9
  66:22 68:4
  70:10,12,
  15,18
  73:4,10,11
  74:5,6,12,
  15 77:13,
  14,19,24
  78:4,9,25
  79:6,12,
  18,22
  80:13,16,
  22 81:1
  82:12,18
  92:19 99:2
  103:10,11,
  12 104:2
  123:7,13
  124:10
  125:9,23

**reported**
  39:21 40:7
  60:13
  99:10
  124:14

**reporter**
  4:2,13,17
  10:22,23
  33:16 59:1
  72:14
  104:18
  107:21
  122:24
  129:25

**reporting**
  7:22 10:5,
  10 11:7,18

```
12:18 13:6        85:21            31:5 44:1,        reside   5:6
14:7,23           92:16            7,22 45:23
15:1,6,9,         93:7,19          54:13             residence
12,21             97:11            56:19,20            112:24
16:9,19           98:1,11                              113:20
19:7 20:10        101:25          request
21:1,18           102:13           53:25             residential
22:9,12           106:18           54:1,3             57:8
23:2,8,10         115:1            95:24 96:2
24:17             116:13,20        97:2              resolve
25:1,10,          117:13,19                           121:7
16,18             118:6           requested
26:6,10,19        119:13           26:2 117:3        resolved
27:14,19,         123:11,15,                          39:23,25
21,22,25          18 124:3,       requesting          40:4,10,11
29:17,22,         15 125:21,       127:18             99:9
23 30:19          24 128:1,                           121:15
31:16             23 129:6        require
42:3,19                            94:12             Resource
43:3,10          reports                              116:13
48:6,19           13:8,15         required            119:13
49:15,22          17:7 65:4        31:16 43:5
50:3 51:4,                                           resources
5 52:20          represent        requirements        129:12
53:8 55:8         4:19 24:9        25:11 42:4
59:15             28:24            53:9              respect
60:8,12           35:12            120:14             15:9,24
63:5              42:13            124:24             21:3 22:9
64:15,22          66:14            126:3              24:14
65:2,17                                               41:20 52:3
67:16            represented      requires            55:5,8
73:20             32:20            12:18              74:2 77:11
74:5,7,12,        35:22            120:11             84:4 104:7
16,20             54:18            121:8              115:23
76:12             56:16 57:2       127:9              125:19
80:21             59:17 60:7
83:25             67:11           research           respective
84:1,15                            18:4 41:22         100:21
                 representing      79:4 94:18
                  11:9 24:23       127:10            respond   26:4
                  29:24 30:1                          99:2
                                  reserved
                                   130:5            responded
                                                     71:15
```

