**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**DAVID WOOD,**

      **Plaintiff,**

v.                                                      **No. 3:15-cv-594-MHL**

**CREDIT ONE BANK, N.A.,**

      **Defendant.**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, David Wood, by counsel, and in support of his Motion for Partial Summary Judgment, he states as follows:

**OVERVIEW**

Plaintiff seeks an Order finding that (1) Credit One Bank's reporting that Mr. Wood opened and was responsible for its credit card account was inaccurate; (2) Credit One Bank failed to conduct a reasonable investigation of Mr. Wood's disputes; and (4) Credit One Bank failed to truthfully report the results of its investigation back to the consumer reporting agencies.

Mr. Wood is a victim of familial identity theft.  Credit One Bank sent an unsolicited promotional offer for a pre-approved credit card to Mr. Wood at a rural post office box that he shared with his family (including his now estranged mother, Dyan Lollis).  Ms. Lollis diverted his mail and formally applied for the card over the Internet with Credit One Bank, using Mr. Wood's personal identifying information.

Over the course of several years, Mr. Wood has battled Defendant to remove its credit reporting.   After their investigations, all of the co-defendants have resolved their case, including

1

Midland, the entity to whom Credit One sold the very same fraudulent account.  And yet, absent the Court's pre-trial resolution of this dispute by partial summary judgment, the case will go to trial.  There are two bases underlying Credit One's intransigence.  First, Defendant believes it can use the fact that the fraudster in this case is the Plaintiff's mother to persuade a jury to nullify its otherwise uncontestable liability.  Second, Credit One's policy (antiquated after *Johnson v. MBNA*) is that the ID Theft consumer must disprove (prove a negative) his or her liability for an account.  He must "prove a negative."

Accordingly, and to make it possible for the two sides to understand the other's view of the case, Plaintiff is asking the Court to consider whether there is more than a scintilla of evidence that Mr. Wood is actually liable for Credit One's account and whether or not a furnisher conducts a reasonable investigation when it refuses to remove a reported account unless the consumer disproves its attribution.

## STATEMENT OF UNDISPUTED FACTS

**The following material facts are undisputed:**

1.      David William Wood did not request, apply for, open, authorize, consent to the issuance of, obtain, or use a Credit One Bank credit card of any kind. (Wood Dep. Tr. 87:7-88:4)(Ex. 1).

2.      Credit one is "a credit card company issuing credit to those who need credit restoration help."  (Chu Dep Tr. 19:22-23)(Ex.10).

1.      Credit One Bank issued a credit card account in Mr. Wood's name without first obtaining a request from him or consent in writing to the issuance of a credit card.  (Def.'s Resp. to Interog. #2(a); #4)(Ex. 2); (COB00065)(Ex. 6).

2.      Credit One Bank sent a written solicitation for a pre-approved Credit One credit card to David Wood at 2115 Lee Street, West Point, VA 23181. Credit One stated that on or

about June 4, 2013, the solicitation was fulfilled via Credit One's website – meaning that it opened the account online. (Def.'s Resp. to Interog. #2(a)); (COB00065)(Ex. 6); (James Lynn Dep. Tr. 31:10-22)(Ex. 7)(Maragos Dep. Tr. 18:22-19:11)(Ex. 8)[1].

3.      Credit One Bank claims to have a "good faith" belief, but no proof that Mr. Wood accepted the offer of credit or used the credit card.  (Def.'s Resp. to Interog. #4).  In fact, Defendant's Rule 30(b)(6) designee answered the question, "Q. Do you know how Mr. Wood allegedly opened this account?" with the binding answer, "I do not know for certain." ). (Maragos Dep. Tr. 20:21-23).

4.      Credit One Bank Account notes demonstrate that a woman tried to activate the card and add herself as an authorized user, before instead activating the card by automated means (IVR). (Maragos Dep. Tr. 19:14;20:5); (Lynn Dep. Tr. 32:10-32:21)(COB00065). After issuing the credit card with a credit limit of $300, the card was used by someone other than Mr. Wood and quickly exceeded the credit limit within two billing cycles.  (COB00015-40)(Ex. 9).   No payments were ever made on the account.  (COB00015-40)(Ex. 9).

5.      At times between 2012 and 2013, Mr. Wood lived in various places in Virginia. At time, he lived with his mother in West Point, Virginia, or his grandmother in New Kent County, Virginia.  Other times he rented rooms or stayed with friends.  (Wood Dep. Tr. 11:25-17:23.) [2]

6.      At times when Mr. Wood lived with his mother in West Point, Virginia, mail would be delivered at P.O. Box 725, West Point, Virginia.  (Wood Dep. Tr. 18:1-19:1; 23: 22:12-24:5).  The only way to receive mail in West Point, Virginia, was at a post office box. (Wood Dep. Tr. 23:22-24:1).

---

[1] The Maragos deposition was actually a Rule 30(b)(6) deposition of Credit One.

[2] David Wood is 28 years old.

7.      Mr. Wood did not own that post office box or the key to the post office box. (Wood Dep. Tr. 18:13-19:14).

8.      Mr. Wood's mother, Dyan Lollis, and/or his stepfather owned P.O. Box 725. (Wood Dep. Tr. 18:18-20; 22:18-21).

9.      Lollis had access to Mr. Wood's mail that went to the post office box and Mr. Wood suspected that his mother and possibly his aunt had been tampering with his mail. (Wood Tr. 27:3-30:6; 30:14-31:3).

10.     Although Lollis initially denied tampering with Mr. Wood's mail, she ultimately admitted that she opened credit card accounts using his identity and supplied a notarized affidavit stating that the accounts were "opened against his will" but instead by "Dyan Lollis." (Wood Tr. 34:6-36:3; Ex. 3, at 4).

11.     Mr. Wood believed his mother was the person who stole his identity in order to open up credit accounts in his name. (Wood Tr. 71:1-72:3).

