```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                       RICHMOND DIVISION

 4                    CASE NO. 3:15-cv-594

 5

 6   DAVID WILLIAM WOOD,

 7           Plaintiff,

 8   v.

 9   EQUIFAX INFORMATION SERVICES,

10   LLC, et al.,

11           Defendants.

12   _____

13

14

15

16        VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

17                       JAMES F. LYNN

18

19               Thursday, August 25, 2016
                Western Washington University
20                    516 High Street
                    Miller Hall, 56 & 58
21

22

23

24
     Reported by:  JUDY ROBINSON, CCR #2171
25   Notary Public - State of Washington
```

1  communicated.  I'm representing myself as an expert on the
2  facts of the case, on what happened, what was supposed to
3  happen, what should have happened and so forth.
4      Q.   So are you an expert in identity theft?
5      A.   It's obviously a subject I've worked with before on
6  multiple cases, and applying a standard that do I understand
7  it at a -- at a level where a court can rely on it, obviously
8  that's for the court to determine, but I do know a lot about
9  it.
10     Q.   So how common is familial identity theft?
11     A.   What kind of identity theft?
12     Q.   Identity theft by a family member.
13     A.   I understand, I think, from your article -- or
14 excuse me -- your testimony, it's very rare.
15     Q.   Okay.  That family ID theft is very rare?
16     A.   That's what I recall.  If I misstated that, I
17 apologize.  But my recollection was that it was rare.
18     Q.   All right.  Even though that testimony said exactly
19 the opposite, but it's the most frequent credit reporting
20 type of identity theft.  Like --
21          MR. SEARS:  Is --
22 BY MR. BENNETT:
23     Q.   So you don't know one way or the other the
24 prevalence of family identity theft beyond having read my
25 congressional testimony?

```
 1      A.   Well, I -- again, your professional testimony was
 2  one element of it, and I've read other information about
 3  identity theft.  I can't give you the -- what I've learned
 4  from where and so forth, but again, I have a reasonable
 5  working knowledge of it.  That's what I'm representing.
 6      Q.   So in this case, you're aware that the account that
 7  is at issue that was disputed was a credit card account;
 8  correct?
 9      A.   That's correct.
10      Q.   And how was the application for that credit card
11  received by Credit One?
12      A.   It was online.
13      Q.   Can you explain to me what an online credit
14  application means?
15      A.   Someone at their home computer or similar
16  instrument accessing the website, reporting the required
17  information effectively hitting "enter" and it's sent.
18           That's what I understand.
19      Q.   And were any hard copy documents or anything with
20  actual human handwriting on them sent to Credit One when this
21  account was applied for?
22      A.   Not to my knowledge.
23      Q.   What is an IP address?
24      A.   IP address?
25      Q.   Yes.
```

```
 1      A.   I'm not sure.
 2      Q.   What is an email?
 3      A.   I'm sorry?
 4      Q.   What is an email address?
 5      A.   Oh, email.  An address where one party can -- well,
 6  I've never been asked this question before.  An email address
 7  is a place where -- is a -- an online communication mechanism
 8  where a person can communicate with another party or another
 9  party can communicate with that person.
10      Q.   And what email address was provided with the online
11  application in this case?
12      A.   Can you guide me to a document where I could read
13  it?
14      Q.   Well, I want to know, do you -- do you recall
15  anything about the email address that seemed strange?
16      A.   I believe I did.
17      Q.   I'll show you the documents in a second.  You can
18  say "I don't know," if you don't know.
19      A.   I believe the email address was a person who has
20  been represented as Mr. Wood's mother.  At least, it was her
21  name that was part of that email address.
22      Q.   And again, you do not know what an IP address is;
23  correct?
24      A.   I might know it, but I don't know it as an IP
25  address.  Sorry.  I can't speak to it.
```

1    Q.   So you're not aware that -- at least in the modern
2 day, after Merrill National Bank years for you, that thanks
3 to interaction over the Internet, tracked the IP address, the
4 computer location and address of the opposite party to a
5 communication.
6         In this case, the opposite, the person that
7 submitted the application.
8    A.   Oh, didn't know it.  Thank you.
9    Q.   Are you aware that the -- well, obviously, you're
10 not -- you're not aware that Credit One archived the IP
11 address for the person who sent or the computer from which
12 the application was sent to it.
13   A.   They had a home address on the boarding data
14 that I -- that I saw that was located in West Point,
15 Virginia.  I believe it was on Lee Street.
16             THE REPORTER:  What street?
17             MR. SEARS:  Lee, L-E-E.
18 BY MR. BENNETT:
19   Q.   You -- do you have any children?
20   A.   Yes.
21   Q.   Do you know their address?
22   A.   Email address?
23   Q.   Physical mailing address.
24   A.   Not off the top my head, no.
25   Q.   How hard would it be to find out their address

