IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

```
DAVID WILLIAM WOOD,              )
                                 )
              Plaintiff,         )    CASE NO.:  3:15-cv-594
                                 )
         vs.                     )
                                 )
EQUIFAX INFORMATION SERVICES     )
LLC, et al.,                     )
                                 )
                                 )
                                 )
              Defendants.        )
_____   )
```

PERSON MOST KNOWLEDGABLE

OF CREDIT ONE BANK

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF KIM MARAGOS

LAS VEGAS, NEVADA

FRIDAY, MAY 13, 2016

1:36 P.M. -  2:34 P.M.

REPORTED BY:  GINA DILUZIO, RPR, CCR #833

```
 1                  MR. SEARS:  -- to refer to a document to answer

 2    the question, you have a right to do that.

 3                  THE WITNESS:  Okay.  And I'm sorry.  Repeat

 4    your question.

 5    BY MS. ROTKIS:

 6        Q.     How many times did Mr. Wood call Credit One

 7    Bank regarding the dispute that is the subject of this case?

 8        A.     Regarding the dispute?

 9                  MR. SEARS:  Object to form.

10                  THE WITNESS:  If we're saying telephone calls

11    specifically relating to the dispute, it would appear there

12    may have been three calls specific --

13    BY MS. ROTKIS:

14        Q.     What documents are you looking at?

15        A.     This was in your first binder, Section --

16        Q.     Do you have Bates numbers?

17        A.     Section 4 -- or tab 4.

18                  MR. SEARS:  The Bates numbers --

19                  THE WITNESS:  Oh.

20                  MR. SEARS:  -- at the bottom.

21                  THE WITNESS:  COB00059.

22                  MR. SEARS:  Beginning.

23    BY MS. ROTKIS:

24        Q.     Okay.

25        A.     Through --
```

Page 16

KIM MARAGOS - 5/13/2016

```
 1      Q.      So can you point --

 2      A.      -- 65.

 3      Q.      Can you just point me to the page number that

 4  you're looking at for the first phone call that you're aware

 5  of.

 6      A.      So if you would start at 65 --

 7      Q.      Yes.

 8      A.      I'm just going up through these dates.  Let's

 9  see.  So there's nothing on page 65 that would lean me to

10  the direction that his call was dispute related.

11              Page 64, nothing on that page.  63 -- the

12  date -- looks like August 28, 2013, where a lost/stolen

13  report was filed.

14      Q.      What does that mean?

15      A.      That Mr. Wood called in to report the account

16  to us as a fraudulent application.

17      Q.      And what happened after that?

18      A.      Page 62, on 3/27/14, and where it says, "ORR

19  Fraud."

20      Q.      Yeah.  What does that mean?

21      A.      That he's called -- I don't know the details of

22  the call, but he's calling something relating to a dispute

23  on the account.

24      Q.      Okay.

25      A.      And then on --
```

Page 17

```
1        Q.      And then the next time he called?

2        A.      On 4/14 -- pardon me -- 4/22, we resent an

3    affidavit to him.

4        Q.      How can you tell?

5        A.      The systemic notes, on 4/14 -- that's a

6    systemic note -- it says, "Affidavit sent."

7        Q.      Ahh.  Yes.  Okay.

8        A.      Okay.  Page 61, I do not show anything there.

9    Page 60, I do not show anything.  Page 59, on November 3,

10   2015, he notified us that he was represented by an attorney.

11       Q.      How can you tell that's a phone call?

12       A.      Actually, I apologize.  I -- I would not be

13   able to state that for -- to be certain.

14       Q.      Do you know who agent 248362877 is?

15       A.      I do not know based on what I have available in

16   front of me, no.

17       Q.      Do you have an agent number?

18       A.      My agent number is F71.

19       Q.      Okay.  Let's go back to page 62, I think.  No.

20   Go all the way back to 65.

21       A.      (Complied.)

22       Q.      Can you just take me through these work history

23   notes -- these case history notes and tell me what happened

24   starting in -- in June 11 of 2013.

25       A.      Okay.
```

