IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

DAVID WILLIAM WOOD,         )

                                 )

              Plaintiff,    )   CASE NO.:  3:15-cv-594

                                 )

        vs.               )

                                 )

EQUIFAX INFORMATION SERVICES  )

LLC, et al.,                  )

                                 )

                                 )

                                 )

              Defendants.   )

_____)


PERSON MOST KNOWLEDGABLE

OF CREDIT ONE BANK

VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF HELEN LANHAM

LAS VEGAS, NEVADA

FRIDAY, MAY 13, 2016

10:09 A.M. - 1:24 P.M.


REPORTED BY:  GINA DILUZIO, RPR, CCR #833

HELEN LANHAM - 5/13/2016

1        A.      Yes, I was.

2        Q.      And how long did you work as an analyst for

3   Credit One?

4        A.      For Credit One, I worked as an analyst for,

5   approximately, a year.

6        Q.      And then what happened?

7        A.      And then my -- my supervisor, my head of

8   department, at that time, left to take another job.  So I

9   was promoted to assistant vice president and responsible for

10  the department.

11       Q.      And what department was that?

12       A.      Corporate risk management.

13       Q.      And where do you work now?

14       A.      I work for Credit One Bank.

15       Q.      And what is your job at Credit One Bank?

16       A.      I'm a senior vice president in corporate risk

17  management.

18       Q.      While at Credit One Bank, have you had occasion

19  to learn about the Fair Credit Reporting Act?

20       A.      Yes, I have.

21       Q.      Okay.  And did you receive any training about

22  the Fair Credit Reporting Act?

23       A.      Yes.  We received training from our compliance

24  department.

25       Q.      Who's the head of the compliance department?

Page 16

1     A.    Who is the current head or who was the head at

2  the time that I would have received that training?

3     Q.    Let's just deal with right now.   Who -- do you

4  know who the head of corporate compliance is now?

5     A.    Yes.

6     Q.    I'm sorry.   Yes.   Who is the head of

7  compliance?

8     A.    David -- David Balk (phonetic).

9     Q.    Okay.   Thank you.   And then, so, you mentioned

10  that there might have been somebody else who was the head of

11  compliance when you were trained.   Do you know who that was

12  then?

13     A.    I believe it was Sheila Baker.

14     Q.    Is Ms. Baker still with the bank, do you know?

15     A.    No, she's not.

16     Q.    Do you know why she left the bank?

17     A.    She retired.

18     Q.    Did Mr. Balk take over for Ms. Baker?

19     A.    No.   There was another person in between that

20  time.

21     Q.    Do you re -- do you recall who that was?

22     A.    Alan Schutt (phonetic).

23     Q.    What do you -- what does the corporate risk

24  management department do?

25     A.    So, generally, the corporate risk management of

Page 17

1    the bank is -- is responsible for managing the -- the risk

2    to the bank for, you know, new accounts or existing

3    accounts, portfolio management.

4              And we also help guide the -- the, you know,

5    collections process as well, collection strategy.

6         Q.    Does Credit One Bank do its own collections?

7         A.    Yes, they do.

8         Q.    Does Credit One Bank employ any debt collectors

9    or any debt -- any debt collection law firms to do any

10   collections?

11        A.    Not to my knowledge, no.

12        Q.    What are your duties as senior VP for corporate

13   risk management?

14        A.    So the -- the team that I manage now produces

15   management information system reports for other departments

16   in the bank.  I'm also responsible for data governance.

17        Q.    What is data governance?

18        A.    Data governance is strategic data management.

19        Q.    What data do you refer to when you're talking

20   about data management?

21        A.    Specifically data in our -- data that our

22   analysts use to monitor account performance.

23        Q.    Specifically, what data do your analysts use to

24   monitor account performance?

25        A.    Things like, you know, payments, delinquency.

HELEN LANHAM - 5/13/2016

```
1    Those are, you know, two of the -- two of the large areas.
2    What the -- you know, what the cardholder's activity is
3    on -- on their account.
4         Q.      Anything else?
5         A.      Those are the -- those are the large areas.
6         Q.      Payments and delinquency?
7         A.      Payments, delinquency, transactions, what a
8    consumer is -- you know, how a consumer is using their card,
9    what they're -- what they're spending, you know, where
10   they're shopping.
11                (Pause in the proceedings.)
12   BY MS. ROTKIS:
13        Q.      If your boss asked you to make a list of all
14   the data that your analysts use to do their jobs, tell me
15   what would be on that list.
16        A.      I'd say all -- all data relating to the
17   cardholder's activity on the card.
18                (Pause in the proceedings.)
19   BY MS. ROTKIS:
20        Q.      What FCRA training have you received since you
21   joined Credit One bank?
22        A.      I believe that the compliance department had
23   training in FCRA shortly after I started with the bank.  I,
24   you know -- I have read the, you know, documents myself, so
25   I have that awareness.
```

Page 19

HELEN LANHAM - 5/13/2016

1      Q.      What documents have you read concerning the

2   FCRA?

3      A.      I've -- I've read through the -- the actual --

4   the law, the statute.

5      Q.      Anything else?

6      A.      In preparation for this deposition, I read

7   summaries of the MBNA case as well as the Saunders case.

