Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                     Richmond Division

4

5

6    DAVID WILLIAM WOOD,             )

7                     Plaintiff,     )

8       v.                           )   Civil Action No.:

9    EQUIFAX CREDIT INFORMATION      )   3:15CV594(MHL)

10   SERVICES, LLC, et al.,          )

11                    Defendants.    )

12

13

14

15           VIDEO DEPOSITION UPON ORAL EXAMINATION

16                 OF DAVID WILLIAM WOOD

17     TAKEN ON BEHALF OF DEFENDANT CREDIT ONE BANK, N.A.

18                 Newport News, Virginia

19                    July 14, 2016

20

21

22

23

24

25       Job No. CS2331616

Page 10

1    something like -- some disability?

2         Q.    Okay.  And thank you for doing that.  If

3    there's any question I ask that you don't understand,

4    please ask me to restate it, clarify it, or -- or explain

5    it, and I will do that.

6              So what I'm asking is, first of all, do you

7    have any physical limitations that I should know about

8    today.  For instance, you indicated that you were in a car

9    accident.

10             So do you have problems sitting for a

11   prolonged period of time?  Do you need to take breaks

12   certain periods of time so you can get up and move around?

13   Anything like that.

14        A.    As far as I'm aware of, no.

15        Q.    Okay.  Are there any time limitations today?

16   Do you have an appointment later on today or someplace you

17   have to be that I need to be aware of?

18        A.    Not that I can recall at the moment.

19        Q.    Okay.  Now, if I ask a question and you

20   respond to the question, I'm going to assume that you

21   understood the question and the answer that you're giving

22   is responsive to that.  Is that fair?

23        A.    Yes.

24        Q.    Okay.  Mr. Wood, what is your current

25   address?

Page 11

1      A.      2710 Wickham Avenue, Newport News, Virginia

2    23607.

3      Q.      And how long have you lived at that address?

4      A.      About a year.

5      Q.      And do you live by yourself or with anyone

6    else?

7      A.      By myself.

8      Q.      So it would have been from about July of 2015

9    to present; is that correct?

10     A.      I don't know the specific date that I moved

11   in there.  But it's been about a year.

12     Q.      Okay.  Where are you -- are you employed?

13     A.      Yes.

14     Q.      Where are you employed?

15     A.      Eastern State.

16     Q.      What do you do there?

17     A.      I'm a CNA.

18     Q.      Do you have a professional license in the

19   State of Virginia?

20     A.      Yes.

21     Q.      How long have you held that license?

22     A.      Since about 2012.

23     Q.      And have you held that license continuously?

24     A.      Yes.

25     Q.      Before living at 2710 Wickner (sic) Avenue,

Page 12

1    where did you live?

2         A.    I can't remember the correct number address,

3    but it was something similar to 15-something River Bend

4    Trail, Lanexa, Virginia.

5         Q.    How long did you live at that address?

6         A.    About six or seven months.

7         Q.    So from about the beginning of July of 2015?

8         A.    I don't know the exact date.

9         Q.    Okay.  And between your move between River

10   Bend Trail and Wickner Avenue, did you temporarily reside

11   any -- anywhere else, or did you move from one place to

12   the other?

13        A.    Yes.  I lived at -- I can't remember the

14   numbers of it correctly, but it was in Williamsburg for a

15   short period of time.

16        Q.    Like days?  Weeks?

17        A.    Whatever the gap is in between the two.

18        Q.    Okay.  Since I don't have dates, I don't know

19   what the gap is, but --

20        A.    I didn't write down the dates, so --

21        Q.    All right.  So it was a Williamsburg address,

22   though?

23        A.    Yes.

24        Q.    Between the River Bend Trail residency and

25   the Wickner Avenue residency; is that correct?

Page 13

1      A.      Yes.

2      Q.      Do you remember the street that it was on?

3      A.      Centerville.

4      Q.      Centerville.  Did you live by yourself or

5  with someone else?

6      A.      No.  I stayed -- there was a room to rent.  I

7  rented a room.

8      Q.      Okay.  Rented a room.  And who did you rent

9  that room from?

10      A.      A man named Wayne Davis.

11      Q.      Do you know -- okay.  The River Bend Trail

12  residency, where did you reside before then?

13      A.      Before River Bend Trail?

14      Q.      Yes.

15      A.      It was -- I don't remember the number address

16  again, but it was 30-something Chelsea Road, West Point,

17  Virginia.

18      Q.      How long did you live there?

19      A.      I'd say that was about a year.  Maybe two.

20      Q.      Did you live with someone?

21      A.      I rented a room again.

22      Q.      Rented a room?  Was it like in a house or --

23      A.      Yes.

24      Q.      Okay.  And who -- who did you rent from?

25      A.      Jennifer Maynard Brannon.

Page 14

1       Q.    And between living at Chelsea Road and River

2  Bend Trail, did you stay anywhere else temporarily?

3       A.    Not that I can recall.  This is going pretty

4  far back on the time line, however.

5       Q.    Okay.  So -- and we're back now at the

6  Chelsea Road to 2013 maybe?

7       A.    I don't know.

8       Q.    Okay.  Where did you live before the Chelsea

9  Road?

10      A.    I can't remember if it was either my

11  grandmother's house or my mother's house.  Both were in

12  New Kent.

13      Q.    And do you recall the address?

14      A.    I do not.

15      Q.    It's in New Kent?  You don't remember the

16  street name?

17      A.    No.

18      Q.    How long did you live there?

19      A.    I don't know.

20      Q.    Do you recall where you lived before living

21  at -- in New Kent with either your grandmother or mother's

22  house?

23      A.    My mother at some point along the time line

24  moved back into West Point and jumped back and forth

25  between New Kent and West Point.  So it's difficult to

Page 15

1   place exactly where on the time line without a specific
2   date.  And then even then I wouldn't recall it.
3       Q.    Okay.  So you were living with her during
4   this time period that she was moving back and forth?
5       A.    Yes.
6       Q.    Okay.  And you said West Point.  What was the
7   address in West Point that she moved between?
8       A.    21st Street.
9       Q.    21st Street?  Have you ever lived at 8315
10  Mill Creek Road, West Point, Virginia?
11      A.    Yes.  That is the -- sounds like the New Kent
12  address for my grandmother.
13      Q.    Okay.  So you said that was in New Kent.  Is
14  that New Kent County that you're referring to or New Kent
15  as a city?
16      A.    It has a West Point address.  Pay New Kent
17  taxes.
18      Q.    Okay.  All right.  So just so I'm clear, you
19  did live for a period of time at 8315 Mill Creek Road,
20  West Point, Virginia; is that correct?
21      A.    Yes.
22      Q.    Okay.  Have you ever lived at 8120 Kentwood
23  Avenue, West Point, Virginia?
24      A.    Yes.
25      Q.    When was that?  Do you recall?

