**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**DAVID WOOD**

**v.**                                                                **No. 3:15-cv-594-MHL**

**CREDIT ONE BANK, N.A.**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the DAVID WOOD, by counsel, and in opposition to the Defendant's

Motion for Summary Judgment he states as follows:

**I.       CREDIT ONE'S MOTION IS PROCEDURALLY IMPROPER.**

Neither Defendant's Motion nor its memorandum identify or list any fact contended to be

material and undisputed.  In making a Rule 56 motion, "A party asserting that a fact cannot be or

is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in

the record … or (B) showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(B).  And as the Court is aware, Local Rule 56 demands even more:

> Each brief in support of a motion for summary judgment shall include a
> specifically captioned section listing all material facts as to which the moving
> party contends there is no genuine issue and citing the parts of the record relied on
> to support the listed facts as alleged to be undisputed.

L.R. 56(B).  It is not a close call – Defendant does not even attempt to comply with these

requirements.

Plaintiff's objection is not merely procedural.  The Credit One tactic here is to simply

make two broad statements:  *Plaintiff cannot prove he suffered actual damages*, and *Plaintiff*

*cannot prove the Defendant's FCRA violations were willful*.  But the Motion does not attempt to suggest its own facts or claimed reality.  It instead broadly demands:  Prove your case now.  Without a list of purported undisputed material facts, Plaintiff's response becomes instead a trial brief, forced to offer evidence or positions though Defendant itself suggests none.

A defendant may not merely assert on Summary Judgment an unsubstantiated demand that the plaintiff prove facts both sides otherwise know are disputed."  *Mercado v. Lynnhaven Lincoln-Mercury, Inc.*, No. 2:11CV145, 2011 WL 13077033, at *1 (E.D. Va. Dec. 14, 2011) Defendant's motion suggests a "seemingly fundamental misunderstanding of the rules governing summary judgment in this Court—Federal Rule of Civil Procedure 56 and Local Civil Rule 56(B)" in that it argues solely that its claim of no damages was "undisputed because the Plaintiff did not have sufficient corroboration of [his]r own testimony."  *Id.* At *2.  However, "neither the Federal Rules of Civil Procedure nor the Local Civil rules mandate" such a "formulated [] requirement associated with filing a motion for summary judgment[.]"  *Id.*  "There is no requisite level of corroboration necessary to render a fact disputed."  *Id*.

## II.    MATERIAL FACTS ESTABLISH THAT PLAINTIFF SUFFERED ACTUAL DAMAGES AND DEFENDANT'S FCRA VIOLATION WAS WILLFUL

Mr. Wood clearly suffered some degree of actual damage, and for the reasons Plaintiff has moved for summary judgment on liability (Doc. 55), Credit One has no credible factual defense as to willfulness.

### General Background – Credit Plus's Credit Reporting was Inaccurate[1]

---

[1] To simplify these exchanges, Plaintiff has tried to maintain the same factual statements and supporting exhibits as already filed in support of his own Motion for Summary Judgment. Accordingly, to avoid duplication and confusion, Plaintiff's exhibit citations refer to the exhibits in Plaintiff's own summary judgment memorandum as "59-[#]".  (Doc. 59).

1.      David William Wood did not request, apply for, open, authorize, consent to the issuance of, obtain, or use a Credit One Bank credit card of any kind. (Wood Dep. Tr. 87:7-88:4)(Ex. 59-1).

3.      Credit One Bank issued a credit card account in Mr. Wood's name without first obtaining a request from him or consent in writing to the issuance of a credit card.  (Def.'s Resp. to Interog. #2(a); #4)(Ex. 59-2); (COB00065)(Ex. 6).

4.      Credit One Bank claims to have a "good faith" belief, but no proof that Mr. Wood accepted an offer of credit or used its credit card.  (Def.'s Resp. to Interog. #4).   In fact, Defendant's Rule 30(b)(6) designee answered the question, "Q. Do you know how Mr. Wood allegedly opened this account?" with the binding answer, "I do not know for certain."). (Maragos Dep. Tr. 20:21-23).

5.      Credit One Bank account notes demonstrate that the person who tried to activate the card and add herself as an authorized user, before instead activating the card by automated means (IVR), was female. (Maragos Dep. Tr. 19:14;20:5); (Lynn Dep. Tr. 32:10-32:21)(COB00065). After issuing the credit card with a credit limit of $300, the card was used by someone other than Mr. Wood and quickly exceeded the credit limit within two billing cycles. (COB00015-40)(Ex. 59-9).

6.      Credit One's own records captured the "IP Address" of the person who activated the subject account.    An IP Address is "an address associated with a specific device, whether it be a computer or a cell phone." (Chu Dep. Tr. 28:11-22).  However, Defendant admits that its dispute agents never check or rely upon such information in handling disputes.

7.      Mr. Wood believed his mother was the person who stole his identity in order to open up credit accounts in his name.  (Wood Tr. 71:1-72:3).

3

8.      When Mr. Wood learned of credit cards that had been opened fraudulently in his name, he immediately and repeatedly began to try to correct the accounts. (Wood Tr. 81:13-85:19): (Maragos Tr. 17:3-19:8).  He disputes the Credit One account to this day. (Compl.)(Doc. 1).

9.      Upon learning of the fraudulent account, Mr. Wood contacted Credit One Bank directly by phone and in writing, he estimates at least twenty five contacts.  (Wood Tr. 81:13-85:19): (Maragos Tr. 17:3-19:8).  But Credit One Bank did not correct the fraudulently-opened account.  (Wood Tr. 81:13-85:19).

**Defendant's Dispute Investigations were Superficial**

10.      On April 15, 2015, Mr. Wood wrote a letter that he sent to each Trans Union, Experian and Equifax to dispute the inaccurate consumer reports in which Credit One Bank included the fraudulent account that he never opened.  (Ex. 59-3).  In those letters, Mr. Wood specifically alerted the consumer reporting agencies and Credit One Bank to the fact that he was "a victim of fraud on several accounts opened in my name by my mother" and that the account did not belong to him.  He supplied a handwriting exemplar, as well as the affidavit signed and notarized by his mother, in which she took responsibility for opening the account. He provided his phone number and asked to be called if he could supply any additional information.  (Ex. 59-3).

11.      In this case, Credit One produced ACDV disputes from the CRAs regarding Mr. Wood, each one reflecting a separate dispute conveyed to it by the credit bureau.  (Ex. 59-4). These five disputes were received and responded to by Credit One on July 11, 2014, April 28, 2015, May 5, 2015, June 10, 2015, and June 15, 2015.  In each, Defendant verified the account as belonging to Mr. Wood and as undisputed.

