```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
                  RICHMOND DIVISION

DAVID WILLIAM WOOD,            )
                               )
           Plaintiff,          )   CASE NO.:  3:15-cv-594
                               )
      vs.                      )
                               )
EQUIFAX INFORMATION SERVICES   )
LLC, et al.,                   )
                               )
                               )
                               )
           Defendants.         )
_____)



              PERSON MOST KNOWLEDGABLE
                 OF CREDIT ONE BANK
   VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF KIM MARAGOS
                  LAS VEGAS, NEVADA
                 FRIDAY, MAY 13, 2016
                 1:36 P.M. -  2:34 P.M.



REPORTED BY:  GINA DILUZIO, RPR, CCR #833
```

Page 2

1  VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF KIM MARAGOS,
   PERSON MOST KNOWLEDGABLE OF CREDIT ONE BANK, taken at 3770
2  Howard Hughes Parkway, Suite 300, Las Vegas, Nevada, on
   Friday, May 13, 2016, at 1:36 p.m., before Gina DiLuzio,
3  Certified Court Reporter, in and for the State of Nevada.

4  APPEARANCES:
   For the Plaintiff:
5       CONSUMER LITIGATION ASSOCIATES, P.C.
        BY: SUSAN M. ROTKIS, ESQ.
6       763 J. Clyde Morris Boulevard
        Suite 1-A
7       Newport News, Virginia 23601
        (757) 930-3660
8       srotkis@clalegal.com

9  For Defendant Credit One Bank, N.A.:

10      CIPRIANI & WERNER
        BY: CHRISTOPHER J. SEARS, ESQ.
11      500 Lee Street East
        Suite 900
12      Charleston, West Virginia 25301
        (304)444-8780
13      csears@c-wlaw.com

14      CREDIT ONE BANK IN-HOUSE COUNSEL
        BY: NARINE YENOVKIAN, ASSISTANT VICE
15         PRESIDENT COUNSEL
        585 Pilot Road
16      Las Vegas, Nevada 89119
        (702) 269-1190
17      narine.yenovkian@creditone.com

18
   Also Present:   HELEN LANHAM
19                 TERRELL HOLLOWAY, Videographer
20
21
22
23
24
25

Page 3

1              I N D E X
2  WITNESS: Kim Maragos
3  EXAMINATION                      PAGE
4     By Ms. Rotkis                   5
5
6           E X H I B I T S
7  NUMBER                          MARKED
8          (None marked.)

Page 4

1       LAS VEGAS, NEVADA, FRIDAY, MAY 13, 2016
2               1:36 P.M.
3                 -oOo-
4  Thereupon--
5       THE VIDEOGRAPHER: This is the beginning of
6  videotape No. 1 in the deposition of PMK of Credit One Bank,
7  Kim Maragos, in the matter of Wood versus Credit One Bank,
8  N.A., held at Litigation Services, on May 13, 2016, at
9  1:36 p.m.
10      The court reporter is Gina DiLuzio. I'm
11 Terrell Holloway, the videographer, an employee of
12 Litigation Services, located at 3770 Howard Hughes Parkway,
13 Suite 300, Las Vegas, Nevada 89169.
14      This deposition is being videotaped at all
15 times unless specified to go off the video record.
16      Would all present please identify themselves
17 beginning with the witness.
18      THE WITNESS: Kim Maragos.
19      MR. SEARS: Christopher Sears on behalf of
20 Credit One Bank. And I have with me in attendance in-house
21 counsel for Credit One, Narine Yenovkian, and a corporate
22 representative for Credit One, Helen Lanham.
23      MS. ROTKIS: My name is Susie Rotkis. And I
24 represent David Wood, the Plaintiff in this case. And I'm
25 joining from Newport News, Virginia --

Page 5

1       THE VIDEOGRAPHER: Would the court reporter --
2       MS. ROTKIS: -- by videoconference today.
3       THE VIDEOGRAPHER: -- please swear in the
4  witness.
5       KIM MARAGOS,
6  was called as a witness, and having been first duly
7  sworn, was examined and testified as follows:
8
9               EXAMINATION
10 BY MS. ROTKIS:
11      Q.   Good afternoon. You got to sit through the
12 deposition of Ms. Lanham, correct?
13      A.   That is correct.
14      Q.   Do you have any questions about what your duty
15 is here today as a deponent?
16      A.   I do not.
17      Q.   Do you have any reason to think that you can't
18 testify truthfully today?
19      A.   No, I do not.
20      Q.   Could you please say your last name for me
21 again so I can pronounce it correctly.
22      A.   Yes. Maragos, M-a-r-a-g-o-s.
23      Q.   Maragos.
24      A.   Maragos.
25      Q.   That's not so hard. Okay. So what is your job

KIM MARAGOS - 5/13/2016

Page 6

1   at Credit One Bank, Ms. Maragos?
2   A.   I am the assistant vice president in customer
3   service.
4   Q.   And who is your employer?
5   A.   Credit One Bank.
6   Q.   Is that what's on your paycheck and your W-2
7   form?
8   A.   Yes.
9   Q.   Okay. How long have you worked at Credit One
10  Bank?
11  A.   In various capacities, 16 years.
12  Q.   What was your first job there?
13  A.   I came in as a telephone supervisor.
14  Q.   And what did that job entail?
15  A.   I managed, approximately, 15 agents who handled
16  customer service telephone calls.
17  Q.   Were credit disputes among those things that
18  your customer service representatives might handle on the
19  phone?
20  A.   Yes.
21  Q.   And what did you do after you were a supervisor
22  of that -- was it a department?
23  A.   It was a department with several agents,
24  multiple supervisors. I was one of five or six other
25  supervisors.

