1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     RICHMOND DIVISION

 3

    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ __ _ _
 4                                         )
    DAVID W. WOOD                          )
 5                                         ) Civil Action
     v.                                    ) No. 3:15CV594
 6                                         )
    CREDIT ONE BANK, N.A.                  ) October 18, 2016
 7   _ _ _ _ _ _ _ _ _ _ _ _ _ __ _ _)

 8
               COMPLETE TRANSCRIPT OF MOTIONS
 9         BEFORE THE HONORABLE M. HANNAH LAUCK
                UNITED STATES DISTRICT JUDGE
10

11

12   APPEARANCES:

13   Leonard A. Bennett, Esquire
     Consumer Litigation Associates
14   763 J. Clyde Morris Boulevard, Suite 1A
     Newport News, Virginia   23601
15
               Counsel for the Plaintiff
16
     Christopher J. Sears, Esquire
17   Cipriani & Werner PC
     Laidley Tower Suite 900
18   500 Lee Street E
     Charleston, WV   25301
19
     Lauren C. Mahaffey, Esquire
20   McGuireWoods LLP
     2001 K Street, NW
21   Suite 400
     Washington, DC   20006-1040
22
               Counsel for the Defendant
23

24             DIANE J. DAFFRON, RPR
                OFFICIAL COURT REPORTER
25           UNITED STATES DISTRICT COURT
```

1               I N D E X

2
                       DIRECT   CROSS   REDIRECT
3
   JAMES F. LYNN            95      104      --
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (The proceedings in this matter commenced at

2       10:30 a.m.)

3              THE CLERK:  Civil Action 3:15CV195, David W.

4       Wood versus Credit One Bank.

5              Mr. Leonard A. Bennett represents the

6       plaintiffs.  Mr.  Christopher J. Sears and

7       Ms. Lauren C. Mahaffey represent the defendant.

8               are counsel ready to proceed?

9              MR. BENNETT:  The plaintiff is, Your Honor.

10             MR. SEARS:  We are, Your Honor.

11             THE COURT:  All right.  Well, first of all,

12      my apologies for delaying my entrance.  I actually had

13      to call up OSHA to see if it was going to be a

14      violation to have my clerk carry these notebooks to

15      the bench given the amount of information that you

16      have presented to me.  It took awhile to get them to

17      answer, but, as you can see, we got approval.  We have

18      the notebooks on the bench and we will proceed.  All

19      joking aside, I am very sorry to delay you, and I am

20      prepared to go forward.

21             Obviously, we have a series of motions in

22      front of us.  What I would not like to do is make a

23      poor use of your time in evaluating these.  Certainly

24      I have reviewed them, and I have a sense about how I

25      think we should proceed here, but I'd like to hear

1    from you all the order in which you think we should go

2    because you may have opinions about that that I should

3    take into account, and you may not agree about how we

4    should go forward.  So I'd like to hear from both of

5    you, first of all, in that regard.  And we'll ask the

6    plaintiffs to start.

7            MR. BENNETT:  Yes, Your Honor.

8            Judge, of course, if I knew what the Court

9    preferred, that would be my choice, but I think that

10   it makes the most sense, to the extent the Court needs

11   argument on the motions that shape the evidence that

12   it would consider on summary judgment, that those

13   motions would be resolved first.

14           In that regard, we have the *Daubert* challenge

15   of Mr. Lynn, and we have, I believe, Docket 72, which

16   is the Rule 37(c)(1) motion, really to exclude the two

17   West Point employees.  But, of course, in terms of

18   number of trees killed per strength of argument, then

19   I think that we've already briefed it.  So we would

20   argue as long as the Court wants me to argue or rely

21   on the Court's discretion or preference as to how we

22   do so.

23           THE COURT:  We also have before us a

24   discovery dispute.

25           MR. BENNETT:  We do.  The only -- the Rule 72

1    motion is that dispute, and I would put that in two

2    categories, the second of which I don't intend to

3    argue, and we do not intend to press forward, and we

4    are asking to withdraw as a basis for a motion.   And

5    that is the argument regarding the net worth

6    challenge.

7         The other two matters regarding L. L. Woodson

8    and Karen Schumacher, two West Point employees, really

9    are 37(c)(1) motions.   The Court knows better than I,

10   but we didn't initially proceed with those as

11   discovery motions.   The Court may be aware that Judge

12   Payne has found that the 37(c)(1) challenge to

13   evidence offered in dispositive motion did not have to

14   go through in his court the conventional motion to

15   compel or even the local rule and Federal Rule 37 meet

16   and confer process.   But, of course, this Court asked

17   us to do that.   We did do that.   But really it's just

18   an objection to the use of that evidence on summary

19   judgment.   The Court has not set a trial, although, if

20   we go to trial, I assume the date would be imminent,

21   and that would be followed by our filing of motions in

22   limine on that same question.

23        THE COURT:   All right.   So let me be clear

24   with respect to what I characterize as the discovery

25   dispute.   So you are only withdrawing your objection

1   to request for production No. 15?

2           MR. BENNETT:  Yes, Judge.

3           THE COURT:  So that's moot.

4           MR. BENNETT:  Candidly, it's because this

5   court has a -- we should have moved more quickly on

6   the request to produce the net worth information.  So

7   that's the reason that I'm withdrawing that at this

8   stage.

9           THE COURT:  Okay.

10          MR. BENNETT:  The other issues all relate to,

11  really, the only identified evidence the defendant

12  seeks to use, it's identified for summary judgment, is

13  the evidence from Schumacher and from Woodson.  So

14  that chart that the Court has has sort of a

15  miscellaneous category, but it's really redundant with

16  the Woodson and Schumacher paragraphs.

17          THE COURT:  All right.  So I'll hear from

18  defense counsel at least as to the order of business.

19          MR. SEARS:  Sure.  With regard to the cross

20  motions for summary judgment, it would probably make

21  sense to take the liability, and then the damages.  So

22  that would be plaintiff's motion first, and then

23  Credit One's motion.

24          As far as the discovery dispute and the

25  *Daubert* motion, I know Credit One's motion for summary

1    judgment is not based upon Mr. Lynn's expert

2    testimony.   I don't believe that plaintiff's motion

3    for summary judgment is based on Mr. Lynn's expert

4    testimony.   Therefore, I don't know that that's

5    necessary to resolve the summary judgment.

6           With regard to the dispute, the discovery

7    dispute, that's pretty easy to deal with.   Maybe we

8    could get that out of the way now.   Other than that, I

9    don't really have a preference other than the notion

10   that maybe plaintiff's summary judgment should go

11   first, and then ours, and then we could either do the

12   *Daubert* issue at the end or before we get into the

13   cross motions for summary judgment.

14          THE COURT:   All right.

15          MR. SEARS:   Thank you, Your Honor.

16          THE COURT:   Uh-huh.

17          Well, I certainly do think that what I

18   characterize as these discovery disputes or motions to

19   exclude should be addressed first.   It does seem to me

20   that the *Daubert* motion could go either way, or

21   *Daubert*.   Someday I'll learn how to say that word.

22   Because it doesn't seem that he has relied upon Mr.

23   Lynn.

24          My sense about that, though, is it might take

25   a little less time to do that motion, and sort of

1  clipping away at things might be better.  It also

2  seems that Mr. Lynn is here.

3       Is he planning on staying for the whole

4  thing?  And are you paying him by the hour?  We might

5  want to save that time.  Why don't we handle the

6  discovery disputes first, and then my inclination, out

7  of courtesy to Mr. Lynn, and perhaps out of sort of a

8  timesaving saving device we might go with him next,

9  and then handle the more substantial issues after

10  that.  Not because they are driven by Mr. Lynn's

11  testimony, but just for purposes of organization.

12       All right?

13       MR. SEARS:  Sure.

14       THE COURT:  So why don't we first talk about,

15  essentially, the motion to exclude Sergeant Woodson's

16  affidavit and testimony.

17       MR. BENNETT:  May it please the Court, good

18  morning.  The background, I think, my smarter

19  colleague had already briefed for Your Honor in our

20  motion, but this is a Rule 37(c)(1) challenge to the

21  use of two witnesses who were never identified as

22  intended defense witnesses.  And I'll make a

23  distinction that, candidly, a number of defense

24  opponents that we face have made, which is the

25  distinction between knowing who has knowledge versus

1    knowing who the defendant intends to call as a

2    witness.

3          Rule 26(a)(1) and its supplemental

4    requirement 26(e) require that a party, plaintiff or

5    defendant, identify for the other party the persons,

6    documents as well, but for this motion the persons

7    that it would intend to use in support of its

8    position, its case.  In this case, Credit One's

9    defense.

10          Early in this case, Mr. St. George

11   represented another defendant, and we learned that

12   Midland, who was the credit card debt collection

13   company that bought this same account, had a

14   conversation with a Sergeant Woodson.  So Ms. Rotkis

15   and I telephoned on speaker phone, spoke to Sergeant

16   Woodson.  Sergeant Woodson provided us information and

17   said, no, she had never said that our client was

18   responsible for the debt, and that the reason that she

19   had stopped doing any further investigation was

20   because she found out our client was going behind West

21   Point's back to go to New Kent County and then to

22   Florida and try to prosecute the estranged mother in

23   those other jurisdictions, and the challenge was:

24   Where did he really live when this supposedly

25   occurred?

1          This witness was not going to be somebody who
2     was excited to support David Wood's case, and, thus,
3     we never identified or never took the deposition and
4     never proceeded to introduce Sergeant Woodson into the
5     case.  Her testimony, by our account, wouldn't hurt
6     us, but it wouldn't help us, and the defendant made
7     no, despite that we had identified this person as a
8     person with knowledge, made no effort, at least to our
9     eyes, of disclosing Woodson as an intended witness or
10     otherwise bringing Woodson into its defense.
11          The first time that we understood that
12     Woodson was going to be used in the defendant's
13     defense was in the summary judgment motion's process.
14     And that's important.  It's an important distinction
15     because the fact that we knew that Woodson had
16     knowledge, we made a strategic decision, which we
17     believed to be the correct one, that we weren't going
18     to push and bring Woodson into the case.  The
19     defendant was not proceeding to bring Woodson into the
20     case, and, therefore, we didn't discover further.  We
21     didn't push.  We didn't challenge.  And we did not
22     otherwise seek to bring that person into the case.
23     The witness wasn't going to help us, could marginally
24     hurt us, and we didn't believe -- we thought we were
25     better strategically with the defendant not having

1   called the witness to bringing her in.  And that's

2   different because the defendant's argument in

3   opposition to our Rule 37(c)(1) challenge is you knew

4   Woodson existed.  You knew Woodson had some connection

5   to the case.  And that's absolutely true.  And there

6   are a lot of individuals who we knew had a connection

7   to the case that neither party has deposed, that

8   neither party has sought to do discovery from.  In

9   fact, there are plenty of individuals that neither

10  party has even interviewed, I'm sure.

11          And Rule 26(a)(1) is more precise than people

12  who might have some knowledge about a case.  26(a)(1)

13  asks for your intentions.  Who does the defendant

14  intend to call in its defense or who it may call in

15  its defense?  You have a copy of the Rule 26(a)(1)

16  disclosures that the defendant has served on us at

17  Docket 73, 2.  73, Exhibit 2.  You have the

18  interrogatory responses at 73, 3.  That latter one,

19  even in a universe in which a defendant would have to

20  identify only people with knowledge, the defendant

21  never identified Woodson in its interrogatory

22  responses either.

23          Now, there are plenty of cases.  I would bet,

24  Your Honor, 90 plus percent of the cases that come

25  before Your Honor that you never see, we have the

1    parties not supplementing their 26(a)(1)s, but when

2    they identify witnesses in interrogatory answers, that

3    sort of takes the gas out of our argument.  So if I

4    was to come before you and say, They didn't formally

5    serve a 26(a)(1) supplement or 26(e) supplement, I

6    would have a defendant say, Judge, we sent them our

7    interrogatory responses, and we very clearly

8    identified this person as someone with knowledge that

9    we thought important enough to put in our

10   interrogatory responses.

11           In this instance, you don't have that.  I

12   don't think that Woodson changes the summary judgment

13   battle, but Rule 37(c)(1), of course, is not -- it's

14   just a simply binary remedy.  It's not you didn't

15   disclose, therefore you can't use.

16           It is possible that we -- that this could be

17   cured before trial by having us -- giving us the

18   opportunity to now conduct the discovery we would have

19   conducted had the defendant said, Hey, we may use this

20   person.  But we certainly shouldn't have that

21   evidence, though as marginal as it may be, a part of

22   the summary judgment exchange.

23           And so if the Court does not automatically

24   exclude, it would certainly be within its discretion

25   to condition the use of those individuals on our

 1    ability to now do what we would have done had the

 2    defendant timely identified the witness under Rule

 3    26(a).

 4          THE COURT:  So, obviously, part of what they

 5    indicate is that they did disclose.  So I guess you

 6    need to tell me why you have a dispute as to whether

 7    or not they disclosed or did not.

 8          He says, On February 22, you disclosed

 9    Sergeant Woodson, and on March 28th, Credit One

10    disclosed Sergeant Woodson in response to your first

11    set of interrogatories.

12          MR. BENNETT:  Your Honor has the

13    interrogatory set.  We certainly -- the answer is we

14    knew that Woodson existed, and we answered that

15    Woodson had knowledge.  And there's no doubt Woodson

16    had some knowledge.  But, I mean, we just disagree.

17    The defendant has never disclosed that witness.

18          The first time that we received -- that we

19    saw anything regarding Woodson being used in

20    defendant's defense was when we took the deposition of

21    Mr. Lynn, which was I believe in August, and Mr. Lynn

22    had seen a declaration, had seen it before we ever saw

23    it, that the defendant had arranged and that you now

24    see in summary judgment.  That deposition took place

25    August 25.

1           So it was we issued a subpoena prior to that

2    to Mr. Lynn.   We asked for documents that he had used.

3    The defendant and Mr. Lynn produced those documents.

4    So I believe it would have been within the period of

5    roughly two weeks or so before that August deposition

6    that we would have seen such a declaration.

7           I don't know what else to say to Your Honor.

8    The defendant has never identified Woodson as its

9    intended witness.

10          THE COURT:  Well, can you respond to their

11   argument that they don't need to if it's for

12   impeachment only.

13          MR. BENNETT:  Well, it's still -- if they

14   have identified the witness as a person with knowledge

15   for that purpose, for impeachment, then -- well, let

16   me say this:  We're not going to -- we don't want to

17   win this case on technical enlargement.  If they were

18   to call Woodson for impeachment purposes only, that's

19   an entirely different standard, and I don't think that

20   we'd have an issue with that.  I mean, there are legal

21   arguments.  There are rules-based arguments that we

22   could still use to challenge that person, but I could

23   not argue that Your Honor would be beyond reasonable

24   discretion in permitting -- I mean, imagine if my

25   client came up and said, I spoke to Sergeant Woodson,

1   and assuming the defendant didn't object on hearsay

2   grounds, and Sergeant Woodson said this was the worst

3   case of identity theft she had ever seen, and,

4   clearly, I wasn't responsible, how could I credibly

5   argue to Your Honor that they couldn't bring Woodson

6   in at that point?

7          But I don't think that's the challenge that

8   we have.  It's the affirmative use in the defense.  I

9   don't think there's any basis for impeachment.  I

10  don't think there are many facts that are in dispute

11  as to what occurred.

12         It's really the tone of Woodson.  If you read

13  that declaration, it's contrary to all that we

14  understood that Woodson knew.  Because the way the

15  declaration is worded, it implies, it doesn't state,

16  and by saying "I decline to prosecute," that somehow

17  there's implied belief or an unstated conclusion that

18  the West Point Police Department determined our client

19  was lying.  If Woodson wants to come here and say this

20  person was lying, I mean, that's not what the evidence

21  that you have in front of you.  But you have this

22  open-ended declaration that we can't rebut.  Discovery

23  was closed before we ever got that declaration or the

24  identification of the witness as a case-in-chief or

25  defense-in-chief --

1          THE COURT:  Well, let me tell you this, and

2     I'll ask your opposing counsel questions.  But I do

3     have something labeled "Defendant's Response to

4     Plaintiff's Interrogatories," and it does indicate,

5     "Identify all persons who have knowledge of the

6     facts."

7          I'm not sure I have the whole document is one

8     of the problems.  But interrogatory 3 and their

9     response, they list in letter I, Sergeant L. L.

10    Woodson, and other employees, representatives, and

11    custodian of records, who would be the other person,

12    Schumacher, that you're challenging, they identify.

13         So is your dispute that that answer is not

14    responsive under 26(a)(1) because it doesn't,

15    (a)(1)(A)(i), along with the subjects of the

16    information that the disclosing party may use to

17    support its claims or defenses unless it would be

18    solely used for impeachment?

19         MR. BENNETT:  And it's the preceding clause

20    as well.  That is, it is the identification of

21    witnesses the defendant intends to use in its defense

22    or that a party intends to use.

23         And so the fact that someone has knowledge --

24    I mean, there are cases before you where we have 50

25    people identified.  There's a big distinction between

1    this person may have some connection or knowledge and

2    these are people that we intend to use.

3           THE COURT:   What would you suggest that

4    they -- if they were to say that it is impeachment,

5    because, really, they are using Woodson in response to

6    your Wood affidavit, is that impeachment or is it

7    affirmative evidence?

8           MR. BENNETT:   I think for summary judgment

9    it's affirmative evidence.   They're not saying he

10   lied.   There's no dispute of fact that's at issue with

11   respect to those exchanges.

12          I will tell the Court, I mean our M.O., my

13   firm's way of conducting its litigation practice is to

14   serve repeated Rule 26(a) -- supplemental Rule

15   26(a)(1)s.   And we're careful to that because we don't

16   want to be the pot calling the kettle black.   We

17   certainly don't want to affect our practice and our

18   ability to use evidence.   That was not done here.

19          There have been a lot of back and forth

20   between the parties, and I will tell you that Mr.

21   Sears has been honorable in our dealings, and I cannot

22   criticize this as an attempt by the defendant to

23   connive or to trick or to be deliberately unfair.

24          I do represent to the Court that we bring

25   this one forward because it's not simply a you didn't

1    follow the rules, but it actually legitimately did

2    surprise us that Woodson was helping the defendant.

3    We excluded Woodson as a threat to us when we

4    interviewed her.  That's a decision that we made.  And

5    we could have belted and suspendered it by not just

6    simply relying on the lack of a Rule 26(a) disclosure,

7    but we didn't, and we were entitled to not.

8         If it's just impeachment, if there are

9    factors that are at issue, even on summary judgment, I

10   don't think that I'd have a -- that's unfair argument.

11   I would object to it.  But I legitimately think it's

12   unfair that the defendant did not so disclose during

13   the discovery period of its intent to use this

14   witness.

15        THE COURT:  All right.  Okay.  I'll hear from

16   the other side.

17        MR. SEARS:  Thank you, Your Honor.

18        THE COURT:  Uh-huh.

19        MR. SEARS:  Your Honor, Rule 26(a)(1)

20   requires the disclosure of each individual likely to

21   have discoverable information that the disclosing

22   party may use to support its claim or defenses.  It's

23   not a list of witnesses that are going to be called at

24   trial.  It's not list of witnesses that are going to

25   be used in support of motion for summary judgment.

It's just witnesses disclosing to the other party to
give them notice of people with discoverable
information.

The rule, as recognized by the courts, is
designed to prevent two things:  Surprise and
prejudice.  Neither of those exist here.

First of all, Your Honor, in defendant Credit
One Bank's Rule 26(a)(1) disclosures, we do include a
catchall provision that says, "All individuals
identified as potential witnesses by any other party
in their initial disclosures or elsewhere in
discovery."

Now, I have never seen any court say that a
catchall provision doesn't work when the other parties
are well aware of the individuals being identified,
but that does -- that is in our initial disclosure
that there may be other witnesses, and in other
people's initial disclosures, or elsewhere in
discovery that may be used.

