1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3

    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
4                                     )
    DAVID WOOD,                       )
5                                     )
                      Plaintiff       )
6   v.                                )    Civil Action
                                      )    No. 3:15CV594
7   CREDIT ONE BANK, N.A.,            )
                                      )    January 11, 2018
8                     Defendant       )
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _)
9

10

11

     COMPLETE TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
12        BEFORE THE HONORABLE M. HANNAH LAUCK
             UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15   Leonard A. Bennett, Esq.
     Craig C. Marchiando, Esq.
16   Consumer Litigation Associates
     763 J. Clyde Morris Boulevard
17   Suite 1A
     Newport News, VA   23601
18
             Counsel for the Plaintiff
19
     Bryan A. Fratkin, Esq.
20   Heidi Siegmund, Esq.
     McGuireWoods LLP
21   Gateway Plaza
     800 East Canal Street
22   Richmond, Virginia   23219

23           Counsel for Defendant Credit One Bank

24
                 DIANE J. DAFFRON, RPR
25             OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT
```

2

```
 1              (The proceedings in this matter commenced at

 2   1:17 p.m.)

 3              THE CLERK:  Case No. 3:15CV594, David William

 4    Wood versus Credit One Bank.

 5              The plaintiff is represented by Leonard

 6    Bennett and Craig Marchiando.

 7              The defendant is represented by Bryan Fratkin

 8    and Heidi Siegmund.

 9              Are counsel ready to proceed?

10              MR. BENNETT:  The plaintiff is, Your Honor.

11              MR. FRATKIN:  The defendant is, Your Honor.

12              THE COURT:  All right.  Could you all please

13   be sure that you put on the record who's at counsel

14   table with you.

15              MR. BENNETT:  For the plaintiff, Leonard

16   Bennett, Craig Marchiando, and David Wood, our client.

17              MR. FRATKIN:  Your Honor, Bryan Fratkin,

18   Heidi Siegmund, and this is David Bouc, who is the

19   general counsel for Credit One.