**JAMES F. LYNN on 08/25/2016**

98:23
128:15

**response**
53:16
95:25
96:6,22
99:14
103:2

**responsibiliti
es** 101:3

**responsibility**
85:22

**responsible**
42:10,14
72:21
84:24
86:20
92:16
110:16,17
111:1,6

**responsive**
93:12
113:8

**rest** 18:23
109:25

**restate**
114:10

**result** 11:12

**results**
125:23

**resume** 6:4,5
7:19,20
8:19,21
14:11
46:1,19,23

47:6 48:20
53:12
62:14

**retail**
47:11,15

**retained**
61:17
68:18
69:25

**retaining**
61:22

**revenue**
44:16

**review** 7:19
51:20
72:25
78:11
79:12
95:11
105:10
110:12
114:19
120:20,21
121:17
122:19
123:23
125:20

**reviewed**
18:25
39:12 54:6
92:22
97:18
102:15
110:13
120:16

**reviewing**
70:3,13
75:9
118:25

**right-hand**
97:14

**Rita** 58:9

**road** 83:11

**Robinson**
4:2,14

**rough** 100:21

**rule** 42:22
127:3

**ruled** 8:3,15

**rules** 13:18

**running**
129:17

**Runyon** 62:7,
8,16

_____

**S**

_____

**S-2b** 23:15
52:4

**S-h-a-n-t-e-l-
l** 76:22

**S-n-u-f-f-e-r**
65:13

**safety** 15:1

**sample** 88:8,
13

**Sanders**
12:3,21

**sat** 5:24
6:3

**satisfied**
121:17

**Saturday**
61:23

**SB** 22:16

**Schmitt**
100:20,25

**schooled**
117:20

**scope** 21:13

**score** 36:23
37:11,14,
16,18,22
38:10
103:16
123:8

**scorecard**
37:7,12,15

**scored** 38:5,
7

**scores**
36:16,25
37:5

**scoring**
36:15 39:1

**Scott** 57:20
62:7

**scratch**
118:13

**screen** 90:13

**JAMES F. LYNN on 08/25/2016**

**screens**
 116:4

**search**  15:4
 21:3 91:8

**Sears**  4:21
 10:11
 11:25
 12:4,9
 15:17
 18:14
 19:11
 22:14 25:4
 26:12 29:1
 30:21
 33:17
 38:15,22
 40:23
 42:24
 43:18 44:9
 45:3,15,25
 46:6 50:4
 53:21
 59:10,12
 61:5,16,21
 62:2,10,21
 63:17,19,
 23 65:8,10
 66:5,14
 67:8,11,
 13,18
 68:12,20
 69:14,22
 71:25
 73:6,22
 74:23
 79:13,14
 80:5 81:3,

 7,13,17,24
 82:9,19,24
 83:3,6,10
 87:16,25
 90:9,17,24
 96:16
 101:13
 113:7,10,
 25 114:8,
 14 115:14,
 17,20
 116:2
 117:2,5
 121:22
 124:5,8
 126:17,18
 129:19

**Sears's**
 18:22
 65:14

**secondary**
 5:8 112:23

**section**
 22:16
 23:11
 70:24 71:2
 73:9 92:22
 119:6
 124:18
 125:12
 126:4

**security**
 34:4,5,11
 84:19
 85:7,23
 86:3 87:11
 94:13

**seek**  18:12

**seeking**  10:8
 57:14

**segment**
 15:6,11
 49:22

**seminal**
 123:1

**send**  12:9

**sends**  20:4,
 19

**sense**  56:3
 65:4

**sentence**
 77:17

**separate**
 22:6 66:19
 105:21
 107:19

**Sergeant**
 69:18
 78:13

**series**  8:9,
 25

**serve**  19:2
 47:14
 123:12

**servicer**
 67:5

**servicers**
 56:19

**services**  4:9
 13:25 14:5

 15:16 27:4
 43:23
 44:1,3,7,
 14,17 58:9
 62:8 65:12
 66:3,18

**servicing**
 58:6

**serving**
 43:23
 44:13

**session**
 93:25

**set**  47:2
 55:22
 121:1

**settle**  65:6

**settled**
 21:25 22:2
 66:12

**settlement**
 14:20 84:4

**Settlements**
 55:13

**settles**  83:2

**Shantell**
 76:21

**share**  18:6

**sharing**
 67:10

**short**  110:1

**shorthand**
 106:14

**JAMES F. LYNN on 08/25/2016**

show  32:17
 76:23
 78:12,19
 93:23
 104:6
 111:24

showed  99:2

showing
 60:10
 93:25
 107:12
 115:13

shown  27:5

shows  94:3
 105:11

side  56:16,
 24 97:14
 102:13

signature
 91:12,15,
 16,21
 93:6,18
 94:12
 130:5

signatures
 35:11,14

signed  80:23
 81:2 91:25

significance
 93:1,9

significant
 10:3 11:5,
 16 18:25
 19:3

signify
 91:12
 122:9

Silver  5:7
 66:9,11

similar
 31:15
 102:14

simply  23:23
 63:3 73:9

simultaneously
 106:4

Sincerity
 57:21

single  21:21

single-family
 113:19

sir  5:1,6
 69:10,22
 117:12
 130:1

sit  119:17

situational
 15:11

skip  72:2
 89:10 95:1
 103:16

skyrocketed
 83:5

Sloan  59:6,
 14

small  17:3,5
 89:13,19

Smith  57:21

Smoke  94:4

snippet
 109:19

snow  66:10

Snuffer
 65:12

Social  34:4,
 5 84:18
 85:7,23
 86:2 87:6,
 7,11

sold  52:8
 95:6

solicitation
 88:8,14,20
 89:7
 103:22
 114:8

solicited
 91:25

sort  15:14
 88:8

sought  77:24
 78:3,19

source  16:8
 19:5 70:25
 76:18
 85:17
 86:4,23,25
 87:2 91:20
 123:24
 126:11
 128:9,24

sources
 19:12
 84:10,21
 85:18
 86:18,21
 87:4
 123:24
 126:12
 127:5
 128:8,22
 129:9,14

south  14:16
 94:3

speak  24:6
 28:11
 32:25
 34:9,14
 44:19
 55:24
 66:15 71:5
 75:21
 76:7,19
 77:6,8
 85:5