12.     Mr. Wood believes that his mother has moved to Florida, but he has not had contact with her since 2015. (Wood Tr. 44:7-15).

13.     When Mr. Wood learned of credit cards that had been opened fraudulently in his name, he immediately and repeatedly began to try to correct the accounts. (Wood Tr. 81:13-85:19): (Maragos Tr. 17:3-19:8). He disputes the Credit One account to this day. (Compl.)(Doc. 1).

14.     Mr. Wood contacted the West Point Police Department, the New Kent County Sheriff, and the Orange County, Florida Police Department in order to try and make police reports and request an investigation. (Wood Tr. 43:18-44:1).

15.     Upon learning of the fraudulent account, Mr. Wood contacted Credit One Bank directly by phone and in writing, he estimates at least twenty five contacts. (Wood Tr. 81:13-

85:19): (Maragos Tr. 17:3-19:8).  But Credit One Bank did not correct the fraudulently-opened account.  (Wood Tr. 81:13-85:19).

16.     Mr. Wood found a credit repair organization on the internet that he contacted in order to obtain assistance since Credit One had done nothing to correct the fraudulent account. (Wood Tr. 61:4-63:6).

17.     Several important aspects of Credit one's dispute procedures were uniformly followed for Mr. Wood's disputes.  First, for an Identity Theft dispute where the consumer represents that his name, social security number and other identifiers were used by a fraudster to open the subject account, literally the only things Credit One will ever do are: (1.) check to confirm that the personal identifiers listed in the ACDV provided by the CRA (name, address, SSN and date of birth) match the same identifiers contained in Credit one's own computer account record; and (sometimes) (2.) check Accurint to see if the address in Credit one's account record is linked (in some way) to the disputing consumer.  Nothing else is ever attempted for such a dispute even though the consumer's actual dispute is that another person has fraudulently provided and used the consumer's identifiers to open the account.  Defendant's Rule 30(b)(6) witness described the Credit one "investigation" as follows:

> [W]e received the ACDV, with some document attached, from Equifax was the source. The claim came through with identity theft account fraudulently opened. Cardholder claims identity theft. Address provided by cardholder matches that of our records in both CAS and cach systems. Address provided on app was a P.O. Box 725, West Point, Virginia 23181. It is linked to the cardholder through Accurint. And the decision was not to modify anything, change anything. The cardholder was responsible based on the matches.

(Maragos Tr. 26:8-25).

18.     For example, Ms. Chu testified that she "verified that the cardholder was responsible because of the address matches."  (Chu Dep. Tr. 99:20-23)(Ex. 10).  Credit One's investigation of Mr. Wood's allegation that the account was fraudulently opened consisted of

reviewing its own documents and seeking information from third parties that would validate "Mr. Wood's identity, in terms of his name, social security number, date of birth" using Experian social trace, and his address using Accurint.  (Lanham Tr. 71:1-19).  There is no documentary evidence that Experian Social Trace was ever used to investigate Mr. Wood's dispute.

19.     Credit One's dispute agents earn $15 per hour.  (Chu Dep. Tr. 33:21-34:5)(Ex. 10).  As they process "anywhere between 80 to 100 [disputes] a day" and average about "five minutes" per dispute, the dispute agents are paid less than $ 1.00 for each dispute investigation. (Chu Dep. Tr. 41:7-42:1)(Ex. 10).

20.     Dispute agents do not use a telephone to "investigate" a dispute. (Chu Dep. Tr. 52:12-14)(Ex.10).

21.     Once one Credit One agent has processed a dispute and determined that Credit one will still report the consumer as "responsible", it will not separately "investigate" any subsequent ACDV dispute for at least 30 days.   It does not do any further investigation of the subsequent dispute.  (Schmidt Tr. 44:2-10).

22.     To best summarize Credit one's "investigation" policy – unless the consumer can disprove the challenged account, Defendant will continue to report that he is responsible:

> *Q. What underlying documents* does Credit One have in its possession that *demonstrate that Mr. Wood is liable* on the account?
>
> *A.*   Based on our investigation and the information that -- in reviewing from the CRA, *there was nothing to indicate that it was not Mr. Wood who in fact opened the account.*

(Lanham Dep. Tr. 72:24-73:6).(Emphasis added).

23.     The Credit Reporting Resource Guide, provided to Credit One by the CRAs details the proper way to respond to an ACDV and in particular how to use a field labeled, Compliance Condition Code or "CCC".  (Ex. 5). The proper code for an account that remains in

dispute is "XB," which indicates, "Account information disputed by consumer under the Fair Credit Reporting Act."   If that code is used, the impact on the consumer's credit score is "negligible."  (Lynn Tr. 37:21-38:3). See also *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 146–47 (4th Cir. 2008) ("BB & T therefore could have indicated that it considered the debt uncollectible and also reported that Saunders had disputed the debt; if BB & T had done so, Trans Union would have reported both the debt and the dispute and would not have considered the debt in determining Saunders' total credit score. Thus, BB & T's decision to report the debt but not the dispute resulted in a much lower credit score for Saunders than a report of both the debt and the dispute.")

24.   Notwithstanding this obligation to report by the "XB" code that the subject account was still disputed by Mr. Wood, Credit One followed its own policy of never doing. Here, not only did Credit One fail to report that the subject account remained disputed, but it reported the exact opposite substituting the "XH" code, which expressly means that the account is no longer disputed – the dispute was resolved.  (Ex. 5)

25.   On April 15, 2015, Mr. Wood wrote a letter that he sent to each Trans Union, Experian and Equifax to dispute the inaccurate consumer reports in which Credit One Bank included the fraudulent account that he never opened.  (Ex. 3).  In those letters, Mr. Wood specifically alerted the consumer reporting agencies and Credit One Bank to the fact that he was "a victim of fraud on several accounts opened in my name by my mother" and that the account did not belong to him.  He supplied a handwriting exemplar, as well as the affidavit signed and notarized by his mother, in which she took responsibility for opening the account. He provided his phone number and asked to be called if he could supply any additional information.  (Ex. 3).