 1   testimony, it triggers a natural curiosity as to who are
 2   these people?
 3           And so I punched up Accurint.com and found out they
 4   were affiliated with LexisNexis.  They have, at least
 5   according to their website, extensive experience in this
 6   area, and I guess the tested market is, do people still use
 7   them?  And that appears to be the case.
 8       Q.   Well, all that information comes from you looking
 9   on their website; right?
10       A.   That's correct.
11       Q.   And in this case, your -- I'm sorry.  The
12   defendant, Credit One, used a binder report; right?
13       A.   I'm -- I'm not sure.
14       Q.   Okay.  All right.  Are you an expert in credit
15   scoring?
16       A.   You mean FICO scores?
17       Q.   I'll get more specific in a minute.
18       A.   Okay.  Generally speaking, yes, just what I know
19   from my experience as -- as a lender, so forth.
20       Q.   Well, you were a lender.  Again, what was your last
21   year as a lender?
22       A.   1992.
23       Q.   And what FICO score model was used in 1992?
24       A.   None that I can recall.  I think that it -- FICO
25   scores came about, I believe, in the mid 1990's.  And at that

1  time, again, that was when I was getting into -- the mid to
2  late 1990's, I was working as a consultant to various banks,
3  and I was teaching that consumer lending course that I
4  referenced before.  And I basically educated myself on FICO
5  scores because I was certainly becoming a relevant and
6  prevalent way of evaluating consumer product.
7       Q.   What is a scorecard?
8       A.   Boy.  In the old days, you gave certain points for
9  various components of a consumer profile.  That's what it
10 used to be known as, but I can't tell you --
11      Q.   Sure.  In the context of a FICO score model, what
12 is a scorecard?
13      A.   In the context of what model?
14      Q.   A FICO credit score model.
15      A.   I don't know the term scorecard as applied to that,
16 but I can tell you the components of a FICO score and
17 relevant weights of different -- and characteristics of a
18 FICO score.  Is that what you're asking?
19      Q.   No.  I'm trying to see if you know anything that's
20 not readily available on the Internet.
21           How much weight does the existence of a major
22 derogatory trade line in a credit file have on a credit score
23 if that major derogatory has an XB compliance condition code?
24      A.   Just -- just the XB compliance -- compliance code,
25 you're trying to isolate that out; is that correct?

```
 1      Q.   Yes.
 2      A.   Okay.  As I understand it, it's going to be
 3   negligible.
 4      Q.   Why -- first of all, it's going to be zero.  It's
 5   not scored.  But why would you understand it would be
 6   negligible?
 7      A.   I'm not sure if it's not scored.  The account XB
 8   means the account is in dispute, and I'm not sure that it's
 9   counted in -- as long as it's classified XB, as I understand
10   it, the calculation of a FICO score accommodates the payment
11   history on that account if that is, in fact, what the dispute
12   is about.  Other issues, like the length of time the credit
13   has been open is not a matter of dispute and is counted as it
14   would normally be counted.
15           MR. SEARS:  Excuse me.  Lynn, hold on a
16   second.  I'd like to interject an objection.  I was not able
17   to fit it in between the question and the answer.  I object
18   to testimony provided by plaintiff's counsel and would move
19   to have that stricken.
20           MR. BENNETT:  I was trying to help the
21   gentleman become an expert.
22           MR. SEARS:  And any editorial comments, I
23   object to as well.
24   BY MR. BENNETT:
25      Q.   So where did you come up with that belief, that an
```

```
 1   XB code blocks scoring if the dispute does not block scoring
 2   as to components of the trade line that are not subject to
 3   the dispute?
 4        A.   I believe it was Bankers Online.
 5        Q.   And when did you check Bankers Online?
 6        A.   It was within the last couple of days.
 7        Q.   So how does -- how does an ex -- I'm sorry.  I'm
 8   trying to find a way to phrase this?
 9             Why do you believe it's proper to remove an XB
10   compliance condition code when the consumer still disputes
11   attribution of an account to their credit file?
12        A.   Well, they disputed it.  It was reviewed.  They did
13   their normal -- "they" being Credit One Bank, did their
14   normal and customary investigation process.  Based upon that
15   investigation process, verifying and validating information
16   that they had in their file and confirming such information
17   as they were able to through an independent third party, such
18   as Accurint, they concluded, "they" being the bank, that the
19   information they rendered or information they had in their
20   file was either correct or if it was not correct, they --
21   they corrected it or updated it.  And then they reported it
22   back to the CRA, and as far as Credit One Bank was concerned,
23   the dispute was resolved.
24        Q.   I understand that.  But as far as Mr. Wood, you
25   would agree it was not resolved; right?  Mr. Wood did not
```