Page 18

KIM MARAGOS - 5/13/2016

```
1        Q.      I mean, is that the first entry on this where
2   this record starts?
3        A.      That's correct.  And that's just
4   acknowledging --
5        Q.      Okay.
6        A.      -- that we -- the first note, on June 11, is
7   just a systemic note acknowledging the setup of the account
8   and our initial fee for a membership fee.
9        Q.      Okay.  So this 6/11 is when this whole --
10  6/11/13 is when the whole story starts.  Credit One Bank
11  sets up a new account?
12       A.      Yes.  Upon receipt --
13       Q.      And --
14       A.      Upon receiving the application, there was a
15  request to add an authorized user name.  And we did not add
16  that, because the voice that had requested it was not
17  recognized to be one that would match the account details.
18       Q.      How do you know that?
19       A.      The request was a verbal one.  It goes through
20  a recording.
21       Q.      Uh-huh.
22       A.      And then we have a manual -- an agent actually
23  listens to the recording.  And, if, for instance, Kim
24  Maragos is on the account and a man calls in and says, I'd
25  like to be to added Kim's account, the only one that can add
```

Page 19

KIM MARAGOS - 5/13/2016

```
1    somebody to the account is Kim.

2              So then that voice --

3         Q.   Okay.

4         A.   -- becomes unrecognizable and we do not honor

5    that request.

6         Q.   Okay.

7         A.   Okay.  On June 14, 2013, the account was

8    activated.

9         Q.   How does that account get activated, do you

10   know?

11        A.   It can -- the -- it is a telephone call.  They

12   can either --

13        Q.   Uh-huh.

14        A.   -- stay within our automated voice response,

15   which is IVR.  Or they can request to push out and speak to

16   an agent, if they have additional questions regarding the

17   card, prior to actually activating the card.

18        Q.   Okay.

19        A.   This particular one would indicate a couple of

20   lines up that they stayed within the IVR to activate.

21        Q.   So does that include that voice recognition

22   thing or is it something else?

23        A.   That is separate.

24        Q.   That is separate?

25        A.   Uh-huh.
```

Page 20

KIM MARAGOS - 5/13/2016

```
 1        Q.      Okay.  So you could activate the card having a
 2   complete -- I mean, I don't know how the voice matching
 3   works, but -- all right.  Well, at any rate, this was
 4   activated?
 5        A.      Correct.
 6        Q.      Where -- do you have any records anywhere that
 7   show, like, how Credit One made the decision to grant credit
 8   in the first place?
 9        A.      From our application processing?  Is that --
10   you're wanting --
11        Q.      Yeah.
12        A.      -- to start there?
13        Q.      Yeah.
14        A.      I think Helen touched on the Experian piece of
15   it, right, where and how we determined to solicit Mr. Wood,
16   sending him an invite letter to apply for that credit card
17   with us.
18                And upon completion, once received the
19   application invite, then they can either mail it in, go on
20   our website.  Again, do it by phone or with an agent.
21        Q.      Do you know how Mr. Wood allegedly opened this
22   account?
23        A.      I believe -- I do not know for certain.
24                MR. SEARS:  Well, you have to refer to a
25   document.  What document do you need?
```

Page 21

```
 1                    THE WITNESS:  The application.
 2                    MR. SEARS:  Okay.  I think her -- her response
 3    is that she would be able to answer your question if she
 4    could refer to a document.  Would you like for her to
 5    search for that --
 6    BY MS. ROTKIS:
 7         Q.    Could you tell me --
 8                    MR. SEARS:  -- document?
 9    BY MS. ROTKIS:
10         Q.    -- what the Bates number of this -- of the
11    application is?
12                    MR. SEARS:  Well, that's what I'm asking you.
13    Would you like for us to search for that document so she can
14    respond to your answer?
15                    MS. ROTKIS:  I'll just carry that -- that over.
16                    MR. SEARS:  Okay.
17    BY MS. ROTKIS:
18         Q.    You oversee the fraud department, right?
19         A.    Correct.
20         Q.    Okay.  So do you get information from the
21    consumer reporting agencies that breaks out how many
22    identity theft disputes you get per -- in some period of
23    time?
24         A.    I do not specifically, no.
25         Q.    Are you aware of that as -- does Credit One
```