8      Q.      Did you have any knowledge of MBNA -- Johnson

9   versus MBNA prior to preparing for this deposition?

10             MR. SEARS:  Clarification.  Are you asking her

11  in her individual capacity or as corporate representative?

12  Because the -- you've designated, in No. 5, with regard to

13  Credit One's knowledge and understanding in the Fourth

14  Circuit's decisions in those cases.

15             So are you asking her with regard to her

16  individual knowledge or whether or not Credit One had

17  knowledge?

18             MS. ROTKIS:  Well, is she -- is she one of the

19  ones designated for -- for the testimony on Johnson versus

20  MBNA?  I don't think she is, right?

21             MR. SEARS:  No, she is.  I -- I indicated

22  that --

23             MS. ROTKIS:  Oh, she is?

24             MR. SEARS:  -- she's designated for 1 through

25  8, which -- and No. 4 is the one that includes those two

1    cases.

2              MS. ROTKIS:  Oh.  Okay.  I don't know what I

3    did.  Hang on a second.  Oh.  I see what you're saying.

4    Okay.

5              MR. SEARS:  Right.  Now, I just want to make

6    sure for --

7              MS. ROTKIS:  Yeah --

8              MR. SEARS:  -- the record.

9              MS. ROTKIS:  -- you can --

10             THE COURT REPORTER:  One at a time, please.

11             MR. SEARS:  Okay.  I just want to make sure for

12   the record that when she responds, she knows what

13   questions -- or what capacity you're asking, individual or

14   corporate representative.

15   BY MS. ROTKIS:

16       Q.    Well, I'm always -- okay.  To be clear, I'm

17   always asking you in your capacity as the corporate

18   designee.  But if you have personal knowledge about it, you

19   may answer with your personal knowledge as well.  Okay?

20             So we don't need to make that distinction as we

21   go along.  We can -- you're being deposed as a corporate

22   representative, but if you have personal knowledge, then you

23   can tell me that as well.  Okay?

24             Now, you did mention that you had read the

25   cases in preparation for the deposition.  And I just want to

                                                      Page 21

HELEN LANHAM - 5/13/2016

1    know if you had ever been aware of those cases before --
2             MR. SEARS:  Okay.
3    BY MS. ROTKIS:
4        Q.    -- this deposition.
5             MR. SEARS:  And, so, I would just instruct the
6    witness then that you distinguish between whether or not
7    you're talking as to personal knowledge or corporate
8    knowledge.
9             THE WITNESS:  Right.  So as personal knowledge,
10   I did not specifically read those cases prior to the
11   deposition prep.
12   BY MS. ROTKIS:
13       Q.    Did Credit One Bank have any knowledge of
14   Johnson versus MBNA prior to this deposition?
15       A.    Yes.  It's my understanding that our
16   attorney -- Credit One Bank's attorney did have knowledge of
17   those cases.
18       Q.    What year did Credit One acquire knowledge of
19   those cases?
20       A.    I don't know specifically what -- what year.  I
21   know the cases are 2008, so I believe that it would have
22   been after the judgments were made that -- as part of the
23   practice that Credit One Bank's attorney goes through,
24   the -- that person would have reviewed relevant case law to
25   help instruct the bank in its compliance with FCRA.

Page 22

HELEN LANHAM - 5/13/2016

1      Q.      Do you know that they did do that?

2      A.      I don't specifically know that they looked at

3   those two specific cases.  I know, as part of bank practice,

4   our attorney reviews all relevant case law in -- in addition

5   to anything that would come with our -- from our regulator,

6   any updates to any law that's applicable to the bank so that

7   policies and procedures can be updated accordingly.

8      Q.      What did Credit One specifically do after it

9   read the Johnson versus MBNA case?

10             MR. SEARS:  Objection.  I believe that assumes

11  a -- a fact not testified to.

12             MS. ROTKIS:  You may answer.

13             THE WITNESS:  I'm not sure what specific

14  actions Credit One took as a result of this case.

15             As I have explained, our attorney reviews all

16  relevant documents.  And if any changes to policies and

17  procedures as to how the bank is in compliance with FCRA are

18  updated, those are put forward.

19  BY MS. ROTKIS:

20     Q.      What is Credit One's understanding of a

21  furnisher's duty, under 1681s-2(b), in response to the case,

22  Johnson versus MBNA?

23     A.      So under the -- under -- under the statute,

24  we're required to do an investigation of the disputed

25  information.  We're required to review all relevant

1    documents provided by the CRA in -- you know, in relation to

2    that dispute.

3            We're required to notify the credit reporting

4    agency.  And if -- if any of the information that we -- is

5    inaccurate, we're required to -- to change that and update

6    the consumer's credit file as -- as a result of that

7    investigation.

8    Q.      What is Credit One's understanding of its

9    duties under 1681s-2(b) as a result of Saunders versus BB&T?

10   A.      So it's -- in terms of Saunders versus BB&T, I

11   believe the issue in that case was around marking the credit

12   file as being in dispute.