Page 16

1          A.      Quite a while ago.

2          Q.      Are you able to be more specific?

3          A.      No.

4          Q.      Have you ever lived at 2115 Lee Street?

5                  MR. MARCHIANDO:  Chris, do you have a

6      document you're reading from?  Are these your notes?

7                  MR. SEARS:  I am reading from a document,

8      yes.

9                  MR. MARCHIANDO:  Do you have a document you

10     can show the witness?

11                 MR. SEARS:  I'm not -- I mean, I have

12     documents, but I don't want to move to documents.  I'm

13     just asking him a question of whether or not he has lived

14     at a specific address.

15                 MR. MARCHIANDO:  Okay.  I'm asking if we

16     could please see the document that you're reading these

17     addresses from.

18     BY MR. SEARS:

19         Q.      Sir, do you need to see a document in order

20     to answer my question of whether or not you've ever lived

21     at 2115 Lee Street?

22         A.      If you have a time line of previous addresses

23     I've lived at, yes, that would greatly help.

24         Q.      I -- I don't have a -- a time line.  I

25     have -- and I don't know whether or not you've lived at

Page 17

1    these addresses.  That's why I'm asking you.

2          A.     If you have any information on previous

3    addresses I may have lived at, that would be helpful to

4    help me recall.

5          Q.     All right.  So let me ask you this question

6    then.  You don't -- you don't specifically recall at this

7    time whether or not you lived at 2115 Lee Street, West

8    Point, Virginia.  But you would need to see some document

9    to refresh your recollection; is that correct?

10         A.     I believe that's what I just said.  Yes.

11         Q.     Okay.  Do you -- we'll come back to that

12   later then.  Okay?  Do you recall living at any other

13   addresses other than what we have just gone over?

14         A.     To my memory, there was one in Zuni.  I do

15   not remember any details on that.  That's really far back

16   on the time line.

17         Q.     How do you spell that?

18         A.     Z-u-n-i.

19         Q.     Is that in Virginia?

20         A.     Yes.

21         Q.     Have you always lived in Virginia?  Lived in

22   any other state?

23         A.     Always lived in Virginia.

24         Q.     Have you ever received mail at any address

25   other than what we have gone through?

Veritext Legal Solutions

Page 18

1        A.      I have never received mail anywhere besides

2    those addresses.

3        Q.      Okay.  Have you -- are you familiar with a

4    Post Office Box 725 in West Point, Virginia?

5        A.      Yes.  That's -- in the West Point that's the

6    only way to get mail.

7        Q.      Okay.  Why is that?  Do they not have

8    delivery to specific physical addresses?

9        A.      They do not.

10       Q.      Okay.  And did you receive mail at West

11   Point -- I'm sorry -- at P.O. Box 725 in West Point,

12   Virginia?

13       A.      Yes.  That would have been the West Point

14   address that I lived at's mailing address.

15       Q.      All right.  And did you own that post office

16   box or did someone else own that?

17       A.      I did not own it.

18       Q.      Do you know who owned that post office box?

19       A.      My mother or stepfather.  No, I do not know

20   who owned it.

21       Q.      But you know you did not own it; is that

22   correct?

23       A.      I did not own it.

24       Q.      Okay.  Did you have access to that post

25   office box?

Page 19

1      A.      Sometimes.

2      Q.      What do you mean by sometimes?  Can you

3  explain that for me?

4      A.      By law, you're not allowed to make a copy of

5  the post office box key.

6      Q.      Uh-huh.

7      A.      There was only one key.

8      Q.      Okay.  So sometimes you would have the key

9  and sometimes you would not have the key?  Is that what

10  I'm understanding your testimony to be?

11      A.      Sometimes I was asked to pick up the mail.

12      Q.      And you were given the key to do so; is that

13  correct?

14      A.      Yes.

15      Q.      All right.  And would you use the Post Office

16  Box 725 address -- would you give that to other parties

17  for them to send mail to you during the time that you

18  lived on Mill Creek Road?

19      A.      No.

20      Q.      What about when you were -- the licensing

21  board for your CNA?  Did you give them the Post Office Box

22  725 address to send you mail?

23      A.      Licensing board wants the physical address of

24  where you physically live.  I gave them an address where I

25  could receive mail at that time.

Page 20

1      Q.      And that would be the Post Office Box 725; is

2    that correct?

3      A.      Your question is not clear.

4      Q.      Okay.  So my question is did you give the

5    licensing board, Virginia state licensing board that --

6    for which you have the CNA the Post Office Box 725, West

7    Point, Virginia, address so that they could send you mail.

8      A.      I don't understand if you're trying to be

9    oddly specific as to ask what address do they have on file

10   now or has that ever been on file.

11     Q.      Yeah.  My -- my question is has it ever been

12   on file with the licensing board that they could send mail

13   to you at P.O. Box 725, West Point, Virginia.

14     A.      I do not recall.

15     Q.      Okay.  What about Department of Motor

16   Vehicles?  Similar question.  Did you have a vehicle, own

17   a vehicle, or register a vehicle for the State of Virginia

18   at the time that you lived at the Mill Creek Road address?

19     A.      Yes.

20     Q.      And did you provide the Department of Motor

21   Vehicles the Post Office Box 725 address so that they

22   could send mail to you?

23     A.      I had issues getting mail at the post office

24   box, so it is unlikely that I would use that address to

25   receive important mail.

Page 21

1      Q.     Okay.  So the question is did you provide the

2   Post Office Box 725 -- and so let me just clarify what --

3   what I understand your response is.  Do you -- do you

4   remember?  Or, I mean, what is your response?  I

5   understand that you had issues and that maybe you would

6   not have given out that post office box.

7           But do you remember whether or not you

8   provided the Post Office Box 725 to the Department of

9   Motor Vehicles?

10      A.     To me it sounds like you understand my

11   answer.

12      Q.     Okay.

13      A.     Perhaps you can reask your question.

14      Q.     Did you provide the Virginia Department of

15   Motor Vehicles a mailing address of Post Office Box 725,

16   West Point, Virginia?

17      A.     I don't recall.

18      Q.     What would happen if a piece of mail was

19   addressed to the 8315 Mill Creek Road address and sent?