**David Wood Suffered Cognizable Actual Damage**

12.     As detailed above, Credit One acknowledges that it conducted its first failed investigation on July 11, 2014.

13.     After that date, Mr. Wood's credit reports show his numerous attempts to obtain credit.  Wood's Trans Union credit file reveals the Plaintiff's attempt to obtain credit Wells Fargo on March 8, 2016. (Ex.1)[2]. Both Experian and Equifax furnished credit reports with the uncorrected Credit One account to SpringLeaf on October 20, 2014.  (Exs. 2 &3). And Equifax also furnished such reports to Comenity Capital Bank/PayPal Credit on March 18, 2016; EVB Bank on October 22, 2014 and October 29, 2014; and Universal Investors, a residential landlord, on September 23, 2014. (Ex. 3).

14.     Mr. Wood applied for small loans from SpringLeaf, EVB and Wells Fargo so that he could build a home on a piece of land that he owned in New Kent County.  (Wood Decl. ¶ 6-8)(Ex. 4). Mr. Wood applied for a debit card from Comenity Bank/Paypal so that he could use funds that he already had as a balance in a PayPal account in order to make purchases, but was denied even for a debit card.  (Wood Decl. ¶ 6).  Mr. Wood made the loan applications using substantial collateral so that he could have a place to live where he couldn't be turned away.  He applied for a debit card so that he could access his own money electronically.  (Wood Decl. ¶ 10, 11, 6).

15.     Mr. Wood did not obtain credit on any of these occasions, not even for the debit card from Comenity Bank/PayPal.  (Wood Decl. ¶ 5-11).

16.     After many turndowns, Mr. Wood withdrew himself from even trying to

---

[2] Plaintiff has attached the inquiry pages from Mr. Wood's May 2016 credit reports.  He would prefer not to file the entire report given its personal content and as no other issues they would address besides timing were raised in Defendant's motion.  These reports were furnished to Mr. Wood in this case and while each consumer reporting agency remained a defendant.

participate in the credit market out of fear and embarrassment that he would again be made to feel stupid, like a person who could not be trusted, who was living off credit cards, and who had defaulted when he had not.  (Wood Decl. ¶¶ 12, 14, 15).  Mr. Wood withdrew from the credit market because it was a futile waste of time and would further negatively impact his credit. (Wood Decl. ¶13).

17.    Mr. Wood wanted and needed to be approved for credit because he wanted a lease so that he had a safe place to live and work on his hobby, he wanted to access money in his PayPal account to use for other purchases, he wanted to qualify for a loan to complete his education, he wanted to build a home on land that he already owned in order to get out of a cycle of homelessness. (Wood Decl. ¶¶16-23).

18.    Mr. Wood was not able to get an apartment or place to live due to his credit report. (Wood Decl. ¶ 16-18)(Wood Dep. Tr. 163:19-166:3.)

19.    Mr. Wood was homeless for a time, since July 2014, he was only able to stay with friends, rent rooms in individual homes, and live in his car.  (Wood Decl. 12, 18-20) (Wood Dep. Tr. 156:12-167:3).

20.    After July 11, 2014, Mr. Wood continued to try and obtain the correction and removal of the Credit one account from his credit reports. At his basic hourly wage not counting overtime or holiday pay, Mr. Wood has pent more than $979.00 in his time trying to obtain Credit One's accurate credit reporting. (Wood Decl. ¶¶ 2-4).  He spent another $55 sending disputes to the consumer reporting agencies. (Wood Decl. ¶3).

21.    Beyond the economic harms he has incurred, Mr. Wood suffered real injury in the frustration, anger, embarrassment and emotional distress caused when he was repeatedly rebuffed by Credit One – over a two year period - when he tried to get it to correct its reporting.

(Wood Decl. ¶ 3-5; 23). Each time he disputed, and each response by Credit One that he was the person who defaulted on the account, was a repeated reminder that his mother had stolen his identity.  (Wood Decl. ¶ 23).  He felt shame and hopelessness because he did not know how he would be able to improve his life, get a place to live, obtain more education and have security. (Wood Decl. ¶ 25).  He hasn't been able to enjoy his hobby of video editing and special effects. (Wood Decl. ¶ 27-28).  He has lost countless hours of sleep worrying about Credit One's refusal to correct the account, which has made him tired, including at work where he needs to be at his best.  He has felt sick to his stomach when he thinks about the stress that he is under as a result of the inaccurate report.  (Wood Decl. ¶ 31).  Everytime Credit One Bank verified the account, his stress and anger level increases.  (Wood Decl. ¶ 31).  These feelings of anger, frustration, sleepless nights and feelings of sickness have not ony continued, but have increased.  (Wood Decl. ¶ 32).

22.    Mr. Wood felt real embarrassment that caused deterioration of his social relationships because he felt he had not been able to do anything with his life and was homeless, he did not pursue his friendships.  (Wood Decl. ¶ 21). He felt that his friends thought he was imposing on them.  (Wood Decl. ¶21).

## Credit One Willfully Violated 15 U.S.C. § 1681s-2(b)

23.    Several important aspects of Credit One's dispute procedures were uniformly followed for Mr. Wood's disputes.  First, for an Identity Theft dispute where the consumer represents that his name, social security number and other identifiers were used by a fraudster to open the subject account, literally the only things Credit One will ever do are: (1.) check to confirm that the personal identifiers listed in the ACDV provided by the CRA (name, address, SSN and date of birth) match the same identifiers contained in Credit one's own computer

account record; and (sometimes) (2.) check Accurint to see if the address in Credit one's account record is linked (in some way) to the disputing consumer.  Nothing else is ever attempted for such a dispute even though the consumer's actual dispute is that another person has fraudulently provided and used the consumer's identifiers to open the account.  Defendant's Rule 30(b)(6) witness described the Credit one "investigation" as follows:

> [W]e received the ACDV, with some document attached, from Equifax was the source. The claim came through with identity theft account fraudulently opened. Cardholder claims identity theft. Address provided by cardholder matches that of our records in both CAS and cach systems. Address provided on app was a P.O. Box 725, West Point, Virginia 23181. It is linked to the cardholder through Accurint. And the decision was not to modify anything, change anything. The cardholder was responsible based on the matches.

(Maragos Tr. 26:8-25).

24.     For example, Ms. Chu testified that she "verified that the cardholder was responsible because of the address matches."  (Chu Dep. Tr. 99:20-23)(Ex. 59-10).  Credit One's investigation of Mr. Wood's allegation that the account was fraudulently opened consisted of reviewing its own documents and seeking information from third parties that would validate "Mr. Wood's identity, in terms of his name, social security number, date of birth" using Experian social trace, and his address using Accurint.  (Lanham Tr. 71:1-19).  There is no documentary evidence that Experian Social Trace was ever used to investigate Mr. Wood's dispute.