Page 7

1   Q.   Okay. And what did you do after that?
2   A.   I was then a supervisor in our office of the
3   president handling escalated complaints.
4   Q.   Did the president work in that office?
5   A.   The president is in our Las Vegas office, which
6   is where I'm located.
7   Q.   But was he in that office where you had
8   escalated complaints, he or she?
9   A.   She did not directly work in our walls, but he
10  was in that same building. And was very engaged in the
11  process.
12  Q.   Who is the president of Credit One Bank?
13  A.   Currently, it's Mr. Robert Deong (phonetic).
14  Q.   And who was it when you were in the office of
15  the president working on escalated issues?
16  A.   I do not remember his first name, but I believe
17  it was Matthias (phonetic) when I first started.
18  Q.   Okay.
19  A.   Yeah.
20  Q.   Okay. And what did you do in that department?
21  A.   Over -- again, supervised, approximately, three
22  to five agents handling any sort of escalated complaints
23  that the consumer or customer might have.
24  Q.   What does escalated complaint mean?
25  A.   If they did not feel that they were getting a

Page 8

1   resolution at their first customer service point with either
2   one of the agents handling general inquiry, then they could
3   ask to speak to somebody higher. And this department would
4   handle calls at a higher level.
5   Q.   What does Credit One Bank -- how does Credit
6   One Bank define "resolution"?
7   A.   It would depend on the circumstance, the issue.
8   Q.   Okay. How long were you in that department?
9   A.   I would say probably two to three years.
10  Q.   And what did you do after that?
11  A.   Was promoted to an operations manager over
12  customer service telephones.
13  Q.   And how long did you do that?
14  A.   Approximately, three years.
15  Q.   Okay. And then what did you do after that?
16  A.   Was promoted to assistant vice president over
17  customer service, which would have included customer service
18  telephones, some back office correspondence, fraud
19  investigations.
20  Q.   Where are the ACDV operators -- okay. Focusing
21  just on the period of time that the disputes were active by
22  Mr. Wood, the time that Mr. Wood first submitted a dispute
23  to Credit One Bank until now, can you describe to me where
24  the ACDV processing function took place.
25  A.   It is within our office in Las Vegas with our

Page 9

1   employees' agents handling that.
2   Q.   What department is that function in?
3   A.   Sure. There's a split. There -- it's customer
4   service is the main department. And then some would be
5   handled in back office. If there's a claim, a nature of
6   fraudulent concerns, then that is handled under the fraud
7   department.
8   Q.   What are fraudulent concerns?
9   A.   They're predetermined by e-OSCAR or the credit
10  reporting agencies of what options they can choose. They --
11  I don't know them all. There is a drop-down box within the
12  credit reporting agencies, I believe.
13       They might say true identity theft. They could
14  say not his, not hers. They could say fraud identity theft.
15  I -- to name a few. I don't know all of what the options
16  are.
17  Q.   Do you remember any other of the options just
18  sitting here right now?
19  A.   No. Any of the other options related to fraud
20  or related to any consumer dispute?
21  Q.   Well, you had mentioned fraud concerns. So I
22  just kind of wanted to drill down a little bit and find out
23  what fell into that category of fraud concerns.
24       And then you gave me some examples. And I'm
25  just following up on that seeing if you have any other

Maxene Weinberg Agency
(800) 640-1949

KIM MARAGOS - 5/13/2016

Page 10

1  examples of the true identity theft, fraud, not his, not
2  hers.
3          So if there's anything else you can think of
4  right now, I would like to know.
5      A.  Not right now.
6      Q.  Okay.
7      A.  I would have to look at a document or
8  something.
9      Q.  Okay. What did you do before you joined Credit
10  One Bank, 16 years ago?
11     A.  I worked for another credit card issuer.
12     Q.  Who was that?
13     A.  Citibank.
14     Q.  And where was that job located?
15     A.  At the Lakes Las Vegas.
16     Q.  And how long did you work there?
17     A.  I was there for nine years.
18     Q.  And what did you do at Citibank?
19     A.  Initially, I became a -- I was -- came in as a
20  telephone representative. I then was promoted to supervisor
21  handling calls.
22          And then I became, at the final end, a special
23  projects supervisor where they were offering premium cards
24  with perks. I overseen that department with agents working
25  and handling customer service calls.