THE COURT:  That's not what it says.  It
says, "Identified as potential witnesses by any other
party."  So there are only two parties here.  It's you
and --

MR. SEARS:  Well, at the time there were
about four other defendants.

1    THE COURT:  So you expect the plaintiffs to

2  go back and look at all of those witnesses?

3    MR. SEARS:  I --

4    THE COURT:  You can abandon that argument.

5    MR. SEARS:  Okay.  I'll abandon that.  It's

6  not -- okay.  So the plaintiffs do identify Sergeant

7  Woodson in their supplemental disclosures.  And one of

8  the co-defendants, TransUnion, identifies Woodson in

9  theirs.

10    Courts also say that with regard to the duty

11  to supplement disclosures that -- and I cited the case

12  law here, Your Honor, that Rule 26(e) requires

13  supplementation unless the information has otherwise

14  been made known to the parties during the discovery

15  process or in writing.

16    The defendant, Credit One Bank's, response to

17  the interrogatories identifies, as the Court

18  indicated, Sergeant L. L. Woodson with regard to -- in

19  response to a request.

20    THE COURT:  So when was that, L. L. Woodson?

21    MR. SEARS:  This was --

22    THE COURT:  The initial disclosure date.

23    MR. SEARS:  The initial disclosure?

24    THE COURT:  I'm sorry.  The response to

25  plaintiffs' interrogatories.  Tell me the dates you're

1   talking about.

2         MR. SEARS:  March 28, 2016.  The certificate

3   of service says 2015, but that's not correct.  It's

4   March 28, 2016, just a month after the initial

5   disclosures were made.

6         THE COURT:  And that's your initial

7   disclosure?  I'm sorry.  I interrupted you.

8         MR. SEARS:  That's correct.  That's our

9   initial disclosure and also after their supplemental

10   disclosure.  February 22 is their supplemental

11   disclosure.

12         THE COURT:  Wait.  Wait.  Wait.  Your initial

13   disclosure you did not identify Woodson.

14         MR. SEARS:  That's right.  At the time she

15   wasn't on our radar.

16         THE COURT:  Okay.  So you didn't.  And then

17   after March 28 what happened?

18         MR. SEARS:  Well, plaintiff did.

19   Co-defendant did.  And then on March 28 in response to

20   the discovery we identified her as someone with

21   discoverable information.  At that time I had not

22   contacted her yet.  I didn't know exactly what she was

23   going to say, but it was someone that became of

24   interest to me in the discovery process, and so I

25   disclosed that to counsel.

1          Now, in addition to that, Your Honor, I did

2     obtain two affidavits.  One from Woodson and one from

3     Schumacher.  And I disclosed with affidavits to

4     plaintiffs' counsel.  In addition to that --

5               THE COURT:  When?

6               MR. SEARS:  That would have been probably in

7     August, early August.  It was in conjunction with Jim

8     Lynn's deposition testimony.  They had issued a

9     subpoena wanting all documents that he looked at, and

10     I had just sent this to him because I hadn't received

11     these affidavits until maybe in August.  I don't have

12     the timeline in front of me.

13               THE COURT:  You didn't receive them.  Did

14     they write them?  Who wrote them?

15               MR. SEARS:  No, I spoke to them.  Based upon

16     our conversation, I drafted an affidavit, sent it to

17     them in Word so that they could make changes.  I

18     believe Sergeant Woodson made changes to hers.  They

19     executed it and then they sent it to me, but they

20     didn't send it to me right off.  Sergeant Woodson

21     executed hers some time period before

22     Ms. Schumacher's, and then I don't recall if they were

23     sent together, but I know that I did not receive them

24     immediately after they were executed.

25               THE COURT:  But you had drafted them, so you

1    knew about them in advance.

2              MR. SEARS:  Oh, yes.  Yes.

3              THE COURT:  Okay.

4              MR. SEARS:  And in speaking with Suzie Rotkis

5    during discovery, because, again, it says "otherwise

6    made known during discovery," we discussed Sergeant

7    Woodson.  I told her that -- I said, "Have you seen

8    the police report?"  Because Mr. Wood testified that

9    he asked for many, many times over a series of months

10   for a copy of the police report, that they refused to

11   give it to him.  That was actually the first time I

12   contacted or attempted to try to contact Woodson was

13   after his deposition to find out why she's not

14   providing him the police report.  It was some time

15   after that that I actually spoke to her the first

16   time, and she says he never asked for it.  I don't

17   recall him ever asking for it.  The records custodian

18   doesn't remember it.  If he would have asked for it, I

19   would have given it to him.

20             I said, "Well, can I get a copy of it?"  And

21   it was one phone call and $5 and I received a copy of

22   the police report that Mr. Wood testified that he

23   couldn't get.  And I asked her, I said -- well, I then

24   spoke to Suzie Rotkis.  I said, Have you seen the

25   police report?  Because the police report is not good

1  for them.  The police report --

2          THE COURT:  Wait.  Did you say that to her or

3  did you just ask her?

4          MR. SEARS:  Who?  Suzie Rotkis?

5          THE COURT:  Ms. Rotkis.

6          MR. SEARS:  Oh, yes.  I said that to her.  I

7  said, This police report is not good for you guys.

8  The police officer, Mr. Wood, filed the complaint.

9  The police officer asked for him to provide

10  supplemental information.  He would not bring in the

11  supplemental information that she needed.  He did

12  bring in some stuff.  She took a look at an affidavit

13  that was supposedly signed by Ms. Lawless, Mr. Wood's

14  mother, and a title that she supposedly signed, and

15  compared that with the signature of Mr. Wood, and

16  determined that --

17          THE COURT:  Right.  I read the affidavit.

18          MR. SEARS:  Right.  So -- but then also she

19  ultimately concluded that the only reason he was

20  filing a complaint was to get out of paying credit

21  card debt, and that it wasn't a bona fide claim.  And

22  I told Suzie this.  And Suzie says, Well, that's --

23          THE COURT:  We're really formal.  So I'm

24  going to ask you to call everybody by their last name,

25  please.

1          MR. SEARS:  I'm sorry.

2          THE COURT:  I know you know her well.  People

3    make mistakes, though, about who they decide to call

4    by first names.  So I'm just going to say everybody by

5    last names.

6          MR. SEARS:  Okay.  So I spoke to Ms. Rotkis,

7    and she indicated, Well, that's not what she told us.

8    We've talked to her at least on three different

9    occasions.

10          THE COURT:  So when is that conversation that

11    you had with Ms. Rotkis?

12          MR. SEARS:  It would have been towards the

13    end of July, I'd say, because it was after Mr. Wood's

14    deposition, but not immediately after, and certainly

15    prior to the time that I obtained an affidavit from

16    them.

17          So when I spoke to Ms. Woodson next, I said,

18    "Have you talked to plaintiff's counsel?"  And she

19    goes, "I've never talked to them."

20          So I'm not sure what the status of that is.

21    But certainly the fact that Sergeant Woodson had

22    information that is not good for the plaintiffs' case

23    is no surprise to the plaintiffs because he just told

24    you that they considered her as a witness, and as a

25    strategic move decided not to use her, and --

1          THE COURT:  When did discovery close, again?
2    I should have that right off the top of my head.
3          MR. SEARS:  Again, that was I think towards
4    the end of July, beginning of August.  I've got the
5    scheduling order here, Your Honor.
6          THE COURT:  I'm sure it's in --
7          MR. SEARS:  Although it does say "days
8    before" instead of -- it was in the July-August time
9    period.
10          THE COURT:  Mr. Bennett, do you know?
11          MR. BENNETT:  If you can give me a second,
12    Your Honor.  I don't want to hold the Court up.  I'm
13    trying to get you the exact date.
14          THE COURT:  Well, while we're looking that
15    up, and I'll ask him to do that just because you're
16    the person I'm asking questions to now, and it's hard
17    to do two things at once.  As to these
18    interrogatories, I don't have the final pages, I don't
19    think.
20          MR. SEARS:  I have a copy, Your Honor.
21          THE COURT:  Can I see it, please?
22          MR. SEARS:  May I approach?
23          THE COURT:  No.  Actually, our court security
24    officer will do that.
25          MR. SEARS:  It looks like the discovery

deadline would have been sometime in mid-August.  It
is 70 days prior to the trial date, and the trial date
was October 6.

THE COURT:  I want to be sure I'm
understanding this process.  So the response to the
interrogatories, did your client sign them?

MR. SEARS:  Yes, we have a verified --

THE COURT:  It's not on what I have here?

MR. SEARS:  My co-counsel gave that document
to me, so I don't know if it includes the verification
or not.

THE COURT:  Is there any dispute as to
whether or not they are verified?  I haven't seen
verifications.

MR. BENNETT:  We're not disputing that, Your
Honor.

THE COURT:  Okay.

MR. BENNETT:  We're not contending that as a
basis to disqualify those.

THE COURT:  I just want to know, though,
whether it was verified.  Did your client say this or
did you?

MR. SEARS:  My client would have reviewed
that and verified it.  It would be my practice.  I
would be very surprised if there's no verification.

```
 1            THE COURT:  So, Ms. Mahaffey, can you look
 2   that up?
 3            MS. MAHAFFEY:   Sure.
 4            THE COURT:  Just go ahead and do that
 5   quietly.
 6            All right.
 7            MR. SEARS:  But, Your Honor, beyond the
 8   disclosure issue, both of these witnesses are
 9   impeachment witnesses.  I mean, Mr. Wood's claims that
10   he has a bona fide claim of identity theft, and that
11   he filed a police report, and that he never sent the
12   police report to Credit One Bank because --
13            THE COURT:  So explain why it's not
14   affirmative evidence if you're using it in summary
15   judgment.
16            MR. SEARS:  Oh, in summary judgment, no.  It
17   would be affirmative evidence in support of summary
18   judgment on --
19            THE COURT:  It would have to be disclosed
20   under summary judgment and it wasn't.
21            MR. SEARS:  When you say "disclosed under
22   summary judgment" --
23            THE COURT:  Because part of your basis for
24   discovery in this discovery dispute is that you didn't
25   have to disclose it because it was impeachment.
```

 1          MR. SEARS:  Right.

 2          THE COURT:  So under summary judgment, that

 3     exception would not apply.

 4          MR. SEARS:  The identity of the witness would

 5     have to be disclosed, not the affidavit.  The parties

 6     can choose to do whatever discovery in whatever order

 7     and to whatever extent they want to do so.  If a

 8     witness who's been disclosed is never deposed, that

 9     doesn't preclude them from being used as a witness at

10     trial necessarily or on summary judgment so long as

11     they've been disclosed, and they had the opportunity

12     to take discovery of them.  And certainly the

13     affidavits themselves are not documents that I intend

14     to rely on at the trial of this matter.  It's the

15     witness testimony, and both of whom have stated that

16     they'll be here in person.

17          But I agree that with regard to the motion

18     for summary judgment, it is affirmative evidence on

19     the issue of whether or not it's a bona fide claim,

20     and impeachment at the trial of this matter, if

21     Mr. Wood testifies, that he attempted to get a copy of

22     the police report on multiple occasions, but West

23     Point Police Department refused to provide that to

24     him, and certainly that would come in as impeachment.

25          THE COURT:  Just give me one minute.  I tried

1    to separate this out so it would be easy to look

2    separate things up.  All right.  Do we know when

3    discovery closed yet?

4         MR. BENNETT:  July 26, 2016.  It was enlarged

5    by joint or subsequent motion, Docket No. 42, to

6    permit the discovery of Mr. Lynn, the expert the

7    defendant had disclosed.  The plaintiff had timely

8    submitted a subpoena and had not received a response.

9         In our meet and confer effort in that regard,

10   the parties jointly moved that's 42, Document No. 42.

11        THE COURT:  It was enlarged until when?

12   Because Mr. Lynn wasn't deposed until August 25.

13        MR. BENNETT:  Yes, Your Honor.  I believe it

14   was a 30-day enlargement.

15        MR. SEARS:  Your Honor, also I don't know if

16   that factors in, the extension of deadline.

17        THE COURT:  You have to speak into the

18   microphone because that's the only way my court

19   reporter can hear.

20        MR. SEARS:  There's also an agreement by

21   Credit One to permit an extension of the deadline for

22   plaintiffs to disclose a rebuttal expert.  I'm not

23   sure if that was factored into the ultimate discovery

24   deadline.

25        MR. BENNETT:  Your Honor, the Court's order

1    dated August 19, 2016, Docket 45, resolved that motion

2    to enlarge, and the Court made very specific changes

3    to the scheduling order.  Dispositive motions were to

4    be filed by August 31.  *Daubert* motions by the same

5    date.  And then the Court set a hearing for today at

6    that particular hearing, but the discovery generally

7    wasn't enlarged.

8                    THE COURT:  Do you all have a copy of Dockets

9    42 or 43?  Madam Clerk, can you get me a copy?

10                    I think Ms. Charity can get it.

11                    Ms. Mahaffey, have you found the information?

12                    MS. MAHAFFEY:  Your Honor, may I confer with

13   Mr. Sears for a moment?

14                    THE COURT:  Certainly.

15                    MR. SEARS:  Your Honor, I was informed that

16   she does not have a copy of the verification.

17                    MS. MAHAFFEY:  We believe you have the full

18   copy there.  We're not certain that --

19                    MR. SEARS:  The discovery responses would not

20   have been filed with the Court.

21                    THE COURT:  Yes, discovery responses are not

22   filed with the Court unless they become part of

23   another motion.

24                    MS. MAHAFFEY:  I think they were -- that

25   document was part of another motion.

32

1          MR. SEARS:  Right.  So I would not be able to

2    tell you today based on the information I have with

3    me.

4          THE COURT:  Mr. Bennett, have you found it?

5          MR. BENNETT:  I found what we have, which is

6    filed in support of our summary judgment as Docket

7    60-2, which is just signed by counsel.  We don't have

8    a verification page.  I don't have one.  If I could

9    correct.  If we had a verification page, we would have

10   attached it here, but that is not part of our chart

11   that we submitted to Your Honor as our challenge.  But

12   I think that is the copy that we have.

13         THE COURT:  And it doesn't have a

14   verification.  So I'm going to ask Ms. Cordner to go

15   back and see.  Do I have everything that we have?

16         MS. CORDNER:  Yes, Your Honor.  I can go

17   check.

18         THE COURT:  All right.

19         Pardon me.  I'm reading the dockets.

20         All right.  Okay.  Is there anything else?

21         MR. SEARS:  I don't have anything further,

22   Your Honor.

23         THE COURT:  All right.

24         MR. SEARS:  Thank you.

25         THE COURT:  Well, one issue is I want to be

1  sure that we have the affirmation statements.  I don't

2  doubt that you have them somewhere, but I need to

3  eyeball them because, obviously, it's required under

4  discovery rules.  And I do find that making sure that

5  you're following each rule as articulated by the

6  federal rules is the best way to assure that things go

7  forward in an appropriate manner.

8       So this is what I'm going to do:  It does

9  seem that there was some notification of the fact that

10 Sergeant Woodson existed.  I think the plaintiffs are

11 being candid in saying that they did an informal

12 discussion with Sergeant Woodson, and that they didn't

13 either locate or ask for the police report, and that

14 they were under -- they made a strategic decision not

15 to go forward because Woodson did not seem sympathetic

16 to their client, which is a strategic choice that can

17 come back to bite you.

18      The defendants indicate that they identify in

19 the interrogatories Woodson and a custodian.  So I'm

20 really speaking to both of these individuals, the

21 custodian of records, which is also Schumacher.

22      In their initial disclosures, it is clear

23 that there was information that was found afterward

24 that certainly materially changed the nature of what

25 it is those individuals offered as far as testimony.

1    And I do think that the plaintiffs easily could have

2    sought the police report in the way that the defendant

3    did, but I'm troubled by this characterization of an

4    oral representation to Ms. Rotkis being somehow

5    mitigative.  Either you don't need to make the oral

6    representation or you need to update your disclosures

7    in some fashion, it seems to me, if that's part of the

8    defense that is going on here.

9            It's also the case that I think counsel is

10   being candid, defense counsel is being candid, in

11   stating that he's not quite sure of the timing of all

12   this, but certainly Mr. Wood's deposition was on

13   July 14th, so that was near the end of when discovery

14   was supposed to close, which was July 26th.

15           Let me look at this.  Mr. Lynn's report is

16   dated July 7th.  We're going to address issues about

17   Mr. Lynn in the future, but it seems that it's through

18   documents supporting his report that the plaintiffs

19   were notified of the police report and the contents.

20           Is this letter that I have from July 7th, is

21   this Mr. Lynn's report?

22           MR. SEARS:  Your Honor, it is.  Let me just

23   provide some clarification there.  Mr. Lynn's report

24   was prepared on that date.  I then subsequently took

25   Mr. Wood's deposition.  Mr. Lynn did not have the

1    affidavits from Woodson or Schumacher because it was

2    after Mr. Wood's deposition that I obtained those

3    affidavits, and then I supplemented my -- what I was

4    giving to him as discovery developed, I supplemented

5    information to Mr. Lynn.  And then we received the

6    subpoena for all information that I had communicated

7    to him, and that's when it was produced, the

8    affidavits.

9              THE COURT:  All right.  So he didn't update

10   his report.

11             MR. SEARS:  He did not.

12             THE COURT:  Where is the rest of his report?

13   I mean, his list of cases where he's testified or the

14   rest of 26(a)(2).

15             MR. SEARS:  That was all produced to

16   plaintiffs' counsel.

17             MR. BENNETT:  I apologize, Judge.  It's not

18   attached.

19             THE COURT:  All right.  So it was produced.

20             MR. BENNETT:  It was produced, yes, Your

21   Honor.

22             MR. SEARS:  There's a curriculum vitae and

23   also a list of items that he relied upon.

24             THE COURT:  All right.  So the production

25   date was July 7?

1              MR. SEARS:  I believe it was produced the

2    same day that he finalized it, Your Honor.

3              MR. BENNETT:  Your Honor, there was a

4    supplemental production as a result of the Court

5    having entered a largely uncontested motion to compel

6    enforcement of our subpoena.  So in August is when we

7    received the substantive response to our requests

8    regarding Mr. Lynn materials.

9              THE COURT:  All right.  Well, my clerk has

10   looked through everything you have given us, and we

11   don't have any indication that your client has signed

12   off on these.  So I'm going to hold in abeyance any

13   ruling with respect to this because you can't speak

14   for your client through interrogatories.  And whether

15   or not the plaintiff raises that, I have to determine

16   what's admissible and what I'm allowed to review.

17   Most lawyers do that as a matter of course, so I'm not

18   doubting that, but until I see it, I just can't make a

19   ruling based on your defense as to these

20   interrogatories.

21             I will say, generally speaking, in this court

22   we have tight deadlines, and one of the ways that we

23   manage these deadlines is, in some respects, what Mr.

24   Bennett described, which is that you are overly

25   cautious about disclosure because you want the other

1   side to be overly cautious with you.  And so we demand

2   hard work and fair play from everyone.  And so it is

3   not the case generally that as a matter of course one

4   would not suggest that you are calling a witness for a

5   particular purpose with respect to this kind of

6   information.

7          I think that the defendants could have gotten

8   it.  So this is, I would say, a very close call.  They

9   knew about this witness, and they could have done the

10  exact same thing you did.  So I'm not saying it's

11  staying in.  I'm not saying it's going out.  It

12  probably makes sense in the end that maybe they just

13  can depose Sergeant Woodson.  And I'm not sure you

14  really need to depose the custodian, although you

15  could, and that could take you all about an hour and a

16  half.  It wouldn't be overly burdensome on anyone, and

17  it would just clear up the nature of how this

18  unfolded.