20              THE COURT:  All right.

21              So we're here to go over the issues we need

22   to address for purposes of the final pretrial

23   conference.  Let me just say initially, you both were

24   courteous to stand as I was addressing you, which is

25   what we normally do in the court.  We're going to be
```

1    dealing with a lot of documents today, and so feel

2    free just to argue carefully into the microphone, so

3    my court reporter can hear you, for purposes of

4    today's hearing.

5            All right.  So I'm going to start with the

6    motions in limine, and there are quite a few of them.

7    I want to confirm that I have what you all want me to

8    have.  As I see the record, Credit One has filed four

9    motions in limine:  One on willfulness, ECF No. 120;

10   one on causation, ECF No. 123; one about loans, ECF

11   No. 127; and lost wages, ECF No. 130.

12           That's what you filed; is that correct?

13           MR. FRATKIN:  That's correct, Your Honor.

14           THE COURT:  All right.

15           Now, Mr. Wood initially had filed ECF No. 122

16   with respect to handling of factual matters.  It's my

17   understanding that that has been withdrawn; is that

18   correct?

19           MR. BENNETT:  That is correct, Your Honor.

20           THE COURT:  But there is an omnibus motion in

21   limine, and I count, essentially, ten -- well, more

22   than that, but 10 separate motions within that, ten

23   separate issues, although issue six has subparts, and

24   I just want to confirm that at least three of those

25   are not objected to or are essentially withdrawn or

1    agreed to.

2          MR. FRATKIN:  Your Honor, do you want me to

3    confirm?

4          THE COURT:  Yes.  I have them numbered.

5          MR. FRATKIN:  Seven, eight, and eleven.

6          THE COURT:  Right.

7          MR. FRATKIN:  Are the ones that are --

8          THE COURT:  I wanted to make sure that the

9    numbers I used would comport with your counting of

10   them.

11         MR. FRATKIN:  Right.

12         THE COURT:  Yes.  I have that there's no

13   objection essentially to the issues set forth in

14   seven, eight, and eleven.

15         MR. FRATKIN:  Correct.

16         THE COURT:  Both parties are in agreement as

17   to that?

18         MR. BENNETT:  Yes, Your Honor.

19         THE COURT:  All right.  So I tried to look at

20   these in a manner that I think will expedite or in

21   consideration of all the issues, and so I'm going to

22   go straight to Mr. Wood's motion, which I have labeled

23   6C, which is the motion to exclude the CDIA documents.

24   So I'm going to hear both parties with respect to

25   that.  And you can catch up with me.  I know I'm

1    taking things out of order.

2           MR. BENNETT:  Judge, the documents at issue,

3    the easiest and most important basis is to exclude

4    them pursuant to Rule 37(c)(1) and Rule 36(e), which

5    requires timely supplementation.

6           These documents were not produced to us

7    until, by my email count, November 21, 2017.  This

8    was, of course, after discovery was closed in June of

9    2016, and it was after we had locked in our positions

10   that we would take in the case.

11          We did not subpoena the documents from the

12   CDIA.  Of course, we couldn't have seen those for the

13   second reason that I'll argue.  They didn't exist.

14          THE COURT:  Let me stop you.  Exactly what

15   volume and type of documents are we talking about?

16          MR. BENNETT:  The document itself, which I

17   can pull up if the Court wants to look at it --

18          THE COURT:  What was turned over on

19   November 21?

20          MR. BENNETT:  There was an email that was

21   sent to us, if the Court would permit me, and that

22   email just said, "Please find attached," and it had

23   this document in it.

24          May I approach, Your Honor?

25          THE COURT:  Mr. Melton.

1          MR. BENNETT:  We've had a number of

2    discussions.  The Court is probably very certain that

3    I am familiar with both of my new opponents.  I have

4    tremendous respect for them in and out of the

5    courtroom.  And there have been a number of gotcha

6    opportunities that both sides have had and have not

7    exercised.  So there are some objections we could have

8    asserted as to timeliness of document not included in

9    the original exhibit list or otherwise.  You're not

10   seeing any of those from either side.  You are seeing

11   substantive complaints and challenges and objections.

12   And this is absolutely one of them.

13          This document itself purports to be a change

14   that the CDIA made in 2017 to the way that the

15   compliance condition code would be used and it's a

16   document that, if the Court would permit me, it's on

17   the screen.  It's Defendant's Exhibit 13.  And, of

18   course, we have had significant litigation against the

19   credit bureaus in other cases and significant

20   third-party discovery against the credit reporting

21   agency owned, controlled, and operated CDIA from which

22   this document was apparently generated.

23          I represent to the Court I have never seen

24   this before.  It was brand new.  If you look on the

25   screen, you will see at the bottom the document even

1   says, "In advance of the 2017 Credit Reporting

2   Resource Guide."

3            Exhibit 8 has been updated.  Credit One is a

4   significant customer of the credit reporting agencies,

5   what's called a strategic customer.  I have never

6   personally seen the credit reporting agencies do an

7   in-the-middle-of-the-year addendum to change a code

8   which is so clearly focused on just the single issue

9   that this court considered in the opinion.

10           So it's new to me.  Obviously, it's not

11   even -- it was sent out even when it was not in the

12   2017 reporting guide yet.  We have no explanation from

13   the defendant as to how it got this.  I have no

14   knowledge, not technical, not real, not any knowledge

15   about where this came from that's outside the email

16   the Court is holding in its hand.  That is -- and I've

17   not seen it from any other creditor, the credit

18   reporting agency, or our copy of the Credit Reporting

19   Resource Guide.

20           Certainly, to the extent that discovery were

21   open and we had plenty of time for this many year old

22   case, I would go right to the CDIA and begin to depose

23   these people.  The individuals that make the decision

24   there are all at each of the credit bureaus.  So we

25   would be traveling to Atlanta and to Chicago where

1    TransUnion is, and to Costa Mesa where Experian is to

2    find out how this came about.

3          Independent of the Rule 37(c)(1) standards

4    which we addressed, there's no substantial

5    justification for this, and it's certainly not

6    harmless.

7          It's irrelevant under -- because -- under the

8    Federal Rules of Evidence because this was not the

9    standard at the time that any of the disputes were

10   made by the plaintiff.  It is not evidence because

11   whether or not this is the standard for the credit

12   reporting agencies at a moment does not change the

13   fact that both the Fourth Circuit in *Saunders v. BB&T*

14   and the Third Circuit in *Siemens v. Temple University*

15   have both held that you have to note an account is

16   disputed when it's still disputed.  And what a code

17   definition charge that occurs in November of 2017 does

18   doesn't change that legal reality.  The reporting

19   would remain inaccurate and incomplete.  The response

20   to the dispute incomplete because it was disputed

21   regardless of what instruction the credit reporting

22   agencies would empower a furnisher with in

23   Thanksgiving of 2017.

24         THE COURT:  All right.  So, Mr. Fratkin, why

25   don't you tell me why you sent or Ms. Siegmund sent

1   the November email and included this document and

2   under what procedural mechanism you were doing so.

3          MR. FRATKIN:  Thank you, Your Honor.  I'll

4   take this one, and Ms. Siegmund and I will be

5   splitting off, but this one is mine.

6          To begin, to address the Rule 37 issue, this

7   document, as the date reflects, wasn't available until

8   March 2017.  And if you look at the timeline for this

9   case, the Court had indicated it was going to grant

10  plaintiff's motion and deny the defendant's in

11  November of 2016.  So before the document even

12  existed.

13         And then there was a period from

14  November 2016 until when the Court ultimately issued

15  its summary judgment opinion where the compliance

16  condition codes, which are the subject of this

17  document, were really written about in Your Honor's

18  opinion.  That was the end of September 2017.

19         We, McGuireWoods, or Ms. Siegmund and I then

20  got involved in the case, and this is a document that

21  Ms. Siegmund actually Googled and found.  We talked to

22  our client about the document.  It was a document that

23  it was aware of, too.  And produced it really once we

24  sort of got our arms around this case in

25  November 2017.

1        And so in terms of the timing of when we

2   produced it, you know, it was well after the discovery

3   period ended, of course, but the document didn't exist

4   at that point in time.  And from November of 2016 to

5   September of 2017 nothing happened in this case.  We

6   were all just waiting on Your Honor's opinion.

7        And so that's the reason for the delay in

8   producing it, which I think is justifiable in this

9   case.

10        In terms of the substance of the document on

11   the relevance, it's a four- or five-page document.  So

12   it's not as if we dumped a giant load of documents on

13   the plaintiff at that time.

14        And the relevance, in our client's view, this

15   is not a change in what the reporting requirements

16   were.  This was consistent with what our client was

17   doing all along, and that's why we want to use it.

18   Our witness, Ms. Lanham, will testify that it

19   confirmed the existing procedures and policies that

20   the bank already had in terms of how it reported

21   accounts in dispute.  Primarily that the XH code --

22   well, the client's position was that the XH code was

23   the appropriate code to report because it indicated

24   that the furnisher had looked at the dispute and there

25   was no other code to indicate that.

1    This document actually clarifies all that and

2 says, Don't use any of the compliance condition codes

3 when the dispute comes in from the furnisher.  So we

4 want to use that for purposes of the willfulness --

5    THE COURT:  So, Mr. Fratkin, you sent an

6 email, and what was the procedural mechanism that

7 you -- discovery was closed.  You don't deny you know

8 discovery was closed.

9    MR. FRATKIN:  Correct, Your Honor.  I mean,

10 we supplemented our document production because of the

11 --

12    THE COURT:  But you don't say how or why you

13 are supplementing your document production after the

14 close of discovery.

15    MR. FRATKIN:  Well, our email to Mr. Bennett

16 said the production includes guidance that Credit One

17 Bank received from the Consumer Data Industry

18 Association in early 2017 clarifying the use of

19 compliance condition codes in Metro 2.  That was the

20 email.

21    We got a response back from Mr. Bennett that

22 said he objected to the production of the document.

23 He appreciated our -- I think the email said he

24 appreciated our supplementation of discovery, as

25 required by the rules, but that he was going to object

1    to the production of the document.

2         So discovery had closed when the document was

3    created as well.  I mean, I think we were doing what

4    we thought was the right thing to do, which is we had

5    a new document that we thought was relevant to the

6    case, and, of course, we were going to produce it as

7    soon as we became aware of it.

8         THE COURT:  Right.  But you're not just going

9    to produce it.  You're going to rely on it in trial.

10        MR. FRATKIN:  And in our briefing, Your

11   Honor, we offered a supplemental deposition of

12   Ms. Lanham.

13        THE COURT:  At whose cost?

14        MR. FRATKIN:  Pardon me?

15        THE COURT:  At whose cost?  Yours?

16        MR. FRATKIN:  We didn't get that far, but

17   we're happy to pay for that if that's what allows this

18   document to get in.

19        THE COURT:  So, Mr. Fratkin, what am I

20   supposed to do with the fact that while you say you

21   think you're doing the right thing, it doesn't -- the

22   issue does not come to me until three weeks before

23   trial?  Why doesn't that rest on you if you want to

24   use it at trial?  I've never seen it before.  This

25   issue came to me as part of this final pretrial

1    conference.

2            So you brought it to the attention of the

3    other side, but you're the one who's trying to adduce

4    evidence beyond discovery, not them.

5            MR. FRATKIN:  Your Honor, understood.  And I

6    think from our perspective, when we sent it over to

7    Mr. Bennett and he said he appreciated our

8    supplementing under the rules, I think, in our view,

9    trying to work things out between the parties and not

10   bring that type of issue before the Court was the

11   approach we took.

12           I understand the Court's concern, though,

13   that now we're butting up against the trial date.

14           THE COURT:  We're at the trial date.  And

15   what you are offering is a cure of a deposition that

16   would move the trial date.  In fairness, that's --

17           MR. FRATKIN:  We could certainly try to get

18   the deposition.  I think it's not offered for much

19   other than for Credit One to confirm that this

20   document is consistent with the way it viewed its

21   reporting requirements all along.

22           THE COURT:  So then why isn't it cumulative?

23           MR. FRATKIN:  Because the Court has already

24   found as a matter of law that investigation we did was

25   unreasonable, and what we're trying to show is that

14

1    there's guidance out there that is consistent with

2    Credit One's interpretation of the statute.  And it's

3    certainly the previous version, the 2011 version of

4    this document, has not been objected to but doesn't

5    clarify the issue as much as this document does.  And

6    so I think --

7            THE COURT:  So --

8            MR. FRATKIN:  It's relevant to --

9            THE COURT:  But what does it go to that the

10   jury has to decide?

11           MR. FRATKIN:  I think that the jury

12   understands that there's guidance out there that has

13   since clarified what the issue is.  It will -- I mean,

14   Mr. Bennett, for example, is trying to get into the

15   *Johnson v. MBNA* decision, the *Saunders v. BB&T*

16   decision.  Those are decisions that he wants the jury

17   to go back and review.  And this is additional

18   guidance that Credit One considered that I think would

19   be helpful to the jury to understand the way in which

20   it reported and understood to be reporting disputes.

21           THE COURT:  To what end?  What element of a

22   claim or defense does that go to?

23           MR. FRATKIN:  I think it goes, Your Honor, to

24   whether Credit One's conduct was willful.  The

25   evidence about how it understood to report disputes is

1    directly addressed by this document.

2         THE COURT:  How is that not bolstering if it

3    didn't exist at the time that you made the decision or

4    cumulative?

5         MR. FRATKIN:  I think it clarifies what our

6    decision was already.

7         THE COURT:  It bolsters it.  You're looking

8    to have a third-party presentation about a decision

9    that you made that was presented after it was made.

10        MR. FRATKIN:  That clarifies what our

11   position was already, not changes our position.  But I

12   understand the bolstering point, Your Honor.

13        We think it's probative, but there's

14   certainly an argument that it didn't exist at the

15   time.

16        THE COURT:  Well, it's not an argument.  It

17   didn't exist at the time.

18        MR. FRATKIN:  You're right.  And therefore it

19   shouldn't be admissible.  I understand that argument.

20        THE COURT:  Is there anything you want to

21   say, Mr. Bennett?

22        MR. BENNETT:  Yes, Your Honor.  Just the

23   suggestion that the document was created and in the

24   defendant's possession in March and was known to its

25   counsel here in September and not produced until the

1   end of November kills any argument that could be made

2   about substantial justification.

3          With respect to the proposed remedy of taking

4   their 30(b)(6) deponent's deposition again, we took

5   it.  She didn't know about any of this at that time in

6   that deposition.

7          THE COURT:  So you're going -- I'll tell you,

8   both of your motions are very sweeping.  You're

9   terrific advocates.  You are a little too advancing of

10  broad propositions, both of you.  So I'm going to ask

11  you during this pretrial conference to be specific

12  about what you claim someone did or did not know and

13  why.

14         So if you say she didn't know about any of

15  this stuff, you're going to have to be specific so

16  that in fairness Mr. Fratkin can say, Yes, she did,

17  and then you can say, Oh, well, that's not enough.

18  Because I actually think that's more of what's going

19  on here than the broad sweeping propositions both

20  sides have given me.

21         MR. BENNETT:  And I apologize.  In fact, it's

22  worse than that.  The basis is my overconfidence in my

23  memory.

24         So I hold the memory that having tried to

25  flush out any specific knowledge that I was unable to

1  find it.  And I cannot swear that I've reviewed every

2  page of a transcript to find that.

3          I will note that --

4          THE COURT:  Any specific knowledge of --

5          MR. BENNETT:  Of the compliance condition

6  code.  The process for deciding how to use a

7  compliance condition code.  Just like testimony from

8  Ms. Lanham.  She wasn't offered as their deponent on

9  how did you determine what your procedure would be.

10  That was a gentleman named Mr. Shutt, a former lawyer

11  that no longer worked there.

12          So I would also, though, say the document

13  itself, this is page two of it, I believe, that we

14  object to.  If you see the bold section under XB, it

15  says, "Important note.  Code XB should no longer be

16  reported after the investigation is completed," which