speaking
 36:18 64:6
 110:9

specialized
 26:18
 27:13 29:6

specialty
 9:25

specific
 9:23 11:19
 12:16
 15:10 21:7

**JAMES F. LYNN on 08/25/2016**

22:25
36:17 61:8
104:10
107:10

**specifically**
14:1 19:14
23:9 24:6
28:11
34:14
44:19 52:1
54:20
55:25

**specifics**
61:20
67:20
75:22

**speculation**
96:16

**spell** 59:1
72:14

**spelled**
117:23

**spend** 5:10

**spending**
109:25

**spent** 70:3

**spinning**
75:12

**spoke** 61:15
71:7 78:13

**spoken** 42:2

**spouse**
109:14,18,
21,22

**spreadsheet**
35:1

**spreadsheets**
34:20

**Spring** 5:8
66:9,11

**stack** 87:22

**staff** 16:3

**stamp** 79:1,2

**Stamped**
87:20

**stand** 19:16
35:2 46:7
83:14 98:7
129:21

**standard**
24:12 30:6
43:5 54:12
117:18
120:22
121:19
124:2
125:7,10,
16 126:23
127:15
128:16

**standards**
126:14

**standing**
17:9

**stands** 5:4

**start** 9:17
16:15,21
55:10

118:22

**started**
51:25 56:8
98:14

**starting**
52:14

**state** 4:3
5:1,6
6:10,12
45:5
65:19,22
71:14 73:4
104:2

**stated** 73:10
124:10
126:14

**statement**
79:6
100:11
122:20
123:6,12

**statements**
17:6 90:6
93:22
94:20
114:9

**states**
58:15,16,
17 119:25
125:18

**station** 94:6

**statute**
22:18
26:23
125:3

126:14,25

**statutes**
15:20

**statutory**
124:17

**steal** 112:5

**Steven** 65:12

**stop** 34:12
59:5 68:6

**straightforwar
d** 64:6,9

**strange**
32:15

**street**
33:15,16
89:25
112:7
113:19

**stricken**
38:19

**strike** 45:16
67:9 74:13
93:12

**strived**
96:18

**structure**
67:6

**structured**
51:1

**studied**
102:16

**subject** 7:25
30:5 39:2

**JAMES F. LYNN on 08/25/2016**

42:15 63:2
68:25
115:4
118:20

**submitted**
33:7 40:5
86:8 91:19

**subpoena**
21:3 53:16

**subscriber**
97:13,17,
19,25
98:4,7,8

**subsequent**
40:5 51:8
111:24

**substantiate**
86:18

**sued** 57:18

**suffer** 42:21

**sufficient**
42:17

**suit** 57:12

**summarize**
70:14

**summarizing**
71:14

**summer** 102:4

**Sun** 57:5,12

**supplemental**
90:10
123:9

**supplementatio
n** 90:13

**supplemented**
91:3

**supplies**
25:21

**support**
53:13
54:18
74:17
83:25
84:15
86:18,19
100:14

**supposed**
15:8 16:18
30:2
124:24

**supposedly**
103:23

**survey** 15:15
19:8

**swear** 4:17

**switch** 101:7

**symptoms**
128:9

**system** 24:5,
7,10 86:16
89:22,24
96:15
98:18
105:2,22
106:5,11
107:12

---
**T**
---

**T-h-i-e-m**
60:4

**tab** 90:25
91:2

**takes** 100:22
128:17

**taking** 112:8

**talk** 10:20,
21 16:6
46:18 47:9
120:6

**talk-off**
109:14

**talked** 47:12
69:19

**talking** 34:1
49:10 90:8
110:9
113:18,19,
20 115:18

**tape's**
129:17

**task** 34:24
47:21

**taught**
14:13,25
50:20

**teacher** 52:9

**teaching**
16:1 17:18
37:3 50:21

**technical**
24:4 29:25
98:21

**telephone**
100:15

**telling** 53:1
120:17
121:5

**temporary**
7:5

**ten** 52:18
63:18,22