26.   Equifax, Trans Union and Experian "handle most consumers' trade line disputes they receive through an electronic information network called e-OSCAR (the Online Solution for

Complete and Accurate Reporting). The e-OSCAR network began in 1993 as a system run by the Associated Credit Bureaus, now the CDIA. Four companies built and still own e-OSCAR – Equifax, Experian, Innovis, and TransUnion. The current Internet-based system was created in 2001; the CDIA created the Online Data Exchange (OLDE) in 2006 to independently operate the system. In 2011, 16,000 furnishers connected to these companies through e-OSCAR." Consumer Financial Protection Bureau, KEY DIMENSIONS AND PROCESSES IN THE U.S. CREDIT REPORTING SYSTEM, December 2012 available at http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf last visited August 31, 2016.

27.    Experian, Trans Union and Equifax each transmitted the disputes to Credit One Bank as a standardized electronic form - an "automated consumer dispute verification" or "ACDV" - using the e-Oscar system. (COB00047-58)(Ex. 4.)

28.    In this case, Credit One produced ACDVs that related to Mr. Wood's disputes, each one reflecting a separate dispute conveyed to it by the credit bureau.  (Ex. 4).  On July 11, 2014, Credit One processed an ACDV from Equifax that indicated a dispute code "103: Claims true identity fraud, account fraudulently opened. Confirm complete i.d."  It also provided FCRA relevant information that Mr. Wood had disputed the account directly to Credit One and had called back every other week for four months while Credit One said it was under investigation, "Not a word was said to me." (COB00047)(Ex. 4). Credit One agent Shantel Reed processed the ACDV and verified the account.  (COB00048).  The only evidence Credit One produced in response to discovery about what steps Ms. Reed took to investigate Mr. Wood's dispute appear in the account history notes indicate "previously resolved/no action taken."  (COB00062).  The account history notes indicate "RCVD ACDV FR EQ D/C 103 CH CLAIMS ID THEFT ADDRESS." (COB00059).

29.    On April 28, 2015, Credit One processed an ACDV from Equifax that indicated a

dispute code "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete i.d." Credit one agent Alexandra Chu processed the ACDV and verified the account. (COB00049-50).  Credit One supplied a Compliance Condition Code (CCC) of XH, that the account was previously in dispute but is now resolved as well as an ECOA code of "joint contractual liability." The Response Data field reflected and Interest Type Indicator that included a notation of "Fraud with docs." The account history notes indicate "RCVD ACDV w/IMAGES FR EQ" and that the account was verified by checking Accurint to see that address provided on the application  P.O. Box 725 was "linked" to the cardholder. (COB00063).

30.     On April 28, 2015, Credit One processed an ACDV from Trans Union that indicated a dispute code "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete i.d." The FCRA relevant information field read, "Provided police report." Alexandra Chu also processed that ACDV and verified the account.  (COB00051-52).  Credit One supplied a Compliance Condition Code (CCC) of XH, that the account was previously in dispute but is now resolved. The Response Data field reflected and Interest Type Indicator that included a notation of "Fraud with docs." The account history notes indicate "RCVD ACDV w/IMAGES FR TU" and that the account had previously been investigated and no further action taken. (COB00063).

31.     On May 5, 2015, Credit One processed an ACDV from Equifax that indicated a dispute code "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete i.d." Alexandra Chu processed the ACDV and verified the account.  (COB00053-54). Credit One supplied a Compliance Condition Code (CCC) of XH, that the account was previously in dispute but is now resolved. The Response Data field reflected and Interest Type Indicator that included a notation of "Fraud." The account history notes indicate "RCVD ACDV w/IMAGES FR EQ" and that the cardholder was previously found responsible for the account

and no further action was taken. (COB00063).

32.     On June 10, 2015, Credit One processed an ACDV that indicated a dispute code "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete i.d." Alexandra Chu processed the ACDV and verified the account.  (COB00055-56).  Credit One supplied a Compliance Condition Code (CCC) of XH, that the account was previously in dispute but is now resolved. The Response Data field reflected and Interest Type Indicator that included a notation of "Fraud with docs." The account history notes indicate "RCVD ACDV w/IMAGES FR EXP," and that Accurint indicated that Mr. Wood was linked to the address of a motor vehicle registration and phone number on the account, and thus found him responsible for the account. (COB00060).

33.     On June 15, 2015, Credit One processed an ACDV that indicated a dispute code "103: Claims true identity fraud, account fraudulently opened. Confirm complete i.d." Jennifer Schmitt processed the ACDV and verified the account.  (COB00057-58).  Credit One supplied a Compliance Condition Code (CCC) of XH, that the account was previously in dispute but is now resolved. The Response Data field reflected and Interest Type Indicator that included a notation of "Fraud." The account history notes indicate "RCVD ACDV w/IMAGES FR EXP" and that the cardholder was previously found responsible, no further action taken. (COB00063).

34.     Credit One's Rule 30(b)(6) witness Kim Maragos, assistant vice president for customer service, testified that Credit One does not retain any of the documents sent to it through e-Oscar.  (Maragos Tr. 28:11-16).

35.     Credit One produced the 2011 Consumer Reporting Resource Guide, which provides the reporting requirements for the Compliance Condition Code (CCC). (COB00066, 192-193)(Ex. 5).  The CCC used by Credit One in each of Mr. Wood's ACDVs was "XH," which according to the CRRG means, "Account previously in dispute – now resolved, reported

by data furnisher." The XH CCC is inaccurate and misleading because Mr. Wood continued to dispute Credit One's verification of the account and did not agree that the dispute was resolved.