Page 22

1   Bank get that --

2        A.     Yes.

3        Q.     -- kind of information from consumer reporting

4   agencies?  All right.  And does Credit One Bank know how

5   many identity theft disputes it may get in a month?

6        A.     I do not have that information available to --

7   to state Credit One Bank would know.

8        Q.     Does --

9        A.     I do not know if it was supplied to us in a

10  fashion describing the dispute type or just overall quantity

11  in a particular month.

12       Q.     Do you know how much Credit One spends -- you

13  may estimate -- Credit One may estimate how much it spends

14  on the investigation of each ACDV?

15              MR. SEARS:  Objection to the extent that it

16  goes beyond what has been designated.

17  BY MS. ROTKIS:

18       Q.     You may answer.

19       A.     Approximately, depending on -- $5.50, $7,

20  somewhere in that range.

21       Q.     Do you know how much Credit One spent to

22  investigate Mr. -- each of Mr. Wood's disputes?

23       A.     I do not, no.

24       Q.     Do you have an estimate -- your best

25  estimate -- does Credit One have a best estimate how much it

Page 23

1    spent to investigate each one of Mr. Wood's disputes?

2        A.    Based on the detail that was provided, I would

3    say it was more of the higher end.  So probably 6 or $7.

4        Q.    Okay.  How -- how -- what do you base that

5    estimate on?

6        A.    The requirement to satisfy the act, we were --

7    we were checking multiple systems, not just our own.  And

8    each of those come with a cost.

9        Q.    Okay.  Do you know who developed the Credit One

10   Bank procedures for responding to ACDVs that were in place

11   from August of 2013 through November of 2015?

12            MR. SEARS:  Objection as to form.

13            THE WITNESS:  For those dates, Jim Shaunessy

14   at -- I'm starting with the department first, because it was

15   a group effort.  And I -- I can actually -- I'll go the

16   other route.

17            Our attorneys provide us specifics on statutes.

18   We meet as a group.  Each department has own -- has to take

19   those specifics back, provide procedures, write the draft,

20   resubmit those into our attorney and compliance to ensure

21   that that is the document -- that is a working document

22   going forward.

23   BY MS. ROTKIS:

24       Q.    Okay.  What are the names of the people in --

25   of the people -- of the people -- in addition to

Page 24

KIM MARAGOS - 5/13/2016

1    Mr. Shaunessy?  Are there any other names?

2         A.     Yes.  Jim Shaunessy, Laurie James, Tom Hanell

3    (phonetic), Jim Bathone (phonetic).  From the department,

4    there would be Alan Schutt that participated in the first

5    part of the years.

6              Compliance department would be Lisa Cooper,

7    Roland Higga (phonetic).

8         Q.     Anyone else?

9         A.     I think that's it.

10        Q.     Okay.  Starting in January of 2012, what were

11   your e -- starting with January 2012 and just come forward

12   or I can ask you for each month, I don't really care how we

13   do it -- I want to know the e-OSCAR score card information

14   for each one of those months.

15             So if you could start with January 2012 and

16   move forward to the present.

17        A.     I do not have access to that information.

18   Yeah, I do not have access.  I would not be able to

19   speculate or assume what that is.

20        Q.     Who has access to that information?

21        A.     Customer service senior vice president

22   Laurie -- Laurie James.

23        Q.     Did you know that I was going to be asking

24   about the e -- e-OSCAR score card every month since January

25   2012?