13           So I believe that that was -- the -- the

14   primary thing that came out of -- of that case that, in

15   order to make sure that even if the data furnisher said that

16   the -- said that the reporting was accurate and -- and

17   correct, that if -- if the account wasn't noted as being in

18   dispute, that even accurate and correct might be misleading.

19   Q.      How does Credit One obtain its understanding

20   regarding Saunders versus BB&T?

21           MR. SEARS:  Objection.  Asked and answered.

22           THE WITNESS:  It's -- you know, from Credit One

23   Bank's attorney, it's their responsibility to again read the

24   law and any relevant case law or any other information from

25   our regulator to make sure that the bank is in compliance.

Page 24

HELEN LANHAM - 5/13/2016

1  BY MS. ROTKIS:

2      Q.      Who is the person responsible for obtaining the

3  understanding of Saunders versus BB&T?

4      A.      Understanding.  Well, primarily, it would be

5  our -- our attorney.  Our attorney, you know, work in --

6  obviously, in cooperation with our compliance department and

7  then any substantive business unit in the -- in the bank

8  that's responsible for the work functions that, you know --

9  that, you know, resulted in compliance.

10             So our attorney works with the compliance

11  department in -- in concert with -- so our customer service

12  organization.  So whatever the attorney's understanding

13  of -- of the law and the bank's requirements are put through

14  into the policies and procedures that our agents use in

15  addressing specific cases.

16      Q.      What is the name of the attorney that you

17  believe acquired the understanding regarding Saunders versus

18  BB&T?

19      A.      I believe that was Alan Schutt.

20      Q.      How did Alan Schutt obtain that understanding?

21      A.      I believe that he would have obtained the

22  understanding by reading -- reading the -- the case.

23      Q.      How did he learn about the case?

24      A.      I believe that he would have learned about the

25  case through -- through different, you know, correspondence

Page 25

1    that -- and, you know, news that come -- come through to

2    someone in an attorney position, different, you know,

3    industry groups that -- that might provide bulletins that

4    would have alerted that person that this is a case that --

5    that, you know, now, you know, settled -- or, you know, has

6    now been completed.

7             So that he could have, you know, reviewed that

8    to see what was pertinent in terms of the bank.

9        Q.    You started answering the question by saying,

10   "I believe." Do you have knowledge -- does the corporation

11   has knowledge that Mr. Schutt obtained his understanding of

12   Saunders versus BB&T from an industry association

13   newsletter?

14       A.    Not specifically, no.

15       Q.    Do you know what industry associations

16   Mr. Schutt obtains information from?

17       A.    I believe the American Bankers Association

18   would be one. I'm not -- I'm not aware of which other ones

19   would.

20       Q.    Do you know how Mr. -- oh. Do you know the

21   name of the person who obtained an understanding of -- if --

22   Credit One's duties pursuant to Johnson versus MBNA?

23       A.    I believe it would have also been Mr. Schutt,

24   because it's about the same time frame. And he was our --

25       Q.    Do you have knowledge --

1   now.  I'm going to start my clock right now.  So if you want

2   the put your objection on the record, for every minute that

3   we are on the -- on the stop watch, I'm going to add to the

4   end of the deposition.  Go ahead.

5            MR. SEARS:  The objection to the question

6   under -- at issue is attorney-client privilege and also

7   argumentative to the extent that it violates the rules with

8   regard to appropriate questions.  Thank you.

9   BY MS. ROTKIS:

10       Q.     Please tell me everything that Credit One Bank

11  does to inform itself of the obligation to comply with

12  1681s-2(b).

13       A.     So it starts with Credit One Bank's attorneys

14  knowledge and understanding of what the -- what is required

15  of the bank to be in compliance.

16            As I stated before, our attorney works with our

17  compliance department and the substantive business units in

18  order to correct policies and procedures that ensure that

19  the bank is in compliance with what the -- with what the law

20  requires.

21       Q.     Other than the law itself, the statute, what

22  other information does Credit One Bank use to craft these

23  policies and procedures, if anything?

24       A.     It would -- it would use different -- you know,

25  relevant case law and also any, you know, interaction with

Page 39

1   our, you know, credit reporting agencies in terms of -- in

2   terms of compliance.

3        Q.    Do the credit report agencies provide any

4   instruction to Credit One Bank for compliance with

5   1681s-2(b)?

6        A.    Not -- not specifically in compliance with the

7   law.  The credit reporting agencies assist the bank as

8   needed on individual -- for individual cases really is a

9   question of, you know, what the -- what the trade line looks

10  like at the bureau, if there -- if we have any issues in

11  processing or updating the -- the consumer's file.

12       Q.    What industry associations in addition to the

13  American Bankers Association does Credit One belong to?

14       A.    We participate in the Consumer Industry Data

15  Association (sic), the CDIA, which is responsible for the

16  general, you know, credit bureau reporting guidelines.

17       Q.    Is Credit One Bank familiar with the Credit

18  Reporting Resource Guide?

19       A.    Yes.

20       Q.    Is Credit One Bank familiar with the

21  regulations that govern credit reporting?

22       A.    The bank is familiar with what its requirements

23  are under FCRA for credit reporting.

24             (Pause in the proceedings.)