20   Would it go into the post office box, or how would it get

21   to that address?

22      A.     I believe it would come straight to the

23   address.

24      Q.     Okay.  So they do have physical delivery to

25   that address?

Page 22

1      A.      You're in New Kent now.  Earlier you were

2   asking about West Point's post office box system.

3      Q.      Okay.  All right.  So maybe I misunderstood

4   your earlier testimony.  Let me clarify.  I understood

5   what you said earlier to be that if you lived at 8315 Mill

6   Creek Road, New Kent/West Point -- it's in New Kent, but

7   it has a West Point mailing address -- that the only way

8   you could receive mail was to have it delivered to the

9   post office box.  Is that a correct understanding of your

10  testimony or incorrect?

11     A.      Incorrect.

12     Q.      Okay.  So if you lived at 8315 Mill Creek

13  Road in New Kent but has a West Point, Virginia, address,

14  mailing address, and someone sent a letter to 8315 Mill

15  Creek Road, it would have been delivered to the physical

16  location.

17     A.      Yes.

18     Q.      Okay.  But at the same time that you were

19  living there, either your mother or your stepfather also

20  owned a Post Office Box 725 in West Point, Virginia; is

21  that correct?

22     A.      Yes.

23     Q.      Okay.  Why did they, if you know -- do you

24  know why they had a post office box?

25     A.      That is the only way to receive mail in West

Page 23

1  Point.  There was an address they lived at in West Point.

2      Q.    Okay.  When you say -- are you talking about

3  a different address than the 8315 Mill Creek Road?

4      A.    Yes.  Earlier you asked me about a West Point

5  address.

6      Q.    Well, the address that I'm asking you about

7  is the 8315 Mill Creek Road, West Point, Virginia.  Is

8  that an address where you resided?

9      A.    Yes.

10     Q.    Okay.  And it is -- is it at that address,

11  then, that -- well, let me ask you this.  If the post

12  office box is the only way to receive mail for a

13  unknown-to-me West Point address, what West Point address

14  are you unable to receive mail but through a post office

15  box?

16     A.    If you could show me that document earlier

17  that has all those addresses on it, I could maybe recall

18  it.  But as I remember a question earlier, it was like a

19  21st or a 22nd Street.

20     Q.    Oh, okay.

21     A.    In West Point.

22     Q.    All right.  That makes sense then.  So

23  there's a 21st Street, West Point, address that you lived

24  at.  And the only way you could receive mail at that

25  particular address was through a post office box.

Page 24

1        A.      Yes.

2        Q.      Okay.  And do you know how -- what period of

3   time either your mother or stepmother -- or stepfather

4   owned this post office box?

5        A.      No.

6        Q.      All right.  Now, you had indicated before

7   that you had issues receiving mail; is that correct?

8        A.      Yes.

9        Q.      Okay.  Tell me about that.

10       A.      I would be expecting mail.  I would not

11   receive it.

12       Q.      All right.  And where would you -- where --

13   what address were you living at where you expected mail

14   but did not receive mail?  Or addresses.

15       A.      Both addresses in New Kent, the address I

16   can't recall, and West Point --

17       Q.      All right.  So --

18       A.      -- which includes the P.O. box.

19       Q.      All right.  So that would be the 21st Street

20   address and the Mill Creek address; is that correct?

21       A.      I believe there's one more somewhere in New

22   Kent.

23       Q.      Okay.  And so you were expecting mail and you

24   would not receive mail as you lived at different

25   addresses.  Were the -- the mail that you were expecting

Page 25

1    and did not receive, was that being sent to the post

2    office box, to one of the addresses that you were living

3    at, or a mixture?

4         A.    I'm confused with your previous question.  I

5    thought you had asked me which addresses did I have

6    trouble receiving mail at.

7         Q.    Uh-huh.

8         A.    And I believe I said the two in New Kent and

9    the 21st or 22nd Street, West Point, address, which

10   includes the P.O. box address.

11        Q.    All right.  So whether the mail was being

12   sent to one of the addresses in New Kent or the -- one of

13   the addresses in West Point, including the post office

14   box, at all those addresses you had issues receiving your

15   mail; is that correct?

16        A.    Yes.

17        Q.    Okay.  What was the source of those issues?

18   The issue being that you would not receive your mail; is

19   that correct?  You would expect someone to mail something

20   to you and you would not receive that mailing.  Is that

21   fair?

22        A.    Say that one more time.

23        Q.    All right.  The issue -- I'm just trying to

24   be very specific as to what that issue is.  And that is

25   that you expected someone to mail something to you, and

Page 26

1   you would not receive that mail when you resided at one of

2   these addresses either in New Kent or in West Point.

3       A.    Correct.  I would receive virtually no mail.

4       Q.    And do you know why?

5       A.    No.

6       Q.    Did you make any inquiries as to why you were

7   not receiving mail?

8       A.    I don't understand.

9       Q.    Did you ask -- did you go to anyone, a family

10  member or a member of the post office or people sending

11  you mail, and ask questions as to why you're expecting to

12  receive mail and not receiving it?

13      A.    Yes.  I started putting tracking on objects,

14  but it would still say delivered.  I wouldn't get it.

15      Q.    Like, for instance, if you're ordering

16  something by mail, like a product or something, and they

17  would send it, you would put a tracking number on it so

18  you could track it, and you still would not receive it

19  even though it said it was delivered?

20      A.    Correct.

21      Q.    Is that an example?  Okay.  And did you do

22  anything else with regard to your nonreceipt of mail?

23      A.    Yes.

24      Q.    What else?

25      A.    I found if I cleared my schedule and was

Page 27

1   there when the -- right as soon as the mail was delivered,

2   I could get everything.

3       Q.    All right.  So was it your belief that

4   someone at the address that it was -- where the mail was

5   being received was tampering with your mail?

6       A.    That's what it started to look like.

7       Q.    Okay.  Do you have that belief as we sit here

8   today, that you did not receive mail that was intended to

9   be mailed to you at one of these address because someone

10  at the mailing address was tampering with your mail?

11      A.    That is what I believe.

12      Q.    Okay.  Do you have a belief as to who that

13  person or persons were?

14      A.    Yes.

15      Q.    And who do you believe was responsible for

16  that?