25.     Credit One's dispute agents earn $15 per hour.  (Chu Dep. Tr. 33:21-34:5)(Ex. 59-10).  As they process "anywhere between 80 to 100 [disputes] a day" and average about "five minutes" per dispute, the dispute agents are paid less than $ 1.00 for each dispute investigation. (Chu Dep. Tr. 41:7-42:1)(Ex. 59-10).

26.     Dispute agents do not use a telephone to "investigate" a dispute. (Chu Dep. Tr. 52:12-14)(Ex. 59-10).

27.     Once one Credit One agent has processed a dispute and determined that Credit one will still report the consumer as "responsible", it will not separately "investigate" any subsequent ACDV dispute for at least 30 days.   It does not do any further investigation of the subsequent dispute.  (Schmidt Tr. 44:2-10).

28.     To best summarize Credit One's "investigation" policy – unless the consumer can disprove the challenged account, Defendant will continue to report that he is responsible:

> **Q. What underlying documents** does Credit One have in its possession that **demonstrate that Mr. Wood is liable** on the account?
>
> **A.**   Based on our investigation and the information that -- in reviewing from the CRA,
>
> **there was nothing to indicate that it was not Mr. Wood who in fact opened the account.**

(Lanham Dep. Tr. 72:24-73:6).(Emphasis added).

29.     The Credit Reporting Resource Guide, provided to Credit One by the CRAs details the proper way to respond to an ACDV and in particular how to use a field labeled, Compliance Condition Code or "CCC".  (Ex. 59-5). The proper code for an account that remains in dispute is "XB," which indicates, "Account information disputed by consumer under the Fair Credit Reporting Act."   If that code is used, the impact on the consumer's credit score is "negligible."  (Lynn Tr. 37:21-38:3). See also *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 146–47 (4th Cir. 2008) ("BB & T therefore could have indicated that it considered the debt uncollectible and also reported that Saunders had disputed the debt; if BB & T had done so, Trans Union would have reported both the debt and the dispute and would not have considered the debt in determining Saunders' total credit score. Thus, BB & T's decision to report the debt but not the dispute resulted in a much lower credit score for Saunders than a report of both the debt and the dispute.")

30.    Notwithstanding this obligation to report by the "XB" code that the subject account was still disputed by Mr. Wood, Credit One followed its own policy of never doing. Here, not only did Credit One fail to report that the subject account remained disputed, but it reported the exact opposite substituting the "XH" code, which expressly means that the account is no longer disputed – the dispute was resolved.  (Ex. 59-5)

31.    Credit One's corporate designee admitted that Defendant knows the Consumer Data Industry guidelines for credit reporting and the Credit Reporting Resource Guide.  (Lanham Dep. Tr. 40:3-23; 47:24-48:2).

32.    Credit One produced the 2011 Consumer Reporting Resource Guide, which provides the reporting requirements for the Compliance Condition Code (CCC). (COB00066, 192-193)(Ex. 59-5).  The CCC used by Credit One in each of Mr. Wood's ACDVs was "XH," which according to the CRRG means, "Account previously in dispute – now resolved, reported by data furnisher."  The XH CCC is inaccurate and misleading because Mr. Wood continued to dispute Credit One's verification of the account and did not agree that the dispute was resolved.

33.    Credit One did not use the XB or XC codes required by the CRRG to indicate that the consumer still disputed the account or disagreed with the results of the investigation. (COB00192-193).  Credit One followed its policy to use the XH CCC whenever it completed an ACDV, and never to note the account as disputed regardless of the result or the nature of the consumer's challenge.  (Chu Dep. Tr. 89:22-90:4; 93:1-11).  Credit One never used the XB code when an account was a charge-off.  (Chu Tr. 93:1-11); (Schmitt Dep. Tr. 40:2-13; 47:1-49:14)(Ex. 59-11).

34.    Credit One knew that Mr. Wood continued to dispute the results of the investigations regarding the fraudulent account, yet it continued to report the CCC as "XH."

(Lanham. Tr. 69:1-70:25).

35.    To this day, Credit One maintains that Mr. Wood is liable on the account. (Lanham Tr. 87:21-88:2).

36.    Credit One's corporate designee testified that it was Allan Shutt, Credit One's former legal and compliance officer, who established Credit One's policies and procedures for conducting reasonable investigations and for choosing the correct CCC.  (Maragos Tr. 25:1-6; 29:2-30:3)(Lanham Tr. 17:22 – 26:24). Mr. Shutt's represented that he was familiar with the Fourth Circuit's holding in *Johnson v. MBNA*, in pertinent part,

> "I believe that case evaluated what an investigation would entail, and they coined term that is not in the statute or regulation, may not even be in any of the regulatory materials.  But, basically insinuated that an investigation had to be a reasonable one.  And then they used the definition from a dictionary about what reasonable meant, and it's not really different, I think, than what most people in the industry were already doing . . .I would argue Credit One Bank was doing that."

(Shutt Tr. 88:15-25).(Ex. 59-13).

Mr. Shutt also testified that he (and Credit One) were aware of the Fourth Circuit's decision in *Saunders v. BB&T*,

> Again, I mean, I can't speak directly for them but both of those Fourth Circuit decisions interpreting investigations, you know, were considerations that people reviewed to make sure that they were following, at least in that jurisdiction, what the courts were dictating as investigations should be. I personally didn't feel, again, that there was any real change as to in those two cases how investigations were being performed.

(Shutt Tr. 90:11-25)(Ex. 59-13).

## II.    ARGUMENT

**A.    A JURY COULD FIND THAT MR. WOOD SUFFERED ACTUAL DAMAGE1.**

**1.    Proof that a Jury could find that Mr. Wood Suffered ANY Actual Damage is Sufficient on Summary Judgment.**

Defendant challenges the mere existence of any actual damages, whether economic or non-economic.  Though these arguments are characterized as a basis for summary judgment, they are inappropriate at this posture to the extent Mr. Wood can adequately establish a jury question as to whether he suffered **any** actual damage.   The correct posture to consider the more item-by-item, damage element by damage element arguments Defendant proffers is to the jury. Provided the Plaintiff can establish **some** measure of damage, he has satisfied his burden at this posture and the damages case should proceed to trial.