Page 11

1      Q.  Okay. So that takes us back 25 years. What
2  were you doing before you joined Citibank?
3      A.  I had -- I had a -- worked primarily with
4  Sheridan Corporation in sales and catering capacities. And
5  then somewhere in between there, I also worked for a credit
6  union bank in Georgia.
7      Q.  Were you located in Georgia?
8      A.  I was at the time.
9      Q.  Did you graduate from high school?
10     A.  I did.
11     Q.  What about college?
12     A.  I took some courses. Did not graduate.
13     Q.  Where did you take courses?
14     A.  In Georgia. And then I also took some -- I
15  guess it was more targeted to tour and travel. I was going
16  into the industry and, so, I took some courses in that.
17  Became certified.
18     Q.  Did you --
19     A.  Sorry.
20     Q.  Oh -- oh, yeah. Please, continue.
21     A.  Yeah. Became certified. And then my husband
22  had a job offer in Las Vegas, so we relocated, and I was not
23  able to ever use that.
24     Q.  Are you still married?
25     A.  I am not.

Page 12

1      Q.  Do you live with anybody?
2      A.  I have a daughter that lives with me.
3      Q.  Did you discuss this case with your daughter at
4  all?
5      A.  No. I told her simply that I was going to be
6  in a deposition, but -- and I wouldn't be able to be
7  reached, but not that -- anything about the case.
8      Q.  Okay. Have you ever given a deposition before?
9      A.  I have. It's been years ago.
10     Q.  Do you recall what the subject matter of your
11  deposition was in the past?
12     A.  I was there in -- we were the victim -- Credit
13  One Bank was the victim in a fraudulent case. And, so, I
14  was testifying to actual documents and use of card.
15     Q.  So you oversee the fraud department now?
16     A.  I do.
17     Q.  How long have you been doing that?
18     A.  It's been since July 2015.
19     Q.  Okay. Did Credit One Bank make any mistakes
20  with respect to the ACDV processing that it conducted
21  concerning Mr. Wood's dispute?
22          MR. SEARS: Objection.
23          THE WITNESS: It --
24          MR. SEARS: Calls for a legal conclusion.
25          THE WITNESS: In my observation of one error

Page 13

1  that occurred, they -- the agent had indicated that it was a
2  joint account, but immediately cor -- corrected that.
3          So to my understanding, that would not have
4  even transmitted to the credit report agencies. It was --
5  the correction was immediate, so -- but that, in my
6  observation, was the error -- only error.
7  BY MS. ROTKIS:
8      Q.  Did David Wood open the Credit One account?
9          MR. SEARS: Objection.
10         THE WITNESS: According to all of our facts and
11  records, yes.
12  BY MS. ROTKIS:
13     Q.  So sitting here today, Credit One Bank is
14  testifying that David Wood opened that account?
15         MR. SEARS: You know, I'm going to object.
16  That is not what this case is about. And it calls for a
17  legal conclusion.
18         And, so, go ahead, if you can answer that. But
19  I think it mischaracterizes what this case is all about.
20  BY MS. ROTKIS:
21     Q.  Please answer the question.
22     A.  Based on the facts that we have available, it
23  is our belief that Mr. Wood did apply for the card.
24         (Pause in the proceedings.)
25  BY MS. ROTKIS:

Page 14

1   Q.   What was Credit One Bank's net worth in 2012?
2   A.   I'm sorry. I do not have that information.
3   Q.   What was Credit One Bank's net worth in 2013?
4   A.   I do not have that information.
5   Q.   What was Credit One Bank's net worth in 2014?
6   A.   I do not have that information.
7   Q.   What was Credit One Bank's net worth through
8   the first quarter of 2016?
9   A.   I do not have that information.
10  Q.   When did you learn that you were going to be
11  giving a deposition in this matter?
12  A.   I believe it was Monday.
13  Q.   One week a -- or Monday of this week?
14  A.   Yes, ma'am.
15  Q.   Okay. And what did you do to prepare for your
16  deposition today?
17  A.   I --
18  Q.   Other than I think that you learned only from
19  the lawyers in this case.
20  A.   I reviewed what documents were presented to you
21  and reviewed some of that -- the details there on what the
22  ACDV processing was.
23  Q.   Do you recall what documents you reviewed?
24  A.   Some of the procedure manuals that we provided.
25  I don't know all of what's in the books. Just off the top

Page 15

1   of my head, but some of the procedure manuals in there.
2        I think there was some ACDVs that we reviewed.
3   Primarily, procedure documents.
4   Q.   Did you go and locate any of the procedure
5   manuals yourself?
6   A.   I did not.
7   Q.   Did you go and look at the ACDVs on Credit One
8   Bank systems yourself?
9   A.   I did not.
10  Q.   Did you do any investigation of any of the
11  topics yourself?
12  A.   I -- I reviewed what I had available to me on
13  the -- our main system, which just collaborated on the case
14  notes that were in the case file -- or in the documents that
15  were shared.
16  Q.   Okay. Are there any documents that you
17  reviewed that you don't -- that I did not get?
18  A.   No. Not that I'm aware of.
19  Q.   How many times did the Plaintiff call Credit
20  One Bank regarding this dispute that is the subject of this
21  lawsuit?
22       MR. SEARS: Objection. Vague.
23       THE WITNESS: Can I refer to any of the --
24       MR. SEARS: Yeah, if -- if you need --
25       THE WITNESS: -- if they're available?