19         I say that in part because the joint motion

20  that you all submitted to extend the deadlines is

21  unusually specific.  It does not talk about additional

22  depositions.  What it talks about is modifying the

23  scheduling order for the designation of plaintiffs'

24  rebuttal expert, which you were not agreeing to or

25  disagreeing to.  Actually, you were disagreeing to the

1    plaintiffs' rebuttal for the deposition of your

2    expert.  It was represented.  It wasn't overly

3    represented that you were disputing it, Mr. Sears, the

4    filing for the *Daubert* motions and then the filing for

5    the dispositive motions because there was going to be

6    this expert potential working in.

7            Interestingly enough, Mr. Lynn's testimony

8    was taken and not utilized in the dispositive motions,

9    but it doesn't really say anything about the rest of

10   discovery, and that's a point of confusion.  While the

11   plaintiffs could have said, can we depose this person,

12   can we follow-up, I try to take into account common

13   lawyers' experience, which is when you have a lot of

14   deadlines pending, each of you is working just to meet

15   the deadlines.  I can tell that is what was going on

16   here.  I don't think there was any bad faith.

17           And so my inclination is to just allow the

18   testimony in but subject to a brief deposition by

19   plaintiffs so they can supplement whatever they seek

20   to put in.  And so that's really a nonruling.

21           I want to be sure we've crossed the T's and

22   dotted the I's with respect to the affirmation.  So

23   I'm not going to finalize that ruling until I hear

24   from you all that you had a client sign off on this

25   stuff.  In my mind, you have to get your client

1  engaged.   It is so important that they understand the
2  upshot of what's going on for everything about the
3  case so that they are engaged in the trial, for the
4  inconvenience that it takes them to understand what
5  exactly are the nuances of a particular case, and, of
6  course, ultimately, they are the ones who are going to
7  be sanctioned, not the lawyers.   Generally speaking.

8        So I'm holding my ruling as to Woodson and
9  Schumacher in abeyance, and I'm sure you all can find
10 that swiftly.   You can find it in the next day or two.

11       Basically, what I want a statement from each
12 side is that any interrogatories, any requests, any
13 documents that your clients are supposed to have
14 signed for purposes of discovery they have in fact
15 signed.   So that goes for the plaintiff and it goes
16 for defense.   I just really dislike those things
17 coming up at trial.   It's an unnecessary mess.

18       So you all can do that within 48 hours?

19       MR. BENNETT:   Yes, Your Honor.

20       MR. SEARS:   Just for clarification, if we
21 find there hasn't been that affirmation, that T
22 crossed, go ahead and get it done, right?

23       THE COURT:   No.

24       MR. SEARS:   No?

25       THE COURT:   You have to tell me why it's all

1    valid.

2              MR. SEARS:  Oh, okay.  All right.  Thank you,

3    Your Honor.

4              THE COURT:  Because your client has to verify

5    it.

6              MR. SEARS:  Understand.

7              THE COURT:  All right.

8              All right.  So that's Ms. Schumacher and

9    Sergeant Woodson.

10             This next discovery issue is an attempt to

11   exclude?  What are you trying to do?  All the

12   documents that were not disclosed prior to July 13.

13   I'll tell you, there are a few things I need to know

14   about these documents.  One is it doesn't seem they

15   were objected to right away; two, I have no idea what

16   the number of documents are; three, I need to

17   understand the prejudice that resulted; and, four, I

18   need to know why they were disclosed late in time,

19   relatively speaking.  So those are my main questions.

20             MR. BENNETT:  Yes, Your Honor.  With respect

21   to what documents the defendant has sought to

22   introduce to date, we would withdraw our -- plaintiffs

23   would withdraw their request for relief as to those

24   matters.  In fact, as to all matters other than

25   Woodson and Schumacher, which the Court has already

1    addressed.

2           The reason is I think that our team was being

3    prophylactic in trying to address this in anticipation

4    of what may come at trial, but I believe it would be

5    better to wait until we get Rule 26(a)(3) disclosures,

6    and if there are exhibits that the defendant has not

7    produced that it intends to use at trial, then we

8    would make that objection and make the argument at the

9    appropriate time rather than broadly argue that

10   everything that they gave us in August is improper.

11          THE COURT:  How much was it?

12          MR. BENNETT:  It was all documents related to

13   Mr. Lynn and that he might have --

14          THE COURT:  I mean, the volume.  I'm just

15   trying to get a sense of how much it was.

16          MR. BENNETT:  OSHA level.  So I'd say maybe a

17   binder as thick as Your Honor has right there at the

18   top of your pile.

19          THE COURT:  All right.

20          MR. BENNETT:  I can't give you a specific

21   number.  A lot of that was not new.  Let me correct

22   that.  A lot of that were documents that --

23          THE COURT:  They indicate that some of it was

24   a Bates numbering error.  And you're not disputing

25   that.

1          MR. BENNETT:  Correct.

2          THE COURT:  All right.  So you're essentially

3    withdrawing this without prejudice.

4          MR. BENNETT:  Yes, Your Honor.

5          THE COURT:  So I can deem it moot, but you're

6    still expressing willingness to object to individual

7    documents that are raised, perhaps under this basis or

8    other bases; is that fair?

9          MR. BENNETT:  That is fair, Judge.  We would

10   narrow it to, if we get to the point where we're going

11   to trial, 26(a)(3) disclosures in anticipation of the

12   Court's decision at a final pretrial conference or

13   otherwise as to particular documents the defendant

14   might have used.

15          That is, the defendant produced documents in

16   response to our discovery requests.  That itself is

17   not in violation of any rule.  The question is:  Can

18   they use them under Rule 26?  And that, I believe, the

19   position we take here is unnecessarily premature.

20          THE COURT:  I would agree with that.  You're

21   saying the same with this any witness not disclosed in

22   mandatory disclosures.  Those are all things you will

23   object to once you know that witness exists.  It's not

24   a general objection, which you know how I feel about

25   general objections.

1        MR. BENNETT:  I know how you feel about

2  general objections.

3        THE COURT:  So you are withdrawing your

4  general objection.

5        MR. BENNETT:  I am.  I am withdrawing that,

6  and I will say that I personally reviewed that.  So

7  this is not me saying somebody else is responsible.

8  Everything went through my email box, my Word screen,

9  and I looked at everything that came out.  So that any

10  criticism, I'm the one here that would deserve it.

11        THE COURT:  All right.  Well, it wasn't

12  really critical, just factual.

13        MR. BENNETT:  Yes, Your Honor.

14        THE COURT:  All right.  So, Mr. Sears, you're

15  not going to, as one judge here was famous for saying,

16  grasp defeat from the hands of victory, are you, sir?

17        MR. SEARS:  No, I won't.

18        THE COURT:  All right.  So that for the time

19  being takes care of the discovery issues, correct?

20  Most of them are withdrawn as moot.  So that's all

21  documents not disclosed prior to July 13, any witness

22  not disclosed in the defendant's mandatory disclosures

23  or supplemental mandatory disclosure, and the

24  overarching objection to plaintiffs' -- the response

25  to plaintiffs' request for production to defendant of

1  number 15 was withdrawn earlier as moot with

2  plaintiffs' recognition that they requested that

3  information on an untimely basis.

4       And I will say that in response, Mr. Sears,

5  you indicated there were certain Bates numbers that

6  appeared responsive, but I just want you all to know

7  to the extent you're practicing in front of me in the

8  future, it's not clear to me we had those documents.

9  So if it is the case, maybe we did because we've had a

10  lot of documents, but whenever you're saying we did

11  produce them, show me the documents so I can be with

12  you in your argument, and I can rule more quickly.

13  It's obviously a nonissue now.  That's really just for

14  future information.

15       All right.  So on to Mr. Lynn, is that what

16  we agreed to do next?  Do you all want to take a

17  five-minute recess or are you ready to go straight

18  into Mr. Lynn?  We have a lot of time together today.

19  We can do Mr. Lynn and then take a recess.

20            MR. BENNETT:  Plaintiff is ready.

21            THE COURT:  Pardon me?

22            MR. BENNETT:  I'm ready.

23            THE COURT:  Okay.

24            MS. MAHAFFEY:  We're ready, Your Honor.

25            THE COURT:  All right.

1          All right.  So, obviously, Mr. Bennett,

2    you're seeking to strike the testimony of Mr. Lynn.

3          MR. BENNETT:  Your Honor, the sequence for

4    knowing the basis for an expert's testimony is, under

5    Rule 26(a)(2), the party propounding or proffering the

6    expert has to provide an expert witness report that

7    complies with Rule 26(a)(2) and includes, of course,

8    the specific opinions, and the methodology, and

9    analysis to reach those opinions, amongst other

10   requirements.  Then we have an opportunity to depose

11   the witness and to request documents.  And here we did

12   that, both requesting documents from the defendant

13   directly as well as through a third-party subpoena to

14   Mr. Lynn.

15         And then, thirdly, we can depose the witness.

16   Here we've done that.  We took Mr. Lynn's deposition,

17   and we recounted that testimony appropriately, I

18   think, in the plaintiffs' motion and memorandum in

19   support of that motion to strike Mr. Lynn.

20         Ordinarily, in accordance with this Court's

21   preference, as well as ours, we do not include the

22   complete deposition transcript of a witness.  We did

23   that here so that the Court would know that we were

24   not parsing or excerpting a sentence here or there.

25   It's not a pleasant read to have any deposition or

1   hearing in which I'm speaking a lot, but the

2   deposition itself, I circled back again and again on a

3   couple of important issues.  The first was to try to

4   understand what the witness's qualification was, and,

5   in related importance, what the witness's opinions

6   were.

7          If you look at the report, which Your Honor

8   referenced moments ago, but which is filed with this

9   court as 58, Document 58, Exhibit 1, the first exhibit

10  in support of our motion, it's not exactly clear what

11  the opinions are except at page 3 of 7 following the

12  Pacer pagination, it says, "A summary of my findings,

13  opinions, judgments and conclusions on the six ACDVs

14  are as follows."

15         The Court by now knows that ACDV is the

16  acronym for Automated Consumer Dispute Verification

17  form.  That's the way credit reporting agencies

18  communicate a dispute that comes in from a consumer to

19  the credit furnisher.

20         So you then have, at least by numbering, six

21  separate numbers.  Then, I guess, there would have

22  been an opinion as to each one if this were following

23  an ordinary expert witness report structure.  Then it

24  follows at page 5.  You provided me a series of

25  questions.  Here's my answers with some bullet points.

1        So my deposition attempted to determine the

2   basis, the methodology, and the credentials of the

3   witness to so testify as to each of these.  And I

4   think that we proved in our memo that the witness was

5   not qualified to render opinions about how a furnisher

6   conducts a credit reporting dispute investigation, and

7   that the witness did not provide methodology, and that

8   the witness attempted to offer legal opinion, long

9   legal opinion, but legal opinion nonetheless.  Still

10  the defendant didn't respond to that memo

11  substantially.  Its response consisted of --

12        THE COURT:  I'm going to stop you there.  So

13  your challenge is the expert based on what?

14        MR. BENNETT:  We're challenging the expert

15  because -- well, we're challenging the report because

16  it doesn't itself identify the opinions, methodology,

17  and analysis to get to those opinions.  Second, we're

18  challenging Mr. Lynn's use at trial because he's not

19  qualified to render the opinions that we at least

20  discern from his report.  That is, his opinions are

21  basically that this credit furnisher conducted a

22  reasonable investigation of the ACDV disputes.

23        There's absolutely no evidence, with no

24  exaggeration, there's no evidence that this witness is

25  qualified to testify as to that.  In sub letters here,

1   (a), could it be industry standards?  Would the
2   witness be qualified to testify as to this is the
3   industry standard?  And the answer is no.  We sought
4   that evidence and he didn't so testify.  (b) Is he
5   mistakenly but nonetheless offered as a witness to say
6   here's the legal standard?  That the Fair Credit
7   Reporting Act legal standard requires you to do this
8   under *Johnson v. MBNA*.  For example, the searching,
9   meaningful inquiry to determine the truth.  And the
10  witness was not familiar with the case law that set
11  those standards, the regulations of the Federal Trade
12  Commission and CFPB or other bases to understand the
13  law even if legal opinion were properly the subject of
14  an expert opinion here.
15          And so -- and, of course, we are left with
16  three, which is any other basis.  And the only other
17  basis that the defendant offered to have any knowledge
18  as to what a credit furnisher investigation does is
19  that he read the depositions of the defendant's
20  witnesses in this case and then restated what they did
21  and said, That's reasonable.
22          Now, we talked about, and I intend to do it
23  again here, the cosmetic appearance of credentials
24  that Mr. Lynn offered.  And I asked him in his
25  deposition, and we cite this repeatedly, "What are the

1  bases of your claim to be so qualified?"

2          And in the deposition, it came down, in my

3  examination, to three bases.  The first was that this

4  witness had worked at a bank in the '90s and before

5  the '90s.  At page 4 of our brief, we start with the

6  presentation of the deposition testimony, but his

7  summary at the bottom of page 4 is at the deposition

8  transcript 13, 7 through 16, and he says, "The

9  preponderance of my professional experience has been

10  as a lending officer with Merrill National Bank, as a

11  training officer with Merrill National Bank."  And

12  I'll pause there because then the second, which I'll

13  talk about in a moment, he says, "as a consultant to

14  various financial institutions around the country,

15  and -- and obviously from litigation."

16          So I could talk about those three credentials

17  which he offered.  First, he worked for a bank;

18  second, he served as a consultant with various

19  financial institutions around the country; and, third,

20  obviously from litigation.

21          Now, for the first, his banking experience.

22  In his deposition, which the whole exhibit is attached

23  as Document 58-2, I asked him at page 16, when I say,

24  "So I want to talk about the first category," which is

25  that he worked for a bank.  "You would agree that your

1    greatest source of information about the Fair Credit

2    Reporting Act" --

3              THE COURT:  Where are you?

4              MR. BENNETT:  I'm sorry.  Page 16, line 8.

5              THE COURT:  All right.

6              MR. BENNETT:  So I say, "Your greatest source

7    of information about the Fair Credit Reporting Act

8    came from your years working with or for Merrill,"

9    M-E-R-R-I-L-L, "National Bank; correct?"

10             Answer:  "I would say that, but I'd also say

11   working with other financial institutions as a

12   consulting -- as a consultant."

13             And then I begin down at line 24 -- by the

14   way, 23, "When did you leave Merrill National Bank?"

15             I left January of 1993.

16             By the way, Judge, 1681S-2 was enacted by

17   Congress in '96 and went into effect in 1997.  *Johnson*

18   *v. MBNA* was the second case nationally, the first

19   appellate case to interpret it, and that, I believe,

20   was 2003.

21             So then I asked the next question, page 16,

22   line 24, "What experience did you have at the point at

23   handling credit-reporting disputes at Merrill National

24   Bank?"

25             Page 17, line 1, answer:  "I didn't work in

1   that area.  I worked as -- again, as a lender end as

2   part of being a lender -- and I was a commercial

3   lender at Merrill National, small business lender."

4          And I'm skipping to the last sentence.  He

5   says in that paragraph, "So you were evaluating their

6   personal credit standing as part of the overall

7   underwriting process."

8          "But you didn't have any experience with the

9   ACDV process while you were at Merrill National Bank?"

10         Answer:  "That's correct."

11         "What about 1681S-2B?  Did you have any

12  experience with that while you were at Merrill

13  National Bank?"

14         Answer:  "No."

15         So the first category is Merrill National

16  Bank.  I'm sure if -- and by the way, at page 29, I'm

17  sorry.  At page 13, line 7, the witness explained what

18  type of knowledge he had.  And for that he said -- I

19  believe it's 7.  He says that he was a user of credit

20  reports given the professional experience that he had.

21  That is, and again, as a commercial lending officer,

22  he had read credit reports in considering how they

23  would be used in credit.

24         I might challenge the relevance of a late

25  '80s expertise to decide what credit damage is

1   cognizable, but we don't have to because the witness

2   isn't offered for that purpose.  That is, the witness

3   isn't offered to say Mr. Wood could have gotten a

4   mortgage.  I've looked at his credit, notwithstanding

5   this issue, he could have obtained a mortgage.  And I

6   know that because I was a lending officer.  That's if

7   Mr. Lynn was going to say anything about being a user

8   of credit reports, providing expertise, it would be in

9   that category, and that's not where he's offered here.

10  He's offered to provide ACDV expertise, something he

11  explicitly and unquestionably says I have no expertise

12  in.

13       The second category of expertise or of

14  experience that he claimed got him some knowledge

15  would be what he characterized as he's done consulting

16  work before.  Now, initially, I thought, well, that's

17  intimidating.  A CLE speaker typically knows the

18  material that they're speaking about.  And so we

19  delved further into that, and if the Court will start

20  at page 14 of the transcript.  Actually, I'm sorry.  I

21  apologize, Judge.  Start at page 47.  I will drag the

22  Court back to 14, but there's proof of my limited

23  deposition skills.

24       So at page 47, line 14, "And what years did

25  you serve as a consultant on commercial and retail

1    credit issues?"  And he said, "I'd say from the early

2    onset, probably 1996 through, oh, 2008."

3         I'm skipping to line 22.  He says, "Some of

4    those institutions would be included in the work I did

5    through Omega -- Omega Performance Corporation that I

6    described before."

7         And skipping to -- and I'm not skipping to

8    exclude it but to save time, at page 48, line 11.  And

9    then "Some of the individual clients that I had I also

10   did the Omega consumer lending program that I

11   described before.  That might have been four or five."

12        We've also cited other testimony about the

13   consultant experience, and I'll point to it in a bit,

14   but if I give the Court what we learned in the

15   deposition, in 1996, Mr. Lynn had an opportunity to

16   teach a survey course on using these materials that

17   were provided him by the Omega Performance

18   Corporation.  He testified in his deposition that the

19   actual course book was given to him.  It included a

20   chapter on Consumer Lending Laws, one of which was the

21   Fair Credit Reporting Act, and that Mr. Lynn used the

22   same materials from 1996 to when he stopped with

23   Omega, and then used the same materials on his own for

24   those four or five additional customers or clients.

25   And he would do bank training for some of these

1    employees on a wide variety of issues, and one section

2    was Consumer Lending Laws, and one section of that was

3    Fair Credit Reporting Act, all from materials that

4    were drafted and used by him and unchanged from 1996

5    forward.  1996, of course, the furnisher investigation

6    duties didn't exist.

7            Now, the deposition, it is replete with our

8    return to this question.  The survey nature of it is

9    at page 14 of the deposition.  So prior to -- so

10   between 1996 and 2000 Mr. Lynn said he worked on his

11   own apparently.  The dates weren't crystal clear to me

12   as to when he did it on his own or with Omega.  What's

13   clear is that he used the same materials.

14           At line 11, he explains he was the

15   facilitator of various credit-training programs.  He

16   taught, at line 13, a consumer-lending program or

17   facilitated a consumer-lending program approximately

18   15 times at various institutions in the mid-Atlantic

19   region as well as in the south.

20           Part of the consumer-lending program was an

21   explanation of various consumer protection regulations

22   that included the host of laws Your Honor is likely to

23   see our firm litigate here, but well more than the

24   Fair Credit Reporting Act.  So that's lines 17 through

25   21, page 14.

1          And then if you look at line 24, page 14, I

2      asked, "You can't say that you taught how to comply

3      with the furnisher obligations of the Fair Credit

4      Reporting Act, the safety" -- but that would have read

5      the "1681S-2B provision in this case when you worked

6      for Omega; right?"

7          Answer:  "I can't say that for sure because I

8      don't have the materials.  I did search for them, but

9      I don't have them any longer.  I've done it -- I did

10     it 10, 12 years ago."

11         And he says at line 10, "I can't be more

12     specific than that, but there was a segment in that

13     program that described and gave situational elements

14     as to how the Fair Credit Reporting Act works and how

15     it applied."

16         "And that is in the context of discussing

17     sort of a survey course of all the different laws that

18     might affect a financial services entity; right?"