17  the bold is the change that was made, and that refers

18  to a change to what should have been done in the past.

19          To the extent that the defendant's

20  substantive defense of its bolstering right would be

21  this merely confirms that what they were doing before

22  complied with the CDIA requirement, to the extent

23  that's relevant, it's also wrong because the CDIA

24  document the defendant now seeks to use says it's

25  different today than it was during the time that the

1    case facts occurred.

2         Lastly, with respect back to the 37(c)(1)

3    remedy, the deposition of the defendant would be

4    inadequate.  We would need to have an expert now

5    because the defendant would now be asserting an

6    industry standards defense.  I'm unaware of that

7    having been previously successful in any Eastern

8    District case, but we would have to be concerned

9    enough that we would need to find somebody, and we

10   would need to depose the CDIA representatives who made

11   this change, principally the representatives from the

12   big three credit reporting agencies.  It's not a

13   matter of let's just fly this person in here next

14   Sunday at their airfare expense.  It's a significant

15   undertaking, to the extent that the Court would find

16   it relevant, that in 2017 the CDIA sent out this piece

17   of paper to its customers.

18         MR. FRATKIN:  Your Honor, may I just respond

19   to a couple points?

20         One, Mr. Bennett said that we knew about it

21   in September and then didn't produce it until

22   November.  If I suggested that, I didn't mean that.

23   We got involved in the case shortly after the opinion

24   came out in September, but it took some time to get

25   our hands around this.  I don't know the exact date

1    that we became aware of this 2017 document, but it

2    certainly wasn't right when the case came out.

3           The second point, on our 30(b)(6) witness's

4    testimony, this is from the transcript.

5           THE COURT:  So where and --

6           MR. FRATKIN:  Certainly.  This is page 43 of

7    Ms. Lanham's testimony.  So turning to Bates No. 66,

8    "Have you seen this document before?"  Answer:  "Yes,

9    I have."

10          THE COURT:  I'm sorry.  You know what?  I'm

11   pulling up documents, and you pulled it out before,

12   and I don't have it yet.  So slow down, please.  What

13   page?

14          MR. FRATKIN:  Page 43.

15          THE COURT:  All right.  Thanks.

16          MR. FRATKIN:  So page 43 in the middle of the

17   page, Ms. Rotis asked Ms. Lanham -- and this document

18   is called the 2011 Credit Reporting Resource Guide.

19   This is the prior version of the 2017 one.

20          "Is this the Credit Reporting Resource Guide

21   that was in use at Credit One Bank at the time of the

22   disputes that are the subject of this case?"

23          "Yes, it is."

24          "How did you come about getting a copy of

25   it?"

1          "I received it from our compliance

2     department."

3               And then the deposition, several pages, goes

4     on about the various codes, and so for Mr. Bennett to

5     say that our witness didn't know about this Credit

6     Reporting Resource Guide, of course she didn't know

7     about the 2017 one at the time of the deposition

8     because it was before it existed, but to suggest that

9     our client wasn't aware of these guides is just wrong.

10    Ms. Lanham testified that this was the guide that the

11    company used.

12              MR. BENNETT:  Judge?

13              THE COURT:  Uh-huh.

14              MR. BENNETT:  So the substantive testimony

15    after the pages of objections I believe starts at page

16    47.

17              THE COURT:  Uh-huh.

18              MR. BENNETT:  And it's just this particular

19    witness saying that they believe they downloaded the

20    Credit Reporting Resource Guide from the Internet, and

21    that their official policy, which is at page 48, line

22    10, "Do you have any specific policies that are based

23    on information from the Credit Reporting Resource

24    Guide?"

25              "Yes.  The policies related to ACDV

1    processing or instructed by the Metro 2 format."

2          I mean, I'm unfamiliar -- I mean, I don't --

3    the first time they mention a compliance condition

4    code is on page 50, line 14, and then page 51.

5    There's nothing in here that explains the use of the

6    XH code.  There's only a real general statement about

7    it at line 11 on page 51.  But there's no explanation

8    in this testimony how they researched what they're

9    supposed to do other than their policies to follow the

10   Credit Reporting Resource Guide.

11         In fact, this testimony was Ms. Rotkis

12   saying, "Why don't you follow the XB requirement here

13   in the Credit Reporting Resource Guide?"

14         So the fact, as Mr. Fratkin suggests in his

15   sur-rebuttal, is that there was testimony from

16   Ms. Lanham that they analyzed what the -- interpreted

17   the Credit Reporting Resource Guide, and that now she

18   would say that the 2017 document that the defendant

19   proffers somehow confirms their research that she had

20   performed, there's no evidence that that was done.  It

21   was just a very cursory discussion where she says we

22   think we followed the law.  We followed the guide.

23         I'd also suggest, Judge, we'd object because

24   this document is unauthenticated and hearsay.  So

25   there's been no testimony or explanation as to how it

1    came about, how the document came into anyone's hands,

2    where it came from.  There's no testimony that it was

3    even in the Credit Reporting Resource Guide.

4          THE COURT:  So, Mr. Fratkin, I have to say

5    you're going to have to show me where what Mr. Bennett

6    says here is incorrect about how general and

7    non-specific Ms. Lanham's testimony is in this

8    deposition.

9          MR. FRATKIN:  Your Honor, I think she

10   answered the questions that she was asked.  They

11   didn't probe any further, but there's not a lot to

12   explain.  There's a resource guide that tells you how

13   to report an account that is in dispute, and our

14   client's disposition is that if it is an account that

15   is a pending dispute, they report the XB code.  That's

16   what the guide says.  That's what our client testified

17   to.  That's in the deposition in the pages that Mr.

18   Bennett was citing.  I can point the page to you if

19   you'd like.  Page 50, line 14.

20         So for compliance condition code XB, "Under

21   what circumstances would Credit One Bank use the

22   compliance condition code XB?"

23         "So we use the compliance condition code of

24   XB when an account is in dispute and the investigation

25   is continuing.  So before the investigation has been

1   completed."

2           There's no further -- there are not any

3   serious further questions there.  Then there's the

4   discussion about the compliance condition code XC.

5   Credit One doesn't use that compliance condition code,

6   it says, and the guidelines in Credit One's view say

7   not to as well.

8           And then there is a lengthier discussion on

9   page 51, beginning at line 11, about using the XH

10  code.  And I don't know what more Ms. Lanham could

11  have said based on the questions, but the XH code, as

12  Ms. Lanham testified, is that we use that code to show

13  that we've completed the investigation and that we,

14  Credit One, are the ones who are providing that

15  information.

16          That's the -- I mean, I don't think there's a

17  lot more specific that can be said, but there's

18  certainly not many more questions about that either.

19          There is the Credit Resource Reporting Guide.

20  The 2011 one has a few pages dedicated to it.

21  Ms. Rotkis, and I'm not criticizing her, but she

22  didn't go through it line-by-line with Ms. Lanham.

23  That's mostly the testimony that was elicited on those

24  codes.

25          MR. BENNETT:  Just for the record, Ms. Rotkis

1    is not here.  The 30(b)(6) designee on the questions

2    that would deal with willfulness, how is it that you

3    came to adopt these procedures, was not Ms. Lanham.

4    And the testimony, the answers that you see, she was

5    simply explaining what they did.  This is what our

6    procedure was.

7            What Mr. Fratkin is suggesting is that --

8            THE COURT:  Who is the 30(b)(6) --

9            MR. BENNETT:  Mr. Shutt, who is a former

10   attorney.

11           THE COURT:  Right.

12           MR. BENNETT:  And what Mr. Fratkin is

13   suggesting is that, and you recall his original

14   argument that gets us here, was that they need this

15   new document to show that that is the thinking that

16   the company had when it was trying to figure out what

17   the law required and what the CDIA required.  And

18   there's no testimony about that thought process.

19   There is testimony about we pressed this lever and we

20   pressed this lever, figuratively speaking, but there's

21   no testimony suggested here by Ms. Lanham that

22   explains -- where she would explain that this is how

23   Credit One came to decide to press this lever in this

24   way.

25           It's also, the Court already is aware based

1   on this Court's ruling on summary judgment, the Credit

2   Reporting Resource Guide that Ms. Rotkis was examining

3   the witness about was the opposite procedure of what

4   the company was doing during this time period.

5        So that the point, all of this discussion

6   about the Credit Reporting Resource Guide and the

7   reason there wouldn't be more delving into it is

8   because the gotcha was done.  It was you're aware of

9   the Credit Reporting Resource Guide.  It tells you to

10  use the XB code when a consumer disputes an account.

11  And you don't do that.  Right?  Right.  Mic drop.

12       There was no further explanation about, well,

13  what if at some point in time the procedure changed.

14  There was no reason for anyone to ask those questions.

15  This was effective.  This deposition testimony was

16  confirmed that the defendant was not following the

17  guidance that the Credit Reporting Resource Guide had

18  to the extent that's relevant.

19       MR. FRATKIN:  Your Honor, one more point if I

20  may.  I think that shows why we want this in

21  because -- and I understand that's what the Court has

22  essentially held, too, on whether Credit One conducted

23  a reasonable investigation, but that's not Credit

24  One's position in this case, and it's the evidence

25  that we interpreted it differently, even if

1   erroneously, but we interpreted it differently than

2   what Mr. Bennett is saying and what Your Honor is

3   saying, and that is why we think it's not a willful

4   violation, and that is what the jury --

5          THE COURT:  So what do you mean?  What

6   evidence did you interpret differently?  Where is that

7   evidence?

8          MR. FRATKIN:  That we --

9          THE COURT:  How did you present it to me?

10         MR. FRATKIN:  Pardon me?

11         THE COURT:  Take the CDIA bolstering argument

12   aside.  How did you present it, previous counsel,

13   present it to me that you interpreted the statute

14   differently?

15         MR. FRATKIN:  Your Honor, this gets into our

16   motion on willfulness, the motion in limine.  It

17   wasn't presented to Your Honor.

18         THE COURT:  It wasn't raised.

19         MR. FRATKIN:  It wasn't raised; it wasn't

20   presented.  The threshold issue that we've raised in

21   that what we've been calling our *Safeco* motion, but

22   the motion in limine for the Court to rule that it

23   wasn't willful as a matter of law, it was not raised

24   with Your Honor.  It's a -- I don't want to go too far

25   into that, but it's a topic that courts rule on

1    frequently on the pleadings.  And Judge Payne --

2           THE COURT:  It wasn't pled.  You cited

3    *Safeco*.  Your previous counsel cited *Safeco* in reply

4    to a brief that the plaintiffs filed in opposition

5    citing *Safeco*.  You never cited *Safeco*.

6           MR. FRATKIN:  Understood.  There are two

7    *Safeco* issues, though, in the case.  One is the issue

8    that I think our previous counsel cited in the reply

9    which is just the standard as to whether the conduct

10   was sufficient evidence-wise to establish willfulness,

11   whether it was, you know, the language is a risk of

12   violating the law substantially greater than a risk

13   associated with a reading that was merely careless.

14   That's the evidentiary issue, and that's in our jury

15   instructions that if willfulness goes to the jury,

16   that's the teaching from *Safeco* as a jury issue.

17           There's a separate preliminary issue that was

18   not raised that the Court, we think, should decide,

19   which is whether *Safeco* had -- I'm sorry -- whether

20   Credit One had a reading of the statute that was not

21   objectively unreasonable.  And that is a, I think

22   everyone would agree, a question for the Court to

23   decide.  It wasn't raised on summary judgment before.

24           THE COURT:  So why isn't this an improper

25   second motion for summary judgment?

1          MR. FRATKIN:  Well --

2          THE COURT:  Let me tell you this, Mr.

3    Fratkin.  I'm aware that you did not file that first

4    motion.

5          MR. FRATKIN:  Understood.

6          THE COURT:  And so another lawyer filed that

7    motion.  But it is both -- that motion is filed on

8    behalf of that same client.  That you have a new --

9    you've mentioned a couple of times it took us awhile

10   to get our arms around this, our hands around this,

11   after you got my decision, but your client was the

12   defendant in this case the whole time.

13         So either you realize that previous counsel

14   missed a significant issue of law, raising it before

15   me in summary judgment, and you move to reopen the

16   case and do something about it or you own what the

17   previous lawyer did.  Tell me why that's not true.

18         MR. FRATKIN:  So we obviously had a decision

19   to make, and we thought this was a significant issue.

20   And one was reopen the case; one was move to

21   reconsider summary judgment or some combination; one

22   was motion in limine, which was the path we chose; and

23   I think one is after all the evidence comes in, raise

24   it as a motion for judgment as a matter of law.

25         And I think in thinking the best way to get

1    this before the Court where we looked at all the cases

2    or a substantial number of cases on this issue where

3    they've been raised on motions to dismiss, they've

4    been raised on summary judgment, which I think is the

5    most appropriate place, and then Judge Payne had in

6    the *Milbourne* case, which we point out in our reply

7    brief, Judge Payne had it raised at the final pretrial

8    conference and asked the parties to brief it.

9          And knowing all of that, and while it's, I'll

10   say, unconventional to do as a motion in limine, we

11   thought that if you're talking about a motion, the

12   purpose of a motion in limine is to streamline the

13   issues for trial and, you know, make the process more

14   efficient, if this were successful, then what would be

15   left for trial would be the issue of damages as a

16   result of a negligent violation.

17         THE COURT:  That also is pretty conveniently

18   most advantageous to your client after discovery has

19   closed.  So you can't control whether or not when you

20   took over the case discovery is closed.  But when

21   Judge Payne was deciding *Milbourne*, I would say the

22   case was at a different procedural posture, and the

23   issues that were before the Judge were different in

24   many respects.  So we're at the same place.  We're at

25   the final pretrial conference, but this is not

1    *Milbourne.*

2            I, in my first opinion, in the opinion that I

3    wrote, told you and your client I could have struck

4    everything.  So rather than striking everything

5    because of the immensely violative motion that your

6    client, you put in front of this court, so that this

7    court had to, in an effort to give the parties

8    something to work with, cull through documents which

9    this Court thought it was doing in the interest of

10   justice so the parties could have a sense of what the

11   core of the case should be, and I issued an opinion

12   saying I could have struck everything.  You have so

13   violated the rules, I could have struck everything.

14           And so I can tell you I don't think that

15   deciding to do it in a motion in limine in a final

16   pretrial conference three weeks before the trial is

17   responsive to the concerns that this Court expressed

18   about how your client previously had handled the case

19   unless it is the case that you want to take advantage

20   of the timing with respect to when this Court would

21   have to handle it and when defense counsel would have

22   to respond to it relative to an impending trial date.

23           MR. FRATKIN:  Your Honor, if we had decided

24   to seek to reopen the case, I think the timing,

25   assuming the trial date were still there, reopen

1  discovery or move to reconsider summary judgment, I

2  don't think would be any different place on the

3  timing.  We certainly did not, and we still do not

4  have -- there was no thought of taking advantage of

5  any timing.  That did not come into play at all in any

6  of our discussions.  And if there's an appearance that

7  that was the case, then it certainly is not something

8  that we thought of in our strategic discussions.

9          Honestly, Judge, I think the view was we have

10  an important legal issue, and discovery didn't come

11  into play either because, I think, because what I said

12  earlier, these motions can be decided on the pleadings

13  oftentimes.  And we cited a case where it was in the

14  Northern District of Georgia.  It was a default

15  judgment setting but it was essentially everything was

16  done on the pleadings.  The Court held unreasonable as

17  a matter of law for the s2b violation for the

18  investigation but then said, based on the pleadings,

19  there wasn't enough to give rise to

20  willfulnesswillfulness based on the *Safeco* analysis.

21          So our thinking was let's get this issue that

22  we think is a very important issue before the Court to

23  get decided.  And it is a question of law.  Like I

24  said earlier, I don't think there's any question that

25  this is something the Court needs to decide, and it