**tendency**
65:5

**Teresa** 58:20
66:2

**term** 37:15
89:17

**terminal**
75:3

**terms** 22:1
26:4 41:20
64:7,13
98:18
123:8

**test** 84:11,
20 85:25
127:8

**tested** 36:6

**testified**
6:14,18
7:18,21
11:22
27:17

57:24
68:17
74:19 81:7
82:13
86:24
100:25
113:22
126:10

**testify** 8:9
9:2,19
27:12
29:11
42:17
114:3

**testifying**
52:12

**testimonial**
93:16
94:17
105:10

**testimony**
8:12,14
12:8 20:7
23:18 26:2
30:14,18,
25 31:1
36:1 38:18
67:8,10
72:12
76:17
105:1,8
106:16
109:21
118:19

**testing**
128:9

**text** 125:1

**theft** 16:19
30:4,10,
11,12,15,
20,24 31:3
34:13,16
35:7
42:19,21,
22 72:20
80:13,18
82:4 85:3,
19 91:24

**thief** 80:8
83:23
85:3,6
87:10

**Thiem** 60:4

**thing** 27:11
40:7 63:12
93:10
110:21
119:17,20

**things** 10:13
34:21 35:1
91:1
103:19
113:21
120:22

**third-party**
28:17

**thought** 7:11
90:4 107:1
109:19

**three-day**
49:14

76:20

**time** 4:11
5:10 6:3,
18 7:5 8:5
9:15 15:20
17:16
22:4,5
25:22
26:1,4
37:1 38:12
46:10,14
49:5 51:2
52:25 55:6
56:14
61:17 62:5
69:11,24
70:3 82:25
83:14,18
90:2 97:20
100:24
106:3
110:1
114:25
115:6
117:6,10
124:1
129:21

**timeframe**
61:20

**timely** 71:15

**times** 5:20
6:16 8:3
14:15 19:9
21:6 23:20
52:6 57:24
63:18
92:21

120:16
121:18

**timing** 25:13
27:18

**Timothy** 57:4

**today** 5:16,
23 10:2
43:17,18
52:12
87:23
88:19
90:10,17
98:19
101:12

**Today's** 4:11

**told** 22:15
54:11
100:13

**tool** 19:19

**top** 8:18
9:17 33:24
68:11,14
70:20 71:9
97:14
101:20
102:20,23
107:19
109:11
110:16,17

**topics** 9:18

**total** 48:2

**touched**
48:19

**tracked** 33:3

**JAMES F. LYNN on 08/25/2016**

**trade** 37:22
39:2 83:25
116:17,24

**training**
13:12 19:9
48:6,15
49:25
50:21
51:19,20,
22

**transcript**
73:1 76:21
112:18

**transcripts**
12:8 70:4

**transmission**
77:6,9
116:19

**Transunion**
20:11
73:18
75:10
110:7
117:13
122:23
124:15

**travel** 66:8

**traveling**
5:11

**travesty**
112:18

**trial** 6:14,
18 7:18,21
64:18,23
66:7,10,13

111:16

**triggers**
36:1

**troubled**
11:8

**true** 53:19,
22 64:19
87:13
96:23
100:13
103:7

**Trust** 57:5,
12

**truth** 45:6
90:5

**truthfully**
118:19

**truthfulness**
79:5

**TU** 110:6

**turn** 20:11
53:12
54:17 61:1
69:5,20
70:18 71:9
75:8
106:21

**turning** 91:8

**turns** 72:9

**type** 30:20
88:13
99:15,24

**typical**

63:25 64:4

**typically**
85:8
112:20
116:25

---

**U**

---

**U.S.** 112:19

**U.S.A.** 58:8

**Uh-huh** 20:4
90:7 120:9
122:2

**Uh-oh** 60:25

**unaware**
71:19

**uncover**
83:25

**underlined**
70:21

**understand**
5:16 9:3
11:13
13:15,18
18:4 20:9
24:4,10,
12,20
25:13,15
28:14
30:6,13
31:18
38:2,5,9
39:24 40:8
45:6 54:21
64:7 75:17

76:25
80:20
84:25
90:22 95:8
97:18
99:3,21
101:20
102:21
103:9
104:13,22
105:24
107:11
110:24
113:25
116:14,22
120:3
121:3,4