36. Credit One did not use the XB or XC codes required by the CRRG to indicate that the consumer still disputed the account or disagreed with the results of the investigation. (COB00192-193). Credit One followed its policy to use the XH CCC whenever it completed an ACDV, and never to note the account as disputed regardless of the result or the nature of the consumer's challenge. (Chu Dep. Tr. 89:22-90:4; 93:1-11). Credit One never used the XB code when an account was a charge-off. (Chu Tr. 93:1-11); (Schmitt Dep. Tr. 40:2-13; 47:1-49:14)(Ex. 11).

37. Credit One's corporate designee claimed that it follows the Consumer Data Industry guidelines for credit reporting and the Credit Reporting Resource Guide. (Lanham Dep. Tr. 40:3-23; 47:24-48:2).

38. Credit One knew that Mr. Wood continued to dispute the results of the investigations regarding the fraudulent account, yet they continued to report the CCC as "XH." (Lanham. Tr. 69:1-70:25).

39. To this day, Credit One maintains that Mr. Wood is liable on the account. (Lanham Tr. 87:21-88:2).

40. Credit One's own records captured the "IP Address" of the person who activated the subject account. An IP Address is "an address associated with a specific device, whether it be a computer or a cell phone." (Chu Dep. Tr. 28:11-22). However, Defendant admits that its dispute agents never check or rely upon such information in handling disputes.

41. Credit One's corporate designee testified that it was Allan Shutt, Credit One's former legal and compliance officer, who established Credit One's policies and procedures for conducting reasonable investigations and for choosing the correct CCC. (Maragos Tr. 25:1-6;

29:2-30:3)(Lanham Tr. 17:22 – 26:24). Mr. Shutt's represented that he was familiar with the

Fourth Circuit's holding in *Johnson v. MBNA*, in pertinent part,

"I believe that case evaluated what an investigation would entail, and they coined term that is not in the statute or regulation, may not even be in any of the regulatory materials. But, basically insinuated that an investigation had to be a reasonable one. And then they used the definition from a dictionary about what reasonable meant, and it's not really different, I think, than what most people in the industry were already doing . . .I would argue Credit One Bank was doing that." (Shutt Tr. 88:15-25).(Ex. 13).

Mr. Shutt's interpretation of the Fourth Circuit's decision in *Saunders v. BB&T*, stated in pertinent part,

Again, I mean, I can't speak directly for them but both of those Fourth Circuit decisions interpreting investigations, you know, were considerations that people reviewed to make sure that they were following, at least in that jurisdiction, what the courts were dictating as investigations should be. I personally didn't feel, again, that there was any real change as to in those two cases how investigations were being performed. (Shutt Tr. 90:11-25)(Ex. 13).

## STANDARD OF REVIEW

Partial summary judgment shall be granted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, the movant must support its factual position by citation to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A). *See Ratledge v. Science Appl. Int'l Corp.,* 1:10-CV-239, 2011 WL 652274 (E.D. Va. Feb. 10, 2011)(relying on established summary judgment standards where "[t]he inferences drawn from the underlying facts must be construed in the light most favorable to the nonmoving party" and "Rule 56 mandates that summary judgment be entered against a party 'who fails to make a showing sufficient to establish the existence of an element essential to

that party's case.'")(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) and quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

Under Rule 56(c)(1)(B), the movant may demonstrate that there is no dispute of a material nature, including by showing that a non-movant cannot produce admissible evidence to establish or controvert a fact.  This is consistent with the established case law, for example, when the non-moving party will bear the burden of proof at trial, the moving party's burden can be met by "pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp..* 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

In this case, it is the party moving for summary judgment, the Plaintiff, who bears the burden of proof at trial.  The Plaintiff must establish there is no credible dispute as to the facts. Here the movant has established the material facts necessary to prevail at trial through the testimony of defendants' employees, un-rebuttable witnesses and documents produced by the defendant itself.  With the existence of such evidence, the non-movant may not merely rest on conclusory allegations but must present evidence demonstrating that there is a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 140 (3d Cir. 2004); s*ee also Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 868 (E.D. Va. 2009)(explaining that "a party who raises an affirmative defense but fails to make a sufficient showing on an element of that defense may not defeat summary judgment for the plaintiff").

For the dispute to be considered genuine, the evidence must demonstrate that a reasonable jury could return a verdict for the non-moving party. *Addison*, 2011 WL 587005, at *8.  The court may not weigh the evidence or attempt to determine the truth of the matter, but

only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

## ARGUMENT

### I.  CREDIT ONE'S REPORTING THAT MR. WOOD OWED, USED AND DEFAULTED UPON A CREDIT ONE ACCOUNT WAS INACCURATE.

One of the basic elements of Plaintiff's claim is proof that Defendant's credit reporting was inaccurate.  As the Court has previously explained in granted partial summery judgment to the consumer in a comparable FCRA credit card case involving familial identity theft,

> [T]he resolution of the issue of the accuracy of the information is a question of law that would have to be resolved by the court anyway at some point. Accordingly, the motion will be entertained and granted for the reasons already discussed.
>  The undisputed facts establish that the Plaintiff was ... but not obligated for the indebtedness. Therefore, the information provided to the credit bureaus ... was inaccurate.

*Alabran v. Capital One Bank*, No. CIV.A. 3:04CV935, 2005 WL 3338663, at *8 (E.D. Va. Dec. 8, 2005).  And as has been frequently stated, "It is not seriously debated, however, that factually incorrect information is "inaccurate" for purposes of FCRA."  *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014).

There is no question in this case that Credit One's reporting was not accurate.  It is a simple enough question – did David Wood apply for and agree to pay the Credit One account? The answer is even simpler:  No, he did not.  He never applied for the Credit One card and did not authorize Dyan Lollis to act on his behalf.  The Defendant has produced no application or encumbrance signed by or attributable to Mr. Wood.  The documents produced in this case by the Defendant reveal a loan application that would have put a reasonable lender on notice of the fraud.  The extension of credit could not have occurred without Credit One's blind eye.