Page 25

KIM MARAGOS - 5/13/2016

```
 1        A.     I did not know if it was for every month.  I
 2   thought the score card was including some of the costs that
 3   were associated with that and volume on an average.
 4               (Pause in the proceedings.)
 5   BY MS. ROTKIS:
 6        Q.     Going back to page 61.
 7        A.     (Complied.)
 8        Q.     If you would go up to -- well, if you could
 9   tell me, where is the first ACDV in this exhibit that you
10   see -- the -- the date of the first ACDV that you see?
11        A.     April 28, 2015.
12        Q.     Okay.  And from those -- the -- the notes that
13   are under the Result column, what can you tell me about that
14   dispute?
15        A.     That we received the ACDV, with some document
16   attached, from Equifax was the source.  The claim came
17   through with identity theft account fraudulently opened.
18               Cardholder claims identity theft.  Address
19   provided by cardholder matches that of our records in both
20   CASS and cash systems.  Address provided on app was a P.O.
21   Box 725, West Point, Virginia 23181.
22               It is linked to the cardholder through
23   Accurint.  And the decision was not to modify anything,
24   change anything.  The cardholder was responsible based on
25   the matches.
```

Page 26

1     Q.     Do you know who performed this -- this process?

2     A.     I do not know agent name.  Or if we could --

3  have different records available, I could cross-reference

4  the two and be absolutely sure.  But I believe this initial

5  would be Alex Chu -- or Alexandria Chu, C-h-u.

6     Q.     Did you talk to Ms. Chu about this case?

7     A.     About the case?  I did not.

8     Q.     Okay.  Do you have -- do you supervise Ms. Chu?

9     A.     I do oversee her.  I'm not her immediate

10 supervisor.

11    Q.     Okay.  And would you have any reason to

12 disbelieve what she wrote in these notes?

13    A.     I would not.

14    Q.     Okay.  And could you point in here anything

15 that would demonstrate that Ms. Chu investigated the

16 allegations that my client made regarding the identity

17 theft?

18          MR. SEARS:  Objection as to form.

19          THE WITNESS:  Repeat your question, please.

20 Sorry.

21 BY MS. ROTKIS:

22    Q.     Can you point me to anything in this -- in

23 these notes -- I'm just looking for anything that shows that

24 Alex Chu investigated the allegations of identity theft.

25          MR. SEARS:  Object -- okay.  Is there a --

Page 27

KIM MARAGOS - 5/13/2016

```
 1   okay.  Objection as to form even though there's not a
 2   question.  Go ahead.
 3                THE WITNESS:  This is just our note system, so
 4   details are brief here.  Just to provide detail for if the
 5   consumer called in again.  But the fact that she notes that
 6   she checked other resources, the details are there.
 7   BY MS. ROTKIS:
 8        Q.    If it says that images -- strike that.
 9              (Pause in the proceedings.)
10   BY MS. ROTKIS:
11        Q.    Where does Credit One maintain the images that
12   it receives with ACDVs?
13        A.    Credit One Bank does not maintain the images.
14   It is -- they come through e-OSCAR.  That is the tool, the
15   source, the means of that communication.  And credit One
16   depends on e-OSCAR to retain those documents.
17        Q.    Would Credit One be able to go back and look at
18   those documents from an ACDV that they investigated back in
19   April of 2015?
20                MR. SEARS:  Objection as to form.
21                THE WITNESS:  My understanding is e-OSCAR has a
22   retention policy of, I believe, 90 or 120 days.
23   BY MS. ROTKIS:
24        Q.    Okay.
25              (Pause in the proceedings.)
```

Page 28

1    BY MS. ROTKIS:

2        Q.      So the -- the ACDV procedures that were

3    followed in this case, can you tell me how those were

4    created?

5        A.      As indicated, earlier, we get provided guidance

6    from our attorney, our compliance department.  Then the

7    department owners draft the procedures, provide them back to

8    our attorney and compliance to make sure that we're meeting

9    all of the requirements.  And then it is put into place as a

10   working document.