25  BY MS. ROTKIS:

HELEN LANHAM - 5/13/2016

1      Q.     Okay.

2             (Pause in the proceedings.)

3    BY MS. ROTKIS:

4      Q.     Okay.  Did you -- what is Credit One Bank's

5    understanding of its obligation under 1681s-2(b)?

6             MR. SEARS:  Objection.  Asked and answered.

7             THE WITNESS:  As I stated, previously, our

8    understanding is that when we receive a dispute, we -- we're

9    required to do an investigation of the dispute.  We're

10   required to review all the documentation that is provided to

11   us by the CRA with regard to the dispute.

12            We're required to notify the CRA of -- of the

13   disposition of the dispute as well as to, you know, update

14   on the consumer's file any inaccurate or incorrect

15   information.

16            (Pause in the proceedings.)

17   BY MS. ROTKIS:

18     Q.     Okay.  You should have a couple different books

19   that -- I think she sent you black binders.  She did.  Okay.

20            So the first one that I want you to look at is

21   the book that starts with tab No. 12.

22     A.     (Complied.)  I have that.

23     Q.     Okay.  These are documents that we received

24   from Credit One Bank in discovery in this matter.  And they

25   have provided the 2011 Credit Reporting Resource Guide.  And

                                                        Page 41

1    that's tab No. 12 of your exhibit book.

2              MS. ROTKIS:  But for the court reporter, I'm

3    going to be identifying all of the exhibits that we use by

4    Bates stamp number.  And that's just to keep things

5    consistent.

6              So they won't be exhibits specifically that,

7    you know, get attached to this deposition.  There'll be

8    documents that we use throughout the case.

9              The Credit Reporting Resource Guide -- and

10   also, for the deponent, is -- we call them Bates numbers.  I

11   don't know why they're called Bates numbers.  I always think

12   I'm going to look it up after a deposition and I never do.

13             But it starts with No. -- it says COB00066 at

14   the bottom.  And it goes through COB00316.  And I'm just

15   going to refer the Bates numbers from now on as just the

16   last digits to identify them.  So I'll just say this is 66

17   through 316.  Okay?

18   BY MS. ROTKIS:

19        Q.    Do you know Shontel Reed?

20        A.    No, I do not.

21        Q.    Okay.

22             MR. SEARS:  Personally or as the corporate

23   representative?

24             THE WITNESS:  Oh.  I -- I know that she is one

25   of the ACDV operators who processed disputes with regard to

Page 42

HELEN LANHAM - 5/13/2016

1   the -- this case.  I apologize.

2   BY MS. ROTKIS:

3       Q.    Do you know where at Credit One I might be able

4   to locate her address and phone number?

5       A.    I -- the only place I would know would be our

6   human resources department.

7       Q.    Okay.  Thank you.  So turning now to Bates No.

8   66.  Have you ever seen this document before?

9       A.    Yes, I have.

10      Q.    And this document is called the 2011 Credit

11  Reporting Resource Guide.

12            Is this the Credit Reporting Resource Guide

13  that was in use at Credit One Bank at the time of the

14  disputes that are the subject of this case?

15      A.    Yes, it is.

16      Q.    And how did you come to get a copy of this 2011

17  Credit Reporting Resource Guide?

18      A.    I received it from our compliance department.

19      Q.    Do you know how Credit One Bank received it?

20      A.    I believe that we downloaded it directly from

21  the CDIA website.

22      Q.    It's stamped "Confidential".  Do you have any

23  knowledge or reason to believe that this is a confidential

24  document?

25            MR. SEARS:  I'm going to -- I want to object to

Page 43

1    the extent that it goes beyond the scope of the designated

2    subject areas.   That includes a -- a legal conclusion, the

3    subject of which I've already told you that we may be

4    amenable to amend confidentiality status with regard to

5    certain things that have been designated.

6              MS. ROTKIS:   Okay.   Well, you still haven't

7    done that.   And, so, if we get into a situation where we

8    have to litigate whether it's confidential or not, I need to

9    know whether the corporation, what they've done to, you

10   know, protect it, how they obtained it, whether it's a trade

11   secret, all of those elements that we need to show.

12             I -- I think we're going to be able to come to

13   an agreement, Chris.   I don't think we're going to have a

14   disagreement about this.

15             MR. SEARS:   Yeah.

16             MS. ROTKIS:   But if we just, like -- if you

17   Google it right now, you can get it offline.   But I just --

18   you know, I have to do it while I have the deponent here.

19             MR. SEARS:   Can you allow me one moment to

20   confer with in-house --

21             MS. ROTKIS:   Sure.

22             MR. SEARS:   -- counsel?

23             MS. ROTKIS:   I got it going.

24             MR. SEARS:   Well, Susie, I'm not agreeing with

25   your keeping of time there.   The deposition is a chance for

Page 44

1    both parties to do what needs to be done to ask the

2    questions and defend the deposition itself.  Okay?  So only

3    if there's an unreasonable delay.

4              And the only one causing an unre --

5              MS. ROTKIS:  Okay.  Well, I mean --

6              MR. SEARS:  Susie, the only one --

7              MS. ROTKIS:  -- only opportunity --

8              THE COURT REPORTER:  One at --

9              MR. SEARS:  Susan.  Susan.  The only one

10   causing an unreasonable delay is -- is you and posturing.