17      A.    My mother.

18      Q.    And that's Dyan Lollis?

19      A.    Yes.

20      Q.    And did you confront her about this?

21      A.    Yes.

22      Q.    What did she say?

23      A.    She said I hadn't gotten anything.

24      Q.    Did she ever admit to you that -- that she

25  was tampering with your mail?

Page 28

1      A.      No.

2      Q.      Did you suspect anyone else of tampering with

3   your mail?

4      A.      Yes.

5      Q.      Who else did you suspect of tampering with

6   your mail?

7      A.      My aunt.

8      Q.      What is your aunt's name?

9      A.      Frieda Wood.

10      Q.      F-r-e-d-a?

11      A.      F-r-i-e-d-a.

12      Q.      F-r-i-e-d-a?  Wood.  Does she live at the

13   address where you were living at the time you expected to

14   receive mail?

15      A.      She was in and out of many addresses.

16      Q.      Did you ever confront Frieda Wood about your

17   belief that she had possibly tampered with your mail?

18      A.      Yes.

19      Q.      And what did she say?

20      A.      Ask my mom.

21      Q.      Ask her what?

22      A.      About my mail.

23      Q.      All right.  So you would -- you would -- you

24   had a belief that Frieda Wood was tampering with your --

25   your mail.  You made inquiry of her regarding your belief.

Page 29

1    And she referred you to Dyan Lollis.  Is that what you're

2    telling me?

3          A.    Yes.  But I'd already suspected both of them.

4          Q.    All right.  Did Frieda Wood ever admit to you

5    that she had tampered with your mail?

6          A.    I don't understand the question.  Did Frieda

7    admit to tampering with the mail herself, or did Frieda

8    admit that she knew my mom was tampering with the mail?

9          Q.    Okay.  Let me ask both.  So the first one is

10   did Frieda ever admit to you that she tampered with your

11   mail?

12         A.    No.

13         Q.    Did Frieda ever make any statements to you of

14   her belief or knowledge as to whether or not Dyan Lollis

15   was tampering with your mail?

16         A.    No.  She told me my mom had some mail for me.

17         Q.    Is this a specific conversation that you're

18   recalling or just generally?

19         A.    This would be anytime I would bring it up,

20   these would be the same answers.

21         Q.    Okay.  So she would say that your mother has

22   mail for you.

23         A.    Yes.

24         Q.    Okay.  But not that she was -- not --

25   Frieda -- well, let me ask you this.  Did Frieda make any

Page 30

1    statements suggesting that Dyana (sic) Lollis was

2    preventing mail from getting to you?

3        A.    No.

4        Q.    Okay.  Did you suspect of anyone -- anyone

5    else of tampering with your mail?

6        A.    No.

7        Q.    Did you report your suspicions of anyone

8    tampering with your mail to any authorities?

9        A.    No.

10       Q.    Whether it be post office or law enforcement.

11       A.    No.  I did tell the post office for some

12   things that were coming to hold the item at location, and

13   I could get it that way.

14       Q.    Okay.  When you're living at the four

15   addresses that we -- well, living at the three addresses

16   that we just talked about, the 21st Street, the 8315 Mill

17   Creek Road -- let me reask the question.

18             So we -- we have been talking about problems

19   that you had in receiving mail while residing at two

20   addresses in New Kent and one address in West Point and

21   also problems that you've had in receiving E-mail (sic) at

22   a post office box located in West Point.

23             Are these the only times that you had

24   problems receiving mail?

25       A.    To my knowledge, that would be the only time

Page 31

```
 1    I've had a problem receiving mail was when I was staying
 2    at the two addresses in New Kent and then the one with
 3    the P -- which includes the P.O. box in West Point.
 4         Q.     Okay.  What is your educational background?
 5         A.     I have a GED and some trade school.
 6         Q.     And when did you get your GED?
 7         A.     I do not recall.
 8         Q.     Do you recall the year?
 9         A.     I do not recall.
10         Q.     Where did you attend trade school?
11         A.     Riverside School of Nursing.
12         Q.     Did you graduate from that school?
13         A.     Yes.
14         Q.     You receive a degree?
15         A.     Yes.
16         Q.     What degree was that?
17         A.     A certified nurse aide.
18         Q.     Do you recall the year that you completed
19    that program?
20         A.     I believe it was 2012.
21         Q.     Okay.  And have you worked for any other
22    employers other than Eastern State as a CNA?
23         A.     Yes.
24         Q.     What other employers have you worked at?
25         A.     BAYADA Home Health Care.  Dominion Village.
```

Page 32

1    Envoy of Westover Hills.

2          Q.     Envoy?

3          A.     Yes.  Hope In Home.

4          Q.     Hope In?

5          A.     Hope In.  Like I have hope in my home.

6          Q.     Oh, okay.

7          A.     Americare Plus or something similar.

8    Riverside.  There are two more.  I can't remember their

9    strange names.

10          Q.     Okay.  And you worked at all these places

11    since 2012 or since receiving your CNA?

12          A.     Yes.

13          Q.     How long have you been at Eastern State?

14          A.     Over two years.

15          Q.     Have you ever used any of your employers'

16    addresses to receive mail?

17          A.     No.

18          Q.     Have you ever used any addresses other than

19    what we have identified today where you resided and other

20    than any of the employment -- or employers that you had,

21    did you use any other addresses to receive mail since

22    2000 -- January 2013?

23          A.     Yes.

24          Q.     What other addresses have you used to receive

25    mail?

Page 33

1      A.      There's quite a number.  I would just use a

2    friend's address, whoever was going to be available, to

3    get some mail of importance, be it a registration or a

4    package.

5      Q.      Okay.  So you would use other people's

6    addresses even though you didn't reside at that address;

7    is that correct?

8      A.      Yes.  I would use other addresses as a

9    mailing address.

10      Q.      All right.  And why was that?  I understand

11    the purpose was to make sure that you received certain

12    things.  But was it because you didn't trust the address

13    that you were living at to receive the packages, or was

14    there some other reason why you would use someone else's

15    address?

16      A.      I did not trust the address that I lived at.

17      Q.      All right.  So these -- this use of friends'

18    addresses, is it fair to say that that would occur during

19    the time period that you lived at the two New Kent

20    addresses and the one West Point address that also

21    received mail through the post office box?

22      A.      Yes.

23      Q.      Do you remember the year that -- or strike

24    that.  I suppose you probably -- well, let me ask.  Do you

25    recall any of the addresses that you used that you didn't

Page 34

1  live at or work at?