Instead, Credit One is really asking for the Court to sort through each of the many items of evidence and categories of damages available to the Plaintiff and rule on them one by one. Defendant contemplates that if the Plaintiff may have evidence for damages "A","B", "C" and "D", and while Credit One may concede "A", the Court should consider the admissibility of evidence as to "B", "C" and "D". While there is a time and a place for either party to challenge individual items of evidence, it is not appropriate for summary judgment. Once the Defendant has conceded or the Plaintiff has established that the consumer has some element of recoverable damage, assuming liability, the case would proceed to trial.  Presented with the same type of summary judgment attempt by the same type of credit card company sued under the FCRA, United States Magistrate Judge Almond effectively explained the inappropriateness of this issue as presented here for summary judgment.  "Plaintiff correctly points out that MBNA's argument is more in the nature of multiple motions in limine to exclude damages evidence than a motion for summary judgment as to 'all or any part' of a' claim' by a 'defending party.'" (R. & R., at 19). The parties and the Court would not save any time or generate any judicial economy by requiring Plaintiff to list and prove (and with no proffered counter evidence) each item of damage that the jury may consider. As Judge Almond summarized,

> This Court has concluded that there is a triable issue regarding MBNA's liability under the FCRA in this case and MBNA concedes that if Plaintiff establishes liability at trial, he would have **at least some viable damages claims**. Thus, this Court believes that it would be an advisory and potentially academic exercise to sort through the legal and factual grounds for all of Plaintiff's damages claims prior to Plaintiff establishing liability against MBNA and actually pursuing a claim for these damages at trial. See <u>Kendall McGaw Labs, Inc. v. Community Memorial Hosp.</u>, 125 F.R.D. 420, 422-423 (D.N.J. 1989)(court declined for reasons of judicial efficiency to entertain motion for partial summary judgment on issue of damages in view of unresolved liability issue.

(R. & R., at 20-21) (bold emphasis added).

## 2.    Plaintiff Clearly Has "Some Viable Damage Claims"

Defendant cannot reasonably deny that the Plaintiff has established some degree of damages.

Even simply the time a consumer spends attempting to dispute and correct a defendant's credit reporting is cognizable as actual damage. *Robinson v. Equifax Info. Servs, LLC*, 560 F.3d 235, 246 (4th Cir. 2009) ("Based on our review of the record, we also conclude that Robinson proffered sufficient evidence of loss of income from time missed from work addressing Equifax's errors."); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, No. 09-0646, 2010 WL 4939441 (E.D. Pa. Sept. 23, 2010) ("At the very least, she is entitled to damages suffered in connection with her efforts to correct the error in Trans Union's credit report.); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 717 (3d Cir. 2010). ("Time spent trying to resolve problems with the credit reporting agency may also be taken into account."); *Sheffer v. Experian Solutions, Inc.,* No. 02-76404, 2003 WL 21710573, at *3 (E.D.Pa. July 24, 2003) (plaintiff may be entitled to damages for emotional distress suffered in connection with trying to correct the error). Mr. Wood suffered such a loss. (Wood Decl. ¶¶ 1-4).

Defendant ignores the broad range of other economic damages that the Plaintiff is entitled to take to a jury. While there is sufficient evidence that Mr. Wood suffered injury in the

denial of his applications for third party credit, he also suffered economic damage in his forced

withdraw from the credit market.  As established above, the Plaintiff was taken out of the credit

market because of continuing derogatory inaccurate credit reports issued by the Defendant.   He

knew he could not obtain credit and could not stomach the attempt while his reports remained

fatally blemished.  This lost credit opportunity is an established measure of FCRA damages:

> Plaintiff asserts she did not apply for additional credit after these denials for fear
> that her new applications would be denied as well. She also contends her
> reputation has been damaged as a result of Equifax's actions.  Defendant, in turn,
> argues Plaintiff was unable to identify any specific lost credit opportunities and,
> in any event, any purported damage to her reputation is speculative.  The Court
> disagrees that Plaintiff's fear of lost credit opportunities and/or damage to her
> reputation is speculative or factually implausible. As the record reflects, Plaintiff's
> poor credit rating as reported by Equifax has already had adverse consequences in
> the recent past, and, as a matter of common sense, rational jurors might conclude
> it is likely to be harmful in the future unless changes, if warranted, are made to
> her credit report. Accordingly, the Court denies Defendant's Motion for Partial
> Summary Judgment on this ground as well.

*Miller v. Equifax Info. Servs., LLC*, 3-11-CV-01231-BR, 2012 WL 5984656 (D. Or. Nov. 28,

2012).

Credit One acknowledges and even cites Plaintiff's deposition testimony regarding the

impact of Credit One's refusal to correct his credit.  (Doc. 63 at 5).  As Defendant acknowledges,

"Mr. Wood testified that he was denied housing, "sought a personal loan from Springleaf" and

had sought "to apply for a construction loan with Wells Fargo" and "was denied a school loan

and a car loan[.]"  *Id.*  All of those credit events are evidenced in the Plaintiff's credit files with

the three consumer reporting agencies.

But Credit One complains that, "Mr. Wood is unable to temporally link the alleged

adverse denials of credit to Credit One's investigations of the ACDVs at issue in this case."

(Doc. 63 at 5).   The timing may not have been sought in discovery (Credit One never served

Interrogatories), but it is undisputable when confirmed, as herein, from the actual documents in

the case – Credit One's dispute archives and Wood's credit file.  (Exs. 1-3).

Defendant also argues, that "the absence of denial letters (or any other admissible evidence setting forth the reasons for the denial of credit) results in speculation as to why any adverse credit decision may have been made."  *Id*.  But there is no evidentiary obstacle here – Defendant is free to argue that there would have been other causes for these denials, but the jury could also accept the circumstantial evidence and consumer testimony to find otherwise.  Credit One mistakenly believes that the only economic damages a consumer can recover under the FCRA are associated with a formal denial of a written credit application.  Fortunately, the Court does not need to devote substantial attention to this position as both this Court and the Fourth Circuit have recognized that a credit damages are much broader than Credit One assumes.  It is not necessary for a consumer to prove such damage by direct evidence, let alone by a formal written application and formal written denial notice.  More often than not, the consumer will not receive a detailed explanation of the denial sufficient to survive beyond any reasonable doubt against a defense spray of arguments.  In enacting the FCRA, in addition to enabling a consumer to overcome the "difficulty in correcting inaccurate information," and "getting [his] version of a legitimate dispute recorded in ... [his] credit file," "Congress also hoped to address a number of related problems, including <u>'the inability at times of the consumer to know he is being damaged by an adverse credit report'</u> [and] the lack of 'access to the information in [his] file[.]' " S.Rep. No. 91-517, at 3 (1969). *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010). (emphasis added).