Page 16

1        MR. SEARS: -- to refer to a document to answer
2   the question, you have a right to do that.
3        THE WITNESS: Okay. And I'm sorry. Repeat
4   your question.
5   BY MS. ROTKIS:
6   Q.   How many times did Mr. Wood call Credit One
7   Bank regarding the dispute that is the subject of this case?
8   A.   Regarding the dispute?
9        MR. SEARS: Object to form.
10       THE WITNESS: If we're saying telephone calls
11  specifically relating to the dispute, it would appear there
12  may have been three calls specific --
13  BY MS. ROTKIS:
14  Q.   What documents are you looking at?
15  A.   This was in your first binder, Section --
16  Q.   Do you have Bates numbers?
17  A.   Section 4 -- or tab 4.
18       MR. SEARS: The Bates numbers --
19       THE WITNESS: Oh.
20       MR. SEARS: -- at the bottom.
21       THE WITNESS: COB00059.
22       MR. SEARS: Beginning.
23  BY MS. ROTKIS:
24  Q.   Okay.
25  A.   Through --

Page 17

1   Q.   So can you point --
2   A.   -- 65.
3   Q.   Can you just point me to the page number that
4   you're looking at for the first phone call that you're aware
5   of.
6   A.   So if you would start at 65 --
7   Q.   Yes.
8   A.   I'm just going up through these dates. Let's
9   see. So there's nothing on page 65 that would lean me to
10  the direction that his call was dispute related.
11       Page 64, nothing on that page. 63 -- the
12  date -- looks like August 28, 2013, where a lost/stolen
13  report was filed.
14  Q.   What does that mean?
15  A.   That Mr. Wood called in to report the account
16  to us as a fraudulent application.
17  Q.   And what happened after that?
18  A.   Page 62, on 3/27/14, and where it says, "ORR
19  Fraud."
20  Q.   Yeah. What does that mean?
21  A.   That he's called -- I don't know the details of
22  the call, but he's calling something relating to a dispute
23  on the account.
24  Q.   Okay.
25  A.   And then on --

KIM MARAGOS - 5/13/2016

Page 18

1  Q. And then the next time he called?
2  A. On 4/14 -- pardon me -- 4/22, we resent an
3  affidavit to him.
4  Q. How can you tell?
5  A. The systemic notes, on 4/14 -- that's a
6  systemic note -- it says, "Affidavit sent."
7  Q. Ahh. Yes. Okay.
8  A. Okay. Page 61, I do not show anything there.
9  Page 60, I do not show anything. Page 59, on November 3,
10 2015, he notified us that he was represented by an attorney.
11 Q. How can you tell that's a phone call?
12 A. Actually, I apologize. I -- I would not be
13 able to state that for -- to be certain.
14 Q. Do you know who agent 248362877 is?
15 A. I do not know based on what I have available in
16 front of me, no.
17 Q. Do you have an agent number?
18 A. My agent number is F71.
19 Q. Okay. Let's go back to page 62, I think. No.
20 Go all the way back to 65.
21 A. (Complied.)
22 Q. Can you just take me through these work history
23 notes -- these case history notes and tell me what happened
24 starting in -- in June 11 of 2013.
25 A. Okay.

Page 19

1  Q. I mean, is that the first entry on this where
2  this record starts?
3  A. That's correct. And that's just
4  acknowledging --
5  Q. Okay.
6  A. -- that we -- the first note, on June 11, is
7  just a systemic note acknowledging the setup of the account
8  and our initial fee for a membership fee.
9  Q. Okay. So this 6/11 is when this whole --
10 6/11/13 is when the whole story starts. Credit One Bank
11 sets up a new account?
12 A. Yes. Upon receipt --
13 Q. And --
14 A. Upon receiving the application, there was a
15 request to add an authorized user name. And we did not add
16 that, because the voice that had requested it was not
17 recognized to be one that would match the account details.
18 Q. How do you know that?
19 A. The request was a verbal one. It goes through
20 a recording.
21 Q. Uh-huh.
22 A. And then we have a manual -- an agent actually
23 listens to the recording. And, if, for instance, Kim
24 Maragos is on the account and a man calls in and says, I'd
25 like to be to added Kim's account, the only one that can add

Page 20

1  somebody to the account is Kim.
2     So then that voice --
3  Q. Okay.
4  A. -- becomes unrecognizable and we do not honor
5  that request.
6  Q. Okay.
7  A. Okay. On June 14, 2013, the account was
8  activated.
9  Q. How does that account get activated, do you
10 know?
11 A. It can -- the -- it is a telephone call. They
12 can either --
13 Q. Uh-huh.
14 A. -- stay within our automated voice response,
15 which is IVR. Or they can request to push out and speak to
16 an agent, if they have additional questions regarding the
17 card, prior to actually activating the card.
18 Q. Okay.
19 A. This particular one would indicate a couple of
20 lines up that they stayed within the IVR to activate.
21 Q. So does that include that voice recognition
22 thing or is it something else?
23 A. That is separate.
24 Q. That is separate?
25 A. Uh-huh.