19         And his answer at line 18, page 15, "Yeah.

20     There were -- as I said, there were several of the

21     major -- what I would consider the major federal

22     statutes at the time which I've described before, and

23     that was -- the Fair Credit Reporting Act was part of

24     that description."

25         After we cleared, or at least what I thought

1  we had in our deposition, effectively gotten the

2  witness to say I didn't have any business knowledge

3  through Merrill.  I didn't have any specific furnisher

4  knowledge.  I then said, "Well, let's talk about the

5  third."  And I'm sorry.  One more thing on that second

6  category of knowledge, Judge.

7           Page 51, line 12.  And, again, we had

8  subpoenaed all the documents that included these

9  materials that the witness claimed would show he had

10 taught stuff about the Fair Credit Reporting Act.  So

11 I went back again about these materials.

12          If you start, I'm sorry, at line 3, "So

13 during what years were you doing," it says "the

14 Experian program," but it would have been the "program

15 on the Fair Credit Reporting Act -- that would have

16 included something regarding the Fair Credit Reporting

17 Act outside or prior to the Omega Performance?"

18          "That would probably be '96, in that

19 neighborhood, until '99."

20          At line 12 I asked, "And you don't know what

21 materials that would have regarded a furnisher's

22 obligation of to conduct a dispute under 1681S-2B?"

23          Answer:  "I didn't put materials together.

24 When I did it with Omega Performance Corporation's

25 materials, I didn't write the materials."

1          Question:  "And so the expert knowledge that

2     you contend you obtained through these two training

3     programs was through your review of the Omega training

4     materials?"

5          Answer:  "That's correct."

6          Question:  "And do you know whether those

7     training materials existed in 1996?"

8          "I believe they did, yes.  I want to say '96,

9     '97, in that range, I started doing this.  I can't

10    remember specifically the year."

11         Question at page 52, "And did they change

12    any -- any material ways with respect to the

13    explanation of the furnisher's obligations under

14    1681S-2B?"

15         I had not revealed to the witness the

16    knowledge that S-2B didn't exist at that time.  And

17    the answer was:  "No.  No.  I think it was the same

18    program that I used at all times.  I mean, again, it

19    was prepared by Omega Performance."

20         Now, the third category of knowledge or

21    source of the witness's knowledge was that he had been

22    an expert before and in this case.  And this is a

23    contention the parties have.  You see it in the

24    defendant's memorandum opposing our motion the

25    argument that a witness can grow their knowledge.  I

1    could hire someone to read the depositions in this

2    case, and then they could opine as an expert from the

3    new knowledge they obtained in this case.  We disagree

4    that that's valid under 702.

5             But at page 18, line 24, "Are you claiming

6    that you have obtained your expert knowledge in

7    significant part because you have reviewed documents

8    and information in lawsuits where lawyers or clients

9    hired you to serve as an expert?"

10            Answer:  "That was a significant part, yes."

11            Question:  "So other than when you were hired

12   in litigation to be an expert" --

13            THE COURT:  I'm sorry.  What page was that?

14            MR. BENNETT:  I'm sorry.  19.

15            THE COURT:  19.  Sorry.

16            MR. BENNETT:  Line 4.  I'm sorry, Judge.

17            THE COURT:  24, right?

18            MR. BENNETT:  Page 19.

19            THE COURT:  Line 24?

20            MR. BENNETT:  Line 4.

21            THE COURT:  Sorry.  My apologies.

22            MR. BENNETT:  "So other than when you were

23   hired in litigation to be an expert, the only other

24   source of information that you have that educated you

25   about the furnisher obligation in the Fair Credit

1  Reporting Act would have been when you" --

2          THE COURT:  Okay.  I have to stop you.  I'm

3  not finding that.  What page?

4          MR. BENNETT:  19, line 4.

5          THE COURT:  Sorry.  I thought you said line

6  24.  My apologies.

7          MR. BENNETT:  Between the two of us, Judge, I

8  suspect my communication would have been -- but if you

9  look at line 4.

10         THE COURT:  Ms. Daffron will get it right.

11  So we're good.

12         MR. BENNETT:  Of course she will.

13         THE COURT:  I'll check and make sure it was

14  not me.

15         MR. BENNETT:  And so I asked him -- the

16  question pretty plainly was, Besides your homegrown

17  expert knowledge from being an expert, the only other

18  furnisher obligation -- the only other knowledge you

19  have about the furnisher obligations under the FCRA

20  would have been when you were putting together the

21  survey coursework for the Omega training you did maybe

22  15 times, right?

23         Witness:  "Yes.  Both of these sources were

24  basically -- gave me the background and experience I

25  have."

1        By the way, at this point I didn't know that
2    the witness didn't put the courses together.  He
3    bought them.  That was pages later.  But that's it.
4    So maybe 15 times the witness did a survey course.
5    He's abandoned the Merrill National Bank that the
6    defendant tries to resurrect in its opposition brief.
7    By this point in the deposition everybody agrees
8    that's not a basis for his furnisher FCA knowledge.

9        So the two bases for the knowledge in this
10   deposition the witness says are, I taught a survey
11   course with somebody else's materials created sometime
12   in '96 or '97.  I can't find them.  I don't remember
13   whether they said anything about a furnisher, and I
14   taught maybe 15 times over that course, and it was a
15   small subset of a survey course, and, number two, I've
16   been an expert before.

17       Now, on that last category, we asked the
18   witness repeatedly to give us knowledge -- the
19   information about what cases.  The witness
20   identified -- you don't have it.  I'm sorry.  But
21   there were a number of --
22       THE COURT:  No, I've got it.  It was filed.
23   My clerk is ahead of you and me, and she brought it to
24   me.
25       MR. BENNETT:  But the -- so there was this

1    long list of cases the witness and I -- the first

2    thing the Court will note is that no court has ever

3    found the witness an expert in this field at all.  I'm

4    unaware of any field, but in this field the witness

5    couldn't identify one instance.  And in terms of being

6    even hired by -- Mr. Sears had hired him a couple of

7    times, but being hired in cases involving the Fair

8    Credit Reporting Act, the witness was unclear as to

9    which cases might have been Fair Credit Reporting Act

10   derived.

11          The witness also did not offer any basis to

12   explain how he become knowledgeable.  That is, going

13   back to what I said before, we're not entirely clear,

14   the Court cannot be clear, as to what the opinion is

15   as to why an investigation was reasonable and proper.

16          The witness could not and did not offer or

17   proffer his testimony as being one of here are

18   industry standards.  So the witness did not say "I can

19   testify about what the rest of the industry does."  He

20   doesn't explain that he's done a survey of industry or

21   identify any particular companies for which he's been

22   hired to examine their investigation procedures other

23   than that we know he's been in two cases, I believe,

24   with Mr. Sears.

25          I asked him -- if you look at the index that

1    we attached, which is at page 156, most of the time

2    that I asked that the word "industry" is cited amongst

3    those seven or eight were me trying to see if he would

4    testify as to an industry standard.  He doesn't.  He

5    doesn't proffer himself as having any knowledge of an

6    industry standard.

7         And so then I asked him, Well, what do you

8    think a reasonable investigation is?  And this is

9    within the brief, our brief, our memorandum's analysis

10   of his attempt to offer legal opinion, but he would

11   repeatedly just read the verbatim text of 1681S-2B.

12   So I would say, What's the standard?  And he would

13   read, S-2B1A, B, C and D.  That's it.

14        There is also cited in our brief at page 5 of

15   our memorandum citing deposition testimony at page 29,

16   line 21, where the witness himself says, "I'm not

17   representing myself as an expert in the technical

18   details of how information is communicated.  I'm

19   representing myself as an expert on the facts of the

20   case on what happened, and what was supposed to

21   happen, what should have happened, and so forth.

22        And in none of the testimony he offered in

23   his deposition, nothing in the expert witness report

24   does the witness provide a basis for him to testify

25   about what was supposed to happen or what should have

1    happened.

2          All the witness does in his expert witness

3    report is describe that he read what the employees

4    whose depositions were taken testified to.

5          I will say, as well, the last way that a

6    witness can seek to become an expert is the one, and

7    the only one the defendant apparently seeks, which is

8    to come here to a hearing after formal briefing,

9    substantive briefing, citations to the deposition in

10   their expert testimony, and the defendant's position

11   is that it does not have to have provided in its

12   opposition any details to counter or respond to our

13   claims, our fact claims, of a lack of knowledge.

14         So anything that comes after here today, both

15   in terms of argument by Mr. Sears or proffered new

16   testimony by Mr. Lynn, is new to us and will be new to

17   the Court because it wasn't in the opposition brief.

18         In the defendant's opposition brief, there

19   are six pages of text.  And the defense of Mr. Lynn

20   really begins at page 3 of that, which is Document 66.

21   And the response to our challenge to the lack of

22   methodology was that we didn't ask questions by which

23   Mr. Lynn could have explained himself, but Rule

24   26(a)(2) -- first of all, we did.  You've seen the

25   giant 200-page transcript.  But Rule 26(a)(2) requires

1   the expert witness to provide that information.  It's

2   not simply a five-page or five-line identification of

3   the conclusions of the report.  Rule 26(a)(2) requires

4   more than just that.

5       And regardless, in our brief, we say there's

6   no methodology.  Here's why.  The defendant doesn't

7   even attach a declaration from Mr. Lynn, which we

8   would have objected to as contrary to his deposition.

9   But there's no -- in the opposition brief, there's no

10  argument to challenge the facts that we assert to say

11  in fact we do have methodology.

12      Instead, the defendant says, At the hearing

13  on this motion, Mr. Lynn will be available to testify

14  as to the established industry standards upon which

15  his opinions are based.

16      I asked him repeatedly about that.  It should

17  have been in his report.  It should have been in an

18  opposition brief, and it's unfair to proceed further

19  and now attempt to redo essentially the deposition, to

20  give a do over after Mr. Lynn has sat here and heard

21  the argument.  I'm certain he's read the brief seeking

22  to have him found not qualified as an expert.

23      The only other -- well, at page 4 of the

24  defense memo, the second paragraph, defendant says,

25  Mr. Lynn's credentials indicate he's qualified to

offer expert opinions regarding many banking-related
matters.  He has worked in the financial services
industry for more than 30 years and has training and
experience in consumer and commercial lending, federal
and statute consumer protection laws and regulations,
and policies and procedures in the industry.

None of that was offered beyond what's in the
report and then addressed by me in taking the
deposition, which we've already recounted for the
Court.  He did not have any knowledge with respect to
how furnishers handle credit disputes.  He didn't have
identity theft knowledge.  His knowledge of identity
theft, to put in the record something to address my
own insecurity, was to refer to my congressional
testimony and quoted that back.  He had read that in
preparation for my upcoming deposition of him.

And then he said, the defendant says rather,
he has also taught courses on consumer lending issues,
including the requirements of the FCRA, and I have now
addressed that in the transcript itself.

I don't have anything more I can say, Judge,
but I have done everything to shake these pockets to
try to come up with what we might be faced with in
terms of expertise in this particular case, and there
isn't one to understand the basis for concluding that

1  the defendant's investigation was reasonable, and no

2  methodology was provided at any point, not in the

3  deposition, not in the memorandum in opposition, and

4  not in the expert witness report.

5  THE COURT:  All right.

6  MR. SEARS:  Thank you, Your Honor.

7  Your Honor, referring to the July 7, 2016

8  report of Mr. Lynn, I would note for clarification

9  that the numerated paragraph No. 5, which is on page 5

10  of 7 regarding the XB XH code, regards opinions that

11  pertain to consumer lending.

12  THE COURT:  Wait an minute.  Your expert

13  report does have a number on it.

14  MR. SEARS:  I was referring to the Court's

15  number at the top.

16  THE COURT:  Thirty-nine, 5.  What are you

17  saying?  Page 1 of 7, 2 of 7; is that what you're

18  referring to?

19  MR. SEARS:  I'm on 5 of 7.

20  THE COURT:  Okay.  I'm sorry.  Let me just

21  catch up with you.  All right.  I'm with you.

22  MR. SEARS:  So one of the issues in this case

23  is whether or not XB code or XH code was appropriate

24  to use, and that has --

25  THE COURT:  And that's, for the record,

1    that's capital X, capital H.   Capital X, capital H.

2    They are different codes.

3           MR. SEARS:   That's correct.   And that is a

4    condition compliance code that is reported on a credit

5    report that ultimately goes to the end user of that

6    credit report.   And that is creditors or potential

7    lenders out there who are reviewing the credit report

8    for lending purposes.

9           Similarly, on the next page --

10          THE COURT:   Wait.   So what are you

11   clarifying?

12          MR. SEARS:   Okay.

13          THE COURT:   Are you supplementing his report?

14          MR. SEARS:   No, I'm not.

15          THE COURT:   Okay.

16          MR. SEARS:   What I'm doing is I'm trying to

17   define the subject matters of expertise that are at

18   issue in this case.

19          THE COURT:   Well, he's supposed to do that.

20          MR. SEARS:   I'm sorry?

21          THE COURT:   His report is supposed to do

22   that.   So where is it in the report?

23          MR. SEARS:   Okay.   For the purpose of

24   identifying his qualifications, my argument to the

25   Court is that there is an analysis of his

1    qualifications in two different areas.  Okay?  I want

2    to define the subject matters of expertise that are

3    called upon in this.  And that is one that deals with

4    ACDV investigations and one that relies upon

5    experience when it comes to consumer lending.  And

6    what I'm suggesting to the Court is that the opinions

7    that are expressed in the report of Mr. Lynn, I am

8    trying to clarify which one of those from a

9    qualification standpoint when it would implicate which

10   subject matter, whether consumer lending or an ACDV

11   experience.

12          THE COURT:  So what is he being offered as an

13   expert in?  FCRA?  Financial information?  Are you

14   saying that he's being offered as an expert in ACDV

15   investigations and consumer lending?

16          MR. SEARS:  Yes.  To the end.  That he's

17   being offered as an expert with regard to ACDV

18   investigations and also with regard to consumer

19   lending.

20          THE COURT:  This is under consumer stuff

21   generally or with FCRA?

22          MR. SEARS:  No, consumer lending generally.

23          THE COURT:  I mean, ACDV also.

24          MR. SEARS:  ACDV is separate from the

25   consumer lending.  The ACDV investigation has to do

1    with the dispute that's filed under the Fair Credit

2    Reporting Act.

3            THE COURT:  Right, but there's not any ACDV

4    disputes under FCRA, right?  Are there other -- can it

5    be --

6            MR. SEARS:  Oh, I see what you're saying.  He

7    has experience in cases that have been disclosed to

8    plaintiffs' counsel including all the materials that

9    he produced and reports in those specific cases with

10   FCRA generally and has had a couple cases dealing with

11   the investigation component.  So he does have --

12           THE COURT:  So that's my question.  Is he

13   offering expert testimony in ACDV investigation in

14   FCRA cases?

15           MR. SEARS:  That's correct.  And in addition

16   will be -- has offered opinions that pertain to the

17   area of consumer lending with regard to how those

18   reports are ultimately used.

19           THE COURT:  Okay.

20           MR. SEARS:  Okay.  And, Your Honor, Mr. Lynn

21   conceded at his deposition and I concede now.  His

22   experience and his work through his professional life

23   is more balanced on the side of the lending issues,

24   the consumer and commercial, than it is under the ACDV

25   investigation issues under the Fair Credit Reporting

1   Act.

2           And the standard with regard to determining

3   whether Mr. Lynn will have the ability to assist a

4   finder of fact is whether or not he has any -- and

5   these are ors - they are disjunctive - the knowledge,

6   skill, experience, training or education.  And it is

7   sufficient specialized knowledge --

8           THE COURT:  What are you quoting?

9           MR. SEARS:  -- to assist -- well, I got that

10  list from Rule 702 with regard to --

11          THE COURT:  Just making sure I'm following

12  you.

13          MR. SEARS:  Okay.  All right.  It's whether

14  or not he has sufficient specialized knowledge to

15  assist the trier of fact in understanding something.

16  And he can -- an expert can pull from any of those.

17  And there's no perfect recipe as to what combination

18  you would have to have.

19          And then once the testimony is admitted, then

20  it's up to the trier of fact to assess the credibility

21  and determine whether or not they will believe that --

22          THE COURT:  You're stepping ahead, obviously,

23  because it has to be admissible.

24          MR. SEARS:  That's right.

25          THE COURT:  So we're at whether it is

1    admissible.

2        MR. SEARS:  Right.  We're at the gatekeeper

3    function.

4        THE COURT:  Correct.

5        MR. SEARS:  But I say that it's up to the

6    trier of fact because much of what you've heard today

7    as far as Mr. Bennett's argument I believe mostly goes

8    to cross-examination issues, not as to qualification.

9        Under the Rule 702 standard, and we cited the

10   case law in our brief, Your Honor, and this I speak

11   more to in this regard to Mr. Lynn's qualifications on

12   the ACDV investigation opinions as opposed to the

13   consumer lending because the consumer lending I think

14   even plaintiffs' counsel indicated he has extensive

15   experience in that, but the case law indicates that a

16   lack of personal experience should not ordinarily

17   disqualify an expert so long as they're qualified on

18   some other factor, on the knowledge, or the skill, or

19   the training.

20       The federal courts say that an expert witness

21   is not strictly confined to his area of practice but

22   may testify concerning related applications, and that

23   if he has educational and experiential qualifications

24   in a journal or field related to the subject matter of

25   the issue in question, it's admissible.

1        And that is in our response to the motion

2   what we return to.  And that is that base level that

3   is required to establish qualification to provide an

4   expert testimony.

5        Mr. Bennett discusses this course that was

6   taught by Mr. Lynn.  He describes it -- Mr. Bennett

7   describes it as a survey course.  Those are Mr.

8   Bennett's words, not Mr. Lynn's.  But the point of the

9   deposition that he took was not really to discover

10  anything other than what he could do to try to exclude

11  Mr. Lynn because Mr. Lynn is the only expert in this

12  case.  The plaintiffs had disclosed an expert, but he

13  refused to accept engagement in the case.

14       And when it comes down to looking at the

15  experience or the background that Mr. Lynn has, I

16  would argue that it is sufficient to assist the trier

17  of fact to give him that specialized knowledge to be

18  able to testify as to the matters that he's testifying

19  to.

20       His work experience, obviously he worked most

21  of his time in consumer lending.  So obviously that

22  assists him in providing testimony with regard to the

23  lending issues, and that is what should have been

24  reported or how it was reported accurately,

25  completely, or whether or not it was misleading to an

1   end user of the credit report.

2          The consulting issue is an issue that Mr.

3   Bennett primarily focused on with regard to the Omega

4   course, but the Omega course Mr. Lynn explained in his

5   deposition is a large corporation that goes around

6   teaching and training businesses with regard to what

7   their obligations are.

8          THE COURT:  Okay.  So let me ask you this:

9   Rule 26 -- I'm sorry to interrupt you, but I have read

10  through your briefs, and I'm aware that I let Mr.

11  Bennett go for an extensive time.  So I will let you

12  follow-up on this, but here's my concern about this

13  expertise.

14         It's certainly not the case that Mr. Lynn is

15  not an expert in something.  I mean, that goes without

16  saying based on the level of experience that he has.

17  But Rule 702 and *Daubert* and 26(a)(2) really require

18  that you can't just offer somebody up as an expert in

19  something.  Right?  The whole point is to hone in the

20  discussion.  So as a gatekeeper, a judge can decide is

21  it really sufficient to aid the jury.

22         So what that means is it's got to be narrow

23  to some degree, and there has to be a basis for the

24  opinion that a jury couldn't utilize equally.  So

25  clearly that's part of what Mr. Bennett is challenging

1   which is that you can't just read the depositions

2   because, of course, the jury can read the depositions

3   and they can decide what they want to decide about it.

4   And they have access to the laws as written, and they

5   have access to the coding that your client used about

6   XB and XH.  And do they really need somebody to help

7   them with that if that's one of your examples?