```
1   doesn't go to the jury, and we thought by getting it
2   before the Court this way, this was the right way to
3   do it.
4         THE COURT:  Why isn't it -- because it's been
5   done before doesn't answer why when we had willfulness
6   in front of us on summary judgment you aren't
7   obligated to raise it then.  So I decided willfulness.
8         MR. FRATKIN:  Your Honor, I don't believe you
9   decided this --
10         THE COURT:  No, no, no, no.  So get to the
11   core of what I'm asking.  Okay.  You just started to
12   advocate.  I know what your position is.
13         I had a motion that addressed willfulness
14   that your client was fully represented as to all the
15   positions it should have or would have wanted to take
16   with respect to willfulness.  It was briefed and
17   argued.
18         Why, as part of that process, is it
19   appropriate in any world for you not to address the
20   issue you now seek to have me address?  You say it's a
21   matter of law.
22         MR. FRATKIN:  The question is why isn't it
23   appropriate to have raised it earlier?
24         THE COURT:  Yes.
25         MR. FRATKIN:  They should have raised it
```

1   earlier, I think, but I don't think that takes away

2   that it can be decided at any time.  There is a --

3   I'll make an aside.  There's a difference of opinion

4   among the courts in this district about whether some

5   facts need to be established.  Our view, and we put

6   this in our motion, is that it's appropriate to decide

7   as a matter of law.  But I don't have a defense for

8   why it wasn't raised originally at summary judgment.

9   It wasn't.

10          Mr. Bennett said it was an issue that the

11  Court already decided.  The Court did decide an issue

12  of willfulness.

13          THE COURT:  So take into account, ignore what

14  Mr. Bennett said for a little bit, stay on the issue

15  I'm asking you about.

16          MR. FRATKIN:  It should have been -- the best

17  time to have raised it would have been --

18          THE COURT:  But why doesn't it constitute,

19  once summary judgment is entered on the issue to which

20  it pertains, I know you're saying there are separate

21  sub factors, but why isn't that the procedural moment

22  that you are obligated to raise it?

23          MR. FRATKIN:  The summary judgment was denied

24  against the bank in this case, and so --

25          THE COURT:  But it wasn't raised.  So for you

1   to say I didn't decide this particular issue in

2   summary judgment, it's because you didn't tee it up,

3   even though I had willfulness in front of me.  And you

4   can't claim that what happened here is that it was a

5   conscious decision not to raise it.  You are trying to

6   correct a previous lawyer's mistake.

7            MR. FRATKIN:  Well, Your Honor, I understand

8   what you're saying, but I don't think deciding whether

9   it was conscious or not, and I would agree.  I don't

10  think that they thought that this issue was there and

11  raised it.  I don't know.  But I'm guessing they

12  missed it.  But just because you don't raise an issue

13  on summary judgment doesn't forever preclude you from

14  raising that issue again.

15           THE COURT:  But if the issue is before the

16  Court, there is prejudice to the other side if you

17  fail to raise it.

18           MR. FRATKIN:  The issue of willfulness

19  generally was before the Court but not this particular

20  issue.

21           THE COURT:  But you're saying I have to find

22  it.  So how can willfulness not include that that

23  issue would have been part of it, Mr. Fratkin?  I

24  understand that you are trying to create essentially a

25  different record than your previous counsel did, but

1    you are dancing on the head of a pin here.

2           MR. FRATKIN:   Judge, I mean, again, our view

3    is that if it's not decided right now, we will raise

4    it, I don't think we've waived it, at the end of

5    plaintiff's evidence to move for judgment as a matter

6    of law.  And we are trying to get it before the Court

7    so we don't go through that process.

8           I don't think -- and the plaintiff, I don't

9    think -- I know I'm not supposed to focus on what he

10   says, but I don't think there's been a contention that

11   we've waived an issue.  I don't think we have because

12   we didn't raise it.

13          And so our point simply is we'd like to get

14   this issue decided.  It's either now or it's after the

15   plaintiff's presentation of the evidence or maybe

16   after the close of the evidence if the jury comes back

17   for a motion to set aside the verdict.  But at some

18   point in time I think the Court needs to address this,

19   and this was our first opportunity -- let me take that

20   back because it could have been before.  I apologize.

21   We think it should be decided by the Court.  And so

22   that's why we put it before it.

23          THE COURT:   All right.  So, Mr. Bennett, I'll

24   let you -- we switched into willfulness a bit.

25          MR. BENNETT:   Yes, Judge.

 1          So the issue was fully briefed and on *Safeco*

 2     by the plaintiff, and the defendant's argument is

 3     not -- I mean, is now that the Court should do exactly

 4     what you're suggesting, which is that the defendant is

 5     arguing, which is to have a second summary judgment

 6     argument.

 7          For all the reasons that we made in our

 8     papers and the Court already knows, we disagree with

 9     that.  The local rule doesn't permit it.  The

10     plaintiff would be prejudiced.  But also we shouldn't

11     let the Court believe that there are any new facts.

12     It isn't as if we -- that willfulness should be denied

13     or should have been denied on summary judgment because

14     former counsel did a poor job of briefing.  That may

15     be true, but substantively, factually, there is no

16     evidence that there was a reading made.  That is, we

17     took Mr. Shutt's deposition, and we asked in written

18     interrogatories.  There's plenty of opportunities for

19     the defendant to assert that it had a reading of the

20     statute.

21          A year or so ago our argument was *Milbourne*.

22     It was that in *Milbourne*, Judge Payne correctly held

23     that you don't look at *Safeco* unless there's proof

24     that there was actually reading.  We don't need to do

25     that anymore.  *Milbourne* is still great.  It's been

1    cited in Oklahoma.  It's been cited in Florida.  But I

2    can now cite authority which is the Fourth Circuit

3    decision, and that, pardon my scrawl, *Daugherty*, in

4    considering another furnisher case on summary

5    judgment, and this is on page eight of the opinion, of

6    the Westlaw version of it, but it's at page 257.  It

7    rejected the argument that was made that precedes the

8    highlights by the defendant on appeal as to defend its

9    position, its legal position under *Safeco*.  And the

10   Fourth Circuit importantly held that nothing in the

11   record suggests that *Ocwen* acted in reliance on any

12   other interpretation of the statute.  And that thus

13   the jury could so conclude.

14          I don't have it on here, but you now have

15   Justice Pryor in a 2017 case in the Eleventh Circuit

16   that is styled *Pedro v. Equifax*, but it was actually a

17   TransUnion decision, granted summary judgment to

18   the -- or affirmed, rather, summary judgment to the

19   credit reporting agency on the question of accuracy in

20   that case, a different fact pattern.  And the

21   plaintiff in that case was trying to argue that an

22   earlier Eleventh Circuit case, *Hinkle*, H-I-N-K-L-E,

23   *versus Midland*, the Eleventh Circuit had ruled

24   differently as to willfulness.

25          And the majority opinion in *Pedro* said yes,

1    but in *Hinkle* the defendant didn't put up any evidence

2    to prove that it actually had a reading of the

3    statute.  And so it's different here.

4          And on wilfulness, the plaintiff in *Pedro*

5    lost because in that case, the Eleventh Circuit held

6    that there was proof that TransUnion had actually

7    adopted a reading, analyzed it, and determined it.

8          So the decision in *Milbourne* is important

9    because it's in this courthouse.  The Fourth Circuit

10   has similarly analyzed the statute.  The Eleventh

11   Circuit, in *Pedro*, has similarly analyzed the statute.

12   And there is no evidence substantively that even if

13   Mr. Fratkin had tried to save this defendant on

14   summary judgment, maybe the case would have settled

15   then, but it certainly wouldn't have had a different

16   outcome.

17         There is no evidence that this defendant made

18   an effort to interpret the statute such to qualify for

19   even coming before your court on summary judgment, let

20   alone at this stage, and arguing objectively

21   reasonable interpretations like a qualified immunity

22   defense.

23         THE COURT:  So, Mr. Fratkin, I do want to

24   hear where you think, in the evidence that exists,

25   that you put forth evidence that there was a

1    reasonable reading of the statute.

2           MR. FRATKIN:  Thank you.

3           So there's two issues in the *Safeco* motion.

4    One is the Court's decision that we failed to conduct

5    a reasonable investigation for not reporting the

6    account as in dispute.  And that's this whole

7    discussion we've had about the XP versus XH code.

8           So what Mr. Bennett said was the *Daugherty*

9    opinion said --

10          THE COURT:  No.  I'm asking you about facts.

11   So you've got to get to facts a little faster than you

12   are right now.

13          MR. FRATKIN:  All right.  Warming up to it,

14   Your Honor, but I apologize.

15          So the facts are everything we've been

16   talking about on the compliance condition codes.  Our

17   facts are that we interpreted the provision to require

18   an XH code, or we thought it was okay to put down an

19   XH code when the account was in dispute.  And that's

20   what I read earlier that Ms. Lanham's testimony was.

21          That's an erroneous interpretation of the

22   statute under the Court's ruling, but that's okay

23   under the *Safeco* analysis.

24          The Court's view --

25          THE COURT:  What part of that testimony you

40

1  pointed to me suggests remotely that it's reasonable

2  or even not unreasonable?  She gave no detail.  So if

3  you say you have facts that put that at issue, it's

4  not -- if you want this in front of a jury in some

5  form or another, you can't rely on that.

6      MR. FRATKIN:  Well, this part we don't want

7  in front of the jury.

8      THE COURT:  Yeah, I know.  You want it in

9  front of me.  I know you're saying this is something

10 that I need to decide as a matter of law.  And Mr.

11 Bennett says there isn't any evidence in the record

12 that you made either a reasonable or a not

13 unreasonable interpretation.  So you can't just say,

14 This is what we did.

15     MR. FRATKIN:  Right.  The interpretation is

16 laid out in all of our policies and procedures.

17     THE COURT:  Which was never in front of me on

18 summary judgment.  You didn't append it.  In summary

19 judgment, you didn't append Mr. -- I would say Shutt,

20 but Mr. Shutt's (pronounced Shoot's) deposition at

21 all.

22     MR. FRATKIN:  We didn't raise this on summary

23 judgment, Your Honor.  I get that.  The *Safeco*

24 issue -- that's why it wasn't before, Your Honor,

25 because it wasn't raised.  But if the Court is asking

1    me what evidence there is now, if the Court wants to

2    know evidence of an interpretation --

3              THE COURT:  Yeah, I want to know.  Give me a

4    sense that if you want me to decide this on some kind

5    of motion in limine after discovery has closed, after

6    you haven't identified it at all, after your first

7    counsel totally missed it, you're going to have to

8    give me a reason that it's not going to be an entire

9    secondary waste of this Court's time.

10             MR. FRATKIN:  So we begin with Mr. Shutt's

11   testimony where he testified that he read the statute.

12   He read *Johnson v. MBNA*.  He read *Saunders*.

13   Ms. Lanham testified that she read *Saunders* and

14   interpreted it to mean that the company has to report

15   a debt that's in dispute as disputed.

16             Mr. Shutt's testimony was that he created a

17   policy that then was disseminated to the different

18   departments at the bank to create procedures.  We have

19   the procedures that are before the Court now on

20   exhibits, but the procedures with respect to the

21   dispute codes say to report XH once the creditor

22   finishes its investigation.

23             Ms. Chu and Ms. Schmitt testified that

24   they -- or I know Ms. Chu testified about why she

25   reported the code as XH.  That was what their policies

1    instructed them to do.  And --

2           THE COURT:  Ms. Chu said she hadn't been

3    trained on FCRA at all.

4           MR. FRATKIN:  She did side-by-side training

5    on how to respond -- I don't think the *Safeco*

6    analysis requires --

7           THE COURT:  Right.  I'm just making clear

8    that if you're saying that this is reasonable, what

9    Ms. Chu says is nothing that's reasoned; right?

10          MR. FRATKIN:  Well, she did what the -- I was

11   using that to show that the policies were in place,

12   and the policies reflect the company's interpretation

13   of the statute which were created by the departments

14   that had been given guidance by --

15          THE COURT:  So where is Mr. Shutt's testimony

16   about why he concluded XH was appropriate?

17          MR. FRATKIN:  I'm not sure Mr. Shutt said

18   that.  Ms. Lanham said that they followed the Credit

19   Reporting Resource Guide, and that her interpretation

20   of that was that XH is supposed to be the way in which

21   to report a dispute as disputed.

22          We're coming at this from the premise that

23   the bank was wrong.  The Court has ruled that.  The

24   *Safeco* analysis assumes that the bank was wrong.  And

25   so the questions the Court is asking are such that --

1          THE COURT:  Yeah, but what you're trying to

2    say is that you're wrong but that you're reasonable.

3    And so I'm trying to get at that it's not

4    unreasonable, at least.  That's the *Safeco* standard.

5    Right?  That's what you're trying to get me to find.

6          MR. FRATKIN:  Right.

7          THE COURT:  So why is it not unreasonable

8    that you got it wrong?

9          MR. FRATKIN:  So the statute says -- so the

10   *Safeco* analysis to determine whether the reading is

11   reasonable or not is:  Is the statute less than

12   pellucid?  And our view is yes, it's not clear.  And

13   that's based on the statute saying you have to conduct

14   a reasonable investigation, and if you find it

15   inaccurate, you have to report those results --

16   incomplete or inaccurate, you have to report those

17   results back.  That's all the statute says.

18          It took *Johnson v. MBNA* and *Saunders* to flush

19   out that investigation means --

20          THE COURT:  Yeah, but they're done.  They're

21   done.

22          MR. FRATKIN:  But you start with whether the

23   statute is less than pellucid.  And my point on step

24   one is that the statute is less than pellucid.  So

25   that satisfies *Safeco* test No. 1.  Then you look at

1    what the courts have said, *Saunders* and *BB&T*, because

2    that gives guidance.  And *Saunders* and *BB&T* don't

3    specifically say -- *Saunders*, *BB&T* and *Johnson* don't

4    specifically say how do you actually code an account

5    as in dispute.  They just say you have to mark an

6    account as disputed.  That's all *Saunders* says.  So

7    you're left with that as your guidance.  Mark the

8    account as disputed.

9            The Court has said, You have to do XC.  We

10   say, We thought XH was the right way to do it.

11           THE COURT:  XH being?

12           MR. FRATKIN:  XH being --

13           THE COURT:  -- being the account was in

14   dispute, now resolved.

15           MR. FRATKIN:  Correct, right.

16           THE COURT:  You're saying that is reasonable?

17           MR. FRATKIN:  Your Honor, that's what we're

18   saying, and that's why the CDIA guidance from 2017 is

19   important because it says don't even report any of the

20   codes.  Use those in direct disputes.

21           The testimony from Ms. Lanham was that XH, to

22   her, indicated that the account was in dispute.

23   Everything that comes to a furnisher from the consumer

24   reporting agency is in dispute.  And so their position

25   is that that's how you respond to an ACDV where --

1          THE COURT:  Where did she testify to that,

2    that level of detail, or are you adding it?

3          MR. FRATKIN:  I can find where I'm getting

4    that from.  So we used the -- this is on page 51.  So

5    we used the -- I'm skipping the extra words, but we

6    used the code XH after an ACDV is completed to make

7    sure that when the consumer sees their credit report,

8    they know that we have, you know, completed the

9    investigation and that we are the one who are

10   providing that information because it says account

11   previously in dispute now resolved, reported by the

12   data furnisher, so that the consumer knows that the

13   bank is the one updating the credit report, not the

14   CRA.

15         And then what does "now resolved" mean?  It

16   means that we've completed our investigation of the

17   dispute in compliance with FCRA.  It's telling the

18   consumer that the account was disputed and that the

19   furnisher has reviewed the dispute.

20         And I get the Court says that that's wrong,

21   but that's the investigation that we think shows

22   that -- I mean, that's the testimony that we think

23   shows that the furnisher acted reasonably.

24         I'll add that the guidelines that we relied

25   on, the 2011 Credit Reporting Resource Guide, don't

1    give -- I mean, those tell, in our view, tell us to

2    report that way as well.  And then, you know, again,

3    not to rehash the old argument, but the 2017 document

4    certainly says that the way in which the bank has

5    interpreted it is not unreasonable.

6            That's only on this compliance condition code

7    piece.  There's the whole separate issue with the

8    identity theft report, which we haven't touched on.

9            THE COURT:  No, we're staying on this one.

10           MR. FRATKIN:  Okay.

11           THE COURT:  So, Mr. Bennett, did you want to

12   respond?

13           MR. BENNETT:  The only thing I'd note is that

14   while we get in the weeds about the 2017 versus the

15   then present CDIA code, the law was *Saunders* and

16   *Siemens*, the Third Circuit decision, and those cases

17   said you had to tell the credit reporting agencies the

18   consumer disputed the debt.  So whatever code is used

19   or not used.

20           And our position, I think we've already made

21   it with respect to these other arguments here, but the

22   case law was crystal clear.  You have Third and Fourth

23   Circuit decisions, long held, that if the furnisher

24   knows the account is disputed, they need to tell the

25   CRAs that.

1          In *Saunders* and *Siemens* -- in *Saunders*,

2     rather, the argument is that no code was used.  That

3     was a fact.  I tried the case in front of Judge

4     Dohnal, and I did the appeal.  The facts were no code

5     was used and they should have used a code.

6          And so to the extent that the confusion the

7     defendant suggests exists in the statute as to whether

8     it had to report -- as to whether its procedures were

9     correct, the question of confusion of what's pellucid

10    is not what the CDIA manual reads.  I don't think

11    that's pellucid, but that's not the legal question.

12    The question is:  Was the statute clear?  And to the

13    extent the defendant would argue it wasn't, it was in

14    2007 when *Saunders* came down, and it was when the

15    Third Circuit decision in *Temple University* came down.

16         This is black letter law now that if a

17    consumer disputes an account and that account remains

18    disputed, the defendant needs to report that, and it

19    didn't, whatever code is at issue.  And certainly the

20    XB code during the reporting period was itself clear.

21    It is what you use when there's a dispute made under

22    the FCRA.

23         And it's clear enough that the 2017 document

24    that brought us to this conversation expressly says

25    "No longer do it that way."

1          MR. FRATKIN:  Your Honor, an additional

2     point, based on what Mr. Bennett said.  So *Saunders*,

3     we agree, states that you have to report the account

4     as disputed.  And what he just said was no code was

5     used in *Saunders*.  That was the problem.

6          When you're a consumer and you get your

7     consumer report or presumably when you're a lender and

8     you get a consumer report, there is nothing that shows

9     that the account was ever reviewed because they

10    reported it back with no code.

11         Here XH was used, and our witness said that

12    that indicated that we had looked at the dispute, that

13    the account was in dispute.  So that makes our point.

14    That's why the use of the XH code is important here.

15         THE COURT:  So why -- tell me this.  I know

16    you keep saying, Well, you say we got it wrong.  Why

17    is that a reasonable interpretation if you have an XC

18    code?

19         MR. FRATKIN:  I'm sorry, Your Honor.  Why is

20    it a reasonable interpretation?

21         THE COURT:  Or not unreasonable.

22         MR. FRATKIN:  I'm not saying that -- well, so

23    we disagree with the Court's opinion that we failed to

24    conduct a reasonable investigation as a matter of law

25    and didn't mark the account in dispute.  The Court's

1    opinion was that you have to use an XC code.

2           I'm not here to say whether that's an

3    unreasonable position.  It's not that you can't use

4    XC.

5           THE COURT:  Well, what does XC say?

6           MR. FRATKIN:  XC says, Account -- I can pull

7    it up quickly.  I think it's reported the consumer

8    disagrees is the key language.

9           I mean, there's more to this.  The bank's

10   position on that is when you're doing a direct

11   dispute, meaning you're not going through the CRAs,

12   the consumer reporting agencies, so the consumer calls

13   up himself and says, "I dispute this on my credit

14   report," the only way for the consumer to know or the

15   CRA to know is if you do an investigation, and if you

16   know that the consumer continues to disagree in a

17   direct dispute to market as XC.  But we're not talking

18   about a direct dispute here.  So that's why the bank

19   didn't use the XC code.

20          There's a frequently asked question --

21          THE COURT:  I've read that.

22          MR. FRATKIN:  Pardon me?

23          THE COURT:  I've read that.

24          MR. FRATKIN:  Okay.  Well, I don't think the

25   Court wants me to go through it then.

1        I don't think -- I mean, the bank's
2   interpretation of the XC code and other companies
3   would be that's used when there's a direct dispute.
4   Again, that's what the 2017 document says as well.
5   But we're not talking about a direct dispute here for
6   purposes of this case.  We're talking about a dispute
7   that came through the consumer reporting agencies.
8        THE COURT:  All right.  So I'm going to take
9   a recess.  We've been on the record for a bit.  I'm
10  going to review my thoughts on this, and then I'll
11  take the bench again in 10 or 15 minutes.  All right.
12  We'll take a recess.
13        (Recess taken from 2:30 p.m. to 2:55 p.m.)
14        THE COURT:  All right.  So we've addressed
15  two issues today, which one especially is substantive,
16  which is why I began with them, and it's fed in some
17  part by the desired use by Credit One of these CDIA
18  documents that were disclosed on November 21.
19        Essentially, with respect to what is Wood's
20  omnibus Subsection 6C seeking to exclude the CDIA
21  documents as untimely and prejudicial, what Credit One
22  suggests here is that under Rule 26(e) that it
23  requires -- 26(e) requires supplementation in a timely
24  manner if the party learns that in some material
25  respect the disclosure or response is incomplete.