**understanding**
12:17 24:1
29:16 58:1
73:15,16
74:1,9,25
80:14,20
91:18,22
92:21 98:4
105:1
114:23
117:25
118:12

**understood**
19:23
41:1,9
66:19
72:12 98:2
105:4
107:6,18

**undertaken**

34:24

**underwriting**
17:9 84:3

**unfavorable**
54:10

**unique** 66:6,
11 76:16
97:19

**United**
58:15,16,
17

**unknown** 96:4

**unlawful**
121:1

**unreasonable**
126:24
128:17

**unrecognized**
104:17

**untimely**
71:20

**untrue** 73:19

**unusual**
106:18

**update** 120:1

**updated**
39:21
40:25
41:19 96:1

**user** 13:8
104:13,23
105:17

—————————

**V**
—————————

**validate**
40:14
128:22

**validating**
39:15

**values**
117:21,22

**variable**
99:25

**veracity**
84:11
86:15

**Verification**
19:17

**verified**
96:6,14,
23,25
128:12

**verify** 40:14
128:22

**verifying**
39:15 82:3

**version**
49:25
102:23

**versus** 11:23
12:3 23:6
35:18
54:24,25
55:12
56:17
57:5,17,20

58:6,8,20,
23 60:4,11
62:8 65:12
66:2
122:23,24
127:10
128:1

**victim** 85:4

**victim's**
113:13

**Victor** 58:23

**video** 120:23

**videoconferenc
e** 4:20

**Videoconferenc
ed** 4:1

**view** 102:20
127:23

**viewed**
102:24
103:2

**Vincent**
58:20,21,
24

**violated**
43:4,9

**violating**
128:19

**Virginia**
4:20 12:24
33:15
42:11
65:21 66:9

**voice**
104:17,24
105:3,4,7

**vulnerable**
91:24

—————————

**W**
—————————

**wait** 58:19
94:5
113:18
115:15

**walk**
119:17,19

**Walmart** 94:8

**wanted** 61:21

**wanting** 78:3

**Washington**
5:9

**ways** 49:3
52:2 80:12

**wealth**
29:16,22

**website**
31:16
35:23
36:5,9
67:25
76:2,12

**week** 23:4
49:9 50:25
68:21
69:15

**weeks** 43:19

61:19

**weight**   37:21

**weights**
  37:17

**Weinberg**
  4:15

**Werner**   4:22

**West**   33:14
  65:21 66:9
  69:8 79:4,
  10 86:6
  92:19
  107:24

**wife**   7:5

**wild**   63:24

**William**   4:8
  60:5

**Wilson**   58:20

**withdraw**
  35:14
  45:20
  74:18
  126:21

**woman**   105:12

**Wood**   4:8
  39:24,25
  40:3,16
  42:14 65:9
  76:11 77:2
  80:4,18
  84:16
  86:9,20
  87:5,6,7,8
  88:14,19

95:3,4
100:11,15
101:21,22
105:3
106:17
107:14
109:17,22
111:1
112:14,15
114:21
115:3
121:16
124:12
129:7

**Wood's**   10:2,
  8 32:20
  53:15 79:6
  85:22
  87:10 90:3
  93:6,19
  105:14
  114:15
  115:1
  121:15
  129:13

**Woodson**
  69:18,19
  78:14,20

**word**   11:8

**work**   17:1
  23:19
  43:12,21
  44:20,21
  47:23 48:3
  49:24
  50:11,12
  53:5 54:3

57:25
61:23
97:20
103:17

**worked**   13:7
  15:2 16:2
  17:1 21:12
  30:5 40:24
  41:18
  43:25 44:2
  46:3 62:1,
  6 64:14
  69:24
  74:10

**working**
  13:25
  16:10,12
  18:8 21:9
  31:5 37:2
  50:13
  56:14

**works**   15:12
  57:25
  80:21

**worth**   49:21

**worthy**   79:23

**would've**
  17:23

**write**   26:25
  51:17
  122:20

**writes**   28:8

**writing**
  70:12

**written**   8:23
  65:4

**wrong**   81:11

**wrote**   65:13

_____

|   X   |

**XB**   37:23,24
  38:7,9
  39:1,9
  40:10,17,
  21 41:15,
  20 42:4
  98:25
  100:3
  122:6

**XC**   121:25
  122:3,5,7,
  8,14

**XH**   99:2,3
  100:3
  121:6
  122:17,19

_____

|   Y   |

**Y"'s**   103:1

**year**   8:7
  17:21,22
  22:3 36:21
  43:22
  44:5,7,12,
  16 52:1
  61:15,24

**year-by-year**
  44:4

**JAMES F. LYNN on 08/25/2016**

```
years  15:5
  16:10
  21:6,11
  23:19 33:2
  40:25
  43:25
  47:14 51:3
  52:18
  60:14
  102:19
  118:14

yesterday
  22:14,15
  23:3
```