14

This case is packed with itemized indicia of obvious fraud, but Credit One chose only to investigate Mr. Wood's name, address and date of birth. Facts that would have been known to the ID thief – his mother. But the simplest accuracy facts are these:  the Plaintiff has and will – by affidavit and deposition in this case – provided unqualified testimony that he never applied for the Credit One account, never agreed to pay it, and never authorized his mother to open the account in his name.

A Federal Study Commission concluded that in those cases where the ID Theft involved the opening of new accounts or the committing of other types of fraud, of those who knew the thief's identity, 37% of victims identified a family member or relative as the perpetrator. *Identity Theft Survey Report*, Federal Trade Commission (November 2007), at 28.   Such cases, especially one like in this case, are always difficult on family victims.  Creditors often count on the unwillingness of the family victim to press criminal charges or expose their criminal loved one to prosecution by the lender.  But this strategy, relied on by Credit One, was not available in this instance as the ID thief mother who admitted by way of affidavit that she was the person who opened the account without her son's knowledge. Credit One's credit reporting was objectively inaccurate.  It is factually impossible for Mr. Wood to have been delinquent or in default on an account that he never had, a fact that cannot possibly be in dispute.

In order to prevail on summary judgment, Plaintiff must demonstrate first that Credit One's reporting that Mr. Wood owned the Credit One account is inaccurate.  Mr. Wood's testimony is evidence that he did not open, authorize or use the account is one way of demonstrating that the report was false.  Credit One has no evidence that Mr. Wood opened the account – it sent an unsolicited offer to an address it could not be sure that he lived.  Even though this is not an action to enforce a contractual obligation, it is relevant and useful to analyze whether Credit One could have proved that the account belonged to Mr. Wood under basic contract principles

applicable to consumer credit cards.  The analysis leads to one conclusion: Credit One could never prevail in an action to enforce a contractual obligation.

**The most basic and enduring law of contract requires that all the essential elements of contract formation be met.**

No contract exists unless all of the elements are established. "[T]here must be a complete agreement, which requires acceptance of an offer, as well as valuable consideration." *Dean v. Morris*, 287 Va. 531, 536, (2014)(quoting *Montagna v. Holiday Inns, Inc.,* 221 Va. 336, 346, (1980)). This court recently explained:

> A contract is formed when the offeree communicates acceptance to the offeror. *See Levy v. Beach Inv. Corp.,* 212 Va. 19, 20 (1971). "An offer, which is usually but not always a promise, is a manifestation of a willingness to enter into a bargain." *Chang v. First Colonial Sav. Bank,* 242 Va. 388, 392 (1991) (citing Restatement (Second) of Contracts § 24 (1981)). "The offer identifies the bargained for exchange, and creates a power of acceptance in the offeree." *Id.* (citations omitted). "The most basic principle of contract law is that when one party makes an offer that is clear, definite, and explicit, and leaves nothing open for negotiation, acceptance of that offer by the other party will complete the contract." *Judicial Inquiry and Review Comm'n of Va. v. Elliott,* 272 Va. 97, 119 (2006) (citing *Chang,* 242 Va. at 391).

*Howell v. Kelly Servs., Inc.*, No. 1:12-CV-821, 2015 WL 2070348, at *3 (E.D. Va. May 1, 2015), appeal dismissed, 627 F. App'x 229 (4th Cir. 2015).

In this case, the only element that the Defendant could prove is that it unilaterally sent a written offer of credit to Mr. Wood at an address where it thought it might reach Mr. Wood. (Def's Resp. to Interog. #4).  There is no evidence at all that Mr. Wood ever accepted the offer, let alone an unequivocal acceptance of the offer of credit.  Therefore, absent evidence that Mr. Wood unequivocally accepted the Credit One offer of credit, there can be no enforceable contract and no right to report Mr. Wood in delinquent and in default on a credit card that didn't belong to him.

16

**Virginia Law provides that a consumer is not liable in the absence of a request for, consent to issuance of, or use of a credit card.**

Credit One's position has been and is that it need not prove an asserted indebtedness; instead the consumer must disprove it.  But the actual law does not work that way.  In fact, both federal law and the Virginia Code have statutory provisions directly addressing this 'obstinate creditor' problem.  In Virginia

> A. A cardholder who receives a credit card from an issuer, which card the cardholder has not requested nor consented to the issuance of in writing, nor used, shall not be liable for any amount owing because of a use of the credit card.
> B. The failure to destroy or return an unsolicited credit card shall neither:
> 1. Be evidence of a cardholder's request for or consent to the issuance of the credit card, nor
> 2. Constitute negligence on the part of the cardholder.
> C. Use by an authorized agent of the cardholder shall be the equivalent of use by the cardholder. The burden of proving the authority of an agent shall be upon the issuer.

Va. Code Ann. § 6.2-425. The plain text of this statute appears to be custom designed for the facts of this case. Credit One could never have demonstrated that Mr. Wood requested or consented to the issuance of the Credit One account in writing because it was opened online without a signature.  It does not have any document showing Mr. Wood's signature. Credit One cannot show that Mr. Wood used the card at all – it has not produced any evidence that Mr. Wood made any purchase on the card, and thus it cannot hold him liable simply because Credit One issued the card and someone made charges on it.  The un-rebutted evidence is that Mr. Wood did not open the account, nor did he authorize anyone to do so.  Credit One has failed to prove that Mr. Wood granted authority to any agent to open and use an account.

**Federal Law also provides that a consumer is not liable in the absence of a request for, consent to issuance of, or use of a credit card.**

Based on the evidence adduced in this case so far, it is also clear that Credit One could not prevail in any action to force liability upon Mr. Wood under Federal law, which provides:

> **(b) Burden of proof**
> In any action by a card issuer to enforce liability for the use of a credit card, the burden of proof is upon the card issuer to show that the use was authorized or, if the use was unauthorized, then the burden of proof is upon the card issuer to show that the conditions of liability for the unauthorized use of a credit card, as set forth in subsection (a) of this section, have been met.