11       Q.      What requirement -- where do you get the -- the

12   source information to ensure that your ACDV dispute

13   procedures are compliant with the Fair Credit Reporting Act?

14       A.      Our attorney provided -- provides us that

15   guidance and then --

16       Q.      Where does Credit One's attorney get that

17   information?

18       A.      My understanding is through various sources.

19   Bankers Online.  I believe -- I can't think of what --

20   specific statutes, cases, regulatory bodies that provide us

21   details on where and how we should comply.

22              That -- all of them, I don't know.  That is to

23   name a few, I guess.

24       Q.      Do you know what specific regulatory guidance

25   Credit One Bank relied on in crafting its ACDV dispute

Page 29

1    procedures?

2         A.     I do not, since I was not the one that crafted

3    them to be absolutely sure of what was used.

4              (Pause in the proceedings.)

5              MS. ROTKIS:  All right.  Well --

6              MR. SEARS:  I don't have any.

7              MS. ROTKIS:  I don't have further questions,

8    Chris, except that she wasn't prepared on item 18 and --

9              MR. SEARS:  What is that one?  Oh.  Okay.

10             MS. ROTKIS:  And 16.

11             MR. SEARS:  Hold on a second.  You want this on

12   the record or do you want to discuss this off the record?

13             MS. ROTKIS:  Sure.

14             MR. SEARS:  Sure what?

15             MS. ROTKIS:  Oh.  We can have a meet-and-confer

16   on the record.  That's fine.

17             MR. SEARS:  That's -- well -- all right.  Is

18   that it?  16 and 18?

19             MS. ROTKIS:  I think so.

20             MR. SEARS:  Well, the 16, she gave best

21   estimate of -- I mean, I -- I did hear her give estimate of

22   the cost of the ACDV generally and as to Plaintiff.

23             I -- I had objected as to designation when you

24   asked just the average cost, but she knew that.  And then

25   she gave it with regard to the Plaintiff.  So I'm not

1    and cost of each ACDV investigation for each dispute

2    received regarding the Plaintiff.

3         A.     For each dispute regarding the Plaintiff, I had

4    said between 5.50, 6 -- I'm sorry -- 6 to $7.  5.50 was the

5    average low end.  Six to $7 is what I believe we applied to

6    Mr. Wood.

7               MS. ROTKIS:  Okay.  And then -- okay.  e -- the

8    e-OSCAR score card and then also the net worth.  She wasn't

9    prepared on net worth.

10              MR. SEARS:  Okay.  Well --

11              MS. ROTKIS:  You can just -- you can just give

12   me that information and we won't have to keep the deposition

13   open.

14              MR. SEARS:  Yeah.  That -- 18.  Hold on a

15   second.  Let me confer real quick about something.

16              MS. ROTKIS:  Oh.  Put it on mute.  Mute it.

17              MR. SEARS:  I don't know that it mutes.

18              MS. ROTKIS:  It does.  It mutes.

19              (Discussion off the record.)

20              MR. SEARS:  Okay.

21              MS. YENOVKIAN:  Are you on mute?

22              MR. SEARS:  So -- can you hear me?

23              MS. ROTKIS:  Yeah.

24              MR. SEARS:  Okay.  So, first of all, this is a

25   meet-and-confer with regard to the challenges as to whether

Page 32

1   or not she was prepared for 18.

2           I will tell you that we -- she was prepared.  I

3   think she indicated that -- that the understanding of -- of

4   what was going to be asked was not consistent with what your

5   expectation was.

6           And -- and, frankly, from my perspective, I

7   thought that your reference to January 2012 was a mistake

8   given that his account wasn't opened until much later and

9   given the other clerical errors in --

10          MS. ROTKIS:  Well --

11          MR. SEARS:  -- that.

12          MS. ROTKIS:  -- yeah.  Well, yeah, we did have

13  some clerical errors regarding Bank of America, but the --

14  so in order to -- we have an allegation for willfulness and

15  punitive damages.