11   Okay?  So allow us to get through this in a professional

12   manner and -- and you will not need to keep track of time.

13   Okay?  Thank you.

14             (Pause in the proceedings.)

15             (Off the record.)

16             MR. SEARS:  Okay.  Back on the record.  Susan?

17             MS. ROTKIS:  Yeah.

18             MR. SEARS:  After consulting with in-house

19   counsel, we are prepared to stipulate to remove the

20   confidentiality designation of this particular document.

21   And, therefore, it won't be necessary for you to make that

22   inquiry with regard to confidentiality --

23             MS. ROTKIS:  Okay.

24             MR. SEARS:  -- since you were going there.  And

25   for the record, I would like to note that that would save

Page 45

1    Plaintiff's counsel quite a bit of time in not having to go

2    down that road.

3              MS. ROTKIS:  Okay.  Do we have that stipulation

4    on the record --

5              MR. SEARS:  I -- I just made it on --

6              THE COURT REPORTER:  Yeah.

7              MS. ROTKIS:  -- from the court reporter?

8              THE COURT REPORTER:  Yeah.

9              MS. ROTKIS:  Okay.  Thank you.

10             MR. SEARS:  She's doing her job.

11   BY MS. ROTKIS:

12       Q.    All right.  Let me go back a little bit.  So if

13   we're -- we're looking now at Bates No. 66.  And this is the

14   Credit Reporting Resource Guide that was in use at the time

15   of the disputes that are the subject of this lawsuit.

16             And do you know what hexadecimal reporting is?

17       A.    Hexadecimal, I believe, refers to the -- the

18   actual format of the data.

19       Q.    Okay.

20       A.    It's a data format.

21       Q.    If you would please turn to Bates No. 129.

22       A.    (Complied.)

23       Q.    Do you know what this page is referring to?

24       A.    Yes.  It's referring to the compliance

25   condition codes of the Metro2 reporting format.

```
 1                    THE COURT REPORTER:  Of the what?
 2                    THE WITNESS:  It's the --
 3                    THE COURT REPORTER:  I --
 4                    THE WITNESS:  Oh.  I'm sorry.  It's the -- it
 5     refers to the com -- compliance -- compliance condition
 6     codes of the Metro2 reporting format.
 7                    THE COURT REPORTER:  Thank you.
 8     BY MS. ROTKIS:
 9          Q.    Can you please explain to me Credit One's
10     understanding of the compliance condition code.
11          A.    So the compliance condition code is a code
12     that's used by the bank to indicate that the -- that the
13     account is being disputed by the consumer.
14          Q.    What is the base understanding of Metro2
15     format?
16          A.    So the Metro2 format is -- it -- it's published
17     by the CDIA, which, again, is the -- the Consumer Industry
18     Data Association.
19                    So this is the guideline for all data
20     furnishers use to ensure consistency not only between
21     individual data furnishers, but also between the major
22     credit reporting agencies.
23                    So this is the guideline for reporting.
24          Q.    Does Credit One Bank follow the Credit
25     Reporting Resource Guide?
```

HELEN LANHAM - 5/13/2016

```
 1        A.      Yes, we do.

 2        Q.      Does the bank use the Credit Reporting Resource

 3   Guide to develop any policies?

 4        A.      Yes, we do.

 5        Q.      What policies does the bank use to -- I mean,

 6   what policies are developed as a result of the Credit

 7   Reporting Resource Guide?

 8        A.      Our general com -- policy is to be in

 9   compliance with FCRA by reporting information accurately.

10        Q.      Do you have any specific policies that are

11   based on information from the Credit Reporting Resource

12   Guide?

13        A.      Yes.  The policies related to -- to ACDV

14   processing were instructed by -- by the -- by the Metro2

15   format.

16        Q.      Not just limited to Metro2, but just the

17   Consumer Reporting Resource Guide, what specific policies

18   does the bank have, the names of those policies, that are

19   based on Credit Reporting Resource Guide?

20        A.      We have the, you know, com -- the Compliance

21   Guidelines Manual and the compliance policy.

22        Q.      Are there any other policies that are based on

23   the Credit Reporting Resource Guide?

24        A.      I don't believe there's any other specific

25   policies.
```

Maxene Weinberg Agency
(800) 640-1949

1       Q.      Okay.  Now, I'm going to go on to procedures.

2    Are there any procedures that are based on the Credit

3    Reporting Resource Guide?

4       A.      Yes.  The procedures that are used to ensure

5    that our agents are properly responding to dispute

6    verification requests.

7       Q.      Any other specific policies that use the Credit

8    Reporting Resource Guide?

9       A.      Really, specifically, anything that has to do

10   with dispute processing, whether it's ACDV, so the automatic

11   dispute verification, or if we get a specific billing

12   dispute from the consumer.

13           So, basically, any -- any -- any dispute

14   procedure.

15      Q.      Are there any other -- sorry.

16      A.      Oh.  I just said any other dispute procedure.

17      Q.      So other than the ACDV dispute procedures, do

18   you have any other written procedures that specifically

19   reference information that's from the Credit Reporting

20   Resource Guide?

21      A.      I'm not aware of anything outside of -- outside

22   of our procedures for dispute processing.