2      A.    No, because I had no reason to memorize them.

3  Most of them I used one time or a handful of times, all of

4  which the friends gave me them as -- live as I was

5  updating it.

6      Q.    Okay.  Sir, do you claim that someone stole

7  your identity?

8      A.    Yes.

9      Q.    And who do you believe stole your iden --

10  your identity?

11      A.    My mother.

12      Q.    That would be Dyan Lollis?

13      A.    Yes.

14      Q.    When do you believe that she stole your

15  identity?

16      A.    Around 2012 I became aware that someone had

17  stolen my identity.

18      Q.    All right.  So that's -- the first indication

19  that -- that someone had stolen your identity was in 2012.

20  At what point did you come to believe that that person was

21  your mother, Dyan Lollis?

22      A.    Some date in October 2015.

23      Q.    October 2015?

24      A.    Yes.

25      Q.    Okay.  And how -- did you confront Ms. Lollis

Page 35

1    regarding your belief that she had stolen your identity?

2          A.    Yes.

3          Q.    When did you confront her?

4          A.    October 2015.

5          Q.    And what did -- did she ever admit to you

6    that she stole your identity?

7          A.    Yes.

8          Q.    What did she say?

9          A.    I owe it to her.

10         Q.    Okay.  So -- so she -- I'm not going to guess

11   as to what you mean by that.  Explain what you understand

12   that to mean.

13         A.    I asked her a question along the lines of,

14   Why would you take my identity.  She replied with I owe it

15   to her.  But before she said I owe -- I owed it to her,

16   she -- she then told me she didn't remember it but

17   obviously it was -- it was her and that I owed it to her.

18   She gave me a roof over my head, that sort of thing.

19         Q.    All right.  So let's back up.  In 2012 you

20   became aware that someone may have stolen your identity.

21   How did you become aware of that?

22         A.    For I think it was about two -- a long period

23   of time, my mother had misplaced the keys to the post

24   office box.  I found them.  Went up to the post office box

25   and found some mail saying I owed money to some credit

Page 36

1  cards.  I then called the credit cards, and they said I

2  had opened this account way back when and owed all this

3  stuff.

4        Q.    Okay.  Do you recall what credit cards in

5  2012 that you saw that led you to the knowledge that your

6  identity had been stolen?

7        A.    Credit One.

8        Q.    Any other?

9        A.    No.

10       Q.    All right.  Mr. Wood, the -- the account that

11 is at issue in this case, according to my notes, was

12 opened in 2013.  So with that representation, does that

13 help refresh your recollection as when you may have become

14 aware of this?

15             Or was there another Credit One account that

16 was opened in your name other than the one that's at issue

17 in this case that you discovered in 2012?

18       A.    Like I have said, I do not -- this is really

19 far back on the time line.  I'm not certain of the dates.

20 However, the moment I discovered it, I did close it and

21 requested them to start a identity theft investigation.

22 And I started credit monitoring with Equifax.

23       Q.    Okay.

24       A.    All on the same day.

25       Q.    Had you ever had credit monitoring with

Page 43

1          THE WITNESS:  How was I to know who it was?
2     BY MR. SEARS:
3          Q.    Okay.  So had you never talked to her about
4     that before?  Did she know that you had become aware that
5     your identity had been stolen prior to your conversation
6     with her?
7          A.    Yes.  She told me it was all my online
8     activity.
9          Q.    But it was after reading this article that
10    it's usually a family member that you had a discussion
11    with her, and she said, well, obviously she did it?  I
12    don't understand.
13         A.    Yes.
14         Q.    Okay.  All right.  Did you report this claim
15    of identity theft to any authorities, like law enforcement
16    authorities?
17         A.    Yes.
18         Q.    And who did you report this to?
19         A.    I don't remember her name.  I believe I have
20    it somewhere.  West Point Police Department.
21         Q.    Okay.  Did you report it to any other law
22    enforcement authorities?
23         A.    Yes.
24         Q.    Who else?
25         A.    I tried Florida, Orange County, I believe,

Page 44

1    and I tried New Kent.

2         Q.    Is that the sheriff's department?

3         A.    I don't recall.  Both of those said it had to

4    be where I was living at the time of the identity theft.

5    However, West Point would tell me that it's not a Virginia

6    issue.

7         Q.    The West Point Police Department told you it

8    was not a Virginia issue?

9         A.    Yes.  Because after this conversation with my

10   mother when I thought it was her, she moved to Florida.

11        Q.    Down to Crystal -- Crystal River?  Is that

12   where she's living?

13        A.    I don't know where she's living.

14        Q.    When's the last time you spoke to her?

15        A.    Somewhere in 2015.

16        Q.    What happened with the West Point Police

17   Department report of identity theft?

18        A.    Nothing that I know of.  That's how I feel,

19   anyway.

20        Q.    Okay.  Did you ever receive a copy of the

21   police report that you filed?

22        A.    I never received one.

23        Q.    You say I.  Did someone else receive it that

24   you know of?

25        A.    I don't know if someone else got it.

Page 45

1          Q.     Okay.

2          A.     I never got one.

3          Q.     So you've never -- to this -- to this day,

4     have you ever seen a copy of the West Point Police

5     Department report?

6          A.     Not that I can recall, no.

7          Q.     Okay.  Sir, I'm going to hand to your

8     attorney, who will then review and give to you, what has

9     been marked as part of Credit One's disclosures as

10    COB04157 and COB04158.  Please take some time and read

11    through that and let me know when you're done.

12         A.     (Pause.)

13                THE VIDEOGRAPHER:  Excuse me, Mr. Sears.  We

14    have eight minutes left on the media.

15                MR. SEARS:  Okay.  Do you want to take a

16    break?

17                MR. MARCHIANDO:  Yeah.  If it's a good time

18    for you, sure.

19                THE VIDEOGRAPHER:  This marks the end of

20    media number 1.  We're going off the record at 11:18 a.m.

21                (Recess.)

22                THE VIDEOGRAPHER:  This marks the beginning

23    of media number 2.  We're back on the video record at

24    11:26 a.m.

25                MR. SEARS:  As a matter of housekeeping,

Page 60

1       A.      This was -- I believe this one to be one of a

2    credit repair company's assistants helped me write a

3    better letter.

4       Q.      All right.  So you had a credit repair

5    company help you write that letter, or they wrote it for

6    you?