Accordingly, traditional tort causation principles have been remedially applied to the FCRA.  The principle case on point is the Third Circuit's decision in *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996), cited by multiple Circuits, including ours.  The Third Circuit

considered a case in which the consumer did not have direct evidence that any of his credit denials were caused by a FCRA defendant, Trans Union.  As a result, the agency challenged the consumer's credit damage claim contending that there could be other factors to explain the adverse decisions by Philbin's third party lenders.   The Court of Appeals rejected such challenges and permitted proof of the credit denials by circumstantial evidence and inference:

> More fundamentally, the district court erred by assuming that Philbin could satisfy his burden only by introducing direct evidence that consideration of the inaccurate entry was crucial to the decision to deny credit. While Philbin's case might have been stronger had he deposed or taken affidavits of those responsible for the decision, such evidence is not essential to make out a prima facie case pursuant to   § 1681e(b). We deem it sufficient that, as with most other tort actions, a FCRA plaintiff produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a "substantial factor" that brought about the denial of credit. Restatement (Second) of TortsS § 431(a); Keeton *et al.,* Prosser and Keeton on Torts § 41, at 266-68 (5th ed. 1984) [hereinafter Prosser & Keeton]. Philbin has met that burden in this instance as to each of the six credit denials encompassed by his complaint.

*Philbin v. Trans Union Corp.*, 101 F.3d 957, 968 (3d Cir. 1996).   This "substantial factor" language has become established law.

A consumer often cannot rule out every alternate explanation for an adverse credit decision.  Under the "substantial factor" analysis, "Courts have recognized that where a decision-making process implicates a wide range of considerations, all of which factor into the ultimate decision, it is inappropriate to saddle a plaintiff with the burden of proving that one of those factors was *the* cause of the decision."  *Id.* at 969.  As *Philbin* explained,

> Forcing a plaintiff affirmatively to rule out other explanations for the credit denial ignores the fact that decisions to deny credit will frequently have more than one cause. For example, in some instances the inaccurate entry and another factor may each, considered separately, be insufficient to have caused the denial of credit but when taken together are sufficient. Each may then be considered a substantial factor in bringing about the denial of credit and therefore a cause of plaintiff's injury. *See* Prosser & Keeton § 41, at 266-67 & n. 25.

*Id.*

In practice, the "substantial factor" analysis and the permitted use of circumstantial evidence to establish credit injury makes sense.  A jury is permitted thereby to draw reasonable inferences and accept the impact of an inaccurate credit report as a relevant and substantial factor in a lender's denial decision.  For example, in *Philbin*, the Court of Appeals criticized the District Court's reversal of its initial willingness to allow a consumer "convince a jury, 'by process of elimination,' *Philbin I* at 19, that the credit granting agencies must have both used the inaccurate report and considered the inaccurate information on that report in reaching their decisions to deny credit."   *Philbin*, 101 F.3d at 967-68.  The better set of proofs required to circumstantially a credit inaccuracy as a substantial factor in causing credit damage is: (1.) proof of a credit inaccuracy and  (2.) proof that the consumer applied for credit and (3.) proof that the consumer did not obtain the credit.  *Price v. Trans Union, LLC*, 737 F. Supp. 2d 281 (E.D. Pa. 2010) ("a consumer-plaintiff is minimally required to present some evidence of a credit inaccuracy and then some evidence of applying for and not obtaining credit.").  *See also Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 501 (4th Cir. 2007) (Equifax next argues that the evidence does not support any award for economic losses. Equifax claims that only speculation and conjecture support such an award … We disagree. The evidence at trial in this case clearly demonstrates that on numerous occasions Suzanne attempted to secure lines of credit from a variety of financial institutions, only to be either denied outright or offered credit on less advantageous terms that she might have received absent Equifax's improper conduct. At times, these financial institutions consulted credit reports from other agencies, but at other times these institutions relied exclusively on the erroneous credit information provided by Equifax. Based on these incidents, we find that there is a legally sufficient evidentiary basis for a reasonable jury to have found that Equifax's conduct resulted in economic losses for Suzanne."); *Lendino v. Trans*

17

*Union Credit Info. Co.*, 970 F.2d 1110, 1112-13 (2d Cir. 1992) (permitting a reasonable inference that adverse information in a credit report caused a credit denial); *Alley v. First Am. Credco, Inc.*, No. 05CV2130, 2007 WL 188036, at *5 (N.D. Ill. Jan. 19, 2007) ("Although [the mortgage broker] also testified that he did not personally know why Alley's loan was denied. Nevertheless, material issues of fact remain. Specifically, CREDCO concedes that the Shell Management account was the only delinquency on Alley's credit report"); *Koropoulos v. Credit Bureau, Inc.,* 274 F.2d 37 (D.C.Cir.1984), (the plaintiff presented a material question of fact as to whether "the only reasonable interpretation" was that this was the reason for the denial."); *Bach v. First Union Nat. Bank*, 149 F. Appx. 354, 361 (6th Cir. 2005) ("FUNB also argues that the district court erred in relying on Bach's rejected credit card application in finding that Bach had proved actual damages resulting from FUNB's FCRA violation. FUNB asserts that the credit report on which Bank One relied in rejecting Bach's application did not include the false FUNB information from Bach's file and says this false information had already been deleted. However, … Viewing this evidence in the light most favorable to Bach, the district court did not err in finding that sufficient evidence was presented from which a jury could reasonably conclude that a causal link existed between the rejected credit card application and FUNB's FCRA violation.")

Coupled with the details stated in his credit reports, Mr. Wood's own testimony is more than sufficient to prove his credit damage. *See e.g. Bach v. First Union Nat. Bank*, 149 F. Appx. 354, 361 (6th Cir. 2005) ("FUNB argues further that the district court erred in relying on this mortgage application at all in determining whether Bach had proven actual damages because she failed to produce any evidence other than her own testimony documenting the failed mortgage application."); *Drew v. Equifax Info. Servs., LLC*, No. C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010) ("Defendant also argues that the only evidence that could possibly support an

award are tri-merge documents, which are hearsay and cannot be used to prove the contents of plaintiff's Equifax file. But other evidence-such as plaintiff's testimony-shows that plaintiff's Equifax file contained erroneous information both before and after plaintiff considered investing in the Chico properties. The jury was free to deduce from that evidence and from plaintiff's testimony that his emotional distress damages were caused by defendant's FCRA violation."); *Adams v. Phillips*, No. 01-3803, 2002 WL 31886737, at *2-3 (E.D. La. Dec. 19, 2002) ("In order to prove the amount of his economic loss damages, Adams testified that his access to credit was severely damaged as a result of Phillips' actions. … Adams also testified that his damaged credit reputation has prevented him from carrying on his construction business in which he was earning more than $100,000 a year. Adams additionally testified that his construction business has still not fully recovered from the damage suffered due to Phillips' actions. Lastly, Adams testified that he also lost an opportunity to make a $35,000 profit on the purchase and sale of a condominium in Florida.   A review of Adams' testimony supports the finding that the jury's verdict in regards to compensatory damages was not against the great weight of the evidence produced at trial. While it is true that much of Adams' testimony was not corroborated by any documentary evidence, the jury was entitled to base its determination on the credibility of Adams as a witness.")