Page 21

1  Q. Okay. So you could activate the card having a
2  complete -- I mean, I don't know how the voice matching
3  works, but -- all right. Well, at any rate, this was
4  activated?
5  A. Correct.
6  Q. Where -- do you have any records anywhere that
7  show, like, how Credit One made the decision to grant credit
8  in the first place?
9  A. From our application processing? Is that --
10 you're wanting --
11 Q. Yeah.
12 A. -- to start there?
13 Q. Yeah.
14 A. I think Helen touched on the Experian piece of
15 it, right, where and how we determined to solicit Mr. Wood,
16 sending him an invite letter to apply for that credit card
17 with us.
18    And upon completion, once received the
19 application invite, then they can either mail it in, go on
20 our website. Again, do it by phone or with an agent.
21 Q. Do you know how Mr. Wood allegedly opened this
22 account?
23 A. I believe -- I do not know for certain.
24    MR. SEARS: Well, you have to refer to a
25 document. What document do you need?

Page 22

1  THE WITNESS: The application.
2  MR. SEARS: Okay. I think her -- her response
3  is that she would be able to answer your question if she
4  could refer to a document. Would you like for her to
5  search for that --
6  BY MS. ROTKIS:
7  Q. Could you tell me --
8  MR. SEARS: -- document?
9  BY MS. ROTKIS:
10 Q. -- what the Bates number of this -- of the
11 application is?
12 MR. SEARS: Well, that's what I'm asking you.
13 Would you like for us to search for that document so she can
14 respond to your answer?
15 MS. ROTKIS: I'll just carry that -- that over.
16 MR. SEARS: Okay.
17 BY MS. ROTKIS:
18 Q. You oversee the fraud department, right?
19 A. Correct.
20 Q. Okay. So do you get information from the
21 consumer reporting agencies that breaks out how many
22 identity theft disputes you get per -- in some period of
23 time?
24 A. I do not specifically, no.
25 Q. Are you aware of that as -- does Credit One

Page 23

1 Bank get that --
2 A. Yes.
3 Q. -- kind of information from consumer reporting
4 agencies? All right. And does Credit One Bank know how
5 many identity theft disputes it may get in a month?
6 A. I do not have that information available to --
7 to state Credit One Bank would know.
8 Q. Does --
9 A. I do not know if it was supplied to us in a
10 fashion describing the dispute type or just overall quantity
11 in a particular month.
12 Q. Do you know how much Credit One spends -- you
13 may estimate -- Credit One may estimate how much it spends
14 on the investigation of each ACDV?
15 MR. SEARS: Objection to the extent that it
16 goes beyond what has been designated.
17 BY MS. ROTKIS:
18 Q. You may answer.
19 A. Approximately, depending on -- $5.50, $7,
20 somewhere in that range.
21 Q. Do you know how much Credit One spent to
22 investigate Mr. -- each of Mr. Wood's disputes?
23 A. I do not, no.
24 Q. Do you have an estimate -- your best
25 estimate -- does Credit One have a best estimate how much it

Page 24

1 spent to investigate each one of Mr. Wood's disputes?
2 A. Based on the detail that was provided, I would
3 say it was more of the higher end. So probably 6 or $7.
4 Q. Okay. How -- how -- what do you base that
5 estimate on?
6 A. The requirement to satisfy the act, we were --
7 we were checking multiple systems, not just our own. And
8 each of those come with a cost.
9 Q. Okay. Do you know who developed the Credit One
10 Bank procedures for responding to ACDVs that were in place
11 from August of 2013 through November of 2015?
12 MR. SEARS: Objection as to form.
13 THE WITNESS: For those dates, Jim Shaunessy
14 at -- I'm starting with the department first, because it was
15 a group effort. And I -- I can actually -- I'll go the
16 other route.
17 Our attorneys provide us specifics on statutes.
18 We meet as a group. Each department has own -- has to take
19 those specifics back, provide procedures, write the draft,
20 resubmit those into our attorney and compliance to ensure
21 that that is the document -- that is a working document
22 going forward.
23 BY MS. ROTKIS:
24 Q. Okay. What are the names of the people in --
25 of the people -- of the people -- in addition to

Page 25

1 Mr. Shaunessy? Are there any other names?
2 A. Yes. Jim Shaunessy, Laurie James, Tom Hanell
3 (phonetic), Jim Bathone (phonetic). From the department,
4 there would be Alan Schutt that participated in the first
5 part of the years.
6 Compliance department would be Lisa Cooper,
7 Roland Higga (phonetic).
8 Q. Anyone else?
9 A. I think that's it.
10 Q. Okay. Starting in January of 2012, what were
11 your e -- starting with January 2012 and just come forward
12 or I can ask you for each month, I don't really care how we
13 do it -- I want to know the e-OSCAR score card information
14 for each one of those months.
15 So if you could start with January 2012 and
16 move forward to the present.
17 A. I do not have access to that information.
18 Yeah, I do not have access. I would not be able to
19 speculate or assume what that is.
20 Q. Who has access to that information?
21 A. Customer service senior vice president
22 Laurie -- Laurie James.
23 Q. Did you know that I was going to be asking
24 about the e -- e-OSCAR score card every month since January
25 2012?