8          But the important thing is he does have to

9   talk about methodology, and he has to say in the

10  opinion, in the written opinion, the basis for it.  So

11  our jurisdiction is very specific that you're

12  essentially stuck with the report you file because

13  otherwise it is unfair.  That's true for them, right?

14  They're stuck with not having an expert at all because

15  they didn't file anything.  So they get nothing.  They

16  can't do opinion testimony at all.

17         So as I read through, first of all, it's not

18  clear to me how you designated in his report what he's

19  being offered as an expert in.  So, ultimately, I'm

20  going to ask you to point those two things out for me,

21  and I know you started to, but I will say it's often a

22  little more clear.  So I'll warn you that that's a

23  concern for me.

24         For instance, if you look at what is marked

25  as page 5 of 7, which is where you were before, and I

1  think I'm exactly where you were before, it's

2  paragraph No. 5, and it has within it three subsets.

3  Excuse me, subparagraphs.

4       So it talks about Count Eight as a complaint,

5  and it talks about these codings of XB and XH.  It

6  says what code XB indicates, and that is, I'm quoting,

7  "An active dispute that is being investigated by a

8  data furnisher," or Credit One Bank in this case.  And

9  it says, "The code XH denotes that the investigation

10  has been completed and that the information reported

11  by Credit One Bank has been verified as accurate."

12       So then he says, Both the Consumer Data

13  Industry Association Credit Reporting Resource Guide

14  as well as the Credit One Bank Customer Service

15  Procedural Manual indicate that XH is a proper and

16  appropriate compliance condition code for the subject

17  credit card account given the circumstances as

18  discussed throughout this report.

19       So where are they on notice as to his

20  methodology?  So presuming he can say that much.

21  Presuming he can get to that issue that it's maybe not

22  a legal conclusion, where is the other side on notice

23  as to the basis of that decision and the methodology

24  of getting there?

25       MR. SEARS:  You know, that's difficult for me

1    to answer, and the reason why is because I believe the

2    Court or Mr. Bennett, more specifically, would like to

3    see a methodology the type of which comes to my mind

4    as formulaic because *Daubert* had to do a lot with

5    scientific evidence, scientific opinions.  And when it

6    comes to opinions such as this, the methodology is

7    really nothing more than looking at what the industry

8    standard is.

9             THE COURT:  So where's the industry standard?

10            MR. SEARS:  He cites it right there, the

11   Consumer Data Industry Credit Reporting Resource

12   Guide.  That establishes an industry standard with

13   regard to what condition compliance code.  And the --

14            THE COURT:  But does he --

15            MR. SEARS:  What he does is he takes that

16   standard and tests what Credit One is doing to render

17   a conclusion as to whether or not it's consistent or

18   not.  So in my mind it's difficult for me to answer a

19   question of where's the methodology when to me, and

20   maybe --

21            THE COURT:  This is the issue.  The other

22   side and the non-expert, which is me, has to be on

23   notice.  I read that, and I thought, What the heck is

24   the Consumer Data Industry Association Credit

25   Reporting Resource Guide?  Where is it?  Why does he

1   think that's the one to go to and not one touted by

2   the plaintiffs' bar?  Or if there's another industry

3   guide.  So, for instance, there's case law in med mal

4   cases about what an appropriate standard of care is.

5   So I think you're saying it can't be the same.  But if

6   he's relying on something, he has to say why, in my

7   mind, it's something to rely on.

8           When I read a reporter's report of an event,

9   I read some reporter's differently than I read other

10  reporters, and that informs my response to what it is

11  that they say happened.  So there's a big difference

12  in an oral reporting of Bill O'Reilly and Rachel

13  Maddow, right?  If they're talking about very same

14  event, you might hear it differently depending on

15  who's saying it.

16          So I don't see anywhere in this report where

17  he says this is the methodology and it's the industry

18  standard.  And the problem is, under Rule 26, he has

19  to tell not just plaintiffs' side, so they're saying I

20  didn't get a chance to investigate it, and maybe he

21  said it in here, and I'll give you the opportunity to

22  tell me where he said that that's what he should have

23  relied on, and anybody in the industry would have

24  relied on, but he didn't tell me.  And you have a lot

25  of opportunity, you can make whatever report you want,

1    but you have to make the report.  It doesn't change

2    after this.  Mr. Bennett is correct about that.

3           So why don't you tell me where in his report

4    or in his deposition testimony I can discern what you

5    just said, that that's the industry standard, that

6    that's the basis, the methodology.

7           MR. SEARS:  Well, that that's the basis of

8    methodology of going to the industry standard?  I

9    don't know that -- I'd have to go back and look.  I

10   don't know that he was asked about the XB or XH

11   specifically in the deposition.  Maybe he was.  I'll

12   have to look at the transcript.

13          THE COURT:  It's in the little thing.

14          MR. SEARS:  Right.

15          THE COURT:  Yes, he's asked a lot.  On 37,

16   38, 39, 40.

17          MR. BENNETT:  Judge, page 40, line 17, is

18   where the question begins, and you look thereafter,

19   "Where did you learn about the XB code?"

20          MR. SEARS:  While I'm looking, there's

21   actually case law.  I'm not sure if it's from the

22   Fourth Circuit or not, but I ran across it while I was

23   doing research.  And there's a claim made that because

24   a data furnisher did not follow these guides, that it

25   was negligence because they didn't have a policy that

 1  was consistent with the guides.  And the Court kicked

 2  that saying -- but I understand what the Court is

 3  saying that --

 4      THE COURT:  Well, I'm sorry to interrupt you,

 5  but I'm just going to read a little bit of this, and

 6  you can look in his deposition, too, because we're all

 7  here together, obviously.

 8      MR. SEARS:  Okay.

 9      THE COURT:  So on page 41, he says, In

10  reading the manuals that were here and reading Credit

11  One first, as well as the CDIA, which is the Credit

12  Data Industry Association information, that's also at

13  my disposal, and he was asked, "What CDIA information

14  did you read?"

15      MR. SEARS:  That's correct.  And that was

16  referring to documents that were produced in response

17  to the subpoena.

18      MR. BENNETT:  Respectfully, counsel, those

19  were documents that the defendant produced.  The

20  defendant produced the CDIA manual.  It was a

21  Bates-numbered early production by the defendant to

22  which the witness was referring.  That is.  It was the

23  CDIA manual the defendant produced.  It was not a Mr.

24  Lynn-generated document.  He was referring to -- he

25  had looked at the documents the defendant gave him,

1  and that's the CDIA manual that is referenced here.

2          MR. SEARS:  That is correct.

3          THE COURT:  So he says he reviewed it.  And

4  where does it identify it as the industry standard?

5  Okay.  So this is what -- well, I'll allow you to

6  file -- we'll be around.  Unfortunately, I have a

7  criminal matter that is going to be a little

8  complicated at two o'clock.  So we should finish up on

9  this and take a little break.

10          I'll need to hear from you where he talks

11  about his basis and his methodology.

12          MR. SEARS:  Well, I would say that's it, Your

13  Honor.  I understand that perhaps the report may not

14  put the Court on notice that this is the standard that

15  he is relying upon.  I understand that you may have a

16  different background than what Mr. Bennett has in this

17  area of the law.  I don't think that there's, in my

18  mind and in the spirit of this case, in disclosing Mr.

19  Lynn's opinions that there would have been any doubt

20  with regard to Mr. Bennett as to whether or not the

21  Consumer Data Industry Association Credit Reporting

22  Resource Guide, which has "industry" in its name

23  represents the industry standard.

24          THE COURT:  This is the issue, though.  It is

25  for purposes of this deposition, which is if he says,

1   and that's not supposed to happen in front of a jury.

2   So Mr. Bennett is supposed to have an opportunity or

3   you with the reverse is supposed to have an

4   opportunity to challenge whether or not it's the

5   industry standard.

6          So what happens in medical cases isn't

7   whether or not there's necessarily a standard of care,

8   but what does happen is a little bit of whether or not

9   a doctor is familiar with that particular standard of

10  care, if the pedestrian can speak about a particular

11  lung damage in an 8-year-old or whether you need a

12  lung specialist to do it.

13         So even in scientific cases, there are bases

14  to challenge, and I'm putting that in quotes, air

15  quotes, there are bases to challenge an expert's

16  opinion because of how they support the opinion they

17  offer, but you have to know what they are relying on.

18  And I guess I'm going to turn back because what are --

19  Rule 26 -- I have new glasses and I have to move them.

20  Rule 26(a)(2) says you have to have a complete

21  statement of all opinions the witness will express,

22  and the basis, and the reasons for them.

23         So you have to be able to show that he has

24  what he's offering an opinion in, what specifically

25  opinion is based upon, what level of expertise or type

1    of expertise.  So that would be a pedestrian versus a

2    lung expert.  Can a regular lung expert talk about

3    damage to a little kid or do you need a pedestrian

4    who's going to know how lungs in little kids operate?

5    And parties are going to fight about that, right?

6          So it matters what his background is.  And

7    you are saying his subject matter is ACDV

8    investigation in FCRA cases and consumer lending, how

9    these reports are used.  Right?

10         MR. SEARS:  Yes.

11         THE COURT:  So what are the opinions that he

12   offers and how does a reader know or the jury know

13   what he can be bound to as opinions regarding the ACDV

14   investigation in FCRA cases?  So what are the opinions

15   he offers in the report?

16         MR. SEARS:  You're asking me to point that

17   out for you?

18         THE COURT:  Yes.

19         MR. SEARS:  That's, again, going to 5 of 7,

20   enumerated No. 5.  That is the consumer lending area.

21         THE COURT:  Number 5 is consumer lending?

22         MR. SEARS:  Right, the XB versus XH because

23   it's a condition compliance code that has meaning to

24   the end users of the credit reports, and those end

25   users are the potential lenders or creditors who are

1   reviewing this.  And Mr. Wood's argument is that it

2   should have been an XB because that would have had a

3   negligible impact on his credit score.  And credit

4   score, obviously, is something that's taken into

5   consideration when credit worthiness is reviewed.

6              THE COURT:  Can you slow down your

7   explanation a little bit?

8              MR. SEARS:  Sure.  The next page?

9              THE COURT:  No, page 5.  So you say that's

10  consumer lending expertise because why?

11             MR. SEARS:  Because it is a compliance

12  condition code which conveys to the end user the

13  status of the account.  And that is whether or not it

14  is in dispute or what stage of dispute it is in

15  because they both indicate dispute.

16             THE COURT:  Okay.

17             MR. SEARS:  Again, it goes to -- if I can

18  just lump the consumer lending together, the next

19  page, the last two bullets, are consumer lending

20  issues because it goes to whether or not the

21  information is complete and accurate or potentially

22  misleading.

23             And, again, that goes to the end user of the

24  report, which ultimately results in the damages that

25  Mr. Wood would try to claim in this case, and that is

1   denial of credit, inability to get credit, change the

2   terms.

3           THE COURT:  So you're saying the last two

4   bullet points?

5           MR. SEARS:  Yeah, those are consumer lending

6   areas as well for which Mr. Lynn is uniquely

7   qualified.

8           The first four bullets on that page deal with

9   investigation procedures for which Mr. Lynn has some

10  experience in.

11          THE COURT:  Okay.  So the first four bullet

12  points are also opinions?

13          MR. SEARS:  That's correct.

14          THE COURT:  And that's under the ACDV?

15          MR. SEARS:  Yes.

16          MR. BENNETT:  I apologize, Your Honor.

17          Mr. Sears, you're saying the first four

18  bullet points at page 6 you're contending are FCRA

19  expertise or consumer lending expertise?

20          THE COURT:  He said investigative procedures

21  ACDV.

22          MR. SEARS:  Uh-huh.

23          THE COURT:  Right?

24          MR. SEARS:  That's correct.

25          THE COURT:  So you're not offering him as a

1    damages expert.  So the last bullet on 7 of 7 can't be

2    offered; right?

3           MR. SEARS:  Well, he has no opinion as to

4    damages because at the time there was no evidence of

5    damages.

6           THE COURT:  Well, he expressed an opinion

7    that there's no evidence of damage.

8           MR. SEARS:  Right.  Or economic damages.

9    Obviously, he's not going to testify with regard to

10    emotional distress.

11           THE COURT:  So you are not offering the third

12    paragraph of number 4 on 5 of page 5 of 7, which says,

13    "Based on its verification via Accurint, the bank was

14    able to verify that the information being reported to

15    the CRAs was accurate and complete.  In my opinion,

16    the bank's verifications were reasonably appropriate

17    and consistent with the standard of care in the

18    consumer data furnishing industry that data furnishers

19    use credible external sources of information as

20    necessary and appropriate in order to enhance the

21    completeness of consumer credit investigations"?

22           MR. SEARS:  We would be offering that

23    opinion, Your Honor.  I did not include that in my

24    review of separating here, but, yeah, that is

25    certainly an opinion we would want to present to the

1  jury.

2          THE COURT:  And what expertise does that flow

3  from?

4          MR. SEARS:  It doesn't say.  I could tell you

5  what my understanding of it is, but it doesn't

6  specifically say with regard to No. 4, but he has

7  prefaced the report with his experience that I would

8  point back to to say that that is what gives him the

9  basis to say that.

10          THE COURT:  Which part of his experience?

11          MR. SEARS:  That would certainly go to his

12  experience with regard to conducting investigations,

13  which began -- well, generally, with his understanding

14  of the FCRA before the section was added to here,

15  continuing through the educational course that he

16  taught based upon materials that were developed by an

17  organization that taught the standard of the industry

18  to folks in the industry, and continuing through --

19          THE COURT:  What are you reading from?  Where

20  is that?

21          MR. SEARS:  I'm explaining.  I'm not reading.

22  I'm referring back to -- well, this is probably --

23  actually goes to his addendum report or not -- the

24  appendix that has the C.V. on it, which is not

25  included in plaintiffs' motion.

1          THE COURT:  I have the C.V.

2          MR. SEARS:  You do have it?

3          THE COURT:  Yeah, I have what you filed.

4          MR. SEARS:  So that goes through there with

5     regard to the courses that he has done.  And also,

6     Your Honor, there is a disagreement, I guess, between

7     Mr. Bennett and I as to whether or not litigation

8     experience feeds into the experience and knowledge

9     that you have.  I mean, if you conduct a survey as a

10    result of work in a particular case, then that has

11    come within your body of knowledge, and to the extent

12    that Mr. Lynn, in addition to teaching the classes,

13    has had an opportunity to see how other banks have

14    responded to ACDV disputes in conducting

15    investigations, then he could certainly base his

16    opinion on his own experience.

17         THE COURT:  Well, so this is the issue.  I'm

18    just going to say this to you.  We probably should

19    take a break.  So it's one o'clock.  I'm going to give

20    you an opportunity to sort of put your head together

21    about this because Rule 26 is very specific.  You can

22    probably tell that one of my issues is, one, the

23    opinions he's expressing have to be clear, and the

24    basis for the opinions has to be clear.  Not just for

25    purposes of the deposition, but so that the report

1    essentially can't involve its own sort of surprise,

2    which is part of what Mr. Bennett is talking about.

3         So if you have expertise in litigation, what

4    you then need to do is say, you know, I had three

5    cases that involved FCRA, and they were ACDV cases,

6    and the issue was the reasonableness of the

7    investigation.  And so I was able to review what they

8    did.  And in that instance, they didn't look at

9    Accurint at all.  They did something else.  So based

10   on my knowledge and my experience and this specific

11   part of the consumer data industry, blah, blah, CDIA,

12   what they did is reasonable because it's exactly what

13   the CDIA requires in this section, and plus we looked

14   at Accurint.  Because then you have a sense of the

15   methodology and the basis for the opinion.

16        So I read through Mr. Lynn's report or his

17   deposition, and I do think that he was completely

18   honest.  And you don't want any witness to be anything

19   but that, and I wouldn't expect him to be anything --

20   this is a financial services executive.  But if he's

21   offering expertise in ACDV investigation in FCRA

22   cases, I'm struggling with his honest statements that

23   suggest a lack of knowledge about the ACDV process.

24        In his testimony, I think that on page 28 he

25   suggested or testified that he didn't know about

Experian's dispute process.  He indicated he doesn't

claim that he has a wealth of knowledge in furnisher

credit reporting disputes under FCRA, which, frankly,

Mr. Sears, you're not overstating that either.  And I

appreciate that.

He indicates, I'm representing myself as an

expert on the facts of the case and what was supposed

to happen and what should have happened.  He said he

is generally speaking, an expert on credit scoring,

from his experience as a lender.  He indicates, I

think on page 35, that he had never heard of Accurint

before this case.  He testified that he didn't know

where Accurint got its address data.

He suggests he might have first learned about

the XB code in this case.  He indicated that these

furnisher requirements, 1681S-2B, he thought was

enacted in the late '60s or early '70s, and he did

testify -- which, of course, is not correct.  That

particular part was enacted later, in '96.  He

indicated that he was teaching from this course

material and that it didn't change.

And so one of the difficulties about that --

frankly, I think his memory -- as I read it, his

memory wasn't clear.  He wasn't trying to overstate

what he did know or didn't know, and he didn't have

1    the materials.

2         MR. SEARS:  If I can put things in context --

3    that's fine.

4         THE COURT:  So he said that no court had ever

5    found that he was qualified to give an expert opinion,

6    and I can't remember -- I know it's on page 64, and I

7    can't remember if he just never needed to offer the

8    expert opinion or if he was actually found not to be

9    expert.  He said -- now, this is a part I find

10   troubling.  I think he said on page 74 that he

11   believes the consumer is the person who puts the

12   information in the all relevant information field of

13   the ACDV.  And that's a big problem because that's a

14   big issue in these cases.

15        He said he didn't know how a consumer creates

16   the ACDV.  He didn't know how a furnisher would open

17   and access an ACDV.  So all of those don't just

18   suggest general knowledge.  They suggest important

19   absence of knowledge on pivotal issues in the case.

20        And so being able to separate that out from

21   then being able to offer a consumer lending expertise

22   on XB codes and XH codes without saying why,

23   independent of your FCRA expertise or the ACDV

24   expertise, is a problem about how the report exists as

25   it is.  Because, you know, we just don't fly by the

1    seat of our pants in federal court.  As you know, we

2    require things in writing, and we have to follow the

3    rules.  And the reason is you want to be sure that

4    what Mr. Lynn can offer or anybody can offer is a good

5    use, a reliable, admissible use of information that

6    can aid the jury in its decision.

7              MR. SEARS:  Right.

8              THE COURT:  So I am telegraphing to you I am

9    struggling with not Mr. Lynn personally.  And, Mr.

10   Lynn, this has got to be so frustrating, and I want

11   you to know I'm sorry about that.  But it certainly is

12   not personal.  It is what I have to review for

13   purposes of the jury genuinely being aided under the

14   facts and the law of this particular case.

15             And I know how expert reports get created.  I

16   know deadlines are hard.  I know information flies

17   back and forth.  And so that happens with every single

18   lawyer, every single expert.  But I do the same thing

19   with, you know, the pediatrician who wants to testify

20   about a lung disease when they really don't know

21   anything about lungs and they know everything about

22   kids.

23             So I am telegraphing that to you.  I am going

24   to give you an opportunity to review anything else you

25   want me to consider, but I think we should take a

1    brief recess and then think about where we go next.

2         Now, I have a 2:00 hearing, and I'm telling

3    you that's going to be an uncomfortable one.  We could

4    take a 10-minute recess and start on the next bit.

5    I'm happy to take over again.  I want to hear from

6    you, either of you.  I think Mr. Bennett is objecting

7    to Mr. Lynn testifying right now.  Do you have a

8    position on that?  I'm talking to Mr. Sears.