```
 1    They say that this particular document was not

 2    available until March of 2017, and in their briefing

 3    they suggest that they weren't aware of its importance

 4    until the Court made its decision September of 2017,

 5    and then new counsel spent time trying to assess the

 6    case when previous counsel no longer was handling it.

 7            They suggest that to the extent there is any

 8    violation, it was substantially justified and

 9    harmless.  They've argued that there's really no

10    surprise because it's been at issue all along, and

11    then at some point suggested it was publicly available

12    both in their briefing and that it was available on

13    Google, and that Mr. Wood has had the opportunity to

14    cure offering today to allow testimony from Ms. Lanham

15    about the information in the document.  And they say

16    it's important to his claim and their defense with

17    respect to willfulness.

18            So, obviously, in order to determine whether

19    or not the sanction of exclusion would be justified,

20    the Court has to determine whether a violation of the

21    discovery order or one of the Federal Rules of Civil

22    Procedure occurred and determine whether or not that

23    violation was harmless or substantially justified

24    applying the Southern States Sherwin Williams factors

25    as articulated by the Fourth Circuit, and then fit the
```

1   sanction to the violation, if one is found.

2         Here the Court has to find that this was not

3   turned over in compliance with Federal Rule of Civil

4   Procedure 26(e).  26(e) requires a party to supplement

5   its disclosures in a timely manner if the party learns

6   that in some material respect the disclosure or

7   response is incomplete or incorrect.  It argues it was

8   timely here based on when it learned of the document,

9   but it is the case here that we had discovery close on

10  July 26 of 2016.  This document was created in March

11  of 2017, and there's no attempt to suggest why they

12  wouldn't have presented the document in March of 2017,

13  which would have been beyond the close of discovery in

14  any event.

15        This Court issued its opinion in September,

16  and Credit One didn't issue or supplement even then to

17  the extent there's some suggestion that Credit One was

18  not anticipating what the Court would address in its

19  summary judgment motion or that it was an issue in the

20  case.

21        They then supplemented essentially the week

22  of Thanksgiving, November 21st of 2017.  The Court,

23  first of all, even presuming that some kind of

24  supplementation is appropriate after the close of

25  discovery without trying to somehow invoke my case

1    management order or involve the Court in the process

2    as to what might be going on.  Credit One I can't find

3    made the supplementation in a manner that was

4    substantially justified or harmless.

5            So looking at *Southern States*, the Court has

6    to address the surprise to the party against whom the

7    evidence would be offered, the ability of the party to

8    cure the surprise, the extent to which allowing the

9    evidence would disrupt the trial, the importance of

10   the evidence, and the nondisclosing party's

11   explanation for its failure to disclose the evidence.

12           So the explanation with respect to the

13   failure to disclose is not entirely persuasive, and

14   certainly the fact that even when it was discovered I

15   can't find the delay or the supplementation or the

16   attempted supplementation could be substantially

17   justified.

18           It is the case that, sort of on the other

19   hand, Credit One is sitting and standing before this

20   Court arguing that these codes were important all

21   along, and that it had a reasonable interpretation of

22   the codes, and that because of that willfulness is a

23   nonissue in front of this Court.  And so to the extent

24   it wants to supplement its position as to how these

25   codes should or should not be read, and that it is now

1   belatedly raising directly the issue of whether or not

2   it had a not unreasonable interpretation of the

3   statute, it certainly can't claim surprise about this

4   particular issue.

5            So to the extent it's trying to lay the issue

6   of whether or not it should have known to address this

7   at the hands or the feet of this Court's decision,

8   Credit One cannot take the inconsistent position that

9   of course this Court had this matter of law in front

10  of it the whole time and should have ruled on it and

11  now should rule on it in a motion in limine because

12  it's so obviously something that this Court should

13  rule on.  So it does not meet the first factor.

14           The document itself clearly has issues about

15  relevance because it's after-acquired evidence.  It's

16  evidence that certainly Credit One does not claim nor

17  could it that it relied upon when making any kind of

18  decision with respect to its reasonable or not

19  unreasonable interpretation of the statute.  And so

20  any attempt to bring it in now certainly isn't

21  relevant to the decision it was making at the time of

22  this particular case, but it also leans toward

23  bolstering its own interpretation through a third

24  party in an inappropriate fashion.  And so it's

25  potentially deeply prejudicial for that reason.

1          Although Credit One stands here offering to

2    allow additional discovery with respect to the nature

3    of the document and how Credit One interpreted it,

4    that's certainly, while they would offer to do that in

5    the next three weeks, it disrupts the pretrial

6    preparation process to offer that in any event,

7    especially for a document that's now been extant

8    nearly a year, whether or not Credit One knew about

9    it.  It's not the case that the emergency of when they

10   figured it out should create undue prejudice to the

11   other side or interfere with trial preparation.

12          So the Court has to find that it would

13   disrupt the trial.  Because the Court finds that it

14   violates and does not meet several of the factors in

15   *Southern States*, and the Court does not have to

16   consider all of the factors, Mr. Wood's motion 6C to

17   exclude evidence as to this document is granted.

18          Now, I'm going to talk about willfulness a

19   little bit, and I'm going to be sure that I get back.

20   This is an important issue.  And so I'm going to tell

21   you where I'm leaning on the willfulness issue, and

22   I'm going to issue an opinion so you guys can have the

23   opportunity to address it on appeal.

24          So both Credit One and Mr. Wood recognize

25   that there is no specific rule with respect for

1    motions in limine, but certainly courts have used them

2    in an evolutionary process for an inherent authority

3    to manage trials.  And it is, generally, the purpose

4    is to allow a Court to rule on evidentiary issues in

5    order to avoid delay and ensure an evenhanded and

6    expeditious trial and focus on the issues that the

7    jury would consider.  That's certainly Eastern

8    District law and black letter law.

9         It is not generally to use for the purpose of

10   granting judgment as a matter of law.  And that's

11   generally covered under rule 56(a).  My initial

12   pretrial order, as modified by amended scheduling

13   order, set the deadline for dispositive motions, such

14   as summary judgment, for August 31 of 2016.  And this

15   Court's local rules give each party one motion to file

16   for summary judgment under Local Rule 56(e).

17        Credit One submitted a motion for summary

18   judgment seeking summary judgment on all aspects of

19   Mr. Wood's complaint, including his allegation that

20   Credit One willfully failed to comply with the FCRA.

21        It then filed a memorandum of law that was

22   nine pages long.  Two paragraphs of the memorandum

23   were devoted to its argument that Mr. Wood's

24   willfulness claim failed.  So at the opportunity of

25   Rule 56 seeking -- Credit One seeking its motion as a

1    matter of law, it filed two paragraphs on willfulness.

2    It didn't cite *Safeco*.  It cited *Safeco* for the first

3    time in its reply brief in response to the plaintiff

4    having raised it.  And it purportedly included a full

5    two pages of argument and analysis related to *Safeco*,

6    but I can't say that the two pages fully covered the

7    issues, even the issues they say they were raising.

8           Credit One made no argument about objective

9    reasonableness and certainly did not present the

10   argument that counsel is now seeking to present in the

11   court as a motion in limine.  Specifically, Credit One

12   argued at pages seven and eight that its "actions were

13   not objectively unreasonable."  It argued its actions

14   were not objectively unreasonable.  And in support of

15   this statement, Credit One included the following

16   sentence:

17          "The only evidence in the record is that

18   Credit One had in place written procedures and

19   policies governing its investigation of credit

20   disputes.  Personnel are trained on the handling of

21   credit disputes.  Mr. Wood cannot present any evidence

22   to demonstrate that Credit One did not comply with

23   these procedures in investigating its disputes."

24          So when Credit One made that assertion at

25   page eight, it cited zero portions of the record.  It

 1    didn't make a single assertion on the record.  It did

 2    attach to its motion for summary judgment elsewhere

 3    depositions of Mr. Wood and Ms. Chu and Ms. Schmitt.

 4    Obviously, Mr. Wood didn't have any testimony

 5    regarding Credit One's policies or interpretation of

 6    the FCRA.  Ms. Chu was, as everyone here knows, the

 7    ACDV processor during the time period relevant in the

 8    case, and she testified regarding the training she

 9    received and the procedures she undertook when

10    investigating an ACDV submitted by a CRA.

11            On page 51, Ms. Chu specifically said she was

12    never trained in Credit One's FCRA policies.  She

13    didn't know what the Fair Credit Reporting Act was,

14    and she said she didn't know what ACDV stood for.

15            Ms. Schmitt was also an ACDV processor at the

16    relevant time.  She testified regarding the training

17    she received and the procedures she undertook.  During

18    the deposition, she was shown a training manual that

19    appeared to discuss procedures in place while

20    Ms. Schmitt worked at Credit One, and counsel

21    questioned her about the manual.

22            Ms. Schmitt didn't, as far as this Court can

23    assess, she testified that she really didn't know

24    specific personal knowledge of the training manual nor

25    did she testify as to how the manual was created.

1        In its motion for summary judgment on

2    willfulness, Credit One did not submit the depositions

3    of Allan Shutt, who was in-house counsel and chief

4    compliance officer and who did testify somewhere

5    regarding how Credit One developed its compliance

6    policies and procedures.

7        It did not submit the deposition of Helen

8    Lanham, Senior Vice President in Corporate Risk

9    Management, who testified that Credit One had

10   procedures based on the Credit Reporting Resource

11   Guide, and although these depositions were before the

12   Court, at least parts of both of them because Mr. Wood

13   submitted them in support of his motion for partial

14   summary judgment, Credit One is required to support

15   its motion with, under Rule 56, "particular parts of

16   the materials in the record that would be admissible

17   in evidence."

18       The Court does not have any obligation to

19   sort through the record and make a party's case for

20   it, rather the Court need only cite the submitted

21   materials or it only considered the cited materials.

22       On summary judgment, the party seeking

23   summary judgment bears a burden of showing that

24   there's no genuine dispute as to any material fact and

25   that the movant is entitled to a matter of law.

 1          So on summary judgment, Credit One chose not

 2  to make any argument as to whether or not it had

 3  relied on an objectively reasonable or not

 4  unreasonable objectively interpretation of the FCRA.

 5  And it now contends that the Court should consider

 6  that as a motion in limine.

 7          So certainly the Court has grave concern as

 8  to whether or not this motion is an attempt to

 9  circumvent what Credit One should have done under the

10  Court's pretrial order and under Rule 56.

11          If this is an issue that has been addressed

12  as a matter of law, and the rules require that

13  dispositive motions address such issues, and certainly

14  it is clear that Credit One is arguing now that this

15  would be dispositive of this aspect of the willfulness

16  issue and so the Court has to do it before trial, the

17  Court finds that plaintiff's argument, that this is

18  essentially an end run by new counsel to address

19  issues that former counsel essentially missed and is,

20  in essence, a secondary Rule 56 motion in violation of

21  that rule and the local rules prohibiting that.

22          Now, as the Court has already mentioned to

23  counsel here, it took into account previous counsel's

24  motion despite a series of failures as to how it was

25  briefed and what it briefed, and then addressed issues

1  in an attempt to, in the interest of justice, move the

2  case along in an appropriate fashion.

3          It did that, however, not seeking out

4  arguments that a party chose not to raise for whatever

5  reason or just failed to raise by inadvertence or

6  negligence, and it is the case that Credit One is

7  correct.  I am required to make a finding as a matter

8  of law whether or not they were engaged in an

9  objectively reasonable interpretation or at least a

10  not unreasonable interpretation of the law as defined

11  in the *Safeco* case.

12          So Mr. Wood here is crying foul saying that

13  Credit One is seeking a second stab at summary

14  judgment and is inappropriately attempting to use a

15  vehicle of a motion in limine to do what it should

16  have done initially under both the Court Order and

17  Rule 56.

18          So I am telling Credit One that I'm going to

19  issue an opinion on this, that I will consider the

20  arguments that they have raised today, but I am

21  strongly inclined to make a finding that this does

22  violate the Court's rules and Rule 56, and that it

23  does so in a fashion that would subject Credit One to

24  an appropriate set of sanctions, which can include all

25  sorts of things, certainly monetary sanctions.  It can

1    also include certain findings with respect or

2    corrective instructions or findings that I instruct to

3    the jury.

4            As I do that, though, I want to be sure that

5    I've taken into good account all that the parties have

6    put in front of me.  Specifically, I want to be sure,

7    because there has been a tendency to underrepresent

8    the facts of what each side is relying upon as they

9    make their arguments, I want to review what I did have

10   in front of me and make sure that I'm giving credit to

11   what Credit One says was there.  Whether or not that

12   can get over the procedural mistakes will be a

13   secondary matter.

14           So I'm not going to make a final

15   determination on willfulness, but I'm having trouble

16   seeing how we determine that at this late stage after

17   discovery is closed when you had an opportunity to

18   move, and you didn't, how that is not a violation of

19   the Court's orders as they stood.

20           So I will issue an opinion.  And it is the

21   case also if I decide I need briefing, I'll ask you

22   all for it, but I want Credit One to know that all of

23   that is going to come at the risk of sanctions.

24   Sanctions being, of course, not just your own fees,

25   but, of course, the fees of the other party.

1          MR. FRATKIN:  May I ask a clarifying

2    question, Your Honor?

3          THE COURT:  Yes.

4          MR. FRATKIN:  If I understood the Court

5    correctly, is the Court still inclined to issue a

6    ruling on the substantive issue of whether there

7    was -- whether there was an objectively reasonable

8    interpretation as a matter of law?  Put aside the

9    procedural sanctions issue, if the Court finds that

10   the procedural way in which we brought this was

11   improper, does that mean that the Court is not going

12   to issue a substantive ruling on the willfulness

13   issue?  Maybe I misunderstood the way in which the

14   Court was saying what it would do, and I apologize.

15         THE COURT:  The issue would be whether

16   there's any evidence that I can consider that you had

17   a reading of the statute at all since you failed to

18   address the issue.

19         MR. FRATKIN:  Failed to address the issue on

20   summary judgment?

21         THE COURT:  Failed to address the issue.  You

22   didn't address it.  A dispositive issue at a time when

23   you were addressing the other part of the dispositive

24   issue.  And so the question is whether you should be

25   allowed to do that at this late date with evidence

1    that was on the record the whole time.  And I'm

2    excluding the CDIA.

3          MR. FRATKIN:  I understood that.  We have

4    not -- we have not addressed the arguments at all on

5    the identity theft report, and, again, I think if the

6    Court's consideration is that that evidence was there

7    all along, too, then I assume that there's no need to

8    separately ask a question about that.  But we didn't

9    argue that today.

10         Sorry.  I'm thinking out loud for a second.

11   If I may ask the Court if the motion in limine is

12   withdrawn, will the Court not issue an opinion on the

13   sanctions issue, because in our view this is something

14   that while it wasn't raised on summary judgment, if we

15   get to trial --

16         THE COURT:  Don't you have to ask to withdraw

17   it?

18         MR. FRATKIN:  Well, the Court is inclined to

19   issue a sanctions ruling, and I don't want to withdraw

20   a motion and then still have the Court issue a

21   sanction for the filing of this motion.  And I would

22   need to talk to my client, but -- I was

23   inquiring whether a --

24         THE COURT:  Are you saying that you want to

25   avoid sanctions by filing it even later without having

1    a ruling on whether or not this is admissible?

2         MR. FRATKIN:  I think the issue can be raised

3    at any time.  It can be raised at the pleadings.  It

4    can be raised on summary judgment.  We thought motion

5    in limine.  I hear what the Court is saying, but

6    certainly after all the evidence at trial comes in, we

7    can raise the issue as a motion for judgment as a

8    matter of law.  And if the Court feels --

9         THE COURT:  I said I haven't decided yet.

10        MR. FRATKIN:  Well, I'm asking -- I

11   understand that, Your Honor, and I'm trying to get an

12   understanding of our possibilities here given that the

13   Court -- I don't want to run the risk of the Court

14   excluding evidence at trial as a sanction, which --

15        THE COURT:  So you take the opportunity to

16   educate me about why you are so absolutely right about

17   why it can be raised at any time and I shouldn't issue

18   sanctions before I issue the order.  You can file that

19   whenever you want to.  When do you want to file it?

20        MR. FRATKIN:  Right.  Thank you.

21        THE COURT:  All right.  We're going to turn

22   to some of Mr. Wood's motions with respect to

23   exclusion.  So I want to address first Mr. Wood's

24   motions with respect to one, two, three, and four.

25   And so I'll hear your argument, Mr. Bennett, as to the

1   motion where you say you want to exclude evidence with

2   respect to Credit One's reporting to the CRAs

3   regarding an account whether it was accurate.

4          MR. BENNETT:  Yes, Your Honor.  We sought

5   summary judgment on this very issue to avoid a body of

6   evidence that we believed would be unfairly

7   prejudicial and confusing.  I don't want to go to

8   trial when the identity thief or the fraudster is

9   related to the victim.  There's no legal distinction

10  there.  A victim is a victim.

11          I've lost a trial where a son stole the

12  identity of a father and spent a week in Detroit on

13  this issue.  And so in circumstances like this, to

14  avoid attempts to essentially get the jury to nullify

15  the evidence, to find that notwithstanding that as a

16  matter of law Mr. Wood never opened the account, used

17  the account, knew of it while it was happening, that

18  because relatives are responsible for the sins of the

19  other relatives, he should be responsible for that.

20  So the very basis for us going to substantial links to

21  prove pretrial, pre-motions practice, and then to

22  litigate on summary judgment the question of whether

23  or not the reporting was accurate was to avoid this

24  very issue at trial.  We thought it was done and over,

25  and now we have a new defense team, a good defense

1    team, but a defense team that, again, wants a do-over

2    on this subject.

3         I've had discussions, substantive

4    discussions, of us attempting to convince defense

5    counsel that it should not make these arguments.

6         THE COURT:  So tell me specifically.  You're

7    saying the questions about whether or not -- that

8    you're seeking to exclude evidence about whether or

9    not the reporting was accurate.  That's pretty broad.

10   So, you know, you have to give me something to rule

11   on.

12        MR. BENNETT:  So, specifically, in terms of

13   tangible, hard documents and witnesses, this is the

14   motion that would describe our objections to the West

15   Point police officer with the after-acquired evidence,

16   and then the police incident report or the notes that

17   the defendant produced.

18        It also, Judge, would seek, because a motion

19   in limine can deal with evidence, but it would also

20   prohibit the defendant from opening statement and

21   closing argument suggesting and stating that our guy,

22   Mr. Wood, was responsible for the account and that its

23   reporting in any way would be accurate and could have

24   been accurate.

25        We won that issue on summary judgment through

1    great effort, which it is correct that we won that

2    issue on summary judgment.  And I don't want to go to

3    trial and have this trial about whether a jury should

4    assign blame to Mr. Wood because of the actual

5    identity theft with his mother.  And everything in our

6    pretrial discussions with counsel suggest that's a big

7    part if not their primary defense is to continue the

8    same type of argument that even though there is no

9    contractual basis, no evidence that our guy used the

10   card, knew of it, or otherwise, that there's this

11   philosophic position that he should be responsible,

12   and that's not the law generally in Virginia, and it's

13   certainly not the law in this case based on the

14   Court's ruling.

15          I think that if the Court rules that with

16   respect to statements or claims that the reporting was

17   accurate, that our client was responsible for the

18   account, such as with respect to those witnesses and

19   those documents, and then Mr. Fratkin makes the

20   argument or makes the statement in opening contrary, I

21   will object, and the Court's position will have

22   already been stated.  So I don't believe that the

23   Court needs to have a long list of things that can be

24   said or not be said.

25          So that's the generality of our motion that

1   explains that.  But the tangible part of it would be

2   attempting to argue through these two police

3   employees, apparently police employees, a belief that

4   my client was making it up.  That, in fact, he might

5   have been the one that used this account.  In fact,

6   the legal question has already been determined.

7          THE COURT:  All right.

8          MR. FRATKIN:  Your Honor, it's not the

9   position we're going to take.  We're not going to take

10  a position at trial that the reporting or that Mr.

11  Wood opened the account.  I thought this motion was

12  trying to prevent us from taking the position at trial

13  that we now believe that he did not open the account,

14  which is a position I think we want to take, which is

15  after thinking through this and learning some

16  additional things, and the Court's opinion, we don't

17  think Mr. Wood opened the account.  That's the

18  position we're planning on taking at trial, not that

19  he continues to be responsible for the account.  So

20  I'm not sure where Mr. Bennett gets our position from.

21          On the police reports, we've said in our

22  separate motion on that that we plan to use that, if

23  necessary, for impeachment purposes.  The Court ruled

24  in a prior order that at least one of those witnesses

25  would only be for impeachment purposes.  The second

1   witness is also for impeachment purposes.  I'm not

2   planning on bringing that up in opening.

3          So our plan is, just to sum it up, we're not

4   planning to reference or suggest that Mr. Wood is

5   responsible for the account.

6          MR. BENNETT:  Your Honor, may I ask counsel a

7   question?

8          THE COURT:  Why don't you express your

9   concern to me.

10          MR. BENNETT:  To the extent that this is a

11   change in position from the opposition brief, that it

12   would be resolved, but the opposition brief -- and I

13   overhear that that's not so.

14          So the opposition brief suggests that the

15   defendant still intends to use this evidence on

16   willfulness to suggest that its belief that its

17   reporting was accurate, was correct.  And that's at

18   page 2 of document 144.

19          Defendant writes, "Put more concretely,

20   evidence that was relevant to the question of

21   inaccuracy at the summary judgment stage will also be

22   relevant to willfulness at trial.  For example, when

23   deciding whether Credit One's reporting to the CRAs

24   was inaccurate, the Court considered Credit One's

25   reporting procedures and the information it received

1   from Wood, the CRAs, and the Consumer Data Industry

2   Association (CDIA), and regardless of the Court's

3   ultimate conclusion on accuracy, these procedures and

4   that information are still relevant to Credit One's

5   intent with respect to the Wood's account."

6          So to the extent that the defendant's

7   position is that it wants to re-litigate what was

8   argued and proven on summary judgment, that is, the

9   fact that this was not his account, the defendant

10  wants to do this now at trial under the guise of

11  saying, Yeah, we know today it's not his account, but

12  all of the evidence that was presented to us, we

13  thought it was his account, and here's all the

14  evidence that would support a belief that it was

15  accurate.

16         The Court has seen all that evidence and

17  ruled that it could not have so found its

18  investigation reasonable in the face of that evidence.

19  So from both of those directions, it would not be

20  relevant.  But certainly any modest benefit the

21  defendant would get would be overwhelmingly unfairly

22  prejudicial to our client because of the risk of jury

23  nullification or somehow re-litigating the accuracy

24  and obligation evidence that's already been

25  determined.

1        With respect to what Mr. Fratkin just said as

2   to the police individuals' impeachment, I don't know

3   how it would impeach unless the issue was accuracy,

4   because the only evidence that they were offered for

5   by the defendant was this belief by one person that

6   she believed my client wasn't telling her the truth.

7   He didn't say there was any evidence of that, and it

8   turns out we know she was wrong.  But they would use

9   that evidence to impeach him only on the question of

10  accuracy.

11        This is not somebody, if the Court recalls,

12  this is not somebody that the defendant ever talked to

13  itself, had any evidence from, had any documents from.

14  This was all litigation after-acquired evidence.

15        THE COURT:  So can you see of no way that Mr.

16  Wood, through testimony, could open up the door where

17  they could try to introduce those -- are you saying

18  they're precluded as a matter of law from impeachment

19  if he says something that opens the door?

20        MR. BENNETT:  So he never had any

21  communication with one of the individuals.  The other

22  individual, Sergeant - I believe - Woodson, I think

23  that the Court would -- I don't think that on the

24  question of impeachment, the Court could fairly

25  exclude from the entire universe of possibilities that

1    witness.  So I would agree with the premise of Your

2    Honor's semi-rhetorical question there for

3    impeachment.  But I'm unaware of anything because

4    there was not that much communication, and the only

5    issue was -- the only issue was her suspicion that my

6    client was gaming the system because he had gone to

7    two different police departments to report the theft.

8    And that's it.

9         So if the Court found that she's excluded

10   except for impeachment, there's still, on the question

11   of accuracy, the evidence wouldn't be properly

12   admitted, and I don't think ultimately there's any

13   possibility the witness comes in.  So that at trial,

14   if Mr. Fratkin proffered that witness to impeach, he

15   would have to explain it.  I can't conceive of what

16   the basis would be.

17            THE COURT:  So why don't you tell us.

18            MR. FRATKIN:  Well, for one, it's for

19   impeachment, but there's testimony and evidence that

20   came out on summary judgment about whether Mr. Wood

21   asked for an identity theft.  I mean, asked to have

22   his police report.  He said he contacted the police

23   department multiple times and never was able to get

24   it.

25            The police officers, one of the police

1    officers' testimony, and I apologize, I don't remember

2    which one it was, maybe both, said they don't recall

3    any record of him ever requesting, and that had he

4    requested one, they would have given it to him.

5          So for that reason I think that there's a

6    potential it could be used for impeachment.  I don't

7    think the Court should be ruling now on the document

8    that didn't need to be disclosed in the first place

9    for impeachment purposes.

10          So separate reason not to address that issue

11    right now.  These are documents that don't need to be

12    disclosed until at trial.  And so I'd ask the Court

13    not to rule on those documents or those witnesses now.

14          The separate issue on the accuracy, and maybe

15    Mr. Bennett and I were talking past each other on the

16    motion, there's what Credit One believed at the time

17    versus what it believes today.  At the time it

18    certainly believed that Mr. Wood was responsible for

19    the account.  If they'd thought he was not

20    responsible, then they would have deleted the account

21    and we wouldn't be here today.

22          I don't want the jury to be left with an

23    impression they thought that he was responsible for

24    the account and part of their investigation looks into

25    whether they believed that the consumer is responsible

1   for the account.  And so certainly at the time they

2   thought he was based on the information that they had,

3   and we put this in our brief, but this is evidence

4   appropriate to be considered for the dual purpose of

5   willfulness.

6          So that's why for the belief at the time we

7   think it's still appropriate for our witnesses to

8   testify that based on the information they had, they

9   thought that they were properly reporting the account

10  based on their belief that Mr. Wood still was

11  responsible for the account.

12         And, again, the Court already ruled that he's

13  not.  And the Court's ruled that the investigation was

14  unreasonable, but there's still the question of

15  willfulness left.  And certainly what they did in the

16  investigation is relevant which includes whether they

17  thought he was responsible.

18         THE COURT:  So tell me the basis of your new

19  theory that he's not responsible for the account.

20         MR. FRATKIN:  I talked to Mr. Wood's mother.

21  She told me that she opened the account.  She said Mr.

22  Wood was in a coma when the account was opened, and I

23  don't have any reason not to believe her.

24         There's other reasons, too, from the Court's

25  opinion and our investigation.

1          THE COURT:  You had a sworn affidavit.

2          MR. FRATKIN:  It was not an affidavit, Your

3    Honor.  It was a document that says --

4          THE COURT:  Okay.  I wrote about that.  I

5    wrote about how that document was attested.  And,

6    unfortunately, your counsel, who broke every

7    evidentiary rule filing his motion for summary

8    judgment, decided to attack that statement because it

9    wasn't properly attested to.

10          MR. FRATKIN:  Your Honor, you asked me why we

11    believed, and I said I talked to the mother.  She told

12    me --

13          THE COURT:  No.  I asked you after that.  You

14    had that document in advance, and you said it

15    wasn't --

16          MR. FRATKIN:  Well, I was going to say and

17    the Court's opinion and other things.  And, sure, that

18    document factors into a whole bunch of things that the

19    company's position now is going to be we don't believe

20    he was responsible for the account.  It doesn't change

21    what they believed at the time even though they had

22    that document.

23          I mean, that's why the Court probably found

24    they were wrong, but we're talking about willfulness

25    now.  So with the benefit of some hindsight and

```
 1   additional research or investigation --

 2           THE COURT:  You mean, that you actually did

 3   the investigation that Credit One through its previous

 4   counsel hadn't done?