15 U.S.C.A. § 1643. In this case, the Defendant could not carry the burden if it sought to enforce the obligation because there is no evidence that any person used the credit card with or without authority. Like the defendant in *Fifth Third Bank/Visa v. Gilbert*, the quantum of evidence is insufficient to carry the burden of proof. 478 N.E.2d 1324, 1326 (Hamilton Cnty. Oh, Sept. 28, 1984). There is no evidence that Mr. Wood opened or used the account, or that he consented to the opening and use of the account. There is no testimony from any employees of the retail locations where the card was used to tie Mr. Wood to any purchase. Credit One could never prevail in demonstrating that Mr. Wood owned the account under § 1643.

## II.    CREDIT ONE VIOLATED § 1681s-2(b) AS A MATTER OF LAW.

### A.    Statutory Background

In 1996 Congress amended the FCRA, Pub.L. 104-208 (Sept. 30, 1996), as explained in the Senate Report:

> Currently, the FCRA contains no requirements applying to those entities which furnish information to consumer reporting agencies. Section 413 imposes certain obligations upon those furnishers of information to consumer reporting agencies. The Committee believes that bringing furnishers of information under the provisions of the FCRA is an essential step in ensuring the accuracy of consumer report information.

S. Rep. 104-185, 104th Cong., 1st Sess. 49 (1995); see *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002). Among the changes that Congress enacted was

§ 1681s-2, which imposes on those furnishers[3] of information, such as Credit One, detailed and specific responsibilities.

This Court provided one of the earliest[4] and most complete summaries of this FCRA "furnisher" section, which governs the present case. *Ayers v. Equifax Info. Services*, CIV. 3:03CV551, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003). After two plaintiff jury verdicts in this Court, the Fourth Circuit had the opportunity to consider and further define these "s-2(b)" furnisher obligations. See *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426 (4th Cir. 2004); *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142 (4th Cir. 2008). Both of these decisions remain the seminal appellate cases regarding this section.

As currently enacted, § 1681s-2(b) requires:

> **(b) Duties of furnishers of information upon notice of dispute**
> **(1) In general**
>> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall–
>>> **(A)** conduct an investigation with respect to the disputed information;
>>> **(B)** review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>>> **(C)** report the results of the investigation to the consumer reporting agency;
>>> **(D)** if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>>> **(E)** if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting

---

[3] A furnisher is defined as a person who "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer." 15 U.S.C. § 1681s-2(a)(2).

[4] The Court's opinion in Ayers was actually decided earlier than Judge Wilkins' opinion in *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426 (4th Cir. 2004) and Judge Motz's opinion in *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142 (4th Cir. 2008), both of which accepted the same conclusions as to a § 1681s-2(b) as did the Court in *Ayers*.

agency only, as appropriate, based on the results of the reinvestigation promptly–

    **(i)** modify that item of information;

    **(ii)** delete that item of information; or

    **(iii)** permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b).

Fair Credit Reporting Act cases based on a furnisher defendant's failure to investigate and correct credit reporting information nearly always require proof of the same narrow set of liability elements: Was the disputed information inaccurate?  Was an "investigation" conducted?  Was the investigation "reasonable"?[5] Did the Defendant correctly respond to the dispute after the investigation process?[6]

**B.**    **As a Matter of Law, Credit One does not Conduct "Reasonable Investigations"**

    **1.**    **An "Investigation" Must be a Rigorous Searching inquiry**.

If the Defendant did not conduct any "investigation," the Defendant violates the statute. *Johnson,* 357 F.3d at 431-32.  Partial summary judgment is appropriate when the investigation is wholly lacking.  See *Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008) (Granting summary judgment for consumer when furnisher's investigation consisted of merely comparing the ACDV to its computer records); *See also Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1071 (9th Cir. 2008) ("A reinvestigation that overlooks documents in the court file expressly stating that *no* adverse judgment was entered falls far short of this standard. On our own motion, therefore, we grant summary judgment[.]" ).

Section 1681s-2(b)(1)(A) is Plaintiff's primary FCRA claim. Credit One did not conduct anything that a jury could reasonably find constituted an "investigation", let alone a reasonable

---

[5] *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 431-32 (4th Cir. 2004).

[6] *Saunders v. Branch Banking & Trust Co. of VA*, 526 F.3d 142, 147-49 (4th Cir. 2008); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162-63 (9th Cir. 2009).

one. .   The leading case in this regard is the Fourth Circuit's *Johnson v. MBNA Am. Bank, NA,* 357 F.3d at 431-32 (affirming jury verdict before Judge Williams for a furnisher violation of § 1681s-2(b)(1)(A)).   *Johnson* and its progeny long ago established that the § 1681s-2(b)(1)(A) directive to furnishers to "conduct an investigation with respect to the disputed information" required a "reasonable investigation," that is, a "careful" or "searching inquiry," as opposed to a "superficial" one, "to determine whether the disputed information can be verified." *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004).   The Courts of Appeals continue to unanimously follow this "reasonable investigation" standard. *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012) ("We join every circuit to have addressed this duty in holding that the investigation an information furnisher undertakes must be a reasonable one. *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430–31 (4th Cir.2004); *accord Chiang*, 595 F.3d at 37; *Gorman*, 584 F.3d at 1155–57; *Westra*, 409 F.3d at 827 (assuming a reasonableness standard). As several of these circuits agree, the term "investigation" itself denotes a "fairly searching inquiry," or at least something more than a merely cursory review. *See, e.g., Gorman*, 584 F.3d at 1155–57 (reviewing definitions of "investigation" considered by courts interpreting § 1681s–2(b))").

This standard for an investigation requires more than a superficial data conformity check of comparing the consumer's identifying information provided by the CRA to the identifying information in the furnisher's computer record.   In a decision adopting the Fourth Circuit's *Johnson* standard, the Court of Appeals for the Ninth Circuit explained:

> The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. **By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.** Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete **\*1156** credit reporting." *Nelson,* 282 F.3d at 1060. **A provision that required only a cursory investigation would not provide such**

> **protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.**

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155-56 (9th Cir. 2009) (emphasis added).