16          And, so, to get a -- get a good -- you know, a

17  temporal look-back period, we never met, conferred over the

18  time period.  And, so, I think that five years -- we -- we

19  have, on numerous occasions, been able to get five years

20  prior from date --

21          MR. SEARS:  Okay.

22          MS. ROTKIS:  -- complaint was filed.

23          MR. SEARS:  Right.

24          MS. ROTKIS:  This is less than five years.

25  This is information they can easily get.

Page 33

```
 1                  MR. SEARS:  Uh-huh.  So -- so --
 2                  MS. ROTKIS:  So --
 3                  MR. SEARS:  The first thing I wanted to do --
 4                  THE COURT REPORTER:  One at a time, please.
 5                  MR. SEARS:  The first thing I wanted to do is
 6     to express the notion that -- that she had not, in good
 7     faith, prepared for that, which she had done some work, but
 8     not consistent with what you were looking for.
 9                  Now that we specifically know what you're
10     looking for, we will provide that information to you and --
11     and --
12                  MS. ROTKIS:  Okay.
13                  MR. SEARS:  -- in the format.  Okay?  And with
14     regard to 27, again, I'm just going to generally challenge
15     that she wasn't prepared for that.
16                  She indicated that -- that she sat here, she
17     didn't know the numbers, and then the questioning ended.
18     That information is publicly available, I believe, through
19     the website.
20                  And, I mean, if she had the -- the documents in
21     front of her, that's something that she could have testified
22     to and prepared to.
23                  In any event, I don't know how you want -- I
24     don't know if you want to go and get it, because it's
25     publicly available.  But that information is --
```

Page 34

1                    MS. ROTKIS:  Well, no, because -- I mean, I --

2       the -- the topic is duly noticed.

3                    MR. SEARS:  So --

4                    MS. ROTKIS:  I can examine her on that.

5                    MR. SEARS:  Absolutely.

6                    MS. ROTKIS:  I don't have to provide her with

7       any documents about the company's net worth.

8                    MR. SEARS:  I'm not going to argue about that.

9                    MS. ROTKIS:  This is information that was

10      easily available to her.  So I -- I mean, this is -- I do

11      this in every 30(b)(6) deposition.  It's not some unusual

12      thing that we ask.

13                   So we've alleged punitive damages.  We're

14      entitled to the information.  If your position, now, is that

15      I should go get it somewhere else, that's the subject of

16      meet-and-confer, I can see if that is suitable information,

17      and then we can reconvene.

18                   MR. SEARS:  Based on our last meet-and-confer,

19      it would be a lot faster for me just to go to the website

20      and print it out and send it to you.

21                   MS. ROTKIS:  Fine.

22                   MR. SEARS:  Okay.  Thank you.

23                   MS. ROTKIS:  Excellent.

24                   MR. SEARS:  All right.  All right.  So that

25      resolves all the issues, then?

```
 1                    MS. ROTKIS:  Yeah, I'm resolved.

 2                    MR. SEARS:  Okay.

 3                    MS. ROTKIS:  I think we're -- I'm finished.

 4      Thank you so much --

 5                    THE WITNESS:  You're welcome.

 6                    MS. ROTKIS:  -- Ms. Maragos.

 7                    THE WITNESS:  Maragos, yes.

 8                    MS. ROTKIS:  Did I say it?

 9                    THE WITNESS:  You did.

10                    MS. ROTKIS:  Maragos.  All right.

11                    MR. SEARS:  All right.

12                    THE VIDEOGRAPHER:  Off the record at 2:34.

13                    MR. SEARS:  And I don't have any questions.

14      And we will read.  And we will read the previous one as

15      well.  Sorry.  I don't think I said that.  Thank you.

16                    (Whereupon, the videoconference videotaped

17      deposition was concluded at 2:34 p.m.)

18

19

20

21

22

23

24

25
```

Page 36