23      Q.      Okay.  Turning now to -- so in looking at Bates

24   No. 129, and reading this page, I -- I just go down to the

25   fourth paragraph where it says, "Exhibit 8 provides a list

Page 49

```
 1    of compliance condition codes and examples that demonstrate

 2    how to report these codes."

 3                    Does Credit One Bank follow that procedure?

 4        A.      Yes, we do.

 5        Q.      Okay.  Turning now to 192.

 6        A.      (Complied.)

 7        Q.      And if you just take a minute to read that

 8    page, please.

 9        A.      (Complied.)

10        Q.      Does Credit One Bank follow this --

11        A.      Yes, we do.

12        Q.      -- compliance con -- okay.

13        A.      Yes, we do.

14        Q.      So for compliance condition code XB, under what

15    circumstances would Credit One Bank use the compliance

16    condition code XB?

17        A.      So we use the compliance condition code of XB

18    when a -- an account is in dispute and the investigation is

19    continuing.  So before the investigation has been -- has

20    been completed.

21        Q.      Do you ever use the code of XB after you

22    complete an investigation?

23                    MR. SEARS:  Objection.  Vague.

24                    THE WITNESS:  Like I said, that we generally do

25    not use that code when the investigation has been completed.
```

Page 50

HELEN LANHAM - 5/13/2016

1    BY MS. ROTKIS:

2        Q.     You say generally.  Can you think of any

3    situations where you use XB after an investigation has been

4    completed?

5        A.     I cannot think of any specific situation where

6    we would use XB.

7        Q.     Under what circumstances does Credit One Bank

8    use the compliance condition code XC?  That's X, as in

9    x-ray, C, as in Charlie.

10       A.     We do not use that compliance condition code.

11       Q.     Under what circumstances does Credit One Bank

12   use the compliance condition code XH?  That's x-ray, hotel.

13       A.     So we use the -- we use the -- the code XH

14   after an ACDV is completed to make sure that when the

15   consumer sees their credit report, they know that we have --

16   we have -- you know, completed the investigation and that we

17   are the one who are providing that information.

18              Because it says, "Account previously in dispute

19   now resolved.  Reported by the data furnisher."  So that we

20   know that -- so that the consumer knows that the bank is the

21   one updating the credit record, not the CRA.

22       Q.     What does "now resolved" mean to Credit One

23   Bank?

24       A.     It means that we've completed our investigation

25   of the dispute in -- in compliance with FCRA.

1        Q.      If the consumer submits a second dispute

2    disagreeing with the resolution holding an account --

3    holding a person account for -- holding a person liable for

4    an account, does Credit One Bank use the code XB?

5                MR. SEARS:  Objection as to form.

6                THE WITNESS:  No, we do not.  We use the code

7    that indicates that -- that the consumer's account

8    information has been most recently reviewed and updated by

9    us as the data furnisher.

10   BY MS. ROTKIS:

11       Q.      And what code is that?

12       A.      XH.

13       Q.      Turning now to page 187.

14       A.      (Complied.)

15       Q.      If you just take a couple of minutes to look at

16   this exhibit.  It's Bates No. 187 through 191.  I'm sorry.

17   Strike that.  That's -- I'm -- they're two different

18   exhibits.  First is page 187 only.  And then the next one is

19   188 through 191.

20       A.      So I'm sorry.  You want me to look at -- of all

21   of it or just --

22       Q.      Just look at 187 for now.

23                MR. SEARS:  If you need to review any other

24   portion of that to make sense of anything on 187, certainly,

25   take your time --

HELEN LANHAM - 5/13/2016

1                      THE WITNESS:  Uh-huh.

2                      MR. SEARS:  -- to do that.

3                      MS. ROTKIS:  That's fine.

4    BY MS. ROTKIS:

5         Q.    Okay.  Does Mr. Schutt set the compliance

6    standards for Credit One to comply with the FCRA?

7         A.    The bank's attorney, including previous

8    attorneys, such as Mr. Schutt, are the ones that are

9    responsible for -- for conveying what the bank's

10   responsibility is to being in compliance with FCRA.

11        Q.    Okay.  Who were the previous attorneys prior to

12   Mr. Schutt?  You only have to go back five years.

13        A.    I believe that prior to Mr. Schutt, we utilized

14   outside -- outside counsel.

15        Q.    Do you know when Mr. Schutt joined Credit One

16   Bank?

17        A.    I believe it was in 2007.

18        Q.    And do you know what his title is?

19        A.    I believe his title was -- was -- was in-house

20   counsel.

21        Q.    Okay.  All right.  So page 187, do you know

22   what this is?

23        A.    Yes.  It's a description of special comment

24   codes, again, of the Metro2 format.

25        Q.    Okay.  And explain to me Credit One's

1   showed one that he thought represented his situation.

2   BY MS. ROTKIS:

3       Q.     Have you seen the letter that Mr. Wood wrote to

4   the consumer reporting agencies disputing the accuracy of

5   the Credit One account?