7       A.      They helped me write it.

8       Q.      Okay.  So how did they help you write it?

9              MR. MARCHIANDO:  Object.  And I'll instruct

10   the witness not to answer.  I don't know the specifics of

11   the relationship with the credit repair company, whether

12   or not they were lawyers.

13   BY MR. SEARS:

14      Q.      Okay.  Was the credit repair company lawyers?

15      A.      I don't know.

16      Q.      You don't know.  Do you have a belief that

17   you had an attorney-client relationship with whoever

18   helped you write that letter?

19      A.      I don't know.

20             MR. SEARS:  Okay.  So I'm going to ask the

21   question again.  I don't know if you're going to have an

22   objection because I don't know that there's a assertion of

23   privilege with regard to that.  Certainly, if it turns out

24   that there is attorney-client privilege, I would agree to

25   have his testimony in response to this stricken because of

Page 61

1    that privilege.

2              MR. MARCHIANDO:  Fair enough.

3    BY MR. SEARS:

4         Q.    What assistance did this credit repair

5    company provide to you in writing that letter?

6         A.    I showed them what I wrote.  They gave me

7    advice of points that I should put in there, such as the

8    account number and --

9         Q.    Okay.  Was this done in person?

10        A.    No.

11        Q.    Was it a company through the Internet?

12        A.    Yes.

13        Q.    Okay.  What was the name of that credit

14   repair company?

15        A.    Credit Repair.

16        Q.    Okay.  How did you find them?

17        A.    Online search.

18        Q.    Okay.  I'm sorry.  Could I see that?

19              So by this date, you were aware -- the date

20   is November 4th, 2014.  You were aware that you were

21   having issues receiving mail at 8315 Mill Creek Road; is

22   that correct?

23        A.    Yes.

24        Q.    And you were also aware that someone had

25   stolen your identity, I think your prior testimony was, by

Page 62

1    this date?

2        A.    Yes.

3        Q.    Okay.  So my -- my question is, number one,

4    you would agree with me that the letter does not state

5    your belief that your identity has been stolen; is that

6    correct?

7        A.    That is not correct.

8        Q.    Okay.  Read to me there what you believe is

9    the language that would communicate that your identity had

10   been stolen.

11       A.    Error.

12       Q.    I'm sorry?

13       A.    The use of the word "error."

14       Q.    In what context?

15       A.    In the context of a mistake.

16       Q.    No.  What is the context of the -- where does

17   the word appear?  Can you read the sentence?

18       A.    Since personnel -- personally harmful

19   institutional error may be in those materials, I formally

20   request that Credit One Bank document and send this

21   notarized validation promptly.

22       Q.    Okay.  So it's your position as we sit here

23   today when you use the term "institutional error," you

24   mean to convey that your mother had stolen your identity.

25       A.    Yes.

Page 63

1     Q.     Okay.  Is there a reason why you didn't just

2   specifically state that, My identity has been stolen and I

3   believe that Dyan Lollis is the one that did it?

4     A.     I had before.

5     Q.     Okay.

6     A.     I got no reply.

7     Q.     All right.  But my question is is there a

8   reason why you did not include that language in that

9   letter more specifically, other than saying institutional

10  error and expecting someone to understand from that

11  identity theft.  My question is why wouldn't you just come

12  out and say, My identity has been stolen.

13    A.     I was told innocent until proven guilty kind

14  of thing.

15    Q.     I don't understand that.  What does that

16  mean?

17    A.     You are innocent until proven guilty.  I had

18  not taken her to court or anything to prove that she had

19  stolen my identity.

20    Q.     But you had a conversation with her in

21  October, just the previous month, had you not, where she

22  says, I don't remember opening the account but obviously I

23  did and you owed her.

24    A.     Yes.

25    Q.     And you -- you take that as a -- an admission

Page 64

1    on her part that she had stolen your identity, correct?

2         A.    Yes.

3         Q.    And in December you go to the police to

4    report that she had stolen your identity and had engaged

5    in the act of -- criminal act of impersonation.  And you

6    specifically name your mother as the suspect, correct?

7         A.    Correct.

8         Q.    All right.  So I -- I -- I guess I'm having a

9    difficult time reconciling your explanation that you were

10   told innocent until proven guilty as to the reason why you

11   would not say, I have identity theft here, Credit One, in

12   this letter.

13        A.    This is not the only letter I wrote to Credit

14   One.  Other ones did include that.

15        Q.    Okay.

16        A.    Just trying something else.

17        Q.    I understand.  So -- that's fair.  Thank you.

18              But you don't have a copy of the other

19   letters --

20        A.    No.

21        Q.    -- that you sent to them.  You don't have a

22   diary, and you don't -- as we sit here today, you don't

23   have an independent recollection of the number of letters

24   or the dates of those letters.

25        A.    I had -- I do have a copy of.

1      Q.    Do you recognize that document?

2      A.    Vaguely.  But, yes.

3      Q.    What do you recognize that document to be?

4      A.    Another letter I sent to Credit One Bank.

5      Q.    All right.  And did you also have assistance

6 in preparing that letter?

7      A.    I don't recall.

8      Q.    Okay.  Did you write that letter?

9      A.    Yes.

10      Q.    What was the purpose of writing the letter?

11      A.    To try and get the Credit One report

12 resolved.

13      Q.    Okay.  You would agree with me that you do

14 not state in that letter your claim that your identity had

15 been stolen, correct?

16      A.    In this one, correct.

17      Q.    All right.  And it doesn't even include the

18 language "error" or the word "error" or language

19 "institutional error," correct?

20      A.    Correct.

21      Q.    And is that date the correct date, as far as

22 you know, of the date that you wrote that letter?

23      A.    I don't remember.

24      Q.    Okay.  But as you sit here today, you can't

25 say that that is not the date that you wrote that letter,

Page 71

1    December 9th, 2014.

2         A.    Correct.

3         Q.    And the day before, you had gone into the

4    West Point Police Department to report an identity theft

5    and specifically named Dyan Lollis as the suspect,

6    correct?

7         A.    Correct.

8         Q.    And the day that you wrote this letter on

9    December 9th, you went back to the police department and

10   gave Sergeant Woodson that Credit One bill dated

11   August 15th, 2013, that we previously talked about,

12   correct?

13        A.    I don't recall the specifics of it, but --

14        Q.    But that's the date that you gave the --

15   according to the report, that you gave the Credit One bill

16   to Sergeant Woodson, correct?