Often, as in this case, "[T]he most significant damage sustained by a consumer is the emotional distress and vexation of dealing with the repercussions of an inaccurate credit report and the often frustrating ordeal of trying to set the record straight." *Fair Credit Reporting*, Fifth Ed., NCLC, §11.2.3.1, p. 273 (2002).  Damages are available under the FCRA for loss of sleep, nervousness, frustration and mental anguish over the consumer report[3]; injury to reputation,

---

[3] *Millstone v. O'Hanlon Reports, Inc.*, 383 F. Supp. 269 (E.D. Mo. 1974), *aff'd,* 528 F.2d 829

family, work and sense of well-being[4]; and humiliation, embarrassment, and mental distress.[5] Defendant also suggests with only minimal legal citation that a FCRA consumer must provide detailed diagnostic evidence to collaborate his claim for non-economic and intangible actual damages. But, "Actual damages may include not only economic damages, but also damages for humiliation and mental distress." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007))(citations omitted). In the context of a FCRA claim, the Fourth Circuit has "specifically recognize[ed] that a plaintiff's testimony can provide sufficient evidence to support an emotional distress award" and merely "required a plaintiff to 'reasonably and sufficiently explain the circumstances of [the] injury and not resort to mere conclusory statements.'" *Sloane*

---

(8th Cir. 1976) ($2,500) *Rasor v. Retail Credit Co.*, 87 Wash. 2d 516, 554 P.2d 1041 (1976). *See also Thomas v. Gulf Coast Credit Servs.*, 2002 WL 1813463 (M.D. Ala. July 22, 2002) (plaintiff may recover for emotional distress but must show objective physical manifestations; changes in complexion and demeanor are sufficient); *Bryant v. TRW, Inc.*, 487 F. Supp. 1234 (E.D. Mich. 1980) *aff'd* 689 F.2d 72 (6th Cir. 1982).

[4] *Morris v. Credit Bureau of Cincinnati*, 563 F. Supp. 962 (S.D. Ohio 1983) ($10,000). In *Rasor v. Retail Credit Co.*, 87 Wash. 2d 516, 554 P.2d 1041 (1976), in which damages were awarded for injury to reputation, the lower court issued a jury instruction that the reputation of the consumer is presumed good at the time of the violation, unless evidence to the contrary is established. *See also Dalton v. Capital Assoc. Indus.*, 257 F.3d 409 (4th Cir.2001) (damages for loss of reputation are available under FCRA); *White v. Imperial Adjustment Corp.*, 2002 WL 1809084 (E.D. La. Aug 6, 2002) (noting that damages for injury to reputation and creditworthiness are available even without proof of pecuniary damages).

[5] *Fischl v. GMAC*, 708 F.2d 143 (5th Cir. 1983); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509 (5th Cir.1982) ($8000); *Zala v. Trans Union L.L.C.*, 2001 U.S. Dist. LEXIS 549 (N.D. Tex. Jan 17, 2001); *Bruce v. First U.S.A. Bank*, 103 F. Supp. 2d 1135 (E.D. Mo. 2000); *Matise v. Trans Union Corp.*, 1990 WL 872511 (N.D. Tex. Nov 30, 1998); *Pinner v. Schmidt*, 617 F. Supp. 342 (E.D. La. 1985), *aff'd in part and rev'd in part,* 805 F. 2d 1258 (5th Cir. 1986), *cert. denied,* 483 U.S. 1022 (1987) (court upheld $100,000 jury award with no out-of-pocket loss shown); *Swoager v. Credit Bureau*, 608 F. Supp. 972 (M.D. Fla. 1985); *Bryant v. TRW, Inc.*, 487 F. Supp. 1234 (E.D. Mich. 1980), *aff'd,* 689 F.2d 72 (6th Cir. 1982) ($8000); *Collins v. Retail Credit Co.*, 410 F. Supp. 924 (E.D. Mich. 1976) ($21,750); *Jones v. Credit Bureau of Huntington, Inc.*, 399 S.E. 2d 694 (W. Va. 1990). *See also Dalton v. Capital Assoc. Indus.*, 257 F.3d 409 (4th Cir. 2001)(damages for emotional distress are available under FCRA); *White v. Imperial Adjustment Corp.*, 2002 WL 1809084 (E.D. La. Aug 6, 2002) noting that damages for humiliation and mental distress are available even without proof of pecuniary damages).

at 503 (citations omitted). See also *Philbin v. Trans Union Corp.,* 101 F.3d 957, 963 n. 3 (3rd Cir.1996) ("Given the amorphous nature of the damages at issue, we do not consider it necessary that [the plaintiff] state his damages with any greater degree of particularity.") In fact, the Fourth Circuit has explained that "a victim of identity theft" who "suffered the systematic manipulation of [his]personal information, which, despite [his] best efforts", a defendant "failed to correct over a protracted period of time may be expected to suffer "more emotional distress than that found in these other FCRA cases." *Id.* at 505–06.

The amount of proof necessary to establish such damages under the FCRA is lower than for §1983, or as in the context of other cases cited by Experian. In fact, in *Bakker v. McKinnon*, a case cited favorably by the Fourth Circuit in *Dalton*, the Eight Circuit concluded:

> While it is true that appellees were not able to produce any actual out-of-pocket expenses or costs incurred as a result of appellant's willful conduct, appellees testified about how they felt when appellant obtained their credit reports and violated their privacy, thereby causing them some emotional distress. We hold that the district court did not abuse its discretion in awarding appellees actual and punitive damages.

152 F.3d 1007, 1013 (8th Cir. 1998).

In fact, on summary judgment in a comparable "failure to investigate" FCRA case, this Court found fully comparable explanation of non-economic damages sufficient at this posture:

> The record before the Court contains a sufficient articulation of emotional distress to satisfy the standard enunciated by the Fourth Circuit. For example, plaintiff's interrogatory responses state:
>
>> I lost sleep worrying about the issue, which made me tired at work. 1 lost my appetite, had upset stomach and was not eating properly due to the stress. It affected my relationship with my girlfriend and my mom ... My stress and anger level was escalating since I had been planning my own family and wanted to get a place for my fiancé and I to live. The anger, frustration, sleepless nights and upset stomach continued ... My anger and frustration grows each and every day that Experian refuses to do the right thing and get this trade line to report accurately ... Th[e] situation is embarrassing, humiliating and distressing. I could not pay for a decent

21

> wedding and honeymoon ... in the end of April, 2010, I went to the emergency room at Fairfax Hospital because I was having chest pains. I was admitted and stayed the night for observation. I was having heart attack type symptoms, but the doctors were unable to determine the cause. I believe the stress that I was experiencing related to Experian had some part in causing that event.