Page 26

1  A. I did not know if it was for every month. I
2  thought the score card was including some of the costs that
3  were associated with that and volume on an average.
4       (Pause in the proceedings.)
5  BY MS. ROTKIS:
6     Q. Going back to page 61.
7     A. (Complied.)
8     Q. If you would go up to -- well, if you could
9  tell me, where is the first ACDV in this exhibit that you
10 see -- the -- the date of the first ACDV that you see?
11    A. April 28, 2015.
12    Q. Okay. And from those -- the -- the notes that
13 are under the Result column, what can you tell me about that
14 dispute?
15    A. That we received the ACDV, with some document
16 attached, from Equifax was the source. The claim came
17 through with identity theft account fraudulently opened.
18       Cardholder claims identity theft. Address
19 provided by cardholder matches that of our records in both
20 CASS and cash systems. Address provided on app was a P.O.
21 Box 725, West Point, Virginia 23181.
22       It is linked to the cardholder through
23 Accurint. And the decision was not to modify anything,
24 change anything. The cardholder was responsible based on
25 the matches.

Page 27

1     Q. Do you know who performed this -- this process?
2     A. I do not know agent name. Or if we could --
3  have different records available, I could cross-reference
4  the two and be absolutely sure. But I believe this initial
5  would be Alex Chu -- or Alexandria Chu, C-h-u.
6     Q. Did you talk to Ms. Chu about this case?
7     A. About the case? I did not.
8     Q. Okay. Do you have -- do you supervise Ms. Chu?
9     A. I do oversee her. I'm not her immediate
10 supervisor.
11    Q. Okay. And would you have any reason to
12 disbelieve what she wrote in these notes?
13    A. I would not.
14    Q. Okay. And could you point in here anything
15 that would demonstrate that Ms. Chu investigated the
16 allegations that my client made regarding the identity
17 theft?
18       MR. SEARS: Objection as to form.
19       THE WITNESS: Repeat your question, please.
20 Sorry.
21 BY MS. ROTKIS:
22    Q. Can you point me to anything in this -- in
23 these notes -- I'm just looking for anything that shows that
24 Alex Chu investigated the allegations of identity theft.
25       MR. SEARS: Object -- okay. Is there a --

Page 28

1  okay. Objection as to form even though there's not a
2  question. Go ahead.
3       THE WITNESS: This is just our note system, so
4  details are brief here. Just to provide detail for if the
5  consumer called in again. But the fact that she notes that
6  she checked other resources, the details are there.
7  BY MS. ROTKIS:
8     Q. If it says that images -- strike that.
9       (Pause in the proceedings.)
10 BY MS. ROTKIS:
11    Q. Where does Credit One maintain the images that
12 it receives with ACDVs?
13    A. Credit One Bank does not maintain the images.
14 It is -- they come through e-OSCAR. That is the tool, the
15 source, the means of that communication. And credit One
16 depends on e-OSCAR to retain those documents.
17    Q. Would Credit One be able to go back and look at
18 those documents from an ACDV that they investigated back in
19 April of 2015?
20       MR. SEARS: Objection as to form.
21       THE WITNESS: My understanding is e-OSCAR has a
22 retention policy of, I believe, 90 or 120 days.
23 BY MS. ROTKIS:
24    Q. Okay.
25       (Pause in the proceedings.)

Page 29

1  BY MS. ROTKIS:
2     Q. So the -- the ACDV procedures that were
3  followed in this case, can you tell me how those were
4  created?
5     A. As indicated, earlier, we get provided guidance
6  from our attorney, our compliance department. Then the
7  department owners draft the procedures, provide them back to
8  our attorney and compliance to make sure that we're meeting
9  all of the requirements. And then it is put into place as a
10 working document.
11    Q. What requirement -- where do you get the -- the
12 source information to ensure that your ACDV dispute
13 procedures are compliant with the Fair Credit Reporting Act?
14    A. Our attorney provided -- provides us that
15 guidance and then --
16    Q. Where does Credit One's attorney get that
17 information?
18    A. My understanding is through various sources.
19 Bankers Online. I believe -- I can't think of what --
20 specific statutes, cases, regulatory bodies that provide us
21 details on where and how we should comply.
22       That -- all of them, I don't know. That is to
23 name a few, I guess.
24    Q. Do you know what specific regulatory guidance
25 Credit One Bank relied on in crafting its ACDV dispute