9         MR. SEARS:  My understanding is that he

10   believes that we did not provide substantive response

11   to the arguments that he raised, and therefore I've

12   waived addressing any new evidence.  My response to

13   that is that we did provide a substantive response,

14   but I'm not going line for line in the deposition

15   because the deposition is what it is.  What I'm doing

16   is I'm going back to the basic, which is the

17   experience that he does have.  That this is fodder for

18   cross-examination, not for matter of exclusion, and it

19   doesn't take pages and pages to state that in

20   response.

21        So my point is that we have done that.  The

22   Court had given Mr. Lynn the opportunity to appear.

23   If the Court would like to hear something, we're more

24   than happy to put him on and provide further insight

25   into this.  But other than that, I do not agree that I

1  have waived any right to bring Mr. Lynn.  If the Court

2  could like to seek clarification on any issue, but I'm

3  also not going to insist upon it if the Court believes

4  that it can rule based upon the arguments that we have

5  now.

6        THE COURT:  Well, this is what I'm going to

7  do.  We're going to take a recess because I'm certain

8  that I have been very ungracious to our court

9  reporter, if nothing else.  And we're going to just

10 take a 10-minute recess.

11       If Mr. Lynn -- if you all agree that he's

12 going to testify, one issue is we do have him in the

13 room now.  And so, Mr. Bennett, your objection is on

14 the record.  I'll let you put on evidence.  I want it

15 to be short shrift evidence, though.  It can't be any

16 more than 10 or 15 minutes.  And it can be honed into

17 what we are saying today with the caveat that Mr.

18 Bennett says that's completely unfair.

19       And I'm going to be honest with you, I'm not

20 unsympathetic to that argument.  But I believe in

21 creating a full record, and it's really up to you and

22 to Mr. Bennett about how we want to go.

23       It's now one o'clock.  Am I right about that?

24 So we can take a recess to 1:15, and we can hear

25 evidence until quarter of two.  Then we're going to

1    take a longer recess for this other case, and then I

2    want to finish up later today.  I wish I could do

3    otherwise.  And I tried to schedule it.  It's a

4    criminal matter.  It has Speedy Trial issues, and

5    nobody was available except for today at two, and I

6    had to put it in because we have an early November

7    trial date.

8                 Does anybody object to that?

9                 MR. SEARS:  No objection, Your Honor.

10               MR. BENNETT:  Of course, I don't object.

11   Counsel may want this; the Court may want this; I know

12   the court reporter does not want this, but not because

13   I think it's insignificant, but because I think it's

14   well briefed that the plaintiff would be willing to

15   submit the summary judgment to the Court on papers or,

16   of course, argue.  I'm here for the duration.

17               THE COURT:  Okay.  Well, why don't we take a

18   10-minute recess regardless.  All right?  Because I

19   need a break.  So we'll take a recess until 1:15, and

20   we'll just be aware that whatever we do next, you all

21   talk among yourselves, as they say, and decide how

22   we're going to use the next really only half hour that

23   we have.  I'm not requiring that you put on Mr. Lynn

24   certainly.  That's up to you all.  All right?

25               MR. SEARS:  Okay.

1        THE COURT:  Good lawyers litigate their own

2   cases.  So we'll take a recess until 1:15.

3        (Recess taken.)

4        THE COURT:  All right.  So we have the

5   pending issue about the expert disclosure.  I'm really

6   leaving it up to you all whether we need any

7   testimony.  I'm certainly not requiring it.

8        MR. SEARS:  Your Honor, we would like to just

9   have some short testimony on a very limited issue.

10       THE COURT:  All right.

11       Your objection is noted, Mr. Bennett, just so

12  you know.

13       MR. BENNETT:  Thank you, Judge.

14       THE COURT:  Come on up, Mr. Lynn.

15

16   JAMES F. LYNN, called by the Defendant, first

17  being duly sworn, testified as follows:

18       MR. SEARS:  May I proceed, Your Honor?

19       THE COURT:  Yes, please.

20       MR. SEARS:  Thank you.

21

22   DIRECT EXAMINATION:

23  BY MR. SEARS:

24  Q    Would you please state your name for the record?

25  A    First name James, middle initial F., last name

1  Lynn, L-Y-N-N.

2  Q    Mr. Lynn, you have been designated as an expert in

3  this case on behalf of Credit One Bank; is that

4  correct?

5  A    Yes, I have.

6  Q    Mr. Lynn, have you prepared a report in this case?

7  A    Yes, I did.

8  Q    I don't have a witness copy to provide to you.  If

9  you'd like to see one, I could provide that to you,

10  but was that on or about July 7th of 2016?

11  A    Yes.

12  Q    Mr. Lynn, you've been here today during this

13  hearing and have heard the arguments of counsel and

14  the discussion with the Court, have you not?

15  A    Yes.

16  Q    You understand that with regard to your report

17  there are opinions related to FCRA investigations and

18  then opinions related to consumer lending; is that

19  correct?

20  A    That's correct.

21  Q    All right.  Mr. Lynn, I'm not going to ask you any

22  questions today regarding the FCRA experience that you

23  have.  I believe that has been fully developed and

24  analyzed on the record, but I am going to ask you

25  about your qualifications to provide an opinion on

1  issues relating to consumer lending.  Okay?

2  A   All right.

3  Q   One of the opinions that you offer in this case

4  has to do with the XB versus XH --

5          THE COURT:  Why don't you -- all right.  Go

6  ahead.

7  Q   -- XH issues raised by the plaintiff.  Is that an

8  issue that invokes the subject matter of consumer

9  lending?

10 A   Yes.

11 Q   And the opinion in your report also has two

12 paragraphs dealing with an investigation that produces

13 incomplete, inaccurate or potentially misleading

14 information on a credit report.  Does that have to do

15 with consumer lending as well?

16 A   Yes.

17 Q   So let me ask you, first of all, can you please

18 explain how these issues or these opinions relate to

19 consumer lending?

20 A   As a user of consumer credit reports, a lender

21 using consumer credit reports, whether it is a

22 commercial lender or a consumer lender you are

23 evaluating the credit worthiness of your prospective

24 borrower or your existing borrower and analyzing their

25 credit report.  A personal credit report is integral

1   to that process.  And what is on that credit report,

2   obviously, you like to see very little derogatory

3   information and more favorable or acceptable

4   information.  But if it is derogatory, you're trying

5   to evaluate the significance of it, how it impacts

6   your decision as to whether to proceed with a loan or

7   restructure an existing loan or whatever.  So that's

8   basically how it's significant and important.

9   Q   And how does XB versus XH designation for the

10  condition compliance code factor into that?

11  A   XH means it's a matter that was in dispute.  It's

12  now a closed matter.  It's concluded so it has more

13  definition to it.  XB is a matter that is an open

14  issue, and so you're looking at it and saying, well,

15  which way -- it depends on the significance of the

16  amount that's outstanding.

17      If it's an account that has a 100-dollar balance,

18  that's one thing.  If it's your mortgage balance and

19  your mortgage loan, that's another thing.  So to an

20  extent, it's a matter of perspective as to its

21  importance.

22  Q   Mr. Lynn, what specialized knowledge do you

23  possess with regard to the consumer-lending aspects of

24  the opinions that you've offered with regard to

25  accurate information, misleading information, or

1   designation of an XB or XH as a condition compliance

2   code?

3   A    I didn't quite hear.

4   Q    My question is:  With regard to your opinions that

5   pertain to consumer lending, what specialized

6   knowledge do you possess in that subject area of

7   consumer lending?

8   A    As testified before, as has been discussed this

9   morning, I've taught a consumer lending program about

10  15 times.  And, frankly, a lot of that teaching was

11  prior to the time I became an expert.  And what I

12  didn't know when I became an expert is that the

13  preponderance of the work that I ended up doing was on

14  consumer lending rather than commercial lending.  So

15  it was really instructive for me, not from the actual

16  lending principles themselves, I knew that, but the

17  regulatory issues that impact lending and having a

18  depth and breath of knowledge about them.

19  Q    Okay.  So let me just focus on your experience

20  with regard to actual lending issues aside from the

21  course.  Could you please explain specifically what

22  experience, knowledge, education, or training you have

23  with regard to reading and reviewing consumer reports

24  for the purpose of lending?

25  A    Okay.  For several years, about nine years, I

1   worked as a consultant to Citizens and Farmers Bank,

2   which is headquartered in West Point, Virginia.   I did

3   teach the consumer-lending course there several times.

4   I taught commercial-lending courses there several

5   times.

6       I also reviewed the loan portfolio on an ongoing

7   basis for all nine years, and the portfolio had

8   consumer loans in it and it had commercial loans in

9   it, but there was a significant amount of consumer

10  loans.   Within those consumer loan files, you had

11  consumer credit reports.   You were looking at the

12  consumer credit report and you would be looking at an

13  existing loan that was originated perhaps four to six

14  months before you looked at it, and you'd see some

15  issues on a consumer credit report, and you'd like to

16  know, well, what happened.   So I could ask a person at

17  the bank if they could run another copy of that

18  consumer credit report so I could see whether the

19  situation that was an issue at the time of origination

20  has been resolved or whether it hasn't.

21      So they're the kind of things that you use them

22  for, analytical purposes, to determine what your level

23  of risk is with respect to any type of credit you're

24  working with.

25  Q   Approximately, in your entire career,

 1   approximately how many times have you looked at a

 2   consumer report in either a commercial or consumer

 3   retail loan situation, if you're able to estimate?

 4   A    I'm clearly into four figures.  Several thousand.

 5   When I say several, it's not over 5,000, but 2-,

 6   3,000.   It's hard to say because I've been doing this

 7   for a long time and have seen a lot of credit and a

 8   lot of iterations, but it's a high number.  Let me put

 9   it that way.

10   Q    With regard to the list of cases that have been

11   attached to your report, and we have discussed at your

12   deposition that there's only a few of those where you

13   have been designated as an expert with regard to ACDV

14   investigations, how many of those cases are cases

15   where you were designated as an expert on consumer

16   lending issues?

17   A    I would say 90 percent of the cases that I worked

18   on were consumer lending loans and most were mortgage

19   loans.   And in each one of them, you always had a

20   credit report and origination documents in addition.

21   Q    All right.  Have you been recognized and admitted

22   as an expert in the area of consumer lending with

23   regard to loan origination issues where you would

24   review or was asked to opine with regard to a review

25   of a credit report?

1  A    Yes.

2  Q    Okay.  When was the last time you were so

3  designated and admitted?

4  A    It was 11 days ago.  I was in federal court in

5  Brooklyn, New York, on a mortgage case, and I

6  testified for three hours on Friday morning into

7  afternoon on it.

8  Q    Mr. Lynn, with regard to the opinions that you

9  offer in your report with regard to consumer lending,

10  on the first page of your report there's a statement

11  that says, "All of my opinions are based not only on

12  my training and experience in consumer and commercial

13  lending, but also my knowledge of the various federal,

14  state, consumer protection laws and regulations that

15  govern" --

16        THE COURT:  I'm just going to ask you, as you

17  read, you're going really fast, and Ms. Daffron has to

18  type.  Everybody does that.  So just slow it down,

19  please.

20        MR. SEARS:  All right.

21  BY MR. SEARS:

22  Q    Mr. Lynn, on the first page of your report you

23  have this statement, "All of my opinions are based not

24  only on my training and experience with consumer and

25  commercial lending, but also on my knowledge of the

1   various federal and state consumer protection laws and

2   regulations that govern consumer lending practices,

3   policies and procedures."

4        Now, that statement with regard to the opinions

5   expressed, would that apply to the opinions that you

6   expressed with regard to the consumer-lending issues

7   that we just talked about?

8   A    In this particular case?

9   Q    Yes.

10  A    Yes.

11  Q    In rendering your opinions with regard to whether

12  or not there was a statement or item that was

13  incomplete or inaccurate or misleading, what did you

14  do to reach that opinion?

15  A    I'm sorry?

16  Q    What was the process you used to reach the

17  determination that the investigation did not result in

18  something that should have uncovered something that

19  was misleading, inaccurate or incomplete?

20  A    I looked at the ACDV in each case and looked at

21  what the Credit One Bank person did, and how they

22  reported it, and so forth, and it was verifying what

23  amounts to factual information.

24  Q    With regard to XB versus XH designation, how did

25  you reach the conclusion that the XH was appropriate

1    to use during the time period that is the subject of

2    the complaint?

3    A    They stated that, by their signature, that they

4    had resolved all the issues that were outstanding.  I

5    could see that that's what it was in reading the

6    report, and it was their conclusion that the matter

7    was resolved and closed, and I could see how they

8    reached that conclusion and agreed with it.

9    Q    All right.

10                  MR. SEARS:   Thank you.

11

12        CROSS-EXAMINATION

13   BY MR. BENNETT:

14   Q    How are you, Mr. Lynn?

15   A    Hi.

16   Q    So we've heard conversation about the XB and the

17   XH code.  And if you can make sure I understand and

18   the Court understands this, is it your testimony that

19   while you were a commercial lending officer at

20   Merrill, you become familiar with the use of the XB or

21   the XH code?

22   A    First, it's Maryland National Bank.  So I'll just

23   clarify for the record.  And I did not become familiar

24   with it while I was at Maryland National Bank.

25   Q    In fact, you had never heard of an XB or an XH

1  code while you were at Merrill National Bank because

2  there was no XB or XH code in existence at that time?

3  A    That is my recollection.

4  Q    Well, you wouldn't have known that.

5  A    Well, the credit reports were different at that

6  time.  They didn't have FICO scores and so forth when

7  I was there.

8  Q    In fact, when you were there, this was 1993?

9  A    From March 1 of 1982 to January 31 of 1993.

10  Q    And the only thing that you would have observed

11  would have been the end user version, right?  A dumbed

12  down version that they print out for humans to read?

13  A    Or that are printed internally for the banker to

14  read, yes.

15  Q    They wouldn't have had Metro 2 coding?  You don't

16  know Metro 2 coding?

17  A    I know what it is, but I can't tell you whether it

18  had that formatting at that time.  I just don't know.

19  Q    But did you know what Metro 2 coding was when I

20  took your deposition?

21  A    I can't recall my answer.  I knew it had something

22  to do with formatting information that was presented.

23  It was a language, in fact.

24  Q    Well, have you read the CDIA manual that details

25  one thing, which is what Metro 2 code is?

1    A    I didn't focus in on it.

2    Q    Are you aware that the CDIA manual states what the

3    Metro 2 fields and values are and what they're to be

4    used for?

5    A    Yes.

6    Q    And so you're aware that XB and XH are Metro code

7    values for what field?  How about that?  What field do

8    you understand the XB code to be a value for?

9    A    I don't know.  I can't answer that.  I just know

10   what -- the interpretation of the code itself rather

11   than the formatting of how it's presented.

12   Q    Right.  So you're not familiar with what's called

13   the compliance condition code or CCC field that's in

14   the ACDV --

15   A    I know what it is, and I know that's where the

16   codes go.  There are several different codes.  I'm

17   going to guess there are about 10 of them.  They all

18   have standard definitions to them.  We just talked

19   about two; XB and XH.

20   Q    In fact, you know that because you learned it by

21   reading the documents that the defendant gave you in

22   this very case, right?

23   A    I've had cases before, but I can't recall whether

24   those were issues and whether I had exposure to those

25   codes.  That's what I'm saying.

LYNN - CROSS                    107

1    Q    You testified about the impact of an XB code, that

2    that was something you derived because of your years

3    of experience reading reports, right?

4    A    Yes.

5    Q    When I asked you in your deposition, "So where did

6    you come up with that belief that an XB code blocks

7    scoring if the dispute does not block scoring as to

8    components of the trade line that are not subject to

9    the dispute?"  You do you remember what answer you

10   gave this last August?

11   A    No.

12   Q    You said, "I believe it was Bankers Online."  Does

13   that refresh your memory?

14   A    It's a source that is out there.  It's a credible

15   source to be used for information.

16   Q    When I said in August 31st or, I'm sorry, whenever

17   in August, at the deposition --

18   A    The 25th.

19   Q    When I said, "And when did you check Bankers

20   Online?" do you recall what answer you gave?

21   A    No, I don't.

22   Q    It said, "It was within the last couple of days."

23   And that would be truthful.  You weren't lying during

24   your deposition, right?

25   A    No, I'm not saying that I didn't say it at

1   sometime previous in other cases.  I simply can't

2   recall whether I did or I didn't.  You go back to

3   refresh your memory and look for sources to illuminate

4   the particular issue at hand.

5   Q    Now, you understand that even if you were working

6   at Merrill National Bank --

7   A    Maryland.  The state of Maryland.

8   Q    Maryland?  Okay.  So if you were working at

9   Maryland National Bank today as a commercial banker --

10           THE COURT:  Let me be clear.  Doesn't the

11   deposition say "Merrill"?

12           MR. BENNETT:  It does.

13           THE COURT:  So the deposition is entirely

14   wrong.  It says, "Merrill."

15           MR. BENNETT:  Correct.  In fact, Judge, my

16   initial briefing, when we were doing drafting, I said

17   "Maryland," and we corrected it because of the

18   deposition.

19           THE COURT:  I want to be clear, Mr. Sears.

20   Is it Merrill or Maryland?  I have a deposition that

21   says "Merrill."

22           THE WITNESS:  I can be helpful here.  It is

23   Maryland, the state of Maryland, spelled the same way.

24   That is the name of the bank.  I worked there for 11

25   years.  It's Maryland National Bank.

1      THE COURT:  All right.  Well, somebody should

2  read the depositions and fix them.

3      THE WITNESS:  It is now part of Bank of

4  America.  I think you were going in that direction.

5  Just for clarity.

6  BY MR. BENNETT:

7  Q   But you didn't fill out an errata sheet.  You had

8  an opportunity to make any corrections to your

9  transcript, right?

10  A   No, I didn't fill one out.

11  Q   Now, you would have -- even if you were at Bank of

12  America today, you understand, you may not know, but

13  that you would not, as a commercial lender, ever see

14  XB or XH, I'm doing air quotes around those, you

15  wouldn't see those?

16  A   I don't know.  I'm not there.  So I simply can't

17  answer.

18  Q   Do you know if any bank version of the credit

19  reports or the bank version of credit reports for any

20  year from 1993 to the present would have included XB

21  or XH coding?

22  A   Again, I can't recall.

23  Q   Your explanation of XH code that is in your

24  report, you took out of the CDIA manual that Mr. Sears

25  gave you in this case?

1   A    That's correct.

2   Q    Not out of your own expert memory, right?

3   A    Yes.  I'd like to clarify one point.

4            MR. BENNETT:  I'd object, Your Honor.

5            THE COURT:  You'll have redirect.

6   BY MR. BENNETT:

7   Q    I'm sorry.  Let me just be respectful.  What point

8   would you like to clarify?

9   A    A lot of times we do not focus on the XB or XH,

10  but you focus on the description, account currently in

11  dispute or account was in dispute now settled.  So

12  you're looking at the verbiage that describes the

13  account rather than the actual code.

14  Q    Well, you understand you're under oath being

15  examined by somebody who knows what those codes mean,

16  right?

17  A    Yes.

18  Q    You are not representing to the Court you have a

19  belief that an XB code translates to any particular

20  text in the end user report, are you?

21  A    No.  It's an interpretation by the end user, such

22  as a lender such as myself, looking at a credit report

23  in its totality and looking at notations where an

24  account may be in dispute and is still in dispute or

25  an account that was in dispute and it has been

1  resolved.   That's a qualitative judgment that you make

2  in the evaluation of the credit capacity of an

3  individual.

4  Q    Let me make sure we understand each other.   You

5  understand that when a credit furnisher reports data

6  to credit reporting agencies, it uses a particular

7  code?