 5           MR. FRATKIN:  I believe --

 6           THE COURT:  In defending the case in front of

 7   this Court?  Is that what you mean?

 8           MR. FRATKIN:  Your Honor, I can't -- I don't

 9   know how to respond to that.

10           THE COURT:  Well, one issue here is that

11   Credit One, your client, is required to take

12   principled stands in front of this Court.  Mr.

13   Fratkin, there is nobody here who is saying you're not

14   taking principled stands.  But Credit One has been

15   here for a long time, and they have their own lawyers,

16   and they have the lawyers that came in front of me,

17   and they have counsel, in-house counsel.

18           So if you're now saying to me, which you said

19   obliquely I think one time directly, that you now want

20   to change the entire way you defended this case

21   because the whole time Mr. Wood is saying it's not my

22   account, and my mom opened it fraudulently, and you

23   took him to the wall for however long you took him to

24   the wall saying we're accurately reporting it, and now

25   you want to refract it because you, Mr. Fratkin, have
```

1   done investigation that maybe somebody else didn't do,

2   but the client had that information the whole time.

3   The client.  You are representing the same individual.

4   I have no idea why this case, for instance, hasn't

5   settled.  You're sitting here in front of me saying

6   that you now know Mr. Wood didn't open the account.

7          MR. FRATKIN:  Your Honor, accuracy is a

8   defense.  If we would prove accuracy, we would have

9   prevailed.  But the statute doesn't require accurate

10  reporting or a cause of action.  It requires the

11  plaintiff to prove that we conducted an unreasonable

12  investigation.  And on this point, we think this is

13  *Safeco*, but -- and we've raised it.

14         THE COURT:  You didn't raise that part of

15  *Safeco*.  Credit One did not.  That is a Supreme Court

16  case.

17         MR. FRATKIN:  But the point being factually,

18  and I didn't mean to get into the legal argument

19  again, the point being factually Credit One's policies

20  are to require that Mr. Wood submit an identity theft

21  report, and we think that's supported with the CFPB,

22  and we spent the other half of our *Safeco* brief on

23  that.  But that was their policy.  And so if you're

24  asking why they took the position that he was

25  responsible for the account and why we take the

1  position, and still do, that the investigation was

2  reasonable on this identity theft issue, we think the

3  law says that unless you get a police report or an

4  identity theft report, that it's okay, it's

5  permissible to continue to report that he's

6  responsible for the account.

7          And so -- I mean, I don't say that -- I don't

8  think Credit One did anything wrong before.  I don't

9  think they did anything wrong continuing the account

10 and taking the position that it was accurate.

11         We've done some additional research.  We have

12 Your Honor's opinion, which certainly is something

13 that went into consideration, and, you know, if the

14 witness -- if our client wants to now take the

15 position that it doesn't believe he owes on the

16 account anymore, and that's the truth, then they ought

17 to be able to say it.

18         THE COURT:  Maybe not without consequence.

19         MR. FRATKIN:  I think our response is they

20 should get impeached with their prior testimony that

21 said they thought he owes the account.  That's what we

22 argued in our briefing.  If they want to change a

23 position, then there's an impeachment issue.  And I

24 fully expect Mr. Bennett to take advantage of it.

25         But they didn't have all that information all

1    along and they certainly -- they had the CFPB guidance

2    that said require an identity theft report before you

3    change a credit report.

4         MR. BENNETT:  May I use the court reporter's

5    record here since we have the general counsel to put

6    on the record the fact that familial identity theft is

7    almost impossible to prosecute.  It is almost

8    impossible.  And I recognize this doesn't have any

9    bearing on this case.  But on the record, if I have to

10   deal with Credit One in the future, we will prove that

11   point.

12        Statistics -- CFPB statistics and the FTC

13   statistics, you cannot -- it is almost impossible to

14   get a police officer to take a police report or

15   prosecute a family member, a familial identity theft,

16   and that's exactly what happened here.  But that's

17   also -- there is no CFPB guidance that says require

18   this, and there is significant case law that says you

19   can't impose such a requirement, even if factually

20   there was evidence that that was the reason that the

21   defendant rejected my client's very detailed disputes,

22   including written sworn statement from the mother.

23        I'd also put on the record, and I apologize,

24   Judge, I did not know of this conversation.  I

25   understand Mr. Fratkin was doing his job

1    investigating.  We were unable to get the mother to

2    talk to us.  She is still estranged from Mr. Wood.

3    So, if anything, she would be an ally of Credit One.

4            And while I have this microphone, in the

5    effort to try to get the defendant to settle, when you

6    go through the actual accounts that the mother

7    supposedly would have charged, there's only a hundred

8    and change that were not Credit One imposed fees,

9    interest and other.  It was a 300 R account charged

10   off at $700, and only $118 of which this woman

11   apparently used at McDonald's and cigarette stores.

12   So this case should resolve.

13           But we certainly don't think that there

14   should be any litigation of the question of accuracy

15   at trial.  Even if there's a modest probative utility

16   here, it is overwhelmed by the unfair prejudice, and

17   under the Federal Rules of Evidence should be

18   excluded.

19           THE COURT:  All right.  Let's turn to -- to

20   the extent we haven't addressed, I want to be sure I

21   cover all aspects of what you've raised because they

22   are being raised in interesting ways.

23           So your second, No. 2, Mr. Wood is arguing

24   that there should be an exclusion of any evidence all

25   together with respect to the -- that it had an

1    interpretation of the FCRA defense.

2         Do the parties think that we have essentially

3    addressed that issue through our willfulness

4    discussion or is there more to it?

5         MR. BENNETT:  I believe we have.  In

6    opposition to the motion in limine, the defendant,

7    essentially, effectively concedes that its

8    interrogatory responses in Rule 30(b)(6) testimony

9    would not have provided evidence of that, and it

10   retreats to the position that it doesn't matter,

11   bravely arguing, in part, that the interrogatory

12   answers weren't sworn and thus not useful, and arguing

13   that it's not bound by its 30(b)(6) testimony.  And

14   there was still seven more pages that could have been

15   used in the brief.

16        There was no evidence that the defendant

17   suggests saying, No, no, no, the plaintiff is wrong.

18   There is evidence in the record that there was such an

19   interpretation, and there's not.

20        THE COURT:  Why are you arguing here that

21   you're not bound by your interrogatory answer?  I will

22   say --

23        MR. FRATKIN:  I'm just asking for it here, I

24   think.

25        THE COURT:  Listen, you know, Mr. Fratkin,

1   whatever happened before happened before.  You want to

2   rely on the fact that another counsel didn't swear to

3   interrogatories appropriately --

4        MR. FRATKIN:  No.

5        THE COURT:  I don't honestly understand what

6   the heck you're trying to do.  It may be too clever by

7   far.  So you're going to have to explain to me why

8   it's not.

9        MR. FRATKIN:  It's not that -- you're bound

10  by -- the case law --

11       THE COURT:  What are you getting away from?

12  What aren't you bound from?

13       MR. FRATKIN:  You can contradict your

14  testimony, 30(b)(6) testimony, interrogatory answers,

15  any deposition testimony.  I'm not saying we are going

16  to, but you can't -- he's saying we didn't offer

17  enough evidence of any of that, and therefore we can't

18  say anything at trial about our policies -- I'm

19  sorry -- our interpretation of the statute.

20       So the point was simply that it's just a

21  party admission.  The interrogatories are a party

22  admission.  They're not sworn.  We're probably being

23  too clever, and it's not worth, for me, not worth

24  arguing about it anymore.  I think it was just a small

25  point that there is nothing different about these

1    interrogatories.

2         THE COURT:  But, you know, you are arguing

3    it.  So what's going to be different?  The whole point

4    is surprise.  The whole point is now you're saying we

5    do have a -- you know, we've learned.  We're a

6    reasonable company.  So we got it wrong for a long

7    time.  We argued it wrong for you in front of summary

8    judgment.  We don't really like your opinion, but

9    we're going to adhere to it a little bit while we

10   present our evidence in front of you.  And so but to

11   do that, we're going to change our theory of the case.

12        So what is it that you are saying that you're

13   going to change?  And if you're not going the change

14   it, then why do I have this position in front of me?

15        MR. FRATKIN:  He brought a motion, as I

16   understand it, that we cannot offer any evidence that

17   we had an interpretation of the FCRA and said that,

18   based on our scant evidence of policies and

19   procedures, that, and other things, that we aren't

20   allowed to offer any evidence that we thought the FCRA

21   required us, for example, to conduct a reasonable

22   investigation.

23        Under his motion, he says that, and he points

24   to all of this discovery that he thinks binds us to a

25   point where we can't offer any evidence.

1          THE COURT:  So cite the evidence that you are

2     going to offer that either is already on the record or

3     that I can make a finding as to whether or not you're

4     allowed to do it.  Why am I in the dark about that?

5     This is a civil trial.  There's no surprises here.

6     Because if you surprise, it's prejudicial.

7          MR. FRATKIN:  You asked at the beginning of

8     this -- well, before Mr. Bennett started talking,

9     whether what we had already covered in the *Safeco*

10    argument covered this, too, and the answer, I think,

11    is yes.  Everything that I read out loud from

12    Mr. Shutt to Ms. Lanham about the policies and

13    procedures that they had, all that is what would

14    support our position that we can offer evidence of

15    that at trial.

16         THE COURT:  Existing evidence.

17         MR. FRATKIN:  Well, the witness that's here

18    live is not going to read word-for-word for her

19    deposition.

20         THE COURT:  So that's a secondary question.

21    Is everybody going to be here live?

22         MR. FRATKIN:  Ms. Lanham will be here live.

23         THE COURT:  What about Mr. Shutt?  You're

24    talking about him an awful lot.

25         MR. FRATKIN:  Mr. Shutt's deposition will be

1    presented, and I think we're mostly in agreement on

2    Mr. Shutt being able to testify through deposition.  I

3    took Mr. Bennett's position to be that -- well, I

4    don't know what the position is, but Mr. Shutt will be

5    here through a deposition.

6            THE COURT:  Is it Shutt (pronounced shoot)?

7    I'm going to try to get it right.

8            MR. FRATKIN:  Shutt (pronounced shut).  Mr.

9    Shutt.

10           THE COURT:  All right.

11           MR. FRATKIN:  So certainly, obviously, his

12   evidence will be what he said in his deposition about

13   the policies that he wrote, and how they were

14   disseminated to the rest of the company.  How he read

15   *Johnson*, how he read *Saunders*.  All that's been

16   designated.

17           Ms. Lanham will be here live.  I don't expect

18   her testimony to be inconsistent with what she

19   testified in her deposition, but, I said this earlier,

20   they didn't ask every single question of her in a

21   deposition that they could have, and so she may expand

22   on her testimony, and she's allowed to do that.  And

23   if she says something that Mr. Bennett thinks is

24   inconsistent, then he's got her testimony to impeach

25   her with.  So I'm not expecting anything inconsistent.

1    I'm just trying to address the motion that he's made

2    which says we're not allowed to offer any of that.

3         The interrogatory answers have not been

4    cited -- have not been -- I don't think Mr. Bennett is

5    using those as evidence in the case.  He's not listed

6    that as an exhibit.  I mean, they could be used for

7    impeachment, which we wouldn't object to.  But I'm not

8    trying to suggest that there's going to be anything

9    inconsistent.  I'm just trying to say we think we

10   ought to be able to defend our case with evidence

11   about --

12        THE COURT:  So one of the issues is your

13   brief says you can contradict.  So you may just be

14   citing law, but as somebody who doesn't know what your

15   theory of the case is, hadn't heard until now that you

16   intend to say that, oh, it's the mother who opened it

17   because you talked to her, I was presuming you were

18   going to contradict, and it sounds like in some

19   respects you are.

20        MR. FRATKIN:  I think on the accuracy piece,

21   we're taking a different position than what we took

22   earlier.  This is a question.  This particular motion

23   is about whether we had a policy or procedure in place

24   that interpreted the FCRA.  And that's what we raised.

25   And the point about being able to contradict is simply

1    that you can expand it.  You can contradict it.

2    That's all permissible.  And so to try to prevent us

3    from putting on any evidence, which is what we took

4    this motion to mean, is not close to what's required

5    or what's allowed.

6              MR. BENNETT:  Judge, we cite deposition

7    testimony from their 30(b)(6) designee, Ms. Lanham, on

8    this question.

9              THE COURT:  Right.  You cite that, but what

10   is she the 30(b)(6) -- you said she wasn't.  Now you

11   say her "I don't know" is attributable to Credit One.

12             MR. BENNETT:  I'm sorry.  I was incorrect,

13   apparently, and we talked before -- during the break

14   that she was the 30(b)(6) deponent, and that Mr.

15   Shutt, we took his deposition as a result of this

16   answer that I'm reading.  This is the answer that she

17   gave.  And the answer is:  Where did Credit One's

18   attorney get the information to ensure that your

19   dispute procedures are compliant with the Fair Credit

20   Reporting Act?

21             And the answer is:  My understanding is

22   through various sources, bankers online.  I believe --

23   I can't think of what specific statutes, cases,

24   regulatory bodies that provide us details on where and

25   how we would comply.  That's all of them.  I don't

1    know.  That is to name a few, I guess.

2          And the defendant's position is that it

3    should be able to expand on that.  You wouldn't be

4    expanding on it.  Expanding would be I went to 15

5    conferences last year that dealt with the Fair Credit

6    Reporting Act and at trial naming them.

7          THE COURT:  I'm going to interrupt you

8    because I'm getting distracted.

9          (Addressing Mr. Bouc)  It's not the case that

10   you're using your device, sir, in this court in the

11   middle of a hearing?

12         That's not okay.  It's extremely rude.  It's

13   improper.  We let you bring these devices in for

14   purposes of convenience if we ask about calendar

15   matters.

16         MR. FRATKIN:  We apologize to the Court.  We

17   should have said something, Your Honor.  And I talked

18   over his apology, if you didn't hear.

19         THE COURT:  Please don't do that again.

20         MR. BOUC:  Yes, Your Honor.

21         THE COURT:  We have court rules that are

22   public that I waive when appropriate.

23         Sorry.  Go ahead.  I was distracted.

24         MR. BENNETT:  Sorry.

25         So to the extent that the Court considered an

1   answer that said I went to five conferences, and then

2   at trial the witness said the first conference was

3   this, the second conference was the CDIA conference,

4   and that was in February, that's expanding on it.

5   This answer said, This is all I can think of.  I don't

6   even know.

7           And to be able to come here and say, in fact,

8   we did this legal research, and we, you know,

9   whatever.  I don't know what the defendant would say.

10  It would be like trying a Virginia General District

11  Court trial with no discovery.  But the 30(b)(6)

12  answer was -- and even if the attorney, Mr. Shutt, was

13  the 30(b)(6)

14          THE COURT:  You have to start saying "Shutt"

15  (shut).  It offends people when you say their name

16  wrong, and if we get it right now, we'll get it right

17  at trial.

18          MR. BENNETT:  Yes, Judge.

19          Mr. Shutt doesn't offer much more either.

20  But if the defendant believed that there was other

21  evidence that it was entitled to use, it should have

22  at least identified it now or in response to our

23  motion.

24          THE COURT:  So that has some common sense to

25  it, Mr. Fratkin.

1      MR. FRATKIN:  Your Honor, there is a little

2  confusion over who the 30(b)(6) witnesses were, but it

3  wasn't just Ms. Lanham.  It was Ms. Maragos, and then

4  Ms. Chu was also designated for some pieces.

5      He took the deposition of Mr. Shutt, who is a

6  lawyer.

7      THE COURT:  Well, either he is or he's not. I

8  mean, that's a procedural fact.

9      MR. FRATKIN:  He's a lawyer.

10     THE COURT:  I know.  No, no, no.  It's either

11  he's a 30(b)(6) deponent or not.

12     MR. FRATKIN:  But they have multiple

13  witnesses that they deposed with evidence about what

14  the bank's procedures were.  We also produced hundreds

15  of pages of documents of our procedure manuals in

16  response to discovery requests that says produce all

17  your procedures.  And so that's been into evidence,

18  too.  And so to suggest that based on a 30(b)(6) --

19  one 30(b)(6) witness on one point who said she didn't