Generally, it has been considered to be a jury question whether the furnisher has instituted and complied with the requirement to implement and follow reasonable procedures. *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 416-17 (4th Cir. 2001)("The issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases.' *Guimond v. Trans Union Credit Info. Co,* 45 F.3d 1329, 1333 (9th Cir. 1995). *See also Andrews v. TRW Inc.,* 225 F.3d 1063, 1068 (9th Cir. 2000) ("'It would normally not be easy for a court as a matter of law to determine whether a given procedure was reasonable in reaching the very high standard set by the statute ....'"). However, when the Defendant's procedures were unreasonable *because they provide no avenue to correct a known inaccurate report and no meaningful investigation*, then no reasonable jury could ever find in favor of the defendant. *Johnson*, 357 F.3d at 431-32; *Saunders*, 526 F.3d at 148-49; *see also Addison* 2011 WL 587005, at *8-9 (describing the circumstances where, on summary judgment, a court may resolve factual disputes when the non-moving party's evidence simply "strains credulity"). In this case, the actual degree or quality of investigation is not an issue.

**2.     Nothing Mr. Wood Could Have Done would have Resolved His Dispute Because Credit one does not Investigate for Substantive Information.**

The undisputed evidence establishes that Credit One never investigated Mr. Wood's disputes when it received the ACDVs. Defendant did not just undertake a poor investigation, but instead it did not undertake *any* real investigation of the Plaintiff's specific dispute – that Wood was not the person who applied for, signed to or used Credit One's credit card. She had

knowledge of his personally identifying information, and lived with him so that the addresses would necessarily match. All that Defendant did was data-match, comparing the name, address and social security number in its computer screen with the same fields in the "ACDV" forms sent by the reporting agencies.   Defendant did take it one step further, but only to confirm the identifying information about the Plaintiff.   Even though they access databases such as Accurint, the point is that it is not an investigation into the consumer's actual dispute but instead doing exactly what was done in *Johnson*, verifying the identifying information that it has in its system.

Put in clearer context – this is what Credit One did (and still systemically does):  The consumer contends that an identity thief obtained his name, address, and social security number and gave it to the lender to obtain a fraudulent account.    When the consumer disputes the account, stating that he was the victim of the theft and unlawful use of his name, address and social, the lender "investigates" such dispute by simply checking to see if the name, address and social in its computer assigned to the disputed loan belongs to the protesting consumer. Of course they match.  That's the problem in the first place.  The Fourth Circuit addressed this in 2004.  Credit One knows that *Johnson* is the law.  And yet it ignores its obligation to conduct a "meaningful, searching inquiry."

When a furnisher conducts only such a "data conformity" check in lieu of a § 1681s-2(b) investigation, the Defendant violates the FCRA as a matter of law. In a federal case in the Fifth Circuit relying heavily on *Johnson*, the District Court considered a procedure nearly identical to that used by Credit One.    *Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008).  The Court entered summary judgment for the consumer-plaintiff, explaining:

> However, whether such a "reasonable" investigation has been conducted is generally a question of fact for the jury. See *Cousin v. Trans Union Corp.,* 246 F.3d 359, 368-69 (5th Cir.2001).

**GE received the TransUnion ACDV on September 29 and returned it the same day with only a verification of identity information. There appears to have been no investigation of the disputed status of the claim at all**.

[…]

This response, in the face of the statutory requirement to perform a reasonable investigation, was, at the very least, negligence on the part of the GE employees. **While this finding is one generally left to the province of the trier of fact, in this case the court finds that no reasonable juror could conclude otherwise but that GE's "investigation" of the dispute noted in the ACDVs from both TransUnion and Equifax was not "reasonable" as a matter of law.** Thus, there being no disputed issue of material fact in this regard, the plaintiffs are entitled to summary judgment on the issue of negligence.

*Robertson v. J.C. Penney Co., Inc.*, CIV.A. 2:06CV3KSMTP, 2008 WL 623397 (S.D. Miss. Mar. 4, 2008) (emphasis added).   And just this July, the Eleventh Circuit held:

> These definitions support the conclusion that § 1681s–2(b) requires some degree of careful inquiry by furnishers of information. In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s–2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as "verified." *See id.* at 431 (reversing summary judgment because a reasonable jury could find a violation of § 1681s–2(b) where the furnisher "d[id] not look beyond the information contained in the [internal data file] and never consult [ed] underlying documents such as account applications"); *cf. Cahlin*, 936 F.2d at 1160 (observing that a claim for failure to investigate "is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts").

*Hinkle v. Midland Credit Mgmt., Inc.*, No. 15-10398, 2016 WL 3672112, at *6 (11th Cir. July 11, 2016).

Credit One's defense – that it actually complied with the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s-2(b) and attempted a "reasonable investigation" – is an illusion. Even though it accesses commercially available databases such as Accurint, the substance of its so-called investigation is limited to rubber-stamping the information it already has in its system. Like the Defendant in *Johnson*, all that Credit One actually does when a consumer makes a FCRA dispute is "(1) confirm[] that the name and address listed on the ACDVs were the same as the name and address contained in the [Defendant's computer system], and (2) not[e] that the

[computer system] contained a code indicating that [the consumer] was the sole responsible party on the account." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004) ("The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications.").

Mr. Wood told Credit One and the CRAs over and over that his mother used his personally identifying information without his knowledge to open the account.  Of course, linking the information she used to open the account is going match. This is not a meaningful inquiry into whether Mr. Wood's identity was used to fraudulently obtain a credit card from Credit One.

## C.  Credit One also violated § 1681s-2(b) (1)(C) by failing to accurately report the results of its "investigation" – that the account remained in dispute and that it had not "verified" the debt as Mr. Wood's.