6              MR. SEARS:  I'm going to object to the extent

7   that it goes beyond what she's been designated.

8              THE WITNESS:  I looked at the AC --

9   BY MS. ROTKIS:

10      Q.     You may answer.

11      A.     -- the ACDVs, but I don't recall specifically

12  the content of the -- those -- that letter.

13      Q.     Do you recall ever seeing the letter?

14             MR. SEARS:  Note my continuing objection.

15             THE WITNESS:  I -- I don't specifically recall

16  seeing -- seeing the letter.  I  -- as I said, I -- I looked

17  through the ACDV screens, the -- the printouts of those, but

18  I did not look at the letter.

19  BY MS. ROTKIS:

20      Q.     Do you know where the ACDVs come from?

21      A.     Well, there's -- there's a couple of ways that

22  a consumer can submit an ACDV.  They can go directly to the

23  credit bureau site and do it directly electronically or they

24  can send correspondence to the CRA and the CRA will then

25  forward that information on to a data furnisher.

Page 68

1      Q.      So it's your understanding that a consumer

2  fills out the ACDV; is that correct?

3      A.      It's my understanding that a consumer can fill

4  out the ACDV.  There are -- the ACDV can be filled out

5  either directly by the consumer or by representative at the

6  CRA, who's either, I believe, speaking to a consumer on the

7  phone or is processing correspondence that the consumer has

8  sent directly to the CRA.

9      Q.      Did Mr. Wood ever communicate to Credit One

10  that he agreed with Credit One's conclusion that he was

11  liable on the account?

12     A.      Not to my knowledge, he did not.

13     Q.      Did he continue to dispute the accuracy of the

14  account after his initial dispute that was communicated to

15  you by the CRAs?

16             MR. SEARS:  Please note an objection.  This

17  clearly is subject 12, which someone else is designated.  If

18  you want to ask this witness, that's fine, but that's your

19  choice.

20             MS. ROTKIS:  Okay.  She's designated for

21  testimony on all the facts of the complaint.  And, so, these

22  are all facts that I got out of the complaint.  So that's

23  why I'm asking her.  And I'll be happy to ask the other one,

24  too.  So that's --

25             MR. SEARS:  That's fine.  That's specificity --

Page 69

HELEN LANHAM - 5/13/2016

1              MS. ROTKIS:  I can do that.

2              MR. SEARS:  Specificity rolls over vague.  So

3    that would be my point.  Go ahead.

4    BY MS. ROTKIS:

5        Q.    Please answer the question.

6        A.    So I am aware that Mr. Wood submitted

7    additional ACDVs after -- after Credit One reviewed his

8    previous dispute.

9        Q.    Okay.

10       A.    So he -- I -- I'm -- I'm aware that he

11   submitted multiple ACDVs.

12       Q.    Under what circumstances may Credit One

13   continue to report an account that a consumer has identified

14   was the result of identity theft?

15             MR. SEARS:  Objection as to form.

16             THE WITNESS:  It's my understanding that we can

17   continue to report the accuracy of the account if we have

18   not been able, through our reasonable investigation, to

19   determine that it was actually a case of identity theft.

20   BY MS. ROTKIS:

21       Q.    What evidence does Credit One have that

22   Mr. Wood was liable on the account?

23             MR. SEARS:  Objection as to form.

24   BY MS. ROTKIS:

25       Q.    What info -- I'll -- I'll -- I'll rephrase.

HELEN LANHAM - 5/13/2016

1   What information does Credit One have that Mr. Wood was

2   liable on the account?

3           MR. SEARS:   Objection as to form.

4   BY MS. ROTKIS:

5       Q.    Please answer.

6       A.    As part of our -- as part of our investigation

7   of Mr. Wood's dispute, we reviewed not only our own account

8   records, but underlying documents, as well as going to third

9   parties to determine that -- that in -- that Mr. Woods (sic)

10  opened the account.

11      Q.    What third parties confirmed that Mr. Wood

12  opened the account?

13      A.    Well, we're looking at a couple of things.  So

14  we're looking at an Experian social trace, which, I believe,

15  validates that, you know, Mr. Wood's identity in terms of

16  his name, Social Security number, date of birth.

17          And then we use a LexisNexis product called

18  Accurint that also looks at -- at -- at -- to verify the --

19  the consumer's address.

20      Q.    Did Credit One sell Mr. Wood's account to

21  Midland Funding?

22      A.    Yes.  We sell all charge-off accounts.

23      Q.    But did you sell it directly to Midland

24  Funding?

25      A.    It's not direct to Midland Funding.  We sell it

Page 71

1    first to the Sherman Originator III and Midland Funding is

2    the -- the final owner.

3        Q.    Has Credit One ever communicated with Midland

4    or Encore or any of the Midland companies about Mr. Wood's

5    account?

6        A.    I believe that we did, because our general

7    practice is that if we have a dispute on an account that we

8    previously charged off and sold, we will buy back that

9    account from whoever purchased it in order to address the

10   consumer's concerns directly versus going through a -- the

11   party that -- that had purchased the debt.