17        A.    If that's what it says.

18        Q.    All right.  Is there a reason why you didn't

19   advise Credit One of your claim that your identity had

20   been stolen on -- in that letter dated December 9th, 2014?

21        A.    They reply with a lot of legal terms saying I

22   need a police report proving her guilty.

23        Q.    Okay.  So I -- I don't understand.  Can you

24   explain your answer a little bit more?  My question is why

25   did you not include in that letter your claim that your

Page 72

1    identity had been stolen, whether or not you specifically

2    named Dyan Lollis or not.

3             And your response was because they will reply

4    something.  But I don't understand why you didn't include

5    that.  How does that play --

6        A.    I get a response from them this way.  When I

7    don't say identity theft, I get a response.  If I say

8    identity theft, it's like it was lost in the mail, or they

9    give me some around -- something to the effect of I need a

10   police report, I need the court findings, I need --

11       Q.    All right.  So I just want to make sure I

12   understand what you're saying.  And if I get this wrong,

13   correct me.  Okay?

14            You did not tell Credit One in the

15   December 9th, 2014, letter that your identity had been

16   stolen because one of the reasons is that their response

17   may get lost in the mail.  Is that correct?

18            MR. MARCHIANDO:  Objection.  Mischaracterizes

19   his testimony.

20            MR. SEARS:  I think it -- that's fine.  The

21   record speaks for itself.  I think it specifically quotes

22   what he said.

23            THE WITNESS:  I don't get a reply.

24   BY MR. SEARS:

25       Q.    Okay.  That if you -- you believe that if you

Page 73

1   had put identity theft in there, that Credit One would not

2   have replied to your letter.

3       A.      There is a strong correlation to me putting

4   identity theft and naming my mother to no reply.

5       Q.      What do you base that on?

6       A.      A correlation?

7       Q.      Yeah.

8       A.      Do -- do you know the word correlation?

9   There's -- it's not a connection.  But it would be like, I

10  drink water but I don't have cancer.  Water -- correlation

11  of water and not having cancer.

12      Q.      Okay.  What I'm -- what I'm asking is you --

13  you have expressed the opinion there that if you had

14  included a disclosure to Credit One of your claim that

15  your identity had been stolen, that there is a correlation

16  then to Credit One not responding to your letter.

17          My question to you is on what basis do you

18  make that statement that there is a correlation.  What

19  experience had you had in the past with Credit One or any

20  other creditor or utility company or any other entity

21  where you've raised the issue of identity theft that you

22  have not received a response?

23      A.      Credit One.

24      Q.      Okay.  When?

25      A.      I don't recall the dates.

Page 80

1    to Karen?

2         A.    I don't remember the names of the people

3    working in the office and whatnot, but --

4         Q.    How many times did you make a request for a

5    police report?

6         A.    Quite a few.  I didn't --

7         Q.    Can you estimate?

8         A.    Seven.

9         Q.    Seven times you made -- over what period of

10   time?

11        A.    Sixty days.

12        Q.    Seven times over 60 days.  Starting what

13   month and year?

14        A.    I don't know.

15        Q.    Well, it would have been after December of

16   2014, either that month or after, correct?  Because you

17   didn't go to the police until then.

18        A.    That would make sense.

19        Q.    Do you recall ever receiving an affidavit of

20   fraud from Credit One in the mail for you to fill out?

21        A.    No.

22        Q.    Do you recall them telling you that they were

23   going to be sending you an affidavit of fraud and asking

24   you to fill it out and return it?

25        A.    No.

Page 81

1          Q.    I'm going to show you what has been disclosed

2     as COB04160 through same prefix ending with 2.  Mr. Wood,

3     I am handing you this document, and I will represent to

4     you that this is a sample letter that's been produced by

5     Credit One Bank of the form letter and then attachment

6     regarding affidavits of fraud that they send to customers

7     who either write or call in claiming that their identity

8     had been stolen.  Okay?

9                I show this to you to see if any of this

10    looks familiar to you that might refresh your recollection

11    as to whether or not you received such correspondence from

12    Credit One at any time.

13         A.    It's my first time seeing it.

14         Q.    Okay.  Thank you.  Sir, I will represent to

15    you that in our review of records, those are the only two

16    letters that we could find that you had sent directly to

17    Credit One, the ones that I'd shown to you, the

18    November 4th and December 9th, 2014, letters.

19                Are you able to state as we sit here today

20    whether you had sent any other letters directly to Credit

21    One?

22         A.    Yes.

23         Q.    Okay.  Give me the -- the dates of those

24    letters.

25         A.    I don't know the dates.

Page 82

1       Q.      Okay.  Can you give me the approximate dates?

2       A.      I don't know the dates.

3       Q.      Okay.  Can you give me the approximate dates?

4       A.      I don't know the dates.

5       Q.      You can't approximate the dates for me?

6       A.      I don't know the dates.

7       Q.      Do you know the year?

8       A.      I don't know the dates.

9       Q.      How many letters were there?  In addition to

10  the two that we have here.

11      A.      I want to say three.

12      Q.      Three more letters in addition to the two

13  that we have.  So a total of five letters?

14      A.      I believe so.  Yes.

15      Q.      All right.  Again, these are correspondence

16  directly with Credit One, not to a credit reporting

17  agency.  I just want to make that clear.

18      A.      Correct.

19      Q.      You understand that, and you're -- it doesn't

20  change your previous answer, correct?

21      A.      Correct.

22      Q.      All right.  What were those other three

23  letters about?  Let's take the first letter.

24      A.      All three of them were about identity theft

25  and I don't know what this account is.

Page 83

1      Q.      All three of them -- okay.  Am I to
2  understand your testimony that you sent three more letters
3  at some point to Credit One wherein you raised your claim
4  of identity theft on this account that we're dealing with
5  in this case?
6      A.      Yes.
7      Q.      Further, am I to understand your testimony
8  that you do not have a copy of these letters?
9      A.      Correct.
10     Q.      That you do not know the dates of these
11 letters.
12     A.      Correct.
13     Q.      That you cannot approximate the dates for
14 these letters.
15     A.      Correct.
16     Q.      Do you recall receiving any responses from
17 Credit One either by mail or -- or telephone to the three
18 letters that you sent in addition to the two that we have
19 on record?
20     A.      I got no response.
21     Q.      You received no response.
22     A.      I received no response.
23     Q.      Okay.  Do you know how many -- I may have
24 asked this.  If I did, I apologize.  Do you know how many
25 times you spoke with Credit One directly on the telephone?