> Def.'s Mem. in Supp. of MSJ, Ex. G, at pp. 13–16. Based on the record before this Court, the Court cannot conclude that there is no genuine issue of material fact pertaining to Burke's claim for emotional distress based on Credit One's actions, and Credit One's motion for summary judgment on this basis will be denied as well.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *8 (E.D. Va. Mar. 18, 2011).   Similarly, in affirming Judge Lee's entry of a damages jury verdict, the Fourth Circuit rejected the FCRA defendant's argument that the plaintiff's testimony as to damages was to speculative.  As the Court of Appeals summarized:

> To meet this burden, Robinson proffered evidence of various damages she sustained as a result of Equifax's conduct, including, (1) loss of opportunity in the home mortgage market, (2) emotional distress, and (3) loss of income from missing approximately 300 hours of work addressing Equifax's mistakes. Equifax counters that Robinson did not meet her burden because she "failed to establish that she was denied any credit because of an inaccuracy in an Equifax credit report" and "presented no evidence that she sustained emotional distress proximately caused by Equifax." We conclude that there is more than sufficient evidence in the record connecting Equifax's errors with Robinson's damages to support the jury's actual damages award.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 240 (4th Cir. 2009).  As in each of these many FCRA cases, Mr. Wood offers more than sufficient evidence to get to the jury on his non-economic damages.

## B.     CREDIT ONE'S FCRA VIOLATIONS WERE WILLFUL

Under the FCRA, a person who "negligently" violates its provisions is liable for actual damages under 15 U.S.C. §1681o.  If a jury finds that the violations were "willful", then the defendant can be liable for punitive damages under 15 U.S.C. §1681n.  Despite the Fourth Circuit's

admonition in *Dalton* that "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind," *Dalton,* 257 F.3d at 418, Credit One still asks the Court to take from the jury the question of whether its conduct and policies were willful.[6] The Court should decline this invitation to narrowly and unreasonably constrain the FCRA.

Defendant's asserts that Plaintiff has not (cannot?) establish that it "knowingly and intentionally committed an act in conscious disregard for the rights." (Doc. 63 at 7). Defendant misstates the willfulness standard under the FCRA. Its knowledge of same is apparently derived from the 2006 decision it cites out of the Northern District of Georgia. While the Eleventh Circuit always did have the most rigorous standard for willfulness prior to 2007, even it's governing law became uniform with the Fourth Circuit's after a seminal Supreme Court's decision. Judge Payne recently summarized the decision and restated the *Safeco* standard as follows:

> In *Safeco Ins. Co. of Am. v. Burr*, the Supreme Court considered two consolidated cases in which consumers had sued insurers for violations of 15 U.S.C. § 1681m(a), which requires that notice be provided to any consumer subjected to "adverse action ... based in whole or in part on any information contained in a consumer report." 551 U.S. 47, 52, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). One who "willfully fails" to provide such notice is civilly liable under 15 U.S.C. § 1681n.
>
> The Supreme Court began by clarifying that **"willfulness" in the context of the FCRA "cover[s] not only knowing violations, but reckless ones as well** [.]" *Safeco*, 551 U.S. at 57, 127 S.Ct. 2201 (internal citations omitted). The Court reasoned that a definition of willfulness encompassing "reckless disregard" was

---

[6] Willfulness is nearly always a question of fact for the jury. *Lenox v. Equifax Info. Servs. LLC,* 2007 WL 1406914, at *6 (D. Or. May 7, 2007)(reasoning "whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995)(recognizing "The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."); *Cahlin v. Gen'l Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991); *Centuouri v. Experian Info. Solutions, Inc.,* 431 F.Supp.2d 1002, 1007 (D.Ariz.2006)(refusing to grant summary judgment on the issue of willfulness in a case involving the reasonableness of consumer protection procedures); *Holmes v. Telecheck Int'l, Inc.,* 556 F. Supp. 2d 819, 847 (M.D. Tenn. 2008).

> consonant with both the common law and the Court's interpretations of comparable language in other statutes. *Id.*
>
> The Supreme Court then elaborated that **"recklessness" is defined** "in the sphere of civil liability as conduct violating an objective standard: action entailing 'an **unjustifiably high risk of harm that is either known or so obvious that it should be known**.' " 551 U.S. at 68, 127 S.Ct. 2201 (citing Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Therefore, the Court held that a company subject to the FCRA "does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. at 69, 127 S.Ct. 2201.

*Milbourne v. JRK Residential Am., LLC*, No. 3:12CV861, 2016 WL 4265741, at *4–5 (E.D. Va. Aug. 11, 2016) (Bold emphasis added). Here, the distinction between a knowing violation and a reckless one is really moot as the evidence in the case is sufficient to satisfy either threshold.

Unlike Virginia's common law torts, "A showing of malice or evil motive is not required to prove willfulness under the Act." *Dalton,* 257 F.3d at 418. A defendant may "willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721-22 (3d Cir. 2010) (citing *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007)). The "FCRA is concerned with whether the defendant ran an unjustifiably high risk of *violating the law.*" *Drew v. Equifax Info. Servs., LLC*, C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010).

The Court need not look far to find comparable legal authority to deny this motion. In *Mullins v. Equifax Info. Servs., LLC*, Judge Payne entered a jury verdict based on far weaker facts than in this case, based upon the CRA's established ACDV alternative to a real investigation, and the fact that the defendant had substantial notice that these procedures violated the FCRA. The Court explained:

> The case was tried on, and the jury was instructed pursuant to, the law of this circuit at the time of trial in the issue of willfulness. See *e.g., Dalton v. Capital Associated Industries, Inc.,* 257 F.3d 409 (4th Cir.2001). Thereafter, the Supreme Court of the United States decided *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007)

> which actually articulated a standard for willfulness that was less stringent than the standard which controlled the trial and the jury verdict.
>
> Viewed as a whole, the record here supports a finding of willfulness under either standard. The plaintiff presented evidence from which the jury reasonably found TU deliberately and consciously committed the violations of the FCRA found by the jury. Certainly, the evidence supports a finding under the rule of *Safeco*. Indeed, from the record, the jury reasonably could have inferred that TU has chosen to disobey the FCRA's reinvestigation and related provisions because it is less expensive to do so, even if it loses a few cases, than it is to comply with the statute.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888, 2007 WL 2471080 (E.D. Va. Aug. 27, 2007).

While here there were at least five over a multi-year period, even a single FCRA dispute can support a willfulness verdict. *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 151 (4th Cir. 2008). And certainly there was no mistake or human error. Instead, Credit One testified that it intended its employees to follow the exact procedures used to rebuff Mr. Wood's disputes. Worse, Defendant testified that it had actual knowledge of the Fourth Circuit's elaboration of a furnisher's FCRA duties in *Johnson* and *Saunders*. A jury could fairly find that Defendant knowingly ignored or disobeyed those warnings.