Page 30

1  procedures?
2    A.   I do not, since I was not the one that crafted
3  them to be absolutely sure of what was used.
4         (Pause in the proceedings.)
5         MS. ROTKIS: All right. Well --
6         MR. SEARS: I don't have any.
7         MS. ROTKIS: I don't have further questions,
8  Chris, except that she wasn't prepared on item 18 and --
9         MR. SEARS: What is that one? Oh. Okay.
10        MS. ROTKIS: And 16.
11        MR. SEARS: Hold on a second. You want this on
12 the record or do you want to discuss this off the record?
13        MS. ROTKIS: Sure.
14        MR. SEARS: Sure what?
15        MS. ROTKIS: Oh. We can have a meet-and-confer
16 on the record. That's fine.
17        MR. SEARS: That's -- well -- all right. Is
18 that it? 16 and 18?
19        MS. ROTKIS: I think so.
20        MR. SEARS: Well, the 16, she gave best
21 estimate of -- I mean, I -- I did hear her give estimate of
22 the cost of the ACDV generally and as to Plaintiff.
23        I -- I had objected as to designation when you
24 asked just the average cost, but she knew that. And then
25 she gave it with regard to the Plaintiff. So I'm not

Page 31

1  sure --
2         MS. ROTKIS: Okay. Well, maybe I missed that.
3  I thought she just said the higher end in my --
4         MR. SEARS: Yeah. She gave a range for the
5  average. She actually --
6         MS. ROTKIS: Okay.
7         MR. SEARS: -- gave you numbers and then she
8  said that the high -- the Plaintiff, it was the higher end
9  of that range. If you'd like to clarify that on the record,
10 she can do that.
11        MS. ROTKIS: I -- I may just not have had the
12 right memory of it. But I -- I don't know if --
13        MR. SEARS: We're on the record. Ask her the
14 question --
15        MS. ROTKIS: -- Madame Court Reporter --
16        MR. SEARS: -- while we've got her.
17        MS. ROTKIS: -- is able to look back at it.
18 But I think -- I think clarifying on the record would take a
19 quicker -- quicker route.
20        MR. SEARS: Okay.
21        MS. ROTKIS: What is -- okay. We'll just
22 continue on the record again. I'll direct the question
23 again to the deponent.
24 BY MS. ROTKIS:
25    Q.   Credit One Bank's best estimate of the expense

Page 32

1  and cost of each ACDV investigation for each dispute
2  received regarding the Plaintiff.
3    A.   For each dispute regarding the Plaintiff, I had
4  said between 5.50, 6 -- I'm sorry -- 6 to $7. 5.50 was the
5  average low end. Six to $7 is what I believe we applied to
6  Mr. Wood.
7         MS. ROTKIS: Okay. And then -- okay. e -- the
8  e-OSCAR score card and then also the net worth. She wasn't
9  prepared on net worth.
10        MR. SEARS: Okay. Well --
11        MS. ROTKIS: You can just -- you can just give
12 me that information and we won't have to keep the deposition
13 open.
14        MR. SEARS: Yeah. That -- 18. Hold on a
15 second. Let me confer real quick about something.
16        MS. ROTKIS: Oh. Put it on mute. Mute it.
17        MR. SEARS: I don't know that it mutes.
18        MS. ROTKIS: It does. It mutes.
19        (Discussion off the record.)
20        MR. SEARS: Okay.
21        MS. YENOVKIAN: Are you on mute?
22        MR. SEARS: So -- can you hear me?
23        MS. ROTKIS: Yeah.
24        MR. SEARS: Okay. So, first of all, this is a
25 meet-and-confer with regard to the challenges as to whether

Page 33

1  or not she was prepared for 18.
2         I will tell you that we -- she was prepared. I
3  think she indicated that -- that the understanding of -- of
4  what was going to be asked was not consistent with what your
5  expectation was.
6         And -- and, frankly, from my perspective, I
7  thought that your reference to January 2012 was a mistake
8  given that his account wasn't opened until much later and
9  given the other clerical errors in --
10        MS. ROTKIS: Well --
11        MR. SEARS: -- that.
12        MS. ROTKIS: -- yeah. Well, yeah, we did have
13 some clerical errors regarding Bank of America, but the --
14 so in order to -- we have an allegation for willfulness and
15 punitive damages.
16        And, so, to get a -- get a good -- you know, a
17 temporal look-back period, we never met, conferred over the
18 time period. And, so, I think that five years -- we -- we
19 have, on numerous occasions, been able to get five years
20 prior from date --
21        MR. SEARS: Okay.
22        MS. ROTKIS: -- complaint was filed.
23        MR. SEARS: Right.
24        MS. ROTKIS: This is less than five years.
25 This is information they can easily get.