8  A    That's correct.

9  Q    You learned in your deposition that that's called

10  Metro 2 code, right?

11  A    Yes.

12  Q    And that Metro 2 code would include a field that

13  would include a dispute status like XB or XH or any

14  others?

15  A    Yes.

16  Q    Now, you cannot testify, you certainly won't

17  represent yourself as an expert to testify, that you

18  know how the credit reporting agencies convert,

19  translate and output the information they receive with

20  an XB or an XH or other dispute code?

21  A    No, I just know what the end user -- what I see in

22  an end user report and what that information states.

23  Q    But you don't know how you got there?   You don't

24  have any expert knowledge to know if there's an XB

25  code, then what happens, right?

LYNN - CROSS                    112

1    A    I don't follow you.

2    Q    Well, you don't have any knowledge as to whether a

3    credit reporting agency even furnishes an XB code?

4    A    I just know what I read on the final statement.

5    That's what I'm saying.

6              THE COURT:  No, that wasn't his question.

7              THE WITNESS:  I'm sorry?

8              THE COURT:  His question was:  Do you know if

9    every furnisher uses XB?

10             Was that your question?

11             MR. BENNETT:  It wasn't, respectfully, Judge.

12             THE COURT:  Okay.  Good.

13             MR. BENNETT:  Obviously, my question is not

14   working here.

15   BY MR. BENNETT:

16   Q    You know what an end user report looks like

17   because that's the only part of this credit reporting

18   question that you have used, right?

19   A    Yes.

20   Q    You don't know how you get or what happens when

21   there's an XB code or an XH code to get to whatever is

22   in an end user report, right?

23   A    Right.  It just has the statement, the descriptive

24   statement of what it is.  That's my experience in

25   looking at these credit reports when I was working at

1    Citizens and Farmers Bank and when I've been a

2    consultant at other banks.  That's what I'm saying to

3    you.  And you take that information along with all the

4    other information and data and so forth in a credit

5    report and make a judgment as to the credit worthiness

6    of a person whose credit report you're looking at.

7    Q    Let me try it this way:  You understand or you

8    have learned as part of this process that if the

9    defendant had reported Mr. Wood's account with an XB

10   dispute status, meaning he has made a dispute under

11   the Fair Credit Reporting Act, you understand that

12   that account would not have hurt his credit score.

13   You've learned that, right?

14   A    That's my understanding.

15   Q    Okay.  So you're not offering any expert testimony

16   to suggest what the proper way to report a dispute

17   code is, not as a consumer-lending expert, right?

18   A    I'm just talking as an end user of a consumer

19   report.

20   Q    All right.  So if you saw a report that noted an

21   account as disputed, that would not hurt a consumer's

22   credit file, right?

23   A    No, it's noted.  It's information.

24   Q    Okay.  But you're not offering yourself as an

25   expert to testify about when it is proper or improper

1  to use one dispute status code over another?

2  A   I just evaluate it when I looked at the ACDV, saw

3  that they could come to a conclusion, saw how they did

4  it, and opined accordingly.

5  Q   Mr. Lynn, Mr. Sears has divided your supposed

6  expertise into these two categories, those two

7  buckets, and we're talking now about consumer lending.

8  Your consumer-lending expertise you offer relates to

9  how you read end user reports, right?

10 A   That's correct.

11 Q   You're not suggesting that your consumer-lending

12 expertise makes you an expert on when it is correct or

13 incorrect to use a particular X code?

14 A   I just understand how it was arrived at.

15 Q   All right.  And the --

16         THE COURT:  What does that mean?  "I just

17 understand how it was arrived at."

18         THE WITNESS:  How -- I look at the code that

19 was assigned.  I look at what the analyst did, the

20 information they confirmed, and so forth, or

21 information they changed.  So their obligation is to

22 either correct it, delete it, or leave it alone if

23 it's accurate.  So they've gone through the entire

24 ACDV and have made, by their own investigation, have

25 looked at it, reviewed it, used whatever sources of

1    information that they have, and came to a

2    determination.   I could understand what they did and

3    how they did it.

4    Q    You're not suggesting you're an expert to testify

5    about whether it was -- whether the defendant complied

6    with industry standards in how they used one X code

7    versus another?

8    A    I saw the XH code.   I saw what it meant.   I saw

9    what they did.   And I understood what the logic of

10   their reasoning was.

11   Q    So what you're saying is you read the ACDV dispute

12   document of Mr. Wood's dispute that Mr. Sears gave

13   you?

14   A    Yes.

15   Q    You compared that to the glossary in the CDIA

16   manual that Mr. Sears gave you?

17   A    Yes.

18   Q    And you read the deposition of the defendant's

19   employee defending itself, right?

20   A    Yes.

21   Q    And then that's how you reached your conclusion?

22   A    And I also had that in the Credit One Bank policy

23   manuals and other manuals.   So it's the same

24   information.   So I understood how they did it.

25   Q    Mr. Lynn, we're having the same problem we had at

1  your deposition, and we're going to be well past the

2  time.

3           MR. BENNETT:   And, Your Honor, I apologize.

4  BY MR. BENNETT:

5  Q   If I could continue this after the hearing.   But

6  I'm trying to understand why you believe you're an

7  expert.   I'm not asking whether or not you read the

8  documents Mr. Sears gave you to read because I assume

9  you're an excellent reader.   You are a good reader,

10 right?

11          MR. SEARS:   Objection, Your Honor.

12 Argumentative.

13          THE COURT:   So I'm going to overrule this.

14 He used a phrase, "industry standard," so I'm

15 overruling your objection.

16          MR. SEARS:   Okay.

17          THE COURT:   So I need to understand from you,

18 sir, what is your baseline, what's the industry

19 standard, and can you articulate it to me?   Not what

20 happened here.   He's asking you what industry standard

21 did you use.   And you're saying, Well, I looked at the

22 Credit One Bank manuals.

23          THE WITNESS:   It's defined.

24          THE COURT:   Okay.   So say it.

25          THE WITNESS:   Okay.   It's defined.   There's a

LYNN - CROSS                    117

1   definition for XH.  There's a definition for XB.

2           THE COURT:  So that's not the question.

3   Something defines it as XH and XB.

4           THE WITNESS:  Right.

5           THE COURT:  What?  What defines it?

6           THE WITNESS:  Again, it's the analyst looking

7   at it.

8           THE COURT:  No, no, no.  What defines XB and

9   XH in a manner that sets an industry standard?  So no

10  matter who is looking, not that analyst, not the two

11  analysts here, some analyst in California.  So if

12  someone in California is looking at XH and they do

13  something that means they deviated from what could

14  possibly be an XH, what defines what they're deviating

15  from?

16          THE WITNESS:  I don't know if I can answer

17  that.

18          THE COURT:  Well --

19          THE WITNESS:  Most analysts that are looking

20  at this, regardless of the institution they are

21  working for, they are looking at the same data.  They

22  are experiencing this.  It's objective data.  They

23  should come to the same conclusion.  They're looking

24  at verifying a name, verifying an address, verifying a

25  Social Security number, verifying a date of birth,

 1   verifying payment information.  It's objective data.

 2            If they have a difference with it, that's in

 3   their system.  Now, you could have differences at

 4   different points in time.  But if the same two people

 5   were looking at the same information, they should come

 6   to the same conclusion is what I'm saying.

 7            THE COURT:  The question is:  What defines

 8   what is a proper verification?

 9            THE WITNESS:  They looked at every line of

10   inquiry that they were supposed to look at and review

11   and evaluate.  They've come to a conclusion whether it

12   was accurate or inaccurate.

13            THE COURT:  No, no.

14            THE WITNESS:  I'm sorry.

15            THE COURT:  How do they come to the

16   conclusion?

17            THE WITNESS:  It's objective data.

18            THE COURT:  If I look up on Google Maps and

19   there's somebody who's named Jane Doe, and Google Maps

20   says to me, or Zillow says, "Jane Doe lives here."

21            THE WITNESS:  There are rules for that.

22   There are rules in the manual that explain that.

23            THE COURT:  Which manual?

24            THE WITNESS:  I think it's in the CDIA

25   manual.  And I think it was also carried forward to

1   the Credit One Bank manual.  I remember reading that.

2   They were the exact same point.  If the name is

3   slightly different or it didn't include a junior or a

4   senior or something like that, how do you deal with

5   that?  So there are rules describing what you should

6   do and how you should do it.

7   BY MR. BENNETT:

8   Q   Are you testifying under oath that there is

9   anything, a sentence or more, in the CDIA manual about

10  how to verify substantive information in a credit

11  dispute?

12  A   What do you mean by substantive?

13  Q   Is there anything in the CDIA manual about how to

14  conduct a proper reinvestigation?

15  A   I don't have the CDIA manual in front of me.  My

16  recollection is that, as I've just described for the

17  Court, that there are rules on how to evaluate certain

18  information that is slightly different.

19      If everyone sees the same name, John Smith, they

20  should come to the same conclusion.  If it has a

21  middle initial or something, that's another issue.

22          MR. BENNETT:  I object.  It's not responsive

23  to the question.

24          THE COURT:  We're done.  We're done with that

25  line of questioning.

LYNN - CROSS                    120

1  BY MR. BENNETT:

2  Q    Now, any of this knowledge of which you've just

3  opined about following the right instructions in

4  whatever manual may have it, you admit that anyone

5  capable of reading those manuals could reach the same

6  conclusion that you now offer, right?

7  A    They should, yes.

8  Q    Now, you testified on direct about what is this?

9  Citizens something?

10 A    Citizens and Farmers Bank.  It is headquartered in

11 West Point, Virginia.

12 Q    You actually wrote your C.V. and bio and expert

13 witness report in this case yourself, right?

14 A    That's correct.

15 Q    And, of course, you sat through an excruciatingly

16 long deposition where I asked you questions repeatedly

17 about why you believed you had any knowledge about

18 what the rest of the banking world did, right?

19 A    Yes.

20 Q    And you have never until today mentioned that bank

21 in either your deposition or in your C.V. and expert

22 witness credentials, correct?

23 A    I believe that is correct.

24 Q    Now, when I asked you in your deposition -- by the

25 way, when we started discussing the CDIA in your

LYNN - CROSS                           121

1    deposition, do you recall you weren't even sure what

2    the CDIA was, right?

3    A    I can't recall.

4    Q    And you testified that as well today that you

5    taught 15 times you taught courses in consumer-lending

6    program, correct?

7    A    Yes.

8    Q    But in your deposition when I asked you, "You

9    don't know what materials that would have regarded a

10   furnisher's obligation to conduct a dispute under

11   1681S-2B you might have had access to?" the best you

12   could answer was you didn't recall because it's been a

13   long time, right?

14   A    Yes.

15   Q    You are not suggesting to the Court that you

16   learned in the 15 opportunities to teach industry

17   employees, you're not here representing to the Court

18   that you can testify under oath that you gained any

19   knowledge about a furnisher's credit reporting

20   obligations or fair credit reporting obligations as

21   part of that process, right?

22   A    Again, I --

23          MR. SEARS:  If I may object.  It goes beyond

24   the direct examination.  He's getting into the

25   qualifications regarding ACDV investigations.  The

1  direct examination was just dealing with consumer

2  lending.

3          MR. BENNETT:  I don't have other questions,

4  Judge.

5          Thank you, Mr. Lynn.

6          THE WITNESS:  You're welcome.

7          THE COURT:  Do you have any redirect?

8          MR. SEARS:  I don't have anything, Your

9  Honor.

10          THE COURT:  Mr. Lynn, I'm just going to ask

11  you one question so the record is clear.

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  I'm going to look at one document

14  before I do.  I'm sorry.

15          I don't see any reference to this Citizen and

16  Farmers Bank in West Point.  What was your role there?

17          THE WITNESS:  The bank?

18          THE COURT:  Yes.

19          THE WITNESS:  Citizens and Farmers Bank.

20          THE COURT:  Okay.  In West Point?

21          THE WITNESS:  It is located in -- its

22  headquarters are in West Point.  I think that's a

23  technical point now because they've moved all of their

24  executive offices out to Toano, and that happened

25  about 10 years ago.  But I think technically the

1   stated headquarters of the bank is still in West

2   Point.

3            THE COURT:  And what was your role there?

4            THE WITNESS:  I'm sorry?

5            THE COURT:  Your role there.

6            THE WITNESS:  I was consultant to the bank

7   for nine years.  I did what is known as credit review.

8   Credit review is examining loans that have been booked

9   and other related loans to an existing borrower, to

10  evaluate the quality of the underwriting, and the

11  adequacy of the cash flow and other qualitative

12  measures, and assess the risk that's inherent in the

13  credit relationship itself.  I did that.

14           I taught the consumer lending course.  I also

15  taught a commercial lending course there.  I wrote

16  their -- drafted, I should say, their commercial and

17  consumer lending policy.  That was back in 2001.

18           I set up their, what we call, watch

19  committee, which is a process to -- it dedicates

20  special attention to what are known as special assets,

21  which are troubled loans and protocols to monitor and

22  assess such credits on an ongoing basis.  I did that

23  for them.

24           That's probably about it.  The ongoing task

25  was really the credit review I just described.  I did

1   that all nine years.

2           THE COURT:  What were the nine years?

3           THE WITNESS:  From January 1 of 2000 to

4   December 31st of 2008.

5           THE COURT:  All right.  I just want to be

6   clear.  It's not the case that you know any of our

7   affiants from West Point, is it?  Sergeant Woodson?

8           THE WITNESS:  No, I don't know any of them.

9   I don't know the plaintiff and I haven't discussed it

10  with anybody at the bank.

11          THE COURT:  All right.  That's all I have.

12          MR. SEARS:  Thank you, Your Honor.

13          THE COURT:  Thank you, sir.  I appreciate

14  your time.

15          (The witness was excused from the witness

16  stand.)

17          MR. SEARS:  Your Honor, I don't have anything

18  further on this particular motion unless the Court has

19  any further inquiry.

20          And just for the record, I concur with

21  plaintiffs' counsel suggestion.  I have no objection

22  to the Court ruling on the cross motion for summary

23  judgment on the briefing unless the Court would like

24  an oral one.

25          THE COURT:  All right.

1          MR. BENNETT:  Your Honor, the only -- with

2    respect to -- we talked a long time about Mr. Lynn,

3    but just for the record, as my reply or rebuttal, if I

4    could just note the Court, direct the Court -- of

5    course, the Court has obviously read the transcript,

6    but I floundered looking for where the discussion of

7    industry standard was concentrated.  I found that,

8    which starts at page 123 and continues for at least

9    the next two pages, through 125, with me attempting to

10   discern the industry standard.  That is where I

11   discussed it expressly.  Previously, I just said,

12   Here's the index with the word industry.  Otherwise, I

13   agree with counsel that we're certainly glad to argue

14   summary judgment, but also glad to have the Court

15   decide it on the briefing.

16         THE COURT:  All right.  Well, I am also glad

17   to decide it on the papers, but let me just review and

18   make sure I didn't have any questions.  I want to be

19   sure I asked you all.

20         I do want to ask a couple of questions.  I'll

21   try to be brief for everybody's sake.

22         Mr. Bennett, can you approach, please?

23         MR. BENNETT:  Yes, Judge.

24         THE COURT:  I want to be sure I understand

25   your argument and your motion for summary judgment.

1   You're seeking summary judgment on three issues,

2   correct?

3           MR. BENNETT:  Yes, Your Honor, and you could

4   see that based on our numbering; one, two and four.

5           THE COURT:  I saw that.  But I would never

6   have raised it.

7           So the issue I want to make sure of is what

8   relief are you seeking?  So you say it's a partial

9   motion for summary judgment.

10          MR. BENNETT:  Yes, Judge.

11          THE COURT:  Are you seeking dismissal of any

12  counts?  What you do you want?

13          MR. BENNETT:  Yes, Judge.  So the first --

14  the accuracy is, we think, critical and strategically

15  the most important from our perspective because we

16  want to make sure there's no jury nullification,

17  familial identity theft where people blame the victim

18  because in was the, in this case, the estranged

19  mother, is always difficult.

20          In the *Alvaran* case, for example, before

21  Judge Dohnal --

22          THE COURT:  That's A-l-v-a-r-a-n?

23          MR. BENNETT:  Yes, Your Honor.

24          THE COURT:  That is a Judge Dohnal case.

25          MR. BENNETT:  A Judge Dohnal by consent.  And

1   in that case, our similar concern was that we had a

2   husband or ex-husband and the then ex-wife had used

3   the credit card, opened it and used it in the

4   husband's -- during the marriage.  And, similarly, in

5   the *Mullins* case, which I don't know that we cite, the

6   *Mullins v. TransUnion* case, was a case before Judge

7   Payne where, again, it was the wife using the

8   husband's account as an authorized user card.  And

9   it's those where the defense strategy is to blame the

10  victim or to suggest that there's something sneaky

11  when, as lawyers, and with a court of law the law of

12  whether or not the consumer is obligated is set by

13  what the consumer did.

14        Here there is no dispute about the following

15  facts.  Well, let me finish answering your question.

16  So with respect to accuracy, we are asking partial

17  summary judgment, for the Court to find that the

18  defendant's credit reporting that said that Mr. Wood

19  owed, opened, and used this account was inaccurate.

20        The defendant acknowledges that's the very

21  first element of a Fair Credit Reporting Act case like

22  this one.  So the jury should not be tasked with

23  deciding whether our client was the applicant who was

24  contractually obligated by some

25  hey-you're-related-to-the-mother theory.

1        So the evidence here is undisputed, and I

2   mean undisputed.  You've read the defendant's brief.

3   And I'd qualify it if there's two sides.  There is no

4   dispute that there's not a piece of paper ever signed

5   by my client.  There is no dispute that there's not a

6   charge that my client made or that the defendant could

7   have any proof at all that my client made.

8        There is no dispute that the post office box

9   at which the mail was sent belonged to the estranged

10  mother.  The family received mail there, but it was

11  not our client's.  There's no factual dispute of those

12  things.  There's no factual dispute that the defendant

13  has no documentary evidence at all that connects our

14  client to any charge, to the application, to any

15  payment.

16        In *Alvaran*, the consumer victim actually had

17  made the payments, same with *Mullins*.  Here it's even

18  clearer.  There is no evidence of that at all.  And

19  we've been in discovery with a summary judgment

20  exchange here that has --

21        THE COURT:  Well, okay.  So I think I

22  understand that.  And so one issue is, I know there's

23  this issue about somebody calling and checking in,

24  the voice didn't match, and you all continuing to

25  brief it saying it's a woman, and there's really no

1    evidence that it's a woman.  It's just that the voice

2    doesn't match.  I get that.

3           What is the upshot of that?  It becomes an

4    instruction to the jury?  What are you saying?

5           MR. BENNETT:  Yes, Your Honor.  So, for

6    example, the *Mullins* case, the way it played out is

7    Judge Payne issued a short one -- sometimes courts

8    spend a lot of time on summary judgment and sometimes

9    they say it's just a big mess of facts.  I'll leave it

10   to the jury.  Judge Payne is very meticulous, as you

11   know, but in this instance it was more the latter.

12          Then we got to the jury trial and these facts

13   arose.  So Judge Payne had to provide a jury

14   instruction to the jury that said, "I am instructing

15   you that the information is inaccurate."  And you did

16   that by motions in limine practice.  So that we did it

17   twice.  We didn't succeed at summary judgment.  We

18   didn't have a ruling against us.  There was no ruling.

19   But then on the motions in limine battle at the final

20   pretrial Judge Payne said, All right.  What are

21   your -- defendant, what basis do you have to conclude

22   that the plaintiff was liable or that the reporting

23   was accurate?  There wasn't any.  It was the same as

24   here.  And he then provided that instruction and

25   barred the defendant from arguing that that's so.