20  know where there was no further action taken upon --

21     THE COURT:  Because she said she didn't know.

22  You can't argue that there.  If she doesn't know --

23  30(b)(6)s are binding on a corporation.

24     MR. FRATKIN:  But it's not the only evidence

25  that comes in with respect to what a company did.

1    It's just evidence that's binding.  We have other

2    evidence.

3            THE COURT:  So far I feel as if a good part

4    of nearly every answer you've given me is that, yep,

5    that's not good, and they can impeach us on it.  Am I

6    wrong?

7            MR. FRATKIN:  I think you're wrong, Your

8    Honor.  She offered other evidence that the Credit

9    Reporting Resource Guidelines are the policies that we

10   go by, and that document was produced.  She talked

11   about manuals.  A 30(b)(6) witness isn't going to know

12   an answer to every single question, and there was no

13   motion to compel.  There was no -- they took other

14   depositions of witnesses and I think were satisfied

15   with the witnesses' testimony, and now we have

16   different witnesses talking about different things,

17   all about the policies and procedures that the bank

18   had in interpreting the FCRA, which has been with them

19   for months.

20           The Court used a lot of that evidence, too,

21   and now he wants to say we can't use it to defend our

22   willfulness defense when all this evidence was before

23   the Court to make a finding that we were unreasonable.

24           I'm not -- I don't know what else -- I mean,

25   it's all there, and he's had it all.

1          MR. BENNETT:  Your Honor, with respect to the

2     second motion in limine, this is narrow.  This is the

3     *Safeco* objectively reasonable reliance on a particular

4     reading argument.  And our position here is there is

5     no evidence that the defendant actually had a reading

6     of the statute.  That's different than had a

7     procedure.

8          There is no evidence the defendant or there's

9     no evidence beyond what I've just read that the

10    defendant actually attempted to learn what was

11    required of it under the Fair Credit Reporting Act.

12    That's our position.

13         To the extent that the defendant is arguing

14    that it's entitled to procedures or otherwise, that

15    would be our Motion in Limine 3, and I will withdraw

16    that Motion in Limine 3 and object if there's any new

17    evidence at trial because I do think that we have

18    separately -- after this motion was filed and

19    prosecuted and working through objections to a number

20    of the exhibits, I was convinced our position was not

21    fair or correct with respect to objections to some of

22    the procedures.

23         The defendant may say, This is our procedure.

24    And we had that procedure at least in time that we

25    wouldn't be prejudiced by when it was produced, and so

1    we would withdraw Motion in Limine 3.  But Motion In

2    Limine 2 is this continued dearth of any evidence that

3    the defendant made a reading or interpretation of the

4    Fair Credit Reporting Act obligations.

5         MR. FRATKIN:  Your Honor, we probably are in

6    agreement.  That specific issue we believe is for the

7    Court to decide.  And so it's not an issue that we

8    think the jury will hear anyway whether Credit One had

9    an objectively reasonable interpretation of the

10   statute.  We'll certainly argue that our policies and

11   procedures told us what we thought was the right thing

12   to do.

13        THE COURT:  Right, but he's saying something

14   different.  He's saying there's no evidence that you

15   had any reading.

16        MR. FRATKIN:  And that question is only

17   relevant for the Court to decide, not for the jury to

18   hear.  If the question is, on the stand, what you

19   think your obligations were under the FCRA in how you

20   report a disputed debt, the witness has already

21   testified.  And that's what we would have her testify

22   again, which is we reported as XH.  And we will

23   separately, I think, argue that that was not willful.

24   But for a witness to say I think that's objectively

25   reasonable, I don't anticipate a witness saying that.

1    But she certainly, I think, should be able to testify

2    as to what they did, and we can certainly argue that

3    we think that doesn't rise to the level of

4    willfulness.  That's what, I think, the remainder of

5    the trial is about.  Take what they did and argue to

6    the jury that it doesn't meet the standard of

7    willfulness.

8              MR. BENNETT:  If -- I'm hesitant to, in any

9    of my cases, to move affirmatively for summary

10   judgment on willfulness because the case law has

11   developed this two-stage analysis.  And that second

12   stage, you know, if you have evidence that

13   notwithstanding an objectively unreasonable

14   interpretation, there was significant efforts to

15   comply and testimony or documents about how you

16   comply, I think that it's tougher for us to win, to

17   convince a court you shouldn't let that come in

18   because you should rule on as a matter of law.

19              There is no such evidence in this case about

20   compliance.  The only evidence is the existence of

21   documents.  And those documents don't -- the Court has

22   seen them.  They don't say much.  They are how to

23   greet a customer on the phone or those types of

24   things, but their paper, the defendant will say, Look

25   at this paper.  And I'll ridicule that at closing.

1    I'll say, Look at the paper.  Sure.  It says nothing.

2    It's two pages that mention this statute.

3         The question of the presence of a procedure

4    is not relevant to the question of whether there was

5    efforts to comply with the statute other than the

6    circumstantial existence of those documents.

7         But the legally proper and correct result

8    here will be at the end of the trial if the evidence

9    is as we expect it's going to come in, we will move

10   for a directed verdict because this Court and Judge

11   Payne in a couple of instances has found a willful

12   violation as a matter of law.

13        The Ninth Circuit has *sua sponte* done so

14   twice when the consumer appealed losses in the *Sa'ad*

15   case and in a case called *Dennis v. BH* against

16   Experian, not only reversed but entered summary

17   judgment.

18        Other courts have entered summary judgment.

19   The *Reardon v. Closet Maid* case, our case in

20   Pittsburgh, where the question in Judge Gibney in

21   *Dreher* on the part of the decision that was not

22   reversed, the question is if you have an

23   interpretation that the Court finds is not objectively

24   reasonable, this is not like in a criminal case where

25   you have guilty with a certainty, not guilty with a

1  certainty, and uncertainty.  It's the metaphor of

2  you're either pregnant or not pregnant.

3        If it's not objectively reasonable, the only

4  other reality that can exist is objectively

5  unreasonable.  It's a binary question.

6        So to the extent the Court and the defendant

7  continues to force this decision now, despite my not

8  having moved for it, and the Court finds as a matter

9  of law that its interpretation was not objectively

10 reasonable, the entire willfulness defense should, as

11 a matter of law, be foreclosed.  And we get to that

12 point if the defendant attempts to use this kind of

13 evidence to say it had an interpretation.  If that

14 interpretation was objectively unreasonable as a

15 matter of law, nothing else matters because the

16 concept of that, the reason it's reckless, is that any

17 normal, reasonable person looking at that statute and

18 its interpretation and acting the way a reasonable

19 company should act, no reasonable company could not

20 have acted without a callousness and recklessness

21 towards its compliance obligations.  It's essentially

22 circumstantial evidence comparable to conscience

23 disregard and knowing violations.

24        With respect to this question that's before

25 us, I think we agree that the defendant does not have

1    evidence that it actually had a reading, but instead

2    is asking the Court to consider that a pure legal and

3    nonfactual question, which is really saying that

4    *Milbourne* and Daugherty and *Pedro* don't matter because

5    it's the Third Circuit view that you don't look at

6    actual intent.

7         MR. FRATKIN:  I don't think we agree, Your

8    Honor.  We're back to *Safeco*, but just to be clear,

9    our position is that you don't have to have evidence

10   of your actual reading of the statute because the

11   company's actions reflect the interpretation of the

12   statute.  And that is what Judge Gibney held in

13   *Dreher*.  Judge Payne held in *Milbourne* that the

14   company has to have evidence of its reading of the

15   statute.  And while we don't think that Judge Payne

16   was correct in requiring that, we offered evidence,

17   which is what we spent the better part of the last

18   couple of hours talking about, we offered evidence of

19   what we believed was an objectively reasonable or not

20   objectively unreasonable reading of the statute.

21        So we think we have both.  But going back to

22   the specific motion in limine, as long as Mr. Bennett

23   agrees that we're allowed to offer evidence about what

24   our policies and procedures are, and that includes Mr.

25   Shutt's testimony that he read statute, he created

1   policies and procedures based on that, he read

2   Johnson, he read *Saunders*, I think we're on the same

3   page as to what would be admissible for purposes of

4   the jury.  The *Safeco* question is totally separate.

5           MR. BENNETT:  To that invitation to agree, we

6   would agree, and we need it to convince the Court to

7   do the unusual thing of allowing instructions or

8   admissibility of the *Johnson* and the *Saunders* case

9   that the witness says he consulted.

10           MR. FRATKIN:  We have that later, I guess, to

11   deal with.  Sounds like Mr. Bennett wants the Court to

12   decide the *Safeco* issue also.  So maybe we should

13   pause everything and let the Court issue an actual

14   opinion on this.

15           THE COURT:  Well, if we're going to pause,

16   you're going to file a trial brief, and you're going

17   to do it by Wednesday.  And I actually think that

18   that's what's going to happen.  You've changed your

19   theory of the case.  I'm getting bits and pieces of

20   how you're changing it and why.  You're raising a new

21   issue of law that you say I have to decide and that I

22   have the power to decide and must decide before the

23   trial goes forward and that you didn't do anything

24   improper by failing to raise it in your willfulness

25   motion for summary judgment.

1          So you're saying all those things.  You're

2    saying them in five different briefs in six different

3    ways.  And the plaintiffs then have to respond to that

4    and they respond by making six different arguments,

5    trying to psych out what it is that you are now

6    saying, and what you say you did, and the basis for

7    it, and that's not how civil litigation happens;

8    right?

9          This is not a case, a circumstance, where

10   parties are not allowed to know what the other side is

11   doing.  That's the whole point of discovery.  What you

12   do in discovery then helps define the parameters of

13   what you can try.

14         So if there are additional things like I just

15   ruled that the CDIA, that you can't use it because

16   it's too late, that's how discovery works; right?

17   Because otherwise you'd be having stuff every day.

18   That's how cases work.  People become more familiar

19   with them.  Somebody finds something.  They give it to

20   their counsel.  The counsel is obligated to turn it

21   over, but at some point you have to stop and try the

22   case.

23         So I am concerned that neither of you is

24   telling me exactly what it is you intend to rely on or

25   not.  Mr. Bennett, your motions are way too broad.

1   You're trying to, I guess, preserve positions so that

2   when something comes out in trial, you can object to

3   it.  But neither of you is doing a good job of telling

4   me what I should be ruling on except *Safeco* with

5   respect to any particular document or how the motions

6   in limine pertain to them.  And so in some respects, I

7   can reserve ruling on all of these things; right?

8   That's not particularly helpful.

9          And this is what I'm inclined to do.  I'll

10  tell you Mr, Fratkin, you have to convince me why you

11  didn't blow your opportunity to say you had a reading

12  of the statute when you moved on summary judgment for

13  willfulness.  So that's a primary concern I have.

14          MR. FRATKIN:  I'm sorry to interrupt.  Do

15  you mean --

16          THE COURT:  Just let me finish.

17          MR. FRATKIN:  Okay.

18          THE COURT:  So I've told you that you are not

19  doing a good job of convincing me right now.  I know

20  there are cases that say in some circumstances you may

21  be able to raise this issue of law.  I know you can do

22  a Rule 50 motion.  I know that, too.  And I'll rule on

23  it if you do it.  But we have the issue in front of us

24  now, belatedly, in the fashion you chose and the

25  fashion that your previous counsel didn't choose, and

1    I want to be sure that whatever you're relying on

2    would be appropriate in any event.  That you're not

3    relying on evidence beyond the record that existed

4    prior to July 26, that you're not relying on testimony

5    that maybe you shouldn't be allowed to bring if

6    there's a dispositive issue that you didn't bring

7    earlier on because you raised willfulness.  I don't

8    know.  Maybe you're allowed to split willfulness and

9    move on one part of it and not another.  That's not

10   generally how the Eastern District looks at issues.

11        We certainly have a local rule about how to

12   raise issues.  And I don't think you're saying that

13   this particular issue that you're raising doesn't go

14   to a finding of willfulness because you're saying I

15   have to decide it before willfulness goes to the jury.

16        So I think I need a trial brief from you

17   about what you think you're doing now and about why

18   you have the procedural basis to do it.  And you need

19   to cite the cases and the procedure.  As far as I'm

20   concerned, you both are going to file trial briefs,

21   and you're going to incorporate the arguments that you

22   have in your motions in limine.  But because the

23   *Safeco* issue is yours, Mr. Fratkin, your trial brief

24   is going to come first.  You're going to file it next

25   Wednesday.

1          MR. FRATKIN:  Is the only issue you want --

2          THE COURT:  No.  I want to know -- it's a

3    trial brief.  I want you to address the issues that

4    you think are left and the evidence that you intend to

5    present with respect to what you think is going to

6    trial and why.

7          And for your purposes that includes why your

8    *Safeco* defense can be raised procedurally, and why it

9    precludes evidence based on the evidence that you

10   think you have to support it, and why then it narrows

11   down the issues in the manner you think it does with

12   respect to this we're just expediting things because

13   all we have left is willfulness anyhow.

14         Now, I'm going to take a recess and figure

15   out the timing and exactly what I want you all to

16   address.  I know that I have two days on the week of

17   trial, the Monday and Tuesday of trial, which is what

18   day?

19         MR. FRATKIN:  Our trial is Thursday and

20   Friday, the 1st and 2nd.

21         THE COURT:  Right.  That's the 29th and

22   30th.  And I may be working around those.  So I'm

23   going to take a recess and make sure that my

24   instructions are clear.

25         Did you want to say something, sir?

1          MR. BOUC:  No.

2          THE COURT:  You know, actions speak, too.

3          (Recess taken from 4:22 p.m. to 5:05 p.m.)

4          THE COURT:  All right.  So I think we are

5   going to proceed along the way I indicated with a

6   little bit of a modification.

7          So, clearly, one of the issues that we need

8   to address is this *Safeco* issue.  And, clearly, Mr.

9   Fratkin, my concern is that you are bringing this

10  motion in a procedurally improper way.  Not because

11  maybe it's happened that way in other courts, but

12  because of the way this particular case has unfolded,

13  and you just have to establish that.

14         So with respect to the other motions in

15  limine that are pending, I do think that you all can

16  probably work it out based on how you think the

17  evidence is going to come in, and what you're going to

18  do and not do.  And I think in most of the instances,

19  as I look at my proposed rulings I would have to

20  reserve on how the evidence comes in in many respects

21  in any event depending on what it is exactly you're

22  trying to exclude, and that functionally what has

23  happened in some respects is that you have preserved

24  your objections.  But because of my concern about this

25  procedural blip, I am going to order that you all just

1   put together trial briefs.  That you do that not by

2   Wednesday.  That you do it by Friday.  That I have a

3   sense of what you're bringing and how you're bringing

4   it.  So that involves procedural bases.  It will help

5   narrow it.  Whatever you put in your motions in

6   limine, which will still be pending, explain to me why

7   you think the universe that you've chosen to raise

8   needs to be raised.

9          And we can have -- if you want a reply to

10  what the other side says, you can do that by the 24th.

11  And then I have open all day the 29th and the 30th to

12  finish this final pretrial conference and to rule on

13  any particular issues.  I'm also willing, to the

14  extent things are briefed up, to rule on the papers to

15  the extent I understand what it is that you all are

16  saying.

17         But with respect to the remaining issues that

18  I have in front of me, many of them I would have to at

19  least decide that -- I'd have to see how some evidence

20  comes in or just narrow down what the objection is

21  itself.

22         And since we have taken a good part of today

23  looking at the *Safeco* issue and this, I think, the