Before the events here, federal precedent had also established that § 1681s-2(b)(1)(C)'s duty to "report the results of the investigation to the consumer reporting agency" incorporates the obligation from § 1681s-2(a) "that furnishers have a general duty to provide accurate and complete information" to the CRAs when so responding.  *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 149-50 (4th Cir. 2008).   Credit One failed the Plaintiff, and the consumer reporting agencies, in a second way:  it failed to accurately report back to the CRAs all that it actually knew about the challenged account.  It failed to alert the CRAs that Credit One was aware of a *bone fide* dispute of the account.  Had it done so, the CRAs would have deleted or suppressed the account.

This claim was the entire claim before first Judge Dohnal and the jury, and then the Fourth Circuit in *Saunders*.  The bank defendant, B.B. & T. admitted that its investigation would have revealed the presence of a consumer dispute.  (In *Saunders* the Plaintiff had several direct

communications with the furnisher, which is exactly what happened in this case as well).  The jury found and Judge Dohnal sustained a violation based solely on the furnisher's failure to advise the CRAs of the disputed nature of the account.

As with *Johnson*, the Fourth Circuit's decision in *Saunders* has been adopted by multiple courts.  The Ninth Circuit did so in *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162-63 (9th Cir. 2009):

> The Fourth Circuit has recently held that after receiving notice of dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under § 1681s–2(b). *See Saunders v. Branch Banking & Trust Co. of Va.,* 526 F.3d 142, 150 (4th Cir.2008). […] This reasoning is persuasive. […]  As the Fourth Circuit observed, holding otherwise would create a rule that, as a matter of law, an omission of the disputed nature of a debt never renders a report incomplete or inaccurate. *See Saunders,* 526 F.3d at 150. Not only might such a rule intimidate consumers into giving up bona fide disputes by paying debts not actually due to avoid damage to their credit ratings, but it also contravenes the purpose of the FCRA, to protect against "unfair credit reporting methods." *See* 15 U.S.C. § 1681(a)(1).

*Id*.  Multiple other Courts of Appeal of similarly held.  In 2014, the Third Circuit held:

> The two Courts of Appeals to have considered this question have both answered it in the affirmative. In *Saunders v. Branch Banking,* discussed *supra,* the Fourth Circuit considered the interaction of § 1681s–2(a), which requires complete and accurate pre-dispute reporting of loan data, and is not privately enforceable, with § 1681s–2(b), which imposes investigative and corrective duties on furnishers, and is privately enforceable. 526 F.3d at 148–50. The panel noted that "[n]o court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s–2(b) by arguing that it should have *already* reported the information accurately under § 1681s–2(a)." *Id.* at 149–50. In other words, the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s–2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s–2(b). *See also Gorman,* 584 F.3d at 1163 (explaining that where a dispute is bona fide, "the omission of the disputed nature of a debt could render the information sufficiently misleading so as to be 'incomplete or inaccurate' within the meaning of [§ 1681s–2(b) ]"); *Van Veen,* 844 F.Supp.2d at 606 (applying *Saunders* and *Gorman* ).

> We agree with this assessment, and conclude that a private ***cause of action arises*** under 15 U.S.C. § 1681s–2(b) ***when, having received notice of a consumer's***

*potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed*.

*Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014) (bold italics added).

And yet, Credit One has refused to admit the inaccuracy of its credit reporting in which it did, even through the present, represent to the credit bureaus that it had "verified" that the Plaintiff applied for, opened and signed its loan, was past due, in default, and charged off. Credit One has not admitted that its reporting was inaccurate because doing so would end its technical liability defense remaining in the case. As the Eleventh Circuit recently explained, a furnisher's investigation necessarily results in one of three outcomes – sufficient information is discovered to prove ("verify") the correctness of the reporting; sufficient information is discovered to prove the incorrectness of the reporting; and insufficient information was discovered to either establish correctness or incorrectness. *Hinkle v. Midland Credit Mgmt., Inc.*, No. 15-10398, 2016 WL 3672112, at *7 (11th Cir. July 11, 2016). As the court explained, "This framework reflects the fact that § 1681s–2(b) is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information. When a furnisher determines that disputed information is false or 'cannot be verified,' the furnisher must notify the CRAs of this result pursuant to § 1681s–2(b)(1)." *Id.* In reaching this conclusion, *Hinkle* relied heavily on Johnson, where the furnisher "d[id] not look beyond the information contained in the [data file] and never consult[ed] underlying documents such as account applications" *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004). The Fourth Circuit found these facts actionable when the bank reported to the CRA that the disputed information was "verified." Given the lack of proof of the underlying obligation, the furnisher should have "at least informed the credit reporting agencies that [it] could not conclusively verify" the disputed information. *Id.*

Thus Plaintiff is necessarily entitled to partial summary judgment because Credit one reported patently false "results" of its investigation.  It knew that the debt remained in dispute and it knew that it had not "verified" that the account belonged to Mr. Wood.

## CONCLUSION

For the reasons stated herein, Plaintiff asks the Court to enter Partial Summary Judgment against Credit One and reserve for trial only the questions of damages and willfulness.

Respectfully,

_____/s/_____
Susan M. Rotkis, VSB 40693
Leonard A. Bennett, VSB 37523
Craig C. Marchiando
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
srotkis@clalegal.com
lenbennett@clalegal.com
craig@clalegal.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August 2016, I served a true and correct copy of the foregoing document by filing it in the CM/ECF system, which will electronically notify (NEF) the following:

Lauren Marie Cafferty                    Christopher James Sears
McGuireWoods LLP (DC)              Cipriani & Werner PC
2001 K Street NW                          400 Tracy Way
Suite 400                                        Suite 110
Washington, DC 20006-1040          Charleston, WV 25311
Email: lcafferty@mcguirewoods.com    Email: csears@c-wlaw.com

_____/s/_____
Susan M. Rotkis, VSB 40693
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
srotkis@clalegal.com