12       Q.    Did you buy back Mr. Wood's account?

13       A.    I believe that we did, yes.

14       Q.    How much did you buy back the account for?

15       A.    I -- I don't know what the price was.

16       Q.    Do you know when that occurred?

17       A.    I -- I don't know the specific date when that

18   occurred.

19       Q.    Does Credit One Bank have any contracts with

20   Midland Funding, LLC, or Encore Capital?

21       A.    I'm not aware of any contracts directly between

22   Credit One and Midland or Encore since they are not the

23   first, you know, purchaser of the debt.

24       Q.    What underlying documents does Credit One have

25   in its possession that demonstrate that Mr. Wood is liable

Page 72

HELEN LANHAM - 5/13/2016

```
 1      Q.      Under A, Prohibitions, sub -- well, romanette
 2  1, sub 2, explain to me what this -- this policy provides.
 3  Or, I guess, this guideline -- this guideline provides.
 4  Sorry.
 5      A.      So I believe this is taken directly -- or very
 6  close to directly to the actual -- from the actual statute.
 7  And part 2 is saying that -- so -- so A is what the bank is
 8  prohibited for -- from doing.
 9              So, generally, we're prohibited from reporting
10  inaccurate information if we have specific knowledge of
11  that.  And that this is -- this is a caveat that's saying
12  that if the consumer told us that -- you know, based on some
13  address that the bank is previously designated for that
14  correspondence, that the specific information is accurate --
15  inaccurate, you know, we're prohibited from reporting that
16  information if the information is, in fact, inaccurate.
17      Q.      Is the receipt of that information from an ACDV
18  suitable notice to the bank that the specific information is
19  inaccurate?
20              MR. SEARS:  Objection.  Calls for a legal
21  conclusion.
22  BY MS. ROTKIS:
23      Q.      I don't -- I don't want to know a legal
24  conclusion.  I just want to know, does the bank consider the
25  receipt of an ACDV that notifies of the consumer's dispute
```

Page 86

1    about the inaccuracy of information in its reporting?

2              MR. SEARS:  Objection as to form.

3              THE WITNESS:  The bank would -- regardless

4    of -- regardless of the channel that the bank is made aware

5    of the dispute from the customer, we do a thorough

6    investigation to -- to, you know, investigate the -- the

7    consumer's dispute.

8              So I -- I believe that the reg has different

9    rules for direct dispute versus ACDV.  In reality, at the

10   bank, we treat those the same.

11             So if a consumer's disputing, you know,

12   obviously, through the ACDV, it's in a -- it's in an

13   electronic form, right, and it's -- it's -- it's set out --

14   set through e-OSCAR.

15             But from a substantive standpoint, we want to

16   address the consumer's dispute, make a -- make a thorough

17   investigation of their dispute and, subsequently, alter

18   their bureau reporting if we had, in fact, been reporting it

19   inaccurately.

20   BY MS. ROTKIS:

21     Q.    Was the bank reporting Mr. Wood's account

22   acc -- the credit line that it attributed to Mr. Wood, was

23   it reporting it accurately?

24     A.    Yes, it was reporting it accurately, based on

25   our investigation of -- of -- of our -- our system data

Page 87

HELEN LANHAM - 5/13/2016

1    and -- and underlying documents.

2        Q.    How -- if you look under C, "Duty to provide a

3    notice of dispute.  If the consumer disputes the

4    completeness or accuracy of any information that the bank

5    has reported to the CRA, the bank will not report the

6    information to the CRA without notice that the information

7    is disputed by the consumer."

8            Did Credit One Bank do that with Mr. Wood?

9        A.    Yes.  On the ACDVs that I -- that I reviewed,

10   there was a compliance condition code put on Mr. Wood's

11   account indicating that the account had been in dispute.

12       Q.    Oh, really?  What compliance condition code was

13   that?

14       A.    The XH.

15       Q.    Okay.  Page 341.

16       A.    (Complied.)

17       Q.    Sub F.  "Duties upon notice of identity theft

18   related information.  Romanette 2.  "If a consumer submits

19   an identity theft report to the bank, at the bank's

20   specified identity theft reporting address, stating that the

21   information maintained by the bank regarding the consumer

22   resulted from identity theft, the bank may not report

23   consumer information to a CRA unless the bank subsequently

24   knows or is informed by the consumer that the information is

25   correct."

HELEN LANHAM - 5/13/2016

```
 1            Does Credit One Bank comply with sub F,
 2    romanette 2?
 3        A.    Yes, we comply, because we have policy and
 4    procedures in place to address a -- a report of -- so any
 5    consumer that says that they have been the victim of
 6    identity theft, we have policies and procedures in place to
 7    address that specific dispute.
 8            (Pause in the proceedings.)
 9            MS. ROTKIS:  Okay.  I have nothing further for
10    this witness.  Mr. Sears?
11            MR. SEARS:  I have no questions.
12            THE VIDEOGRAPHER:  Off the video record at
13    1: --
14            MS. ROTKIS:  Ms. Lanham, thank you so much.
15            THE VIDEOGRAPHER:  -- 24.
16            THE WITNESS:  Thank you.
17            (Whereupon, the videoconference videotaped
18    deposition was concluded at 1:24 p.m.)
19
20
21
22
23
24
25
```

Page 89