Page 84

1    A.    A lot.

2    Q.    A lot.  Can you approximate that for me?

3    A.    Twenty-five-some times.

4    Q.    Twenty-five more times -- twenty-five or more

5    times on the telephone?

6    A.    Over the phone.  It was -- it was a really

7    big number.

8    Q.    Okay.  But you didn't keep a record or diary

9    or log of those telephone calls.

10   A.    No.

11   Q.    It would be all up here in your memory?

12   A.    Uh-huh.

13   Q.    Okay.  But you -- are you able to

14   specifically remember the details of any of those 25-plus

15   phone calls?

16   A.    Most of them ended with a forever -- almost a

17   positive feedback loop of let me transfer you, let me

18   transfer you, until eventually I end up back to the first

19   person who originally started the transfer loop.

20   Q.    Do you have any witnesses who have been

21   involved in the telephone call with you or witnessed your

22   phone call with Credit One where this has occurred?

23   A.    Yes.

24   Q.    Who?

25   A.    George Brannon.

Page 85

1    Q.    Who's George Brannon?

2    A.    A friend that I stayed with for a while.

3    Q.    And he would be able to testify specifically

4    with regard to your telephone calls with Credit One?

5    A.    Yes.  Because I said it would be -- it would

6    be interesting, watch how long they will keep transferring

7    this -- this call.

8    Q.    And what is George Brannon's address?

9    A.    I don't know his address.

10   Q.    What is his telephone number?

11   A.    I don't know his telephone number.

12   Q.    What city does he live in?

13   A.    Williamsburg.

14   Q.    And did he -- was he able to hear both sides

15   of the conversation or just one side?

16   A.    Yeah.  Speakerphone.

17   Q.    Speakerphone?  And how many occasions did he

18   do this?

19   A.    It was a couple times.  It's not funny after

20   you use the same joke.

21   Q.    I'm sorry?

22   A.    That Credit One would just keep transferring

23   me forever and never actually answer any of my questions

24   about identity theft.

25   Q.    But you said something about a joke.

Page 86

1       A.      It seemed to be like they were taking me like

2   a joke.

3       Q.      Oh, I see.  You didn't feel Credit One was

4   taking you seriously.

5       A.      No.

6       Q.      Okay.  All right.

7               THE VIDEOGRAPHER:  Excuse me, Mr. Sears.  We

8   have five minutes left on the media.

9               MR. SEARS:  Okay.  Do you mind if we take a

10  little bit longer of a break, number one, to just take a

11  break and then, number two, I'm going to move into kind of

12  a different, more direct, form-feeding type of

13  examination.  So it will give me some time to organize a

14  little bit.

15              MR. MARCHIANDO:  Okay.  Sure.  How long do

16  you think?

17              MR. SEARS:  Well, do you guys want to take

18  a -- a lunch break?  There's a lot of documentation that

19  I'm going to go through.  We can go off the record.  I'm

20  sorry.

21              THE VIDEOGRAPHER:  Okay.  One second, sir.

22  We're going off the video record at 12:46 p.m.

23              (Recess.)

24              THE VIDEOGRAPHER:  This marks the beginning

25  of media number 3.  We're back on the video record at

Page 87

1    1:08 p.m.

2    BY MR. SEARS:

3         Q.    All right, Mr. Wood.  Before getting into the

4    documents, I just want to go through just some

5    straightforward questions and get your responses to them

6    on the record.

7              Did you apply for the Credit One credit card

8    that's at issue in this case?

9         A.    No.

10        Q.    Did you ever use the credit card issued by

11   Credit One at issue in this case for purchases of

12   merchandise, services, or cash advances?

13        A.    No.

14        Q.    Did you ever authorize anyone else, orally or

15   in writing or given consent to anyone, to use the Credit

16   One credit card for purchases of merchandise, services, or

17   cash advances?

18        A.    No.

19        Q.    Have you ever received any goods, services,

20   or otherwise benefited directly or indirectly from the

21   Credit One credit card account, to your knowledge?

22        A.    No.

23        Q.    With regard to not just the Credit One

24   account but as to all your credit reporting issues that

25   you've experienced in the last few years, did you have a

Page 88

1   particular system or method for keeping documentation that

2   you received or sent out related to your credit reporting

3   issues?

4       A.      No.

5       Q.      We have received disclosures from your

6   counsel of certain documents that you had in your

7   possession, custody, or control related to the credit

8   reporting issues gen -- generally.

9           Do you currently have any documents that you

10  have not provided to your counsel?

11      A.      No.

12      Q.      What you provided to your counsel, is that a

13  collection of everything that you have received regarding

14  these credit issues in the last few years, or have some

15  been lost or thrown away or discarded in some way?

16      A.      That was everything I had.

17      Q.      Okay.  All right.  So I am going to show a

18  series of documents to you now.  The first set is

19  designated as EXPWOOD, underscore, 0000025 through the

20  same prefix ending in 46 instead of 25.  And for matter of

21  convenience, I will refer to that designation as Experian

22  disclosures.

23          They appear to be duplicates of a set of

24  documents that have the prefix EXPWOOD, underscore, SUBP,

25  underscore, 0000009 through same prefix ending in 30.  And

Page 89

1    also appear to be the same document that is produced with

2    the same prefix ending in 107 through 128.  And with

3    regard to that prefix, the EXPWOOD SUBP, I'll refer to it

4    as Experian subpoena documents.

5              So we've got the Experian Rule 26(a)(1)

6    disclosures and then their subpoena responses that include

7    what appears to be duplicates of what was in that.

8              MR. MARCHIANDO:  All right.  So then what are

9    we doing?  You're going to give us --

10             MR. SEARS:  Just one set, if that's okay with

11   you, unless you want to inspect all three of them.  But

12   this is going to be a matter --

13             MR. MARCHIANDO:  No.  That's fine.

14             MR. SEARS:  -- later on I'll work out with

15   Suzie to narrow down the documents that we use because

16   there's a lot of duplicates.

17   BY MR. SEARS:

18        Q.    So, Mr. Wood, for the purpose of my question,

19   I -- I just want you to look at page 1.  It says page 1 of

20   20.  It appears to be a communication from Experian to

21   you.  It's addressed to David Wood, 3990 Chelsea Road,

22   West Point, Virginia, and the date is June 25th, 2014.

23             Two questions.  First of all, number one, is

24   this the complete address for the address that you

25   referred to earlier when you said it was 30-something