Credit One testified that it even today had not changed its credit reporting – still asserting without proof that Wood owed the debt. Further, Defendant ignores the fact that it – for each of the Plaintiff's five disputes and for every other consumer who contacted it, Credit One never reported and disclosed to the consumer reporting agencies that the subject account was disputed. *See Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 153 (4th Cir. 2008) (In reprehensibility analysis, "evidence at trial revealed that **BB & T had never updated its report to the CRAs to reflect the ongoing dispute**, and the jury did find a knowing and intentional violation of FCRA. **BB & T's intentional misconduct and longstanding refusal to correct its errors are more reprehensible than negligence or a mistake quickly corrected**. *See, e.g., Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 775 (9th Cir.2005) (reasoning that a company's failure to remedy or address the effects of a statutory violation supports punitive damages

award); *Bogle v. McClure,* 332 F.3d 1347, 1361 (11th Cir.2003) (considering conduct more blameworthy for purposes of punitive damages analysis when it was "more than mere accident" and engaged in "intentionally").)(Bold emphasis added).

Even before *Safeco*, Judge Dohnal heard a jury trial in *Saunders* in which the evidence of willfulness was primarily limited to the furnisher's systematic refusal to code the challenged account as disputed.  The bank appealed, and the Fourth Circuit affirmed:

> BB & T next contends that, even if it violated its duties under § 1681s–2(b), *151 Saunders failed to present sufficient evidence of intent to establish a *willful* violation under § 1681n. ... [I]n fact, Saunders did present other evidence of intent. Specifically, Saunders presented evidence that (1) BB & T's records reflected the ongoing dispute over the debt, (2) BB & T's reports to the CRAs did not reflect that ongoing dispute, and (3) BB & T *intended* not to report that ongoing dispute. ... Moreover, evidence at trial revealed that BB & T had *never* updated the report to reflect the dispute.
> ...   On the basis of the evidence Saunders presented, a reasonable jury could conclude that BB & T "knowingly and intentionally" chose to report the debt without reporting the ongoing dispute between Saunders and BB & T.

*Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 150–51 (4th Cir. 2008).  Here, there is more evidence even than in *Saunders* for these three determining facts.  More recently, the Third Circuit considered a comparable case and in reversing the District Court's summary judgment on willfulness, it adopted *Saunders* and held:

> A furnisher's objectively unreasonable actions with respect to a particular consumer's account can support a jury finding of willfulness. Blanket policies, too, can underpin such a finding. *See, e.g., Boggio,* 696 F.3d at 620 (remanding for a jury trial as to whether a furnisher's policy "prohibit[ing] its employees from performing anything more than a cursory confirmation of [the consumer's] status before reporting back to a CRA" constituted willful violation of the FCRA); *Van Veen,* 844 F.Supp.2d at 610 (denying defendant's motion for summary judgment as to willfulness where furnisher's policies "never result in marking an account as disputed" and where the furnisher's analysts were allotted only "5 to 10 minutes" for investigations).

> ***
> Seamans points to evidence that undertrained ACS representatives spent, on average, only 15 minutes investigating each dispute, and that the policy of ACS

> was to *never* flag accounts as disputed or to report dates of first delinquency. If
> true, these policies would appear to be in outright conflict with a furnisher's duties
> under FCRA.
>
> We will therefore vacate the District Court's order with respect to its dismissal of
> Seamans's claim for punitive damages under § 1681n[.]

*Seamans v. Temple Univ.*, 744 F.3d 853, 868–69 (3d Cir. 2014). Here, Plaintiff presents even

stronger evidence – Credit One spends far less than 15 minutes per dispute, does follow multiple

blanket policies that avoid a substantive investigation or notation of dispute. Credit One's

systematic refusal to conduct the "searching" substantive investigation required in *Johnson* is

easily willful. Very recently, the (post-*Safeco*) Eleventh Circuit rejected a willfulness challenge

where the allegation was simply that the furnisher had verified the subject debt without written

proof that the disputing consumer was the person who actually opened the account:

> Midland finally asserts that we should affirm the district court on the alternate
> basis that Hinkle cannot prove a "willful" violation of § 1681s–2(b). But a
> reasonable jury could find that Midland either knowingly or recklessly reported
> debts as "verified" without obtaining sufficient documentation to support that
> determination. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–57, 127 S.Ct.
> 2201, 2208, 167 L.Ed.2d 1045 (2007) (holding that liability for "willfully" failing
> to comply with the FCRA extends not only to acts known to violate the FCRA,
> but also to the reckless disregard of a statutory duty). ... A reasonable jury could
> find that Midland adopted such a system with reckless disregard for the fact that it
> would result in perfunctory review in contravention of the FCRA. We therefore
> hold that a reasonable jury could find that Midland willfully violated § 1681s–
> 2(b) when it reported the GE/Meijer and T-Mobile accounts as "verified" without
> obtaining sufficient documentation that the debts in fact belonged to Hinkle.

*Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1307 (11th Cir. 2016). It has long been

the law that where, as here (and in *Hinkle*), the furnisher does not have written proof to refute the

consumer's credible claim that he did not apply for or use the account. *Johnson v. MBNA Am.*

*Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004) (If the furnisher's employees had reasonably

investigated "and determined that [it] no longer had the application, they could have at least

informed the credit reporting agencies that MBNA could not conclusively verify" the consumer's

obligation).   And Credit One's use of a rapid-reject assembly process of handling consumer FCRA disputes itself has been found willful, even before *Safe*co.

## IV.   CONCLUSION

For the reasoned stated herein, Defendant's Motion for Summary Judgment should be denied.

Respectfully,

_____/s/_____
Susan M. Rotkis, VSB 40693
Leonard A. Bennett, VSB 37523
Craig C. Marchiando
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: srotkis@clalegal.com
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of September 2016, I served a true and correct copy of the foregoing document by filing it in the CM/ECF system, which will electronically notify (NEF) the following:

Lauren Marie Cafferty      Christopher James Sears
McGuireWoods LLP (DC)     Cipriani & Werner PC
2001 K Street NW       400 Tracy Way
Suite 400          Suite 110
Washington, DC 20006-1040    Charleston, WV 25311
Email: lcafferty@mcguirewoods.com  Email: csears@c-wlaw.com


         /s/
        Susan M. Rotkis, VSB 40693
        **CONSUMER LITIGATION ASSOCIATES, P.C.**
        763 J Clyde Morris Boulevard, Suite 1A
        Newport News, VA 23601
        Telephone: (757) 930-3660
        Facsimile: (757) 930-3662
        Email:  srotkis@clalegal.com