Page 34

1  MR. SEARS: Uh-huh. So -- so --
2  MS. ROTKIS: So --
3  MR. SEARS: The first thing I wanted to do --
4  THE COURT REPORTER: One at a time, please.
5  MR. SEARS: The first thing I wanted to do is
6  to express the notion that -- that she had not, in good
7  faith, prepared for that, which she had done some work, but
8  not consistent with what you were looking for.
9  Now that we specifically know what you're
10 looking for, we will provide that information to you and --
11 and --
12 MS. ROTKIS: Okay.
13 MR. SEARS: -- in the format. Okay? And with
14 regard to 27, again, I'm just going to generally challenge
15 that she wasn't prepared for that.
16 She indicated that -- that she sat here, she
17 didn't know the numbers, and then the questioning ended.
18 That information is publicly available, I believe, through
19 the website.
20 And, I mean, if she had the -- the documents in
21 front of her, that's something that she could have testified
22 to and prepared to.
23 In any event, I don't know how you want -- I
24 don't know if you want to go and get it, because it's
25 publicly available. But that information is --

Page 35

1  MS. ROTKIS: Well, no, because -- I mean, I --
2  the -- the topic is duly noticed.
3  MR. SEARS: So --
4  MS. ROTKIS: I can examine her on that.
5  MR. SEARS: Absolutely.
6  MS. ROTKIS: I don't have to provide her with
7  any documents about the company's net worth.
8  MR. SEARS: I'm not going to argue about that.
9  MS. ROTKIS: This is information that was
10 easily available to her. So I -- I mean, this is -- I do
11 this in every 30(b)(6) deposition. It's not some unusual
12 thing that we ask.
13 So we've alleged punitive damages. We're
14 entitled to the information. If your position, now, is that
15 I should go get it somewhere else, that's the subject of
16 meet-and-confer, I can see if that is suitable information,
17 and then we can reconvene.
18 MR. SEARS: Based on our last meet-and-confer,
19 it would be a lot faster for me just to go to the website
20 and print it out and send it to you.
21 MS. ROTKIS: Fine.
22 MR. SEARS: Okay. Thank you.
23 MS. ROTKIS: Excellent.
24 MR. SEARS: All right. All right. So that
25 resolves all the issues, then?

Page 36

1  MS. ROTKIS: Yeah, I'm resolved.
2  MR. SEARS: Okay.
3  MS. ROTKIS: I think we're -- I'm finished.
4  Thank you so much --
5  THE WITNESS: You're welcome.
6  MS. ROTKIS: -- Ms. Maragos.
7  THE WITNESS: Maragos, yes.
8  MS. ROTKIS: Did I say it?
9  THE WITNESS: You did.
10 MS. ROTKIS: Maragos. All right.
11 MR. SEARS: All right.
12 THE VIDEOGRAPHER: Off the record at 2:34.
13 MR. SEARS: And I don't have any questions.
14 And we will read. And we will read the previous one as
15 well. Sorry. I don't think I said that. Thank you.
16 (Whereupon, the videoconference videotaped
17 deposition was concluded at 2:34 p.m.)

Page 37

REPORTER'S CERTIFICATE
STATE OF NEVADA     )
                    ) ss:
COUNTY OF CLARK     )

I, Gina DiLuzio, a duly commissioned Notary Public, Clark County, State of Nevada, do hereby certify: That I reported the videoconference videotaped deposition of KIM MARAGOS - PMK OF CREDIT ONE BANK, commencing on Friday, May 13, 2016, at 1:36 p.m.

That prior to being deposed, the deponent was duly sworn by me to testify to the truth. That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript is a complete, true and accurate transcription of my said shorthand notes, and a request has been made to review the transcript.

I further certify that I am not a relative, employee of counsel of any of the parties, nor a relative or employee of the parties involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada, this 12th day of June, 2016.

_____
GINA DILUZIO, RPR, CCR #833

KIM MARAGOS - 5/13/2016

Page 38

ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _____ pages of my testimony, taken on _____(date) at _____(city), _____(state), and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

Page  Line  Should read:              Reason for Change:

Page 39

ERRATA SHEET

Page  Line  Should read:              Reason for Change:

Date: _____   _____
              Signature of Witness

              _____
              Name Typed or Printed

## DEPONENT'S CHANGES OR CORRECTIONS

**NOTE:** If you are adding to your testimony, print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete.

I, __Kim Maragos__, have made the following changes in my deposition:

| PAGE | LINE # | FROM | TO |
|---|---|---|---|
| 7 | 9 | "She did not directly" | "He did not directly" |
| 7 | 13 | "Deong" | "DeJong" |
| 10 | 24 | "Overseen that department" | "Oversaw that department" |
| 20 | 25 | "Uh-huh" | "Yes" |
| 24 | 3 | "6 or $7" | "$6 or $7" |
| 24 | 13 | "Shaunessy" | "Shaughnessy" |
| 25 | 2 | "Shaunessy" | "Shaughnessy" |
| 25 | 2 | "Hanell" | "Haynall" |
| 25 | 3 | "Bathone" | "Baffone" |
| 25 | 4 | "Alan Schutt" | "Allan Shutt" |
| 25 | 3 | "From the department" | "From the Legal department" |
| 25 | 6 | "Lisa Cooper" | "Lisa Cooper-Tippett" |
| 25 | 7 | "Roland Higga" | "Roland Higa" |
| 26 | 20 | "CASS and Cash systems" | "CAS and CA$H systems" |
| 27 | 5 | "Alexandria Chu" | "Alexandra Chu" |

SIGNATURE OF WITNESS: _Kim Maragos_          DATE: _6-28-16_