130

1        Now, this process is, I think, the stronger,
2   I mean, the proper one.  It's a summary judgment
3   question of accuracy.  You have all the paper that --
4   almost a year of litigation or more of litigation have
5   offered, and at this stage, given that you have a
6   Virginia Code and federal law --
7        THE COURT:  What's with this about this
8   contract bury?  I've never seen a contract bury in a
9   FCRA case.  This is brand new to me.  What case has
10  ever applied that?
11       MR. BENNETT:  Well, the question is -- here's
12  how we -- well, we cited --
13       THE COURT:  You cited non-FCRA cases for
14  general contract principles, and that it was a
15  unilateral contract.
16       MR. BENNETT:  What we're left with -- I mean,
17  we do have the Virginia Code on credit cards and the
18  Federal Code on credit cards that both say that mere
19  use of an account doesn't subject a consumer to
20  liability.
21       THE COURT:  Right.  I got that.
22       MR. BENNETT:  But the contract theory, I'm
23  not -- it's not on my list of arguments to make, but
24  it seemed like a good one to leave in there.  I'm
25  gathering it won't in our attempt to get 30 pages or

1    less, but next time around.

2          I will say that with respect to -- the

3    challenge that we face like this or any identity theft

4    victim faces is proving a negative.  And in the

5    Johnson case where it all began, for me anyway, the

6    actual argument that my opponent made at trial was

7    it's not our, MBNA Bank's at that point, obligation to

8    prove that you owed it.  It's your obligation to prove

9    that you didn't, which proving that negative is

10   challenging.

11         That's not, of course, the law because the

12   defendant is making affirmative reporting.  We have a

13   declaration from Mr. Wood that says, "I didn't open,

14   use or authorize the account," and that should be the

15   end of it unless there's some factual basis to say Mr.

16   Wood's declaration is wrong.  Here's a credit card

17   slip with his signature on it.  Here's an application.

18   It was an Internet online application, Judge.  And so

19   there's no evidence, zero, nothing.  There's not a

20   statement by him in their account notes that says,

21   Yeah, it's my account.  There's nothing.  Zero.  Zero

22   point zero zero.

23         This is not a matter of arguing that there is

24   --

25               THE COURT:  All right.  I think I get the

1 | point.

2 |         MR. BENNETT:  All right.  And it's critical

3 | because the defendant's strategy has been to blame the

4 | victim.  Even the attempt to use the Woodson

5 | declaration is to say, Well, she didn't believe that

6 | he didn't open the account.  And what purpose would

7 | that offer?  The defendant would suggest to a jury, So

8 | you shouldn't believe that.  Even though there is no

9 | evidence to the contrary.

10 |         It would strain our ability to bring cases

11 | here if we brought a case where somebody actually just

12 | opened the account and we didn't vet it.  I mean, this

13 | gentleman did not open the account.  We have litigated

14 | that to no end.  And there's no evidence to the

15 | contrary.

16 |         THE COURT:  All right.  So there are others

17 | that are bringing that, and then you're saying failure

18 | to conduct reasonable investigation, failure to

19 | truthfully report the results.  Those are the other

20 | two bases, correct?

21 |         MR. BENNETT:  Correct, Your Honor.

22 |         THE COURT:  Are you trying to get any counts

23 | dismissed?

24 |         MR. BENNETT:  We are trying to have the Court

25 | find as a matter of law the defendant did not

1    report -- did not conduct an investigation.

2            THE COURT:  Which counts do they go to?  You

3    have three counts; Six, Seven and Eight.

4            MR. BENNETT:  Yes, Judge.  Count Six, Your

5    Honor, is what I would call the Johnson or

6    investigation count, which is the defendant conducted

7    absolutely no investigation at all.  Johnson said,

8    This is what -- define investigation.  You have two

9    words.  And the one where it's a tougher time for us

10   on summary judgment is if we're having a battle about

11   what is reasonable because that's so fact based,

12   right?  The law would say this is not reasonable.

13           And Johnson said, in that case, Judge

14   Williams was correct to allow that to go to a jury.

15   So that doesn't end the battle for us, right?  But you

16   also have other decisions.

17           You do have the Southern District of

18   Mississippi case in *Robertson*, 2008 Westlaw --

19           THE COURT:  I'm really just trying to -- I

20   think I get -- I've read your cases.  I don't want to

21   make you do a whole argument.

22           MR. BENNETT:  I'm sorry.

23           THE COURT:  What I want you to do is tell me

24   what you, in your perfect world, if you win these

25   motions, what happens.

1          MR. BENNETT:  If we win our motions, we go to

2  the jury on the single question of whether the

3  defendant's violation of the Fair Credit Reporting Act

4  was willful and what damages are appropriate, if any.

5          THE COURT:  Okay.  So which of your theories

6  goes to Count Six, and which goes to Count Seven, and

7  which goes to Count Eight?

8          MR. BENNETT:  Yes, Your Honor.  The correctly

9  numbered two, Credit One Bank failed to conduct a

10  reasonable investigation is Count Six.

11          THE COURT:  Okay.

12          MR. BENNETT:  The incorrectly numbered four,

13  but the third argument, Credit One Bank failed to

14  truthfully report the results of investigation goes to

15  Count Eight.  And that's it.  I combined C and D now.

16  So Count Eight, which is the defendant, had it done an

17  investigation at all, would have at least known that

18  there was a dispute.

19          THE COURT:  Okay.  So here's my question.

20  What goes to Count Seven?

21          MR. BENNETT:  At trial we would argue that

22  the defendant failed to consider the plaintiffs'

23  disputes, but we're not seeking summary judgment on

24  Count Seven.

25          THE COURT:  That's all I'm trying to ask.

1          MR. BENNETT:  Yes, Judge.

2          THE COURT:  All right.  So that's all I have

3   questions about your motion.  And then I'll ask your

4   opposing counsel about that motion.

5          MR. BENNETT:  Yes, Judge.

6          THE COURT:  All right.  So I just have a

7   couple of questions for you.  You indicate that you

8   are disputing that Wood didn't open the account,

9   correct?

10          MR. SEARS:  Did open the account.

11          THE COURT:  No, you're disputing --

12          MR. SEARS:  I believe, just to be clear on

13   this, number one, the plaintiff has the burden of

14   proving the elements necessary for the claim.  And one

15   of those would be that his identity was in fact

16   stolen, and it resulted in an account being reported

17   incorrectly.

18          And on that burden, the only testimony that

19   exists either way is Mr. Wood's own testimony.  But in

20   addition to the burden of proof, he also has the

21   burden of persuasion.  And I believe that -- and I

22   outline this in the -- I won't go into the specifics

23   because it is in the briefs -- that based upon

24   different facts of the case, a jury could draw an

25   inference that Mr. Wood's claim of identity theft is

1    not a bona fide claim.

2         Sergeant Woodson drew or came to that

3    conclusion based upon the evidence that was presented

4    to her, and if she can reach that, then I think that

5    based upon the evidence in the case, the jury could as

6    well.

7         THE COURT:  All right.

8         MR. SEARS:  We don't have direct evidence to

9    counter to say no, you didn't have your identity

10   stolen, but at the same time the burden is on him, and

11   the jury needs to assess his credibility.

12        THE COURT:  All right.  So where do you get

13   the good faith belief you're referring to?  That's

14   just a phrase you're using?

15        MR. SEARS:  That's a phrase my client used in

16   responding to the interrogatories, Your Honor.

17        THE COURT:  Hopefully, your client signed

18   them.

19        MR. SEARS:  Yes.

20        THE COURT:  So are you disputing that the

21   opening of the account was entirely electronic, that

22   there's no handwritten signature?

23        MR. SEARS:  Oh, no.  No, it was done

24   electronically.  In my reply brief I believe that I

25   make reference to -- I believe it's kind of a

1  distraction, a red herring we would call it back where

2  I'm from, that this whole issue of contract law under

3  Virginia law, but if you're going to go down that

4  route, Virginia recognizes electronic signatures,

5  which is it can be more than just a digital signature.

6  It can be processes and so forth.

7      THE COURT:  But you're not even saying that

8  happened, right?

9      MR. SEARS:  No.  What I'm saying is that

10 somebody did it.

11     THE COURT:  Is there an electronic signature?

12     MR. SEARS:  I'm sorry?

13     THE COURT:  Is there an electronic signature?

14     MR. SEARS:  There is an electronic mechanism

15 where someone went online to apply for the account,

16 yes.  Someone -- my understanding, I could be wrong,

17 my understanding is they went online to apply for the

18 account, filled out the information, was mailed the

19 card, and then they called in to activate it.  The

20 card was not just sent to him.  We sent a

21 solicitation.  Someone returned the solicitation by

22 process of an online application.

23     THE COURT:  And it's not the case that you

24 know who actually did the purchases.  You didn't --

25 certainly I know your folks didn't do that, but you

1    haven't tried to verify who did the 300-dollar

2    purchases anywhere, right?

3              MR. SEARS:  I've tried.  I haven't had much

4    luck there.

5              THE COURT:  All right.  I read something in

6    your brief, and I'm trying to understand, and,

7    unfortunately, I can't remember exactly where it is,

8    but you indicate that there is no claim for FCRA

9    inaccurate reporting and you cite *Davenport*?

10             MR. SEARS:  Yeah.  Basically, the -- and it's

11   in two places.  So I make reference to it in response

12   to their motion for partial summary judgment and their

13   defining of the seminal issue being, hey, we have to

14   prove an inaccuracy.  That's really not a correct

15   statement.

16             The cases, and if you look at, actually, the

17   analysis of 1681A and 1681B, whatever the first part

18   of that statute that's at issue here, I don't have the

19   cite in front of me, but even for an accurate

20   reporting, there is no private cause of action, okay?

21   There is -- the duty is on a data furnisher to report

22   information that is correct and accurate based upon

23   what they know.  And I don't have the statute in front

24   of me because I was doing it by illustration.  Let me

25   see if I can find -- I want to direct the Court

1  correctly here.  So this is on page 15 of 22, Section

2  1681S-2A.

3              THE COURT:  Page 15 of 22 of your brief?

4              MR. SEARS:  Of my response to plaintiff's

5  motion for partial summary judgment.

6              THE COURT:  All right.

7              MR. SEARS:  I can explain it to you if you'd

8  like, but it's also written here.  Data furnishers are

9  not permitted to furnish information that they know or

10  have reasonable cause to believe that the information

11  is inaccurate.  And the violation of that does not

12  give rise to a private cause of action.  There's only

13  administrative enforcement.  Okay?

14              So the fact that --

15              THE COURT:  Wait.  What page are you on?

16              MR. SEARS:  I'm on top of the page, document

17  68, page 15 of 22.

18              THE COURT:  Okay.

19              MR. SEARS:  Okay.  So under 1681S-2A, if I'm

20  reporting inaccurate information, a consumer cannot

21  sue me as a data furnisher.  I have a duty to report

22  any consumer reporting agency if the data furnisher

23  knows or has reasonable cause to believe that the

24  information is inaccurate.

25              THE COURT:  Now, you're reading again.

1        MR. SEARS:   Sorry.   Yes, I'm sorry.

2        And so under 1681S-2B, which is what this
3   lawsuit is brought over, okay, it's not that there is
4   an inaccuracy in the reporting, it's that there was --
5   a person has a duty to conduct a reasonable
6   investigation.   And for there to be liability, it's
7   not enough to prove that the report that you have is
8   inaccurate.   What you have to prove is that it is
9   inaccurate because the data furnisher did not conduct
10  a reasonable investigation, and if they would have,
11  they would have discovered the inaccuracy, and then
12  they would have had an obligation under the law to
13  correct that in the reporting.

14        And that is exactly what *Johnson v. MBNA* is
15  about.   That is exactly what this *Robertson* -- I think
16  it's *Robertson*.   I think it's a wonderful case.   I'm
17  so glad that they brought it up because it perfectly
18  illustrates how this is supposed to work.   Yeah,
19  *Robertson v. J.C. Penney Company*.

20        In that case, the consumer made a payment on
21  a J.C. Penney account.

22        THE COURT:   Right.   I've read that.

23        MR. SEARS:   So if they would have looked,
24  they would have seen it.   They didn't look, so they
25  are liable.   That's what this is really about.   It's

1  not about whether or not it's inaccurate.  It's about

2  whether or not an investigation is reasonable -- would

3  have shown that it's inaccurate.

4       THE COURT:  All right.  Okay.  So I think I

5  understand.

6       MR. SEARS:  Okay.

7       THE COURT:  Let me tell you this, though,

8  sir.  I want you to be aware that perhaps the reason

9  your client is challenging this is that what the

10 plaintiffs here are saying is that your business model

11 is unreasonable.

12      MR. SEARS:  I understand that's what they're

13 saying.

14      THE COURT:  And so one thing you have to

15 accept is if a judge agrees with that, then every

16 other aspect of your arguments fall.  And so I want

17 you to know that as I read *Davenport* and *Johnson* and

18 *Robinson*, I'll issue a written opinion, but I see

19 different cases than you're describing, and I'm pretty

20 familiar with those cases.

21      It's because in what *Alvaran* and what *Johnson*

22 is talking about is that there is some requirement

23 that the system not to be unreviewable.  So, for

24 instance, in *Alvaran*, the whole issue for Judge Dohnal

25 was that there was no original signature card.  There

1  was no way to check because the business system set it

2  up in a way that they just didn't have it available.

3         And so if there is an IP address that can

4  identify exactly where a message came from in order to

5  set up an account that somebody becomes liable for

6  without any other kind of signature, not knowing the

7  IP address is a difficult place for your client to be

8  because that is singular.  Now, it can be a singular

9  computer in a shared home.  It doesn't really help

10  anything.  If it's a cell phone that somebody owns and

11  uses primarily, that's a make or break kind of fact,

12  but not knowing it one way or the other and not having

13  a business system where it's discoverable or checked,

14  I'm struggling with, but I'll review what it is.

15         MR. SEARS:  And, Your Honor, that kind of

16  sounds to me like a strict liability argument, which

17  is not what is contemplated.

18         THE COURT:  It's not an argument when I make

19  it actually.  It's something you appeal.

20         MR. SEARS:  Okay.

21         THE COURT:  So I am saying that I'm going to

22  look at it, but I'm pretty familiar with these cases,

23  and I hope your client is really understanding what he

24  or she is doing.  Which client signed the papers?  Do

25  you remember?

1           MR. SEARS:  The corporate representative.

2           THE COURT:  Who signed the interrogatories?

3           MR. SEARS:  It would have been either Helen

4    Lanham or Kim Maragos.  I believe it was Ms. Lanham.

5           THE COURT:  All right.  Well, I'm struggling

6    with the theory of the case as presented, but I'm

7    going to certainly issue an opinion, and I want to

8    make sure I look at your motion to see if there are

9    any questions there that I need to address.

10          All right.  So, just with respect to your

11   motions, I think I understand the basis of the motions

12   that you placed in front of the court, and I noted

13   that you expressed remorse for not having listed

14   undisputed facts.

15          I'm going to say to you, especially in an

16   instance where you then called the other side on

17   whether or not they have specifically adhered to 1746,

18   really think about what you're placing in front of the

19   Court.  If you want to win on technicalities, don't

20   make them lose on technicalities.  Right?  So I'm

21   going to say that to you by way of introduction.

22          And I am going to tell you that the notion of

23   setting up disputed material facts matters for the

24   reason that was raised by the plaintiffs, right?  They

25   said, Listen, they don't list any facts out.  Now we

144

1    have to list them out and respond to them, and then

2    you dispute their facts.  You're functionally

3    inverting how that motion is supposed to come together

4    altogether.  And signing things pursuant to Rule

5    33(a)(1), making sure your client knows what the heck

6    he or she is making himself or herself liable to,

7    reading Rule 56, and what the disputed and undisputed

8    facts are, all of those drive the efficacy, the

9    efficiency, and the fairness of how cases come

10   together in this court.

11           I'm maybe especially bothered because as you

12   don't do this, you then say they don't use the phrase

13   "true and correct" when the guy swears to something

14   under oath.  That is troublesome.  And so I'm going to

15   tell you in the first instance not appearing is

16   something I'm going to have to look at.  You cite

17   language about whether we say how material it is, and

18   how much issue, and I clearly have plenty of facts in

19   front of me, and I see that you argue that causation

20   about -- you make an argument about damages and your

21   argument about the fact that they failed to articulate

22   damages, I'll tell you, you don't respond to their

23   argument about the *Sloan* case at all.  You raised

24   *Robinson*, which is a case that allowed damages on

25   testimony of an individual person, and you cite

1  *Robinson* in a way as if it sounds as if it might

2  overturn *Sloan*, and so I'm confused about that.

3          I know you have 50,000 cases.  So does

4  anything come immediately to mind?

5          MR. SEARS:  It does not.

6          THE COURT:  All right.  Okay.  I mean, you

7  all are going to have to file something.  They would

8  object if you filed something about *Robinson*, but you

9  can place a one-page statement, and they can respond a

10 one-page response, along with your certifications

11 about who signed the interrogatories.

12          I think that may be all I have to say.  I

13 think you have to address *Sloan*, and the way you

14 represent what this court found in *Robinson*, it's not

15 persuasive to me.

16          MR. SEARS:  Okay.

17          THE COURT:  All right?

18          MR. SEARS:  Thank you, Your Honor.

19          THE COURT:  All right.

20          Mr. Bennett, do you have anything?

21          MR. BENNETT:  No, Your Honor.

22          THE COURT:  All right.  So this is what I'm

23 going to do:  First of all, let me apologize to the

24 folks in the next hearing.  I know that I've gone

25 over, and I know that everybody is busy.

1          I'm going to issue my written opinion.  I'm

2    going to issue it no later than the 31st.  That will

3    give you all time to submit whatever your one-page

4    thing is.  What's today?  Tuesday.  I'd like that by

5    Friday.  If you need more time, I guess you can get

6    more time, but I don't see why you'd need more time

7    for what I've asked you.

8          I will rule on all the issues, and upon the

9    ruling, we will immediately address what needs to

10   happen next in the case.

11         I might encourage you, if I were a different

12   kind of Eastern District judge, to talk to Judge --

13   whatever judge is handling your settlement.  I

14   certainly have given you an indication about issues

15   that might help you value your case.  I've tried to be

16   as forthcoming as I can without coming in predisposed

17   to absolutely rule one way or the other.

18         MR. BENNETT:  Your Honor?

19         THE COURT:  Yes.

20         MR. BENNETT:  If the defendant -- originally,

21   you suggested that we both file position as to the

22   verifications.  The most recent comment the Court

23   offered was that the defendant would file as part of

24   its -- of that process it would do a one-page

25   explanation of the incongruence between the

1   presentation of *Sloan* versus *Robinson*, when we would

2   respond to that.

3           THE COURT:  All right.  So, Mr. Sears, if you

4   could do your statement about verification and your

5   one-page comment about *Sloan* and *Robinson*, if you

6   wish, by Friday.  If you all could respond on -- what

7   is the number on Tuesday?

8           MR. BENNETT:  We could do it by Monday, the

9   24th.

10          THE COURT:  Monday is better.  What day is

11  that?

12          MR. BENNETT:  The 24th.

13          THE COURT:  The 24th.  And I won't rule more

14  than a week after that.  All right?

15          Does anybody have any questions?

16          MR. BENNETT:  No, Your Honor.

17          THE COURT:  I appreciate everyone's good

18  efforts and your time, and I promise it will be a

19  short recess before the next hearing.  I'll allow you

20  time to set up, though.

21          Thank you very much.

22

23          (The proceedings were adjourned at 2:40 p.m.)

24

25

1        I, Diane J. Daffron, certify that the foregoing is

2    a correct transcript from the record of proceedings

3    in the above-entitled matter.

4

5                          /s/
    _____   _____
6    DIANE J. DAFFRON, RPR, CCR          DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25