24  only piece of after-disclosed evidence.  Mr. Fratkin,

25  you're not trying to put in anything else in evidence.

1          MR. FRATKIN:  There's one document, Your

2    Honor, that was a re-created letter that was -- I

3    don't know the right word.  It was re-created.  It was

4    a sample letter that went to Mr. Wood.  Based on your

5    ruling on the 2017 CDIA, we're going to withdraw our

6    proffer on that.  It's an exhibit.

7          THE COURT:  Right.  It's one of the exhibits.

8          MR. FRATKIN:  I'll work with Mr. Bennett to

9    make sure that --

10         THE COURT:  Right.  Have you all worked out

11   most -- I presume you've worked out some of the

12   objections that you had briefed up to me in any event;

13   is that right?

14         MR. BENNETT:  Yes, Your Honor.  A couple of

15   things.  Yes.  So I'll brag about that part of it.

16   But no, because if you transitioned into deposition

17   transcripts, for example, I don't think that on my

18   side, I don't think that we gave that meet-and-confer

19   process sufficient time.  And so I will work over the

20   next week with defense counsel to try and eliminate

21   the deposition disputes.  You know, you go back and

22   look at these things three and four times, and you

23   think how silly your argument was.  In theory I made

24   silly arguments.  And so some of these I would

25   withdraw the depositions.

1          I think the exhibits are pretty well

2    narrowed, and some of them will fall one way or the

3    other based on these other decisions.

4          A couple of the motions in limine I expect

5    that we will formally withdraw unless the Court wants

6    to rule on them now, like the mistake No. 5.  We would

7    be withdrawing these rather than --

8          THE COURT:  Well, you can withdraw anything

9    that you think is appropriate at this point.

10         MR. BENNETT:  Well, we would withdraw

11   Document 125 is the memo, but the No. 5, any

12   suggestion or evidence the defendant's reporting of

13   the Credit One bank account at issue in this lawsuit

14   was a mistake or error, and I've already withdrawn

15   No. 3 of the omnibus motion, and I would also -- I

16   will withdraw No. 4, which is any suggestion or

17   evidence the defendant devoted or allocated any

18   resources to FCRA compliance, and I will fight that

19   battle with evidentiary objections and/or impeachment.

20   It makes more sense.

21         I think you have the sum total of the

22   evidence that we think exists here, but -- and I think

23   the others are already on the table in different

24   fashions for the Court's consideration or for the

25   parties' resolution.

1          THE COURT:  All right.  So that's four and

2    five, and you already withdrew three.

3          MR. BENNETT:  So Defendant's Exhibit 18, the

4    defendant, I think, is withdrawing.

5          THE COURT:  That's the document?

6          MR. FRATKIN:  It's an after-produced exhibit.

7          THE COURT:  Okay.  All right.

8          Okay.  So I will proceed in that fashion.

9    I'll want essentially your trial briefs, how it is

10   that you think the cases are going forward.

11         Is it the case, Mr. Bennett, you're saying

12   you're not objecting to their now saying that the

13   mother opened the account, but you would be objecting

14   to it going toward a reasonable belief toward

15   willfulness?  I'm trying to understand your objection.

16         MR. BENNETT:  My original understanding

17   before we started today and more fortified before a

18   conversation we had about a week ago was that the

19   defendant still continued to re-litigate each of the

20   issues; the reasonableness of the investigation, the

21   willfulness or objectively reasonableness, and the

22   accuracy.

23         We had a conversation where I said, you know,

24   if you want to continue to argue that -- there was an

25   Equifax lawyer named Mara McRae.  The defense that's

1    the hardest one to deal with is the Mara McRae

2    defense, which is, Wow, it was a mistake.  We really

3    didn't want this to happen, but you continue to say it

4    was never a mistake.

5            That conversation, as of that point, I

6    understood last week that the defendant was still

7    continuing to assert the right to defend itself and

8    say accuracy.

9            I'm going to wait when I read the trial brief

10   myself to fully understand the too used distinction

11   for how it would play out as to willfulness otherwise.

12           That probably doesn't answer the Court's

13   question, but it's my own confusion that's causing

14   that.

15           THE COURT:  Right.  Well, it may be the fact

16   that you're expressing the same concern I have, which

17   is why I want a trial brief.  I'm not sure where you

18   think on behalf of your client the lines merge.

19           MR. FRATKIN:  I'm sorry.  The last --

20           THE COURT:  I don't understand exactly where

21   you think on behalf of your client the lines merge and

22   diverge with respect to the evidence that you want to

23   use for what purpose.

24           MR. FRATKIN:  Well, I'll say it, but we'll

25   say it in more detail in the trial brief.

110

1        The evidence that the bank had at the time it

2   did the investigation, its belief was that Mr. Wood

3   opened the account.  And today after, you know,

4   additional investigation and the Court's ruling and

5   everything else I said, it now believes that he did

6   not open the account.  The latter that now believes he

7   did not open the account is this Mara McRae defense

8   that Mr. Bennett talked about, which is essentially

9   what he said.

10       The former evidence that at the time we

11  investigated we believed that he opened the account

12  was part of our investigation and supports our

13  argument that we weren't being willful, in fact we

14  weren't knowingly violating the statute either because

15  we had a belief at the time that he opened the

16  account.  That's the distinction.  We can put that out

17  in our trial brief, but those are the two positions.

18  One at the time we investigated and today.

19       THE COURT:  Right.  So you can put that out

20  in your trial brief.  The way it has come forward

21  today, you've now articulated it, but I think it's

22  going to be better put forward, especially given my

23  concern about whether it functionally amounts to a

24  second summary judgment motion that should have been

25  brought.

1          MR. FRATKIN:  Understood, but we're not

2     planning on -- other than offering that evidence about

3     bringing any legal argument other than --

4          THE COURT:  I know you're not, but you plan

5     on arguing it to be legally either in this motion or

6     through Rule 50.  And so I want to be clear.  You are

7     saying that this reasonable belief -- I know you're

8     saying the jury can find it, but if I find that for

9     some reason that you either can't bring it

10    procedurally or that you haven't established that you

11    had a not objectively reasonable or not objectively

12    unreasonable reading of the statute, I think it

13    changes what the jury hears.

14          MR. FRATKIN:  Your Honor, the issue of

15    accuracy --

16          THE COURT:  Yes.  I know what you're saying.

17    I just want to be sure.  You're right.  You're right.

18    So I'm taking back a little bit of what I just said,

19    which is obviously some of the factual stuff will go

20    forward in the same fashion, but I want to be sure I

21    understand exactly what your legal theory is, and you

22    have to concede at the very least that you are coming

23    in today with a very different presentation than you

24    have for the past very long time in this court.

25    Correct?

1            MR. FRATKIN:  There's two new things we

2   raised today.  One is the position now that we believe

3   we didn't have.

4            THE COURT:  That's pretty big, Mr. Fratkin.

5   So that's it.  Just that alone.

6            MR. FRATKIN:  And then the second issue

7   that's new is the *Safeco* defense that's entirely

8   unrelated to whether he opened the account or not.

9   That's an entirely separate issue.  That goes to the

10  reasonableness of the investigation and whether we're

11  willful.  So we're not trying to touch the accuracy

12  issue that the Court already decided in the sense that

13  we're not going to raise -- re-raise the issue of

14  whether he opened the account or not.

15           THE COURT:  That's why I want a trial brief.

16           MR. FRATKIN:  Those are the only two.  I get

17  that they're big, but those are the two new issues.

18           THE COURT:  They're big.  Mr. Fratkin,

19  they're just big.

20           MR. FRATKIN:  I understand.

21           THE COURT:  So, you know what?  You know,

22  they're big.  And I want a clear presentation of

23  whatever the heck Credit One is going to do because

24  while you are clarifying it over the time you have

25  taken the case, I still don't think with, say, for

1    instance, today that you're saying your position is

2    different with respect to whether who opened the

3    account.  You're saying that three weeks before trial.

4    I don't think that Credit One has been clear about the

5    positions that it is taking in front of this Court.

6    And so whether it's just two new things, Credit One

7    has not been clear for a long period of time in front

8    of this Court, and so I am ordering that you

9    clarify it --

10          MR. FRATKIN:  Yes, Your Honor.

11          THE COURT:  -- in writing.

12          MR. FRATKIN:  Yes, Your Honor.

13          I didn't mean to suggest it was just two new

14   things.  I just wanted to be on the record that it is

15   two things.  That's all I was trying to get across.

16   But understood, Your Honor.

17          THE COURT:  So we will have a hearing

18   starting at 10:30 on the 29th.  And that will be to

19   the extent I haven't issued written opinions on any of

20   the motions in limine or haven't responded to anything

21   that you all think I need to based on your trial

22   briefs, we will just finish up this final pretrial

23   conference, and we'll go from there.

24          If you all, for instance, have narrowed down

25   the things you're objecting to or whatever you're

1    presenting, so on the 24th also you can submit to me

2    an updated final pretrial order.  That way I have time

3    to look at it before the 29th, and I'm not responding

4    to things that you're giving me on the fly.  All

5    right?

6            So I'm actually hesitant to suggest this, but

7    I actually am not just going to suggest it.  I'm going

8    to order it.  I know that Judge Novak is available on

9    the 17th and the 19th of next week for settlement, and

10   I am ordering that you all go on one of those days and

11   give one final shot at settlement.

12           I know you've gone.  I know that you now have

13   filed a fair amount of papers with respect to the

14   pretrial issue.  I am convinced this case has become

15   the tail wagging the dog.  It is actually a fairly

16   simple case.  The problem is that it has not been

17   presented in a simple fashion at all.  And so that's

18   why we're going to get ready for trial.

19           If you settle, you settle.  If you don't

20   settle, you don't settle.  But the amount of resources

21   that you are spending on this I think warrants one

22   more serious try based on the record that has been

23   presented to me over the time that this case has been

24   pending.  So you must attend, and your clients must

25   attend.  And you can notify me which day it is if for

1  some reason Judge Novak doesn't.  But it is not

2  optional.  It is part of the order that I'm issuing

3  today.

4        All right?  Am I unclear about anything?

5        MR. BENNETT:  Your Honor, the only thing I

6  would be unclear about is a person with authority at

7  the settlement conference.  I understand we have the

8  general counsel here, and he's obviously high up, but

9  I understand he would not have authority to settle.

10  So I don't know how the Court addresses that issue or

11  deals with that issue or doesn't deal with that issue.

12        THE COURT:  Well, who has authority to settle

13  your case, Mr. Fratkin?  You can ask your general

14  counsel.

15        MR. FRATKIN:  Do you mind if I go ask him?

16        THE COURT:  No, go ask him.

17        MR. FRATKIN:  Do you mind if we step out for

18  a second, Your Honor?

19        THE COURT:  No, of course.

20        (Mr. Fratkin and Mr. Bouc are out of the

21  courtroom.)

22        MR. BENNETT:  If the Court really wants to

23  inflict burden on a party, Judge Novak on a Friday

24  afternoon, because, particularly with Liz, he has --

25  it's probably three that they've stayed until like

1    9:00 or 10:00 at night.  Of course, it inflicts burden

2    on Judge Novak, too.

3              THE COURT:  Yes.  Well, that's up to you

4    guys.  He just gave me two days.

5              Just so you all know, I have my clerk

6    checking to see if Judge Novak is here now and you all

7    can go and resolve all of these issues with him as far

8    as scheduling.  I just don't want to send you down

9    there if he's in a settlement conference or teaching

10   or something.

11             MR. BENNETT:  He's gotten very good at

12   settlement conferences.  It's like the *Milbourne* case,

13   I was telling Heidi.  I said I can't believe I settled

14   the case.  Because I settled it that night with Judge

15   Novak, and then came back in and told Judge Payne how

16   much, and he said, "That's all?"  So --

17             THE COURT:  Well, you can tell them Judge

18   Novak is not there, but his clerk is, and if there's

19   an issue -- well, I'll tell them.

20             (Mr. Fratkin and Mr. Bouc are back in the

21   courtroom.)

22             THE COURT:  I was just speaking to counsel

23   because it's possible for you all to go down to Judge

24   Novak now, although he's not there, and see what the

25   availability would be.

1           But what do you have to report to me?

2           MR. FRATKIN:  So there's not a clear answer

3    as to who the person with full settlement authority

4    is, but if the Court orders that someone with full

5    settlement authority is to be there, then we'll make

6    sure the person is there, whether it's Bouc or the CFO

7    or someone else, they will be there.  We don't have

8    the answer right now.

9           THE COURT:  Have you already had a settlement

10   conference?  Who showed up then?

11          MR. FRATKIN:  Pardon?

12          THE COURT:  Who showed up then?

13          MR. FRATKIN:  Mr. Bouc.

14          So if the Court orders someone with full

15   settlement authority shows up for where we are now,

16   then we'll do it.

17          THE COURT:  That's a surprising answer.  I'll

18   be honest with you.  So I don't understand why your

19   general counsel was the appropriate person before.

20   Doesn't Judge Novak always order it?

21          MR. FRATKIN:  Well, I wasn't there,

22   obviously, but my understanding was he had full

23   settlement authority then.  We don't know right know

24   whether he has full settlement authority because the

25   demands have gone up.

1          My understanding usually is the settlement

2     authority is based on where you are in the demands.  I

3     mean, in some cases you have to go to the Board of

4     Directors, and I don't know all the ins and outs of

5     this company and where you are in terms of what the

6     reasonable expectation of how big the demand is, how

7     high you go up, but I don't think in every case we

8     typically have the CFO or the CEO show up.

9          So I don't know one way or the other because

10    I wasn't here for the settlement conference whether he

11    didn't have it, but I don't know who has it right now,

12    and so we have to have a discussion as to who the

13    right person is.

14          THE COURT:  So what is today?  Thursday?

15          Well, Judge Novak's clerk is here.  I will

16    say, sir, I served in general counsel's office in a

17    company, and so I am aware that often the business

18    person has a different perspective than the counsel

19    does.  And so I do think it's important to contact a

20    business person with respect to this.  It is somebody

21    with full settlement authority.  And so I guess you

22    all are going to have to address that to some degree.

23    It always is.

24          You can go down and speak with Judge Novak's

25    clerk because what I was starting to say is that I

1   checked to see if he is here.  He's not.  But his

2   clerk indicates that she might be able to at least

3   give you some guidance on it, and at least get a day

4   on the books, and you all at least won't have any

5   dispute if you figure it out today and/or tomorrow

6   about who that person is that you actually do have

7   somebody there with full settlement authority.

8          But that's really all Judge Novak's

9   bailiwick.  I know what I did when I was a magistrate

10  judge, and I know what his order says, and I don't

11  think it's tremendously different from what I did as a

12  magistrate judge.

13         But it is problematic, obviously, if there

14  is -- the biggest problem is that the parties don't

15  agree that the person who is there has real settlement

16  authority.  And so that's really what I'd like you to

17  work out in front of him.  Okay?

18         MR. FRATKIN:  Yes, ma'am.

19         THE COURT:  So please go down and at least

20  get some parameters from Judge Novak's clerk.  I know

21  he will make himself available telephonically if

22  there's something you have to address early tomorrow,

23  I'm sure, and then you can pick which day it is that

24  you want next week, either the 17th or the 19th, and

25  the rest of my order will remain in place.  All right?

1          MR. BENNETT:  Yes, Judge.

2          THE COURT:  Okay.  So we'll take a recess.  A

3    recess from this case is what I meant.  We are

4    adjourning for today.  Pardon me.

5          (The proceedings were adjourned at 5:35 p.m.)

6

7      I, Diane J. Daffron, certify that the foregoing is

8    a correct transcript from the record of proceedings

9    in the above-entitled matter.

10

                              /s/

11         _____   _____

                              DIANE J. DAFFRON, RPR, CCR      DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25